## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

DWAYNE B., by his next friend, John Stempfle;
*et al.,*

        Plaintiffs,

v.

JENNIFER GRANHOLM, in her official capacity
as Governor of the State of Michigan, *et al.,*

        Defendants.

_____

Case No. 2:06-CV-13548

Hon. Nancy G. Edmunds

**<u>Class Action</u>**

## <u>ORDER ENTERING CONSENT DECREE</u>

Pursuant to this Court's Order granting the parties' Joint Motion for Final Approval of Class Action Settlement Agreement, and its Memorandum Opinion granting the motion, both entered on this date, the Settlement Agreement attached to this Order is hereby entered as a consent decree and Order of this Court.

Dated:  October 24, 2008

                                   <u>s/Nancy G. Edmunds</u>
                                   Nancy G. Edmunds
                                   United States District Judge

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

DWAYNE B., by his next friend, John Stempfle; )  
CARMELA B., by her next friend, William Ladd; )   No. 2:06-cv-13548
LISA J., by her next friend, Teresa Kibby; and )   Hon. Nancy G. Edmunds
JULIA, SIMON, and COURTNEY G., by their )   Hon. Mag. Donald A. Scheer
next friend, William Ladd; for themselves and )
others similarly situated, )
                                )   <u>Class Action</u>
                                )
            Plaintiffs, )   **<u>SETTLEMENT AGREEMENT</u>**
     v. )
                                  )
JENNIFER GRANHOLM, et. al., )
                                  )
            Defendants. )
_____ )

Attorneys for Plaintiffs:

Marcia Robinson Lowry
Susan Lambiase
Sara M. Bartosz
Elissa Hendler
Gena Wiltsek
Children's Rights
330 Seventh Avenue, Fourth Floor
New York, New York 10001
Phone: 212.683.2210

Edward P. Leibensperger
Kevin M. Bolan
McDermott Will & Emery LLP
28 State Street
Boston, MA 02109
Phone: 617.535.4046

Elizabeth Phelps Hardy
Noel D. Massie
Jay C. Boger
Kienbaum Opperwall Hardy & Pelton, P.L.C.
280 North Old Woodward Avenue, Suite 400
Birmingham, Michigan 48009
Phone: 248.645.0000
_____/

Attorneys for Defendants:

Michael G. Frezza (P46949)
Assistant Attorney General
Cadillac Place, Su 10-200
Detroit, MI 48202
Phone: 313.456.0040

B. Jay Yelton
Brad Sysol
P. Rivka Schochet
Miller, Canfield, Paddock, and Stone
444 West Michigan Ave.
Kalamazoo, MI 49007
Phone: 269.381.7030

# I.    **PREAMBLE**

A.  The provisions of this Agreement resolve the existing disputes and issues in the case of *Dwayne B. v. Granholm*, Civil Action Number 2:06-cv-13548, and satisfy and resolve the claims of the Named Plaintiffs and the Plaintiff class for injunctive and declaratory relief in the above-entitled case as of the date of this Agreement.

B.  This Court has subject matter jurisdiction and personal jurisdiction over this action and therefore the authority to enter this Agreement.

C.  This Court shall have continuing jurisdiction over this action to ensure compliance with the terms of this Agreement for as long as the Agreement remains in effect.

D.  Any state agency responsible for the care, protection, and/or supervision of Plaintiff class members shall be bound by the provisions of this Agreement.  For as long as this Agreement remains in effect, all provisions of this Agreement referring to the "Department of Human Services," "the Department," or "DHS," upon any subsequent changes to the current governmental organizational structure of the Michigan Department of Human Services concerning the children in the Plaintiff class as defined in this Agreement, shall apply with full force and effect to the state of Michigan and to any subsequent agency or agencies with any of the responsibilities that apply to the current Michigan Department of Human Services under this Agreement as of the date of this Agreement.

E.  The term "DHS" as used in this Agreement refers to all Defendants in the case of *Dwayne B. v. Granholm*, Civil Action Number 2:06-cv-13548, including but not limited to Jennifer Granholm, in her official capacity as Governor of the state of Michigan; Ismael Ahmed, in his official capacity as Director of DHS; and Stanley Stewart, in his official capacity as Chief Deputy Director of DHS.

F.  The term "Plaintiffs" as used in this Agreement refers to all members of the class certified by Judge Nancy G. Edmunds on February 15, 2007 in the case of *Dwayne B. v. Granholm*, Civil Action Number 2:06-cv-13548.

G.  This Agreement, along with any of its provisions, is not, and shall not be construed to be, an admission of any liability on the part of DHS concerning any of the claims and allegations in the complaint in this litigation.

H.  Defendants do not speak for the Michigan Legislature, which has the power under Michigan law to determine the appropriations for the State's child welfare programs. However, at least annually after Court approval of this Agreement, and consistent with existing state budgetary practices and legal requirements, Defendants shall request state funds and any federal/special fund authorization sufficient to effect the provisions and outcome measures set forth in this Agreement in connection with any budget, funding, or allocation request to the executive or legislative branches of State government. To the extent that it is anticipated that the funding of critical needs shall be met, in whole or in part, by way of federal fund sources, Defendants shall request federal fund authorization in amounts which are determined to be realizable and consistent with regular budgetary needs assessments.

I.  Such budgetary requests, which shall be provided to the Monitor, shall, among other things, identify for the executive and legislative branches of State government, with sufficient particularity, the known and anticipated costs to the State for the timely implementation of the reforms and outcome measures provided for herein. Defendants shall maximize available federal funding opportunities. Nothing in this paragraph limits Defendants' obligations under this Agreement.

J.  The parties acknowledge that this Agreement shall be controlled by and implemented in accordance with the United States Constitution and federal law and subject to federal court supervision and enforcement. The parties further acknowledge that this Agreement will be implemented consistent with the Michigan Constitution and state

law insofar as the provisions of the Michigan Constitution and state law do not conflict with controlling federal law.

## II.    PRINCIPLES

Interpretation of the provisions of this Agreement will be guided by the following principles:

A.  Safety:  The first priority of the Department of Human Services ("DHS") child welfare system is to keep children safe.

B.  Children's Needs:  Whenever possible, children must have a voice in decisions that affect them, and DHS must consider the specific needs of each child as decisions are made on his or her behalf.

C.  Families and Communities:  Families must be treated with dignity and respect, and, whenever possible, included in decisions that affect them and their children.  DHS must actively partner with communities to protect children and support families when determining the intervention plan for a child.

D.  Placement:  The ideal place for children is in their own home with their own family.  When DHS cannot ensure their safety in the family home, it must place children in the most family-like and least restrictive setting required to meet their unique needs and must place siblings together whenever possible.  DHS must strive to make the first placement the best and only placement.

E.  Reunification and Permanency:  DHS must reunify children with their siblings and families as soon as is safely possible.  When reunification is not possible, DHS must provide children with a permanent home and/or permanent connection with caring, supportive adults as soon as possible.  DHS must also ensure that children in its care are connected with the resources necessary for physical and mental health, education,

financial literacy, and employment and that they acquire the life skills necessary to become successful adults.

F.  Services:  When DHS intervenes on behalf of children it must strive to leave children and families better off than if there had been no intervention.  DHS must tailor services to meet the unique needs of each family member and provide those services in a manner that is respectful of the child and the family.  Services should be outcome-based, data-driven, and continuously evaluated.

## III.   OUTCOMES

A.  Reporting Periods:  Except in relation to the outcome measures set forth in subsection III.D below, reporting on all other outcome measures set forth in this section shall begin in Reporting Period Three, as defined in Section XVII.H below.

B.  Changes in Federal Indicators:  The indicators set forth in the remainder of this section were developed by the United States Department of Health and Human Services ("HHS") as part of the Child and Family Services Review ("CFSR") process.  In the event that, during the term of this Agreement, HHS modifies these indicators, the parties and the Monitor will meet to determine whether to make corresponding changes in DHS's responsibilities under the Agreement.

C.  Content of Reports and Compliance Expectations:  DHS shall report on aggregate performance for the outcome indicators identified in paragraphs D and E below in each Reporting Period, as defined in Section XVII.H below, and shall comply with the identified interim measures.  By October 2013, DHS shall meet or exceed the federal indicators for each outcome.  Additionally, DHS shall report in each Reporting Period on its performance with regard to each of the component elements of the Permanency outcomes set forth in Section III.E below, as such components are defined by HHS.  Effective October 2013 and thereafter, DHS's performance shall

exceed the median performance of all states with regard to each such component element.

D. <u>Safety</u>:

    1.    *Recurrence of Maltreatment within Six Months (%)*:  By the end of Reporting Period Four, the percentage of children without a recurrence of maltreatment within six months following their exit from foster care will be 94.6% or higher.  This percentage is the national indicator.  Michigan will commit to maintaining or exceeding this percentage over the duration of the Agreement.

    2.    *Maltreatment in Foster Care (%)*:  By the end of Reporting Period Two, the percentage of children not maltreated while in foster care will be 99.68% or higher.  This percentage is the national indicator.  DHS will commit to maintaining or exceeding this percentage over the duration of the Agreement.

E. <u>Permanency</u>:

    1.    *Composite One: Timeliness and Permanency of Reunification*:  By Reporting Period Ten, DHS shall achieve, and shall thereafter maintain, a score of 122.6 or greater on this composite.  DHS shall meet interim targets as follows: by Reporting Period Two, a score of 99; by Reporting Period Four, a score of 100; by Reporting Period Six, a score of 105; by Reporting Period Eight, a score of 113.  DHS shall report the following individual component measures for Composite One:

        a.  Of all children who were discharged from foster care to reunification in the target 12-month period, and who had been in foster care for 8 days or longer, what percent were reunified in less than 12 months from the date of the latest removal from home?

        b.  Of all children who were discharged from foster care to reunification in the 12-month target period, and who had been in foster care for 8 days or longer, what was the median length of stay in months from the date of the latest removal from home until the date of discharge to reunification?

c.  Of all children who entered foster care for the first time in the 6-month period immediately prior to the target 12-month period, and who remained in foster care for 8 days or longer, what percent were discharged from foster care to reunification in less than 12 months from the date of the latest removal from home?

d.  Of all children who were discharged from foster care to reunification in the 12-month period immediately prior to the target 12-month period, what percent re-entered foster care in less than 12 months from the date of discharge?

2.  *Composite Two: Timeliness to Adoption*:  By Reporting Period Ten, DHS shall achieve, and shall thereafter maintain, a score of 106.4 or greater on this composite.  DHS shall meet interim targets as follows: by Reporting Period Two, a score of 93; by Reporting Period Four, a score of 96; by Reporting Period Six, a score of 100; by Reporting Period Eight, a score of 103.  DHS shall report the following individual component measures for Composite Two:

a.  Of all children who were discharged from foster care to a finalized adoption during the 12-month target period, what percent were discharged in less than 24 months from the date of the latest removal from home?

b.  Of all children who were discharged from foster care to a finalized adoption during the 12-month target period, what was the median length of stay in foster care, in months, from the date of the latest removal from home to the date of discharge to adoption?

c.  Of all children in foster care on the first day of the 12-month target period who were in foster care for 17 continuous months or longer, what percent were discharged from foster care to a finalized adoption by the last day of the 12-month target period?

d.  Of all children in foster care on the first day of the 12-month target period who were in foster care for 17 continuous months or longer, and who were not legally free for adoption prior to that day, what percent became legally free for adoption during the first 6 months of the 12-month target period?

e. Of all children who became legally free for adoption during the 12 months prior to the target 12-month period, what percent were discharged from foster care to a finalized adoption in less than 12 months from the date of becoming legally free?

3. *Composite Three: Achieving Permanency for Children in Foster Care for Long Periods of Time*:   By Reporting Period Ten, DHS shall achieve, and shall thereafter maintain, a score of 121.7 or higher on this composite.  DHS shall meet interim targets as follows: by Reporting Period Two, a score of 118; by Reporting Period Four, a score of 119; by Reporting Period Six, a score of 120; by Reporting Period Eight, a score of 121.   DHS shall report the following individual component measures for Composite Three:

a. Of all children who were discharged from foster care during the 12-month target period, and who were legally free for adoption (i.e., there was a termination of parental rights for both parents) at the time of discharge, what percent were discharged to a permanent home prior to their 18th birthday?

b. Of all children who were in foster care for 24 months or longer on the first day of the 12-month target period, what percent were discharged to a permanent home by the last day of the 12-month period and prior to their 18th birthday?

c. Of all children who either (1) were, prior to age 18, discharged from foster care during the 12-month target period with a discharge reason of emancipation, or (2) reached their 18th birthday while in foster care but had not yet been discharged from foster care, what percent were in foster care for three years or longer?

4. *Composite Four: Placement Stability While in Foster Care*:  For all Reporting Periods, DHS will maintain a score of 101.5 or higher on this composite. DHS shall report the following individual component measures for Composite Four:

a. Of all children in foster care during the 12-month target period, and who were in foster care for at least 8 days but less than 12 months, what percent had two or fewer placement settings?

b. Of all children in foster care during the 12-month target period, and who were in foster care for at least 12 months but less than 24 months, what percent had two or fewer placement settings?

c. Of all children in foster care during the 12-month target period, and who were in foster care for at least 24 months, what percent had two or fewer placement settings?

