# Progress of the Michigan Department of Human Services

Monitoring Report for *Dwayne B. v. Snyder*
IMPLEMENTATION, SUSTAINABILITY, AND EXIT PLAN

**ISSUED March 13, 2019**

ISEP 12 & 13
JANUARY TO DECEMBER 2017



PUBLIC CATALYST

# CONTENTS

Introduction ........................................................................................................................ 3

    Summary of Progress and Challenges ........................................................................ 4

    Summary of Commitments ........................................................................................ 7

    Methodology ............................................................................................................ 16

    Demographics .......................................................................................................... 16

Organizational Capacity ................................................................................................ 24

    Caseloads and Supervision ...................................................................................... 24

    Staff Training ............................................................................................................ 28

Accountability ................................................................................................................ 28

    Outcomes ................................................................................................................. 28

    Contract Oversight ................................................................................................... 32

    Quality Service Reviews .......................................................................................... 36

    Data Reporting ......................................................................................................... 38

Permanency .................................................................................................................... 40

    Developing Placement Resources for Children ....................................................... 40

    Placement Standards ............................................................................................... 47

    Case Planning and Practice ..................................................................................... 51

    Caseworker Visitation ............................................................................................. 52

Safety and Well-Being .................................................................................................... 57

    Responding to Reports of Abuse and Neglect ........................................................ 57

    Health and Mental Health ....................................................................................... 61

    Education .................................................................................................................. 70

Youth Transitioning to Adulthood ................................................................................. 71

    Extending Eligibility and Services ........................................................................... 71

    Immediate Actions for Youth Transitioning to Adulthood ...................................... 73

# FIGURES

Figure 1. Age of Children in Custody on June 30, 2017 ............................................................... 17
Figure 2. Placement Types of Children in Custody on June 30, 2017 ......................................... 18
Figure 3. Length of Stay in Care of Children in Custody on June 30, 2017 ................................ 19
Figure 4. Age of Children in Custody on December 31, 2017 ..................................................... 21
Figure 5. Placement Types of Children in Custody on December 31, 2017 ................................ 22
Figure 6. Length of Stay in Care of Children in Custody on December 31, 2017 ....................... 23
Figure 7. Placement Type of Children in Care and Substantiated MIC Victims in FFY2017 ...................... 31

# TABLES

Table 1. Race of Children in Custody on June 30, 2017 .............................................................. 17
Table 2. Exits from Care by Exit Type, January 1, 2017 to June 30, 2017 ................................. 19
Table 3. Federal Goals for Children in Custody as of June 30, 2017 .......................................... 20
Table 4. Race of Children in Custody on December 31, 2017..................................................... 21
Table 5. Exits from Care by Exit Type, July 1, 2017 to December 31, 2017 .............................. 23
Table 6. Federal Goals for Children in Custody as of December 31, 2017.................................. 24
Table 7. DHHS Employees on Leave and Carrying Cases, 2017 ................................................ 27
Table 8. Nonrelative Foster Homes Licensed, FY2017.............................................................. 41
Table 9. ISEP 12 Performance on Worker-Child Visitation ....................................................... 54
Table 10. ISEP 13 Performance on Worker-Child Visitation ..................................................... 55
Table 11. ISEP 12 Performance on Worker-Parent Visitation.................................................... 56
Table 12. ISEP 13 Performance on Worker-Parent Visitation.................................................... 56
Table 13. ISEP 12 Performance on Health Requirements 6.45, 6.46, 6.48, 6.49, & 6.50 .......... 62
Table 14. ISEP 13 Performance on Health Requirements 6.45, 6.46, 6.48, 6.49, & 6.50 .......... 63

# APPENDICES

Appendix A. Dwayne B. Stipulated Order – May 23, 2018 ........................................................ 75
Appendix B. Age Range of Children in Care on June 30, 2017 by County ................................. 79
Appendix C. Length of Stay of Children in Care on June 30, 2017 By County ........................... 81
Appendix D. Age Range of Children in Care on December 31, 2017 by County ........................ 83
Appendix E. Length of Stay of Children in Care on December 31, 2017 By County ................... 85
Appendix F. Child and Family Services Review – Michigan Final Report 2018 ........................... 87

## Introduction

This document serves as the thirteenth report to the Honorable Nancy G. Edmunds of the United States District Court for the Eastern District of Michigan in the matter of *Dwayne B. v. Snyder*. This report reflects the status of Michigan's performance under the previous administration of Governor Snyder as of December 31, 2017. Covering Periods 12 and 13, this report includes performance for all of 2017. Period 12 covers January 1, 2017 to June 30, 2017, and period 13 covers July 1, 2017 to December 31, 2017. The periods were set forth in the Implementation, Sustainability, and Exit Plan (ISEP), which the State of Michigan and the Michigan Department of Health and Human Services (DHHS) and Children's Rights, counsel for the plaintiffs, jointly submitted to the court in February 2016. Judge Edmunds entered an order directing implementation of the ISEP, having previously approved an Initial Agreement among the parties on October 24, 2008, and a subsequent Modified Settlement Agreement on July 18, 2011.

In sum, the ISEP:

- Provides the plaintiff class relief by committing to specific improvements in DHHS' care for vulnerable children, with respect to their safety, permanency, and well-being;
- Requires the implementation of a comprehensive child welfare data and tracking system, with the goal of improving DHHS' ability to account for and manage its work with vulnerable children;
- Establishes benchmarks and performance standards that the State committed to meet in order to realize sustainable reform; and
- Provides a clear path for DHHS to exit court supervision after the successful achievement and maintenance of Performance Standards for each commitment agreed to by the parties in the ISEP.

Pursuant to the ISEP, the court appointed Kevin Ryan and Eileen Crummy of Public Catalyst to continue as the monitors, charged with reporting on DHHS' progress implementing its commitments. The monitors and their team are responsible for assessing the state's performance under the ISEP. The parties have agreed that the monitors shall take into account timeliness, appropriateness, and quality in reporting on DHHS' performance. Specifically, the ISEP provides that:

> "The monitors' reports shall set forth the steps taken by DHHS, the reasonableness of these efforts, and the adequacy of support for the implementation of these steps; the quality of the work done by DHHS in carrying out those steps; and the

extent to which that work is producing the intended effects and/or the likelihood that the work will produce the intended effects."

In the ISEP Period 11 report, the monitors recommended that two commitments exit the agreement, that one commitment move from the "To Be Maintained" section to the "Structures and Policies" section, and that seven commitments move from the "To Be Achieved" section to the "To Be Maintained" section as DHHS attained the required performance standard during ISEP 11. The court ordered the movement of these commitments on May 23, 2018.[1]

## Summary of Progress and Challenges

Michigan DHHS met required performance standards in 11 of 69 areas in ISEP Period 12, and 13 of 74 areas in ISEP Period 13. The ISEP includes numerous commitments that are important to children's safety which have still not taken hold. The monitoring team observes, in particular, these challenges:

- *Maltreatment in Care:* The data reflects 155 children in the class were abused or neglected in Federal Fiscal Year (FFY) 2017 by their caregivers. To meet the agreed-upon standard for child safety, DHHS should have protected at least 98 more of these children from abuse or neglect in placement.

- *Recurrence of Maltreatment:* The data reflects 1,270 children experienced repeat incidences of abuse or neglect during FFY2017, a large increase from the 1,008 children DHHS reported for FFY2016. To meet its agreed-upon standard for child safety, DHHS should have kept an additional 236 children safe.

- *Relative Licensing:* DHHS did not meet any of its relative licensure and support commitments in either Period 12 or 13. The agency's performance was so far below standard across the board, the lapses raise reasonable questions about agency leadership's intentions with respect to supporting and licensing its relative caregivers. For example, DHHS agreed that except for a direct placement of a child by court order into an unlicensed relative home, at least 80 percent of all relative caregivers must either hold a valid license or submit a license application to DHHS and not have had a child placed in their home for more than 180 days. During both Period 12 and 13, most relative homes were neither licensed nor awaiting resolution of their pending license applications. When placing a child with a relative who has not been previously licensed as a foster parent, DHHS shall visit the relative's home to determine if it is safe prior to placement; check law enforcement and central registry records for all adults residing in the home within 72 hours following placement; and complete a home study within 30 days. That only

---

[1] For full text of the court order, see Appendix A. Dwayne B. Stipulated Order – May 23, 2018.

happened in 28.9 percent of unlicensed relative placements in ISEP 12, and in 24.5 percent of unlicensed relative placements in ISEP 13. Like in all previous monitoring reports, this report documents that DHHS did not implement its promises to ensure that relative caregivers are adequately supported and licensed, absent exceptional circumstances documented in a waiver. For ISEP 13, for example, only 1.9 percent of relatives who chose to forego licensure at initial placement had waivers completed as required. This represents seven children out of 372 who were living in relative homes subject to the waiver provision. And too many of those homes were not given the resources and support necessary to strengthen child safety. This report recounts instances where children continued to be placed in homes where beds or cribs were not available and sleeping arrangements were inappropriate to the needs of the child, where guns and ammunition were not stored according to safety standards and where medications were left in areas accessible to children.

- *Emergency or Temporary Facilities:* The ISEP requires that no child shall be placed in an emergency or temporary facility more than one time in a 12-month period, unless exceptional circumstances exist, and no child experiencing a second emergency or temporary facility placement within one year may remain in an emergency or temporary facility for more than seven days. During ISEP 12, 50 children experienced 69 successive stays in shelter care but only three (4.3 percent) of these stays were compliant. DHHS did not meet the performance standard during ISEP 12. During ISEP 13, 30 children experienced 34 successive stays in shelter care. None of these stays were compliant with the terms of the ISEP.

- *Psychotropic Medication:* DHHS did not meet two of its commitments regarding psychotropic medication during either Period 12 or 13. Regarding the requirement to ensure that an informed parental/guardian consent is obtained and documented in writing for each child in DHHS custody who is prescribed psychotropic medication, valid consents were on file for only 65.3 percent of the medications in ISEP 12 and 68.9 percent of the medications in ISEP 13. DHHS also failed to ensure that essential information concerning the administration of psychotropic medications to children was documented in their case files. This includes names and dosages of prescribed medications, identified side effects, routine medication monitoring appointments, and ongoing testing or lab work specific to the prescribed medications. DHHS found that only 25.9 percent of case files were compliant with the documentation requirements during ISEP 12 and 30.6 percent of case files were compliant during ISEP 13.

- *Youth Transitioning to Adulthood*: The ISEP provides that if DHHS' performance falls below the floor performance standard for two consecutive reporting periods, the monitors have the discretion to return the commitment to Section 6 (To Be Achieved). Before doing so,

the monitors must afford DHHS the opportunity to provide information on the causes of the Department's performance change. With respect to DHHS' performance on provisions 5.2, 5.3, 5.6, and 5.7, all of which have fallen below the floor performance standard for the last four report periods, the monitors asked DHHS in April 2018 about the causes of the performance lapse. DHHS provided no information indicating that its low performance is the result of unforeseen or temporary circumstances not within the Department's control. Therefore, the monitors recommend to the court and parties that these four commitments be moved to "To Be Achieved."

At the conclusion of ISEP 13, the monitoring team brings to the court's and the parties' attention several commitments eligible for movement based on DHHS' performance during the two periods:

- *Rolling Exit:* The ISEP allows that once DHHS' performance for certain commitments, as validated by the monitors, has been sustained at the designated performance standard for at least two consecutive reporting periods, the commitment is eligible for rolling exit from the agreement. Based on DHHS' performance in ISEP 12 and 13, two provisions meet these criteria: Education, Appropriate Education (6.36) and Education, Continuity (6.38). The monitors recommend to the court and the parties that these provisions exit the ISEP.

- *Structures and Policies:* The ISEP allows that once DHHS' performance for certain commitments, as validated by the monitors, has been sustained at the designated performance standard for at least two consecutive reporting periods, the commitment is eligible for movement to Section 4 of the ISEP (Structures and Policies), where it remains for the duration of court jurisdiction. Five commitments meet these criteria based on DHHS' performance in ISEP 11 and ISEP 12[2]: Health Care Liaison Officers (5.13); Licensing Worker Qualifications and Training (6.4); Treatment Foster Homes (6.11); Psychotropic Medication, Diagnosis (6.53); and Psychotropic Medication, Oversight Review (6.56). The monitors recommend to the court and the parties that these commitments be moved to "Structures and Policies."

---

[2] The monitors have included in this report DHHS' ISEP 13 performance for these five commitments as the Court has not yet determined they may move to Structures and Policies.

## Summary of Commitments

| Section | Commitment | Period 12 Percent | Period 12 Achieved | Period 13 Percent | Period 13 Achieved |
|---|---|---|---|---|---|
|  | **Commitments to Be Maintained** | | | | |
| 5.2 | DHHS will continue to implement policies and provide services to support youth transitioning to adulthood, including ensuring youth have been informed of services available through the Young Adult Voluntary Foster Care (YAVFC) program, as measured through a QAP. The designated performance standard is 90%.                    **Page 71** | 58.3% | No | 58.8% | No |
| 5.3 | DHHS will continue to implement policies and provide services to support youth transitioning to adulthood, including ensuring access to independent living services through age 20, as measured through a QAP. The designated performance standard is 90%.                    **Page 72** | 51.2% | No | 45.6% | No |
| 5.6 | DHHS will continue to implement policies and provide services to support youth transitioning to adulthood, including ensuring that all youth age 16 and older have a Family Team Meeting (FTM) occurring 90 days before planned discharge from care or within 30 days after an unexpected discharge, as measured through a QAP. The designated performance standard is 90%.                    **Page 73** | 26.7% | No | 23.7% | No |
| 5.7 | DHHS will continue to implement policies and provide services to support youth transitioning to adulthood, including ensuring that youth age 16 and older in foster care with a permanency goal of Another Planned Living Arrangement, Another Planned Living Arrangement – Emancipation, or goal of adoption without an identified family have access to the range of supportive services necessary to support their preparation for and successful transition to adulthood, as measured through a QAP. The designated performance standard is 90%.                    **Page 73** | 54.1% | No | 53.4% | No |
| 5.12 | DHHS shall conduct contract evaluations of all CCIs and private CPAs providing placements and services to Plaintiffs to ensure, among other things, the safety and well-being of Plaintiffs and to ensure that the CCI or private CPA is complying with the applicable terms of this Agreement.                    **Page 32** | | No | | Yes |
| 5.13 | DHHS shall maintain at least 34 Health Liaison Officers (HLOs).                    **Page 65** | | Yes | | No |
| 6.4 | DHHS shall continue to train licensing workers in accordance with the 3.5.09 plan approved by the Monitors. The designated performance standard is 95%.                    **Page 28** | 97.1% | Yes | 98.7% | Yes |
| 6.11 | At any given time, DHHS shall have at least 200 treatment foster home beds.                    **Page 69** | | Yes | | Yes |

| Section | Commitment | Period 12 Percent | Period 12 Achieved | Period 13 Percent | Period 13 Achieved |
|---|---|---|---|---|---|
| 6.20 | DHHS shall commence all investigations of report of child abuse or neglect within the timeframes required by state law. The designated performance standard is 95%. **Page 57** | 92.3% | No | 93.3% | No |
| 6.26 | 95% of CPS caseworkers assigned to investigate allegations of abuse or neglect, including maltreatment in care, shall have a caseload of no more than 12 open investigations. **Page 25** | 98.1% | Yes | 95.9% | Yes |
| 6.27 | 95% of CPS caseworkers assigned to provide ongoing services shall have a caseload of no more than 17 families. **Page 26** | 97.5% | Yes | 96.3% | Yes |
| 6.28 | 95% of POS workers shall have a caseload of no more than 90 children. **Page 26** | 92.8% | No | 95.5% | Yes |
| 6.29 | 95% of licensing workers shall have a workload of no more than 30 licensed foster homes or homes pending licensure. **Page 27** | 94.1% | No, but very close | 94.1% | No, but very close |
| 6.33 | Assessments and service plans shall be of sufficient breadth and quality to usefully inform case planning and shall accord with the requirements of 42 U.S.C. 675(1). To be measured through a QSR. The designated performance standard is 83%. **Page 36** | 83.3% | Yes | 75.0% | No |
| 6.34 | DHHS shall ensure that the services identified in the service plan are made available in a timely and appropriate manner to the child and family, and shall monitor the provision of services to determine whether they are of appropriate quality and are having the intended effect. To be measured through a QSR. The designated performance standard is 83%. **Page 36** | 70.4% | No | 75.0% | No |
| 6.35 | All uses of seclusion or isolation in CCIs shall be reported to DCWL for appropriate action. **Page 35** | | No | | Yes |
| 6.36 | DHHS shall take reasonable steps to ensure that school-aged foster children receive an education appropriate to their needs. To be measured through a QSR. The designated performance standard is 83%. **Page 37** | 85.7% | Yes | 90.9% | Yes |
| 6.37 | DHHS shall take reasonable steps to ensure that school-aged foster children are registered for and attending school within five days of initial placement or any placement change, including while placed in child care institutions (CCIs) or emergency placements. To be measured through a QAP. The designated performance standard is 90%. **Page 70** | 84.2% | No | 89.3% | No, but very close |
| 6.38 | DHHS shall make reasonable efforts to ensure the continuity of a child's educational experience by keeping the child in a familiar or current school and neighborhood, when this in the child's best interests and feasible, and by limiting the number of school changes the child experiences. To be measured through a QSR. The designated performance standard is 83%. **Page 38** | 83.3% | Yes | 92.9% | Yes |

| Section | Commitment | Period 12 Percent | Period 12 Achieved | Period 13 Percent | Period 13 Achieved |
|---|---|---|---|---|---|
| **6.53** | Prior to initiating each prescription for psychotropic medication, the child must have a mental health assessment with a current DSM-based psychiatric diagnosis of the mental health disorder. The designated performance standard is 97%. **Page 67** | 99.9% | Yes | 99.9% | Yes |
| **6.56** | DHHS shall ensure that a qualified physician completes and documents an oversight review of a child whenever one or more of the criteria listed in the "Psychotropic Medication Oversight" section of DHHS Policy FOM 802-1 or any successor policy approved by the Monitors are met. To be measured through a QAP. The designated performance standard is 97%. **Page 69** | 100% | Yes | 100% | Yes |
| | **To Be Achieved** | | | | |
| **6.1** | DHHS shall ensure that of all children who were victims of a substantiated or indicated maltreatment allegation during the first six months of the applicable reporting period, at least 94.6% were not victims of another substantiated or indicated maltreatment allegation within a six-month period. **Page 29** | | | 93.4% DHHS should have kept an additional 236 children safe | No |
| **6.2** | DHHS shall ensure that of all children in foster care during the period, at least 99.68% were not victims of substantiated or indicated maltreatment by a foster parent or facility staff member. **Page 29** | | | 99.13% DHHS should have protected at least 98 more children from abuse or neglect | No |
| **6.3** | DHHS shall achieve an observed performance of at least the national standard (40.5%) on CFSR Round Three Permanency Indicator One (Of all children entering foster care in a 12-month period, what percent discharged to permanency within 12 months of entering foster care?) **Page 31** | | | 29.9% | No |
| **6.5** | DHHS will maintain a sufficient number and array of homes capable of serving the needs of the foster care population, including a sufficient number of available placements for adolescents, sibling groups, and children with disabilities. In consultation with the Monitors, DHHS will develop for each county an annual recruitment plan with foster home targets based on need and number of children in care, including targets for special populations. DHHS will implement said plan upon further input from and consultation with the Monitors. **Page 40** | | | | No |

9

| Section | Commitment | Period 12 Percent | Period 12 Achieved | Period 13 Percent | Period 13 Achieved |
|---|---|---|---|---|---|
| 6.6 | DHHS shall develop a placement process in each county that ensures that a child entering foster care for whom a suitable relative foster home placement is not available is placed in the foster home that is the best available match for that child, irrespective of whether that foster home is a DHHS or private CPA-operated foster home. **Page 42** | | No | | No |
| 6.7 | Children in the foster care custody of DHHS shall be placed only in a licensed foster home, a licensed facility, pursuant to an order of the court, or an unlicensed relative with a waiver. The designated performance standard is 100%. **Page 46** | 58.9% | No | 58.6% | No |
| 6.8 | No child in DHHS foster care custody shall be placed by DHHS or with knowledge of DHHS, in a jail, correctional, or detention facility unless such child is being placed pursuant to a delinquency charge. The designated performance standard is 100%. **Page 47** | 96.4% | No | 89.7% | No |
| 6.9 | DHHS shall place all children within a 75-mile radius of the home from which the child entered custody unless specified exceptions are met. The designated performance standard is 95%. **Page 48** | 91.5% | No | 91.5% | No |
| 6.10.a | Siblings who enter placement at or near the same time shall be placed together unless specified exceptions are met. The designated performance standard is 90%. **Page 48** | 67.5% | No | 65.9% | No |
| 6.10.b | If a sibling group is separated at any time, except for the above reasons, the case manager shall make immediate efforts to locate or recruit a family in whose home the siblings can be reunited. These efforts shall be documented and maintained in the case file and shall be reassessed on a quarterly basis. Compliance will be measured through a QAP. The designated performance standard is 90%. **Page 49** | 72.5% | No | 63.5% | No |
| 6.12 | No child shall be placed in a foster home if that placement will result in: (1) more than three foster children in that foster home, (2) a total of six children, including the foster family's birth and adopted children, or (3) more than three children under the age of three residing in that foster home. The designated performance standard is 100%. **Page 50** | 86.0% | No | 88.7% | No |
| 6.13 | Children shall not remain in emergency or temporary facilities, including but not limited to shelter care, for a period in excess of 30 days, unless specified exceptions apply. No child shall remain in a shelter in excess of 60 days. The designated performance standard is 95%. **Page 50** | 68.4% | No | 63.2% | No |

| Section | Commitment | Period 12 Percent | Period 12 Achieved | Period 13 Percent | Period 13 Achieved |
|---------|-----------|-------------------|--------------------|-------------------|--------------------|
| **6.14** | Children shall not be placed in an emergency or temporary facility, including but not limited to shelter care, more than one time within a 12-month period, unless specified exceptions apply. No child experiencing a second or greater emergency or temporary-facility within one year may remain in an emergency or temporary facility for more than seven days. The designated performance standard is 97%.   **Page 50** | 4.3% | No | 0.0% | No |
| **6.15** | No child shall be placed in a CCI unless specified requirements are met. The initial placement of a child into a CCI must be approved by the County Director, or in a Designated County, a county-level child welfare Administrator and then reassessed every 90 days. No child shall be placed in a residential placement for more than six months without the express authorization of the County Director or, in a Designated County, a county-level child welfare Administrator. No child shall be placed in a residential placement for more than 12 months without the express authorization of the director of Child Welfare Field Operations or the director's manager designee. The designated performance standard is 97%.   **Page 51** | 28.3% | No | 31.3% | No |
| **6.16** | When placing a child with a relative who has not been previously licensed as a foster parent, DHHS shall visit the relative's home to determine if it is safe prior to placement; check law enforcement and central registry records for all adults residing in the home within 72 hours following placement; and complete a home study within 30 days. The designated performance standard is 95%.   **Page 42** | 28.9% | No | 24.5% | No |
| **6.17** | Relative caregivers will be licensed unless exceptional circumstances exist such that it is in the child's best interest to be placed with the relative despite the relative's desire to forgo licensing. Such circumstances must be documented in the case file and approved by the County Director or, in a designated county, a Child Welfare Administrator. The designated performance standard is 90%.   **Page 44** | 17.8% | No | 1.9% | No |
| **6.17** | DHHS must continue to use a form waiver letter, consistent with this commitment. This waiver must be re-signed by the relative caregiver annually and a copy must be placed in the child's file. The designated performance standard is 90%.   **Page 44** | 14.2% | No | 13.9% | No |
| **6.18** | DHHS must license at least 85% of newly licensed relative foster parents within 180 days of the date of placement.   **Page 45** | 26.6% | No | 30.1% | No |

| Section | Commitment | Period 12 Percent | Period 12 Achieved | Period 13 Percent | Period 13 Achieved |
|---|---|---|---|---|---|
| **6.19** | Except for a direct placement by court order into an unlicensed relative home, at least 80% of all relative caregivers must either (a) have submitted a license application to DHHS and not have a child placed in their home for more than 180 days, or (b) hold a valid license.                    **Page 46** | 38.2% | No | 37.6% | No |
| **6.21** | DHHS shall complete all investigations of reports of child abuse or neglect within the required timeframes. The designated performance standard is 90%.                    **Page 57** | 86.3% | No | 84.1% | No |
| **6.22.a** | DHHS shall investigate all allegations of abuse or neglect relating to any child in the foster care custody of DHHS. DHHS shall ensure that allegations of maltreatment in care are not inappropriately screened out for investigation. To be measured through a QAP. The designated performance standard is 95%.                    **Page 58** | 84.6% | No | 87.6% | No |
| **6.22.b** | When DHHS transfers a referral to another agency for investigation, DHHS will independently take appropriate action to ensure the safety and well-being of the child. To be measured through a QAP. The designated performance standard is 95%.                    **Page 60** | 54% | No | 55% | No |
| **6.23** | 95% of foster care, adoption, CPS, POS, and licensing supervisors shall be responsible for the supervision of no more than five caseworkers.                    **Page 24** | 85.6% | No | 88.1% | No |
| **6.24** | 95% of foster care workers shall have a caseload of no more than 15 children.                    **Page 25** | 87.9% | No | 90.5% | No |
| **6.25** | 95% of adoption caseworkers shall have a caseload of no more than 15 children.                    **Page 25** | 68.9% | No | 71.3% | No |
| **6.30** | Supervisors shall meet at least monthly with each assigned worker to review the status and progress of each case on the worker's caseload. Supervisors shall review and approve each service plan. The plan can be approved only after the supervisor has a face-to-face meeting with the worker, which can be the monthly meeting. The designated performance standard is 95%.                    **Page 51** | 74.1% (ISPs); 80.4% (USPs) | No | 79.1% (ISPs); 84.3% (USPs) | No |
| **6.31** | DHHS shall complete an Initial Service Plan (ISP), consisting of a written assessment of the child(ren)'s and family's strengths and needs and designed to inform decision-making about services and permanency planning, within 30 days after a child's entry into foster care. The designated performance standard is 95%.                    **Page 52** | 75.7% | No | 77.4% | No |
| **6.32** | For every child in foster care, DHHS shall complete an Updated Service Plan (USP) at least quarterly. The designated performance standard is 95%.                    **Page 52** | 84.4% | No | 84.4% | No |

| Section | Commitment | Period 12 Percent | Period 12 Achieved | Period 13 Percent | Period 13 Achieved |
|---------|-----------|-------------------|--------------------|-------------------|--------------------|
| **6.39.a** | Each child in foster care shall be visited by a caseworker at least twice per month during the child's first two months of placement in an initial or new placement. The designated performance standard is 95%. **Page 53** | 83.5% | No | 85.3% | No |
| **6.39.a** | Each child in foster care shall be visited by a caseworker at their placement location at least once per month during the child's first two months of placement in an initial or new placement. The designated performance standard is 95%. **Page 53** | 91.7% | No | 93.2% | No, but very close |
| **6.39.a** | Each child in foster care shall have at least one visit per month that includes a private meeting between the child and caseworker during the child's first two months of placement in an initial or new placement. The designated performance standard is 95%. **Page 53** | 91.5% | No | 93.4% | No, but very close |
| **6.39.b** | Each child in foster care shall be visited by a caseworker at least once per month. The designated performance standard is 95%. **Page 53** | 96.4% | Yes | 96.6% | Yes |
| **6.39.b** | Each child in foster care shall be visited by a caseworker at their placement location at least once per month. The designated performance standard is 95%. **Page 53** | 94.9% | Yes | 95.3% | Yes |
| **6.39.b** | Each child in foster care shall have at least one visit per month that includes a private meeting between the child and caseworker. The designated performance standard is 95%. **Page 53** | 93.2% | No | 94.4% | No, but very close |
| **6.40.a** | Caseworkers shall visit parents of children with a goal of reunification at least twice during the first month of placement. The designated performance standard is 85%. **Page 55** | 70.9% | No | 70.2% | No |
| **6.40.a** | Caseworkers shall visit parents of children with a goal of reunification at least once in the parent's home during the first month of placement. The designated performance standard is 85%. **Page 55** | 43.6% | No | 45.8% | No |
| **6.40.b** | Caseworkers shall visit parents of children with a goal of reunification at least once a month, following the child's first month of placement. The designated performance standard is 85%. **Page 55** | 61.3% | No | 64.4% | No |
| 6.41 | DHHS shall ensure that children in foster care with a goal of reunification shall have at least twice-monthly visitation with their parents. The designated performance standard is 85%. **Page 56** | 57.0% | No | 62.5% | No |
| 6.42 | DHHS shall ensure that children in foster care who have siblings in custody with whom they are not placed shall have at least monthly visits with their siblings who are placed elsewhere in DHHS foster care custody. The designated performance standard is 85%. **Page 53** | DHHS is unable to produce data | No | DHHS is unable to produce data | No |

| Section | Commitment | Period 12 Percent | Period 12 Achieved | Period 13 Percent | Period 13 Achieved |
|---------|-----------|-------------------|--------------------|--------------------|--------------------|
| **6.43** | At least 85% of children shall have an initial medical and mental health examination within 30 days of the child's entry into foster care. **Page 63** | 80.8% | No | 84.4% | No |
| **6.43** | At least 95% of children shall have an initial medical and mental health examination within 45 days of the child's entry into foster care. **Page 63** | 86.4% | No | 90.3% | No |
| **6.44** | At least 90% of children shall have an initial dental examination within 90 days of the child's entry into care unless the child has had an exam within six months prior to placement or the child is less than four years of age. **Page 64** | 76.6% | No | 75.1% | No |
| **6.45** | For children in DHHS custody for three months or less at the time of measurement: DHHS shall ensure that 95% of children in this category receive any necessary immunizations according to the guidelines set forth by the American Academy of Pediatrics within three months of entry into care. To be measured through a QAP. **Page 61** | 89.7% | No | 89.8% | No |
| **6.46** | For children in DHHS custody longer than three months at the time of measurement: DHHS shall ensure that 95% of children in this category receive all required immunizations according to the guidelines set forth by the American Academy of Pediatrics. To be measured through a QAP. **Page 61** | 91.6% | No | 87.9% | No |
| **6.47** | Following an initial medical, dental, or mental health examination, at least 95% of children shall receive periodic and ongoing medical, dental, and mental health care examinations and screenings, according to the guidelines set forth by the American Academy of Pediatrics. **Page 64** | 62.2% (well-child); 84.6% (medical); 83.7% (dental) | No | 65.8% (well-child); 87.0% (medical); 86.7% (dental) | No |
| **6.48** | DHHS shall maintain an up-to-date medical file for each child in care containing the information required by DHHS Policy FOM 722-05 or any successor policy approved by the Monitors. To be measured through a QAP. The designated performance standard is 95%. **Page 61** | 47.3% | No | 36.6% | No |
| **6.49** | At the time a child is placed or re-placed, the foster care provider shall receive the child's Medical Passport, which must contain the information required by MCL 722.954c(2) and DHHS Policy FOM 801. To be measured through a QAP. The designated performance standard is 95%. **Page 61** | 5.1% | No | 4.4% | No |
| **6.50** | DHHS shall provide case service plans containing the information required by DHHS policy FOM 801 (Medical, Dental, and Mental Health Consent). To be measured through a QAP. The designated performance standard is 95%. **Page 61** | 33.8% | No | 27.6% | No |
| **6.51** | DHHS shall ensure that at least 95% of children have access to medical coverage within 30 days of entry into foster care by providing the placement provider with a Medicaid card or an alternative verification of the child's Medicaid status and Medicaid number as soon as it is available. **Page 64** | 88.4% | No | 89.8% | No |

14

| Section | Commitment | Period 12 Percent | Period 12 Achieved | Period 13 Percent | Period 13 Achieved |
|---------|------------|-------------------|--------------------|--------------------|--------------------|
| **6.52** | DHHS shall ensure that at least 95% of children have access to medical coverage within 24 hours or the next business day following subsequent placement by providing the placement provider a Medicaid card or an alternative verification of the child's Medicaid status and Medicaid number as soon as it is available.                                   **Page 65** | 83.1% | No | 81.5% | No |
| **6.54** | DHHS shall ensure that informed consent is obtained and documented in writing in connection with each psychotropic medication prescribed to each child in DHHS custody. The designated performance standard is 97%.                     **Page 67** | 65.3% | No | 68.9% | No |
| **6.55** | DHHS shall ensure that the administration of psychotropic medication to children in DHHS custody is documented in accordance with the "Documentation" section in DHHS Policy FOM 802-1 or any successor plan approved by the Monitors. The designated performance standard is 97%.             **Page 68** | 25.9% | No | 30.6% | No |
| **6.57** | DHHS shall continue to generate from automated systems and other data collection methods accurate and timely data reports and information until the full implementation of MiSACWIS. DHHS shall generate from MiSACWIS accurate and timely reports and information regarding the requirements and outcome measures set forth in this Agreement.    **Page 38** | | No, but meaningful improve-ment from prior periods | | No, but meaningful improve-ment from prior periods |

## Methodology

To prepare this report, the monitoring team conducted a series of verification activities. These included: meetings with DHHS leadership, private agency leadership, and plaintiffs' counsel; visits to local child welfare offices and private agencies; focus groups with former foster youth; and extensive reviews of thousands of individual children's records and other data and information. The monitoring team also conducted joint verification activities with DHHS that included participation in two Quality Service Reviews (QSRs) and one Quality Assurance Process (QAP). The QSRs covered seven counties and included: 1) interviews with DHHS stakeholders such as judiciary staff, guardians ad litem, foster parents, service providers, caseworkers, and supervisors; and 2) case specific interviews with individuals involved in case decision making, including children, parents, caregivers, caseworkers, teachers, and therapists. The monitoring team interviewed staff and supervisors across the state and talked to public and private managers about the pace, progress, and challenges of the reform work. The monitoring team also reviewed and analyzed a wide range of aggregate and detail data produced by DHHS, and reviewed policies, memos, and other internal information relevant to DHHS' work during the periods. To verify information produced by DHHS, the monitoring team conducted field-based interviews, cross-data validation, and case record reviews. The monitoring team reviewed over approximately 3,500 distinct reports from DHHS including QAP material, individual case records, Division of Child Welfare Licensing (DCWL) reports, and CPS referrals and investigations.