In reporting on placement stability, DHS shall provide information separately stating scores for each stability measure for children placed in <u>relative</u> foster homes; children placed in <u>non-relative</u> foster homes; and children placed in residential care.

## IV.   <u>ORGANIZATIONAL STRUCTURE</u>

A. The DHS organizational structure shall be modified as follows:

1. There shall be established within DHS a Children's Services Administration, headed by a Director of Children's Services Administration, who shall be at the rank of Deputy Director of the Department of Human Services or higher.

2. Within the Children's Services Administration, and reporting directly to the Director of Children's Services Administration, there shall be: (a) a person responsible for all children's services policy, program development, and support functions ("Director of Bureau of Child Welfare"); (b) a person responsible for child welfare improvement (" Director of Child Welfare Improvement Bureau"); and (c) a person responsible for children's services field operations in Designated Counties ("Director of Bureau of Children's Field Services Operations") as further described in paragraph 3, below.

3.    In, at minimum, Wayne, Genesee, Kent, Macomb, and Oakland Counties (identified as "Designated Counties"), DHS offices providing children's services shall be distinct from those providing other services, and there shall be a county-level Administrator of Children's Services in each of the Designated Counties who reports directly to the Director of Bureau of Children's Field Services Operations as described in paragraph 2, above.

4.    The Children's Services Administration shall include units containing a sufficient number of qualified staff to exercise their functions effectively and shall be responsible for data collection and analysis, quality improvement, federal compliance, and training.

5.    The Children's Services Administration shall hold responsibility for evaluating the performance of private providers of children's services, including, but not limited to, private Child Placing Agencies ("CPAs").  These duties include, but are not limited to, requiring and approving corrective action plans when necessary and making recommendations to the Director of DHS concerning contract renewal, modification, and termination.

6.    Individuals within the Children's Services Administration, including but not limited to caseworkers, supervisors, and managers, shall be assigned full-time to children's services, and shall not hold responsibility for any of DHS's other functions, such as cash assistance, Medicaid, and adult services.

7.    Within the Field Operations Administration of DHS, there shall be established the position of Children's Services Field Manager.  This position shall be responsible for ensuring that policies and practices established in the Children's Services Administration are followed in all parts of the state other than the Designated Counties, and that the needs of these other counties are taken into account by the Children's Services Administration as it formulates policies and practices.  The Children's Services Field Manager shall report

directly to the Deputy Director for Field Operations, and shall consult regularly with the Director of Children's Services Administration.

8. DHS shall establish a Children's Services Cabinet, which shall be headed by the Director of Children's Services Administration and shall include the persons described in subsections IV.A.2 and IV.A.7 above. The Cabinet shall meet regularly as determined by the Director of Children's Services Administration for the purposes of uniformly and efficiently administering all child welfare programs, policies, and practices.

9. The changes enumerated in this section shall be phased in, beginning with the establishment of separate Children's Services offices in Wayne County, and shall be completed by March 31, 2009.

B. On or before January 31, 2009, DHS, Plaintiffs, and the Monitor shall meet to review the progress of implementation of the organizational changes enumerated above. On or before June 30, 2009, the parties shall meet to further review the implementation of the organizational changes and to consider whether structural changes similar to those implemented with respect to the Designated Counties identified in Section IV.A.3 above should be implemented, with whatever modifications may be appropriate, in any remaining non-designated counties. Should either party recommend that these terms be modified, the parties will engage in good faith negotiations with the assistance of the Monitor. Nothing in this section shall be construed to preclude the parties from holding earlier and/or additional meetings to review and consider changes to the organizational structure.

## V. RESPONDING TO REPORTS OF CHILD ABUSE AND NEGLECT

A. DHS shall ensure that its system for receiving, screening, and investigating reports of child abuse and neglect is adequately staffed and that investigations of all reports are initiated and completed within the time periods required by state law.

B. DHS shall establish a statewide centralized hotline, to be operated 24 hours per day. It shall be adequately staffed and supported by adequate telecommunications equipment and information technology, for the receipt, screening, and assignment for investigation of reports of abuse and neglect, as follows:

1. A Wayne County pilot, by October 2009;

2. A statewide centralized hotline, by October 2011.

C. DHS shall, by April 2009, establish and implement a quality assurance process to ensure that reports of abuse and neglect are competently investigated and that, in cases in which abuse and/or neglect is indicated, actions are taken and services are provided appropriate to the circumstances.

D. DHS shall establish separate units to investigate all allegations of abuse or neglect relating to any child in the foster care custody of DHS, whether directly supervised by DHS or privately supervised by one of its private CPAs or child caring institution ("CCI") providers. Such units shall be established within each of the Designated Counties. There shall be no more than three additional units responsible for other areas of the state and each of these additional units shall report to a person within the Children's Services Administration at the level of Deputy Director or higher. DHS shall also establish a mechanism to ensure accountability in those cases in which the abuse or neglect is substantiated, including appropriate follow-up on corrective action plans. These units shall be established according to the following schedule:

1. For the Designated Counties as defined in Section IV.A.3 above, by October 2009;

2. For the remainder of the state, by April 2010.

E. The scope of the Needs Assessment provided for in Section IX of this Agreement shall include consideration of services required to prevent abuse and neglect and to

keep children who have been the subject of abuse or neglect investigations safe in their own homes.

## VI.     STAFF QUALIFICATIONS, TRAINING, CASELOADS, AND SUPERVISION

A.   Caseworker Qualifications and Training:

1.     Entry level caseworkers for positions in Child Protective Services ("CPS"), foster care, and adoption, who are responsible for cases of Plaintiff class members either directly or as Purchase of Service ("POS") monitors, shall have a bachelor's degree in social work or a related human services field.

2.     All such caseworkers shall complete an eight week pre-service training that includes a total of 270 hours of competence-based classroom and field training.  Beginning April 2009, and continuing thereafter, each trainee will receive a competence-based performance evaluation, which shall include a written examination.  As part of pre-service training, a trainee may be assigned specific tasks or activities in connection with a case that is the primary responsibility of an experienced worker and may, under appropriate supervision, be assigned responsibility for a "training caseload" not to exceed three cases.  Prior to assuming any other casework responsibilities, including the assumption of a caseload other than a training caseload, the worker must demonstrate an appropriate level of knowledge and ability to meet the case practice expectations of this Agreement by passing the performance evaluation.

3.     All caseworkers shall receive a minimum number of hours of in-service training annually, as follows:

a.  CPS workers: for the state fiscal year beginning October 1, 2008 ("SFY 2009"), at least 16 hours; for the state fiscal year beginning October 1, 2009 ("SFY 2010"), at least 24 hours; for the state fiscal year beginning October 1, 2010 ("SFY 2011"), at least 32 hours; for state fiscal

years beginning October 1, 2011 ("SFY 2012") and thereafter, at least 40 hours.

b.   Foster Care and Adoption workers:  for SFY 2009, at least 24 hours; for SFY 2010 and thereafter, at least 40 hours.

4.      Private CPA and CCI caseworkers whose activities and responsibilities are comparable to those of DHS caseworkers shall be required to meet the same qualifications, pre-service and in-service training, and competency-based performance evaluation requirements as DHS workers.  Such private CPA workers shall receive a minimum of 24 hours of in-service training for SFY 2010, and a minimum of 40 hours of in-service training for SFY 2011 and thereafter.

B.  Supervisor Qualifications and Training:

1.      By April 2009, DHS shall develop and implement a competency-based Supervisory Training Program for all DHS, CPS, foster care, adoption, and POS supervisors ("Supervisors" or "Supervisory Positions") that is both consistent with the Principles set forth in Section II of this Agreement and designed to serve the overall goals and purposes of this Agreement.  This competency-based training shall address the work management skills, conceptual skills, interpersonal skills, self-management skills, and technical knowledge recognized among child welfare professionals as fundamental requirements for an effective public agency supervisor.  The Supervisory Training Program shall consist of at least 40 class hours**.**

2.      Beginning in April 2009 and continuing thereafter, all staff either promoted from within DHS or hired from outside DHS to a Supervisory Position shall complete the supervisory training program and pass a competency-based performance evaluation based on that training within three months of assuming the Supervisory Position.  The competency-based performance evaluation shall include a written examination.  Failure to achieve a passing grade on the competency-based performance examination as a whole,

including a passing grade on its written portion, within two sittings shall require the subject individual to complete an additional training before becoming eligible to sit for the performance evaluation again, said training to occur within an additional 45 days.  The failure to pass the performance evaluation in the third sitting shall render the subject individual ineligible for further service as a DHS supervisor with responsibility for supervision of CPS, foster care, and adoption cases.

3.      All DHS Supervisors who were promoted or hired to Supervisory Positions before April 2009, and who have not previously received supervisory training, shall receive the competency-based supervisory training, as described above for new promotions and hires, and pass the associated competency-based performance evaluation, which shall include a written examination, by July 2010.   Failure to achieve a passing grade on the performance evaluation as a whole, including a passing grade on its written portion, within two sittings shall require the subject individual to complete  additional training before becoming eligible to sit for the evaluation again, said training to occur within an additional 45 days. The failure to pass the performance evaluation in the third sitting shall render the subject individual ineligible for further service as a Supervisor with responsibility for supervision of CPS, foster care, and adoption cases.

4.      *Supervisor Qualifications*:  Except as set forth below, all staff hired from outside DHS or promoted from within DHS after January 2009 to fill positions including responsibility to supervise child welfare casework shall have earned a master's in social work from an accredited school of social work or a master's or higher degree in a comparable/equivalent field as a condition for such hiring or promotion.  All current DHS Supervisors with either (1) less than 18 months of experience as a DHS Supervisor or (2) less than 18 months of combined experience as a DHS Supervisor and as a similarly situated supervisor in another public child welfare system, or duly licensed CPA or CCI, shall be required to earn a master's in social work from

an accredited school of social work or a master's degree in a comparable/equivalent field within four years following the date of entry of this Agreement as a condition of continued employment as a supervisor of CPS, foster care, or adoption cases. Exceptions to the requirement of a master's degree can be made for persons who have demonstrated the knowledge, skills, and abilities necessary to be an effective supervisor; however, such exceptions can only be made with the approval of the DHS Director and the Director must set forth in the approval the factual basis for the Director's conclusion that the person has demonstrated the competencies necessary to provide high quality supervision. The Monitor shall report on the percentage of supervisors who are granted such exceptions. In the event that such exceptions are granted to more than 10% of DHS supervisors, the Monitor shall conduct a review and report on whether (a) DHS has followed appropriate practices in proposing and granting exceptions, and (b) the individuals granted such exceptions are in fact qualified to perform supervisory duties.

5. *Development of University-Based Training Opportunities*: DHS shall encourage its child welfare staff, and the staff of private CPAs, to pursue master's-level work under a tuition reimbursement program (Title IV-E funded or other appropriate funding source as available) with accredited schools of social work. DHS shall develop relationships, joint programs, and such other programs as are deemed worthwhile with the accredited schools of social work to enhance and improve existing opportunities for the training and education of DHS and private CPA and CCI caseworker and supervisory staff.

6. Private CPA or CCI supervisors whose activities and responsibilities are comparable to those of DHS Supervisors shall be required to meet the same training and performance evaluation requirements as DHS Supervisors within the timeframes set forth in Sections VI.B.2 and VI.B.3 above. Private CPA supervisors whose activities and responsibilities are comparable to those of

DHS supervisors shall be required to meet the qualifications set forth in Sections VI.B.3 and VI.B.4 above by April 2011.

C.  Licensing Worker Qualifications and Training:

By December 15, 2008, DHS shall develop and provide to the Monitor and Plaintiffs a plan identifying the type and amount of training to be provided to all staff responsible for conducting home studies, licensing inspections, annual evaluations, and other activities related to the licensing or monitoring of foster homes or residential care facilities, whether employed by DHS or by a private provider.  The plan shall include timetables for implementation.  Upon the Monitor's approval of the plan as submitted or modified, DHS shall implement the plan.

D.  Oversight of Training Requirements:

There shall be a designated individual within the DHS central office who is solely responsible for overseeing and ensuring compliance with all training requirements for both DHS and private CPA and CCI workers and supervisors.  DHS county offices and private CPAs shall be required to submit to this individual records attesting to the completion of pre-service training requirements and satisfactory performance on competency-based performance evaluations.

E.  Caseload Standards:

1.  DHS shall achieve the caseload standards set forth in this section.  These standards will apply equally to both DHS worker caseloads and caseloads of private CPA caseworkers with comparable case responsibilities.

2.  *Supervisors*:  Each Foster Care, Adoption, CPS, Licensing, and POS monitoring Supervisor will be responsible for the supervision of no more than five caseworkers.  DHS will achieve this standard as follows:

a.  By January 2010, 50% of Foster Care, Adoption, and CPS Supervisors will supervise no more than five caseworkers;

b. By January 2011, 95% of Foster Care, Adoption, and CPS Supervisors will supervise no more than five caseworkers;

c. By January 2011, 50% of Licensing and POS monitoring Supervisors will supervise no more than five caseworkers; and

d. By January 2012, 95% of Licensing and POS monitoring Supervisors will supervise no more than five caseworkers.