## Demographics

### ISEP 12

DHHS produced demographic data from January 1, 2017 to June 30, 2017. DHHS data indicate that there were 12,085 children in custody as of June 30, 2017. Of the children and youth in care on June 30, 2017, 312 youth were enrolled in the YAVFC program. During the reporting period, 3,268 children and youth were placed in foster care and 3,179 children and youth exited care.[3] DHHS served 14,882 children during the period.[4] Though young children aged zero to six years make up the largest portion (5,934 or 49 percent), Michigan continues to have a large population of older youth in custody. Twenty-four percent (2,867) are 12 to 17 years of age and five percent (650) are 18 years and over, as detailed in Figure 1.

---

[3] The monitoring team identified 14 children who appear twice in the entry cohort file (0.4 percent of the 3,282 entries). Each child appearing twice in the file entered foster care more than once during the reporting period. The monitoring team also identified nine children who appeared twice in the exit cohort file (0.3 percent of 3,188 entries). All children appearing twice in the exit cohort file correspond to children or youth who exited foster care two times during the reporting period.

[4] The monitoring team identified 93 children who appeared twice in the during cohort file (0.6 percent of 14,975). All children appearing twice in the "during" cohort were served more than once during the reporting period.

**Figure 1. Age of Children in Custody on June 30, 2017**
*n=12,085*



With regard to gender, the population is about equally split—50.4 percent male and 49.6 percent female. With regard to race, the population of children was 30 percent African-American, 55 percent White, one percent Native American, under one percent Asian, and under one percent Native Hawaiian or Pacific Islander. Additionally, 14 percent of children reported being of mixed race. Eight percent of children were identified with Hispanic ethnicity and can be of any race. The data indicated that DHHS was unable to determine the race of less than one percent of children in care on June 30, 2017.

**Table 1. Race of Children in Custody on June 30, 2017[5]**

| Race | Count | Percent |
|------|-------|---------|
| White | 6,610 | 55% |
| Black/African American | 3,640 | 30% |
| Mixed Race | 1,742 | 14% |
| Native American | 64 | 1% |
| Unable to Determine | 11 | 0.1% |
| Asian | 13 | 0.1% |
| Native Hawaiian, Pacific Islander | 5 | 0.04% |
| **Total** | **12,085** | **100%** |
| Hispanic ethnicity and of any race | 974 | 8% |

Note: Percentages do not add up to 100 due to rounding.

---

[5] Children with "Unable to Determine" and "No Match Found" entered as their race are pooled together in the "Unable to Determine" row.

As the following figure demonstrates, 86 percent of children in DHHS' custody live in family settings, including relatives (36 percent), foster families (37 percent), with their own parents (9 percent), in homes that intend to adopt (2 percent) and in homes of unrelated care givers (3 percent). Of children in custody, 1,158 (10 percent) live in institutional settings, including residential treatment and other congregate care facilities. Another 274 children (2 percent) reside in independent living placements, which serve youth on the cusp of aging-out of care. The remaining two percent reside in other settings, are AWOL, or were in unidentified placements.

**Figure 2. Placement Types of Children in Custody on June 30, 2017**
*n=12,085*



Of the children in care on June 30, 2017, 48 percent were in care less than one year, while 12 percent were in for more than three years.

**Figure 3. Length of Stay in Care of Children in Custody on June 30, 2017**
*n= 12,085*



**Table 2. Exits from Care by Exit Type, January 1, 2017 to June 30, 2017**

| Exit Type | Frequency | Percent |
|---|---|---|
| Reunification | 1,458 | 46% |
| Adoption | 1,017 | 32% |
| No match found[6] | 229 | 7% |
| Emancipation | 217 | 7% |
| Guardianship | 180 | 6% |
| Transfer to another agency | 27 | 1% |
| Living with relatives | 26 | 1% |
| Runaway | 16 | 1% |
| Death of a child | 9 | 0.3% |
| **Total** | **3,179** | **100%** |

Note: Percentages do not add up to 100 due to rounding.

---

[6] The data on exit type is "no match found" when a query to MiSACWIS data warehouse does not find a matching code. DHHS reports that this happens when new codes are introduced into MiSACWIS and these codes have not yet been added into the warehouse tables. DHHS is examining the query and the codes in MiSACWIS to ensure that exit types match for future reporting.

As the table below demonstrates, of the children in custody on June 30, 2017, the majority (8,543 or 71 percent) had reunification as a federal goal. For the remaining children, 2,844 (24 percent) had a goal of adoption, 549 (5 percent) had a goal of APPLA, 104 (1 percent) had a goal of guardianship, and 45 (0.4 percent) had placement with a relative as a federal goal. There were no children with missing federal goal codes.

**Table 3. Federal Goals for Children in Custody as of June 30, 2017[7]**

| Federal Goal | No. | Percent |
|---|---|---|
| Reunification | 8,543 | 71% |
| Adoption | 2,844 | 24% |
| APPLA | 549 | 5% |
| Guardianship | 104 | 1% |
| Relative | 45 | 0.4% |
| Total | 12,085 | 100% |

Note: Percentages do not add up to 100 due to rounding.

### ISEP 13

DHHS produced demographic data from July 1, 2017 to December 31, 2017. DHHS data indicate that there were 12,347 children in custody as of December 31, 2017. Of the children and youth in care on December 31, 2017, 276 youth were enrolled in the YAVFC program. During the reporting period, 3,203 children and youth were placed in foster care and 2,942 children and youth exited care.[8] DHHS served 15,209 children during the period.[9] Though young children aged zero to six years make up the largest portion (6,079 or 49 percent), Michigan continues to have a large population of older youth in custody. Twenty-four percent (2,934) are 12 to 17 years of age and five percent (634) are 18 years and over, as detailed in Figure 4.

---

[7] Children with a federal goal of APPLA and APPLA-E are pooled together for the "APPLA" row.

[8] The monitoring team identified four children who appear twice in the entry cohort file (0.1 percent of the 3,207 entries). Each child appearing twice in the file entered foster care more than once during the reporting period. The monitoring team also identified two children who appeared twice in the exit cohort file (0.1 percent of 2,944 entries). All children appearing twice in the exit cohort file correspond to children or youth who exited foster care two times during the reporting period.

[9] The monitoring team identified 85 children who appeared twice in the "during" cohort file (0.6 percent of 15,294). All children appearing twice in the "during" cohort were served more than once during the reporting period.

**Figure 4. Age of Children in Custody on December 31, 2017**
*n=12,347*



With regard to gender, the population is about equally split—50.5 percent male and 49.5 percent female. With regard to race, the population of children was 31 percent African-American, 54 percent White, one percent Native American, under one percent Asian, and under one percent Native Hawaiian or Pacific Islander. Additionally, 14 percent of children reported being of mixed race. Eight percent of children were identified with Hispanic ethnicity and can be of any race. The data indicated that DHHS was unable to determine the race of less than one percent of children in care on December 31, 2017.

**Table 4. Race of Children in Custody on December 31, 2017[10]**

| Race | Count | Percent |
|---|---|---|
| White | 6,673 | 54% |
| Black/African American | 3,803 | 31% |
| Mixed Race | 1,777 | 14% |
| Native American | 67 | 1% |
| Unable to Determine | 10 | 0.1% |
| Asian | 12 | 0.1% |
| Native Hawaiian, Pacific Islander | 5 | 0.04% |
| **Total** | **12,347** | **100%** |
| Hispanic ethnicity and of any race | 942 | 8% |

Note: Percentages do not add up to 100 due to rounding.

---

[10] Children with "Unable to Determine" and "No Match Found" entered as their race are pooled together in the "Unable to Determine" row.

As the following figure demonstrates, 86 percent of children in DHHS' custody live in family settings, including relatives (36 percent), foster families (37 percent), with their own parents (9 percent), in homes that intend to adopt (2 percent) and in homes of unrelated care givers (3 percent). Of children in custody, 1,200 (10 percent) live in institutional settings, including residential treatment and other congregate care facilities. Another 261 children (2 percent) reside in independent living placements, which serve youth on the cusp of aging-out of care. The remaining two percent reside in other settings, are AWOL, or were in unidentified placements.

**Figure 5. Placement Types of Children in Custody on December 31, 2017**
*n=12,347*



Of the children in care on December 31, 2017, 47 percent were in care less than one year, while 11 percent were in for more than three years.

**Figure 6. Length of Stay in Care of Children in Custody on December 31, 2017**
*n= 12,347*



**Table 5. Exits from Care by Exit Type, July 1, 2017 to December 31, 2017**

| Exit Type | Frequency | Percent |
|---|---|---|
| Reunification | 1,360 | 46% |
| Adoption | 981 | 33% |
| Emancipation | 299 | 10% |
| Guardianship | 192 | 7% |
| Living with relatives | 47 | 2% |
| Transfer to another agency | 32 | 1% |
| Age | 10 | 0.3% |
| Death of a child | 7 | 0.2% |
| Runaway | 7 | 0.2% |
| Other | 4 | 0.1% |
| Terminated court jurisdiction | 3 | 0.1% |
| **Total** | **2,942** | **100%** |

Note: Percentages do not add up to 100 due to rounding.

As the table below demonstrates, of the children in custody on December 31, 2017, the majority (8,799 or 71 percent) had reunification as a federal goal. For the remaining children, 2,892 (23 percent) had a goal of adoption, 513 (4 percent) had a goal of APPLA, 97 (1 percent) had a goal

of guardianship, and 46 (0.4 percent) had placement with a relative as a federal goal. There were no children with missing federal goal codes.

**Table 6. Federal Goals for Children in Custody as of December 31, 2017[11]**

| Federal Goal | No. | Percent |
|---|---|---|
| Reunification | 8,799 | 71% |
| Adoption | 2,892 | 23% |
| APPLA | 513 | 4% |
| Guardianship | 97 | 1% |
| Relative | 46 | 0.4% |
| **Total** | **12,347** | **100%** |

Note: Percentages do not add up to 100 due to rounding.

## Organizational Capacity

### Caseloads and Supervision

The ISEP sets forth caseload standards for staff and supervisors performing critical child welfare functions. The Plan states that caseload compliance will be measured by taking the average of three data reports each Reporting Period, prepared on the last work day of February, April, June, August, October and December. For ISEP 12, caseload counts from February 28th, April 28th and June 30th were utilized to determine compliance. For ISEP 13, caseload counts from August 31st, October 31st and December 28th were utilized to determine compliance.

*Supervisor Caseloads (6.23)*

DHHS agreed that full-time foster care, adoption, CPS, POS, and licensing supervisors, both public and private, would be responsible for no more than five caseload carrying staff each. An employee of DHHS or a private child placing agency that is non-caseload carrying will count as 0.5 toward the worker to supervisor ratio and administrative and technical support staff that support the supervisor's unit are not counted toward the worker to supervisor ratio. In addition, the supervisor methodology requires accounting for the practice among some of the private agencies of assigning both supervisory and direct caseload responsibilities to the same person, which requires pro-rating both supervisory and caseload performance for these hybrid supervisors. DHHS committed that 95 percent of supervisors would meet the ISEP caseload standard.

---

[11] Children with a federal goal of APPLA and APPLA-E are pooled together for the "APPLA" row.

### ISEP 12

During ISEP 12, DHHS averaged 85.6 percent of supervisors meeting the standard, missing the target.

### ISEP 13

For ISEP 13, DHHS averaged 88.1 percent of supervisors meeting the standard, missing the target.

*Foster Care Caseloads (6.24)*

DHHS agreed that full-time staff, public and private, solely engaged in foster care work, would be responsible for no more than 15 children each. Staff who perform foster care work as well as other functions are held to a pro-rated standard. The ISEP requires that 95 percent of staff engaged in foster care work meet the caseload standard.

### ISEP 12

DHHS averaged 87.9 percent of staff meeting the standard during ISEP 12, missing the target.

### ISEP 13

For ISEP 13, DHHS averaged 90.5 percent of staff meeting the standard, missing the target.

*Adoption Caseloads (6.25)*

DHHS agreed that full-time staff, public and private, solely engaged in adoption work would be responsible for no more than 15 children each. Staff who perform adoption work as well as other functions are held to a pro-rated standard. The ISEP requires that 95 percent of staff engaged in adoption work meet the caseload standard.

### ISEP 12

For ISEP 12, DHHS averaged 68.9 percent of staff meeting the standard, missing the target.

### ISEP 13

For ISEP 13, DHHS averaged 71.3 percent of staff meeting the standard, missing the target.

*Child Protective Services (CPS) Investigations Caseloads (6.26)*

DHHS agreed that full-time staff solely engaged in investigations would be responsible for no more than 12 open investigations. Staff who perform investigative work as well as other functions

are held to a pro-rated standard. The ISEP requires that 95 percent of staff engaged in CPS investigations work meet the caseload standard.

**ISEP 12**

For ISEP 12, DHHS averaged 98.1 percent of staff meeting the standard, exceeding the target.

**ISEP 13**

For ISEP 13, DHHS averaged 95.9 percent of staff meeting the standard, exceeding the target.

*CPS Ongoing Caseloads (6.27)*

DHHS agreed that full-time staff solely engaged in CPS ongoing services, a public-sector function, would be responsible for no more than 17 families each. Staff who perform CPS ongoing work as well as other functions are held to a pro-rated standard. The ISEP requires that 95 percent of staff engaged in CPS ongoing work meet the caseload standard.

**ISEP 12**

DHHS averaged 97.5 percent of staff meeting the standard in ISEP 12, exceeding the target.

**ISEP 13**

For ISEP 13, DHHS averaged 96.3 percent of staff meeting the standard, exceeding the target.

*Purchase of Service Caseloads (6.28)*

Purchase of Service (POS) work comprises the support and oversight that DHHS staff provide with respect to foster care and adoption child welfare cases assigned to the private sector. The ISEP established the full-time POS standard at 90 cases. However, there are some DHHS staff who are assigned a mix of POS and other work including licensing, foster care, and adoption. For those staff, the standard of 90 POS cases is pro-rated based on their other responsibilities. DHHS committed that 95 percent of staff engaged in POS work would meet the ISEP standard of 90 cases.

**ISEP 12**

For ISEP 12, DHHS averaged 92.8 percent of staff meeting the standard, missing the target.

**ISEP 13**

For ISEP 13, DHHS averaged 95.5 percent of staff meeting the standard, meeting the target.

*Licensing Caseloads (6.29)*

DHHS agreed that full-time staff, public and private, solely engaged in licensing work would be responsible for no more than 30 licensed foster homes or homes pending licensure. Staff who perform licensing work as well as other functions are held to a pro-rated standard. The ISEP requires that 95 percent of staff engaged in licensing work meet the caseload standard.

**ISEP 12**

DHHS averaged 94.1 percent of staff meeting the standard in ISEP 12, just missing the target.

**ISEP 13**

For ISEP 13, DHHS also averaged 94.1 percent of staff meeting the standard, just missing the target again.

*Caseload Audit*

The monitoring team undertook an in-depth review of caseload compliance for Periods 12 and 13. The Department supplied the monitoring team with caseload leave data for CY2017, which detailed all DHHS caseload-carrying staff who were on leave for two weeks or more during the year, the dates of their leave, whether those staff carried cases on each of the designated caseload count dates (February 28th, April 28th, June 30th, August 31st, October 31st, December 28th), and whether they carried any cases while on leave. The monitoring team compared this information to the caseload reports produced on each count date and verified that there were 52 staff who carried cases while on leave during CY2017. The chart below details the number and percentage of staff who were carrying cases while on leave for each caseload count date.

**Table 7. DHHS Employees on Leave and Carrying Cases, 2017**

| Caseload Count Date | Number of staff carrying cases | Number of staff carrying cases and on leave | Percent of staff carrying cases and on leave |
|---|---|---|---|
| February 28, 2017 | 2,122 | 4 | 0.2% |
| April 28, 2017 | 2,136 | 11 | 0.5% |
| June 30, 2017 | 2,161 | 10 | 0.5% |
| August 31, 2017 | 2,169 | 11 | 0.5% |
| October 31, 2017 | 2,193 | 6 | 0.3% |
| December 28, 2017 | 2,177 | 10 | 0.5% |

27

The monitoring team requested explanations from DHHS for why these 52 workers were carrying cases while on leave. The Department reviewed each individual worker's situation and provided follow-up information, which the monitoring team assessed. Overall, the explanations appear reasonable and include employees who started leaves the day of or shortly prior to the caseload count date and their cases had not yet been reassigned, employees on planned annual leave for two weeks while their cases were covered, and employees who were expected to return to work in fewer than two weeks but unexpectedly extended their leaves beyond this timeframe.

## Staff Training

*Licensing Worker Qualifications and Training (6.4)*

DHHS committed to ensure that public and private agency staff who serve Michigan's at-risk children and families receive adequate training in the practice areas to which they are assigned. DHHS agreed in the ISEP to continue to implement the training plan that was approved by the monitors in previous reporting periods regarding licensing workers. DHHS submitted documentation for ISEP reporting periods 12 and 13 for staff who perform licensing work.

**ISEP 12**

The documentation received by the monitoring team demonstrates that for reporting period 12, 449 staff were involved in licensing work and 436 staff (97.1 percent) had the required training. DHHS achieved the designated performance standard of 95 percent for this provision. *Per the ISEP, compliance during this period makes the commitment eligible to move to "Structures and Policies."*

**ISEP 13**

For reporting period 13, 463 staff were involved in licensing activities and 457 staff (98.7 percent) were compliant with the training. DHHS achieved the designated performance standard of 95 percent.

# Accountability

## Outcomes

Pursuant to the ISEP, DHHS agreed to meet federal outcome standards regarding safety and permanency for children. The ISEP adopts the outcome methodologies developed by the federal government, including two safety measures from Round Two of the federal Child and Family Services Reviews (CFSR) and five permanency measures from CFSR Round Three. DHHS previously achieved compliance on four of the permanency outcomes and the U.S. District Court approved those measures for rolling exit from the ISEP; they are no longer being monitored actively. Performance on all measures is calculated for DHHS by the University of Michigan based

on Adoption and Foster Care Analysis and Reporting System (AFCARS) and National Child Abuse and Neglect Data System (NCANDS) files produced by DHHS.

*Safety Outcomes (6.1, 6.2)*

The first child safety standard selected by the parties is designed to measure how well the child welfare system protects children from repeated incidents of abuse or neglect. DHHS committed to ensure that of all children who were victims of a substantiated or indicated maltreatment allegation within the first six months of the applicable federal reporting period, at least 94.6 percent were not victims of another substantiated or indicated maltreatment allegation within a six-month period.

Data provided by DHHS indicate that for FFY2017, there was no repeat maltreatment for 17,893 (93.4 percent) of 19,163 children. DHHS did not meet the ISEP standard of 94.6 percent. The data reflects 1,270 children who experienced repeat incidences of abuse or neglect during FFY2017. This number is a large increase over the 1,008 children DHHS reported for FFY2016. To meet the agreed upon standard, DHHS should have protected 236 additional children from repeat maltreatment.

The second child safety standard focuses on keeping children placed in foster care safe from abuse and neglect by their caregivers. DHHS committed to ensure that of all children in foster care during the period, at least 99.68 percent were not victims of substantiated or indicated maltreatment by a foster parent or facility staff member.

Final data provided by Michigan and verified by the monitoring team indicate that for FFY2017, DHHS kept 17,673 (99.13 percent) of the 17,828 children in placement during the period safe from abuse or neglect in care, below the agreed upon standard of protection. There were 155 children abused or neglected in placement by their caretakers during the periods. DHHS should have protected at least 98 more of these children from abuse or neglect in placement in order to meet the agreed upon standard. Examples of substantiated abuse and neglect during FFY2017 include:

- A residential staff person brought three residents to her home, gave them marijuana and smoked it with them. She also had sex with one resident, inappropriately touched another, and gave cigarettes to youth. She admitted to bringing youth to her home and giving them cigarettes, but stated they snuck the marijuana from her. Investigators substantiated threatened harm, sexual abuse, and improper supervision, and she was terminated.[12]

---

[12] Additionally, DCWL investigated and found rules violations at the facility that required the agency to establish a corrective action plan.

- Unlicensed relative caregivers for three children aged four, six and eight were beating them with a belt on multiple occasions, causing extensive bruising. The six-year-old had significant bruising all over his body. The children were held down by one caregiver so the other could hit them. The caregivers admitted to the beatings, were criminally charged, and the children were removed from the home.

- A staff member at a residential facility grabbed a 12-year-old resident, ripped his shirt, squeezed and hurt his genitalia, and threatened to "rip off" his testicles. Two staff members then dragged the child, causing rug burns to his left shoulder, and the staff member punched him in the stomach four times. Physical abuse by both staff was substantiated.[13]

- A ten-year-old and eight-year-old were placed in a licensed unrelated foster home. The foster mother pinched and spanked the ten-year-old hard. The child had two bruises on her chest where she was pinched. The foster mother was bending the child's finger back and threatening to break her arm. She also pulled her down the stairs by her hair, causing the child to fall down the last two steps. The foster mother then spanked and sat on the child. The foster parent's six-year-old son stated that his mom kicked, scratched, and bit the foster child. Physical abuse was substantiated and both foster children were removed from the home.

- An eight-month-old was placed in the unlicensed home of her great-grandmother and her husband. The foster mother's 15-year-old granddaughter also visited the home in anticipation of being adopted by the family. The grandmother's husband engaged in grooming behaviors with the 15-year-old, asking about her sex life, telling of his, feeling his genitals over his clothing, and exposing himself to her. He reportedly engaged in similar behaviors with the child's sister in the past, but no one believed her. Improper supervision was substantiated, and he no longer resides in the home. He was criminally charged with two misdemeanors including one count of indecent exposure, and one count of lewd and lascivious behavior.

- A two-year-old was placed in a licensed unrelated foster home. The foster mother allowed the child to stay in the bath tub unattended and he sustained second degree burns to his ankle and buttocks. The foster mother did not take the child for medical treatment nor report the injuries to the agency. She also did not take him to get medical care after being instructed to do so by the child's foster care worker. The foster mother was substantiated for improper supervision and all children were removed from the home.

---

[13] Additionally, DCWL investigated and found rules violations at the facility that required the agency to establish a corrective action plan.

The following chart describes the placement types of the child victims at the time of maltreatment in care in comparison to the placement types of the custodial population.

**Figure 7. Placement Type of Children in Care and Substantiated MIC Victims in FFY2017**
*n=12,085 children in care on June 30, 2017; 155 MIC victims during FFY2017*



As the chart above indicates, there is a disproportionate number of children in unlicensed relative homes who suffer abuse/neglect while in these placements. This raises serious questions about DHHS' work in preparing, supporting and monitoring relatives to provide care for children in the class.

*Permanency Outcomes (6.3)*

The one remaining permanency commitment measures the percent of children who enter foster care within a 12-month period who are discharged to permanency within 12 months of their entry date. Three years of AFCARS data is required to measure performance for this outcome, therefore performance was calculated for children who entered care between April 1, 2015 and March 31, 2016. Michigan reported, and the monitoring team verified, that of the 6,308 children who entered foster care during this time period, 1,888 (29.9 percent) exited to permanency within 12 months of their entry. DHHS did not meet the ISEP standard of 40.5 percent for this commitment.

## Contract Oversight

*Contract Evaluations (5.12)*

The ISEP requires DHHS to conduct contract evaluations of all Child Caring Institutions (CCIs) and private Child Placing Agencies (CPAs), including an annual inspection of each CPA, an annual visit to a random sample of CPA foster homes, and an annual unannounced inspection of each CCI. During the required visits, the Division of Child Welfare Licensing (DCWL) monitors compliance with rules, policy, contractual and ISEP requirements, with the primary focus being the safety and well-being of children.

**ISEP 12**

During ISEP 12 field consultants and area managers received training to help ensure consistent application of administrative licensing rules, DHHS policy, and contract requirements. Training topics included: safety planning in caregiver homes, prudent parenting, personal restraint and seclusion, and procedures for conducting special investigations. Field analysts also were trained on safety planning in caregiver homes.

In February 2017, DCWL initiated a workgroup to discuss crisis management, physical restraint methods, and criteria to be utilized in reviewing a CCI's training model for approval. Upon final approval of the workgroup's recommendations, DHHS represents that changes will be made to DCWL's procedures for reviewing a CCI's restraint and seclusion training model.

As per DHHS, their licensing consultants conducted 52 inspections of 51 contracted CPAs during ISEP 12. One agency required two inspections to modify a provisional license back to regular status; that license was restored due to significant improvements.

During ISEP 12, field analysts visited foster and unlicensed relative homes affiliated with 46 of 52 CPA agencies. Six of the agencies did not have any foster or relative homes. The field analysts visited 157 foster homes and 49 unlicensed relative homes. In reviewing all the analysts' reports, the monitoring team found that 24 of the 46 agencies had at least one home with an identified safety/health issue. Eighteen of the agencies had at least one foster home with a safety/health issue, one agency had at least one relative home with a safety/health issue, and five agencies had both a foster and relative home with safety/health issues. Concerns included: homes lacking safety-approved cribs or having no cribs at all for infants, unsafe sleep practices, foster children not having beds or bedframes, foster children's bedrooms lacking doors or doorknobs, exposed wires, insufficient means of egress, missing or non-working smoke detectors, missing carbon monoxide detectors, no alarms on doors where children had access to outdoor bodies of water, a home with a wasp infestation, portable heaters being used in children's

32

bedrooms, and no protective gate around a wood burning stove. There was documentation in sixteen of the consultants' renewal and interim reports that the health/safety concerns were resolved, while four agencies only had documentation of partial remediation. Documentation of remediation for the other four agencies was not found in the consultants' reports.

Field analysts are required by the ISEP to visit a random sample of each CPA's foster homes as part of the annual inspection. Agencies with less than 50 homes are required to have three homes visited. An agency with two foster homes only had one home visited, and a second agency that had 28 foster homes only had two homes visited. Therefore, DHHS did not meet its performance commitment for ISEP provision 5.12.a.2.

DHHS reported that during the period 55 special investigations were completed on contracted CPAs by the licensing consultants. The 55 investigations included 129 allegations related to rules, policy, contract, and ISEP requirements. DCWL substantiated 78 (60.5 percent) of the 129 allegations, and 33 of the 55 investigations required a corrective action plan (CAP).

During Period 12, DHHS reported that private agencies conducted 705 foster home special evaluations. These are assessments conducted by the supervising agency when a licensing violation is alleged in a home that is part of their network. In reviewing these reports, the monitoring team found there were 28 foster home licensure revocations as a result of the investigations. Reasons for revocation included: child abuse/corporal punishment; domestic violence; foster parent qualifications encompassing bad judgment/character (e.g., lying to the agency, improper supervision, giving alcohol to a child); licensure violations (e.g., failure to complete trainings, lack of cooperation/non-compliance with licensing policies/investigations, failure to follow through with CAPs); and sexual assault by a foster parent or member of the household.

DHHS reported that 44 unannounced renewal and annual inspections of CCIs were conducted during the period. Thirty-three inspections required CAPs, one inspection resulted in a second provisional license based on the nature and number of repeat violations, one inspection resulted in a recommendation to discontinue the contract agreement, and nine inspections determined substantial compliance by the agency.

During the period, DCWL conducted 274 special investigations of 66 CCIs due to allegations pertaining to rules, policy, contract and ISEP requirements. Within the 274 investigations, there were 441 allegations and 185 (42.0 percent) were substantiated. In ten instances a MIC investigation was conducted, and abuse or neglect was substantiated.

**ISEP 13**

DHHS reported that during this period field consultants and area managers received training that included the following topics: conducting annual inspections and special investigations, assessment of MiSACWIS data on seclusion/isolation, and procedures for reviewing a CCI's restraint and seclusion training model. Field analysts received the following trainings: conducting home visits with caregivers, and documentation of safety and service concerns.

As per DHHS, licensing consultants completed 33 renewal or interim CPA inspections during the period. All the agencies required a CAP. Two CPAs were recommended for second provisional licenses, and one CPA was recommended for a first provisional license based on the number and nature of violations.

During the period, field analysts visited homes affiliated with 30 of the 33 CPA agencies. Three agencies did not have any foster or relative homes. The analysts visited 114 foster homes and 50 unlicensed relatives, meeting the ISEP requirement for the number of home visits, as per 5.12.a.2.

The monitoring team reviewed all the analysts' reports and found that 21 of the agencies had at least one home with a safety/health issue. Ten of the agencies had at least one foster home with a safety/health issue, six of the agencies had at least one unlicensed relative home with a safety/health issue, and five agencies had at least one foster and relative home with safety/health issues. Safety issues identified by the analysts included: unsafe play equipment, homes without door alarms where children had access to bodies of water, missing smoke detectors and electrical outlet covers, lack of appropriate beds, smoking in the home, two wheelchair bound children without a ramp for entry or exit, and safe sleep not being practiced. The monitoring team found documentation of remediation in 13 of the consultant reports, partial remediation documentation in four reports, and no documentation of remediation in four reports.