3. *Foster Care Workers*: Each Foster Care worker will have a caseload of no more than 15 children. DHS will achieve this standard as follows:

a. By November 15, 2008, 95% of Foster Care workers will have caseloads of no more than 30 children and 60% of Foster Care workers will have caseloads of no more than 25 children;

b. By October 2009, 70% of Foster Care workers will have caseloads of no more than 22 children;

c. By October 2010, 80% of Foster Care workers will have caseloads of no more than 20 children; and

d. By October 2011, 95% of Foster Care workers will have caseloads of no more than 15 children.

4. *Adoption Workers*: Each Adoption worker will have a caseload of no more than 15 children. DHS will achieve this standard as follows:

a. By February 2009, 60% of Adoption workers will have caseloads of no more than 25 children;

b. By April 2009, 95% of Adoption workers will have caseloads of no more than 30 children;

c. By October 2009, 70% of Adoption workers will have caseloads of no more than 22 children;

d. By October 2010, 80% of Adoption workers will have caseloads of no more than 20 children; and

e. By October 2011, 95% of Adoption workers will have caseloads of no more than 15 children.

5.   *Investigation/Assessment Workers*:

    a.   Each CPS worker assigned to investigate or assess allegations of abuse or neglect will have a caseload of no more than 12 open cases.  DHS will achieve this standard as follows:

       i.   By April 2009, 95% of investigation/assessment staff will have no more than 16 open cases;

      ii.   By October 2009, 60% of investigation/assessment staff will have no more than 14 open cases;

     iii.   By October 2010, 80% of investigation/assessment staff will have no more than 13 open cases; and

     iv.   By October 2011, 95% of investigation/assessment staff will have no more than 12 open cases.

    b.   Each CPS worker assigned to provide ongoing services will have a caseload of no more than 17 families.  DHS will achieve this standard as follows:

       i.   By April 2009, at least 95% of CPS ongoing services workers will have no more than 30 families;

      ii.   By October 2009, 60% of CPS ongoing services workers will have caseloads of no more than 25 families;

     iii.   By October 2010, 80% of CPS ongoing services workers will have caseloads of no more than 20 families; and

     iv.   By October 2011, 95% of CPS ongoing services workers will have caseloads of no more than 17 families.

6.   *POS Monitoring Workers*:  Each POS monitoring worker will have a caseload of no more than 45 cases.  DHS will achieve this standard as follows:

    a.   By October 2009, 60% of POS monitoring workers will have a caseload of no more than 55 cases;

b. By October 2010, 75% of POS monitoring workers will have a caseload of no more than 50 cases; and

c. By October 2011, 95% of POS monitoring workers will have a caseload of no more than 45 cases.

7. *Licensing Workers*: Each licensing worker will have a caseload of no more than 30 cases. DHS will achieve this standard as follows:

a. By October 2009, 60% of licensing workers will have a caseload of no more than 36 cases;

b. By October 2010, 75% of licensing workers will have a caseload of no more than 33 cases; and

c. By October 2011, 95% of licensing workers will have a caseload of no more than 30 cases.

8. *Mixed Caseloads*: With respect to mixed caseloads, DHS, in consultation with Plaintiffs and subject to the approval of the Monitor, shall establish caseload maximums and timeframes by which they will be achieved, based upon an appropriate weighting formula.

9. *Caseload Tracking and Reporting*: Beginning on a date to be established by the Monitor after consultation with the parties, DHS will provide regular reporting, at least quarterly, on the percentage of supervisors and workers in each of the categories above whose workloads meet the standards set forth in this section.

## VII. ASSESSMENT, CASE PLANNING, AND PROVISION OF SERVICES

A. Assessments and Service Plans:

DHS shall complete a written assessment of the child(ren)'s and family's strengths and needs, designed to inform decision-making about services and permanency planning, within 30 days after a child's entry into foster care, and shall update the

assessment at least quarterly thereafter. Assessments shall be of sufficient breadth and quality to usefully inform case planning.

DHS shall complete an Initial Service Plan within 30 days of placement, and an Updated Service Plan at least quarterly thereafter. The written service plan shall accord with the requirements of 42 U.S.C. § 675(1), and shall indicate:

1.     The assigned permanency goal;

2.     How DHS, other service providers (including the private CPA, where applicable), parents, and foster parents will work together to confront the difficulties that led to the child's placement in foster care and achieve the permanency goal;

3.     The services to be provided to the child(ren), parent(s), and foster parent(s);

4.     Who is to provide those services and by when they are to be initiated; and

5.     The actions to be taken by the caseworker to help the child(ren), parent(s), and foster parent(s) connect to, engage with, and make good use of services.

The service plan shall contain attainable, measurable objectives with expected timeframes, and shall identify the party or parties responsible for each task.

Service plans shall be signed by the caseworker, the caseworker's supervisor, the parent(s), and the child(ren), if of age to participate. If the parent(s) and/or child(ren) are not available or decline to sign the plan, the service plan shall include an explanation of the steps taken to involve them and shall identify any follow-up actions to be taken to secure their participation in services.

When a child is placed with a private CPA or CCI, the private CPA or CCI shall complete the assessment and the service plan in accordance with the provisions above. DHS shall review and approve assessments and service plans prepared by a private CPA or CCI. In the event that the parties agree to a different form of oversight of private CPA performance, pursuant to the review set forth in Section XII.G below, this paragraph shall no longer apply.

B.  Supervisory Oversight of Assessments and Service Plans:

Prior to being finalized, each assessment and service plan shall be reviewed and approved by a supervisor only after a face-to-face meeting with the worker. Supervisors shall meet at least monthly with each assigned worker to provide consultation on their cases.

C.  Team Decision-Making:

A Team Decision-Making meeting ("TDM") shall be held to make or recommend critical case decisions.  TDMs shall be led by a trained facilitator, and shall include the parent(s) from whom the child has been or may be removed; foster parent(s); child(ren) if of age to participate; family, friends, or other supports identified by the parent(s) and child(ren); other service providers as appropriate; and the caseworker, with supervisory participation when necessary.  For children placed with a private CPA, the private CPA caseworker, and the private CPA supervisor when necessary, shall also be present. A TDM shall be held:

1.  Prior to placement, or by the next working day after an emergency placement;

2.  Prior to the transfer of a child in foster care to a different placement setting, or by the next working day after an emergency transfer;

3.  Prior to reunification;

4.  Prior to a change in the permanency goal;

5.  When a child returns from Absent Without Legal Permission ("AWOLP") status;

6.  When a child has been in care for 9 months with a goal of reunification, and sufficient progress has not been achieved to ensure reunification within 12 months;

7.  When a child has been legally free for adoption for three months but does not have a permanent placement identified.

At the conclusion of each TDM, the facilitator shall prepare a written report detailing the decisions and recommendations emerging from the meeting.  The report shall be

provided to the worker and the worker's supervisor, and shall include a section identifying areas in which supervisory follow-up is needed.

D. <u>Provision of Services:</u>

DHS will ensure that the services identified in the service plan are made available in a timely and appropriate manner to the child and family, and will monitor the provision of services to determine whether they are of appropriate quality and are having the intended effect. DHS is responsible for helping the parent(s) from whom the child has been or may be removed, the child(ren), and the foster parent(s) identify appropriate, accessible, and individually compatible services; assisting with transportation when necessary; helping to identify and resolve any barriers that may impede parent(s), child(ren), and foster parent(s) from making effective use of services; and intervening to review and amend the service plan when services are not provided or do not appear to be effective.

E. <u>Implementation Schedule:</u>

Assessments, service plans, and TDMs shall be implemented by the dates set forth in the following tables.

Wayne, Oakland, Macomb, Kent, and Genesee Counties:

|  | DHS | CPA |
|---|---|---|
| Initial assessment and initial service plan | Oct., 2009 | Oct., 2009 |
| Quarterly re-assessment and updated service plan | Oct., 2009 | Oct., 2009 |
| Placement TDM | Oct., 2009 | N/A |
| Change of placement TDM | Oct., 2009 | Oct., 2009 |
| Return from AWOLP TDM | Oct., 2009 | Oct., 2009 |
| TDM for children awaiting reunification more than 9 months | Oct., 2009 | Oct., 2009 |
| TDM for children free for adoption for more than 3 months with no permanent resource identified | Oct., 2009 | Oct., 2009 |
| Reunification TDM | Oct., 2009 | Oct., 2009 |
| Change of permanency goal TDM | Oct., 2009 | Oct., 2009 |

Berrien, Calhoun, Ingham, Jackson, Kalamazoo, Muskegon, Saginaw, St. Clair, and Washtenaw Counties:

| | DHS | CPA |
|---|---|---|
| Initial assessment and service plan | Oct., 2009 | Oct., 2009 |
| Quarterly re-assessment and updated service plan | Oct., 2009 | Oct., 2009 |
| Placement TDM | Oct., 2009 | N/A |
| Change of placement TDM | Oct., 2010 | Oct., 2010 |
| Return from AWOLP TDM | Oct., 2010 | Oct., 2010 |
| TDM for children awaiting reunification more than 9 months | Oct., 2011 | Oct., 2011 |
| TDM for children free for adoption for more than 3 months with no permanent resource identified | Oct., 2011 | Oct., 2011 |
| TDM for children free for adoption for more than 3 months with no permanent resource identified | Oct., 2011 | Oct., 2011 |
| Reunification TDM | Oct., 2010 | Oct., 2010 |
| Change of permanency goal TDM | Oct., 2010 | Oct., 2010 |

Remainder of State:

| | DHS | CPA |
|---|---|---|
| Initial assessment | Oct., 2009 | Oct., 2009 |
| Quarterly re-assessment | Oct., 2009 | Oct., 2009 |
| Placement TDM | Oct., 2010 | N/A |
| Change of placement TDM | Oct., 2011 | Oct., 2011 |
| Return from AWOLP TDM | Oct., 2011 | Oct., 2011 |
| TDM for children awaiting reunification more than 9 months | Oct., 2011 | Oct., 2011 |
| TDM for children free for adoption for more than 3 months with no permanent resource identified | Oct., 2011 | Oct., 2011 |
| Reunification TDM | Oct., 2011 | Oct., 2011 |
| Change of permanency goal TDM | Oct., 2011 | Oct., 2011 |

F.  Additional Provisions Regarding Certain Permanency Planning Goals:

A child shall be assigned only one permanency goal at any time and this goal shall be a federally recognized permanency goal.  Where appropriate, a child shall also be assigned a concurrent goal in conformity with federal regulations and subsection VII.F.2 below.

1.  *Maintaining a Permanency Goal of Reunification beyond 12 Months*:  For any child who has a permanency goal of return home for more than 12 months, the child's worker, with written approval from the supervisor, shall include in the record a written explanation justifying the continuation of the goal, and identifying the additional services necessary or circumstances which must occur in order to accomplish the goal.  No child shall have a permanency goal of return home for more than 15 months unless there are documented in the record and approved by the child's worker's supervisor compelling reasons to believe that the child can be returned home within a specified and reasonable time period.

2.  *Concurrent Planning*:  Strategic planning and preparation for possible adoptive placement of a child shall occur concurrently with the delivery of reunification services to the child's birth parent(s), unless clearly inappropriate for case specific reasons that are documented in the child's record.  The adoption planning process shall begin immediately for all children for whom a diligent search has failed to locate the whereabouts of both parents and for whom no appropriate family member is available to assume custody.

3.  *Change of Goal to Adoption*:  In the event that a child's permanency goal is changed to adoption, DHS, and the assigned contract agency where applicable, shall within 30 days of the goal change:

a.  Assign a worker with adoption expertise to the case;

b. Determine whether the child's foster parent(s) or relative(s) are prepared to adopt the child and, if so, take appropriate steps to secure their consent to adoption;

c. If no adoptive resource has been identified, register the child on national, regional, and local adoption exchanges; and

d. If no adoptive resource has been identified, develop and implement a child-specific plan to recruit an adoptive family for the child.

The child-specific recruitment plan shall be reviewed at least quarterly until the child is placed in the home of a family that plans to care for the child through the age of majority as follows: (a) in the first six months following the child's goal becoming adoption or guardianship, in a face-to-face meeting between the Adoption worker and the Adoption Supervisor; (b) in cases where a permanent home has not been identified within six months of the child's permanency goal becoming adoption or guardianship, in a face-to-face meeting attended by the Adoption worker, the Adoption Supervisor and a person designated by the central office, not previously involved in the case, who is specially trained in permanency and adoption processes and planning, and (c) in cases where a permanent home has not been identified within one year of the child's permanency goal becoming adoption or guardianship, in a face-to-face meeting attended by the Adoption worker, the Adoption supervisor, and an outside expert engaged by DHS with expertise in permanency and adoption processes and planning.

Beginning November 15, 2008, DHS in consultation with the Monitor shall develop a process that will identify barriers to adoption and guardianship in cases in which a permanent home has not been identified within six months of the child's permanency goal becoming adoption or guardianship.