DHHS reported that they completed 58 CPA special investigations containing 130 allegations of non-compliance during the period. Seventy (53.8 percent) of the 130 allegations were established.

During ISEP 13 DHHS reported that private agencies conducted 699 foster home special evaluations. These are assessments conducted by the supervising agency when a licensing violation is alleged in a home that is part of their network. In reviewing these reports, the monitoring team found that there were 44 foster home licensure revocations resulting from these investigations. Revocation reasons included: child abuse/corporal punishment; foster parent qualifications encompassing bad judgment/character (e.g.,

lying to the agency, improper supervision, giving alcohol to a child); licensure violations (e.g., failure to complete trainings, lack of cooperation/non-compliance with licensing policies/investigations, failure to follow through with CAPs); sexual assault by a foster parent or member of the household; and a child death.

DHHS reported the agency conducted 46 renewal and interim CCI inspections during the period. Forty-one inspections required a CAP, with four agencies demonstrating substantial compliance, and one agency being recommended for a second provisional license.

During the period, DCWL conducted 306 special investigations involving 65 CCIs. The investigations contained 532 allegations of non-compliance pertaining to rules, policy, contract, and ISEP requirements. DCWL substantiated violations for 228 of the 532 allegations. Twenty-six staff were terminated as a result of the incidents and 50 staff were disciplined. In 12 instances a MIC investigation was conducted, and abuse or neglect was substantiated.

*Seclusion in Contract Agencies (6.35)*

The ISEP requires that all uses of seclusion or isolation in CCIs be reported to DCWL for necessary actions. Licensing rules define when seclusion may be utilized, and the type of documentation required, which is dependent on the length of time a child is in seclusion. DCWL must conduct a special investigation when non-compliance is alleged, and a violation is established by DCWL when supporting information indicates that a licensing rule has been violated.

**ISEP 12**

DHHS reported that during ISEP 12 there were three CCI contract violations in which seclusions and isolations were not entered timely or at all into MiSACWIS, the child welfare database. CAPs were required for these three agencies. In subsequent inspections, licensing consultants found that these agencies were compliant with documentation in MiSACWIS, as per their contract requirements. DHHS is not compliant with this commitment for ISEP 12 as incidents of seclusion and isolation were not reported to DCWL.

**ISEP 13**

DHHS reported no violations for failure to report the use of seclusion or isolation in any CCI during ISEP 13 and is compliant with this commitment.

## Quality Service Reviews

DHHS continues to implement the Quality Service Review (QSR) to provide a comprehensive overview of case practice, identifying strengths as well as opportunities for improvement in how children and their families benefit from services. Each review focuses on an identified county or counties and includes in-depth case reviews, as well as focus groups and surveys.

The parties agreed that four commitments would be measured through QSR case reviews: Assessments and Service Plans, Content (6.33); Provision of Services (6.34); Education, Appropriate Education (6.36); and Education, Continuity (6.38). The parties agreed to a designated performance standard of 83 percent with a floor performance standard of 80 percent for all four commitments.

DHHS conducted four QSRs in 11 counties during ISEP 12 and two QSRs in six counties during ISEP 13. The monitoring team participated in QSRs in Ionia, Montcalm, Allegan and Barry counties in May 2017 and in Delta, Dickinson and Menominee counties in July 2017. Monitoring team members observed and participated in the focus groups, case reviews, case scoring and presentations to administrators.

DHHS chose a randomly selected sample of open cases for review during each QSR. Cases were graded on 21 indicators covering different areas of case practice and the status of the child and family. Information was obtained through in-depth interviews with case participants including the child, parents or legal guardians, current caregiver, caseworker, teacher, therapist, service providers, and others having a significant role in the child's or family's life. A six-point rating scale was used to determine whether performance on a given indicator was acceptable. Any indicator scored at four or higher was determined acceptable, while any indicator scored at three or lower was determined to be unacceptable.

*Assessments, Service Plans, and Provision of Services (6.33, 6.34)*

DHHS agreed to develop a comprehensive written assessment of a family's strengths and needs, designed to inform decision making about services and permanency planning. The plans must be signed by the child's caseworker, the caseworker's supervisor, the parents, and the child, if age appropriate. If a parent or child is unavailable or declines to sign the service plan, DHHS must identify steps to secure their participation in accepting services.

The written service plan must include:

- A child's assigned permanency goal;

- Steps that DHHS, CPAs when applicable, other service providers, parents and foster parents will take together to address the issues that led to the child's placement in foster care and that must be resolved to achieve permanency;

- Services that will be provided to children, parents and foster parents, including who will provide the services and when they will be initiated;

- Actions that caseworkers will take to help children, parents and foster parents connect to, engage with and make good use of services; and

- Objectives that are attainable and measurable, with expected timeframes for achievement.

DHHS agreed that the services identified in the service plan will be made available in a timely and appropriate manner and to monitor services to ensure that they have the intended effect. DHHS also agreed to identify appropriate, accessible, and individually compatible services; to assist with transportation; and to identify and resolve barriers that may impede children, parents, and foster parents from making effective use of services. Finally, DHHS committed to amend the service plan when services are not provided or do not appear to be effective.

**ISEP 12**

DHHS reviewed a total of 54 cases during the four QSRs conducted during ISEP 12. Of these 54 cases, DHHS reported that 45 (83.3 percent) were rated as having acceptable assessments and service plans, meeting the 83 percent performance standard for this commitment. Additionally, DHHS reported that 38 (70.4 percent) of the 54 cases reviewed during ISEP 12 were rated as acceptable for provision of services, falling short of the 83 percent performance standard for this commitment.

**ISEP 13**

For ISEP 13, DHHS reviewed a total of 24 cases during the two QSRs conducted. Of these 24 cases, DHHS reported that 18 (75.0 percent) were rated as acceptable for assessments and service plans. Additionally, DHHS reported that 18 (75.0 percent) of the 24 cases reviewed were rated as acceptable for provision of services. DHHS did not achieve the performance standard of 83 percent for either commitment.

*Education, Appropriate for Child (6.36)*

The ISEP requires DHHS to take reasonable steps to ensure that school-aged foster children receive an education appropriate to their needs. The parties agreed to a performance standard of 83 percent for this commitment.

**ISEP 12**

For ISEP 12, DHHS reported that 28 of the 54 cases reviewed were applicable to this commitment. Of the 28, DHHS rated 24 (85.7 percent) as acceptable, exceeding the performance standard.

**ISEP 13**

For ISEP 13, DHHS reported that 11 of the 24 cases reviewed were applicable to this commitment. DHHS scored 10 (90.9 percent) of the 11 cases as acceptable, exceeding the performance standard. *Per the ISEP, compliance during this period makes the commitment eligible for rolling exit.*

*Education, Continuity (6.38)*

The ISEP also requires that DHHS make reasonable efforts to ensure the continuity of a child's educational experience by keeping the child in a familiar or current school or neighborhood, when in the child's best interests and feasible, and by limiting the number of school changes the child experiences. The parties agreed to a performance standard of 83 percent for this commitment.

**ISEP 12**

Of the 54 cases reviewed during the ISEP 12 QSRs, 36 were deemed applicable to this commitment. DHHS reported that 30 (83.3 percent) of the 36 cases were rated as acceptable, meeting the performance standard.

**ISEP 13**

For ISEP 13, 14 of the 24 cases reviewed were deemed applicable to this commitment. DHHS reported that 13 (92.9 percent) of the 14 cases were rated as acceptable, exceeding the performance standard. *Per the ISEP, compliance during this period makes the commitment eligible for rolling exit.*

## Data Reporting

DHHS produced data from MiSACWIS to demonstrate performance on commitments in ISEP 12 and 13 and to document baseline populations and samples for QAPs. DHHS produced data concerning some commitments in ISEP 12 and 13 that were not produced in ISEP 11, including placement standards (6.7) and relative foster parent waivers (6.17). DHHS continued to submit "cohort" data, which identifies entries and exits from foster care during the period, the number of children served during the period, and the number of children in care at the beginning and end of the period. For QAPs, the monitors approved an updated methodology that allowed DHHS to focus performance measurement resources on commitments where performance neared or

exceeded standards designated in the ISEP as opposed to commitments where past performance indicated only a small chance of meeting ISEP standards.

The monitoring team analyzed the information to verify its quality, assessed the methodology used to compute performance for each metric, and attempted to replicate the performance calculations made by DHHS. In these efforts, both DHHS and the monitoring team relied on a Metrics Plan jointly developed between the monitoring team and DHHS, initiated in January 2017 and refined in ISEP 11. The Metrics Plan outlines in detail the descriptions of data to be supplied by DHHS to the monitoring team and the calculation methodologies to assess performance for each commitment for which DHHS produces a data report.

In general, the data and reporting in ISEP 12 and 13 proceeded with fewer complications compared to prior ISEP periods. The monitoring team worked through many data issues with DHHS by email, conference calls, and meetings. These communications resulted in further refinements to the Metrics Plan.  An important sign of progress is that the monitors were able to verify DHHS' performance on each of the commitments for which DHHS submitted data from MiSACWIS or conducted a QAP. Though that does not yet include every ISEP provision, it represents a very meaningful improvement from previous periods. Moreover, the Department accomplished this improvement as it continued to undertake a comprehensive assessment of its own practice through the QAP and QSR processes, involving critical assessments of its work on thousands of children's cases.

At the same time, DHHS did not consistently meet agreed-upon timeframes for data production, which delayed this report. While it was initially agreed that all data would be submitted to the monitors by the end of June 2018, DHHS subsequently requested extensions for 18 commitments. The monitoring team did not receive all the required data until the end of October 2018. Several commitments required data resubmissions, as DHHS produced data that did not conform to the Metrics Plan or did not match the cohort data. These data were resubmitted more quickly than in prior periods and, in several instances, proactively when DHHS discovered an issue prior to the monitoring team's review.

One of the most significant and unresolved data quality issues remains the Department's inability to report accurately the cases of children abused or neglected while in care. As detailed in the ISEP 11 report, DHHS was unable to report accurately on Maltreatment in Care for FFY2016. As a result, the parties agreed that beginning with FFY2017, DHHS and the monitoring team would separately undertake case record reviews of all substantiated investigations involving children in DHHS' foster care custody to determine if they met the maltreatment-in-care criteria under the ISEP.

In May 2018, DHHS produced an initial NCANDS set of data that indicated 156 children were victims of maltreatment-in-care by a foster parent or facility staff person during FFY2017. DHHS

and the monitoring team then undertook separate case record reviews of over 600 investigations, involving close to 1100 children, to determine the accuracy of DHHS' reporting. Those record reviews identified 35 children who were not appropriately coded in the NCANDS file – 17 children were not coded as victims of maltreatment-in-care by a foster parent or facility staff person and should have been, while 18 children were coded as victims of maltreatment-in-care by a foster parent of facility staff person and should not have been. DHHS corrected the NCANDS data to address these findings, then resubmitted the file to the federal government and the monitoring team. The maltreatment-in-care calculation for this report was then finalized in October 2018.

## Permanency

### Developing Placement Resources for Children

*Foster Home Array (6.5)*

Per the ISEP, DHHS committed to maintain a sufficient number and array of homes capable of serving the needs of the population of children in care, including a sufficient number of available placements for adolescents, sibling groups, and children with disabilities, when foster home placement is appropriate. At the end of ISEP 12, the Department reported a total of 6,159 licensed foster homes, including 4,833 homes that were licensed for unrelated children. DHHS reported this gave the Department a bed capacity of 10,648 beds for a total of 5,660 children who were in placement in an unrelated foster home or needed placement in an unrelated foster home.  At the end of ISEP 13, the Department reported a total of 6,220 licensed foster homes, including 4,829 that were licensed for unrelated children. DHHS reported this gave the Department a bed capacity of 10,616 beds for a total of 5,787 children who were in placement in an unrelated foster home or needed placement in an unrelated foster home.

The agency's performance on numerous ISEP provisions draws into serious doubt its representation it maintained an adequate supply of placement resources to meet the needs of children. Specifically, the Department did not meet the ISEP standards for the following provisions: Placement Outside 75-mile Radius (6.9); Separation of Siblings (6.10); Maximum Children in a Foster Home (6.12); Emergency or Temporary Facilities, Repeated Placement (6.14); and ensuring that children are placed in safe relative homes (6.16). In fact, the most recent federal Child and Family Service Review (CFSR), conducted in August 2018, also raises concerns regarding the adequacy of Michigan's foster home array. Specifically, one of the areas marked as needing improvement was the state's diligent recruitment of foster and adoptive homes.[14]

---

[14] See Appendix F. Child and Family Services Review – Michigan Final Report 2018, for the full CFSR report.

DHHS' first Adoption and Foster Parent Recruitment and Retention (AFPRR) plans finalized under the ISEP cover FY2017, running from October 1, 2016 to September 30, 2017. DHHS licensed 1,299 nonrelative foster homes during this period, surpassing their internal target of 1,150 homes. The Department also exceeded their internal targets for sibling group homes and homes for children with disabilities but did not meet the internal target set for adolescent homes. The chart below details the number of non-relative foster homes licensed during each month of FY2017.

**Table 8. Nonrelative Foster Homes Licensed, FY2017**

| Month | Total # of new unrelated foster homes licensed | Monthly goal for new unrelated foster homes | # licensed for adolescents | Monthly goal for adolescent foster homes | # licensed for siblings | Monthly goal for sibling foster homes | # licensed for children with disabilities | Monthly goal for foster homes accepting children with disabilities |
|---|---|---|---|---|---|---|---|---|
| Oct-16 | 59 | 96 | 15 | 67 | 36 | 56 | 46 | 23 |
| Nov-16 | 71 | 96 | 18 | 67 | 47 | 56 | 40 | 23 |
| Dec-16 | 86 | 96 | 27 | 67 | 55 | 56 | 52 | 23 |
| Jan-17 | 71 | 96 | 16 | 67 | 41 | 55 | 40 | 23 |
| Feb-17 | 119 | 96 | 34 | 66 | 71 | 55 | 83 | 23 |
| Mar-17 | 111 | 96 | 34 | 67 | 72 | 55 | 74 | 23 |
| Apr-17 | 94 | 96 | 27 | 66 | 55 | 55 | 64 | 23 |
| May-17 | 143 | 96 | 44 | 66 | 89 | 55 | 94 | 23 |
| Jun-17 | 141 | 96 | 40 | 66 | 86 | 55 | 94 | 23 |
| Jul-17 | 88 | 96 | 22 | 66 | 53 | 55 | 63 | 22 |
| Aug-17 | 114 | 95 | 33 | 66 | 60 | 55 | 69 | 22 |
| Sep-17 | 202 | 95 | 59 | 66 | 121 | 55 | 131 | 22 |
| Total | 1299 | 1150 | 369 | 797 | 786 | 663 | 850 | 273 |

Although the Department met their overall internal foster home recruitment target for FFY2017, as discussed above DHHS did not achieve the Department's commitments to ensure children are placed in close proximity to their families, to ensure that siblings are placed together, to ensure that foster homes are not overcrowded, to limit the use of temporary or emergency facilities and to ensure that children are safe when placed with relatives. DHHS' inability to meet these agreed upon ISEP standards calls squarely into question the adequacy of the Department's pool of available foster homes. Further, the federal reviewers who conducted Michigan's recent CFSR found that the state "had a severe shortage of foster homes for all children." In some instances, stakeholders reported children sleeping in offices or hotels as there were no foster home beds

available. DHHS did not meet its commitment to maintain a sufficient number and array of homes capable of serving the needs of the foster care population.

*Placement Process (6.6)*

The ISEP requires that DHHS implement a placement process in each county that ensures that a child entering foster care for whom a suitable relative home is not available is placed in a foster home that is the best available match for that child irrespective of whether the foster home is a DHHS or private agency sponsored home.

DHHS requires annual county placement selection plans that are intended to help child welfare staff in each county understand practices that support best placements for each child. DHHS provided the CY2017 annual plans for each of the counties that were in effect during ISEP 12 and 13. In reviewing the plans, the monitoring team found that there continue to be counties that utilize a rotational system of foster home selection, or first consider homes supervised by DHHS and then private agency homes secondarily, rather than conducting an inclusive search that best meets the needs of the children being placed. Funding source was also a major consideration when making placement decisions in some areas. Home selection in these counties is not inclusive of all available homes, a practice that remains inconsistent with DHHS' commitment to ensure that children are placed in the best available home to meet their needs.

*Relative Foster Parents (6.16)*

In the ISEP, DHHS agreed that when it considers relatives as a placement choice for children who are removed from their families, those families will be licensed or in certain exceptional circumstances DHHS may grant waivers of licensure. Placing children with relatives typically reduces trauma and increases the likelihood of placement stability. For relative caregivers of children in DHHS' custody during ISEP 12 and ISEP 13, licensure was necessary to obtain full support, as relatives in Michigan do not receive the same benefits that unrelated foster parents receive until their home is licensed. Timely licensure is critical for many relative caregivers who can be financially strained by the placement of children in their homes, which often happens with placements that are made on an emergent basis.

In order to ensure that children are placed in safe and stable relative homes prior to licensure, DHHS made the following commitments:

- Prior to placement, DHHS will visit the home to determine that it is safe:
- Within 72 hours of placement, DHHS will check law enforcement and central registry records for all adults living in the home;

- Within 30 days of placement, DHHS will complete a home study determining whether the relative should, upon completion of training and submission of any other required documents, be licensed as a foster parent.

The 6.16 relative licensing commitments, and the support they entail, are particularly important to child safety as 36 percent of children in DHHS' custody during ISEP 12 and ISEP 13 were living with relatives. The parties agreed that DHHS' performance regarding the provision would be measured through a QAP conducted by DHHS' Continuous Quality Improvement (DCQI) team.[15] To prepare for the QAP reviews, DHHS identified the population of all children in foster care who were placed with an unlicensed relative during each ISEP period. From these relative homes, QAP review samples were selected consistent with the parameters the monitors approved.

The parties agreed to a performance standard of 95 percent for this commitment. Through the QAP reviews, DHHS concluded that performance during both ISEP periods was significantly below the performance standard.

### ISEP 12

During ISEP 12, there were 1,579 children placed in relative homes subject to this provision. From this population, DHHS pulled a sample of 318 cases for review. DCQI determined 92 (28.9 percent) of the cases to be compliant, and 226 cases to be noncompliant. The monitoring team conducted an independent review of DHHS' results. The review consisted of 75 randomly selected cases that the DCQI unit included in the QAP review. The monitors' review confirmed that DHHS fell well below the designated performance standard.

### ISEP 13

During ISEP 13, there were 1,845 children placed in relative homes subject to this provision. From this population, DHHS pulled a sample of 331 cases for review. DCQI determined 81 (24.5 percent) of the cases to be compliant, and 250 cases to be noncompliant. The monitoring team conducted an independent review of DHHS' results. The review consisted of 75 randomly selected cases that the DCQI unit included in the QAP review. The monitors' review confirmed that DHHS fell well below the designated performance standard.

These pre-licensure relative placement commitments are designed to ensure children removed from their families are placed in homes where they will be safe, with critical supports provided, including financial support to relative families. However, during both ISEP 12 and ISEP 13 DHHS' performance continued to lag significantly. The monitors' review found situations in which DHHS

---

[15] The parties agreed that performance for this commitment can be measured through data once DHHS is able to produce a report from MiSACWIS.

placed children in homes where mandatory safety measures had not been ensured. Many years after the monitoring team raised this as an issue at the highest levels of DHHS, children were found to have been placed in homes where beds were not available and sleeping arrangements were inappropriate to the needs of the child, guns and ammunition were not stored according to licensing regulations, medications were left in areas that are accessible to children and required smoke or carbon monoxide detectors were missing. Additionally, required background checks were not consistently completed or were completed late.

Since the settlement of this litigation and in every monitoring period for which DHHS reported its performance for the agreement's pre-placement relative foster care safety standards, DHHS has not achieved its promise to ensure that these safety and support standards are met for unlicensed relative homes. The monitors strongly urge DHHS to assess the underlying cause(s) of this persistent lapse and to create and implement a plan of action that DHHS monitors for compliance, with the goal to ensure safety, support and stability for children placed in unlicensed relative homes.

*Relative Foster Parent Licensing, Generally (6.17)*

DHHS agreed that relative caregivers will be licensed unless exceptional circumstances exist and it is in a child's best interest to be placed with the relative despite the relative's desire to forego licensure. The circumstances must be documented in the child's case file and appoved by the County Director, or in a Designated County,[16] a county-level child welfare director.

The parties agreed that for exceptional circumstances to exist:

- The relative caregiver and the other adult household members must meet the same safety standards as non-relative providers;

- The relative caregiver must be fully informed of the benefits, including the exact amount of monetary benefits, of licensure; and

- The relative must sign a waiver stating their understanding that they are foregoing the benefits, including the exact amount of monetary benefits of licensure.

DHHS agreed to utilize a standard waiver form signed by the relative at initial placement to document that exceptional circumstances exist. The waiver must be signed by the relative annually and placed in the child's file. DHHS must allow relatives who change their mind to be given the opportunity to undergo the licensure process at any time the child is placed in their home. The designated performance standard for this commitment is 90 percent.

---

[16] The Designated Counties are Genesee, Kent, Macomb, Oakland and Wayne.

### ISEP 12

In ISEP 12, the monitors confirmed through data verification that for relatives who chose to forego licensure at initial placement the Department completed only 17.8 percent of waivers consistent with the 6.17 provisions. Sixty-one children were placed in homes with approved waivers out of 343 children for whom waivers were required. The monitors confirmed that the Department completed annual renewal waivers 14.2 percent of the time. Fifty-three children were placed in homes with approved annual waivers out of 373 children residing in relative homes that required annual waivers.

### ISEP 13

For ISEP 13, the monitors confirmed that for relatives who chose to forego licensure at initial placement only 1.9 percent had waivers completed as required. This represents seven children out of 372 who were living in relative homes subject to the waiver provision. In terms of the annual waiver renewal commitment, DHHS reported that 13.9 percent of renewal waivers were completed for 56 children out of 404 who were living in homes that required them.

DHHS fell well below the 90 percent performance standard for both the completion of initial and annual renewal waivers for all relatives who chose to forego licensure in ISEP 12 and ISEP 13.

*Relative Foster Parent Licensing, Timeliness (6.18)*

DHHS agreed that 85 percent of newly licensed relative foster parents would be licensed within 180 days of the date of a child's placement. The designated performance standard for this commitment is 85 percent.

### ISEP 12

DHHS submitted data to the monitors that showed for the 319[17] homes licensed during ISEP 12, 85 homes (26.6 percent) were licensed within 180 days, far below the performance standard.

---

[17] Upon completing data analysis for this provision, the monitoring team determined that 15 homes should be excluded from the performance calculation as the homes were either licensed during the prior period or were licensed at the time of the child's placement. This data quality issue did not impact DHHS' performance relative to the agreed-upon standard.

**ISEP 13**

In ISEP 13, DHHS' data showed that for the 329[18] relative homes licensed during the period, 99 homes (30.1 percent) were licensed within the agreed upon timeframe, also falling well below the performance standard of 85 percent.

*Relative Foster Parent Licensing, Proportion Licensed (6.19)*

DHHS agreed that except for a direct placement by court order into an unlicensed relative home, at least 80 percent of all relative caregivers must either have submitted a license application to DHHS and not have had a child placed in their home for more than 180 days or they must hold a valid license. Performance is to be measured on the last day of the report period.

**ISEP 12**

For ISEP 12, DHHS reported that on June 30, 2017, 4,372 children were placed with 2,777 relative caregivers. Of the 2,777 relative caregivers, 1,062 (38.2 percent) were either licensed or had submitted a license application and did not have a child in their care for more than 180 days. Of the 1,062 compliant homes, 855 were licensed and 207 relative homes had submitted a licensure application, as required. This level of performance is well below the agreed upon standard of 80 percent.

**ISEP 13**

For ISEP 13, DHHS reported that on December 31, 2017, 4,602 children were placed with 2,859 relative caregivers. Of the 2,859 relative caregivers, 1,076 (37.6 percent) were either licensed or had submitted an application and did not have a child placed in their home for more than 180 days. Of the 1,076 compliant homes, 879 relative caregivers were licensed, and 197 relatives had submitted the required application. This level of performance also falls well below the agreed upon performance standard of 80 percent.

*Placement Standard (6.7)*

The ISEP requires that all children placed in the foster care custody of DHHS be placed in a licensed foster home, a licensed facility, pursuant to a court order or an unlicensed relative with a waiver.

---

[18] Upon completing data analysis for this provision, the monitoring team determined that 19 homes should not be part of the performance calculation as the homes were either licensed during the prior period or were licensed at the time of the child's placement. This data quality issue did not impact DHHS' performance relative to the agreed-upon standard.

**ISEP 12**

According to the data submitted by DHHS for ISEP 12, there were 11,932 children[19] subject to this commitment. Of those children, 7,032 (58.9 percent) children were placed in a compliant setting. Therefore, the Department fell well below the performance standard.

**ISEP 13**

The Department's performance for this metric was also non-compliant in ISEP 13. The Department reported there were 12,208 children[20] subject to this commitment, with 7,149 children placed in compliant settings (58.6 percent), well below the performance standard.

In summary, DHHS did not meet any of the 6.16, 6.17, 6.18, 6.19, and 6.7 performance standards for relative home placements during either ISEP 12 or ISEP 13.

## Placement Standards

*Jail, Correctional, or Detention Facilities (6.8)*

DHHS agreed that unless pursuant to a delinquency charge, no child in DHHS custody will be placed by DHHS in a jail, correctional, or detention facility. The ISEP also requires that a foster child in such a setting without a delinquency charge must be moved to a foster care placement within five days of DHHS becoming aware unless a court orders otherwise over a DHHS objection. If there is a delinquency charge and the disposition is for the child to return to a foster care placement, the child must be returned to foster care within five days of disposition of that delinquency charge.

**ISEP 12**

Based on information submitted by DHHS, 116 children experienced 138 jail or detention placement episodes during ISEP 12. Of the 138 placements, 133 (96.4 percent) were compliant with the terms of this commitment. DHHS was noncompliant with respect to one incident where a child was placed in jail or detention for more than five days with no underlying charge and no objection on the record from DHHS, and with respect to another four placement episodes where children were not returned to a foster care placement within five days of disposition of their delinquency charges.

**ISEP 13**

Based on information submitted by DHHS, 124 children experienced 136 jail or detention placement episodes during ISEP 13. Of the 136 placements, 122 (89.7 percent) were

---

[19] This provision excludes children in temporary placement settings including AWOL, jail, detention, and hospitals.
[20] This provision excludes children in temporary placement settings including AWOL, jail, detention, and hospitals.

compliant with the terms of this commitment. DHHS was noncompliant with respect to fourteen placement episodes where children were not returned to a foster care placement within five days of disposition of their delinquency charges.

*Placement Proximity from Removal Home (6.9)*

The ISEP requires DHHS to place all children within a 75-mile radius of the home from which the child entered custody unless:

- The child's needs are so exceptional that they cannot be met by a family or facility within a 75-mile radius; or

- The child needs replacement and the child's permanency goal is reunification with his or her parents who at the time reside out of the 75-mile radius; or

- The child is to be placed with a relative or sibling out of the 75-mile radius; or

- The child is to be placed in an appropriate pre-adoptive home that is out of the 75-mile radius.

Any of the above listed exceptions require the approval of the County Director or, in a designated county, a county-level child welfare administrator. The approving authority is specifically required to certify the circumstances supporting the placement in writing, based upon his or her own examination of the circumstances and the child's needs and best interests. The designated performance standard for this commitment is 95 percent.

### ISEP 12

DHHS provided data to the monitoring team indicating that 9,490 (91.5 percent) of the 10,370 children who were in care at the end of ISEP 12 were placed within a 75-mile radius of their home. DHHS' performance for this commitment was close to, but did not meet, the designated performance standard during the period.

### ISEP 13

Of the 10,613 children in care at the end of ISEP 13, 9,745 (91.6 percent) were placed within a 75-mile radius of their home. DHHS' performance for this commitment was close to, but did not meet, the designated performance standard during the period.

*Placing Siblings Together (6.10)*

The ISEP requires DHHS to place siblings together when they enter foster care at or near the same time. Exceptions can be made if placing the siblings together would be harmful to one or more of the siblings, one of the siblings has exceptional needs that can only be met in a specialized program or facility, or the size of the sibling group makes such placement impractical

notwithstanding efforts to place the group together. Previously this provision was measured through a QAP. Beginning with ISEP 12, the parties agreed to evaluate this provision through a MiSACWIS data report.

### ISEP 12

DHHS provided data to the monitoring team indicating there were 704 sibling groups whose members entered foster care within 30 days of each other during ISEP 12. Of these 704 sibling groups, 469 (66.6 percent) were either placed together or had a timely approval for an allowable exception. DHHS did not meet the designated performance standard of 90 percent for this commitment.

### ISEP 13

DHHS provided data to the monitoring team indicating there were 632 sibling groups whose members entered foster care within 30 days of each other during ISEP 13. Of these 632 sibling groups, 416 (65.8 percent) were either placed together or had a timely approval for an allowable exception. DHHS did not meet the designated performance standard of 90 percent for this commitment.

The commitment also requires that if siblings are separated at any time except for any of the aforementioned reasons, the case manager shall make immediate efforts to locate or recruit a family in whose home the siblings can be reunited. Efforts to place siblings together are to be documented and maintained in the case file and reassessed quarterly. DHHS continues to monitor this provision through a QAP. The population under review consists of children who were part of a sibling group and were separated at any time during the review period. Consistent with the parameters the monitors approved, DHHS reviewed a random sample of cases, stratified by county, to determine performance.

### ISEP 12

For ISEP 12, a sample of 182 children was selected from a total population of 4,647. DCQI found that DHHS met the terms of the commitment in 132 cases (72.5 percent), below the designated performance standard of 90 percent. The monitoring team reviewed a sample of 35 cases read by DCQI and confirmed that DHHS did not meet the designated performance standard for this commitment.

### ISEP 13

For ISEP 13, a sample of 181 children was selected from a total population of 4,905. DCQI found that DHHS met the terms of the commitment in 115 cases (63.5 percent), below the designated performance standard of 90 percent. The monitoring team reviewed a sample of 35 cases read by DCQI and confirmed that DHHS did not meet the designated performance standard for this commitment.

*Maximum Children in a Foster Home (6.12)*

In the ISEP, DHHS committed that no child shall be placed in a foster home if that placement will result in more than three foster children in that foster home, or a total of six children, including the foster family's birth and adopted children. In addition, DHHS agreed that no placement will result in more than three children under the age of three residing in a foster home. Exceptions to these limitations may be made by the Director of DCWL when in the best interest of the child(ren) being placed.

> **ISEP 12**
>
> As of June 30, 2017, there were 5,293 foster homes in Michigan with at least one child in placement. Of these 5,293 homes, 4,553 (86.0 percent) met the terms of this commitment. DHHS did not meet the designated performance standard.

> **ISEP 13**
>
> As of December 31, 2017, there were 5,463 foster homes in Michigan with at least one child in placement. Of these 5,463 homes, 4,846 (88.7 percent) met the terms of this commitment. DHHS did not meet the designated performance standard.