4. *Preparation and Filing of Petition for Termination of Parental Rights*: The process of freeing a child for adoption and seeking and securing an adoptive

placement shall begin as soon as the child's permanency goal becomes adoption, but in no event later than as required by federal law. A petition to terminate the parental rights of any parent whose rights must be terminated in order for the child to achieve permanency shall be filed within two weeks of the date on which the goal is changed to adoption, whether the goal change results from DHS's decision or from a court order.

5. *Placement with a Fit and Willing Relative*: DHS, and the assigned contract agency where applicable, shall not assign a permanency goal of placement with a fit and willing relative to a child for whom it has not made adoption efforts unless:

   a. An appropriate relative has been identified and has cleared all background checks required for placement of a child in the home;

   b. The relative is willing to assume long-term responsibility for the child but has legitimate reasons for not adopting the child or pursuing permanent legal guardianship;

   c. It is in the child's best interests to remain in the home of the relative rather than be considered for adoption by another person; and

   d. The permanency goal receives the documented approval of the Director of the Bureau of Child Welfare or a higher-ranking official.

   In such circumstances, DHS and the relative shall execute an agreement that ensures the permanency and stability of this placement.

   With respect to any child assigned the goal of placement with a fit and willing relative as of the effective date of this Agreement, DHS shall ensure that, as part of the next regularly scheduled permanency plan review process, the goal is reviewed and changed, or there is documentation established in the case record that the conditions of this subsection of the Agreement have been met.

6. *Another Planned Permanent Living Arrangement*:  DHS, and the assigned contract agency where applicable, shall not assign the permanency goal of Another Planned Permanent Living Arrangement ("APPLA") unless:

    a. The child is at least 14 years old;

    b. Every reasonable effort has been made, and documented in the record, to return the child home, to place the child with appropriate family members, or to place the child for adoption;

    c. The foster parent(s) caring for the child have agreed in writing to continue to do so until the child is emancipated; and

    d. The permanency goal receives the documented approval of the Director of the Bureau of Child Welfare, or a higher-ranking official.

    With respect to any child assigned the goal of APPLA as of the effective date of this Agreement, DHS shall ensure that, as part of the next regularly scheduled permanency plan review process, the goal is reviewed and changed, or there is documentation established in the case record that the conditions of this subsection of the Agreement have been met.

7. *Independent Living and Emancipation*:  DHS, and the assigned contract agency where applicable, shall not assign a permanency goal of independent living or emancipation to any child.  No child below the age of 16 may be placed in an independent living placement.

    With respect to any child assigned the goal of independent living or emancipation as of the effective date of this Agreement, DHS shall ensure that, as part of the regularly scheduled permanency plan review process, the goal is reviewed and changed.

8. *Adoption Subsidies*:  Upon identification of an adoptive family for a child legally freed for adoption, DHS shall within 14 days provide the putative adoptive family with an adoption subsidy application and explanatory

materials regarding the adoption subsidy program in Michigan and related federal Title IV-E regulations and HHS policies. DHS shall include a written record of delivery of such materials in the child's file.

9. *Disrupted Pre-Adoptive Placements*: DHS shall maintain a list, which shall be made available to the Monitor, of all Michigan Children's Institute ("MCI") wards and permanent court wards whose pre-adoptive placements disrupt prior to finalization. This list shall include:

a. The name of the child;

b. The name and address of the child's putative adoptive parents;

c. The date of and reason for the placement disruption; and

d. The current placement of the child.

G. Special Reviews for Backlogged Children:

1. *Backlog Cohorts*: The provisions of this section shall apply to all children in DHS foster care custody, including those children placed through private CPAs, who, at any time from the date of execution of this Agreement until January 1, 2009 (a) have had the parental rights of their parents terminated and have been legally free for adoption for more than 365 days or (b) have a goal of reunification and have been in care for more than 365 days.

2. *Actions to Be Taken During SFY 2008*: Upon execution of this Agreement and throughout the remainder of SFY 2008, DHS will develop and implement the policies, procedures, and organizational structures required to achieve legal permanency for children whose cases are part of the Backlog Cohorts. DHS shall:

a. Establish the position of Permanency Planning Coordinator, with overall responsibility for implementing this section. The Permanency Planning Coordinator shall ensure the development of position descriptions and qualification requirements for the Permanency Planning Specialists described below, develop statements of work for any such positions to be filled by

contract providers, and develop policies and procedures for implementing the other steps required by this section.

b.   Create at least 200 positions for Permanency Planning Specialists, including related supervisory and support staff.  These shall be limited-term, specialized assignment positions responsible for reviewing cases of and pursuing legal permanency for children in the Backlog Cohorts.  If DHS decides to fill some or all of these positions by contract, the statement of work developed for the contracting process will be provided to Plaintiffs and to the Monitor for review and comment prior to issuance.  DHS shall fill 108 of these positions during SFY 2008, and the balance during SFY 2009.

c.   Develop policies and procedures for permanent legal guardianship, subsidized guardianship, concurrent planning, post-adoption services, post-permanency guardianship services, community services, and youth permanency services that will facilitate the effort to achieve timely permanency for children for whom parental rights are terminated.

d.   Undertake a gap analysis study to identify the services and supports required, but not currently available, to adequately address the needs of children in the Backlog Cohorts.

e.   Develop and submit to the Michigan Legislature for legislative action Permanent Legal Subsidized Guardianship legislation.

f.   Hire sufficient training staff to develop curriculum for training, and train Permanency Planning Specialists.

g.   Begin reporting on the number, characteristics, and progress of children in the Backlog Cohorts, sorted by county, worker, and private CPA.

h. Continue to assign the Permanency Planning Coordinator to manage the Backlog Project and monitor and report on progress.

3. *Actions to be Taken During SFY 2009*:  In SFY 2009, DHS shall:

   a. Hire and/or contract for and train an additional 92 Permanency Planning Specialists, including related supervisory and support staff, to review and pursue legal permanency for Backlog Cohort cases.

   b. Continue to assign the Permanency Planning Coordinator to manage the Backlog Project and monitor and report on progress.

   c. By September 30, 2009, achieve legal permanency for at least 50% of the children in each of the two backlog groups identified in Section VII.G.1 above.

4. *Actions to Be Taken During SFY 2010 and SFY 2011*:  During SFY 2010 and 2011, DHS shall:

   a. Continue to employ and/or contract for sufficient Permanency Planning Specialists, as required, to pursue legal permanency for all Backlog Cohort cases not already in permanency status in the manner described above.
   b. Continue to assign the Permanency Planning Coordinator to manage the Backlog Project and monitor and report on progress.

   c. By the conclusion of SFY 2010 (September 30, 2010), achieve legal permanency for 85% of the children in each of the two Backlog Cohorts identified in Section VII.G.1 above.

d. By the conclusion of SFY 2011 (September 30, 2011), achieve legal permanency for 100% of the children in each of the two Backlog Cohorts identified in Section VII.G.1 above.

H. Caseworker Contacts and Visits:

1. *Worker-Child Contacts*:  By October 2011, each child in foster care shall be visited by the assigned foster care case manager at least two times during the child's first month of placement, and at least one time per month thereafter. At least one visit each month shall take place at the child's placement location and shall include a private meeting between the child and the case manager. By October 2012, the requirement of two visits per month shall apply for the first three months following an initial placement or a placement move.

2. *Worker-Parent Visits*:  By October 2009, for each child in foster care with a permanency goal of reunification, the child's caseworker will have face-to-face contacts with the child's parent(s) as follows:  (a) for the first month the child is in care, two face-to-face contacts with each parent, at least one of which must occur in the home, and two phone contacts with each parent, if the parent has a phone; (b) for each subsequent month, at least one face-to-face contact with each parent and phone contact as needed, with at least one contact in each three-month period occurring in the parent's place of residence.

3. *Parent-Child Visits*:  By October 2009, DHS shall take all reasonable steps to assure that children in foster care with a goal of reunification shall have at least twice-monthly visitation with their parents.  Reasonable exceptions to this requirement shall include cases in which: (1) a court orders less frequent visits; (2) the parents are not attending visits despite DHS's having taken adequate steps to ensure the parents' ability to visit; (3) one or both parents cannot attend the visits due to exigent circumstances such as hospitalization or incarceration; or (4) the child is above the age of 16 and refuses such visits.

All exceptions, and all reasonable steps to assure that visits take place, shall be documented in the case file.  If such exceptions exist, DHS shall review the appropriateness of the child's permanency goal.

4. *Sibling Visits*:  By October 2009, DHS shall take all reasonable steps to assure that children in foster care who have siblings in custody with whom they are not placed shall have at least monthly visits with their siblings who are placed elsewhere in DHS foster care custody.  Reasonable exceptions to this requirement shall include cases in which: (1) the visit may be harmful to one or more of the siblings; (2) the sibling is placed out of state in compliance with the Interstate Compact on Placement of Children; (3) the distance between the children's placements is more than 50 miles and the child is placed with a relative; or (4) one of the siblings is above the age of 16 and refuses such visits.  All exceptions, and all reasonable steps taken to assure that visits take place, shall be documented in the case file.

## VIII. <u>SERVICES AND PLACEMENT RESOURCES DEVELOPMENT AND UTILIZATION</u>

A. <u>Provision of Services:</u>

DHS shall ensure that children in foster care have access to appropriate services sufficient in range and quantity to meet their service and placement needs, including medical and dental care, mental health services, and appropriate educational services. Consistent with the provisions of Section VII.D, DHS shall ensure that appropriate action is taken in each case to assist the child(ren), parent(s), and foster parent(s) in connecting to, engaging with, and making use of these services.

DHS shall be responsible for helping the parent(s), child(ren), and foster parent(s) identify appropriate, accessible, and individually compatible services; assisting with transportation when necessary; helping to identify and resolve any barriers that may impede parent(s), child(ren), and foster parent(s) from making effective use of

services; and intervening to review and amend the service plan when services are not provided or do not appear to be effective.

DHS will monitor the provision of services to determine whether they are of appropriate quality and are having the intended effect.

1.  *Provision of Medical, Dental, and Mental Health Services*:  DHS shall, by October 2009, take all necessary and appropriate steps to ensure that each child entering foster care receives:

    a.  Any needed emergency medical, dental, and mental health care;

    b.  A full medical examination within 30 days of the child's entry into care;

2.  *Health Services Plan*:  By June 2009, DHS shall provide to the Monitor and Plaintiff a detailed Health Services Plan, which shall set forth the specific action steps DHS will implement in order to ensure that each child entering foster care receives:

    a.  A screening for potential mental health issues utilizing a valid and reliable tool within 30 days of entry into foster care, and a referral for a prompt further assessment by an appropriate mental health professional for any child with identified mental health needs as indicated by the screening tool;

    b.  All required immunizations, as defined by the American Pediatric Association, at the appropriate age;

    c.  Periodic medical, dental, and mental health care examinations and screenings, according to the guidelines set forth by the American Pediatric Association; and

    d.  Any needed follow-up medical, dental, and mental health care as identified.

The Health Services Plan shall be subject to the approval of the Monitor in consultation with the parties.  The Monitor shall establish timeframes for

implementation of subsections VIII.A.2.a-d above in consultation with the parties.

DHS shall maintain an up-to-date medical file for each child in care, including medical history information reasonably available to DHS. DHS shall ensure that, at the time a child is placed in a foster home or residential care facility, the foster care provider receives specific written information about the child's present health status and any present medical needs or health concerns, as well as any medical history of which DHS is aware, that is reasonably necessary for the foster care provider to responsibly care for the child.

In maintaining medical records, DHS shall ensure that it is in compliance with MCL 722.954c(2) by preparing, updating, and providing medical passports to caregivers. In addition, DHS shall ensure that the medical passport, or some other DHS document inserted in each child's file, includes a complete and regularly updated statement of all medications prescribed to and given to the child. All such information shall be provided to all medical and mental health professionals to whom the child is referred and accepted for treatment, as well each foster care provider with whom a child is placed.

By November 15, 2008 and thereafter, each child entering care shall be assigned a Medicaid number and the foster parent or other placement provider shall receive a Medicaid card, or an alternative verification of the child's Medicaid status and number, within 30 days of the child's entry into care. For any subsequent placement during the same episode of care, the foster parent or other placement provider shall receive the child's Medicaid card or alternative verification of Medicaid status and number upon the child's placement.

3.    *Reconfiguration of Mental Health Services Spending*:  Beginning October 2008, DHS shall redirect at least $3 million to fund mental health services.  In

order to help ensure that children in foster care in each county have access to the range of mental and behavioral health services and supports necessary to address their needs, including behavior management training and supports for caregivers working with children with behavioral problems, DHS will gather and analyze data on the way in which DHS funds are utilized to provide mental health services. DHS shall determine whether the allocation of these funds matches the priority needs of the children served, and if not, shall implement a plan to reallocate those funds to support the development and provision of services to meet the priority needs. New contracts for reconfiguration of Mental Health Services Spending will be implemented as follows:

a. By October 2009, in Wayne, Kent, Oakland, Genesee, and Macomb Counties;

b. By October 2010, in Berrien, Calhoun, Ingham, Jackson, Kalamazoo, Muskegon, Saginaw, St. Clair, and Washtenaw Counties; and

c. By October 2011, in all remaining counties.