*Emergency or Temporary Facilities, Length of Stay (6.13)*

DHHS is required to ensure children shall not remain in emergency or temporary facilities, including shelter care, for a period lasting more than 30 days unless exceptional circumstances exist. DHHS committed that no child shall remain in an emergency or temporary facility for a period lasting more than 60 days with no exceptions. The agreed upon performance standard for this commitment is 95 percent.

> **ISEP 12**
>
> Of the 244 children placed in emergency or temporary facilities during ISEP 12, 167 (68.4 percent) were placed within the length of stay parameters. DHHS did not meet the performance standard during ISEP 12.

> **ISEP 13**
>
> Of the 201 children placed in emergency or temporary facilities during ISEP 13, 123 (61.2 percent) were placed within the length of stay parameters. DHHS did not meet the performance standard during ISEP 13.

*Emergency or Temporary Facilities, Repeated Placement (6.14)*

The ISEP requires that no child shall be placed in an emergency or temporary facility more than one time in a 12-month period, unless exceptional circumstances exist, and no child experiencing a second emergency or temporary facility placement within one year may remain in an

emergency or temporary facility for more than seven days. The agreed upon performance standard for this commitment is 97 percent.

**ISEP 12**

During ISEP 12, 50 children experienced 69 successive stays in shelter care. Three (4.3 percent) of these stays were compliant with the terms of the ISEP. DHHS did not meet the performance standard during ISEP 12.

**ISEP 13**

During ISEP 13, 30 children experienced 34 successive stays in shelter care. None (0.0 percent) of these stays were compliant with the terms of the ISEP. DHHS did not meet the performance standard during ISEP 13.

*Reviewing Long-Term Institutional Placements (6.15)*

The ISEP requires that for DHHS to place a child in a Child Caring Institution (CCI), the placement must be initially approved by the County Director or a county-level child welfare administrator and then reassessed every 90 days. The director of Child Welfare Field Operations or a designee must approve any placements exceeding 12 months. The system is designed to strengthen agency oversight and promote the placement of children in the least restrictive and most family-like settings when in their best interest.

**ISEP 12**

During ISEP 12, there were 2,221 approvals or reassessments due for 1,379 children placed in CCIs. Of the 2,221 Placement Exception Requests (PERs) due, DHHS completed 629 (28.3 percent) timely, well below the designated performance standard of 97 percent.

**ISEP 13**

During ISEP 13, there were 2,243 approvals or reassessments due for 1,456 children placed in CCIs. Of the 2,243 PERs due, DHHS completed 703 (31.3 percent) timely, well below the designated performance standard of 97 percent.

## Case Planning and Practice

*Supervisory Oversight (6.30)*

Supervisors are to meet at least monthly with each assigned caseworker to review the status of progress of each case on the worker's caseload. Supervisors must review and approve each service plan after having a face-to-face meeting with the worker, which can be the monthly supervisory meeting. The designated performance standard for this commitment is 95 percent.

**ISEP 12**

During ISEP 12, there were 3,165 initial case consultations between a worker and supervisor that were due in the first 30 days. Of those, 2,341 (74.0 percent) were completed timely. Additionally, there were 68,888 monthly case consultations between a worker and supervisor that were due. Of those, 55,228 (80.2 percent) were completed timely. DHHS did not meet the designated performance standard for this commitment during ISEP 12.

**ISEP 13**

During ISEP 13, there were 3,141 initial case consultations between a worker and supervisor that were due in the first 30 days. Of those, 2,483 (79.1 percent) were completed timely. Additionally, there were 70,776 monthly case consultations between a worker and supervisor that were due. Of those, 59,697 (84.3 percent) were completed timely. DHHS did not meet the designated performance standard for this commitment during ISEP 12.

*Timeliness of Service Plans (6.31, 6.32)*

The ISEP requires that DHHS complete an initial service plan (ISP) within 30 days of a child's entry into foster care (6.31) and then complete an updated service plan (USP) at least quarterly thereafter (6.32). The designated performance standard for both commitments is 95 percent.

**ISEP 12**

During ISEP 12, DHHS did not achieve the designated performance standard for either commitment. Of the 3,131 ISPs due during the period, 2,369 (75.7 percent) were completed within 30 days of a child's entry into foster care or Young Adult Voluntary Foster Care (YAVFC). Of the 21,381 USPs due during the period, 18,049 (84.4 percent) were completed at least quarterly.

**ISEP 13**

During ISEP 13, DHHS did not achieve the designated performance standard for either commitment. Of the 3,123 ISPs due during the period, 2,418 (77.4 percent) were completed within 30 days of a child's entry into foster care YAVFC. Of the 21,909 USPs due during the period, 18,494 (84.4 percent) were completed at least quarterly.

# Caseworker Visitation

DHHS agreed to the following visitation schedules for all open cases with children in the state's custody:

- Caseworkers shall visit all children in custody at least twice in each of the first two months of a child's initial or new placement, and at least once in each following month. Additionally, at least one visit each month shall occur in the placement setting and include a private meeting between the worker and child.

- Caseworkers shall visit parents of children with a goal of reunification at least twice during the first month of placement, with at least one visit in the parent's home. For subsequent months, visits must occur at least once per month, with at least one contact in each three-month period occurring in the parent's place of residence.

- All children with a goal of reunification shall visit their parents at least twice monthly unless specified exceptions exist.

- Siblings in custody who are not placed together shall visit each other at least monthly unless specified exceptions exist.

For periods 12 and 13, DHHS produced data on worker-child (6.39), worker-parent (6.40), and parent-child (6.41) visits. DHHS was unable to produce data on sibling visits (6.42) for either reporting period.

*Worker-Child Visitation (6.39)*

DHHS agreed that caseworkers shall visit children in foster care at least two times per month during the child's first two months of placement in an initial or new placement, and at least once per month thereafter. At least one visit each month shall be held at the child's placement location and shall include a private meeting between the child and the caseworker. DHHS and the monitoring team established in the Metrics Plan assessment criteria for the six components that are included in the 6.39 commitment. The designated performance standard is 95 percent for all components.

**ISEP 12**

DHHS' ISEP 12 performance on the six components of worker-child visitation is charted below. As the chart indicates, DHHS met the designated performance standard for two of the six components, specifically the provision that each child shall be visited by a caseworker at least one time during each full month the child is in care and the standard that requires the caseworker and child to meet at the child's placement location each month. DHHS was also very close to meeting the standard that requires the caseworker and child to have a private meeting each month.

53

**Table 9. ISEP 12 Performance on Worker-Child Visitation**

| Requirement | Visits Required | Visits Completed | Performance Percentage |
|---|---|---|---|
| Each child shall be visited by a caseworker at least twice per month during the first two months following an initial or new Placement | 19,076 | 15,930 | 83.5% |
| Each child shall be visited by a caseworker at their placement location at least once per month during the first two months following an initial or new placement | 9,538 | 8,742 | 91.7% |
| Each child shall have at least one visit per month that includes a private meeting between the child and caseworker during the first two months following an initial or new placement | 9,538 | 8,726 | 91.5% |
| Each child shall be visited by a caseworker at least once per full month the child is in foster care | 68,782 | 66,279 | 96.4% |
| Each child shall be visited by a caseworker at their placement location at least once per full month the child is in foster care | 68,782 | 65,295 | 94.9% |
| Each child shall have at least one visit per full month the child is in foster care that includes a private meeting between the child and caseworker | 68,782 | 64,098 | 93.2% |

**ISEP 13**

DHHS' ISEP 13 performance on the six components of worker-child visitation is charted below. As the chart indicates, DHHS met the designated performance standard for two of the six components, specifically the provision that each child shall be visited by a caseworker at least one time during each full month the child is in care and the provision that requires the caseworker and child to meet at the child's placement location each month. DHHS came close to achieving compliance with the full commitment, achieving over 93 percent compliance for all components, except for the provision that requires caseworkers to visit children in custody at least twice in each of the first two months of a child's initial or new placement, for which DHHS achieved 85.3 percent compliance.

**Table 10. ISEP 13 Performance on Worker-Child Visitation**

| Requirement | Visits Required | Visits Completed | Performance Percentage |
|---|---|---|---|
| Each child shall be visited by a caseworker at least twice per month during the first two months following an initial or new Placement | 21,320 | 18,190 | 85.3% |
| Each child shall be visited by a caseworker at their placement location at least once per month during the first two months following an initial or new placement | 10,660 | 9,932 | 93.2% |
| Each child shall have at least one visit per month that includes a private meeting between the child and caseworker during the first two months following an initial or new placement | 10,660 | 9,954 | 93.4% |
| Each child shall be visited by a caseworker at least once per full month the child is in foster care | 70,647 | 68,271 | 96.6% |
| Each child shall be visited by a caseworker at their placement location at least once per full month the child is in foster care | 70,647 | 67,332 | 95.3% |
| Each child shall have at least one visit per full month the child is in foster care that includes a private meeting between the child and caseworker | 70,647 | 66,661 | 94.4% |

*Worker-Parent Visitation (6.40)*

Caseworkers must visit parents of children with a reunification goal at least twice during the first month of placement with at least one visit in the parental home. For subsequent months, visits must occur at least once per month. Exceptions to this requirement are made if the parent(s) are not attending visits despite DHHS taking adequate steps to ensure the visit takes place or a parent cannot attend a visit due to exigent circumstances such as hospitalization or incarceration. Exceptions are excluded from the numerator and denominator of this calculation. DHHS and the monitoring team established assessment criteria for the three components of this commitment in the Metrics Plan. The designated performance standard is 85 percent for all components.

**ISEP 12**

DHHS' ISEP 12 performance on the three components of worker-parent visitation is charted below. As the chart indicates, DHHS did not achieve the designated performance standard of 85 percent for any component of the worker-parent visitation commitment during ISEP 12.

**Table 11. ISEP 12 Performance on Worker-Parent Visitation**

| Requirement | Visits Required | Visits Completed | Performance Percentage |
|---|---|---|---|
| Caseworkers shall visit parents of children with a goal of reunification at least twice during the first month of Placement | 9,294 | 6,588 | 70.9% |
| Caseworkers shall visit parents of children with a goal of reunification in the parent's place of residence at least once during the first month of placement | 4,647 | 2,027 | 43.6% |
| Caseworkers shall visit parents of children with a goal of reunification at least once for each subsequent month of placement | 69,173 | 42,398 | 61.3% |

**ISEP 13**

DHHS' ISEP 13 performance on the three components of worker-parent visitation is charted below. As the chart indicates, DHHS did not achieve the designated performance standard of 85 percent for any component of the worker-parent visitation commitment during ISEP 13.

**Table 12. ISEP 13 Performance on Worker-Parent Visitation**

| Requirement | Visits Required | Visits Completed | Performance Percentage |
|---|---|---|---|
| Caseworkers shall visit parents of children with a goal of reunification at least twice during the first month of Placement | 9,624 | 6,758 | 70.2% |
| Caseworkers shall visit parents of children with a goal of reunification in the parent's place of residence at least once during the first month of placement | 4,812 | 2,204 | 45.8% |
| Caseworkers shall visit parents of children with a goal of reunification at least once for each subsequent month of placement | 66,974 | 43,132 | 64.4% |

*Parent-Child Visitation (6.41)*

When reunification is a child's permanency goal, parents and children will visit at least twice each month. Exceptions to this requirement are made if a court orders less frequent visits; the parents are not attending visits despite DHHS taking adequate steps to ensure the parents' ability to visit; one or both parents cannot attend the visits due to exigent circumstances such as hospitalization or incarceration; or the child is above the age of 16 and refuses such visits. The designated performance standard is 85 percent for all components.

**ISEP 12**

Of the 73,202 parent-child visits required during ISEP 12, DHHS completed 41,738 (57.0 percent) timely. DHHS did not meet the designated performance standard of 85 percent for this commitment during the period.

**ISEP 13**

Of the 67,648 parent-child visits required during ISEP 13, DHHS completed 42,301 (62.5 percent) timely. DHHS did not meet the designated performance standard of 85 percent for this commitment during the period.

## Safety and Well-Being

## Responding to Reports of Abuse and Neglect

*Commencement of CPS Investigations (6.20)*

DHHS committed to commence investigations of reports of child abuse or neglect within the timeframes required by state law. The designated performance standard for this commitment is 95 percent.

**ISEP 12**

DHHS reported that during ISEP 12, there were 47,486 complaints that required the commencement of an investigation. Of those, 43,815 (92.3 percent) were commenced timely. DHHS came close to, but did not meet, the designated performance standard during ISEP 12.

**ISEP 13**

DHHS reported that during ISEP 13, there were 47,343 complaints that required the commencement of an investigation. Of those, 44,189 (93.3 percent) were commenced timely. DHHS came close to, but did not meet, the designated performance standard during ISEP 13.

*Completion of CPS Investigations (6.21)*

DHHS agreed that all child abuse or neglect investigations would both be completed by the worker and approved by the supervisor within 44 days. The parties agreed to a performance standard of 90 percent for this commitment.

### ISEP 12

During ISEP 12, there were 43,841 investigation reports due to be completed. Of those, 37,820 (86.3 percent) were submitted by caseworkers and approved by supervisors within 44 days. DHHS did not meet the performance standard for ISEP 12.

### ISEP 13

During ISEP 13, there were 43,027 investigation reports due to be completed. Of those, 36,199 (84.1 percent) were submitted by caseworkers and approved by supervisors within 44 days. DHHS did not meet the performance standard for ISEP 13.

*CPS Investigations and Screening (6.22)*

Under the terms of the ISEP, DHHS is required to investigate all allegations of abuse or neglect relating to any child in the foster care custody of DHHS and to ensure that allegations of maltreatment in care are not inappropriately screened out and therefore not investigated by CPS. The ISEP requires that this provision be measured by conducting a QAP. The review uses a statistically valid sample and a set of questions established by DHHS and the monitors. The population for this review is comprised of all complaints screened out for CPS investigation during the period. The DCQI staff looked at each complaint to determine whether the reason identified for the screened-out complaint met DHHS policy requirements. Cases were determined to be compliant if the reviewer answered "Yes" to the following questions:

- Did the complaint meet DHHS policy standards to be rejected/screened out and/or transferred?

- Did the intake document sufficient information to support the rejection/screen out decision?

Members of the monitoring team participated in several days of the reviews and assessed 171 cases jointly with the DCQI staff. In addition, monitoring team members observed the training that was conducted for the DCQI staff.

### ISEP 12

During ISEP 12 Centralized Intake staff screened out 3,554 referrals for CPS investigation relating to children in the foster care custody of DHHS, from which a sample of 350 referrals was drawn for review. The DCQI unit determined that Centralized Intake made appropriate screening decisions for 296 referrals (84.6 percent). DCQI determined that there were 54 referrals rejected or transferred that were non-compliant.

The monitoring team separately reviewed and analyzed records for 75 of the sample cases assessed by DCQI unit and did not confirm DHHS' reported performance. Of the 75 screened out referrals, the monitoring team determined that DHHS made appropriate

screening decisions in 50 instances (66.7 percent). The monitors determined that 10 referrals should have been assigned for investigation and were not, and that additional information was needed to make an appropriate screening decision for 15 referrals. In their review of these same referrals, DCQI determined that Centralized Intake made appropriate screening decisions in 63 instances (84.0 percent).

Some examples of referrals that the monitoring team concluded should have been investigated for child abuse and neglect include:

- A four-year-old foster child alleged that while in the care of her foster mother she was "whooped" with a belt. The allegations indicated she did not receive injuries. Centralized screening did not assign the case stating the "allegations do not meet the criteria for assignment/no injuries."

- Three children (ages four, three and one) were placed with a relative caretaker. The Director of the child's day care program alleged that the three-year-old had small light brown bruises around his hip and his rib area. He also had some bruising on his forehead (although she noted he can be unsteady on his feet). The Day Care Director believed the bruises were suspicious. In addition, the four-year-old had a big rash with open sores on the back of his neck and left arm. The rashes had dried blood on them. Centralized Intake staff indicated they rejected the complaint because the allegations did not meet the definition of child abuse and there was no indication that the marks were the result of physical abuse.

Examples of referrals that needed additional information before a screening decision was made include:

- It was alleged that the parents of an eleven-year-old had a positive drug screen for methamphetamines, after the child had returned home on a trial home visit. It is unknown where the parents are using the drugs, but there are concerns they are using inside the home. There are concerns about the well-being of the child as drug use was one of the reasons he was previously placed in foster care.

- A staff member at a residential facility allegedly made sexual comments to a resident. The comments were made over Facebook chat and in person at the facility. During one interaction between the staff person and resident, the staff member pointed to her vaginal area and said it was the perfect spot for the youth's head. The staff person also was reported as saying to the resident that he is cute and that she loved him.

**ISEP 13**

During ISEP 13 Centralized Intake staff screened out 3,175 referrals for CPS investigation relating to children in the foster care custody of DHHS, from which a sample of 303 referrals was drawn for review. The DCQI unit determined that Centralized Intake made appropriate screening decisions for 303 referrals (87.6 percent). DCQI determined that there were 43 referrals rejected or transferred that were non-compliant.

The monitoring team separately reviewed and analyzed records for 75 of the sample cases assessed by DHHS and did not confirm DHHS' reported performance. Of the 75 screened out referrals, the monitoring team determined that DHHS made appropriate screening decisions in 48 instances (84 percent). The monitors determined that four referrals should have been assigned for investigation and were not, and that additional information was needed to make an appropriate screening decision for eight referrals. In their review of these same referrals, DCQI determined that Centralized Intake made appropriate screening decisions in 70 instances (93.3 percent).

The following referral is an example of one that the monitoring team concluded should have been investigated for child abuse and neglect:

- A referent stated that a five-year-old had been complaining of pain when she arrived in a new foster home. The new foster mother was advised to take the child to the doctor but did not do so until another medical incident, at which point she took the five-year-old to an urgent care center. The urgent care center administered an x-ray determined that the foster child sustained a broken tail bone. The referent noted that in the child's previous foster home, the child sustained a deep indentation scratch mark on her face/cheek area with pain. The referral received a second line review by a supervisor at Centralized Intake who determined the referral should be transferred to DCWL for a review of possible licensing violations.

The following referral is an example of a referral that the monitoring team concluded needed more information before a screening decision could be made:

- Three children, ages 11, 8 and 7, were brought to a visit on a winter day while it was snowing and temperatures were in the single digits. The children were not wearing any coats. The screening decision was to reject the complaint and the screener surmised that the children may have left their coats in the car.

The ISEP also requires that when DHHS transfers a referral to another agency for investigation, DHHS must independently take appropriate action to ensure the safety and well-being of the

child in the Department's custody. The parties agreed that performance for this provision would be measured through a QAP.

The population for review was comprised of complaints received by Centralized Intake on plaintiff class children that were transferred outside the Department during the period under review. Consistent with the parameters the monitors approved, DHHS reviewed a random sample of cases, stratified by county, to determine performance. The designated performance standard for this commitment is 95 percent.

### ISEP 12
For ISEP 12, a sample of 230 was selected from a total population of 571 transferred referrals. The DCQI team found 124 cases compliant and 106 cases noncompliant for a performance calculation of 54 percent. The monitoring team reviewed a sample of 50 cases read by DCQI and confirmed that DHHS did not meet the designated performance standard of 95 percent.

### ISEP 13
For ISEP 13, a sample of 216 was selected from a total population of 490 transferred referrals. The DCQI team found 119 cases compliant and 97 cases noncompliant for a performance calculation of 55 percent. The monitoring team reviewed a sample of 50 cases read by DCQI and confirmed that DHHS did not meet the designated performance standard of 95 percent.

## Health and Mental Health

*Healthcare Quality Assurance Process Review (6.45, 6.46, 6.48, 6.49, 6.50)*

The ISEP requires that DHHS ensure children receive required health services. Specifically, DHHS is required to:

- Ensure children receive all required immunizations in accordance with guidelines of the American Academy of Pediatrics (6.45 and 6.46).

- Maintain up-to-date medical files for each child in care, containing information required by DHHS policy (6.48).

- Provide the foster care provider with the child's medical passport. This is to occur at the time the child is placed or re-placed, and quarterly thereafter (6.49).

- Ensure case plans contain medical information required by DHHS policy FOM-801 (6.50).

It was agreed that DHHS would evaluate these health requirements together using one QAP tool approved by the monitors. The population for this QAP review was comprised of two groups. The population for 6.45 was all youth in foster care during the first 90 days of each period. For 6.46

and 6.48, the population was comprised of all children in care more than 90 days as of the 90th day of the reporting period. The two samples were combined and utilized for the 6.49 and 6.50 QAPs. Consistent with the parameters the monitors approved, DHHS reviewed a random sample of cases from each of the populations, stratified by county, to determine performance. The designated performance standard for all five commitments is 95 percent.

### ISEP 12

The ISEP 12 results of DHHS' QAP review for commitments 6.45, 6.46, 6.48, 6.49, and 6.50 are charted below. The results of the QAP review include a wide range of performance (5.1 percent to 91.6 percent), but for each commitment DHHS did not reach the designated performance standard.

**Table 13. ISEP 12 Performance on Health Requirements 6.45, 6.46, 6.48, 6.49, & 6.50**

| ISEP Commitment | Total Population | Sample Size | Cases Compliant | Cases Noncompliant | Performance Percentage |
|---|---|---|---|---|---|
| Immunizations/in care < 3 mos. (6.45) | 1,614 | 321 | 288 | 33 | 89.7% |
| Immunizations/in care > 3 mos. (6.46) | 10,633 | 371 | 340 | 31 | 91.6% |
| Up-to-date medical file (6.48) | 12,247 | 692 | 327 | 365 | 47.3% |
| Medical passports (6.49) | 12,247 | 692 | 35 | 657 | 5.1% |
| Case plan information (6.50) | 12,247 | 692 | 234 | 458 | 33.8% |

The monitoring team reviewed a sample of cases assessed by DCQI for each commitment. One hundred cases were reviewed for each of these provisions: 6.45 and 6.46 and 50 cases were reviewed for each of these provisions: 6.48, 6.49, and 6.50. The monitoring team confirmed that DHHS did not meet the designated performance standard for any of the five ISEP child health commitments.

### ISEP 13

The ISEP 13 results of DHHS' QAP review for commitments 6.45, 6.46, 6.48, 6.49, and 6.50 are charted below. The results of the QAP review include a wide range of performance (4.4 percent to 89.8 percent), but for each commitment DHHS did not reach the designated performance standard.

**Table 14. ISEP 13 Performance on Health Requirements 6.45, 6.46, 6.48, 6.49, & 6.50**

| ISEP Commitment | Total Population | Sample Size | Cases Compliant | Cases Noncompliant | Performance Percentage |
|---|---|---|---|---|---|
| Immunizations/in care < 3 mos. (6.45) | 1,614 | 322 | 289 | 33 | 89.8% |
| Immunizations/in care > 3 mos. (6.46) | 10,633 | 380 | 334 | 46 | 87.9% |
| Up-to-date medical file (6.48) | 12,247 | 702 | 257 | 445 | 36.6% |
| Medical passports (6.49) | 12,247 | 702 | 31 | 671 | 4.4% |
| Case plan information (6.50) | 12,247 | 702 | 194 | 508 | 27.6% |

The monitoring team reviewed a sample of cases assessed by DCQI for each commitment. One hundred cases were reviewed for each of these provisions: 6.45 and 6.46 and 50 cases were reviewed for each of these provisions: 6.48, 6.49, and 6.50. The monitoring team confirmed that DHHS did not meet the designated performance standard for any of the five ISEP child health commitments.

*Medical and Mental Health Examinations for Children (6.43)*

DHHS committed in the ISEP that at least 85 percent of children shall have an initial medical and mental health examination within 30 days of the child's entry into foster care, and that at least 95 percent of children shall have an initial medical and mental health examination within 45 days of the child's entry into foster care.

### ISEP 12

During ISEP 12, the Department completed 2,558 (80.8 percent) of 3,165 required initial medical and mental health exams within 30 days of a child's entry into care. Additionally, DHHS completed 2,720 (86.4 percent) of 3,149 required initial medical and mental health exams within 45 days of a child's entry into care during ISEP 12. DHHS did not meet the performance standard for either portion of this commitment during the period.

### ISEP 13

For ISEP 13, DHHS completed 2,652 (84.4 percent) of 3,143 required initial medical and mental health exams within 30 days of a child's entry into care. Additionally, DHHS completed 2,831 (90.3 percent) of 3,136 required initial medical and mental health exams within 45 days of a child's entry into care during the period. DHHS came close to, but did not meet, the performance standard for either portion of this commitment during the period.

*Dental Care for Children (6.44)*

DHHS committed in the ISEP that at least 90 percent of children shall have an initial dental examination within 90 days of the child's entry into care unless the child has had an exam within six months prior to placement or the child is less than four years of age.

**ISEP 12**

During ISEP 12, the Department completed 1,276 (76.6 percent) of 1,666 initial dental exams within the required timeframe. DHHS did not meet the performance standard for this commitment.

**ISEP 13**

For ISEP 13, DHHS completed 1,150 (75.1 percent) of 1,531 initial dental exams within the required timeframe. DHHS did not meet the performance standard for this commitment.

*Ongoing Healthcare for Children (6.47)*

DHHS committed in the ISEP that following an initial medical, dental, or mental health examination, at least 95 percent of children shall receive periodic and ongoing medical, dental, and mental health examinations and screenings, according to the guidelines set forth by the American Academy of Pediatrics. Performance for this commitment was calculated for each medical type: medical well-child visits for children age three and younger, annual physicals for children older than three, and annual dental exams.

**ISEP 12**

During ISEP 12, DHHS completed 3,435 of 5,519 (62.2 percent) medical well-child visits timely; 3,996 of 4,723 (84.6 percent) annual physicals timely; and 3,955 of 4,725 (83.7 percent) annual dental exams timely. DHHS did not meet the performance standard for any portion of this commitment during ISEP 12.

**ISEP 13**

During ISEP 13, DHHS completed 3,675 of 5,582 (65.8 percent) medical well-child visits timely; 4,254 of 4,888 (87.0 percent) annual physicals timely; and 4,239 of 4,888 (86.7 percent) annual dental exams timely. DHHS did not meet the performance standard for any portion of this commitment during ISEP 13.

*Access to Health Insurance (6.51, 6.52)*

The ISEP requires DHHS ensure that at least 95 percent of children have access to medical coverage within 30 days of entry into foster care by providing the placement provider with a Medicaid card or an alternative verification of the child's Medicaid status and Medicaid number as soon as it is available (6.51).

### ISEP 12

Data provided by DHHS indicate that placement providers received a Medicaid card or an alternative verification of the child's Medicaid status and number within 30 days of entry into foster care for 2,798 (88.4 percent) of 3,165 children in ISEP 12. DHHS did not meet the performance standard during ISEP 12.

### ISEP 13

During ISEP 13, placement providers received a Medicaid card or an alternative verification of the child's Medicaid status and number within 30 days of entry into foster care for 2,823 (89.8 percent) of 3,143 children. DHHS did not meet the performance standard during ISEP 13.

The ISEP also requires DHHS to ensure that 95 percent of children have access to medical coverage within 24 hours or the next business day following subsequent placement by giving the placement provider a Medicaid card or an alternative verification of the child's Medicaid status and Medicaid number as soon as it is available (6.52).

### ISEP 12

During ISEP 12, DHHS reported 3,877 of 4,668 (83.1 percent) placement providers received Medicaid cards or alternative verification within 24 hours or the next business day following a child's subsequent placement. DHHS did not meet the agreed-upon designated performance standard of 95 percent.

### ISEP 13

During ISEP 13, DHHS reported 3,894 of 4,777 (81.5 percent) placement providers received Medicaid cards or alternative verification within 24 hours or the next business day following a child's subsequent placement. DHHS did not meet the agreed-upon designated performance standard of 95 percent.

*Health Care Liaison Officers (5.13)*

In the ISEP, DHHS agreed to maintain at least 34 Health Liaison Officers (HLOs) throughout the state. DHHS provided the monitoring team with information regarding the 34 HLOs throughout the state during ISEP 12 and ISEP 13.

### ISEP 12

During ISEP 12, 34 HLO positions were maintained by DHHS apart from vacancies in the regular course of business created by HLO staff movement. Specifically, there was a vacancy in Oakland County from January 1, 2017 to March 11, 2017. The vacancy was filled on March 12, 2017. In Wayne-South Central County, a vacancy existed from April 3, 2017 to June 30, 2017. In Wayne-Western County, there was a vacancy from May 18,

65

2017 to June 30, 2017. Since none of the vacancies during the period exceeded the three-month timeframe,[21] DHHS met its commitment to maintain 34 HLO positions throughout the state during ISEP 12. *Per the ISEP, compliance during this period makes the commitment eligible to move to "Structures and Policies".*

**ISEP 13**

For ISEP 13, there were two vacancies, both of which started during ISEP 12. A vacancy that existed in Wayne-Western County since May 18, 2017, was filled on July 19, 2017. The Wayne-South Central vacancy that began on April 3, 2017, was not filled until August 21, 2017. This exceeded the three-month timeframe for filling vacancies; therefore, DHHS did not meet its designated performance standard for this commitment in ISEP 13.

The ISEP sets forth that:

> "Commitments in section 4 (Structures and Policies) are structural and policy components of the DHHS child welfare system that DHHS will maintain for the duration of this Agreement. Upon placement in section 4, these Commitments will not be actively monitored. At the Monitors' discretion, the Monitors may request, and DHHS will supply, information and data relating to any Commitment in this classification. If the information and data demonstrates a substantial departure from the structural or policy Commitment, the Monitors may request that DHHS propose corrective action. If DHHS fails, within a reasonable period of time as determined by the Monitors, to propose and implement a corrective action that reestablishes compliance with the structural or policy Commitment, the Monitors may, in their discretion, move the Commitment into section 6 (To Be Achieved) or section 5 (To Be Maintained) and undertake full monitoring in relation to the Commitment."

Therefore, while still recommending that Provision 5.13 move to Structures and Policies based on DHHS' performance in Periods 11 and 12, the Monitors formally request that DHHS propose corrective action for Provision 5.13 based on DHHS' Period 13 performance.

---

[21] DHHS had requested a three-month timeframe to fill HLO positions when vacancies occur, without negatively impacting ISEP compliance. In the interim, the vacancy would be covered by Liaisons in neighboring areas. The monitoring team agreed to this request.

*Psychotropic Medication, Diagnosis (6.53)*

The ISEP requires that prior to initiating each prescription for psychotropic medication for a child in DHHS' custody, the child must have a mental health assessment with a current DSM-based psychiatric diagnosis of a mental health disorder that would require psychotropic medication as a form of treatment. The DHHS Psychotropic Medication Oversight Unit (PMOU) conducted a review of children subject to this commitment.

To conduct the review, the PMOU compared a list of children who were in care during each period to a list of Medicaid pharmacy claims for psychotropic prescriptions filled during the reporting period. The claim was determined to be for a "psychotropic medication" if it met the following criteria:

- The drug has a classification that indicates medication for potential psychotropic purpose;

- The drug supply is greater than five days; and

- The drug fill date of service is greater than the foster care entry date and less than the foster care exit date.

### ISEP 12
According to information from the Department, there was at least one psychotropic medication filled between January 1, 2017 and June 30, 2017 for 3,101 children in DHHS custody. Of those 3,101 children, 75 children were removed as they were receiving the medication for a medical condition. Of the remaining 3,026 children, DHHS reported that 3,023 (99.9 percent) met the prescribing criteria, exceeding the designated performance standard of 97 percent. *Per the ISEP, compliance during this period makes the commitment eligible to move to "Structures and Policies."*

### ISEP 13
According to information from the Department there was at least one psychotropic medication filled between June 1, 2017 and December 31, 2017 for 3,154 children in DHHS custody. Of those 3,154 children, 76 were removed as they were receiving the medication for a medical condition. Of the remaining 3,078 children, DHHS reported that 3,077 (99.9 percent) met the prescribing criteria, exceeding the designated performance standard of 97 percent.