This paragraph is not intended to limit any other obligations under this Agreement.


4. *Supports for Children Transitioning to Adulthood*:

a. DHS will ensure that children age 14 and older in foster care and youth transitioning from foster care to adulthood have access to the range of supportive services necessary to support their preparation for and successful transition to adulthood, including but not limited to independent living services eligible for federal reimbursement under the Chafee program, and shall maintain sufficient resources to deliver independent living services to all children in the Plaintiff class who qualify for them.

b. DHS also shall develop and implement the following policies, services, and programs focused on meeting the needs of foster children who are 14 years and older with a permanency goal other than a goal of reunification:

i. Beginning November 15, 2008 and thereafter, DHS shall refer all children age 14 and older in foster care and youth transitioning from foster care to adulthood to Michigan Works! Agencies for participation in youth programs and services administered under the Workforce Investment Act, 29 U.S.C. 2801 et seq., designed to assist youth in developing job skills and career opportunities, and shall refer suitably qualified children for summer training, mentorship, and enrichment opportunities;

ii. By November 15, 2008, DHS shall have developed and implemented a policy and the necessary resources to extend all foster youths' eligibility for child foster care custody until age 20 and to make available independent living services through the age of 21;

iii. By November 15, 2008, DHS shall develop and implement a policy and process by which all children emancipating from the foster care system at age 18 or beyond are enrolled for Medicaid managed care coverage so that their coverage continues without interruption at the time of emancipation;

iv. Beginning November 15, 2008, DHS shall refer all children without an identified housing situation at the time of emancipation from the foster care system at age 18 or beyond to the Michigan State Housing Development Authority for rental assistance and services under the Homeless Youth Initiative; and

v. By October 2009, DHS shall hire 14 regional Education Planners who shall provide consultation and support to youth age 14 and older in accessing educational services and in developing individualized education plans, including identifying all available financial aid resources.

5. *Provision of Educational Services*:

a. DHS shall ensure that each child is screened for general and educational needs within 30 days of his/her entry into foster care.

b.  DHS shall take reasonable steps to ensure that school-aged foster children are registered for and attending school within 5 days of initial placement or any placement change, including while placed in congregate care or emergency placements.  No child shall be schooled pursuant to MCL Section 380.1561(3)(f).

c.  DHS shall make reasonable efforts to ensure the continuity of a child's educational experience by keeping the child in a familiar or current school and neighborhood, when this is in the child's best interests and feasible, and by limiting the number of school changes the child experiences.

6.  *Improved Utilization of Existing Sources of Funding for Child/Family-Specific Goods and Services*:   In order to ensure that the range of funds, including "flexible funds" (referred to in Section IX.B), available to meet individualized needs of families and children can be readily accessed by case managers working with those families and children, DHS shall implement a system that designates appropriate and knowledgeable administrative staff, rather than the case managers, as the staff responsible for determining the specific funding source to be drawn upon for the provision of goods and services identified as needed by the case manager/TDM team and for coding and processing the necessary paperwork.  This system shall be implemented statewide by October 2009.

B.  Foster and Adoptive Home Recruitment, Retention, and Support

1.  DHS shall:

a.  Ensure that each county has a sufficient number and adequate array of foster homes capable of serving the needs of those children coming into care for whom foster home placement is appropriate;

b.  Ensure that relatives of children in foster care and non-relatives with whom a child has a family-like connection are identified and considered as potential foster home placements for children; where a relative or non-relative with whom the child has a family-like connection is an

appropriate foster home placement for a child, DHS shall ensure that appropriate steps are taken to license the relative or non-relative as a licensed foster home as set forth in Section VIII.B.7 below; and

c.  Develop a placement process in each county that ensures that a child entering foster care for whom a suitable relative foster home placement is not available is placed in the foster home that is the best available match for that child, irrespective of whether that foster home is a DHS- or private CPA-operated foster home.

2.  *Immediate Recruitment of Placement Resources for Adolescents, Sibling Groups, and Children with Disabilities*:  By December 15, 2008, DHS shall develop and provide to the Monitor and Plaintiffs a recruitment plan to increase the number of available placements for adolescents, sibling groups, and children with disabilities.   The recruitment plan shall include, for each category of placements, the number of placements to be developed; the strategies to be followed in developing such placements; and specific timetables with interim targets.  Within 30 days of receiving the proposed plan, the Monitor shall, in consultation with the parties, either approve the plan or, if the Monitor determines that the plan is not appropriate, convene the parties for the purpose of revising the plan so that the plan can be approved within an additional 30 days.  DHS shall implement the approved recruitment plan consistent with the timetable and interim targets set forth therein.

3.  *Development of Treatment Foster Homes*:  DHS shall develop treatment foster homes, a category of foster homes designed to serve children with higher levels of need.

a.  By November 15, 2008, DHS will have 50 treatment foster home beds available;

b.  By October 2009, DHS will have 100 treatment foster home beds available; and

c. By October 2010, DHS will have 200 treatment foster home beds available.

4. *Assessment of Adequacy of Foster Home and Adoptive Home Capacity*:  As part of the Needs Assessment set forth in Section IX of this Agreement, DHS shall gather, analyze, and report relevant data and identify the extent to which its present array of available foster and adoptive homes is appropriate to the characteristics and needs of the foster care population.  This review shall focus on issues relating to both recruitment and retention of foster and adoptive homes.

DHS will develop and implement, for each county, a foster and adoptive home recruitment and retention plan reasonably designed to ensure adequate foster and adoptive home capacity.  Consistent with the Needs Assessment, DHS will ensure that resources are available to support the development and implementation of individualized adoption recruitment plans for children who are free for adoption and whose goal is adoption but for whom no adoptive family has been identified.

The assessments of foster and adoptive home capacity shall be completed as follows:
a. By March 2009, for the following counties:  Wayne, Oakland, Macomb, Kent and Genesee;
b. By October 2009, for the balance of the state.
Foster and adoptive home recruitment and retention plans shall be developed, and implementation initiated, within three months of the completion of the assessments.

5. *State Oversight of Foster Home Recruitment*:  A designated unit or person within the central office shall be responsible for monitoring the development and implementation of the foster and adoptive home recruitment and retention

plans by county offices; providing or arranging for technical assistance to the county offices concerning recruitment and retention; and reporting to the Children's Services Cabinet on progress and problems in achieving the goals set forth in the recruitment and retention plans.

6.      *Adequacy of Foster Home Board Payments and Specialized Rate Determinations*:  In order to ensure that payments to foster parents are sufficient to meet the needs of the children in foster care, DHS shall ensure that the Determination of Care ("DOC") process is applied consistently and appropriately across all counties and offices.  DHS shall identify, after consultation with the Monitor and Plaintiffs, a state office responsible for ensuring that Determinations of Care and decisions regarding payment of a specialized administrative rate to contract providers are made uniformly across the state and in accordance with DHS policy.  DHS shall also establish procedures by which a foster parent or CPA may obtain review by a designated official in the central office of a Determination of Care or administrative rate (general or specialized) decision.

7.      *Licensing of Relative Foster Homes*:

   a.   Subject to the timeframes for implementation set forth in subsections (k) through (o) below, other than in some exceptional circumstances, as defined in subsection (e) below, all foster parents (relatives and non-relatives) shall be licensed.

   b.   When placing a child with a relative who has not been previously licensed as a foster parent, DHS shall:

      i.   Prior to placement, visit the relative's home to determine that it is safe;

      ii.  Within 72 hours following placement, check law enforcement and child abuse registry records for all adults residing in the home; and

      iii.  Within 30 days, complete a home study determining whether the relative should, upon completion of training and submission of any other required documents, be licensed as a foster parent.

c.  All licensed relative foster care providers shall receive the same foster care maintenance rates paid by DHS to similarly situated unrelated foster care providers, including the ability to qualify for enhanced Determination of Care rates.

d.  All permanent wards living with relative caregivers shall be provided foster care maintenance payments equal to the payments provided to licensed foster caregivers.

e.  If the foster care provider is related to the child, and exceptional circumstances exist such that it is in the child's best interest to be placed with the relative despite the relative's desire to forego licensing, such exceptional circumstances for foregoing licensing must be documented in the child's record, and must be approved by:

   i.  In a "Designated County," as defined in Section IV.A.3 of this Agreement, the county Administrator of Children's Services;
  ii.  In any other county, the Children's Services Field Manager.

In such instances, the relative caregiver and the other adult household members must meet the same safety standards as non-relative providers; the relative caregiver must be fully informed of the benefits, including the exact amount of monetary benefits, of licensure; and the relative caregiver must sign a waiver stating understanding that he or she is foregoing the benefits, including the exact amount of monetary benefits of licensure. The Monitor shall report on the percentage of relative caregivers who elect to waive licensing. In the event that more than 10% of unlicensed relative caregivers decline to be licensed, the Monitor shall conduct a review and

report on whether DHS has adequately instituted and followed the procedures set forth in this section.

f.   DHS shall submit for pre-approval to Plaintiffs the form waiver letter to be used consistent with the requirements of this section. This waiver must be re-signed by the relative caregiver annually and a copy must be placed in the child's record. The relative caregiver may change his or her mind and choose to undergo licensing at any time, and when this occurs, DHS must allow the relative caregiver to undergo the licensing process.

g.   DHS shall prepare and make public the procedures on obtaining variances from standard foster care licensing requirements for purposes of licensing relative homes. DHS shall not waive any licensing standards that are essential for the safety and well-being of the child.

h.   Other than pursuant to the exception for unlicensed relative foster homes set forth in subsection (e) above, no child shall be placed in an unlicensed foster home unless there is an order of the juvenile court that the child be so placed.

i.   By November 15, 2008, DHS shall produce and begin the implementation of a written plan, as set forth below, to ensure the speedy licensing of all current unlicensed relative caregivers in a phased-in time period, beginning immediately and to be completed no later than September 30, 2010.

j.   The plan shall include:
     i.   The requirement that pre-service and in-service foster parent training be provided to relative caregivers pursuing licensure and that the content of the training include those parts of the general

foster parent training curriculum that are relevant to relative caregivers;

ii. The designation of sufficient licensing staff to review all current unlicensed foster homes, and to complete the licensing process for each family within 90 days;

iii. The designation of sufficient training staff to ensure that all mandatory training is provided to newly licensed relative care foster parents;

iv. A process for the re-placement of any child currently in a relative foster home that does not meet the licensing standards, unless exceptional circumstances have been documented and approved, as outlined above; and

v. Identification of any categories of relative caregivers whose licensure is to be prioritized.

k. With regard to all children entering DHS foster care custody on or after October 1, 2008, relatives providing foster care for children in DHS foster care custody shall be licensed unless exceptional circumstances have been documented and approved, as outlined above.

l. With regard to all children who, prior to October 1, 2008, are placed in an unlicensed relative foster home (as temporary wards, permanent wards, or state MCI wards), referred to as the "Relative Caregiver Backlog Cohort," actions are to be taken as set forth in subsections m, n, and o below.

m. *Actions to be Taken During SFY 2008*: Upon execution of this Agreement and throughout the remainder of SFY 2008, DHS will develop and implement the policies, procedures, and organizational structures required to license all currently unlicensed relative caregivers. Included within this effort, DHS shall do at least the following:

i.   Establish and fill the position of Relative Licensing Coordinator
     with overall responsibility for implementing this section.  The
     Coordinator shall ensure the development of position descriptions,
     qualification requirements, and work processes for the Relative
     Licensing positions described below, and/or develop statements of
     work for any such positions to be filled by contract providers, and
     shall develop policies and procedures for implementing the
     Backlog Reviews required in this section and to oversee
     implementation of these reviews;

ii.  Create and fill, or provide sufficient funds to contract providers for
     such providers to fill, 40 Relative Licensing positions.  These are
     to be limited-term, specialized assignment positions dedicated to
     the Relative Caregiver Backlog Cohort whose responsibilities
     shall include reviewing cases of unlicensed relative caregivers and
     implementing licensing processes to determine whether to license
     these homes and, if so, to get them licensed.  Responsibilities shall
     also include the identification of those homes with the most
     immediate needs for licensure.  The development of necessary
     forms, agreements, promotional/informational materials, and
     services manuals will be completed by the Children's Services
     Administration;

iii. Establish a unit within the Children's Services Administration
     charged with maximizing Title IV-E reimbursements from the
     federal government;

iv.  Develop a combined/coordinated Family Home Assessment for
     relative providers, family foster care, and adoption;

v.   Begin reporting on the number and characteristics of unlicensed
     relative homes and the children in those homes, and on progress in
     licensing the homes, broken down by county and private CPA,
     where applicable; and

vi.  Have available adequate training staff to develop curriculum and training for and to train Relative Licensing staff.

n.  *Actions to be Taken During SFY 2009*:  In SFY 2009, DHS shall:

i.  Continue to employ or contract for Relative Licensing staff as necessary and to maintain Licensing Teams, as required, to address all remaining cases within the Relative Caregiver Backlog Cohort; and

ii.  Continue to assign the Relative Licensing Coordinator to oversee implementation of this Backlog Review; and to monitor and report on progress.