*Psychotropic Medication, Informed Consent (6.54)*

The ISEP requires DHHS to ensure that an informed consent is obtained and documented in writing for each child in DHHS custody who is prescribed psychotropic medication, as per DHHS policy.

### ISEP 12

During ISEP 12 there were 3,026 children who required informed consent documentation, for 7,299 unique prescriptions. Valid consents were on file for 65.3 percent of the medications. Therefore, DHHS did not meet the designated performance standard of 97 percent for this commitment during ISEP 12.

### ISEP 13

During ISEP 13 there were 3,154 children who required informed consent documentation, for 7,430 unique prescriptions. Valid consents were on file for 68.9 percent of the medications.  Therefore, DHHS did not meet the designated performance standard of 97 percent for this commitment during ISEP 13.

*Psychotropic Medication, Documentation (6.55)*

The ISEP requires that the administration of psychotropic medications to children in DHHS' custody be documented in accordance with the "Documentation" section in DHHS Policy FOM 802-1. The designated performance standard for this commitment is 97 percent. Performance for this commitment is measured through a QAP.

The population for the QAP sample consisted of all children who had psychotropic medications filled during the period. Consistent with the parameters the monitors approved, DHHS reviewed a random sample of cases, stratified by county, to determine performance. Reviewers looked at various documents including the Child Assessment of Needs and Strengths (CANS), service plans, case notes, the Medical Passport, and the Strengths and Needs section of MiSACWIS. Cases were determined to be compliant when documentation supporting the use of psychotropic medication was found.

### ISEP 12

DHHS reported there were 3,118 children who were prescribed psychotropic medications during the period. They reviewed case files for 174 of these children and found that 45 (25.9 percent) were compliant with the documentation requirements, while 129 were not compliant. The monitoring team reviewed 35 of the cases that were assessed by DCQI and confirmed that DHHS did not meet the designated performance standard of 97 percent.

### ISEP 13

DHHS reported there were 2,659 children who were prescribed psychotropic medications during the period. They reviewed case files for 173 of these children and found that 53 (30.6 percent) were compliant with the documentation requirements, while 120 were not compliant. The monitoring team reviewed 35 of the cases that were assessed by DCQI

and confirmed that DHHS did not meet the designated performance standard of 97 percent.

*Psychotropic Medication, Oversight Review (6.56)*

The ISEP requires DHHS to ensure that a qualified physician completes and documents an oversight review of a child's psychotropic medication prescriptions, whenever one or more triggering criteria, as identified in DHHS policy, exists. Triggering criteria include: four or more concomitant psychotropic medications; two or more concomitant anti-psychotic, mood stabilizing, anti-depressant, stimulant, or alpha agonist medications; psychotropic medications prescribed above recommended doses; and psychotropic medication prescribed for a child five years or younger.

Performance for this commitment was measured through a QAP. The population under review was comprised of all children who had psychotropic medication prescriptions filled during the period and met at least one of the triggering criteria. Consistent with the parameters the monitors approved, DHHS reviewed a random sample of cases, stratified by county, to determine performance. Cases in the sample were determined to be compliant if the reviewer could ascertain that a physician had completed a review, as required, when triggering criteria existed. The designated performance standard for this commitment is 95 percent.

### ISEP 12

During ISEP 12, the population consisted of 394 youth, and 199 cases were chosen for the geographically stratified sample. DHHS found 100 percent of the 199 cases to be compliant with the physician review, exceeding the performance standard. *Per the ISEP, compliance during this period makes the commitment eligible to move to "Structures and Policies."*

### ISEP 13

During ISEP 13, the population consisted of 433 youth, and 210 cases were chosen for the geographically stratified sample. DHHS found 100 percent of the 210 cases to be compliant with the physician review, exceeding the performance standard.

*Treatment Homes (6.11)*

DHHS committed to have, at any given time, at least 200 treatment foster home beds for youth in foster care. According to information provided to the monitoring team, DHHS has treatment foster home beds through contracts with private agencies to provide placement and services for the children who are deemed eligible for a Serious Emotional Disturbance Waiver (SEDW). As outlined by DHHS, services provided to youth receiving SEDW services include but are not limited to wraparound services, intensive home-based therapy, speech therapy, substance abuse

treatment, speech/hearing assessment and treatment, occupational therapy, treatment for health problems, employment services, group therapy, parent to parent support, transportation, community living support, community based activities, education, psychiatric and other services.

### ISEP 12

During ISEP 12, DHHS reported having 209 treatment foster home beds available for placement. Of these, 199 were licensed and 185 of these licensed beds were utilized by youth receiving SEDW services. Additionally, 10 unlicensed foster home beds were utilized by youth receiving SEDW services. The monitoring team reviewed a random sample of case records for children residing in treatment homes listed on the DHHS submission. Those cases were verified as open treatment home beds during ISEP 12 and the children placed in those homes were receiving SEDW services during the period. During ISEP 12, DHHS met its commitment to maintain at least 200 treatment foster home beds. *Per the ISEP, compliance during this period makes the commitment eligible to move to "Structures and Policies".*

### ISEP 13

During ISEP 13, DHHS reported having 221 treatment foster home beds available for placement. Of these, 208 were licensed and 195 of these licensed beds were utilized by youth receiving SEDW services. Additionally, 13 unlicensed foster home beds were utilized by youth receiving SEDW services. The monitoring team reviewed a random sample of case records for children residing in treatment homes listed on the DHHS submission. It was confirmed that the children placed in those treatment homes were receiving SEDW services during the period. During ISEP 13, DHHS met its commitment to maintain at least 200 treatment foster home beds.

## Education

*Enrollment and Attendance (6.37)*

DHHS is required in the ISEP to take reasonable steps to ensure that school aged foster children are enrolled and attending school within five days of initial placement or any placement change, including while placed in a CCI or emergency placement. To measure its performance for this commitment, DHHS conducted a QAP utilizing a tool and training developed in coordination with the monitoring team.

### ISEP 12

The population under review included all children who were six years of age as of December 2016 and had an initial placement or replacement during the reporting period. Consistent with the parameters the monitors approved, DHHS reviewed a random sample

of cases, stratified by county, to determine performance. The total population was 2,247 children and the sample size was 335 children.

Through the QAP review, DHHS identified that it met the requirement for 84.2 percent of children in ISEP 12. Of the 335 children's cases reviewed, the Department assessed 282 children's cases as compliant and 53 children's cases as non-compliant. As such, DHHS did not meet the designated performance standard of 90 percent for this commitment. The monitoring team reviewed a sample of 35 cases assessed by DCQI and confirmed that DHHS fell short of the designated performance standard.

**ISEP 13**

The population under review included all children who were six years of age as of December 2017 and had an initial placement or replacement during the reporting period. Consistent with the parameters the monitors approved, DHHS reviewed a random sample of cases, stratified by county, to determine performance. The total population was 2,816 children and the sample size was 345 children.

Through the QAP review, DHHS identified that it met the requirement for 89.3 percent of children in ISEP 13. Of the 345 children's cases reviewed, the Department assessed 308 children's cases as compliant and 37 children's cases as non-compliant. As such, DHHS did not meet the designated performance standard of 90 percent for this commitment. The monitoring team reviewed a sample of 35 cases assessed by DCQI and confirmed that DHHS fell short of the designated performance standard.

## Youth Transitioning to Adulthood

### Extending Eligibility and Services

*YAVFC (5.2)*

The ISEP requires DHHS to continue to implement policies and provide services to support youth transitioning to adulthood, including ensuring youth have been informed of services available through the Young Adult Voluntary Foster Care (YAVFC) program, as measured through a QAP. The monitoring team and DCQI unit met and mutually developed a tool and training to conduct this review.

The population for this review was comprised of all youth in foster care, age 16 through 20, who exited care during the period. Consistent with the parameters the monitors approved, DHHS reviewed a random sample of cases, stratified by county, to determine performance.

### ISEP 12

For ISEP 12, the total population consisted of 538 youth, with a sample size of 115 youth. The DCQI team found that 67 of the 115 youth (58.3 percent) were informed of the YAVFC program. In the remaining 48 cases there was no documentation in the youth's file that they were informed of services available through the YAVFC program. As such, DHHS did not meet the designated performance standard of 90 percent for this commitment. The monitoring team reviewed a sample of 35 cases assessed by DHHS and confirmed that the agency did not meet the designated performance standard for this commitment.

### ISEP 13

For ISEP 13, the total population consisted of 523 youth, with a sample size of 114 youth. The DCQI team found that 67 of the 114 youth (58.8 percent) were informed of the YAVFC program. In the remaining 47 cases there was no documentation in the youth's file that they were informed of services available through the YAVFC program. As such, DHHS did not meet the designated performance standard of 90 percent for this commitment. The monitoring team reviewed a sample of 35 cases assessed by DHHS and confirmed that the agency did not meet the designated performance standard for this commitment.

*Independent Living Services (5.3)*

The ISEP requires DHHS to continue to implement policies and provide services to support youth transitioning to adulthood, including ensuring access to independent living services through age 20. Performance relative to this commitment is measured through a QAP. DHHS and the monitoring team established a tool and training for staff who were conducting the reviews. The population for the QAP was compromised of all the youth in foster care, age 16 through 20, who were in care during the period. Consistent with the parameters approved by the monitors, DHHS reviewed a random sample of cases, stratified by county, to determine performance.

### ISEP 12

For ISEP 12, the population consisted of 2,194 youth, with a sample size of 172. DHHS found that 88 (51.2 percent) of the cases were compliant with ensuring youth had access to independent living services. As such, DHHS did not meet the designated performance standard of 90 percent for this commitment. The monitoring team reviewed a sample of 35 cases assessed by DHHS and confirmed that the agency did not meet the designated performance standard for this commitment.

### ISEP 13

For ISEP 13, the population consisted of 2,194 youth, with a sample size of 172. DHHS found that 78 (45.6 percent) of the cases were compliant with ensuring youth had access to independent living services. As such, DHHS did not meet the designated performance

standard of 90 percent for this commitment. The monitoring team reviewed a sample of 35 cases assessed by DHHS and confirmed that the agency did not meet the designated performance standard for this commitment.

*APPLA Goals (5.7)*

DHHS committed to ensure that youth age 16 and older in foster care with a permanency goal of Another Planned Living Arrangement (APPLA), Another Planned Living Arrangement – Emancipation, or adoption without an identified family have access to the range of supportive services necessary to support their preparation for and successful transition to adulthood. The parties agreed that this provision would be measured through a QAP.

DHHS and the monitoring team agreed upon a QAP tool and training for DHHS to utilize during the review. The population for this review was comprised of youth 16 and older with a goal of APPLA or adoption without an identified family, who were in care at the end of the period. Consistent with the parameters approved by the monitors, DHHS reviewed a random sample of cases, stratified by county, to determine performance.

### ISEP 12

For ISEP 12, January 1 to June 30, 2017, the total population was 601 youth and the sample size was 122 youth. DCQI found 66 (54.1 percent) of the cases to be compliant. As such, DHHS did not meet the designated performance standard of 90 percent for this commitment. The monitoring team reviewed a sample of 35 cases assessed by DHHS and confirmed that the agency did not meet the designated performance standard for this commitment.

### ISEP 13

For ISEP 13, July 1 to December 31, 2017, the total population was 573 youth and the sample size was 118 youth. DCQI found 63 (53.4 percent) of the cases to be compliant. As such, DHHS did not meet the designated performance standard of 90 percent for this commitment. The monitoring team reviewed a sample of 35 cases assessed by DHHS and confirmed that the agency did not meet the designated performance standard for this commitment.

## Immediate Actions for Youth Transitioning to Adulthood

*Family Team Meetings (5.6)*

DHHS pledged to hold a Family Team Meeting (FTM) for each youth age 16 and older occurring 90 days before planned discharge from care or within 30 days after an unexpected discharge. The meeting functions as an opportunity to inform youth leaving the child welfare system about

resources available in their community, such as public benefits, housing, education, employment, transportation, financial management, and health. The parties agreed that this provision would be measured through a QAP. DHHS and the monitoring team agreed upon a set of questions to be utilized and training to guide staff conducting the review. The population under review was comprised of all youth 16 years of age and older who exited care during the ISEP reporting period. Consistent with the parameters the monitors approved, DHHS reviewed a random sample of cases, stratified by county, to determine performance.

**ISEP 12**

For ISEP 12, the population consisted of 538 children with a sample size of 116 children. Of the cases reviewed, DHHS found that 31 (26.7 percent) were compliant with the ISEP commitment. DHHS therefore did not meet the designated performance standard of 90 percent for this commitment during ISEP 12. The monitoring team assessed a sample of 35 cases reviewed by DCQI and confirmed that DHHS did not meet the designated performance standard for this commitment.

**ISEP 13**

For ISEP 13, the population consisted of 523 children with a sample size of 114 children. Of the cases reviewed, DHHS found that 27 (23.7 percent) were compliant with the ISEP commitment. DHHS therefore did not meet the designated performance standard of 90 percent for this commitment during ISEP 13. The monitoring team assessed a sample of 35 cases reviewed by DCQI and confirmed that DHHS did not meet the designated performance standard for this commitment.

**Appendix A. Dwayne B. Stipulated Order – May 23, 2018**

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

DWAYNE B., by his next friend, John
Stempfle: CARMELA B., by her next
friend William Ladd; LISA J., by her
next friend, Teresa Kibby; and JULIA,
SIMON, and COURTNEY G., by their
next friend, William Ladd; for
themselves and others similarly
situated,

      Plaintiffs,

v

RICK SNYDER, in his official capacity as
Governor of the State of Michigan, *et al.*,

      Defendants.

No. 2:06-cv-13548

HON. NANCY G. EDMUNDS

Class Action

**STIPULATED ORDER
REGARDING ISEP 11**

_____/

Sara M. Bartosz Attorney for
Plaintiffs Children's Rights
88 Pine Street, Suite 800 New
York, NY 10005 Phone: (212)
683-2210

Kristin M. Heyse (P64353)
Toni Harris (P63111)
Attorneys for Defendants
Michigan Department of
Attorney General
Health, Education & Family
Services Division
525 West Ottawa Street
P.O. Box 30758 Lansing,
MI 48909 Phone: (517) 373-
7700

_____

75

| | |
|---|---|
| Elizabeth P. Hardy (P37426) | John J. Bursch (P57679) |
| Noel D. Massie (P28988) | Attorney for Defendant |
| Jay C. Boger (P58805) | Special Assistant |
| Attorneys for Plaintiffs | Attorney General |
| Kienbaum Opperwall Hardy & Pelton, | Bursch Law PLLC |
| PLC | 9339 Cherry Valley Avenue S.E., |
| 280 North Old Woodward Ave., | #78 |
| Suite 400 | Caledonia, MI  49316 |
| Birmingham, MI  48009 | Phone: (616) 450-4235 |
| Phone: (248) 645-0000 | |

_____/

## STIPULATED ORDER REGARDING ISEP 11

The Court, having heard from the monitors and the parties regarding the Michigan Department of Health and Human Services' (Department) Progress under the Implementation, Sustainability, and Exit Plan (ISEP) during the reporting period from July to December 2016 ("ISEP Period 11"), and the Court being fully advised,

**HEREBY ORDERS THE FOLLOWING:**

1. Based on the Department's performance during ISEP Period 11, DHHS achieved the required performance standards for the following commitments, and they shall exit the ISEP: Youth Transitioning to Adulthood, MYOI (5.4) and Youth Transitioning to Adulthood, MYOI Coordinators (5.5); and

2. Based on the Department's performance during ISEP Period 11, DHHS attained the required performance standards for the following commitment, and it shall be moved to the Structures and Policies section of the ISEP: Psychotropic Medication, Prohibition on Disciplinary Use (5.14); and

3. Based on the Department's performance during ISEP Period 11, DHHS attained the required performance standards for the following commitments, and they shall be moved from the "To Be Achieved" section to the "To Be Maintained" section of the ISEP: Caseload, CPS Investigation Workers (6.26); Caseloads, CPS Ongoing Workers (6.27); Assessments and Service Plans, Content (6.33); Provision of Services (6.34); Education, Appropriate Education (6.36); Education, Continuity (6.38); and Psychotropic Medication, Oversight Review (6.56).

**IT IS SO ORDERED.**

Dated: May 23, 2018

<div style="text-align: right;">

s/ Nancy G. Edmunds
NANCY G. EDMUNDS
United States District Judge

</div>

**STIPULATED AND AGREED TO BY:**

/s/ Sara M. Bartosz               /s/ Kristin M. Heyse
Sara M. Bartosz                    Kristin M. Heyse (P64353)
Attorney for Plaintiffs           Attorney for  Defendants

**Appendix B. Age Range of Children in Care on June 30, 2017 by County**

| County Name | Age Group of Children in Care on June 30, 2017 | | | | | | | | Total |
| | Ages 0-6 | | Ages 7-11 | | Ages 12-17 | | Ages 18+ | | |
| | Children | % | Children | % | Children | % | Children | % | Children |
|---|---|---|---|---|---|---|---|---|---|
| ALCONA | 6 | 40% | 2 | 13% | 6 | 40% | 1 | 7% | 15 |
| ALGER | 4 | 50% | 2 | 25% | 2 | 25% | 0 | 0% | 8 |
| ALLEGAN | 61 | 54% | 22 | 19% | 25 | 22% | 6 | 5% | 114 |
| ALPENA | 31 | 56% | 12 | 22% | 12 | 22% | 0 | 0% | 55 |
| ANTRIM | 4 | 29% | 2 | 14% | 6 | 43% | 2 | 14% | 14 |
| ARENAC | 15 | 56% | 4 | 15% | 5 | 19% | 3 | 11% | 27 |
| BARAGA | 3 | 75% | 0 | 0% | 0 | 0% | 1 | 25% | 4 |
| BARRY | 36 | 55% | 16 | 25% | 12 | 18% | 1 | 2% | 65 |
| BAY | 56 | 43% | 24 | 18% | 45 | 35% | 5 | 4% | 130 |
| BENZIE | 6 | 46% | 1 | 8% | 4 | 31% | 2 | 15% | 13 |
| BERRIEN | 203 | 61% | 61 | 18% | 51 | 15% | 20 | 6% | 335 |
| BRANCH | 59 | 53% | 27 | 24% | 22 | 20% | 4 | 4% | 112 |
| CALHOUN | 136 | 51% | 61 | 23% | 62 | 23% | 8 | 3% | 267 |
| CASS | 58 | 39% | 38 | 26% | 46 | 31% | 7 | 5% | 149 |
| CENTRAL OFFICE | 12 | 36% | 5 | 15% | 11 | 33% | 5 | 15% | 33 |
| CHARLEVOIX | 7 | 47% | 3 | 20% | 3 | 20% | 2 | 13% | 15 |
| CHEBOYGAN | 10 | 31% | 6 | 19% | 14 | 44% | 2 | 6% | 32 |
| CHIPPEWA | 35 | 59% | 10 | 17% | 14 | 24% | 0 | 0% | 59 |
| CLARE | 28 | 38% | 13 | 18% | 26 | 36% | 6 | 8% | 73 |
| CLINTON | 21 | 57% | 6 | 16% | 8 | 22% | 2 | 5% | 37 |
| CRAWFORD | 18 | 42% | 10 | 23% | 11 | 26% | 4 | 9% | 43 |
| DELTA | 35 | 67% | 11 | 21% | 6 | 12% | 0 | 0% | 52 |
| DICKINSON | 17 | 46% | 8 | 22% | 10 | 27% | 2 | 5% | 37 |
| EATON | 33 | 42% | 17 | 22% | 22 | 28% | 6 | 8% | 78 |
| EMMET | 8 | 30% | 7 | 26% | 9 | 33% | 3 | 11% | 27 |
| GENESEE | 213 | 45% | 113 | 24% | 113 | 24% | 31 | 7% | 470 |
| GLADWIN | 12 | 40% | 7 | 23% | 9 | 30% | 2 | 7% | 30 |
| GOGEBIC | 32 | 55% | 17 | 29% | 9 | 16% | 0 | 0% | 58 |
| GRAND TRAVERSE | 42 | 63% | 13 | 19% | 12 | 18% | 0 | 0% | 67 |
| GRATIOT | 18 | 51% | 4 | 11% | 13 | 37% | 0 | 0% | 35 |
| HILLSDALE | 68 | 61% | 25 | 22% | 18 | 16% | 1 | 1% | 112 |
| HOUGHTON | 1 | 17% | 1 | 17% | 4 | 67% | 0 | 0% | 6 |
| HURON | 10 | 34% | 9 | 31% | 8 | 28% | 2 | 7% | 29 |
| INGHAM | 243 | 47% | 132 | 26% | 106 | 21% | 32 | 6% | 513 |
| IONIA | 24 | 42% | 15 | 26% | 14 | 25% | 4 | 7% | 57 |
| IOSCO | 24 | 42% | 12 | 21% | 17 | 30% | 4 | 7% | 57 |
| IRON | 10 | 67% | 1 | 7% | 4 | 27% | 0 | 0% | 15 |
| ISABELLA | 26 | 37% | 25 | 36% | 18 | 26% | 1 | 1% | 70 |
| JACKSON | 107 | 45% | 54 | 23% | 67 | 28% | 12 | 5% | 240 |
| KALAMAZOO | 277 | 52% | 113 | 21% | 112 | 21% | 35 | 7% | 537 |
| KALKASKA | 19 | 66% | 3 | 10% | 5 | 17% | 2 | 7% | 29 |
| KENT | 377 | 47% | 174 | 22% | 206 | 26% | 46 | 6% | 803 |
| LAKE | 12 | 38% | 3 | 9% | 15 | 47% | 2 | 6% | 32 |
| LAPEER | 26 | 41% | 12 | 19% | 20 | 32% | 5 | 8% | 63 |

| County Name | Age Group of Children in Care on June 30, 2017 | | | | | | | | Total |
| | Ages 0-6 | | Ages 7-11 | | Ages 12-17 | | Ages 18+ | | |
| | Children | % | Children | % | Children | % | Children | % | Children |
|---|---|---|---|---|---|---|---|---|---|
| LEELANAU | 2 | 29% | 3 | 43% | 1 | 14% | 1 | 14% | 7 |
| LENAWEE | 69 | 59% | 25 | 22% | 19 | 16% | 3 | 3% | 116 |
| LIVINGSTON | 65 | 56% | 20 | 17% | 26 | 22% | 5 | 4% | 116 |
| LUCE | 7 | 33% | 10 | 48% | 3 | 14% | 1 | 5% | 21 |
| MACKINAC | 3 | 27% | 2 | 18% | 4 | 36% | 2 | 18% | 11 |
| MACOMB | 269 | 49% | 127 | 23% | 123 | 22% | 32 | 6% | 551 |
| MANISTEE | 23 | 66% | 8 | 23% | 4 | 11% | 0 | 0% | 35 |
| MARQUETTE | 35 | 73% | 3 | 6% | 7 | 15% | 3 | 6% | 48 |
| MASON | 22 | 54% | 7 | 17% | 12 | 29% | 0 | 0% | 41 |
| MECOSTA | 5 | 24% | 3 | 14% | 10 | 48% | 3 | 14% | 21 |
| MENOMINEE | 26 | 84% | 4 | 13% | 1 | 3% | 0 | 0% | 31 |
| MIDLAND | 48 | 44% | 20 | 19% | 37 | 34% | 3 | 3% | 108 |
| MISSAUKEE | 3 | 30% | 1 | 10% | 6 | 60% | 0 | 0% | 10 |
| MONROE | 100 | 52% | 50 | 26% | 35 | 18% | 9 | 5% | 194 |
| MONTCALM | 31 | 38% | 16 | 20% | 33 | 41% | 1 | 1% | 81 |
| MONTMORENCY | 5 | 36% | 2 | 14% | 6 | 43% | 1 | 7% | 14 |
| MUSKEGON | 181 | 48% | 85 | 23% | 84 | 22% | 25 | 7% | 375 |
| NEWAYGO | 46 | 45% | 27 | 26% | 26 | 25% | 4 | 4% | 103 |
| OAKLAND | 378 | 49% | 159 | 21% | 176 | 23% | 62 | 8% | 775 |
| OCEANA | 6 | 35% | 9 | 53% | 2 | 12% | 0 | 0% | 17 |
| OGEMAW | 21 | 36% | 15 | 26% | 19 | 33% | 3 | 5% | 58 |
| ONTONAGON | 5 | 71% | 1 | 14% | 1 | 14% | 0 | 0% | 7 |
| OSCEOLA | 5 | 25% | 6 | 30% | 9 | 45% | 0 | 0% | 20 |
| OSCODA | 15 | 71% | 3 | 14% | 2 | 10% | 1 | 5% | 21 |
| OTSEGO | 26 | 51% | 14 | 27% | 10 | 20% | 1 | 2% | 51 |
| OTTAWA | 90 | 53% | 36 | 21% | 39 | 23% | 6 | 4% | 171 |
| PRESQUE ISLE | 7 | 64% | 3 | 27% | 1 | 9% | 0 | 0% | 11 |
| ROSCOMMON | 9 | 53% | 2 | 12% | 6 | 35% | 0 | 0% | 17 |
| SAGINAW | 55 | 42% | 27 | 20% | 38 | 29% | 12 | 9% | 132 |
| SANILAC | 36 | 60% | 14 | 23% | 8 | 13% | 2 | 3% | 60 |
| SCHOOLCRAFT | 4 | 36% | 2 | 18% | 3 | 27% | 2 | 18% | 11 |
| SHIAWASSEE | 54 | 52% | 18 | 17% | 29 | 28% | 3 | 3% | 104 |
| ST. CLAIR | 122 | 52% | 53 | 22% | 57 | 24% | 4 | 2% | 236 |
| ST. JOSEPH | 106 | 53% | 55 | 28% | 37 | 19% | 1 | 1% | 199 |
| TUSCOLA | 33 | 49% | 15 | 22% | 14 | 21% | 5 | 7% | 67 |
| VAN BUREN | 75 | 52% | 33 | 23% | 32 | 22% | 5 | 3% | 145 |
| WASHTENAW | 69 | 51% | 21 | 16% | 35 | 26% | 9 | 7% | 134 |
| WAYNE | 1,410 | 48% | 632 | 22% | 701 | 24% | 169 | 6% | 2,912 |
| WEXFORD | 25 | 68% | 2 | 5% | 9 | 24% | 1 | 3% | 37 |
| **Total** | **5,934** | **49%** | **2,634** | **22%** | **2,867** | **24%** | **650** | **5%** | **12,085** |

**Appendix C. Length of Stay of Children in Care on June 30, 2017 By County**

| County Name | Length of Stay of Children in Care on June 30, 2017 | | | | | | | | | | Total |
| | Less than 1 year | | 1-2 years | | 2-3 years | | 3-6 years | | 6+ years | | |
| | Children | % | Children | % | Children | % | Children | % | Children | % | Children |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ALCONA | 10 | 67% | 0 | 0% | 1 | 7% | 1 | 7% | 3 | 20% | 15 |
| ALGER | 4 | 50% | 2 | 25% | 0 | 0% | 2 | 25% | 0 | 0% | 8 |
| ALLEGAN | 52 | 46% | 37 | 32% | 12 | 11% | 10 | 9% | 3 | 3% | 114 |
| ALPENA | 21 | 38% | 21 | 38% | 9 | 16% | 3 | 5% | 1 | 2% | 55 |
| ANTRIM | 6 | 43% | 2 | 14% | 5 | 36% | 1 | 7% | 0 | 0% | 14 |
| ARENAC | 16 | 59% | 3 | 11% | 4 | 15% | 4 | 15% | 0 | 0% | 27 |
| BARAGA | 2 | 50% | 1 | 25% | 0 | 0% | 1 | 25% | 0 | 0% | 4 |
| BARRY | 44 | 68% | 12 | 18% | 5 | 8% | 3 | 5% | 1 | 2% | 65 |
| BAY | 57 | 44% | 41 | 32% | 16 | 12% | 16 | 12% | 0 | 0% | 130 |
| BENZIE | 5 | 38% | 4 | 31% | 0 | 0% | 4 | 31% | 0 | 0% | 13 |
| BERRIEN | 164 | 49% | 117 | 35% | 36 | 11% | 11 | 3% | 7 | 2% | 335 |
| BRANCH | 61 | 54% | 29 | 26% | 11 | 10% | 11 | 10% | 0 | 0% | 112 |
| CALHOUN | 115 | 43% | 84 | 31% | 40 | 15% | 27 | 10% | 1 | 0% | 267 |
| CASS | 56 | 38% | 66 | 44% | 14 | 9% | 9 | 6% | 4 | 3% | 149 |
| CENTRAL OFFICE | 15 | 45% | 4 | 12% | 1 | 3% | 3 | 9% | 10 | 30% | 33 |
| CHARLEVOIX | 9 | 60% | 3 | 20% | 0 | 0% | 3 | 20% | 0 | 0% | 15 |
| CHEBOYGAN | 14 | 44% | 7 | 22% | 10 | 31% | 1 | 3% | 0 | 0% | 32 |
| CHIPPEWA | 33 | 56% | 9 | 15% | 11 | 19% | 5 | 8% | 1 | 2% | 59 |
| CLARE | 25 | 34% | 27 | 37% | 13 | 18% | 8 | 11% | 0 | 0% | 73 |
| CLINTON | 19 | 51% | 13 | 35% | 3 | 8% | 1 | 3% | 1 | 3% | 37 |
| CRAWFORD | 19 | 44% | 14 | 33% | 5 | 12% | 3 | 7% | 2 | 5% | 43 |
| DELTA | 26 | 50% | 20 | 38% | 5 | 10% | 1 | 2% | 0 | 0% | 52 |
| DICKINSON | 17 | 46% | 13 | 35% | 2 | 5% | 3 | 8% | 2 | 5% | 37 |
| EATON | 45 | 58% | 16 | 21% | 9 | 12% | 4 | 5% | 4 | 5% | 78 |
| EMMET | 7 | 26% | 9 | 33% | 7 | 26% | 2 | 7% | 2 | 7% | 27 |
| GENESEE | 221 | 47% | 127 | 27% | 64 | 14% | 41 | 9% | 17 | 4% | 470 |
| GLADWIN | 17 | 57% | 8 | 27% | 2 | 7% | 1 | 3% | 2 | 7% | 30 |
| GOGEBIC | 19 | 33% | 26 | 45% | 10 | 17% | 3 | 5% | 0 | 0% | 58 |
| GRAND TRAVERSE | 43 | 64% | 18 | 27% | 3 | 4% | 2 | 3% | 1 | 1% | 67 |
| GRATIOT | 16 | 46% | 10 | 29% | 8 | 23% | 0 | 0% | 1 | 3% | 35 |
| HILLSDALE | 61 | 54% | 37 | 33% | 10 | 9% | 4 | 4% | 0 | 0% | 112 |
| HOUGHTON | 2 | 33% | 2 | 33% | 0 | 0% | 2 | 33% | 0 | 0% | 6 |
| HURON | 5 | 17% | 16 | 55% | 5 | 17% | 2 | 7% | 1 | 3% | 29 |
| INGHAM | 213 | 42% | 166 | 32% | 67 | 13% | 55 | 11% | 12 | 2% | 513 |
| IONIA | 37 | 65% | 13 | 23% | 2 | 4% | 2 | 4% | 3 | 5% | 57 |
| IOSCO | 26 | 46% | 17 | 30% | 6 | 11% | 5 | 9% | 3 | 5% | 57 |
| IRON | 6 | 40% | 9 | 60% | 0 | 0% | 0 | 0% | 0 | 0% | 15 |
| ISABELLA | 26 | 37% | 30 | 43% | 7 | 10% | 6 | 9% | 1 | 1% | 70 |
| JACKSON | 133 | 55% | 72 | 30% | 10 | 4% | 22 | 9% | 3 | 1% | 240 |
| KALAMAZOO | 270 | 50% | 138 | 26% | 73 | 14% | 50 | 9% | 6 | 1% | 537 |