By September 30, 2009, review of at least 50% of the Relative Caregiver Backlog Cohort shall have been completed, and all homes reviewed shall have been duly licensed as foster care providers, or specially waived from licensure pursuant to the provisions of this section, or, if not licensed or waived, any children placed in such homes shall have been re-placed within 30 days of the decision not to license the home or waive licensure.

o.  *Actions to be Taken During SFY 2010*:  In SFY 2010, DHS shall:

i.  Continue to employ or contract for Relative Licensing staff as necessary and to maintain Licensing Teams, as required, to address all remaining cases within the Relative Caregiver Backlog Cohort; and

ii.  Continue to assign the Relative Licensing Coordinator to oversee implementation of this Backlog Review; and to monitor and report on progress.

By September 30, 2010, review of 100% of the Relative Caregiver Backlog Cohort shall have been completed, and all homes reviewed shall have been duly licensed as foster care providers, or specially waived from licensure pursuant to the provisions of this section. If the home is not deemed appropriate for licensure or waiver, pursuant to the provisions of this section, all foster children placed in the home shall be re-placed within 30 days of the decision not to license the home or waive licensure.

8. *Implementation of an Adequate Child Placement Process*:  DHS shall implement an adequate child placement process in each county or region. Prior to implementing the process, DHS shall conduct a review and analysis of the Child Placement Network ("CPN") process presently in place in Wayne County, and submit to the Monitor a report indicating the results achieved by the CPN pilot in Wayne County, the strengths and weaknesses of that process, and DHS's conclusions with respect to the appropriateness and effectiveness of a potential rollout of that process in other counties.

DHS shall submit for review and approval by the Monitor plans for implementation of adequate placement processes in the remainder of the state, along with any modifications of the CPN process in Wayne County.  Full implementation of an adequate placement process will be implemented according to the following schedule:

   a. By October 2009, in Oakland, Genesee, Kent, and Macomb counties;

   b. By October 2010, in Berrien, Calhoun, Ingham, Jackson, Kalamazoo, Muskegon, Saginaw, St. Clair, and Washtenaw Counties; and

   c. By October 2011, in the remainder of the state.

9. *Provision of Post-Adoption Services*:  DHS shall develop and implement a full range of post-adoption services to assist all eligible special needs children adopted from state foster care and their permanent families (including, but not limited to, physical therapy, counseling, and other services required to address the developmental and/or physical disabilities of an adopted child) and shall

maintain sufficient resources to deliver such post-adoption services to all children in the Plaintiff class who qualify for these services along with their permanent families.

## IX.   NEEDS ASSESSMENT

A. No later than November 15, 2008, DHS shall begin an Assessment of the need for additional services and placements, including the need for family preservation services, foster and adoptive placements (including placements for children with disabilities or other behavioral needs), wraparound services, reunification services, and medical, dental, and mental health services, for children in foster care throughout the state.

B.  The Assessment shall also include a review of and recommendations regarding the use and availability of "flexible funds" − funds that are available to allow caseworkers to arrange for special cash assistance and/or the purchase of specific goods and services in addition to those normally available through DHS's regular contacting processes – in order to meet identified needs of children or families and/or remove barriers to reunification or permanency.

C. A second Needs Assessment shall be conducted two years after the conclusion of the first Needs Assessment.  The second Needs Assessment will include, in addition to the scope outlined in Sections IX.A and IX.B above, a specific review and recommendation as to whether the additional treatment foster home beds provided pursuant to Section VIII.B.3 are sufficient to meet the needs of children in foster care.

D. Each Needs Assessment shall be conducted in consultation with and subject to the approval of the Monitor, and shall make use of independent experts to the extent that the Monitor reasonably deems necessary.  The first Needs Assessment shall be forwarded to the Monitor and the parties by May 15, 2009, and the Monitor, after receiving comments from Plaintiffs, shall issue a final report containing his or her

findings within 60 days thereafter.  The report shall set forth the findings and recommendations with respect to additional services and placements to be developed and a timeline for development of those additional services and placements.  A similar process shall apply to the second Needs Assessment.

E.  DHS shall make available additional funds of at least $4 million to develop the additional services and placements identified by the first Needs Assessment, and further additional funds of at least $4 million to develop the additional services and placements identified by the second Needs Assessment.   If the costs for implementing the recommendations from the Needs Assessments exceed the additional funds made available pursuant to this subsection, DHS will consult with Plaintiffs and the Monitor to determine how to prioritize the use of the additional funds.   If DHS believes that it can create the new services and placements identified by the Needs Assessment, in whole or in part, by re-programming existing funds rather than expending new funds, DHS, in consultation with Plaintiffs and the Monitor, and with the approval of the Monitor, may utilize such reprogramming of existing funds to support the implementation of the Needs Assessment recommendations.

F.  In order to fund the additional POS monitoring positions needed to meet the caseload standards set forth in Section VI.E.6 of this Agreement, the State has allocated $2 million of additional state funds.  In the event that the review of the POS monitoring function set forth in Section XII.G of this Agreement leads to a revised staffing plan that allows some or all of this $2 million in additional funding to be saved, such savings shall be re-allocated to funding the items and services identified in the Needs Assessment, supplementing the amount of funding provided pursuant to Section IX.E above.

## X. PLACEMENT STANDARDS AND LIMITATIONS

A. General Standards:

DHS shall place children according to the following standards:

1. All children shall be placed in accordance with their individual needs, taking into account a child's need to be placed as close to home and community as possible, the need to place siblings together, and the need to place children in the least restrictive, most home-like setting.

2. Children for whom the permanency goal is adoption should, whenever possible, be placed with a family in which adoption is a possibility.

3. Race and/or ethnicity and/or religion shall not be the basis for a delay or denial in the placement of a child, either with regard to matching the child with a foster or adoptive family or with regard to placing a child in a group facility. Race and/or ethnicity shall otherwise be appropriate considerations in evaluating the best interest of an individual child to be matched with a particular family. DHS shall not contract and shall immediately cease contracting with any program or private CPA that gives preference in its placement practices by race, ethnicity, or religion.

4. Children in the foster care custody of DHS shall be placed only in a licensed foster home, a licensed facility, or, subject to the requirements of Section VIII.B.7 of this Agreement, an unlicensed relative home.

B. Placement Limitations:

1. *Limitations on Out-of-County Placements*: DHS shall place all children within their own county or within a 75 mile radius of the home from which the child entered custody (whichever is greater), unless:

   a. The child's needs are so exceptional that they cannot be met by a family or facility within the county or 75 mile radius;

   b. The child needs re-placement and the child's permanency goal is to be returned to his/her parents who at that time reside out of the county or 75 mile radius;

    c. The child is to be placed with a relative out of the county or 75 mile radius; or,

    d. The child is to be placed in an appropriate pre-adoptive or adoptive home that is out of the county or 75 mile radius.

If placement outside the county or 75 mile radius is made:

    a. In a "Designated County," as defined in Section IV.A.3 of this Agreement, the county Administrator of Children's Services shall be specifically required to certify the circumstances supporting the placement in writing, based on his or her own examination of the circumstances and the child's needs and best interests;

    b. In any other county, the Children's Services Field Manager shall be specifically required to certify the circumstances supporting the placement in writing, based on his or her own examination of the circumstances and the child's needs and best interests.

2. *Limitations on Separation of Siblings*: Siblings who enter placement at or near the same time shall be placed together, unless doing so is harmful to one or more of the siblings, one of the siblings has exceptional needs that can only be met in a specialized program or facility, or the size of the sibling group makes such placement impractical notwithstanding diligent efforts to place the group together. If a sibling group is separated at any time, except for reasons set forth above, the case manager shall make immediate efforts to locate or recruit a family in whose home the siblings can be reunited. These efforts will be documented and maintained in the case file and shall be reassessed on a quarterly basis.

3. *Limitations on Number of Children in Foster Home*: Beginning March 2009, for children entering the foster care system, no child shall be placed in a foster home if that placement will result in more than three foster children in that foster home, or a total of six children, including the foster family's natural

and/or adopted children. No placement will result in more than three children under the age of three residing in a foster home. Exceptions to these limitations may be made, on an individual basis, documented in the case file, when in the best interest of the child(ren) being placed, as follows:

a. In a "Designated County," as defined in Section IV.A.3 of this Agreement, by the county Administrator of Children's Services;

b. In any other county, by the Children's Services Field Manager.

4. *Limitations on Use of Emergency or Temporary Facilities*:

a. *Time limit for placement in emergency or temporary facility*: Beginning October 2009, children shall not remain in emergency or temporary facilities, including but not limited to shelter care, for a period in excess of 30 days.

b. *Number of placements in an emergency or temporary facility*: Beginning October 2009, children shall not be placed in an emergency or temporary facility, including but not limited to shelter care, more than one time within a 12-month period. An exception to this limitation shall be made for:

i. Children who are AWOLP;

ii. Children facing a direct threat to their safety, or who are a threat to the safety of others such that immediate removal is necessary; or

iii. Children whose behavior has changed so significantly that the county director or his/her manager designee has certified that a temporary placement for the purposes of assessment is critical for the determination of an appropriate foster placement.

Children experiencing a second emergency or temporary-facility placement within one year shall not remain in an emergency or temporary facility for more than seven days.

Replacements under this section shall take place in accordance with the determinations made at a TDM held pursuant to the provisions in Section VII.C of this Agreement.

For the period of time between the entry of the Agreement by the Court and the time table for implementation of the TDM process as set forth in Sections VII.C and VII.E of this Agreement, whenever the re-placement of a child is under consideration as a result of any one of the three circumstances set forth in this section, DHS shall conduct a special placement review by the caseworker, which will include talking with the supervisor, the child, and either the most recent foster care provider or the child's therapist. The special placement meeting shall be for the purpose of examining the circumstances surrounding the potential placement disruption and making a placement decision that is in the child's best interest. The review shall result in a written determination setting forth the placement decision and its basis.

5. *Limitations on Placement in Jail, Correctional, or Detention Facility*: No child in DHS foster care custody shall be placed, by DHS or with knowledge of DHS, in a jail, correctional, or detention facility unless such child is being placed pursuant to a delinquency charge. Within 90 days of the signing of this Agreement, DHS shall notify the State Court Administrative Office and the Michigan State Police of this prohibition, and provide written instructions to immediately notify the local DHS office of any child in DHS foster care custody who has been placed in a jail, correctional, or detention facility.

If it comes to the attention of DHS that a child in DHS foster care custody has been placed in a jail, correctional, or detention facility, and such placement is not pursuant to a delinquency charge, DHS shall ensure the child is moved to a DHS foster care placement as soon as practicable, and in all events within five days, unless the court orders otherwise over DHS objection.

If a child in DHS foster care custody is placed in a jail, correctional, or detention facility pursuant to a delinquency charge, and the disposition of such a charge is for the child to return to a foster care placement, then DHS shall return the child to a DHS placement as soon as practicable but in no event longer than five days from disposition, unless the court orders otherwise over DHS objection.

6.    *Limitations on Placement of High Risk Youth*:  DHS shall not place any child determined by a DHS assessment to be at high risk for perpetrating violence or sexual assault in any foster care placement with foster children not so determined.

7.    *Limitations on Residential Care Placements*:   No child shall be placed in a residential treatment center or any other group care setting with a capacity in excess of eight children (campus-wide) without express written approval by:

a.   In a "Designated County," as defined in Section IV.A.3 of this Agreement, the county Administrator of Children's Services;

b.   In any other county, the Children's Services Field Manager.

Such approval shall be based on certification and specific findings, documented in the child's case file, that: (1) the child's needs cannot be met in any other type of placement; (2) the child's needs can be met in the specific facility requested; and (3) the facility is the least restrictive placement to meet the child's needs.  A description of the services available in the facility to address the individual child's needs must also be documented in the case file.

The need for a residential placement shall be reassessed every 90 days.  Children may not be placed in a residential placement for more than six months without the express authorization, documented in the foster care file, of:

a.   In a "Designated County," as defined in Section IV.A.3 of this Agreement, the county Administrator of Children's Services;

b.   In any other county, the Children's Services Field Manager.

No child may be placed in a residential placement for more than 12 months without the express authorization, documented in the foster care file, of the Director of Children's Services Administration or a higher-ranking official.

**XI. USE OF PSYCHOTROPIC MEDICATIONS, PHYSICAL RESTRAINTS, AND SECLUSION**

A. Psychotropic Medications:

1. Psychotropic medication shall not be used as a method of discipline or control for any child.

2. Within six months of the signing of this Agreement, DHS shall undertake a review of the policies and procedures surrounding the use of psychotropic medications. This evaluation will be designed in close collaboration with the Monitor and any additional experts on the use of psychotropic medication for children it deems appropriate. The Monitor shall make recommendations, which shall include timetables for implementation, promptly upon reviewing the results of the evaluation, which DHS shall implement. The Monitor shall consult with Plaintiffs in designing the evaluation and issuing recommendations.

3. By November 15, 2008, DHS shall create and as soon as possible thereafter hire or contract for the services of a full-time Medical Director, with appropriate qualifications, who shall, among other things, be responsible for overseeing the implementation of policies and procedures concerning the use of psychotropic medications for all children in DHS foster care custody, and who shall have the authority to issue and impose corrective actions. The Medical Director shall report directly to the Director of Children's Services Administration.