81

| County Name | Length of Stay of Children in Care on June 30, 2017 | | | | | | | | | | Total |
| | Less than 1 year | | 1-2 years | | 2-3 years | | 3-6 years | | 6+ years | | |
| | Children | % | Children | % | Children | % | Children | % | Children | % | Children |
|---|---|---|---|---|---|---|---|---|---|---|---|
| KALKASKA | 20 | 69% | 5 | 17% | 0 | 0% | 4 | 14% | 0 | 0% | 29 |
| KENT | 390 | 49% | 222 | 28% | 107 | 13% | 72 | 9% | 12 | 1% | 803 |
| LAKE | 13 | 41% | 2 | 6% | 7 | 22% | 7 | 22% | 3 | 9% | 32 |
| LAPEER | 22 | 35% | 31 | 49% | 5 | 8% | 5 | 8% | 0 | 0% | 63 |
| LEELANAU | 2 | 29% | 2 | 29% | 1 | 14% | 0 | 0% | 2 | 29% | 7 |
| LENAWEE | 59 | 51% | 45 | 39% | 7 | 6% | 3 | 3% | 2 | 2% | 116 |
| LIVINGSTON | 60 | 52% | 31 | 27% | 17 | 15% | 8 | 7% | 0 | 0% | 116 |
| LUCE | 8 | 38% | 3 | 14% | 3 | 14% | 6 | 29% | 1 | 5% | 21 |
| MACKINAC | 0 | 0% | 3 | 27% | 1 | 9% | 5 | 45% | 2 | 18% | 11 |
| MACOMB | 264 | 48% | 146 | 26% | 61 | 11% | 70 | 13% | 10 | 2% | 551 |
| MANISTEE | 12 | 34% | 15 | 43% | 7 | 20% | 0 | 0% | 1 | 3% | 35 |
| MARQUETTE | 29 | 60% | 13 | 27% | 1 | 2% | 4 | 8% | 1 | 2% | 48 |
| MASON | 21 | 51% | 13 | 32% | 5 | 12% | 0 | 0% | 2 | 5% | 41 |
| MECOSTA | 4 | 19% | 6 | 29% | 2 | 10% | 7 | 33% | 2 | 10% | 21 |
| MENOMINEE | 21 | 68% | 5 | 16% | 5 | 16% | 0 | 0% | 0 | 0% | 31 |
| MIDLAND | 61 | 56% | 19 | 18% | 13 | 12% | 12 | 11% | 3 | 3% | 108 |
| MISSAUKEE | 5 | 50% | 2 | 20% | 1 | 10% | 2 | 20% | 0 | 0% | 10 |
| MONROE | 105 | 54% | 47 | 24% | 17 | 9% | 23 | 12% | 2 | 1% | 194 |
| MONTCALM | 41 | 51% | 15 | 19% | 11 | 14% | 10 | 12% | 4 | 5% | 81 |
| MONTMORENCY | 4 | 29% | 8 | 57% | 0 | 0% | 2 | 14% | 0 | 0% | 14 |
| MUSKEGON | 205 | 55% | 107 | 29% | 32 | 9% | 19 | 5% | 12 | 3% | 375 |
| NEWAYGO | 47 | 46% | 28 | 27% | 13 | 13% | 15 | 15% | 0 | 0% | 103 |
| OAKLAND | 348 | 45% | 220 | 28% | 92 | 12% | 89 | 11% | 26 | 3% | 775 |
| OCEANA | 3 | 18% | 11 | 65% | 1 | 6% | 2 | 12% | 0 | 0% | 17 |
| OGEMAW | 33 | 57% | 10 | 17% | 14 | 24% | 0 | 0% | 1 | 2% | 58 |
| ONTONAGON | 3 | 43% | 0 | 0% | 4 | 57% | 0 | 0% | 0 | 0% | 7 |
| OSCEOLA | 11 | 55% | 3 | 15% | 4 | 20% | 1 | 5% | 1 | 5% | 20 |
| OSCODA | 10 | 48% | 7 | 33% | 4 | 19% | 0 | 0% | 0 | 0% | 21 |
| OTSEGO | 33 | 65% | 12 | 24% | 4 | 8% | 1 | 2% | 1 | 2% | 51 |
| OTTAWA | 93 | 54% | 51 | 30% | 16 | 9% | 7 | 4% | 4 | 2% | 171 |
| PRESQUE ISLE | 3 | 27% | 6 | 55% | 2 | 18% | 0 | 0% | 0 | 0% | 11 |
| ROSCOMMON | 9 | 53% | 3 | 18% | 1 | 6% | 3 | 18% | 1 | 6% | 17 |
| SAGINAW | 74 | 56% | 29 | 22% | 15 | 11% | 13 | 10% | 1 | 1% | 132 |
| SANILAC | 38 | 63% | 13 | 22% | 4 | 7% | 5 | 8% | 0 | 0% | 60 |
| SCHOOLCRAFT | 3 | 27% | 5 | 45% | 1 | 9% | 2 | 18% | 0 | 0% | 11 |
| SHIAWASSEE | 58 | 56% | 25 | 24% | 15 | 14% | 6 | 6% | 0 | 0% | 104 |
| ST. CLAIR | 96 | 41% | 83 | 35% | 25 | 11% | 31 | 13% | 1 | 0% | 236 |
| ST. JOSEPH | 95 | 48% | 68 | 34% | 22 | 11% | 10 | 5% | 4 | 2% | 199 |
| TUSCOLA | 44 | 66% | 12 | 18% | 5 | 7% | 6 | 9% | 0 | 0% | 67 |
| VAN BUREN | 70 | 48% | 47 | 32% | 18 | 12% | 7 | 5% | 3 | 2% | 145 |
| WASHTENAW | 42 | 31% | 35 | 26% | 35 | 26% | 16 | 12% | 6 | 4% | 134 |
| WAYNE | 1,356 | 47% | 747 | 26% | 374 | 13% | 326 | 11% | 109 | 4% | 2,912 |
| WEXFORD | 21 | 57% | 10 | 27% | 3 | 8% | 1 | 3% | 2 | 5% | 37 |
| **Total** | **5,773** | **48%** | **3,408** | **28%** | **1461** | **12%** | **1,132** | **9%** | **311** | **3%** | **12,085** |

**Appendix D. Age Range of Children in Care on December 31, 2017 by County**

| County Name | Age Group of Children in Care on December 31, 2017 | | | | | | | | Total |
| | Ages 0-6 | | Ages 7-11 | | Ages 12-17 | | Ages 18+ | | |
| | Children | % | Children | % | Children | % | Children | % | Children |
|---|---|---|---|---|---|---|---|---|---|
| ALCONA | 8 | 38% | 6 | 29% | 7 | 33% | 0 | 0% | 21 |
| ALGER | 3 | 50% | 1 | 17% | 2 | 33% | 0 | 0% | 6 |
| ALLEGAN | 66 | 52% | 30 | 23% | 27 | 21% | 5 | 4% | 128 |
| ALPENA | 29 | 59% | 10 | 20% | 8 | 16% | 2 | 4% | 49 |
| ANTRIM | 9 | 53% | 2 | 12% | 5 | 29% | 1 | 6% | 17 |
| ARENAC | 13 | 62% | 1 | 5% | 6 | 29% | 1 | 5% | 21 |
| BARAGA | 4 | 80% | 0 | 0% | 0 | 0% | 1 | 20% | 5 |
| BARRY | 33 | 51% | 16 | 25% | 13 | 20% | 3 | 5% | 65 |
| BAY | 49 | 40% | 27 | 22% | 43 | 35% | 5 | 4% | 124 |
| BENZIE | 4 | 40% | 1 | 10% | 3 | 30% | 2 | 20% | 10 |
| BERRIEN | 172 | 57% | 62 | 20% | 54 | 18% | 15 | 5% | 303 |
| BRANCH | 50 | 47% | 28 | 26% | 25 | 24% | 3 | 3% | 106 |
| CALHOUN | 143 | 48% | 73 | 24% | 78 | 26% | 4 | 1% | 298 |
| CASS | 66 | 39% | 46 | 27% | 50 | 29% | 8 | 5% | 170 |
| CENTRAL OFFICE | 20 | 53% | 8 | 21% | 7 | 18% | 3 | 8% | 38 |
| CHARLEVOIX | 7 | 41% | 4 | 24% | 4 | 24% | 2 | 12% | 17 |
| CHEBOYGAN | 12 | 44% | 4 | 15% | 10 | 37% | 1 | 4% | 27 |
| CHIPPEWA | 37 | 64% | 10 | 17% | 11 | 19% | 0 | 0% | 58 |
| CLARE | 23 | 32% | 21 | 29% | 22 | 31% | 6 | 8% | 72 |
| CLINTON | 21 | 57% | 5 | 14% | 6 | 16% | 5 | 14% | 37 |
| CRAWFORD | 18 | 42% | 8 | 19% | 12 | 28% | 5 | 12% | 43 |
| DELTA | 30 | 65% | 9 | 20% | 7 | 15% | 0 | 0% | 46 |
| DICKINSON | 19 | 58% | 6 | 18% | 6 | 18% | 2 | 6% | 33 |
| EATON | 34 | 44% | 15 | 19% | 26 | 33% | 3 | 4% | 78 |
| EMMET | 10 | 43% | 3 | 13% | 7 | 30% | 3 | 13% | 23 |
| GENESEE | 232 | 46% | 116 | 23% | 127 | 25% | 28 | 6% | 503 |
| GLADWIN | 11 | 35% | 7 | 23% | 13 | 42% | 0 | 0% | 31 |
| GOGEBIC | 30 | 53% | 15 | 26% | 12 | 21% | 0 | 0% | 57 |
| GRAND TRAVERSE | 46 | 68% | 12 | 18% | 10 | 15% | 0 | 0% | 68 |
| GRATIOT | 19 | 58% | 5 | 15% | 8 | 24% | 1 | 3% | 33 |
| HILLSDALE | 56 | 54% | 26 | 25% | 21 | 20% | 1 | 1% | 104 |
| HOUGHTON | 2 | 29% | 0 | 0% | 5 | 71% | 0 | 0% | 7 |
| HURON | 7 | 30% | 9 | 39% | 5 | 22% | 2 | 9% | 23 |
| INGHAM | 260 | 48% | 121 | 22% | 122 | 23% | 36 | 7% | 539 |
| IONIA | 29 | 50% | 12 | 21% | 13 | 22% | 4 | 7% | 58 |
| IOSCO | 24 | 41% | 13 | 22% | 16 | 28% | 5 | 9% | 58 |
| IRON | 8 | 80% | 0 | 0% | 2 | 20% | 0 | 0% | 10 |
| ISABELLA | 32 | 42% | 26 | 34% | 17 | 22% | 1 | 1% | 76 |
| JACKSON | 118 | 46% | 61 | 24% | 64 | 25% | 12 | 5% | 255 |
| KALAMAZOO | 290 | 53% | 107 | 20% | 118 | 22% | 32 | 6% | 547 |
| KALKASKA | 16 | 50% | 6 | 19% | 9 | 28% | 1 | 3% | 32 |
| KENT | 373 | 46% | 166 | 21% | 215 | 27% | 50 | 6% | 804 |
| LAKE | 11 | 41% | 3 | 11% | 11 | 41% | 2 | 7% | 27 |
| LAPEER | 23 | 43% | 9 | 17% | 16 | 30% | 6 | 11% | 54 |

| County Name | Age Group of Children in Care on December 31, 2017 | | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|
| | Ages 0-6 | | Ages 7-11 | | Ages 12-17 | | Ages 18+ | | |
| | Children | % | Children | % | Children | % | Children | % | Children |
| LEELANAU | 2 | 29% | 3 | 43% | 1 | 14% | 1 | 14% | 7 |
| LENAWEE | 86 | 61% | 30 | 21% | 23 | 16% | 2 | 1% | 141 |
| LIVINGSTON | 56 | 49% | 26 | 23% | 28 | 25% | 4 | 4% | 114 |
| LUCE | 8 | 67% | 2 | 17% | 2 | 17% | 0 | 0% | 12 |
| MACKINAC | 7 | 47% | 2 | 13% | 4 | 27% | 2 | 13% | 15 |
| MACOMB | 271 | 49% | 123 | 22% | 133 | 24% | 23 | 4% | 550 |
| MANISTEE | 17 | 71% | 3 | 13% | 4 | 17% | 0 | 0% | 24 |
| MARQUETTE | 29 | 66% | 2 | 5% | 11 | 25% | 2 | 5% | 44 |
| MASON | 23 | 50% | 10 | 22% | 13 | 28% | 0 | 0% | 46 |
| MECOSTA | 12 | 44% | 6 | 22% | 8 | 30% | 1 | 4% | 27 |
| MENOMINEE | 19 | 79% | 5 | 21% | 0 | 0% | 0 | 0% | 24 |
| MIDLAND | 60 | 50% | 22 | 18% | 34 | 28% | 4 | 3% | 120 |
| MISSAUKEE | 4 | 33% | 1 | 8% | 7 | 58% | 0 | 0% | 12 |
| MONROE | 93 | 49% | 46 | 24% | 42 | 22% | 9 | 5% | 190 |
| MONTCALM | 33 | 42% | 11 | 14% | 30 | 38% | 5 | 6% | 79 |
| MONTMORENCY | 4 | 31% | 2 | 15% | 5 | 38% | 2 | 15% | 13 |
| MUSKEGON | 188 | 48% | 95 | 24% | 83 | 21% | 22 | 6% | 388 |
| NEWAYGO | 47 | 47% | 32 | 32% | 18 | 18% | 4 | 4% | 101 |
| OAKLAND | 400 | 52% | 165 | 21% | 160 | 21% | 48 | 6% | 773 |
| OCEANA | 5 | 28% | 7 | 39% | 6 | 33% | 0 | 0% | 18 |
| OGEMAW | 16 | 40% | 5 | 13% | 16 | 40% | 3 | 8% | 40 |
| ONTONAGON | 3 | 50% | 1 | 17% | 2 | 33% | 0 | 0% | 6 |
| OSCEOLA | 5 | 20% | 7 | 28% | 13 | 52% | 0 | 0% | 25 |
| OSCODA | 9 | 60% | 3 | 20% | 2 | 13% | 1 | 7% | 15 |
| OTSEGO | 26 | 54% | 13 | 27% | 7 | 15% | 2 | 4% | 48 |
| OTTAWA | 91 | 55% | 32 | 19% | 36 | 22% | 7 | 4% | 166 |
| PRESQUE ISLE | 8 | 62% | 4 | 31% | 1 | 8% | 0 | 0% | 13 |
| ROSCOMMON | 15 | 65% | 1 | 4% | 7 | 30% | 0 | 0% | 23 |
| SAGINAW | 62 | 43% | 28 | 19% | 46 | 32% | 8 | 6% | 144 |
| SANILAC | 34 | 61% | 13 | 23% | 9 | 16% | 0 | 0% | 56 |
| SCHOOLCRAFT | 9 | 69% | 1 | 8% | 2 | 15% | 1 | 8% | 13 |
| SHIAWASSEE | 50 | 48% | 21 | 20% | 30 | 29% | 3 | 3% | 104 |
| ST. CLAIR | 129 | 53% | 56 | 23% | 48 | 20% | 11 | 5% | 244 |
| ST. JOSEPH | 94 | 48% | 60 | 31% | 38 | 19% | 4 | 2% | 196 |
| TUSCOLA | 27 | 42% | 15 | 23% | 19 | 30% | 3 | 5% | 64 |
| VAN BUREN | 82 | 51% | 34 | 21% | 42 | 26% | 3 | 2% | 161 |
| WASHTENAW | 85 | 51% | 31 | 18% | 45 | 27% | 7 | 4% | 168 |
| WAYNE | 1,476 | 49% | 668 | 22% | 709 | 23% | 188 | 6% | 3,041 |
| WEXFORD | 27 | 66% | 4 | 10% | 7 | 17% | 3 | 7% | 41 |
| **Total** | **6,079** | **49%** | **2,700** | **22%** | **2,934** | **24%** | **634** | **5%** | **12,347** |

**Appendix E. Length of Stay of Children in Care on December 31, 2017 By County**

| County Name | Length of Stay of Children in Care on December 31, 2017 | | | | | | | | | | Total |
| | Less than 1 year | | 1-2 years | | 2-3 years | | 3-6 years | | 6+ years | | |
| | Children | % | Children | % | Children | % | Children | % | Children | % | Children |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ALCONA | 10 | 48% | 6 | 29% | 1 | 5% | 0 | 0% | 4 | 19% | 21 |
| ALGER | 2 | 33% | 2 | 33% | 0 | 0% | 2 | 33% | 0 | 0% | 6 |
| ALLEGAN | 79 | 62% | 28 | 22% | 10 | 8% | 9 | 7% | 2 | 2% | 128 |
| ALPENA | 27 | 55% | 5 | 10% | 11 | 22% | 5 | 10% | 1 | 2% | 49 |
| ANTRIM | 9 | 53% | 3 | 18% | 4 | 24% | 1 | 6% | 0 | 0% | 17 |
| ARENAC | 13 | 62% | 5 | 24% | 1 | 5% | 1 | 5% | 1 | 5% | 21 |
| BARAGA | 3 | 60% | 1 | 20% | 0 | 0% | 1 | 20% | 0 | 0% | 5 |
| BARRY | 35 | 54% | 22 | 34% | 4 | 6% | 3 | 5% | 1 | 2% | 65 |
| BAY | 56 | 45% | 29 | 23% | 22 | 18% | 14 | 11% | 3 | 2% | 124 |
| BENZIE | 5 | 50% | 1 | 10% | 1 | 10% | 3 | 30% | 0 | 0% | 10 |
| BERRIEN | 134 | 44% | 109 | 36% | 32 | 11% | 23 | 8% | 5 | 2% | 303 |
| BRANCH | 66 | 62% | 31 | 29% | 5 | 5% | 4 | 4% | 0 | 0% | 106 |
| CALHOUN | 157 | 53% | 72 | 24% | 43 | 14% | 25 | 8% | 1 | 0% | 298 |
| CASS | 64 | 38% | 61 | 36% | 28 | 16% | 13 | 8% | 4 | 2% | 170 |
| CENTRAL OFFICE | 23 | 61% | 7 | 18% | 1 | 3% | 1 | 3% | 6 | 16% | 38 |
| CHARLEVOIX | 6 | 35% | 6 | 35% | 3 | 18% | 2 | 12% | 0 | 0% | 17 |
| CHEBOYGAN | 12 | 44% | 11 | 41% | 2 | 7% | 2 | 7% | 0 | 0% | 27 |
| CHIPPEWA | 28 | 48% | 15 | 26% | 8 | 14% | 6 | 10% | 1 | 2% | 58 |
| CLARE | 38 | 53% | 16 | 22% | 7 | 10% | 11 | 15% | 0 | 0% | 72 |
| CLINTON | 20 | 54% | 10 | 27% | 5 | 14% | 1 | 3% | 1 | 3% | 37 |
| CRAWFORD | 26 | 60% | 12 | 28% | 2 | 5% | 1 | 2% | 2 | 5% | 43 |
| DELTA | 24 | 52% | 15 | 33% | 5 | 11% | 2 | 4% | 0 | 0% | 46 |
| DICKINSON | 16 | 48% | 12 | 36% | 4 | 12% | 0 | 0% | 1 | 3% | 33 |
| EATON | 53 | 68% | 12 | 15% | 6 | 8% | 6 | 8% | 1 | 1% | 78 |
| EMMET | 10 | 43% | 7 | 30% | 2 | 9% | 2 | 9% | 2 | 9% | 23 |
| GENESEE | 231 | 46% | 140 | 28% | 87 | 17% | 31 | 6% | 14 | 3% | 503 |
| GLADWIN | 20 | 65% | 9 | 29% | 0 | 0% | 0 | 0% | 2 | 6% | 31 |
| GOGEBIC | 16 | 28% | 23 | 40% | 11 | 19% | 7 | 12% | 0 | 0% | 57 |
| GRAND TRAVERSE | 44 | 65% | 18 | 26% | 4 | 6% | 1 | 1% | 1 | 1% | 68 |
| GRATIOT | 15 | 45% | 7 | 21% | 10 | 30% | 1 | 3% | 0 | 0% | 33 |
| HILLSDALE | 63 | 61% | 25 | 24% | 12 | 12% | 4 | 4% | 0 | 0% | 104 |
| HOUGHTON | 4 | 57% | 1 | 14% | 1 | 14% | 1 | 14% | 0 | 0% | 7 |
| HURON | 10 | 43% | 10 | 43% | 1 | 4% | 2 | 9% | 0 | 0% | 23 |
| INGHAM | 262 | 49% | 133 | 25% | 72 | 13% | 59 | 11% | 13 | 2% | 539 |
| IONIA | 40 | 69% | 9 | 16% | 5 | 9% | 1 | 2% | 3 | 5% | 58 |
| IOSCO | 25 | 43% | 14 | 24% | 11 | 19% | 5 | 9% | 3 | 5% | 58 |
| IRON | 7 | 70% | 3 | 30% | 0 | 0% | 0 | 0% | 0 | 0% | 10 |
| ISABELLA | 41 | 54% | 19 | 25% | 11 | 14% | 5 | 7% | 0 | 0% | 76 |
| JACKSON | 143 | 56% | 76 | 30% | 22 | 9% | 11 | 4% | 3 | 1% | 255 |
| KALAMAZOO | 265 | 48% | 151 | 28% | 75 | 14% | 49 | 9% | 7 | 1% | 547 |

85

| County Name | Length of Stay of Children in Care on December 31, 2017 | | | | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Less than 1 year | | 1-2 years | | 2-3 years | | 3-6 years | | 6+ years | | |
| | Children | % | Children | % | Children | % | Children | % | Children | % | Children |
| KALKASKA | 15 | 47% | 12 | 38% | 3 | 9% | 2 | 6% | 0 | 0% | 32 |
| KENT | 337 | 42% | 274 | 34% | 94 | 12% | 85 | 11% | 14 | 2% | 804 |
| LAKE | 7 | 26% | 7 | 26% | 3 | 11% | 8 | 30% | 2 | 7% | 27 |
| LAPEER | 15 | 28% | 22 | 41% | 13 | 24% | 3 | 6% | 1 | 2% | 54 |
| LEELANAU | 2 | 29% | 2 | 29% | 1 | 14% | 0 | 0% | 2 | 29% | 7 |
| LENAWEE | 74 | 52% | 40 | 28% | 20 | 14% | 6 | 4% | 1 | 1% | 141 |
| LIVINGSTON | 38 | 33% | 42 | 37% | 22 | 19% | 12 | 11% | 0 | 0% | 114 |
| LUCE | 3 | 25% | 6 | 50% | 0 | 0% | 2 | 17% | 1 | 8% | 12 |
| MACKINAC | 5 | 33% | 2 | 13% | 1 | 7% | 5 | 33% | 2 | 13% | 15 |
| MACOMB | 228 | 41% | 188 | 34% | 74 | 13% | 51 | 9% | 9 | 2% | 550 |
| MANISTEE | 8 | 33% | 11 | 46% | 4 | 17% | 0 | 0% | 1 | 4% | 24 |
| MARQUETTE | 21 | 48% | 20 | 45% | 1 | 2% | 2 | 5% | 0 | 0% | 44 |
| MASON | 28 | 61% | 12 | 26% | 3 | 7% | 1 | 2% | 2 | 4% | 46 |
| MECOSTA | 16 | 59% | 3 | 11% | 2 | 7% | 6 | 22% | 0 | 0% | 27 |
| MENOMINEE | 9 | 38% | 10 | 42% | 1 | 4% | 4 | 17% | 0 | 0% | 24 |
| MIDLAND | 66 | 55% | 32 | 27% | 12 | 10% | 7 | 6% | 3 | 3% | 120 |
| MISSAUKEE | 7 | 58% | 2 | 17% | 0 | 0% | 3 | 25% | 0 | 0% | 12 |
| MONROE | 109 | 57% | 43 | 23% | 21 | 11% | 13 | 7% | 4 | 2% | 190 |
| MONTCALM | 42 | 53% | 16 | 20% | 6 | 8% | 11 | 14% | 4 | 5% | 79 |
| MONTMORENCY | 1 | 8% | 6 | 46% | 4 | 31% | 2 | 15% | 0 | 0% | 13 |
| MUSKEGON | 214 | 55% | 99 | 26% | 43 | 11% | 23 | 6% | 9 | 2% | 388 |
| NEWAYGO | 43 | 43% | 27 | 27% | 15 | 15% | 15 | 15% | 1 | 1% | 101 |
| OAKLAND | 337 | 44% | 248 | 32% | 96 | 12% | 74 | 10% | 18 | 2% | 773 |
| OCEANA | 12 | 67% | 1 | 6% | 4 | 22% | 1 | 6% | 0 | 0% | 18 |
| OGEMAW | 9 | 23% | 13 | 33% | 15 | 38% | 2 | 5% | 1 | 3% | 40 |
| ONTONAGON | 4 | 67% | 2 | 33% | 0 | 0% | 0 | 0% | 0 | 0% | 6 |
| OSCEOLA | 16 | 64% | 6 | 24% | 0 | 0% | 2 | 8% | 1 | 4% | 25 |
| OSCODA | 4 | 27% | 5 | 33% | 3 | 20% | 3 | 20% | 0 | 0% | 15 |
| OTSEGO | 22 | 46% | 18 | 38% | 7 | 15% | 1 | 2% | 0 | 0% | 48 |
| OTTAWA | 83 | 50% | 62 | 37% | 8 | 5% | 10 | 6% | 3 | 2% | 166 |
| PRESQUE ISLE | 8 | 62% | 0 | 0% | 5 | 38% | 0 | 0% | 0 | 0% | 13 |
| ROSCOMMON | 11 | 48% | 7 | 30% | 1 | 4% | 3 | 13% | 1 | 4% | 23 |
| SAGINAW | 73 | 51% | 44 | 31% | 12 | 8% | 12 | 8% | 3 | 2% | 144 |
| SANILAC | 39 | 70% | 15 | 27% | 1 | 2% | 1 | 2% | 0 | 0% | 56 |
| SCHOOLCRAFT | 5 | 38% | 5 | 38% | 1 | 8% | 1 | 8% | 1 | 8% | 13 |
| SHIAWASSEE | 56 | 54% | 32 | 31% | 10 | 10% | 6 | 6% | 0 | 0% | 104 |
| ST. CLAIR | 114 | 47% | 60 | 25% | 38 | 16% | 30 | 12% | 2 | 1% | 244 |
| ST. JOSEPH | 85 | 43% | 78 | 40% | 20 | 10% | 8 | 4% | 5 | 3% | 196 |
| TUSCOLA | 33 | 52% | 17 | 27% | 9 | 14% | 5 | 8% | 0 | 0% | 64 |
| VAN BUREN | 83 | 52% | 51 | 32% | 16 | 10% | 9 | 6% | 2 | 1% | 161 |
| WASHTENAW | 91 | 54% | 30 | 18% | 22 | 13% | 19 | 11% | 6 | 4% | 168 |
| WAYNE | 1,273 | 42% | 855 | 28% | 464 | 15% | 350 | 12% | 99 | 3% | 3,041 |
| WEXFORD | 24 | 59% | 11 | 27% | 2 | 5% | 1 | 2% | 3 | 7% | 41 |
| **Total** | **5,772** | **47%** | **3572** | **29%** | **1,606** | **13%** | **1,114** | **9%** | **283** | **2%** | **12,347** |

**Appendix F. Child and Family Services Review – Michigan Final Report 2018**



# Child and Family Services Reviews

# Michigan

# Final Report

# 2018



U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES
ADMINISTRATION FOR
CHILDREN & FAMILIES
Administration on Children, Youth and Families
Children's Bureau

This page is intentionally blank.

# Final Report: Michigan Child and Family Services Review

## INTRODUCTION

This document presents the findings of the Child and Family Services Review (CFSR) for the state of Michigan. The CFSRs enable the Children's Bureau to: (1) ensure conformity with certain federal child welfare requirements; (2) determine what is actually happening to children and families as they are engaged in child welfare services; and (3) assist states in enhancing their capacity to help children and families achieve positive outcomes. Federal law and regulations authorize the Children's Bureau, within the U.S. Department of Health and Human Services' Administration for Children and Families, to administer the review of child and family services programs under titles IV-B and IV-E of the Social Security Act. The CFSRs are structured to help states identify strengths and areas needing improvement in their child welfare practices and programs as well as institute systemic changes that will improve child and family outcomes.

The findings for Michigan are based on:

- The statewide assessment prepared by the Michigan Department of Health and Human Services (MDHHS) and submitted to the Children's Bureau on June 18, 2018. The statewide assessment is the state's analysis of its performance on outcomes and the functioning of systemic factors in relation to title IV-B and IV-E requirements and the title IV-B Child and Family Services Plan

- The results of case reviews of 65 cases (40 foster care and 25 in-home) conducted via a Traditional Review process at Van Buren, Wayne, and Wexford counties in Michigan during the week of August 12, 2018

- Interviews and focus groups with state stakeholders and partners, which included:

  - Administrative Review Board
  - Attorneys for children, parents, and the agency
  - Child welfare licensing staff
  - Court Appointed Special Advocates (CASA)
  - Child Serving Agency (CSA) directors, senior managers, and county directors
  - Child welfare agency program managers
  - Child welfare agency training staff
  - Division of Child Welfare Licensing staff
  - Foster and adoptive parents
  - Interstate Compact on the Placement of Children (ICPC) staff
  - Judges

**Michigan 2018 CFSR Final Report**

- – Law enforcement
- – Parents
- – Public and private child welfare agency supervisors and caseworkers
- – Representatives from the courts and Court Improvement Program (CIP)
- – Service providers
- – Tribal representatives
- – Youth served by the agency

In Round 3, the Children's Bureau suspended the use of the state's performance on the national standards for the 7 statewide data indicators in conformity decisions. For contextual information, Appendix A of this report shows the state's performance on the 7 data indicators. Moving forward, the Children's Bureau will refer to the national standards as "national performance." This national performance represents the performance of the nation on the statewide data indicators for an earlier point in time. For the time periods used to calculate the national performance for each indicator, see 80 Fed. Reg. 27263 (May 13, 2015).[1]

## Background Information

The Round 3 CFSR assesses state performance with regard to substantial conformity with 7 child and family outcomes and 7 systemic factors. Each outcome incorporates 1 or more of the 18 items included in the case review, and each item is rated as a Strength or Area Needing Improvement based on an evaluation of certain child welfare practices and processes in the cases reviewed in the state. With two exceptions, an item is assigned an overall rating of Strength if 90% or more of the applicable cases reviewed were rated as a Strength. Because Item 1 is the only item for Safety Outcome 1 and Item 16 is the only item for Well-Being Outcome 2, the requirement of a 95% Strength rating applies to those items. For a state to be in substantial conformity with a particular outcome, 95% or more of the cases reviewed must be rated as having substantially achieved the outcome.