4.      When possible, parents shall consent to the use of medically necessary psychotropic medication.  In the event that a parent is not available to provide consent for psychotropic medication, DHS shall, pursuant to applicable sections of state law, apply to the court for consent.

5.      By January 15, 2009, DHS shall establish and implement processes to ensure documentation of psychotropic medication approvals, documentation by contract agencies of all uses of psychotropic medication, and review of such documentation by appropriate DHS staff, including the Medical Director, on an ongoing basis.

B.  Use of Physical Restraint and Seclusion/Isolation:

1.      DHS shall prohibit the use of Positive Peer Culture, peer-on-peer restraint, and any other forms of physical discipline in all foster care placements.  All uses of physical restraint for children in any placements, and all uses of seclusion/isolation in group, residential, or institutional placements, shall be reported to the Quality Assurance ("QA") unit.  Such reports shall be made available to the licensing unit and the Medical Director for appropriate action.

2.      Within six months of the signing of this Agreement, DHS shall undertake a review of the policies and procedures surrounding all forms and use of physical restraint and seclusion/isolation of children in foster care.   This evaluation will be designed in close collaboration with the Monitor and any additional experts on the use of physical restraint and seclusion/isolation of children as it deems appropriate.  The Monitor shall make recommendations, which shall include timetables for implementation, promptly upon reviewing the results of the evaluation, which DHS shall implement.

3.      The QA unit, in consultation with the Medical Director, shall be responsible for monitoring the implementation of policies and procedures surrounding all

forms and use of physical restraint and seclusion/isolation of children in DHS
foster care custody, and shall issue and impose corrective actions.

## XII. DHS SUPERVISION OF CONTRACT AGENCIES

A. All CCIs and private CPAs that provide placements and child welfare services to
Plaintiff class members shall be bound by all applicable terms of this Agreement,
including, but not limited to, the caseload limits and supervisor-to-caseworker ratio
limits set forth in Section VI.E, the supervisory staff training and qualifications set
forth in Section VI.B, and the caseworker training and qualifications requirements set
forth in Section VI.A.

B. By November 15, 2008, all DHS contracts with CCIs or private CPAs that provide
placements and child welfare services to Plaintiff class members shall be
performance-based contracts that require an annual review of the CPAs' and CCIs'
performance. By October 2009, DHS shall incorporate all applicable performance
outcome goals set forth in Section III of this Agreement and process requirements of
this Agreement into the performance-based contracts, but will do so without limiting
the ability of DHS to independently monitor and enforce these contracts. Further,
DHS shall develop a set of enforcement measures to be imposed in the event that a
contract agency fails to comply with material terms or requirements of the
performance-based contract. DHS shall specify in any such contract: (1) that any
reports of suspected abuse or neglect of any Plaintiff class member while receiving
such contracted placements or services shall be reported to DHS for investigation; (2)
that all placement providers for foster children in DHS foster care custody are
prohibited from using or authorizing the use of corporal punishment for children
under the care and supervision of DHS or the private CPA; and (3) that any reports of
suspected corporal punishment while in that provider's care shall be reported to DHS
for investigation, as necessary.

C. DHS shall give due consideration to any and all substantiated incidents of abuse, neglect, and/or corporal punishment occurring in the placements licensed and supervised by a contract agency at the time of processing its application for licensure renewal. The failure of a contract agency to report suspected abuse or neglect of a child to DHS shall result in an immediate investigation to determine the appropriate corrective action up to and including termination of the contract or placement of the provider on provisional licensing status, and a repeated failure within one year shall result in termination of the contract.

D. By March 2009, DHS shall ensure that all CCIs or private CPAs that provide placements and child welfare services to Plaintiff class members report to DHS accurate data on at least a six-month basis in relation to the requirements of this Agreement.

E. Beginning October 2009, DHS shall conduct contract evaluations of all CCIs and private CPAs providing placements and services to Plaintiff class members, to ensure, among other things, the safety and well-being of Plaintiff class members and to ensure that the contract agency is complying with the applicable terms of this Agreement. At least once each year, DHS shall inspect each private CPA to review all relevant aspects of the agency's operations; shall conduct an unannounced inspection of each residential care facility; and shall visit a random sample of each agency's foster homes, including the greater of 5% of the total number of homes supervised by the agency or 10 homes. Visits to foster homes shall assess the safety of children placed in the home and the extent to which children and foster parents are receiving appropriate supports from the CPA. DHS shall prepare written reports of its inspections and visits, detailing findings. DHS shall require corrective actions and require providers to report to DHS on the implementation of these corrective action plans, and shall conduct follow-up visits when necessary. Such reports will routinely be furnished to the Monitor.

F. DHS shall maintain sufficient resources to permit its staff to undertake timely and

competent contract enforcement activities as set forth in this section.  As necessary based upon workload, DHS shall expand its staff to allow for increased monitoring and oversight responsibilities.

G. By April 2009, DHS will, in coordination with the Monitor, review the effectiveness of the DHS POS monitoring function in providing case-level oversight of private CPAs.

## XIII.  MANAGEMENT INFORMATION SYSTEM

A. By October 2009, DHS shall generate from an automated system accurate and timely data reports regarding each of the requirements and outcome measures set forth in this Agreement and regarding those other requirements of this Agreement for which automated reporting is reasonable and appropriate, as determined by the Monitor in consultation with the parties.  Extensions to this date, allowing additional time during which DHS may supply particular reports based upon manual counts, may be granted by the Monitor after consultation with Plaintiffs.

By October 2012, DHS shall have an automated statewide child welfare information system ("SACWIS") compliant with applicable federal regulations governing functionality, data integrity, and QA measures.

B. By January 2009, in consultation with the Monitor and in coordination with Children's Services Administration, Field Operations Administration, private CPA representatives, and Local/Regional DHS office representatives, DHS shall design a permanency tracking system and associated reports.  The system shall, at a minimum, be capable of reporting pertinent status information sorted by individual child, DHS worker/CPA, and county, for all children in foster care.   By April 2009, DHS shall issue accurate data from the permanency tracking system to the Monitor and Plaintiffs.

C. Both leading up to and subsequent to the full implementation of a SACWIS, DHS shall at all times satisfy all federal reporting requirements and shall maintain data integrity and accuracy on a continuous basis.

## XIV. **QUALITY ASSURANCE**

A. DHS shall, in consultation with and subject to the approval of the Monitor, develop and implement a statewide QA program that will be directed by a QA unit established within the DHS central office.  In administering the QA program, the QA unit shall develop an internal DHS capacity to undertake data collection, data verification, data assessment, case record or qualitative service review and other such oversight and reporting functions that, in coordination with the Monitor and any external data review processes undertaken by the Monitor, will facilitate ongoing assessment of DHS child welfare performance in relation to the performance requirements and goals contained in this Agreement.  The QA unit will support the DHS Director and DHS management in identifying areas of systemic strengths and weaknesses and in formulating strategies to improve in areas of substandard performance.  The QA unit shall provide ongoing critical evaluation and oversight of the strategies designed and undertaken to improve substandard services and outcomes.

B. The QA unit shall become a permanent unit of the Child Welfare Improvement Bureau within the DHS central office.  It shall continue to perform the functions described in this section after full implementation of this Agreement and DHS exit from Court jurisdiction.

C. The DHS Director shall appoint a director to administer the QA unit who possesses the necessary qualifications and experience to conduct competent data collection, evaluation, as well as the management skills necessary to manage a staff tasked to perform QA functions encompassing DHS state, regional, and county offices. The director of the QA unit shall report directly to a member of the Children's Services

Cabinet. The QA unit shall be adequately staffed, and its staff shall receive specialized training to fulfill all unit responsibilities.

D. All reports provided by the QA unit shall become public record so long as any individually identifying information in relation to the temporary or permanent wards in DHS foster care custody is redacted from such report consistent with applicable state and federal confidentiality laws.

E. Reporting on DHS Performance: The QA unit shall, within 60 days following the end of each Reporting Period as defined in Section XVII.H of this Agreement, compile and provide, in consultation with the Monitor, all pertinent data regarding statewide performance in relation to the requirements and outcome measures contained in this Agreement. This data shall be furnished to the Monitor and Plaintiffs.

F. Special Reviews for Higher Risk Cases:

1. By November 15, 2008, DHS shall designate the membership of a special review team, reporting to the Director of Children's Services Administration, charged with conducting reviews designed to assess and meet the needs of children in the following higher risk categories:

   a. Children who have been the subject of an allegation of abuse or neglect in a residential care setting or a foster home, whether licensed or unlicensed, between June 2007 and September 2008, and who remain in the facility or home in which the maltreatment is alleged to have occurred;

   b. Children, not subject to the provisions of Section XIV.F.1.a above, who have been the subject of three or more reports alleging abuse or neglect in a foster home, the most recent of which reports was filed during or after July 2007, and who remain in the foster home in which maltreatment is alleged to have occurred;

   c. Children who, at the time of review, have been in three or more placements, excluding return home, within the previous 12 months;

    d. Children who, at the time of review, have been in residential care for one year or longer; and

    e. Children who, at the time of review, are in an unrelated caregiver placement, defined as an unlicensed home in which the caregiver is not a relative of the child but has been approved as a placement resource because of prior ties to the child and/or the child's family.

2. By November 15, 2008, DHS shall develop, subject to the approval of the Monitor and in consultation with Plaintiffs, a plan setting forth:

    a. The dates and processes by which DHS shall have compiled an accurate list of children subject to review because they meet one or more of the criteria set forth above;

    b. The number and type of special reviews DHS proposes to undertake in the upcoming 90-day period, and the rationale for these choices; and

    c. The data to be reported at the conclusion of the 90-day period.

3. At the conclusion of the initial 90-day period, DHS shall report to the Monitor and Plaintiffs the results of the reviews conducted during the period, and shall develop and implement a corrective action plan, as appropriate, to address the findings.

4. The review process set forth in Sections XIV.F.1 and XIV.F.2 above shall be repeated every 90 days until all special reviews are completed. The Monitor may, upon DHS's request and after consultation with Plaintiffs, terminate the requirement for completing any or all categories of special reviews, upon finding that either (a) DHS has developed sufficient, generally useful information as a result of these reviews, and further special review of individual cases is unlikely to provide significant benefit, or (b) because of DHS's implementation of other relevant sections of this Agreement, such reviews are no longer necessary.

G. <u>Fatality Reviews</u>: DHS shall ensure that a review, conducted by qualified and competent individuals and independent of the county in which the fatality occurred, has been conducted, and the findings and recommendations of that review conveyed to the Monitor and Plaintiffs, of each child who died while in the foster care custody of DHS, as follows:

1.    For such children who died during the three-year period ending March 31, 2008, no later than November 15, 2008;

2.    For child fatalities occurring after March 31, 2008, within six months of the date of death.

Findings and recommendations of these reviews will be incorporated into all relevant QA activities, program improvement, contract agency oversight, and other related policies and practices.

## XV.   IMPLEMENTATION PLAN

No later than December 15, 2008, DHS will develop a detailed implementation plan, approved by Plaintiffs and the Monitor, that will become part of this Agreement and fully enforceable. The implementation plan will set forth the steps, timetables, and persons responsible by which DHS will achieve compliance with the terms of this Agreement.  The parties will review this implementation plan on an annual basis to determine whether modifications are necessary to ensure that DHS achieve compliance in the manner and within the time periods contained in this Agreement.

## XVI.  NAMED PLAINTIFFS

A.  DHS will provide Plaintiffs' counsel with regular quarterly updates of the individual Named Plaintiffs' case records until such time as the Named Plaintiffs are no longer in DHS foster care custody.  Within 30 days of the Court's approval of this Agreement, and each quarter thereafter, the parties will meet and confer in good faith regarding the Named Plaintiffs' case plans and the placements and services provided to the Named Plaintiffs, and attempt to agree on necessary services and plans.  In the

event the parties cannot agree on such services and plans, the issue shall be referred to the Monitor for resolution.

B. In addition to the case record updates described above, DHS will provide Plaintiffs' counsel with prior notification, if possible, and if not possible, with notification as soon as practicable, of any significant events or developments concerning the Named Plaintiffs, including but not limited to any change in placement, services, permanency goal, or permanency plans; and any allegations of abuse or neglect involving any of the Named Plaintiffs or occurring in their placement(s). Plaintiffs may meet and confer in good faith with DHS regarding these events and developments. In the event the parties cannot agree on the actions to be taken with respect to such events or developments, the issue shall be referred to the Monitor for resolution. If there is no monitor for any reason, the issue will be referred to the Court.

C. Nothing in this section shall be read to waive or preclude any and all individual damages claims by Plaintiff class members, including the Named Plaintiffs.

## XVII.  MONITORING

A. The parties agree that Kevin M. Ryan shall be the Monitor of DHS's compliance with the terms of this Agreement.

B. Neither party, nor any employee or agent of either party, shall have any supervisory authority over the Monitor's activities, reports, findings, or recommendations. The retention of the Monitor shall be conducted solely pursuant to the procedures set forth in this Agreement and will not be governed by any formal or legal procurement requirements. The Monitor shall hire such staff as the Monitor deems necessary to discharge his or her responsibilities under this Agreement.