Eighteen items are considered in assessing the state's substantial conformity with the 7 systemic factors. Each item reflects a key federal program requirement relevant to the Child and Family Services Plan (CFSP) for that systemic factor. An item is rated as a Strength or an Area Needing Improvement based on how well the item-specific requirement is functioning. A determination of the rating is based on information provided by the state to demonstrate the functioning of the systemic factor in the statewide assessment and, as needed, from interviews with stakeholders and partners. For a state to be in substantial conformity with the systemic factors, no more than 1 of the items associated with the systemic factor can be rated as an Area Needing Improvement. For systemic factors that have only 1 item associated with them, that item must be rated as a Strength for a determination of substantial conformity.

---

[1] May 2017 revised syntax (pending final verification) uses 2 years of NCANDS data to calculate performance for the Maltreatment in Foster Care indicator. National performance is based on FY 2013–2014 and 2013AB files. All other indicators use the same time periods identified in the May 2015 Federal Register notice.

Michigan 2018 CFSR Final Report

The Children's Bureau made several changes to the CFSR process and items and indicators relevant for performance based on lessons learned during the second round of reviews and in response to feedback from the child welfare field. As such, a state's performance in the third round of the CFSRs is not directly comparable to its performance in the second round. Appendix A provides tables presenting Michigan's overall performance in Round 3. Appendix B provides information about Michigan's performance in Round 2.

## I.  SUMMARY OF PERFORMANCE

## Michigan 2018 CFSR Assessment of Substantial Conformity for Outcomes and Systemic Factors

None of the 7 outcomes was found to be in substantial conformity.

The following 3 of the 7 systemic factors were found to be in substantial conformity:

- Statewide Information System
- Quality Assurance System
- Agency Responsiveness to the Community

## Children's Bureau Comments on Michigan Performance

The following are the Children's Bureau's observations about cross-cutting issues and Michigan's overall performance:

The findings of Michigan's 2018 CFSR confirmed that MDHHS was in substantial conformity with three systemic factors: Statewide Information System, Quality Assurance System, and Agency Responsiveness to the Community. Michigan develops its CFSP and Annual Progress and Services Report (APSR) through regular and effective consultation with its partners and stakeholders. While the Children's Bureau sees this as a strength, some stakeholders said they were unclear about their role in the agency's planning or how their input is used. Building upon the strengths within these three systemic factors will have a positive effect on the state's ability to develop and implement practice and program improvements.

Data provided by the state in the statewide assessment and information collected during stakeholder interviews identified larger issues that may affect child welfare in Michigan. There is a severe shortage of foster homes, and stakeholders reported that, on occasion, children have had to stay the night in an agency child welfare office or in a hotel when a placement could not be located. There are concerns about the effectiveness of each county's and private agency's foster and adoptive parent recruitment and retention efforts. Some stakeholders reported that foster parents do not receive the support needed to provide the level of care that many of the children need. Stakeholders also reported concerns about the adequacy of training for foster and adoptive parents and said that the initial foster and adoptive parent training does not adequately prepare caregivers with the skills and knowledge needed to carry out their duties with regard to foster and adoptive children in their care.

Stakeholders also reported a high level of caseworker turnover, which negatively affects the agency's ability to effectively engage families, provide services, and ensure the safety of children. Adding to the concerns about caseworker turnover is the inadequacy of initial staff training. Many stakeholders reported that although training is generally available, it does not adequately prepare new

workers with the skills or knowledge necessary to perform their job duties, such as engagement of birth parents, foster parents, private agencies, and youth.

The inadequate service array is a concern raised by most stakeholders, who said that there were waiting lists and gaps in services, including substance treatment, psychological and psychiatric services, transportation, housing, trauma-informed treatment, parenting education, domestic violence services, and prevention services. The availability of services varies by area. In rural areas, for example, families may have to travel up to 3 hours to receive needed services.

The CFSR found that reports of child maltreatment were often assigned immediately and there was normally same-day commencement for face-to-face contact. However, not all of the identified children were seen timely. Caseworker contact with children is a fundamental and cross-cutting child welfare case management practice requirement that affects the achievement of desired outcomes in child safety and permanency, and child and family well-being. Case review results identified challenges in accurately assessing risk and safety concerns and in providing appropriate safety-related services to prevent children from coming into foster care. Additionally, safety planning was not always adequate or effective.

The achievement of timely permanency was negatively affected by a lack of family engagement. Caseworker challenges associated with contacting and engaging parents were evident across both foster care and in-home cases and negatively affected desired outcomes in child safety and permanency, and child and family well-being. The case review identified concerns about the frequency and quality of caseworker visits with parents and children. The lack of frequent and quality visitation affected the state's ability to ensure child safety. The lack of effective family engagement resulted in challenges in developing case plans jointly with parents. Because of a lack of adequate assessment of individual and family needs, services were not individualized to meet the unique needs of the family and address the reasons for the agency's involvement. Services were not always available, or the services provided did not match the identified needs. Waiting lists for necessary services resulted in a delay in the achievement of permanency for children in foster care. Although permanency goals were often identified timely in many of the cases reviewed, the identified goal was sometimes inappropriate given the needs of the child and the case circumstances. Delays in achieving permanency were attributed to a lack of concerted efforts by the agency and/or the courts.

The case reviews identified promising practices in several areas. Children were frequently placed with their siblings unless there were valid reasons for them not to be together. The review team observed that the educational needs of children in foster care were often met although to a significantly lesser degree for children in in-home cases. It is apparent that the *My Team Model* is used across the state, but additional adjustments are needed to make the meetings effective to engage all stakeholders. The Michigan Youth Outreach Initiative and Parenting Partners were also two areas of promising practice.

Michigan 2018 CFSR Final Report

A fully integrated, cross-cutting, and statewide child welfare Continuous Quality Improvement (CQI) system has been institutionalized in Michigan. The Children's Bureau encourages the state to continue its efforts to maintain and build capacity to conduct case reviews on a continual basis and to make the necessary adjustments to programs and processes statewide. As Michigan develops a Program Improvement Plan to address the areas identified in this Final Report, the Children's Bureau encourages Michigan to focus on analyzing all relevant information and data to identify the root causes behind its practice performance, along with the broader systemic concerns identified during the CFSR.

# I.  KEY FINDINGS RELATED TO OUTCOMES

For each outcome, we provide performance summaries from the case review findings. The CFSR relies upon a case review of an approved sample of foster care cases and in-home services cases. Where relevant, we provide performance summaries that are differentiated between foster care and in-home services cases.

This report provides an overview. Results have been rounded to the nearest whole number. Details on each case rating are available to MDHHS. The state is encouraged to conduct additional item-specific analysis of the case review findings to better understand areas of practice that are associated with positive outcomes and those that need improvement.

## Safety Outcome 1: Children are, first and foremost, protected from abuse and neglect.

The Children's Bureau calculates the state's performance on Safety Outcome 1 using the state's performance on Item 1.

### State Outcome Performance
Michigan is not in substantial conformity with Safety Outcome 1.

The outcome was substantially achieved in 82% of the 33 applicable cases reviewed.

### *Safety Outcome 1 Item Performance*

#### Item 1. Timeliness of Initiating Investigations of Reports of Child Maltreatment
**Purpose of Assessment:** To determine whether responses to all accepted child maltreatment reports received during the period under review were initiated, and face-to-face contact with the child(ren) made, within the time frames established by agency policies or state statutes.

State policy requires MDHHS to initiate an investigation of the child suspected of being abused or neglected no later than 24 hours after the complaint was made. Initiation is defined as an action taken, within 24 hours of a complaint, to begin this investigation. Actions may include communication or contact with the child or children, the child(ren)'s caregiver, or another person involved with the child(ren); communication or contact with a person who knows the child(ren), recently saw them, or has relevant knowledge about the family situation; and/or communication or contact with law enforcement, medical staff, or an emergency first responder who has

knowledge about the child(ren). Reports designated for Priority One Response require initiation to occur as soon as possible after receipt of the complaint when immediate danger of harm to the child(ren) is determined and within 12 hours. Face-to-face contact must take place with each alleged child victim within 24 hours. Reports designated for a Priority Two Response require initiation within 24 hours after receipt of the complaint, when it is determined the child is not in immediate danger of harm. Face-to-face contact must take place with each alleged child victim within 72 hours.

- Michigan received an overall rating of Area Needing Improvement for Item 1 because 82% of the 33 applicable cases were rated as a Strength.

For performance on the Safety statewide data indicators, see Appendix A.

## Safety Outcome 2: Children are safely maintained in their homes whenever possible and appropriate.

The Children's Bureau calculates the state's performance on Safety Outcome 2 using the state's performance on Items 2 and 3.

### State Outcome Performance
Michigan is not in substantial conformity with Safety Outcome 2.

The outcome was substantially achieved in 54% of the 65 cases reviewed.

The outcome was substantially achieved in 68% of the 40 foster care cases and 32% of the 25 in-home services cases.

### *Safety Outcome 2 Item Performance*

#### Item 2. Services to Family to Protect Child(ren) in the Home and Prevent Removal or Re-Entry Into Foster Care
**Purpose of Assessment:** To determine whether, during the period under review, the agency made concerted efforts to provide services to the family to prevent children's entry into foster care or re-entry after a reunification.

- Michigan received an overall rating of Area Needing Improvement for Item 2 because 55% of the 20 applicable cases were rated as a Strength.
- Item 2 was rated as a Strength in 67% of the 12 applicable foster care cases and 38% of the 8 applicable in-home services cases.

#### Item 3. Risk and Safety Assessment and Management
**Purpose of Assessment:** To determine whether, during the period under review, the agency made concerted efforts to assess and address the risk and safety concerns relating to the child(ren) in their own homes or while in foster care.

- Michigan received an overall rating of Area Needing Improvement for Item 3 because 55% of the 65 cases were rated as a Strength.

**Michigan 2018 CFSR Final Report**

- Item 3 was rated as a Strength in 70% of the 40 foster care cases and 32% of the 25 in-home services cases.

# Permanency Outcome 1: Children have permanency and stability in their living situations.

The Children's Bureau calculates the state's performance on Permanency Outcome 1 using the state's performance on Items 4, 5, and 6.

## State Outcome Performance
Michigan is not in substantial conformity with Permanency Outcome 1.

The outcome was substantially achieved in 13% of the 40 applicable cases reviewed.

*Permanency Outcome 1 Item Performance*

### Item 4. Stability of Foster Care Placement
**Purpose of Assessment:** To determine whether the child in foster care is in a stable placement at the time of the onsite review and that any changes in placement that occurred during the period under review were in the best interests of the child and consistent with achieving the child's permanency goal(s).

- Michigan received an overall rating of Area Needing Improvement for Item 4 because 78% of the 40 applicable cases were rated as a Strength.

### Item 5. Permanency Goal for Child
**Purpose of Assessment:** To determine whether appropriate permanency goals were established for the child in a timely manner.

- Michigan received an overall rating of Area Needing Improvement for Item 5 because 53% of the 40 applicable cases were rated as a Strength.

### Item 6. Achieving Reunification, Guardianship, Adoption, or Other Planned Permanent Living Arrangement
**Purpose of Assessment:** To determine whether concerted efforts were made, or are being made, during the period under review to achieve reunification, guardianship, adoption, or other planned permanent living arrangement.

- Michigan received an overall rating of Area Needing Improvement for Item 6 because 25% of the 40 applicable cases were rated as a Strength.

For performance on the Permanency statewide data indicators, see Appendix A.

# Permanency Outcome 2: The continuity of family relationships and connections is preserved for children.

The Children's Bureau calculates the state's performance on Permanency Outcome 2 using the state's performance on Items 7, 8, 9, 10, and 11.

## State Outcome Performance

Michigan is not in substantial conformity with Permanency Outcome 2.

The outcome was substantially achieved in 70% of the 40 applicable cases reviewed.

***Permanency Outcome 2 Item Performance***

### Item 7. Placement With Siblings

**Purpose of Assessment:** To determine whether, during the period under review, concerted efforts were made to ensure that siblings in foster care are placed together unless a separation was necessary to meet the needs of one of the siblings.

- Michigan received an overall rating of Area Needing Improvement for Item 7 because 89% of the 28 applicable cases were rated as a Strength.

### Item 8. Visiting With Parents and Siblings in Foster Care

**Purpose of Assessment:** To determine whether, during the period under review, concerted efforts were made to ensure that visitation between a child in foster care and his or her mother, father,[2] and siblings is of sufficient frequency and quality to promote continuity in the child's relationship with these close family members.

- Michigan received an overall rating of Area Needing Improvement for Item 8 because 69% of the 29 applicable cases were rated as a Strength.

- In 83% of the 12 applicable cases, the agency made concerted efforts to ensure that both the frequency and quality of visitation with a sibling(s) in foster care who is/was in a different placement setting was sufficient to maintain and promote the continuity of the relationship.

---

[2] For Item 8, "Mother" and "Father" are typically defined as the parents/caregivers from whom the child was removed and with whom the agency is working toward reunification. The persons identified in these roles for the purposes of the review may include individuals who do not meet the legal definitions or conventional meanings of a mother and father.

**Michigan 2018 CFSR Final Report**

- In 72% of the 25 applicable cases, the agency made concerted efforts to ensure that both the frequency and quality of visitation between the child in foster care and his or her mother was sufficient to maintain and promote the continuity of the relationship.
- In 79% of the 14 applicable cases, the agency made concerted efforts to ensure that both the frequency and quality of visitation between the child in foster care and his or her father was sufficient to maintain and promote the continuity of the relationship.

### Item 9. Preserving Connections
**Purpose of Assessment:** To determine whether, during the period under review, concerted efforts were made to maintain the child's connections to his or her neighborhood, community, faith, extended family, Tribe, school, and friends.

- Michigan received an overall rating of Area Needing Improvement for Item 9 because 79% of the 39 applicable cases were rated as a Strength.

### Item 10. Relative Placement
**Purpose of Assessment:** To determine whether, during the period under review, concerted efforts were made to place the child with relatives when appropriate.

- Michigan received an overall rating of Area Needing Improvement for Item 10 because 79% of the 38 applicable cases were rated as a Strength.

### Item 11. Relationship of Child in Care With Parents
**Purpose of Assessment:** To determine whether, during the period under review, concerted efforts were made to promote, support, and/or maintain positive relationships between the child in foster care and his or her mother and father[3] or other primary caregiver(s) from whom the child had been removed through activities other than just arranging for visitation.

- Michigan received an overall rating of Area Needing Improvement for Item 11 because 67% of the 27 applicable cases were rated as a Strength.
- In 68% of the 25 applicable cases, the agency made concerted efforts to promote, support, and otherwise maintain a positive and nurturing relationship between the child in foster care and his or her mother.
- In 86% of the 14 applicable cases, the agency made concerted efforts to promote, support, and otherwise maintain a positive and nurturing relationship between the child in foster care and his or her father.

---

[3] For Item 11, "Mother" and "Father" are typically defined as the parents/caregivers from whom the child was removed and with whom the agency is working toward reunification.

# Well-Being Outcome 1: Families have enhanced capacity to provide for their children's needs.

The Children's Bureau calculates the state's performance on Well-Being Outcome 1 using the state's performance on Items 12, 13, 14, and 15.

## State Outcome Performance

Michigan is not in substantial conformity with Well-Being Outcome 1.

The outcome was substantially achieved in 28% of the 65 cases reviewed.

The outcome was substantially achieved in 25% of the 40 foster care cases and 32% of the 25 in-home services cases.

***Well-Being Outcome 1 Item Performance***

### Item 12. Needs and Services of Child, Parents, and Foster Parents

**Purpose of Assessment:** To determine whether, during the period under review, the agency (1) made concerted efforts to assess the needs of children, parents,[4] and foster parents (both initially, if the child entered foster care or the case was opened during the period under review, and on an ongoing basis) to identify the services necessary to achieve case goals and adequately address the issues relevant to the agency's involvement with the family, and (2) provided the appropriate services.

- Michigan received an overall rating of Area Needing Improvement for Item 12 because 28% of the 65 cases were rated as a Strength.

- Item 12 was rated as a Strength in 25% of the 40 foster care cases and 32% of the 25 in-home services cases.

Item 12 is divided into three sub-items:

### Sub-Item 12A. Needs Assessment and Services to Children

- Michigan received an overall rating of Area Needing Improvement for Item 12A because 66% of the 65 cases were rated as a Strength.

- Item 12A was rated as a Strength in 75% of the 40 foster care cases and 52% of the 25 in-home services cases.

---

[4] For Sub-Item 12B, in the in-home cases, "Mother" and "Father" are typically defined as the parents/caregivers with whom the children were living when the agency became involved with the family and with whom the children will remain (for example, biological parents, relatives, guardians, adoptive parents). In the foster care cases, "Mother" and "Father" are typically defined as the parents/caregivers from whom the child was removed and with whom the agency is working toward reunification; however, biological parents who were not the parents from whom the child was removed may also be included, as may adoptive parents if the adoption was finalized during the period under review. A rating could consider the agency's work with multiple applicable "mothers" and "fathers" for the period under review in the case.

**Michigan 2018 CFSR Final Report**

## Sub-Item 12B. Needs Assessment and Services to Parents

- Michigan received an overall rating of Area Needing Improvement for Item 12B because 35% of the 55 applicable cases were rated as a Strength.

- Item 12B was rated as a Strength in 30% of the 30 applicable foster care cases and 40% of the 25 in-home services cases.

- In 39% of the 51 applicable cases, the agency made concerted efforts both to assess and address the needs of mothers.

- In 33% of the 43 applicable cases, the agency made concerted efforts both to assess and address the needs of fathers.

## Sub-Item 12C. Needs Assessment and Services to Foster Parents

- Michigan received an overall rating of Area Needing Improvement for Item 12C because 63% of the 35 applicable foster care cases were rated as a Strength.

## Item 13. Child and Family Involvement in Case Planning

**Purpose of Assessment:** To determine whether, during the period under review, concerted efforts were made (or are being made) to involve parents[5] and children (if developmentally appropriate) in the case planning process on an ongoing basis.

- Michigan received an overall rating of Area Needing Improvement for Item 13 because 50% of the 62 applicable cases were rated as a Strength.

- Item 13 was rated as a Strength in 57% of the 37 applicable foster care cases and 40% of the 25 in-home services cases.

- In 65% of the 37 applicable cases, the agency made concerted efforts to involve child(ren) in case planning.

- In 58% of the 50 applicable cases, the agency made concerted efforts to involve mothers in case planning.

- In 55% of the 38 applicable cases, the agency made concerted efforts to involve fathers in case planning.

## Item 14. Caseworker Visits With Child

**Purpose of Assessment:** To determine whether the frequency and quality of visits between caseworkers and the child(ren) in the case are sufficient to ensure the safety, permanency, and well-being of the child(ren) and promote achievement of case goals.

---

[5] For Item 13, in the in-home cases, "Mother" and "Father" are typically defined as the parents/caregivers with whom the children were living when the agency became involved with the family and with whom the children will remain (for example, biological parents, relatives, guardians, adoptive parents). In the foster care cases, "mother" and "father" are typically defined as the parents/caregivers from whom the child was removed and with whom the agency is working toward reunification; however, biological parents who were not the parents from whom the child was removed may also be included, as may adoptive parents if the adoption was finalized during the period under review. A rating could consider the agency's work with multiple applicable "mothers" and "fathers" for the period under review in the case.

**Michigan 2018 CFSR Final Report**

- Michigan received an overall rating of Area Needing Improvement for Item 14 because 71% of the 65 cases were rated as a Strength.
- Item 14 was rated as a Strength in 85% of the 40 foster care cases and 48% of the 25 in-home services cases.

### Item 15. Caseworker Visits With Parents

**Purpose of Assessment:** To determine whether, during the period under review, the frequency and quality of visits between caseworkers and the mothers and fathers[6] of the child(ren) are sufficient to ensure the safety, permanency, and well-being of the child(ren) and promote achievement of case goals.

- Michigan received an overall rating of Area Needing Improvement for Item 15 because 43% of the 54 applicable cases were rated as a Strength.
- Item 15 was rated as a Strength in 45% of the 29 applicable foster care cases and 40% of the 25 in-home services cases.
- In 46% of the 50 applicable cases, the agency made concerted efforts to ensure that both the frequency and quality of caseworker visitation with mothers were sufficient.
- In 50% of the 38 applicable cases, the agency made concerted efforts to ensure that both the frequency and quality of caseworker visitation with fathers were sufficient.

## Well-Being Outcome 2: Children receive appropriate services to meet their educational needs.

The Children's Bureau calculates the state's performance on Well-Being Outcome 2 using the state's performance on Item 16.

### State Outcome Performance

Michigan is not in substantial conformity with Well-Being Outcome 2.

The outcome was substantially achieved in 69% of the 36 applicable cases reviewed.

---

[6] For Item 15, in the in-home cases, "Mother" and "Father" are typically defined as the parents/caregivers with whom the children were living when the agency became involved with the family and with whom the children will remain (for example, biological parents, relatives, guardians, adoptive parents). In the foster care cases, "Mother" and "Father" is typically defined as the parents/caregivers from whom the child was removed and with whom the agency is working toward reunification; however, biological parents who were not the parents from whom the child was removed may also be included, as may adoptive parents if the adoption was finalized during the period under review. A rating could consider the agency's work with multiple applicable mother and fathers for the period under review in the case.

Michigan 2018 CFSR Final Report

*Well-Being Outcome 2 Item Performance*

### Item 16. Educational Needs of the Child

**Purpose of Assessment:** To assess whether, during the period under review, the agency made concerted efforts to assess children's educational needs at the initial contact with the child (if the case was opened during the period under review) or on an ongoing basis (if the case was opened before the period under review), and whether identified needs were appropriately addressed in case planning and case management activities.

- Michigan received an overall rating of Area Needing Improvement for Item 16 because 69% of the 36 applicable cases were rated as a Strength.

- Item 16 was rated as a Strength in 76% of the 33 applicable foster care cases and none of the 3 applicable in-home services cases.

## Well-Being Outcome 3: Children receive adequate services to meet their physical and mental health needs.

The Children's Bureau calculates the state's performance on Well-Being Outcome 3 using the state's performance on Items 17 and 18.

## State Outcome Performance

Michigan is not in substantial conformity with Well-Being Outcome 3.

The outcome was substantially achieved in 52% of the 56 applicable cases reviewed.

The outcome was substantially achieved in 48% of the 40 foster care cases and 63% of the 16 applicable in-home services cases.

*Well-Being Outcome 3 Item Performance*

### Item 17. Physical Health of the Child

**Purpose of Assessment:** To determine whether, during the period under review, the agency addressed the physical health needs of the children, including dental health needs.

- Michigan received an overall rating of Area Needing Improvement for Item 17 because 62% of the 50 applicable cases were rated as a Strength.

- Item 17 was rated as a Strength in 60% of the 40 foster care cases and 70% of the 10 applicable in-home services cases.

## Item 18. Mental/Behavioral Health of the Child

**Purpose of Assessment:** To determine whether, during the period under review, the agency addressed the mental/behavioral health needs of the children.

- Michigan received an overall rating of Area Needing Improvement for Item 18 because 51% of the 37 applicable cases were rated as a Strength.

- Item 18 was rated as a Strength in 56% of the 27 applicable foster care cases and 40% of the 10 applicable in-home services cases.

# I.   KEY FINDINGS RELATED TO SYSTEMIC FACTORS

For each systemic factor below, we provide performance summaries and a determination of whether the state is in substantial conformity with that systemic factor. In addition, we provide ratings for each item and a description of how the rating was determined. The CFSR relies upon a review of information contained in the statewide assessment to assess each item. If an item rating cannot be determined from the information contained in the statewide assessment, the Children's Bureau conducts stakeholder interviews and considers information gathered through the interviews in determining ratings for each item.

## Statewide Information System

The Children's Bureau assesses the state's performance on this systemic factor using the state's performance on Item 19.

### State Systemic Factor Performance

Michigan is in substantial conformity with the systemic factor of Statewide Information System. The one item in this systemic factor was rated as a Strength.

*Statewide Information System Item Performance*

## Item 19. Statewide Information System

**Description of Systemic Factor Item:** The statewide information system is functioning statewide to ensure that, at a minimum, the state can readily identify the status, demographic characteristics, location, and goals for the placement of every child who is (or, within the immediately preceding 12 months, has been) in foster care.

- Michigan received an overall rating of Strength for Item 19 based on information from the statewide assessment.

- Information in the statewide assessment showed that the state is operating a statewide information system that captures the status, demographic characteristics, location, and goals for the placement of every child who is in foster care. Michigan

ensures the data are accurate and of good quality by conducting information system reviews of randomly selected cases to verify information. When errors are identified, the state has a system in place to correct the errors.

# Case Review System

The Children's Bureau assesses the state's performance on this systemic factor using the state's performance on Items 20, 21, 22, 23, and 24.

## State Systemic Factor Performance

Michigan is not in substantial conformity with the systemic factor of Case Review System. Two of the 5 items in this systemic factor were rated as a Strength.

### *Case Review System Item Performance*

#### Item 20. Written Case Plan

**Description of Systemic Factor Item:** The case review system is functioning statewide to ensure that each child has a written case plan that is developed jointly with the child's parent(s) and includes the required provisions.

- Michigan received an overall rating of Area Needing Improvement for Item 20 based on information from the statewide assessment and stakeholder interviews.

- Data in the statewide assessment showed that for a recent year, the Child Protective Service Plans were not consistently completed timely and parents were not consistently actively engaged in case planning. Stakeholders reported that active involvement of parents in case planning varied by county and by caseworker and many stakeholders agreed that parents are not consistently engaged in developing case plans. Some stakeholders reported that the case plan is developed without parental participation, then presented to the parent before the court hearing.

#### Item 21. Periodic Reviews

**Description of Systemic Factor Item:** The case review system is functioning statewide to ensure that a periodic review for each child occurs no less frequently than once every 6 months, either by a court or by administrative review.

- Michigan received an overall rating of Strength for Item 21 based on information from the statewide assessment.

- Data and information in the statewide assessment demonstrated that periodic reviews are held at least monthly, but often more frequently. Michigan provided data showing that almost all periodic reviews or hearings occurred timely.

Michigan 2018 CFSR Final Report

## Item 22. Permanency Hearings

**Description of Systemic Factor Item:** The case review system is functioning statewide to ensure that each child has a permanency hearing in a qualified court or administrative body that occurs no later than 12 months from the date the child entered foster care and no less frequently than every 12 months thereafter.

- Michigan received an overall rating of Strength for Item 22 based on information from the statewide assessment.

- Information and data in the statewide assessment showed that Michigan conducts quality permanency hearings at a frequency of no less than every 12 months for almost all children in foster care.

## Item 23. Termination of Parental Rights

**Description of Systemic Factor Item:** The case review system is functioning statewide to ensure that the filing of termination of parental rights proceedings occurs in accordance with required provisions.

- Michigan received an overall rating of Area Needing Improvement for Item 23 based on information from the statewide assessment and stakeholder interviews.

- Information in the statewide assessment and collected during interviews with stakeholders showed that the filing of termination of parental rights (TPR) proceedings are not occurring in accordance with required provisions. Stakeholders confirmed that there is no statewide tracking system for the filing of TPR and that timely filing of TPR varies by county. Stakeholders said timeliness is not a priority in some courts, and some stakeholders reported delays in filing because the court determined that parents should be given more time.

## Item 24. Notice of Hearings and Reviews to Caregivers

**Description of Systemic Factor Item:** The case review system is functioning to ensure that foster parents, pre-adoptive parents, and relative caregivers of children in foster care are notified of, and have a right to be heard in, any review or hearing held with respect to the child.

- Michigan received an overall rating of Area Needing Improvement for Item 24 based on information from the statewide assessment and stakeholder interviews.

- Information in the statewide assessment and collected during interviews with stakeholders showed that Michigan does not have a consistent practice across the state for notifying foster parents, pre-adoptive parents, and relative caregivers of reviews or hearings held with respect to children in foster care. Stakeholders reported that notices are automated in some counties and depend on the worker in other counties. Stakeholders reported variation across the state in providing caregivers an opportunity to be heard when present at court hearings because the level of participation varies based on the judge and the county. Key stakeholders confirmed that caregivers were not always given the opportunity to be heard.

Michigan 2018 CFSR Final Report

# Quality Assurance System

The Children's Bureau assesses the state's performance on this systemic factor using the state's performance on Item 25.

## State Systemic Factor Performance

Michigan is in substantial conformity with the systemic factor of Quality Assurance System. The one item in this systemic factor was rated as a Strength.

### *Quality Assurance System Item Performance*

### Item 25. Quality Assurance System

**Description of Systemic Factor Item:** The quality assurance system is functioning statewide to ensure that it (1) is operating in the jurisdictions where the services included in the Child and Family Services Plan (CFSP) are provided, (2) has standards to evaluate the quality of services (including standards to ensure that children in foster care are provided quality services that protect their health and safety), (3) identifies strengths and needs of the service delivery system, (4) provides relevant reports, and (5) evaluates implemented program improvement measures.

- Michigan received an overall rating of Strength for Item 25 based on information from the statewide assessment.

- Information in the statewide assessment showed that Michigan's Quality Assurance System is fully functioning statewide. Case review and data collection processes are occurring across the state. The system provides consistent follow-up to ensure statewide issues are addressed, program improvement is evaluated, and adjustments to practice and policy are made. The CQI system informs policy and improves practice. Each local state agency has a local CQI team to ensure that services the agency provides meet key performance indicators, and if necessary, implements plans toward meeting standards. The state is providing technical assistance to assist the local CQI teams in implementing program analysis and improvement strategies.

# Staff and Provider Training

The Children's Bureau assesses the state's performance on this systemic factor using the state's performance on Items 26, 27, and 28.

## State Systemic Factor Performance

Michigan is not in substantial conformity with the systemic factor of Staff and Provider Training. One of the items in this systemic factor was rated as a Strength.

**Michigan 2018 CFSR Final Report**

*Staff and Provider Training Item Performance*

### Item 26. Initial Staff Training

**Description of Systemic Factor Item:** The staff and provider training system is functioning statewide to ensure that initial training is provided to all staff who deliver services pursuant to the CFSP that includes the basic skills and knowledge required for their positions.

- Michigan received an overall rating of Area Needing Improvement for Item 26 based on information from the statewide assessment and stakeholder interviews.

- Information in the statewide assessment and collected during interviews with stakeholders confirmed that the skill-based component of training is not sufficient to meet the entry-level training needs of new case managers. Stakeholders reported the need for training on navigating the state's information system and on agency policies. Stakeholders also reported a need for more hands-on training focused on daily job responsibilities and said they felt that many new caseworkers are not prepared to perform their job duties, particularly related to assessment skills and the ability to understand and engage case participants following training. Initial training is provided in two locations in the state and this can result in challenges for new case managers who have to travel to attend the trainings. New staff routinely receive initial training in a timely manner and there are no waiting lists.

### Item 27. Ongoing Staff Training

**Description of Systemic Factor Item:** The staff and provider training system is functioning statewide to ensure that ongoing training is provided for staff[7] that addresses the skills and knowledge base needed to carry out their duties with regard to the services included in the CFSP.

- Michigan received an overall rating of Strength for Item 27 based on information from the statewide assessment and stakeholder interviews.

- Data provided in the statewide assessment shows that in a recent time period, almost all supervisors and caseworkers met the ongoing training requirements. The state tracks participation in training through the Learning Management System and has a comprehensive evaluation system. Stakeholders confirmed that training that addresses the skills and knowledge needed to perform job duties is available, and staff are able to access those trainings, although travel is a challenge for some staff located in rural areas of the state. Generally, stakeholders believed that topics covered in training are appropriate, but some stakeholders said that they would like some changes or additional topics included.