C. The Monitor shall have free and complete access to records maintained by DHS, its divisions and any successor agencies or divisions, and by its contract providers. The

Monitor shall also have free and complete access to the staff of DHS; its divisions and any successor agencies or divisions; persons within the executive branch; contract providers; children in the care of DHS and of contract providers; and other individuals that the Monitor deems relevant to his or her work. DHS shall direct all employees and contract providers to cooperate fully with the Monitor and shall assist the Monitor in gaining free access to other stakeholders in the child welfare system. All non-public information obtained by the Monitor shall be maintained in a confidential manner. In providing the public reports described in Sections XVII.H XVII.I and below, and consistent with applicable state and federal confidentiality requirements, the Monitor shall not identify public or private staff or agencies, except to the extent that such information about public or private staff and agencies has already been made public. Plaintiffs shall have access, through the Monitor, to all information made available to the Monitor, subject to the existing protective order in effect in this case.

D. The Monitor shall have the authority to conduct, or cause to be conducted, such case record reviews, qualitative reviews, and audits as the Monitor reasonably deems necessary. In order to avoid duplication and build capacity within the agency, DHS shall provide the Monitor with copies of all state-issued data reports regarding topics covered by this Agreement. Notwithstanding the existence of state data, data analysis or reports, the Monitor shall have the authority to prepare new reports on outcome measures and all other terms of this Agreement to the extent the Monitor deems necessary.

E. The Monitor and Plaintiffs shall receive, and the Monitor shall review (and, for data, verify the accuracy of) all written processes, programs, procedures, statements of work, formal analyses, system designs, and data reports developed pursuant to this Agreement. The Monitor shall take into account the timeliness, appropriateness, and quality of these work products in reporting on the State's compliance with the terms of this Agreement.

F. In addition to the requirements set forth in paragraph E above, the Monitor's duties shall be to: confirm independently the data reports and statistics provided pursuant to this Agreement; conduct independent case record or other qualitative reviews or audits; review and approve all plans, documents, and data reports agreed to be developed and produced by DHS pursuant to this Agreement; and report on DHS's progress in implementing the terms of this Agreement and the achievement of the outcomes set forth herein. The Monitor shall specifically review and approve, prior to implementation, the following specific products required by this Agreement:

1. The plan for training staff responsible for home studies and licensing, as set forth in Section VI.C;

2. The assessment and case planning process (to ensure that the processes provide the information necessary in high quality case planning) set forth in Section VII.A;

3. The process by which information from the TDM is provided to and utilized by the supervisors (to ensure that this process results in appropriate follow-up, effective on-going case supervision, and timely supervisory oversight of case plan implementation), set forth in Section VII.C;

4. Procedures by which a foster parent or CPA shall seek review of a Determination of Care or administrative rate decision, set forth in Section VIII.B.6;

5. The Needs Assessments set forth in Section IX;

6. The policies and procedures for use of psychotropic medications, set forth in Section XI.A;

7. Data reports for each of the outcome measures in this Agreement and for those other requirements of this Agreement for which the Monitor determines that automated reporting is reasonable and appropriate (in consultation with the parties);

8. The design of a permanency tracking system and associated reports, set forth in Section XIII.B;

9. The development and implementation of a statewide QA program, set forth in Section XIV;

10.    The special review plans set forth in Section XIV.F; and

11.    The Health Services Plan required to be developed pursuant to Section VIII.A.2.


G.  During Reporting Period Two, unless another timeframe is agreed upon by the parties, the Monitor shall provide the parties with a written monitoring plan setting forth the methodologies by which the Monitor will measure DHS's progress in implementing the terms of this Agreement and achieving the outcomes set forth herein.  Specifically, the Monitor's methodologies may include, but are not limited to, analyses of information collected: (a) by DHS's management and information systems if and when available and accurate; (b) from a review of relevant case records; (d) from the production of data aggregated by the Monitor or third parties; and (d) from interviews with DHS staff, resource families, class members or prior class members and their families, contract agency staff, service providers, and other Michigan child welfare stakeholders.  The Monitor shall make best efforts to specify the methods he or she will utilize to perform his or her duties as to each and every section of this Agreement.  The plan may be periodically revised by the Monitor, after consultation with the parties, particularly if and when DHS data becomes more available and accurate and when a QA unit becomes functional.  Nothing in this paragraph is intended to in any way limit the scope of the Monitor's access to information and individuals as otherwise set forth herein.

H.  For each Reporting Period, the Monitor will issue a report setting forth the measurable progress made by DHS in relation to each of the performance (process and outcome) requirements contained in this Agreement.  Reporting Period One will begin on October 1, 2008, and end on March 31, 2009.  Each subsequent Reporting Period (to be identified as "Reporting Period Two," "Reporting Period Three," and so forth in consecutive number sequence) shall be the six-month period of time beginning on the day following completion of the previous Reporting Period.  The end of each Reporting Period will coincide with the end of a federal reporting period.

I. The Monitor's reports, which shall be public documents, shall set forth DHS's levels of compliance with the outcome measures and processes set forth in this Agreement. The reports shall also set forth the steps taken by DHS, the reasonableness of these efforts, and the adequacy of support for the implementation of these steps; the quality of the work done by DHS in carrying out those steps; and the extent to which that work is producing the intended effects and/or the likelihood that the work will produce the intended effects. Such reports shall be issued every six months, unless the parties agree otherwise. The reports shall be provided to the parties in draft form for comment at least two weeks prior to formal issuance.

J. The intent of the parties is that the Monitor shall develop a plan to transfer the primary monitoring function to DHS's QA unit upon the termination of this Agreement, or at such earlier time as the parties may agree. The Monitor shall work in collaboration with DHS in building its QA capacity.

K. The parties may request that the Monitor review and issue recommendations regarding the provision of services to the Named Plaintiffs in this case.

L. The Monitor shall not express any conclusions as to whether DHS has reached legal compliance on any item or items.

M. If at any time the Monitor can no longer serve, the parties shall agree on another Monitor, with input and recommendations from the outgoing Monitor.

N. DHS shall enter into a contract to secure the services of the Monitor. The Monitor shall have a budget and staff sufficient to allow the Monitor to carry out the responsibilities described in this Agreement, and may contract with such experts or consultants as he or she may deem appropriate, in consultation with the parties. Experts or consultants hired by the Monitor may initiate and receive *ex parte* communications with the parties.

O. Other than as expressly provided in this Agreement, this Agreement shall not be deemed a waiver of any privilege or right DHS may assert, including those recognized at common law and created by statute, rule, or regulation against any other person or entity with respect to the disclosure of any information.

P. The Monitor shall be permitted to engage in *ex parte* communications with all parties. The Monitor may periodically meet privately with the Court concerning issues related to this case, provided the parties are made aware of the occurrence of such a meeting.

Q. Unless such conflict is waived by the parties, the Monitor shall not accept employment or provide consulting services that would present a conflict of interest with the Monitor's responsibilities under this Agreement, including being retained (on a paid or unpaid basis) by any current or future litigant or claimant, or such litigant's or claimant's attorney, in connection with a claim or suit against the state of Michigan or its departments, officers, agents, or employees.

R. The Monitor is not a state or local agency or an agent thereof, and accordingly the records maintained by the Monitor shall not be deemed public records subject to public inspection. Neither the Monitor nor any person or entity hired or otherwise retained by the Monitor to assist in furthering any provision of this Agreement shall be liable for any claim, lawsuit, or demand arising out of the Monitor's good-faith performance pursuant to this Agreement. This paragraph does not apply to any proceeding before a court related to performance of contracts or subcontracts for monitoring this Agreement.

## XVIII. ENFORCEMENT, DISPUTE RESOLUTION, AND TERMINATION

A. This Agreement shall constitute the entire integrated Agreement of the parties. No prior or contemporaneous communications, oral or written, will be relevant or admissible for purposes of determining the meaning of any provisions herein in this matter or in any other proceeding.

B. In the event that Plaintiffs identify an area in which they believe DHS is not in substantial compliance with an enforceable provision of this Agreement:

1. Plaintiffs shall, prior to seeking judicial relief, notify DHS and the Monitor, in writing, of the compliance issue.

2. Within 15 calendar days of Plaintiffs' notification, DHS shall respond in writing to Plaintiffs and the Monitor as to what actions, if any, it proposes to take with regard to the issue of alleged non-compliance.

3. Regardless of whether DHS agrees with Plaintiffs' assertion of non-compliance, the parties shall meet with the Monitor within 15 calendar days of Plaintiffs' notice, unless otherwise agreed by the parties. The purpose of this meeting shall be for the parties to engage in good faith discussions facilitated by the Monitor to determine whether additional actions are necessary to address Plaintiffs' assertion of non-compliance. The parties shall engage in these facilitated dispute resolution discussions for a period not to exceed 30 calendar days, unless extended by mutual agreement of the parties.

4. If at the end of the 30-day period, or the period as extended by mutual agreement of the parties, Plaintiffs determine that judicial action is necessary, Plaintiffs may seek further relief from the Court.

5. To the extent that any non-compliance by DHS is in whole or in part attributable to DHS's organizational structure, changes in organizational structure shall be considered as among the elements of the corrective actions needed to correct the non-compliance.

6. If Plaintiffs believe that DHS has violated this Agreement and, as a result, have caused or are likely to cause immediate and irreparable harm to a child(ren) in DHS's foster care custody, they may seek emergency judicial relief. Before taking such action, however, Plaintiffs must give DHS written notice with respect to any such harm, including with such notice any documentation that Plaintiffs believe supports their decision to invoke the provisions of this paragraph. DHS will respond to this notice in writing

within three business days.  The parties must then invoke the provisions in Sections XVIII.B.1-5 above, provided that the entire process shall be completed within 10 business days of DHS's response to Plaintiffs' notice, unless extended by mutual agreement of the parties.

C.  This Agreement shall terminate upon the finding by the Court that DHS has achieved compliance with all terms of the Agreement and has remained in compliance with those terms for a period of 18 months.  The burden shall be on DHS to demonstrate compliance.

D.  DHS shall maintain sufficient records to document its compliance with all of the requirements of this Agreement.  During the period of this Agreement, DHS shall maintain any and all records required by or developed under this Agreement.

E.  The parties agree to defend the provisions of this Agreement.  The parties shall notify each other of any court challenge to this Agreement.  In the event any provision of this Agreement is challenged in any local or state court, the party(ies) affected shall remove the matter to a Michigan federal court and seek consolidation with the present action.

F.  In the event that legislation currently known as the "Federal Consent Decree Fairness Act" is enacted into law, DHS agrees that it will not invoke their right under that Act to modify or vacate the consent decree resulting from this Agreement.  Nothing in this section limits DHS's ability to seek to modify or vacate the provisions of this Agreement under other law.

G.  This Agreement shall be binding on all successors, assignees, employees, agents and all those working for or on behalf of Plaintiffs and DHS.

## XIX. ATTORNEYS' FEES

For purposes of this Agreement, the parties acknowledge that Plaintiffs, as prevailing parties in this lawsuit, are entitled to recover and reserve the right to seek expenses of litigation, including reasonable attorneys' fees and nontaxable costs, pursuant to 42 U.S.C. § 1988 and Fed. R. Civ. P. 23(h).

**AGREED TO AND APPROVED FOR ENTRY BY:**

**FOR PLAINTIFFS:**

Marcia Robinson Lowry
Susan Lambiase
Sara M. Bartosz
Elissa Hendler
Gena E. Wiltsek
CHILDREN'S RIGHTS
330 Seventh Ave., Fourth Floor
New York, NY 10001
T: (212) 683-2210

Edward P. Leibensperger
Kevin M. Bolan
MCDERMOTT WILL & EMERY LLP
28 State Street
Boston, MA 02109
T: (617) 535-4000

Elizabeth Phelps Hardy
Noel D. Massie
Jay C. Boger
KIENBAUM OPPERWALL HARDY & PELTON, P.L.C.
280 North Old Woodward Avenue, Suite 400
Birmingham, MI 48009
T: (248) 645-0000

FOR DEFENDANTS:

_____
Jennifer M. Granholm, in her official capacity as
Governor of the State of Michigan


_____
Ismael Ahmed, in his official capacity as
Director of the Michigan Department of Human Services



_____
Michael G. Frezza, Assistant Attorney General
Michigan Department of Attorney General
3030 W. Grand Blvd. Suite 10-200
Detroit, MI 48202



SO ORDERED AND ADJUDGED, this the ____ day of _____, 2008.


                              _____
                              DISTRICT JUDGE

**FOR DEFENDANTS:**


Jennifer M. Granholm, in her official capacity as
Governor of the State of Michigan

Ismael Ahmed, in his official capacity as
Director of the Michigan Department of Human Services


Michael G. Frezza, Assistant Attorney General
Michigan Department of Attorney General
3030 W. Grand Blvd. Suite 10-200
Detroit, MI 48202


SO ORDERED AND ADJUDGED, this the _____ day of _____, 2008.


_____
DISTRICT JUDGE