---

[7] "Staff," for purposes of assessing this item, includes all contracted and non-contracted staff who have case management responsibilities in the areas of child protection services, family preservation and support services, foster care services, adoption services, and independent living services pursuant to the state's CFSP. "Staff" also includes direct supervisors of all contracted and non-contracted staff who have case management responsibilities in the areas of child protection services, family preservation and support services, foster care services, adoption services, and independent living services pursuant to the state's CFSP.

Michigan 2018 CFSR Final Report

## Item 28. Foster and Adoptive Parent Training

**Description of Systemic Factor Item:** The staff and provider training system is functioning statewide to ensure that training is occurring statewide for current or prospective foster parents, adoptive parents, and staff of state licensed or approved facilities (that care for children receiving foster care or adoption assistance under title IV-E) that addresses the skills and knowledge base needed to carry out their duties with regard to foster and adopted children.

- Michigan received an overall rating of Area Needing Improvement for Item 28 based on information from the statewide assessment and stakeholder interviews.

- In the statewide assessment, Michigan reported that initial foster and adoptive parent training was very recently centralized and is now supported by Regional Resource Teams. Stakeholders said that training is not readily available and there are delays for foster parents in obtaining needed training. Stakeholders also said they felt that Parent Resources for Information, Development, and Education (PRIDE) training does not provide practical information and the skills and knowledge needed for foster and adoptive parents to be able to carry out their duties. For example, the training does not provide foster and adoptive parents with the skills and knowledge to be able to care for children who have experienced trauma. In the statewide assessment, Michigan reported that the Division of Child Welfare Licensing conducts inspections of licensed child-placing agencies and child care institutions to monitor compliance with training requirements. The state did not provide data showing the percentage of facilities or staff within facilities that meet the training requirements.

# Service Array and Resource Development

The Children's Bureau assesses the state's performance on this systemic factor using the state's performance on Items 29 and 30.

## State Systemic Factor Performance
Michigan is not in substantial conformity with the systemic factor of Service Array and Resource Development. None of the items in this systemic factor was rated as a Strength.

### *Service Array and Resource Development Item Performance*

## Item 29. Array of Services

**Description of Systemic Factor Item:** The service array and resource development system is functioning to ensure that the following array of services is accessible in all political jurisdictions covered by the CFSP: (1) services that assess the strengths and needs of children and families and determine other service needs, (2) services that address the needs of families in addition to individual children in order to create a safe home environment, (3) services that enable children to remain safely with their parents when reasonable, and (4) services that help children in foster and adoptive placements achieve permanency.

- Michigan received an overall rating of Area Needing Improvement for Item 29 based on information from the statewide assessment and stakeholder interviews.

- Information in the statewide assessment and collected during interviews with stakeholders showed that the availability and accessibility of services is markedly uneven across the state. Stakeholders reported significant gaps in the service array. In the northern part of the state, a family may need to travel 1½ to 3 hours to receive necessary services. Specific service gaps identified included psychological therapy, trauma-informed therapy, parent mentors, parent aid, visitation supervisors, substance abuse treatment, residential substance treatment for children, parenting education, and prevention services. Stakeholders also said that there are limited transportation and housing options. In some areas of the state where services are available, there are extensive waiting lists for key services such as substance abuse treatment, domestic violence, parenting classes, visitation, substance abuse screens, parent aid, and the Family Reunification Program.

## Item 30. Individualizing Services
**Description of Systemic Factor Item:** The service array and resource development system is functioning statewide to ensure that the services in Item 29 can be individualized to meet the unique needs of children and families served by the agency.

- Michigan received an overall rating of Area Needing Improvement for Item 30 based on information from the statewide assessment and stakeholder interviews.

- Information in the statewide assessment and collected during interviews with stakeholders showed that the state has limited ability to consistently and effectively individualize services. Stakeholders confirmed that services are not always culturally or linguistically appropriate and there are not enough service providers to meet the diverse cultural needs of the populations served. Key stakeholders confirmed that services are often "cookie cutter" and not individualized. Services are also not adjusted based on the developmental or mental health needs of the child or parents. Additionally, stakeholders reported that the ability to individualize services varies by county or area of the state, and that there is more of an opportunity to meet individual needs in larger counties.

# Agency Responsiveness to the Community

The Children's Bureau assesses the state's performance on this systemic factor using the state's performance on Items 31 and 32.

## State Systemic Factor Performance
Michigan is in substantial conformity with the systemic factor of Agency Responsiveness to the Community. Both of the items in this systemic factor were rated as a Strength.

*Agency Responsiveness to the Community Item Performance*

## Item 31. State Engagement and Consultation With Stakeholders Pursuant to CFSP and APSR
**Description of Systemic Factor Item:** The agency responsiveness to the community system is functioning statewide to ensure that, in implementing the provisions of the CFSP and developing related APSRs, the state engages in ongoing consultation with Tribal

representatives, consumers, service providers, foster care providers, the juvenile court, and other public and private child- and family-serving agencies and includes the major concerns of these representatives in the goals, objectives, and annual updates of the CFSP.

- Michigan received an overall rating of Strength for Item 31 based on information from the statewide assessment and stakeholder interviews.

- Information in the statewide assessment and collected during interviews with stakeholders showed that the state engages in ongoing consultation with key stakeholders and their input is integrated into CFSP goals and the state's APSR. Stakeholders confirmed that a variety of active stakeholder groups inform the agency's strategic direction, planning, and program development. A statewide CIP task force and community quality improvement teams are functioning or being developed in each county. The Children's Bureau encourages the state to continue utilizing and improving the work that the state is doing with the stakeholder groups.

### Item 32. Coordination of CFSP Services With Other Federal Programs
**Description of Systemic Factor Item:** The agency responsiveness to the community system is functioning statewide to ensure that the state's services under the CFSP are coordinated with services or benefits of other federal or federally assisted programs serving the same population.

- Michigan received an overall rating of Strength for Item 32 based on information from the statewide assessment.

- In the statewide assessment, Michigan provided examples of intergovernmental agreements and other interorganizational partnerships to illustrate how the state coordinates services or benefits with other federal or federally assisted programs serving the same population. Michigan administers the federal Temporary Assistance for Needy Families (TANF) programs, Child Care and Development Block Grant programs, Supplemental Nutrition Assistance Program (SNAP), Low-Income Home Energy Assistance Program, Title IV-D Child Support Enforcement Program, Disability Determination Services for Title II and XVI funds, Community Mental Health Services Block Grant, Medicaid services, and Family Support Subsidy Program. The state also works closely with the federally recognized Tribes in Michigan and coordinates with other federal and state programs for youth, including transitional living programs.

# Foster and Adoptive Parent Licensing, Recruitment, and Retention

The Children's Bureau assesses the state's performance on this systemic factor using the state's performance on Items 33, 34, 35, and 36.

## State Systemic Factor Performance
Michigan is not in substantial conformity with the systemic factor of Foster and Adoptive Parent Licensing, Recruitment, and Retention. Two of the four items in this systemic factor were rated as a Strength.

**Michigan 2018 CFSR Final Report**

*Foster and Adoptive Parent Licensing, Recruitment, and Retention Item Performance*

### Item 33. Standards Applied Equally

**Description of Systemic Factor Item:** The foster and adoptive parent licensing, recruitment, and retention system is functioning statewide to ensure that state standards are applied to all licensed or approved foster family homes or child care institutions receiving title IV-B or IV-E funds.

- Michigan received an overall rating of Strength for Item 33 based on information from the statewide assessment and stakeholder interviews.

- Information in the statewide assessment and collected during interviews with stakeholders showed that state standards are applied equally to all licensed or approved foster family homes or child care institutions receiving title IV-B or IV-E funds. Stakeholders confirmed that Michigan tracks and addresses variances. Stakeholders reported that variances are primarily granted for relative placements and to ensure siblings are placed together when possible and appropriate. Variances are not granted when safety is a concern. Standards for state child care institutions are applied equally and closely monitored by the state.

### Item 34. Requirements for Criminal Background Checks

**Description of Systemic Factor Item:** The foster and adoptive parent licensing, recruitment, and retention system is functioning statewide to ensure that the state complies with federal requirements for criminal background clearances as related to licensing or approving foster care and adoptive placements and has in place a case planning process that includes provisions for addressing the safety of foster care and adoptive placements for children.

- Michigan received an overall rating of Strength for Item 34 based on information from the statewide assessment and stakeholder interviews.

- Information from the statewide assessment and collected during interviews with stakeholders showed that criminal background checks occur prior to the licensure of all foster and adoptive homes. If there is an immediate need to place a child with a relative, an initial relative screening that includes a background check is completed. Stakeholders report that required background checks are completed not only for initial licensing, but also annually before a home is re-licensed. Information in the statewide assessment and supported by stakeholders indicated that the state has a case planning process in place that addresses safety in foster and adoptive care. There are protocols to address child safety and report safety concerns for children in foster homes and child care institutions.

### Item 35. Diligent Recruitment of Foster and Adoptive Homes

**Description of Systemic Factor Item:** The foster and adoptive parent licensing, recruitment, and retention system is functioning to ensure that the process for ensuring the diligent recruitment of potential foster and adoptive families who reflect the ethnic and racial diversity of children in the state for whom foster and adoptive homes are needed is occurring statewide.

**Michigan 2018 CFSR Final Report**

- Michigan received an overall rating of Area Needing Improvement for Item 35 based on information from the statewide assessment and stakeholder interviews.

- Information in the statewide assessment and collected during interviews with stakeholders showed that Michigan has a severe shortage of foster homes for all children. Stakeholders confirmed that children have had to sleep in offices and hotels due to a lack of foster homes. The local counties and private agencies are responsible for their own recruitment and retention plans and these plans are rolled up into the state plan. Some stakeholders said staff are overwhelmed and often there is no time to do effective recruitment. Stakeholders also reported difficulty or ineffectiveness in supporting and retaining foster families in the system.

### Item 36. State Use of Cross-Jurisdictional Resources for Permanent Placements

**Description of Systemic Factor Item:** The foster and adoptive parent licensing, recruitment, and retention system is functioning to ensure that the process for ensuring the effective use of cross-jurisdictional resources to facilitate timely adoptive or permanent placements for waiting children is occurring statewide.

- Michigan received an overall rating of Area Needing Improvement for Item 36 based on information from the statewide assessment and stakeholder interviews.

- Data in the statewide assessment showed that for a recent time period, a little more than half of incoming requests from other states for home studies were completed within the 60-day requirement. Although some stakeholders said compliance with the 60-day requirement had improved, the state did not provide supplemental data to confirm this. Stakeholders described efforts and processes to facilitate placement of children in the state's care across jurisdictions, both within and out of state.

## Appendix A
## Summary of Michigan 2018 Child and Family Services Review Performance

## I. Ratings for Safety, Permanency, and Well-Being Outcomes and Items

**Outcome Achievement:** Outcomes may be rated as in substantial conformity or not in substantial conformity. 95% of the applicable cases reviewed must be rated as having substantially achieved the outcome for the state to be in substantial conformity with the outcome.

**Item Achievement:** Items may be rated as a Strength or as an Area Needing Improvement. For an overall rating of Strength, 90% of the cases reviewed for the item (with the exception of Item 1 and Item 16) must be rated as a Strength. Because Item 1 is the only item for Safety Outcome 1 and Item 16 is the only item for Well-Being Outcome 2, the requirement of a 95% Strength rating applies.

### SAFETY OUTCOME 1: CHILDREN ARE, FIRST AND FOREMOST, PROTECTED FROM ABUSE AND NEGLECT.

| Data Element | Overall Determination | State Performance |
|---|---|---|
| **Safety Outcome 1**<br>Children are, first and foremost, protected from abuse and neglect | Not in Substantial Conformity | 82% Substantially Achieved |
| **Item 1**<br>Timeliness of investigations | Area Needing Improvement | 82% Strength |

### SAFETY OUTCOME 2: CHILDREN ARE SAFELY MAINTAINED IN THEIR HOMES WHENEVER POSSIBLE AND APPROPRIATE.

| Data Element | Overall Determination | State Performance |
|---|---|---|
| **Safety Outcome 2**<br>Children are safely maintained in their homes whenever possible and appropriate | Not in Substantial Conformity | 54% Substantially Achieved |
| **Item 2**<br>Services to protect child(ren) in home and prevent removal or re-entry into foster care | Area Needing Improvement | 55% Strength |
| **Item 3**<br>Risk and safety assessment and management | Area Needing Improvement | 55% Strength |

112

Appendix A: Summary of Michigan 2018 CFSR Performance

## PERMANENCY OUTCOME 1: CHILDREN HAVE PERMANENCY AND STABILITY IN THEIR LIVING SITUATIONS.

| Data Element | Overall Determination | State Performance |
|---|---|---|
| **Permanency Outcome 1**<br>Children have permanency and stability in their living situations | Not in Substantial Conformity | 13% Substantially Achieved |
| **Item 4**<br>Stability of foster care placement | Area Needing Improvement | 78% Strength |
| **Item 5**<br>Permanency goal for child | Area Needing Improvement | 53% Strength |
| **Item 6**<br>Achieving reunification, guardianship, adoption, or other planned permanent living arrangement | Area Needing Improvement | 25% Strength |

## PERMANENCY OUTCOME 2: THE CONTINUITY OF FAMILY RELATIONSHIPS AND CONNECTIONS IS PRESERVED FOR CHILDREN.

| Data Element | Overall Determination | State Performance |
|---|---|---|
| **Permanency Outcome 2**<br>The continuity of family relationships and connections is preserved for children | Not in Substantial Conformity | 70% Substantially Achieved |
| **Item 7**<br>Placement with siblings | Area Needing Improvement | 89% Strength |
| **Item 8**<br>Visiting with parents and siblings in foster care | Area Needing Improvement† | 69% Strength |
| **Item 9**<br>Preserving connections | Area Needing Improvement | 79% Strength |
| **Item 10**<br>Relative placement | Area Needing Improvement | 79% Strength |
| **Item 11**<br>Relationship of child in care with parents | Area Needing Improvement | 67% Strength |

Appendix A: Summary of Michigan 2018 CFSR Performance

## WELL-BEING OUTCOME 1: FAMILIES HAVE ENHANCED CAPACITY TO PROVIDE FOR THEIR CHILDREN'S NEEDS.

| Data Element | Overall Determination | State Performance |
|---|---|---|
| **Well-Being Outcome 1**<br>Families have enhanced capacity to provide for their children's needs | Not in Substantial Conformity | 28% Substantially Achieved |
| **Item 12**<br>Needs and services of child, parents, and foster parents | Area Needing Improvement | 28% Strength |
| **Sub-Item 12A**<br>Needs assessment and services to children | Area Needing Improvement | 66% Strength |
| **Sub-Item 12B**<br>Needs assessment and services to parents | Area Needing Improvement | 35% Strength |
| **Sub-Item 12C**<br>Needs assessment and services to foster parents | Area Needing Improvement | 63% Strength |
| **Item 13**<br>Child and family involvement in case planning | Area Needing Improvement | 50% Strength |
| **Item 14**<br>Caseworker visits with child | Area Needing Improvement | 71% Strength |
| **Item 15**<br>Caseworker visits with parents | Area Needing Improvement | 43% Strength |

## WELL-BEING OUTCOME 2: CHILDREN RECEIVE APPROPRIATE SERVICES TO MEET THEIR EDUCATIONAL NEEDS.

| Data Element | Overall Determination | State Performance |
|---|---|---|
| **Well-Being Outcome 2**<br>Children receive appropriate services to meet their educational needs | Not in Substantial Conformity | 69% Substantially Achieved |
| **Item 16**<br>Educational needs of the child | Area Needing Improvement | 69% Strength |

**WELL-BEING OUTCOME 3: CHILDREN RECEIVE ADEQUATE SERVICES TO MEET THEIR PHYSICAL AND MENTAL HEALTH NEEDS.**

| Data Element | Overall Determination | State Performance |
|---|---|---|
| **Well-Being Outcome 3**<br>Children receive adequate services to meet their physical and mental health needs | Not in Substantial Conformity | 52% Substantially Achieved |
| **Item 17**<br>Physical health of the child | Area Needing Improvement | 62% Strength |
| **Item 18**<br>Mental/behavioral health of the child | Area Needing Improvement | 51% Strength |

## II. Ratings for Systemic Factors

The Children's Bureau determines whether a state is in substantial conformity with federal requirements for the 7 systemic factors based on the level of functioning of each systemic factor across the state. The Children's Bureau determines substantial conformity with the systemic factors based on ratings for the item or items within each factor. Performance on 5 of the 7 systemic factors is determined on the basis of ratings for multiple items or plan requirements. For a state to be found in substantial conformity with these systemic factors, the Children's Bureau must find that no more than 1 of the required items for that systemic factor fails to function as required. For a state to be found in substantial conformity with the 2 systemic factors that are determined based on the rating of a single item, the Children's Bureau must find that the item is functioning as required.

**STATEWIDE INFORMATION SYSTEM**

| Data Element | Source of Data and Information | State Performance |
|---|---|---|
| **Statewide Information System** | Statewide Assessment | Substantial Conformity |
| **Item 19**<br>Statewide Information System | Statewide Assessment | Strength |

**Appendix A: Summary of Michigan 2018 CFSR Performance**

## CASE REVIEW SYSTEM

| Data Element | Source of Data and Information | State Performance |
|---|---|---|
| **Case Review System** | Statewide Assessment and Stakeholder Interviews | Not in Substantial Conformity |
| **Item 20**<br>Written Case Plan | Statewide Assessment and Stakeholder Interviews | Area Needing Improvement |
| **Item 21**<br>Periodic Reviews | Statewide Assessment | Strength |
| **Item 22**<br>Permanency Hearings | Statewide Assessment | Strength |
| **Item 23**<br>Termination of Parental Rights | Statewide Assessment and Stakeholder Interviews | Area Needing Improvement |
| **Item 24**<br>Notice of Hearings and Reviews to Caregivers | Statewide Assessment and Stakeholder Interviews | Area Needing Improvement |

## QUALITY ASSURANCE SYSTEM

| Data Element | Source of Data and Information | State Performance |
|---|---|---|
| **Quality Assurance System** | Statewide Assessment | Substantial Conformity |
| **Item 25**<br>Quality Assurance System | Statewide Assessment | Strength |

## STAFF AND PROVIDER TRAINING

| Data Element | Source of Data and Information | State Performance |
|---|---|---|
| **Staff and Provider Training** | Statewide Assessment and Stakeholder Interviews | Not in Substantial Conformity |
| **Item 26**<br>Initial Staff Training | Statewide Assessment and Stakeholder Interviews | Area Needing Improvement |
| **Item 27**<br>Ongoing Staff Training | Statewide Assessment and Stakeholder Interviews | Strength |

**Appendix A: Summary of Michigan 2018 CFSR Performance**

| Data Element | Source of Data and Information | State Performance |
|---|---|---|
| **Item 28**<br>Foster and Adoptive Parent Training | Statewide Assessment and Stakeholder Interviews | Area Needing Improvement |

## SERVICE ARRAY AND RESOURCE DEVELOPMENT

| Data Element | Source of Data and Information | State Performance |
|---|---|---|
| **Service Array and Resource Development** | Statewide Assessment and Stakeholder Interviews | Not in Substantial Conformity |
| **Item 29**<br>Array of Services | Statewide Assessment and Stakeholder Interviews | Area Needing Improvement |
| **Item 30**<br>Individualizing Services | Statewide Assessment and Stakeholder Interviews | Area Needing Improvement |

## AGENCY RESPONSIVENESS TO THE COMMUNITY

| Data Element | Source of Data and Information | State Performance |
|---|---|---|
| **Agency Responsiveness to the Community** | Statewide Assessment and Stakeholder Interviews | Substantial Conformity |
| **Item 31**<br>State Engagement and Consultation With Stakeholders Pursuant to CFSP and APSR | Statewide Assessment and Stakeholder Interviews | Strength |
| **Item 32**<br>Coordination of CFSP Services With Other Federal Programs | Statewide Assessment | Strength |

Appendix A: Summary of Michigan 2018 CFSR Performance

## FOSTER AND ADOPTIVE PARENT LICENSING, RECRUITMENT, AND RETENTION

| Data Element | Source of Data and Information | State Performance |
|---|---|---|
| **Foster and Adoptive Parent Licensing, Recruitment, and Retention** | Statewide Assessment and Stakeholder Interviews | Not in Substantial Conformity |
| **Item 33**<br>Standards Applied Equally | Statewide Assessment and Stakeholder Interviews | Strength |
| **Item 34**<br>Requirements for Criminal Background Checks | Statewide Assessment and Stakeholder Interviews | Strength |
| **Item 35**<br>Diligent Recruitment of Foster and Adoptive Homes | Statewide Assessment and Stakeholder Interviews | Area Needing Improvement |
| **Item 36**<br>State Use of Cross-Jurisdictional Resources for Permanent Placements | Statewide Assessment and Stakeholder Interviews | Area Needing Improvement |

## III. Performance on Statewide Data Indicators[8]

The state's performance is considered against the national performance for each statewide data indicator and provides contextual information for considering the findings. This information is not used in conformity decisions. State performance may be statistically above, below, or no different than the national performance. If a state did not provide the required data or did not meet the applicable item data quality limits, the Children's Bureau did not calculate the state's performance for the statewide data indicator.

| Statewide Data Indicator | National Performance | Direction of Desired Performance | RSP* | 95% Confidence Interval** | Data Period(s) Used for State Performance*** |
|---|---|---|---|---|---|
| Recurrence of maltreatment | 9.5% | Lower | 13.6% | 13.2%–14.0% | FY15–16 |
| Maltreatment in foster care (victimizations per 100,000 days in care) | 9.67 | Lower | 14.68 | 13.42–16.07 | 15A–15B, FY15–16 |

[8] In October 2016, the Children's Bureau issued Technical Bulletin #9 (http://www.acf.hhs.gov/cb/resource/cfsr-technical-bulletin-9), which alerted states to the fact that there were technical errors in the syntax used to calculate the national and state performance for the statewide data indicators. Performance shown in this table reflects performance based on May 2017 revised syntax that is pending final verification.

## Appendix A: Summary of Michigan 2018 CFSR Performance

| Statewide Data Indicator | National Performance | Direction of Desired Performance | RSP* | 95% Confidence Interval** | Data Period(s) Used for State Performance*** |
|---|---|---|---|---|---|
| Permanency in 12 months for children entering foster care | 42.7% | Higher | 32.3% | 31.1%–33.5% | 15A–17B |
| Permanency in 12 months for children in foster care 12-23 months | 45.9% | Higher | 47.4% | 45.7%–49.0% | 17A–17B |
| Permanency in 12 months for children in foster care 24 months or more | 31.8% | Higher | 36.6% | 35.2%–38.0% | 17A–17B |
| Re-entry to foster care in 12 months | 8.1% | Lower | 7.0% | 5.8%–8.5% | 15A–17B |
| Placement stability (moves per 1,000 days in care) | 4.44 | Lower | 3.64 | 3.52–3.75 | 17A–17B |

* Risk-Standardized Performance (RSP) is derived from a multi-level statistical model and reflects the state's performance relative to states with similar children and takes into account the number of children the state served, the age distribution of these children and, for some indicators, the state's entry rate. It uses risk-adjustment to minimize differences in outcomes due to factors over which the state has little control and provides a more fair comparison of state performance against national performance.

** 95% Confidence Interval is the 95% confidence interval estimate for the state's RSP. The values shown are the lower RSP and upper RSP of the interval estimate. The interval accounts for the amount of uncertainty associated with the RSP. For example, the CB is 95% confident that the true value of the RSP is between the lower and upper limit of the interval.

*** Data Period(s) Used for State Performance: Refers to the initial 12-month period and the period(s) of data needed to follow the children to observe their outcomes. The FY or federal fiscal year refers to NCANDS data, which spans the 12-month period October 1–September 30. All other periods refer to AFCARS data. "A" refers to the 6-month period October 1–March 31. "B" refers to the 6-month period April 1–September 30. The 2-digit year refers to the calendar year in which the period ends.

119

**Appendix B**
**Summary of CFSR Round 2 Michigan 2009 Key Findings**

The Children's Bureau conducted a CFSR in Michigan in 2009. Key findings from that review are presented below. Because the Children's Bureau made several changes to the CFSR process and items and indicators relevant for performance based on lessons learned during the second round and in response to feedback from the child welfare field, a state's performance in the third round of the CFSR is not directly comparable to its performance in the second round.

## Identifying Information and Review Dates

| General Information |
| --- |
| **Children's Bureau Region:** 5 |
| **Date of Onsite Review:** September 21–25, 2009 |
| **Period Under Review:** April 1, 2008, through September 25, 2009 |
| **Date Courtesy Copy of Final Report Issued:** January 27, 2010 |
| **Date Program Improvement Plan Due:** April 27, 2010 |
| **Date Program Improvement Plan Approved:** June 1, 2011 |

## Highlights of Findings

| Performance Measurements |
| --- |
| A. The state met the national standards for **one** of the **six** standards. |
| B. The state achieved substantial conformity with **none** of the **seven** outcomes. |
| C. The state achieved substantial conformity with **three** of the **seven** systemic factors. |

Appendix B: Michigan 2009 CFSR Key Findings

## State's Conformance With the National Standards

| Data Indicator or Composite | National Standard | State's Score | Meets or Does Not Meet Standard |
|---|---|---|---|
| Absence of maltreatment recurrence (data indicator) | 94.6 or higher | 92.9 | Does Not Meet Standard |
| Absence of child abuse and/or neglect in foster care (data indicator) | 99.68 or higher | 99.51 | Does Not Meet Standard |
| Timeliness and permanency of reunifications (Permanency Composite 1) | 122.6 or higher | 106.8 | Does Not Meet Standard |
| Timeliness of adoptions (Permanency Composite 2) | 106.4 or higher | 95.5 | Does Not Meet Standard |
| Permanency for children and youth in foster care for long periods of time (Permanency Composite 3) | 121.7 or higher | 118.5 | Does Not Meet Standard |
| Placement stability (Permanency Composite 4) | 101.5 or higher | 105.4 | Meets Standard |

## State's Conformance With the Outcomes

| Outcome | Achieved or Did Not Achieve Substantial Conformity |
|---|---|
| Safety Outcome 1: Children are, first and foremost, protected from abuse and neglect. | Did Not Achieve Substantial Conformity |
| Safety Outcome 2: Children are safely maintained in their homes whenever possible and appropriate. | Did Not Achieve Substantial Conformity |
| Permanency Outcome 1: Children have permanency and stability in their living situations. | Did Not Achieve Substantial Conformity |
| Permanency Outcome 2: The continuity of family relationships and connections is preserved for children. | Did Not Achieve Substantial Conformity |

121

**Appendix B: Michigan 2009 CFSR Key Findings**

| Outcome | Achieved or Did Not Achieve Substantial Conformity |
|---|---|
| Child and Family Well-Being Outcome 1: Families have enhanced capacity to provide for their children's needs. | Did Not Achieve Substantial Conformity |
| Child and Family Well-Being Outcome 2: Children receive appropriate services to meet their educational needs. | Did Not Achieve Substantial Conformity |
| Child and Family Well-Being Outcome 3: Children receive adequate services to meet their physical and mental health needs. | Did Not Achieve Substantial Conformity |

## State's Conformance With the Systemic Factors

| Systemic Factor | Achieved or Did Not Achieve Substantial Conformity |
|---|---|
| Statewide Information System | Did Not Achieve Substantial Conformity |
| Case Review System | Did Not Achieve Substantial Conformity |
| Quality Assurance System | Did Not Achieve Substantial Conformity |
| Staff and Provider Training | Achieved Substantial Conformity |
| Service Array and Resource Development | Did Not Achieve Substantial Conformity |
| Agency Responsiveness to the Community | Achieved Substantial Conformity |
| Foster and Adoptive Parent Licensing, Recruitment, and Retention | Achieved Substantial Conformity |

Appendix B: Michigan 2009 CFSR Key Findings

# Key Findings by Item

**Outcomes**

| Item | Strength or Area Needing Improvement |
|---|---|
| 1. Timeliness of Initiating Investigations of Reports of Child Maltreatment | Area Needing Improvement |
| 2. Repeat Maltreatment | Area Needing Improvement |
| 3. Services to Family to Protect Child(ren) in the Home and Prevent Removal or Re-entry Into Foster Care | Area Needing Improvement |
| 4. Risk Assessment and Safety Management | Area Needing Improvement |
| 5. Foster Care Re-entries | Strength |
| 6. Stability of Foster Care Placement | Area Needing Improvement |
| 7. Permanency Goal for Child | Area Needing Improvement |
| 8. Reunification, Guardianship, or Permanent Placement With Relatives | Area Needing Improvement |
| 9. Adoption | Area Needing Improvement |
| 10. Other Planned Permanent Living Arrangement | Area Needing Improvement |
| 11. Proximity of Foster Care Placement | Strength |
| 12. Placement With Siblings | Strength |
| 13. Visiting With Parents and Siblings in Foster Care | Area Needing Improvement |
| 14. Preserving Connections | Area Needing Improvement |
| 15. Relative Placement | Area Needing Improvement |
| 16. Relationship of Child in Care With Parents | Area Needing Improvement |
| 17. Needs and Services of Child, Parents, and Foster Parents | Area Needing Improvement |
| 18. Child and Family Involvement in Case Planning | Area Needing Improvement |
| 19. Caseworker Visits With Child | Area Needing Improvement |

**Appendix B: Michigan 2009 CFSR Key Findings**

| Item | Strength or Area Needing Improvement |
|---|---|
| 20. Caseworker Visits With Parents | Area Needing Improvement |
| 21. Educational Needs of the Child | Area Needing Improvement |
| 22. Physical Health of the Child | Area Needing Improvement |
| 23. Mental/Behavioral Health of the Child | Area Needing Improvement |

**Systemic Factors**

| Item | Strength or Area Needing Improvement |
|---|---|
| 24. Statewide Information System | Area Needing Improvement |
| 25. Written Case Plan | Area Needing Improvement |
| 26. Periodic Reviews | Strength |
| 27. Permanency Hearings | Strength |
| 28. Termination of Parental Rights | Area Needing Improvement |
| 29. Notice of Hearings and Reviews to Caregivers | Area Needing Improvement |
| 30. Standards Ensuring Quality Services | Strength |
| 31. Quality Assurance System | Area Needing Improvement |
| 32. Initial Staff Training | Strength |
| 33. Ongoing Staff Training | Strength |
| 34. Foster and Adoptive Parent Training | Strength |
| 35. Array of Services | Strength |
| 36. Service Accessibility | Area Needing Improvement |
| 37. Individualizing Services | Area Needing Improvement |
| 38. Engagement in Consultation With Stakeholders | Strength |
| 39. Agency Annual Reports Pursuant to CFSP | Strength |

**Appendix B: Michigan 2009 CFSR Key Findings**

| Item | Strength or Area Needing Improvement |
|---|---|
| 40. Coordination of CFSP Services With Other Federal Programs | Strength |
| 41. Standards for Foster Homes and Institutions | Strength |
| 42. Standards Applied Equally | Strength |
| 43. Requirements for Criminal Background Checks | Strength |
| 44. Diligent Recruitment of Foster and Adoptive Homes | Area Needing Improvement |
| 45. State Use of Cross-Jurisdictional Resources for Permanent Placements | Strength |