UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

DWAYNE B., by his next friend, John Stempfle;
CARMELA B., by her next friend, William
Ladd; LISA J., by her next friend, Teresa Kibby;
and JULIA, SIMON, and COURTNEY G., by
their next friend, William Ladd; for themselves
and others similarly situated,

No. 2:06-cv-13548

Hon. Nancy G. Edmunds

Class Action

**MODIFIED
IMPLEMENTATION,
SUSTAINABILITY, AND
EXIT PLAN**

                        Plaintiffs,

v.

GRETCHEN WHITMER, in her official capacity
as Governor of the State of Michigan, *et al.,*

                        Defendants.

_____/

Attorney for Plaintiffs:

Samantha M. Bartosz
Children's Rights
88 Pine Street, Suite 800
New York, New York 10005
Phone: 212.683.2210

Attorney for Defendants:

Kristin M. Heyse (P64363)
Assistant Attorney General
Health, Education and Family
Services Division
P.O. Box 30758
Lansing, MI 48909
Phone: 517.335.7603

# Table of Contents

Table of Contents.................................................................................................i

Index of Definitions ........................................................................................ 2

1.  Preamble................................................................................................. 3

2.  Principles................................................................................................ 4

3.  Implementation, Sustainability, and Exit ........................................ 5

4.  Structures and Policies ....................................................................... 8

5.  To Be Maintained................................................................................ 15

6.  To Be Achieved ................................................................................... 18

7.  Monitoring............................................................................................ 31

8.  Enforcement and Dispute Resolution ............................................. 35

9.  Attorneys' Fees.................................................................................... 37

i

## Index of Definitions

Agreement ...............................................3

CCI .........................................................12

CFSR.......................................................8

Commitment............................................5

CPA ......................................................10

CPS .........................................................9

CSA ........................................................9

DCWL ...................................................13

Designated Counties...............................9

Designated Performance Standard .........5

DHHS......................................................3

Floor Performance Standard ..................5

MIC .......................................................10

Monitors ...............................................31

Plaintiffs.................................................3

POS .........................................................9

QSR .........................................................3

Reporting Period...................................32

The parties agree and the Court orders as follows:

1.  **Preamble**

    1.1   The provisions of this Modified Implementation, Sustainability, and Exit Plan (the "**Agreement**") supersede and replace the February 2, 2016 Implementation, Sustainability, and Exit Plan.  Pursuant to Federal Rule of Civil Procedure 25(d), the individually named public officer defendants have been substituted as parties.

    1.2   This Court has subject matter jurisdiction and personal jurisdiction over this action and the authority to enter this Agreement.  The Court has continuing jurisdiction over this action to ensure compliance with the Agreement for as long as the Agreement remains in effect.

    1.3   The term "**DHHS**" refers to all Defendants in the case of *Dwayne B. v. Whitmer*, Civil Action 2:06-cv-13548, including but not limited to Gretchen Whitmer, in her official capacity as Governor of Michigan, and Robert Gordon, in his official capacity as Director of DHHS.  Any state agency responsible for the care, protection, and/or supervision of Plaintiffs shall be bound by the provisions of this Agreement.  For as long as this Agreement remains in effect, all provisions referring to the Department of Health and Human Services, the Department, or DHHS, upon any subsequent changes to the current government organizational structure of the Michigan Department of Health and Human Services concerning the Plaintiffs, will apply with full force and effect to the State of Michigan and any agency or agencies with responsibilities that apply to the current DHHS under this Agreement.

    1.4   The term "**Plaintiffs**" refers to all members of the class certified by Judge Nancy G. Edmunds on February 15, 2007, in the case of *Dwayne B. v. Whitmer*, Civil Action Number 2:06-cv-13548.

    1.5   This Agreement is not a DHHS admission of any liability concerning any of the claims and allegations in the Complaint in this litigation.

    1.6   The parties acknowledge that this Agreement is controlled by and implemented in accordance with the United States Constitution and federal law and subject to federal court supervision and enforcement.  The parties further acknowledge that this Agreement will be implemented consistent with the Michigan Constitution and state law insofar as the provisions of the Michigan Constitution and state law do not conflict with controlling federal law.

    1.7   In this Agreement, "**QSR**" means a quality service review approved by the Monitors with input from Plaintiffs.

3

## 2.    Principles

### 2.1   Interpretation of Agreement.  Interpretation of the provisions of this Agreement shall be guided by the following principles:

(a)   **Safety.**  The first priority of the DHHS child welfare system is to keep children safe.

(b)   **Children's Needs.** Whenever possible, children must have a voice in decisions that affect them, and DHHS must consider the specific needs of each child as decisions are made on his or her behalf.

(c)   **Families and Communities.** Families must be treated with dignity and respect, and, whenever possible, be included in decisions that affect them and their children. DHHS must actively partner with communities to protect children and support families when determining the intervention plan for a child.

(d)   **Placement.** The ideal place for children is in their own home with their own family. When DHHS cannot ensure their safety in the family home, it must place children in the most family-like and least restrictive setting required to meet their unique needs and must place siblings together whenever possible. DHHS must strive to make the first placement the best and only placement.

(e)   **Reunification and Permanency.** DHHS must reunify children with their siblings and families as soon as is safely possible. When reunification is not possible, DHHS must provide children with a permanent home and/or permanent connection with caring, supportive adults as soon as possible. DHHS must also ensure that children in its care are connected with the resources necessary for physical and mental health, education, financial literacy, and employment and that they acquire the life skills necessary to become successful adults.

(f)   **Services.** When DHHS intervenes on behalf of children it must strive to leave children and families better off than if there had been no intervention. DHHS must tailor services to meet the unique needs of each family member and provide those services in a manner that is respectful of the child and the family. Services should be outcome-based, data driven, and continuously evaluated.

3.    **Implementation, Sustainability, and Exit**

3.1   **Movement of Commitments Between Sections.**

(a)   **Commitments To Be Achieved.**

(1)   Each Arabic-numeraled section designated as a Commitment (each such section, a "**Commitment**") in section 6 (To Be Achieved) is a Commitment for which DHHS's performance, as validated by the Monitors, has yet to attain the required standard or standards of performance for the Commitment for one Reporting Period (each such standard, a "**Designated Performance Standard**"). DHHS will provide to the Monitors for each Reporting Period all data and information necessary to assess performance on Commitments in section 6. The Monitors will review and validate this data and information, conduct whatever other monitoring it deems appropriate, and periodically report on progress to the Court, providing a monitoring report at least every six months on the status of DHHS's performance on each Commitment.

(2)   When the Monitors determine that DHHS's performance has satisfied the Designated Performance Standard or Standards for a Commitment in section 6 (To Be Achieved) at the end of one Reporting Period, the Commitment will be moved to section 5 (To Be Maintained).

(b)   **Commitments To Be Maintained.**

(1)   Commitments in section 5 (To Be Maintained) are those for which DHHS's performance, as validated by the Monitors, has attained its Designated Performance Standard or Standards for at least one Reporting Period. DHHS will provide to the Monitors for each Reporting Period all data and information necessary to assess performance on all Commitments within section 5. The Monitors will review and validate this data and information, conduct whatever other monitoring they deem appropriate, and periodically report on progress to the Court, providing a monitoring report at least every six months on the status of DHHS's performance on each Commitment.

(2)   Provided that DHHS's performance remains above a threshold level or levels designated for a Commitment (each such threshold level, a "**Floor Performance Standard**"), that Commitment will remain in section 5 (To Be Maintained). If performance falls below a Floor Performance Standard for two consecutive Reporting Periods, the Monitors will have discretion to return the Commitment to section 6 (To Be Achieved). Before such a reclassification, DHHS will have the opportunity to provide

5

information demonstrating that the performance change resulted from unforeseen and temporary circumstances not within DHHS's control. Commitments that the Monitors move to section 6 (To Be Achieved) must be returned to section 5 (To Be Maintained) if the Monitors determine that DHHS performance meets the Designated Performance Standard or Standards in a single Reporting Period.

(c) **Rolling Exit and Movement from To Be Maintained.** Each Commitment will become eligible for exit, subject to court approval, based on the criteria specified in this Agreement for that Commitment, which unless otherwise specified, falls into one of the following three categories:

   (1) **Can Become Eligible for Rolling Exit.** Once DHHS's performance on a Commitment in this category, as validated by the Monitors, has been sustained at the Designated Performance Standard or Standards for at least two consecutive Reporting Periods while the Commitment is in section 5 (To Be Maintained), the Commitment will become eligible for rolling exit from this Agreement.

   (2) **Never Eligible for Rolling Exit.** A Commitment in this category is ineligible for rolling exit from this Agreement. It will remain in section 5 (To Be Maintained) and be subject to full monitoring until this Agreement terminates.

   (3) **Can Become Eligible To Move to Structures and Policies.** Once DHHS performance on a Commitment in this category, as validated by the Monitors, has been sustained at the Designated Performance Standard or Standards for two consecutive Reporting Periods (which may include the period of compliance while in the "To Be Achieved" classification), the Commitment will move to section 4 (Structures and Policies), where it will remain for the duration of court jurisdiction, under the terms of section 3.1(d).

(d) **Structures and Policies.** Commitments in section 4 (Structures and Policies) are structural and policy components of the DHHS child welfare system that DHHS will maintain for the duration of this Agreement. Upon placement in section 4, these Commitments will not be actively monitored. At the Monitors' discretion, the Monitors may request, and DHHS will supply, information and data relating to any Commitment in this classification. If the information and data demonstrates a substantial departure from the structural or policy Commitment, the Monitors may request that DHHS propose corrective action. If DHHS fails, within a reasonable period of time as determined by the Monitors, to propose and implement a corrective action that reestablishes compliance with the structural or policy Commitment, the Monitors may, in their discretion, move the Commitment into section 6 (To Be Achieved) or

6

section 5 (To Be Maintained) and undertake full monitoring in relation to the Commitment.

(e) **Default Performance Standard.**  Unless specifically stated otherwise, for each Commitment, the Designated Performance Standard and the Floor Performance Standard are compliance with the terms of that Commitment.

3.2 **Termination.**  This Agreement will terminate when the following conditions are simultaneously met:

(a) Every Commitment is in section 4 (Structures and Policies) or section 5 (To Be Maintained),

(b) DHHS has performed at the Designated Performance Standard on every Commitment in section 5 (To Be Maintained) for at least two consecutive Reporting Periods while that Commitment is in section 5, and

(c) There are neither outstanding requests for corrective action nor incomplete corrective actions, with respect to any Commitment in section 4 (Structures and Policies).

4. **Structures and Policies**

4.1 **State and Federal Funding (Commitment 1).** DHHS does not speak for the Michigan Legislature, which has the power under Michigan law to determine the appropriations for the State's child welfare programs. However, at least annually after Court approval of this Agreement, and consistent with existing state budgetary practices and legal requirements, DHHS shall request State funds and any federal/ special fund authorization sufficient to effect the provisions and outcome measures set forth in this Agreement in connection with any budget, funding, or allocation request to the executive or legislative branches of State government. To the extent that it is anticipated that the funding of critical needs shall be met, in whole or in part, by way of federal sources, DHHS shall request federal fund authorization in amounts which are determined to be realizable and consistent with regular budgetary needs assessments. Such budgetary requests, which shall be provided to the Monitors, shall, among other things, identify for the executive and legislative branches of State government, with sufficient particularity, the known and anticipated costs to the State for the timely implementation of the reforms and outcome measures provided for herein. DHHS shall maximize available federal funding opportunities. Nothing in this paragraph limits Defendants' obligations under this Agreement.

4.2 **Changes to Federal Indicators (Commitment 2).** The indicators set forth in this Agreement for safety and permanency were developed by the United States Department of Health and Human Services as part of the Child and Family Service Review ("CFSR") process. In the event that, during the term of this Agreement, Health and Human Services further modifies these indicators or the methodologies underlying these indicators, the parties and the Monitors shall meet to determine whether to make corresponding changes in DHHS's responsibilities under this Agreement.

4.3 **Quality Assurance Program (Commitment 3).** DHHS shall maintain a statewide quality assurance program, approved by the Monitors, that shall be directed by a Quality Assurance Unit. DHHS shall ensure accurate data collection and data verification. In administering the quality assurance program, the Quality Assurance Unit will maintain internal DHHS capacity to undertake data analysis, case record or qualitative service review, and other such oversight and reporting functions that, in coordination with the Monitors and any external data review processes undertaken by the Monitors, shall facilitate ongoing assessment of DHHS child welfare performance in relation to the performance requirements and goals contained in this Agreement. The Quality Assurance Unit shall support the DHHS Director and DHHS management in identifying areas of systemic strengths and weaknesses and in formulating strategies to improve in areas of substandard performance. The Quality Assurance Unit shall provide ongoing critical evaluation and oversight of the strategies designed and undertaken to improve substandard

services and outcomes.  All reports provided by the Quality Assurance Unit shall be public record so long as any individually identifying information in relation to the temporary or permanent wards in DHHS foster care custody is redacted from such report consistent with applicable state and federal confidentiality laws.  The Quality Assurance Unit shall, within 60 days following the end of each Reporting Period, compile and analyze, in consultation with the Monitors, all pertinent information regarding statewide performance in relation to the requirements and outcome measures contained in this Agreement.  This data shall be furnished to the Monitors and Plaintiffs.

**4.4** **Child Protective Service Investigations (Commitment 4).**  DHHS will maintain a quality assurance process to ensure that Child Protective Services ("**CPS**") reports are competently investigated, and actions taken and services provided are appropriate to the circumstances.  In addition, DHHS will maintain a Book of Business that will provide CPS caseworkers with an at-a-glance look at the previous 30 days' performance, present status, and future benchmarks.

**4.5** **Caseworker Qualifications and Training (Commitment 5).**

(a)   DHHS will maintain a policy that entry-level caseworkers have a bachelor's degree in social work or a related human services field and providing for a caseload progression for all workers that includes appropriate training before the assignment of cases and competency examinations and supervisory approval before assignment of a full caseload.  DHHS will also maintain a policy that entry level licensing workers have a bachelor's degree in social work or a related human services field.

(b)   The requirements in this Commitment apply to all DHHS caseworkers for positions in CPS, foster care, and adoption, who are responsible for cases of Plaintiffs either directly or as purchase-of-service ("**POS**") workers, and any private agency caseworkers with corresponding responsibilities for class members.

**4.6** **Children's Services Agency (Commitment 6).**  DHHS shall maintain a Children's Services Agency ("**CSA**") headed by an Executive Director at the Deputy level within DHHS and dedicated solely to child welfare services.  The CSA will develop child welfare policy and determine statewide standards.  The CSA will take all reasonable steps necessary to ensure that statewide policies, standards, and practices are implemented and maintained in each county of the state, whether services are provided by public or private agencies, and that each county uses uniform forms, data collection, and reporting. Individual staff within Genesee, Kent, Macomb, Oakland, and Wayne counties (each county, a "**Designated County**"), including but not limited to caseworkers, supervisors, managers, and county-level Administrators, shall be assigned full-time to children's services and

shall not hold responsibility for any of DHHS's other functions, such as cash assistance, Medicaid, or adult services.

**4.7   Maltreatment in Care Units (Commitment 7).**  DHHS will maintain regional maltreatment-in-care units, staffed by specially trained CPS staff, responsible for all investigations of abuse or neglect relating to any child in the foster care custody of DHHS.  DHHS shall ensure dedicated supervision, oversight, and coordination of all maltreatment-in-care investigations.

**4.8   Foster Home Capacity (Commitment 8).**  DHHS shall continue to conduct a diligent search for kin and fictive kin caregivers upon removal of a child into DHHS custody.  A designated unit or person within the DHHS central office shall be responsible for monitoring the development and implementation of the foster and adoptive home recruitment and retention plans by county offices; providing or arranging for technical assistance to the county offices concerning recruitment and retention; and reporting to the CSA Director on progress and problems in achieving the goals set forth in the recruitment and retention plans.

**4.9   Relative Foster Care Providers and Caregivers (Commitment 9).**  All licensed relative foster care providers shall receive the same foster care maintenance rates paid by DHHS to similarly situated unrelated foster care providers, including the ability to qualify for enhanced Determination of Care rates.  All permanent wards living with relative caregivers shall be provided foster care maintenance payments equal to the payments provided to licensed foster caregivers.

**4.10   Relative Foster Home Licensing (Commitment 10).**  DHHS shall continue to implement the policies, procedures, and organizational structures required to license all unlicensed relative caregivers.  Included within this effort, DHHS shall maintain a position of Relative Licensing Coordinator with overall responsibility for development of a combined/coordinated Family Home Assessment for relative providers, family foster care, and adoption; monitoring and reporting on the number of unlicensed relative homes and the foster children in those homes, broken down by county and private Child Placement Agency ("**CPA**"), where applicable; and ensure the availability of adequate staff to develop curriculum and training for and to train relative licensing staff.  DHHS shall require that pre-service and in-service foster parent training be provided to relative caregivers pursuing licensure and that the content of the training include those parts of the general foster parent training curriculum that are relevant to relative caregivers.

**4.11   Relative Licensing Waivers (Commitment 11).**  DHHS shall prepare and make public the procedures on obtaining variances from standard foster care licensing requirements for purposes of licensing relative homes.  DHHS shall not waive any licensing standards that are essential for the safety and well-being of the child.

**4.12  Provision of Post-Adoption Services (Commitment 12).**  DHHS shall develop and implement a full range of post-adoption services to assist all eligible special needs children adopted from state foster care and their permanent families (including, but not limited to, physical therapy, counseling, and other services required to address the developmental and/or physical disabilities of an adopted child) and shall maintain sufficient resources to deliver such post-adoption services to all Plaintiffs who qualify for these services, along with their permanent families.

**4.13  Placement Standards and Limitations, Policy (Commitment 13).**  All children shall be placed in accordance with their individual needs, taking into account a child's need to be placed as close to home and community as possible, the need to place siblings together, and the need to place children in the least restrictive, most home-like setting.  DHHS shall not place any child determined by a clinical assessment to be at high risk for perpetrating violence or sexual assault in any foster care placement with foster children not so determined without an appropriate assessment concerning the safety of all children in the placement. Race and/or ethnicity and/or religion shall not be the basis for a delay or denial in the placement of a child, either with regard to matching the child with a foster or adoptive family or with regard to placing a child in a group facility.  Race and/or ethnicity shall otherwise be appropriate considerations in evaluating the best interest of an individual child to be matched with a particular family.  DHHS shall not contract and shall immediately cease contracting with any program or private CPA that gives preference in its placement practices by race, ethnicity, or religion.

**4.14  Transitional Youth Services (Commitment 14).**  DHHS will maintain its Homeless Youth Initiative policy, which connects emancipated youth with community housing resources.

**4.15  Family Engagement Model (Commitment 15).**  DHHS will continue using its family engagement model, including Family Team Meetings, to make critical case decisions.  DHHS will maintain a QSR process to monitor fidelity of implementation and the continuous improvement of the model.

**4.16  Special Reviews for Children Legally Free/In Care More Than One Year (Commitment 16).**  DHHS is committed to moving to permanency all children (a) who have had the parental rights of their parents terminated, have had the goal of adoption for more than 365 days, and do not have an identified adoptive placement, and (b) who have a goal of reunification and have been in care for more than 15 months.  DHHS will commit to conducting special reviews for all children in these categories.

**4.17  Health Care (Commitment 17).**  DHHS shall maintain a full-time Health Unit Manager, with appropriate qualifications, who shall, among other things, be responsible for overseeing the implementation of policies and procedures concerning the use of psychotropic medications for all children in DHHS foster care

custody.  The Health Unit Manager shall have the authority to recommend corrective actions.  The Health Unit Manager shall report directly to the CSA. DHHS shall hire or contract for the services of a medical consultant who shall be a physician.  The medical consultant shall provide consultation on all health-related matters required under this Agreement.  The medical consultant shall report to the Health Unit Manager.

### 4.18  Medical, Dental, and Mental Health Services, Policy (Commitment 18).

(a)  DHHS shall ensure that every child receives all needed emergency medical, dental, and mental health care.

(b)  DHHS shall ensure that every child receives all needed follow-up medical, dental, and mental health care as identified.

### 4.19  Corporal Punishment & Seclusion/Isolation, Prohibition and Policy (Commitment 19).  DHHS shall prohibit the use of Positive Peer Culture, peer-on-peer restraint, and any other forms of corporal punishment in all foster care placements and shall maintain a policy regarding seclusion/isolation.

### 4.20  Contract Agency Requirements (Commitment 20).

(a)  DHHS's contracts with private CPAs and Child Caring Institutions ("CCI"s) shall be performance-based and shall include all of the following requirements: (1) compliance with performance goals as set forth in this Agreement; (2) compliance with all aspects of all DHHS policies and procedures that apply to the provider; (3) any reports of suspected abuse or neglect of any Plaintiff while receiving such contracted placements or services shall be reported to DHHS for investigation; (4) all placement providers for foster children in DHHS foster care custody are prohibited from using or authorizing the use of corporal punishment for children under the care and supervision of DHHS or the private CPA or CCI; (5) any reports of suspected corporal punishment while in that provider's care shall be reported to DHHS and investigated by DHHS, the CPA, or the CCI, as necessary; and (6) all CCIs or private CPAs that provide placements and child welfare services to Plaintiffs report to DHHS accurate data on at least a six-month basis in relation to the requirements of this Agreement.  DHHS shall independently monitor and enforce these contracts.  Further, DHHS shall maintain a set of enforcement measures to be imposed in the event that a contract agency fails to comply with material terms or requirements of the performance-based contract.

(b)  DHHS shall give due consideration to any and all substantial incidents of abuse, neglect, and/or corporal punishment occurring in the placements licensed and supervised by a CPA or CCI at the time of processing its application for licensure renewal.  The failure of a CPA or CCI to report suspected abuse or neglect of a child to DHHS shall result in an immediate investigation to

determine the appropriate corrective action up to and including termination or modification of relevant portions of a contract, or placement of the provider on provisional licensing status. A repeated failure within one year shall result in a review of the contract agency's violations by a designated Administrative Review Team, which shall include the Director of CSA and the Director of the Division of Child Welfare Licensing (that division, the "**DCWL**") or its successor agency that shall consider mitigating and aggravating circumstances to determine the appropriate corrective action up to and including license revocation and contract termination.

(c)  DHHS shall conduct annual contract evaluations of all CCIs and private CPAs providing placements and services to Plaintiffs to ensure, among other things, the safety and well-being of Plaintiffs and to ensure that the contract is complying with the applicable terms of this Agreement.

(d)  DHHS shall maintain sufficient resources to permits its staff to undertake timely and competent contract enforcement activities as set forth in this section.

**4.21  Reporting (Commitment 21).**  For the purposes of determining compliance with requirements of this agreement, DHHS and the Monitors shall meet at least 30 calendar days before the end of each Reporting Period to ensure methods of data collection and data definitions are consistent with the expected reports for that period.

**4.22  Child Welfare Information System (Commitment 22).**  DHHS will maintain an operational statewide automated child welfare information system which will be the primary tracking system and satisfy federal reporting requirements.

**4.23  Psychotropic Medication, Diagnosis (Commitment 89).**  Prior to initiating each prescription for psychotropic medication, the child must have a mental health assessment with a current DSM-based psychiatric diagnosis of the mental health disorder. The Designated Performance Standard for this Commitment is 97%, and the Floor Performance Standard is 95%.

**4.24  Psychotropic Medication, Oversight Review (Commitment 92).**  DHHS shall ensure that a qualified physician completes and documents an oversight review of a child whenever one or more of the criteria listed in the "Psychotropic Medication Oversight" section of DHHS Policy FOM 802-1 (dated 5-1-2015) or any successor policy approved by the Monitors are met. The review shall be completed according to the "DHHS 1643 Physician Review Form" that DHHS currently uses, or any successor form approved by the Monitors.

**4.25  Health Care Liaison Officers (Commitment 35).**  DHHS shall maintain at least 34 Health Liaison Officers, as defined in the "Health Liaison Officers (HLO)" section of DHHS Policy FOM 801 (dated 3-1-15) or any successor policy approved by the Monitors.

**4.26 Psychotropic Medication, Prohibition on Disciplinary Use (Commitment 36).** Psychotropic medication shall not be used as a method of discipline or be used in place of psychosocial or behavioral interventions that the child requires. The Monitors will measure DHHS performance of this Commitment with case-record reviews. This Commitment can become eligible to move to structures and policies.

**4.27 Licensing Worker Qualifications and Training (Commitment 40).** DHHS submitted a plan to the Monitors on March 5, 2009 identifying the type and amount of training to be provided to all licensing workers. The Monitors approved this plan. DHHS shall continue to train licensing workers in accordance with this plan or in accordance with a successor plan approved by the Monitor. The Designated Performance Standard for this Commitment is 95%, and the Floor Performance Standard is 90%.

**4.28 Treatment Foster Homes (Commitment 47).** At any given time, DHHS shall have at least 200 treatment foster home beds.

**4.29 Placement in Jail, Correctional, or Detention Facility (Commitment 44).** No child in DHHS foster care custody shall be placed by DHHS or with knowledge of DHHS, in a jail, correctional, or detention facility unless such child is being placed pursuant to a delinquency charge. DHHS shall notify the State Court Administrative Office and the Michigan State Police of this prohibition, and provide written instructions to immediately notify the local DHHS office of any child in DHHS foster care custody who has been placed in a jail, correctional, or detention facility. If it comes to the attention of DHHS that a child in DHHS foster care custody has been placed in a jail, correctional, or detention facility, and such placement is not pursuant to a delinquency charge, DHHS shall ensure the child is moved to a DHHS foster care placement as soon as practicable, and in all events within five days, unless the court orders otherwise over DHHS's objection. If a child in DHHS foster care custody is placed in a jail, correctional, or detention facility pursuant to a delinquency charge, and the disposition of such a charge is for the child to return to a foster care placement, then DHHS shall return the child to a DHHS placement as soon as practicable but in no event longer than five days from disposition, unless the court orders otherwise over DHHS objection.

**4.30 Education, Attendance (Commitment 73).** DHHS shall take reasonable steps to ensure that school-aged foster children are registered for and attending school within five days of initial placement or any placement change, including while placed in child care institutions or emergency placements. No child shall be schooled pursuant to MCL 380.1561(3)(f).

**5.    To Be Maintained**

**5.1    Contract-Agency Evaluation (Commitment 34).**

(a)    DHHS shall conduct contract evaluations of all CCIs and private CPAs providing placements and services to Plaintiffs to ensure, among other things, the safety and well-being of Plaintiffs and to ensure that the CCI or private CPA is complying with the applicable terms of this Agreement. At least once each year:

    (1)    DHHS shall inspect each private CPA to review all relevant aspects of the agency's operations;

    (2)    DHHS shall visit a random sample of each CPA's foster homes as a part of the annual inspection.  CPAs with less than 50 foster homes shall have three foster homes visited.  CPAs with 50 foster homes or more shall have 5% of their foster homes visited; and

    (3)    DHHS shall conduct an unannounced inspection of each CCI.  DHHS shall prepare written reports of all contract-agency inspections and visits, detailing findings.  DHHS shall require corrective actions and require private CPAs and CCIs to report to DHHS on the implementation of these corrective action plans, and shall conduct follow-up visits when necessary.  Such reports shall routinely be furnished to the Monitors.

(b)    This Commitment is never eligible for rolling exit.

**5.2    CPS Investigations, Commencement (Commitment 56).**

(a)    DHHS shall commence all investigations of report of child abuse or neglect within the timeframes required by state law.

(b)    The Designated Performance Standard for this Commitment is 95%, and the Floor Performance Standard is 90%. This Commitment is never eligible for rolling exit.

**5.3    Caseload, CPS Investigation Workers (Commitment 62).**

(a)    95% of CPS caseworkers assigned to investigate allegations of abuse or neglect, including maltreatment in care, shall have a caseload of no more than 12 open investigations.

(b)    Compliance will be measured by taking the average of three data reports each Reporting Period, prepared on the last work day of February, April, June, August, October, and December.  A mixed caseload comprised of more than one program type shall not exceed the prorated total equal to one full caseload. Mixed caseloads will be measured pursuant to the "Caseload Definitions and

Calculating Methodology" approved by the Monitors. This Commitment is never eligible for rolling exit.

### 5.4 Caseload, CPS Ongoing Workers (Commitment 63).

(a) 95% of CPS caseworkers assigned to provide ongoing services shall have a caseload of no more than 17 families.

(b) Compliance will be measured by taking the average of three data reports each Reporting Period, prepared on the last work day of February, April, June, August, October, and December. A mixed caseload comprised of more than one program type shall not exceed the prorated total equal to one full caseload. Mixed caseloads will be measured pursuant to the "Caseload Definitions and Calculating Methodology" approved by the Monitors. This Commitment is never eligible for rolling exit.

### 5.5 Caseload, POS Workers (Commitment 64).

(a) 95% of POS workers shall have a caseload of no more than 90 children. If DHHS changes operations such that the job function of POS Workers is modified or eliminated, DHHS may present to the Monitors a report that details the changes and a proposal to modify or eliminate the POS workers caseload measure. If the Monitors approve, the Monitors will recommend to the Court that the proposal be adopted.

(b) Compliance will be measured by taking the average of three data reports each Reporting Period, prepared on the last work day of February, April, June, August, October, and December. A mixed caseload comprised of more than one program type shall not exceed the prorated total equal to one full caseload. Mixed caseloads will be measured pursuant to the "Caseload Definitions and Calculating Methodology" approved by the Monitors. This Commitment is never eligible for rolling exit.

### 5.6 Caseload, Licensing Workers (Commitment 65).

(a) 95% of licensing workers shall have a workload of no more than 30 licensed foster homes or homes pending licensure.

(b) This Commitment applies equally to both DHHS caseworkers and supervisor caseloads and caseloads of private CPA caseworkers and supervisors with comparable case responsibilities. Compliance will be measured by taking the average of three data reports each Reporting Period, prepared on the last work day of February, April, June, August, October, and December. A mixed caseload comprised of more than one program type shall not exceed the prorated total equal to one full caseload. Mixed caseloads will be measured pursuant to the

16

"Caseload Definitions and Calculating Methodology" approved by the Monitors. This Commitment is never eligible for rolling exit.

5.7 **Seclusion/Isolation (Commitment 71).** DHHS shall require CCIs to report to DCWL all uses of seclusion or isolation. If not reported, DCWL shall take appropriate action to address the failure of the provider to report the incident and to assure that the underlying incident has been investigated and resolved. This Commitment is never eligible for rolling exit.

**6.    To Be Achieved**

**6.1    Safety—Maltreatment in Foster Care (Commitment 38).** DHHS shall ensure that of all children in foster care during the applicable federal reporting period, DHHS will maintain an observed rate of victimization per 100,000 days in foster care less than 8.50, utilizing the CFSR Round 3 criteria. This Commitment is never eligible for rolling exit.

**6.2    MIC Data Report (Commitment 94).** Until Commitment 38 is achieved, DHHS, in partnership with an independent entity, will generate, at least annually, a report that analyzes maltreatment in care data to assess risk factors and/or complete root-cause analysis of maltreatment in care. The report will be used to inform DHHS practice. The first report will be issued no later than June 1, 2020.

**6.3    Permanency Indicator 1 (Commitment 39).** DHHS shall achieve an observed performance of at least the national standard (40.5%) on CFSR Round 3 Permanency Indicator One (Of all children entering foster care in a 12-month period, what percent discharged to permanency within 12 months of entering foster care?). Notwithstanding section 3.1, this Commitment is eligible for rolling exit after a single period of compliance.

**6.4    Foster Home Array (Commitment 41).** DHHS will maintain a sufficient number and array of homes capable of serving the needs of the foster care population, including a sufficient number of available licensed placements within the child's home community for adolescents, sibling groups, and children with disabilities. DHHS will develop for each county and statewide an annual recruitment and retention plan, in consultation with the Monitors and experts in the field, and subject to approval by the Monitors. DHHS will implement the plan, with interim timelines, benchmarks, and final targets, to be measured by the Monitors based on DHHS's good-faith efforts to meet the final targets set forth in the plan. This Commitment can become eligible to move to structures and policies.

**6.5    Placement Standard (Commitment 43).** Children in the foster care custody of DHHS shall be placed only in a licensed foster home, a licensed facility, pursuant to an order of the court, or an unlicensed relative. This Commitment is never eligible for rolling exit.

**6.6    Separation of Siblings (Commitment 46).**

(a)    Siblings who enter placement at or near the same time shall be placed together unless:

(1)    doing so is harmful to one or more of the siblings;

(2)    one of the siblings has exceptional needs that can only be met in a specialized program or facility; or

(3)    the size of the sibling group makes such placement impractical notwithstanding efforts to place the group together.

(b)    If a sibling group is separated at any time, except for the above reasons, the case manager shall make immediate efforts to locate or recruit a family in whose home the siblings can be reunited. These efforts shall be documented and maintained in the case file and shall be reassessed on a quarterly basis.

(c)    The Monitors will conduct an independent qualitative review to determine compliance with this Commitment. The Designated Performance Standard for this Commitment is 90%, and the Floor Performance Standard is 85%. This measure is never eligible for rolling exit.

## 6.7   Maximum Children in a Foster Home (Commitment 48).

(a)    No child shall be placed in a foster home if that placement will result in:

    (1)    more than three foster children in that foster home,

    (2)    (2) a total of six children, including the foster family's birth and adopted children, or

    (3)    (3) more than three children under the age of three residing in that foster home.

(b)    Exceptions to these limitations may be made by the Director of the DCWL, on an individual basis documented in the case file, when in the best interest of the child(ren) being placed.

(c)    The Designated Performance Standard for this Commitment is 90%, and the Floor Performance Standard is 85%. This Commitment is never eligible for rolling exit.

## 6.8   Emergency or Temporary Facilities, Length of Stay (Commitment 49).

(a)    Children shall not remain in emergency or temporary facilities, including but not limited to shelter care, for a period in excess of 30 days. An exception to this limitation may be made for:

    (1)    children who have an identified and approved placement, but the placement is not available within 30 days of the child's entry to an emergency or temporary facility, and

    (2)    children whose behavior has changed so significantly that the County Director or the County Director's manager designee has certified that a temporary placement for the purposes of assessment is critical for the determination of an appropriate foster placement.

    (b)    The Designated Performance Standard and Floor Performance Standard for this Commitment are 95%. In determining DHHS's compliance with this Commitment a child in custody may never remain in a shelter in excess of 60 days, with no exceptions. This Commitment is never eligible for rolling exit.

### 6.9 Emergency or Temporary Facilities, Repeated Placement (Commitment 50).

    (a)    Children shall not be placed in an emergency or temporary facility, including but not limited to shelter care, more than one time within a 12-month period. An exception to this limitation may be made for:

        (1)    children who are absent without legal permission;

        (2)    children facing a direct threat to their safety or who are a threat to the safety of others such that immediate removal is necessary; and

        (3)    children whose behavior has changed so significantly that the County Director or the County Director's manager designee has certified that a temporary placement for the purpose of assessment is critical for the determination of an appropriate foster placement.

    (b)    Children under 15 years of age experiencing a subsequent emergency or temporary-facility placement within a 12-month period may not remain in an emergency or temporary facility for more than 7 days. Children 15 years of age or older experiencing a subsequent emergency or temporary-facility placement within a 12-month period may not remain in an emergency or temporary facility for more than 30 days.

    (c)    The Designated Performance Standard for this Commitment is 97%, and the Floor Performance Standard is 95%. This Commitment is never eligible for rolling exit.

### 6.10 Relative Foster Parents (Commitment 52).

    (a)    When placing a child with a relative who has not been previously licensed as a foster parent, DHHS shall:

        (1)    prior to placement, visit the relative's home to determine that it is safe;

        (2)    within 72 hours following placement, check law enforcement and central registry records for all adults residing in the home; and

        (3)    within 30 days, complete a home study to determine if the placement is safe and appropriate.

        (4)    A home study will be renewed every 12 months for the duration of the child's placement with the relative.

(b)　The Monitors will conduct an independent qualitative review to determine compliance with this Commitment. The Designated Performance Standard for this Commitment is 95%, and the Floor Performance Standard is 90%. This Commitment is never eligible for rolling exit.

## 6.11　CPS Investigations, Completion (Commitment 57).

(a)　DHHS shall complete all investigations of reports of child abuse or neglect within the following timeframes:

　　(1)　completion of the investigation by the worker and submission of the investigative report to the supervisor within 30 days; and

　　(2)　supervisory review (review and approval of the investigation report) within 14 days.

(b)　Measuring DHHS performance on this Commitment will exclude supervisor-approved extensions for the following circumstances:

　　(1)　arranging travel and coordinating interview schedules with the alleged victims who do not reside in the county or are not available for immediate interviews;

　　(2)　obtaining a second medical opinion to verify an injury was not accidental or related to an existing medical condition; and

　　(3)　coordinating interviews of sexual abuse victims with law enforcement.

(c)　The Designated Performance Standard for this Commitment is 90%, and the Floor Performance Standard is 88%. This Commitment is never eligible for rolling exit.

## 6.12　CPS Investigations, Screening (Commitment 58).

(a)　DHHS shall investigate all allegations of abuse or neglect relating to any child in the foster care custody of DHHS (Maltreatment in Care). DHHS shall ensure that allegations of maltreatment in care are not inappropriately screened out for investigation. In addition, when DHHS transfers a referral to another agency for investigation, DHHS will independently take appropriate action to ensure the safety and wellbeing of the child.

(b)　DHHS will maintain a Placement Collaboration Unit (PCU) to review and assess screening decisions on plaintiff-class children who are in out-of-home placements and to ensure safety and well-being is addressed on those transferred complaints. The PCU will review 100% of cases until reconsideration of complaints involving plaintiff class children placed out of home are less than 5%.

21

(c)     The Monitors will conduct an independent qualitative review to determine compliance with this Commitment. The Designated Performance Standard for this Commitment is 95%, and the Floor Performance Standard is 90%. This Commitment can become eligible to move to structures and policies.

## 6.13 Caseload, Supervisors (Commitment 59).

(a)     95% of foster care, adoption, CPS, POS, and licensing supervisors shall be responsible for the supervision of no more than five caseworkers, excluding non-child welfare supervisors. Supervisors may provide supervision to administrative support staff associated with the caseworkers. An employee of DHHS or a private child placing agency that is non-caseload carrying will count as .5 towards the worker to supervisor ratio (with the exception of new staff that are currently participating in the CWTI, which will count as 1.0 towards the worker to supervisor ratio). Administrative and technical support staff that support the supervisor's unit are not counted toward the worker to supervisor ratio. In instances where a DHHS or Private Agency Foster Care supervisor provides direct case management for one or more of the programs listed in this Agreement, one-fifth of a caseload equals a services worker position. (For example, a supervisor carrying one-fifth of a caseload and four services workers would meet the 5:1 ratio.)

(b)     This Commitment applies equally to both DHHS caseworkers and supervisor caseloads and caseloads of private CPA caseworkers and supervisors with comparable case responsibilities. Compliance will be measured by taking the average of three data reports each Reporting Period, prepared on the last work day of February, April, June, August, October, and December. A mixed caseload comprised of more than one program type shall not exceed the prorated total equal to one full caseload. Mixed caseloads will be measured pursuant to the "Caseload Definitions and Calculating Methodology" approved by the Monitors. This Commitment is never eligible for rolling exit.

## 6.14 Caseload, Foster Care Workers (Commitment 60).

(a)     95% of foster care caseworkers shall have a caseload of no more than 15 children.

(b)     This Commitment applies equally to both DHHS caseworkers and supervisor caseloads and caseloads of private CPA caseworkers and supervisors with comparable case responsibilities. Compliance will be measured by taking the average of three data reports each Reporting Period, prepared on the last work day of February, April, June, August, October, and December. A mixed caseload comprised of more than one program type shall not exceed the prorated total equal to one full caseload. Mixed caseloads will be measured pursuant to the

"Caseload Definitions and Calculating Methodology" approved by the Monitors. This Commitment is never eligible for rolling exit.

**6.15  Caseload, Adoption Workers (Commitment 61).**

(a)   95% of adoption caseworkers shall have a caseload of no more than 15 children.

(b)   This Commitment applies equally to both DHHS caseworkers and supervisor caseloads and caseloads of private CPA caseworkers and supervisors with comparable case responsibilities. Compliance will be measured by taking the average of three data reports each Reporting Period, prepared on the last work day of February, April, June, August, October, and December. A mixed caseload comprised of more than one program type shall not exceed the prorated total equal to one full caseload. Mixed caseloads will be measured pursuant to the "Caseload Definitions and Calculating Methodology" approved by the Monitors. This Commitment is never eligible for rolling exit.

**6.16  Supervisory Oversight (Commitment 66).** Supervisors shall meet at least monthly with each assigned worker to review the status and progress of each case on the worker's caseload. Supervisors shall review and approve each service plan. The plan can be approved only after the supervisor has a face-to-face meeting with the worker, which can be the monthly meeting. The Designated Performance Standard for this Commitment is 95%, and the Floor Performance Standard is 90%. This Commitment can become eligible to move to structures and policies.

**6.17  Assessments and Service Plans, Timeliness of Initial Plan (Commitment 67).** DHHS shall complete an Initial Service Plan, consisting of a written assessment of the child(ren)'s and family's strengths and needs and designed to inform decision-making about services and permanency planning, within 30 days after a child's entry into foster care. The Designated Performance Standard for this Commitment is 95%, and the Floor Performance Standard is 90%. This Commitment can become eligible for rolling exit.

**6.18  Assessments and Service Plans, Timeliness of Updated Plans (Commitment 68).** For every child in foster care, DHHS shall complete an Updated Service Plan at least quarterly. The Designated Performance Standard for this Commitment is 95%, and the Floor Performance Standard is 90%. This Commitment can become eligible for rolling exit.

**6.19  Assessments and Service Plans, Content (Commitment 69).**

(a)   Assessments and service plans shall be of sufficient breadth and quality to usefully inform case planning and shall accord with the requirements of 42 U.S.C. § 675(1), and shall indicate:

(1)   the assigned permanency goal;

(2)    how DHHS, other service providers (including the private CPAs, where applicable), parents, and foster parents shall work together to confront the difficulties that led to the child's placement in foster care and achieve the permanency goal;

(3)    the services to be provided to the child(ren), parent(s), and foster parent(s);

(4)    who is to provide those services and by when they are to be initiated; and

(5)    the actions to be taken by the caseworker to help the child(ren), parent(s), and foster parent(s) connect to, engage with, and make good use of services.

(b)    The service plan shall contain attainable, measurable objectives with expected timeframes, and shall identify the party or parties responsible for each task.

(c)    Service plans shall be signed by the caseworker, the caseworker's supervisor, the parent(s), and the child(ren), if of age to participate. If the parent(s) or child(ren) or both are not available or decline to sign the plan, the service plan shall include an explanation of the steps taken to involve them and shall identify any follow-up actions to be taken to secure their participation in services.

(d)    When a child is placed with a private CPA or CCI, the private CPA or CCI shall complete the assessment and the service plan in accordance with the requirements of this Agreement.

(e)    Compliance with this Commitment will be measured through a QSR subject to the approval of and independently verified by the Monitors. The Designated Performance Standard for this Commitment is 90%, and the Floor Performance Standard is 85%. This Commitment can become eligible for rolling exit.

**6.20 Provision of Services (Commitment 70).** DHHS shall ensure that the services identified in the service plan are made available in a timely and appropriate manner to the child and family, and shall monitor the provision of services to determine whether they are of appropriate quality and are having the intended effect. DHHS is responsible for helping the parent(s) from whom the child has been or may be removed, the child(ren), and the foster parent(s) identify appropriate, accessible, and individually compatible services; assisting with transportation when necessary; helping to identify and resolve any barriers that may impede parent(s), child(ren), and foster parent(s) from making effective use of services; and intervening to review and amend the service plan when services are not provided or do not appear to be effective. Compliance with the requirements of this Commitment shall be measured through a QSR, subject to the approval of and independently verified by the Monitors. The Designated Performance Standard for

this Commitment is 83%, and the Floor Performance Standard is 75%. This Commitment can become eligible for rolling exit.

**6.21 Visits, Worker-Child (Commitment 75).**

(a) Each child in foster care shall be visited by a caseworker at least two times per month during the child's first two months of placement in an initial or new placement, and at least one time per month thereafter. At least one visit each month shall take place at the child's placement location and shall include a private meeting between the child and the caseworker.

(b) This Commitment applies to all children in DHHS foster care custody, including those children placed through private CPAs. In this Commitment "caseworker" is defined as (1) a caseload-carrying caseworker, or (2) a supervisor.

(c) The Designated Performance Standard for both the total number of visits and the number of visits occurring in the placement location is 95%. The Floor Performance Standard for both of these measures is 90%. The performance standards for this Commitment will be calculated as the number of visits that occurred during the Reporting Period divided by the number of visits required by the Commitment during the Reporting Period. This Commitment is never eligible for rolling exit.

**6.22 Visits, Worker-Parent (Commitment 76).**

(a) For each child in foster care with a permanency goal of reunification, the child's caseworker shall have face-to-face contacts with the child's parent(s) as follows:

    (1) for the first month the child is in care, two face-to-face contacts with each parent, at least one of which must occur in the parent's place of residence;

    (2) for each subsequent month, at least one face-to-face contact with each parent and phone contact as needed, with at least one contact in each three-month period occurring in the parent's place of residence.

(b) Exceptions to section (a) are cases in which:

    (1) the parent is not attending visits despite DHHS taking adequate steps to ensure the visit takes place; or

    (2) a parent cannot attend a visit due to exigent circumstances such as hospitalization or incarceration.

(c) Exceptions and reasonable steps to assure that visits take place shall be documented in the case file.

(d)    This Commitment applies to all children in DHHS foster care custody, including those children placed through private CPAs. In this Commitment "caseworker" is defined as (1) a caseload-carrying caseworker, or (2) a supervisor.

(e)    The Designated Performance Standard for each measure in this Commitment is 85%, and the Floor Performance Standard for each measure in this Commitment is 80%. The Performance Standards for this Commitment will be calculated as the number of visits that occurred during the Reporting Period divided by the number of visits required by the Commitment during the Reporting Period.  This Commitment is never eligible for rolling exit.

## 6.23  Visits, Parent-Child (Commitment 77).

(a)    DHHS shall ensure that children in foster care with a goal of reunification shall have at least twice-monthly visitation with their parents.  Exceptions to this requirement are cases in which:

    (1)    a court orders less-frequent visits;

    (2)    the parents are not attending visits despite DHHS taking adequate steps to ensure the parents' ability to visit;

    (3)    one or both parents cannot attend the visits due to exigent circumstances such as hospitalization or incarceration; or

    (4)    the child is above the age of 16 and refuses such visits.

(b)    All exceptions and all reasonable steps to assure that visits take place shall be documented in the case file.  If such exceptions exist, DHHS shall review the appropriateness of the child's permanency goal.

(c)    This Commitment applies to all children in DHHS foster care custody, including those children placed through private CPAs. In this Commitment "caseworker" is defined as (1) a caseload-carrying caseworker, or (2) a supervisor.

(d)    The Designated Performance Standard for this Commitment is 85%, and the Floor Performance Standard is 80%.  The performance standards in this Commitment will be calculated as the number of visits that occurred during the Reporting Period divided by the number of visits required by the Commitment during the Reporting Period.  This Commitment is never eligible for rolling exit.

## 6.24  Visits, Between Siblings (Commitment 78).

(a)    DHHS shall ensure that children in foster care who have siblings in custody with whom they are not placed shall have at least monthly visits with their siblings who are placed elsewhere in DHHS foster care custody.  Exceptions to this requirement are cases in which:

       (1)    the visit may be harmful to one or more of the siblings;

       (2)    the sibling is placed out of state in compliance with the Interstate Compact on Placement of Children;

       (3)    the distance between the children's placements is more than 50 miles and the child is placed with a relative; or

       (4)    one of the siblings is above the age of 16 and refuses such visits.

(b)    All exceptions and all reasonable steps taken to assure that visits take place shall be documented in the case file.

(c)    This Commitment applies to all children in DHHS foster care custody, including those children placed through private CPAs. In this Commitment "caseworker" is defined as (1) a caseload-carrying caseworker, or (2) a supervisor.

(d)    The Designated Performance Standard in this Commitment is 85%, and the Floor Performance Standard is 80%. The performance standards in this Commitment will be calculated as the number of visits that occurred during the Reporting Period divided by the number of visits required by the Commitment during the Reporting Period. This Commitment is never eligible for rolling exit.

**6.25 Medical and Mental Health Examinations (Commitment 79).** At least 85% of children shall have an initial medical and mental health examination within 30 days of the child's entry into foster care, and at least 95% of children shall have an initial medical and mental health examination within 45 days of the child's entry into foster care. This Commitment is never eligible for rolling exit.

**6.26 Dental Examinations (Commitment 80).** At least 90% of children shall have an initial dental examination within 90 days of the child's entry into care unless the child has had an exam within six months prior to placement or the child is less than four years of age. This Commitment is never eligible for rolling exit.

**6.27 Immunizations, In Custody Three Months or Less (Commitment 81).** Children shall receive all required immunizations according to the guidelines set forth by the American Academy of Pediatrics. For children in DHHS custody for three months or less at the time of measurement: DHHS shall ensure that 90% of children in this category receive any necessary immunizations according to the guidelines set forth by the American Academy of Pediatrics within three months of entry into care.

**6.28 Immunization, In Custody Longer than Three Months (Commitment 82).** Children shall receive all required immunizations according to the guidelines set forth by the American Academy of Pediatrics. For children in DHHS custody for longer than three months at the time of measurement: DHHS shall ensure that

90% of children in this category receive all required immunizations according to the guidelines set forth by the American Academy of Pediatrics.

**6.29   Examinations and Screenings (Commitment 83).**  Following an initial medical, dental, or mental health examination, at least 95% of children shall receive periodic and ongoing medical, dental, and mental health care examinations and screenings, according to the guidelines set forth by the American Academy of Pediatrics.  This Commitment is never eligible for rolling exit.

**6.30   Child Case File, Medical and Psychological (Commitment 84).**

(a)   DHHS shall ensure that:

    (1)   The child's health records are up to date and included in the case file. Health records include the names and addresses of the child's health care providers, a record of the child's immunizations, the child's known medical problems, the child's medications, and any other relevant health information.

    (2)   The case plan addresses the issue of health and dental care needs.

    (3)   Foster parents or foster care providers are provided with the child's health care records.

(b)   The Designated Performance Standard for this Commitment will be 95%, and the Floor Performance Standard will be 90%.  This Commitment can become eligible to move to Structures and Policies.

**6.31   Medical Care and Coverage, At Entry (Commitment 87).**  DHHS shall ensure that at least 95% of children have access to medical coverage within 30 days of entry into foster care by providing the placement provider with a Medicaid card or an alternative verification of the child's Medicaid status and Medicaid number as soon as it is available.  This Commitment can become eligible to move to structures and policies.

**6.32   Medical Care and Coverage, Subsequent Placement (Commitment 88).**  DHHS shall ensure that at least 95% of children have access to medical coverage within 24 hours or the next business day following subsequent placement by providing the placement provider a Medicaid card or an alternative verification of the child's Medicaid status and Medicaid number as soon as it is available.  This Commitment can become eligible to move to structures and policies.

**6.33   Psychotropic Medication, Informed Consent (Commitment 90).**  DHHS shall ensure that informed consent is obtained and documented in writing in connection with each psychotropic medication prescribed to a child in DHHS custody.  This informed consent must be obtained in accordance with the "Informed Consent" section contained in DHHS Policy FOM 802-1 (dated 5-1-2015) or any successor policy approved by the Monitors.  The Designated Performance Standard for this

Commitment is 97%, and the Floor Performance Standard is 95%. This Commitment can become eligible to move to structures and policies.

**6.34  Psychotropic Medication, Documentation (Commitment 91).**

(a)  DHHS shall ensure that:

    (1)  A child is seen regularly by a physician to monitor the effectiveness of the medication, assess any side effects and/or health implications, consider any changes needed to dosage or medication type and determine whether medication is still necessary and/or whether other treatment options would be more appropriate.

    (2)  DHHS shall regularly follow up with foster parents/caregivers about administering medications appropriately and about the child's experience with the medication(s), including any side effects.

    (3)  DHHS shall follow any additional state protocols that may be in place related to the appropriate use and monitoring of medications.

The Designated Performance Standard for this Commitment is 97%, and the Floor Performance Standard is 95%. This Commitment can become eligible to move to structures and policies.

**6.35  Generation of Data (Commitment 93).**  DHHS shall generate from its Child Welfare Information System accurate and timely reports and information regarding the requirements and outcome measures set forth in this Agreement. This Commitment can become eligible to move to structures and policies.

**6.36  Support for Transitioning to Adulthood, YAVFC (Commitment 24).**
DHHS will continue to implement policies and provide services to support youth transitioning to adulthood, including ensuring youth have been informed of services available through the Young Adult Voluntary Foster Care program and the availability of Medicaid coverage. Performance for this Commitment will be measured as follows:

(a)  An increase in the rate of foster youth aging out of the system participating in the YAVFC program for a minimum of two periods. Once positive trending has been achieved for two reporting periods, then this Commitment can become eligible to move to structures and policies. Performance for this Commitment will not be monitored during 2019. Instead, 2019 data will be reported to the Monitors and used to establish a baseline performance level. Once that baseline performance level is established, the parties will then revisit this Commitment to determine what constitutes positive trending for purposes of compliance and movement to section 4.

(b) An increase in the rate of foster youth aging out of the system who have access to Medicaid. The Designated Performance Standard for this Commitment is 95%, and the Floor Performance Standard is 85%. This Commitment can become eligible to move to structures and policies.

### 6.37 Support for Transitioning to Adulthood, Permanency (Commitment 25).

(a) DHHS will continue to implement policies and provide services to support the rate of older youth achieving permanency.

(b) This Commitment will be measured by examining the outcomes of all older youth who exit foster care during the monitoring period and comparing rates of exits to permanency and rates of exits to emancipation. For purposes of this Commitment, older youth is defined as youth aged 15 or older with a permanency goal of reunification, guardianship, adoption or APPLA.

(c) The Performance Standard for this Commitment is positive trending, i.e., any reduction in the rates of older youth exiting without permanency. This Commitment can become eligible for rolling exit.

### 7.    Monitoring

**7.1**    The parties agree that Kevin M. Ryan and Eileen Crummy of the Public Catalyst Group shall be the monitors (the "**Monitors**") of DHHS's compliance with the terms of this Agreement.

**7.2**    Neither party, nor any employee or agent of either party, shall have any supervisory authority over the Monitors' activities, reports, findings, or recommendations. The retention of the Monitors shall be conducted solely pursuant to the procedures set forth in this Agreement and shall not be governed by any formal or legal procurement requirements. The Monitors shall hire such staff as the Monitors deem necessary to discharge their responsibilities under this Agreement.

**7.3**    The Monitors shall have free and complete access to records maintained by DHHS, its divisions and any successor agencies or divisions, and by its private CPAs and CCIs. The Monitors shall also have free and complete access to the staff of DHHS; its divisions and any successor agencies or divisions; persons within the executive branch; private CPAs and CCIs; children in the care of DHHS and of private CPAs and CCIs; and other individuals that the Monitors deem relevant to their work. DHHS shall direct all employees and contract providers to cooperate fully with the Monitors and shall assist the Monitors in gaining free access to other stakeholders in the child welfare system.

**7.4**    All non-public information obtained by the Monitors shall be maintained in a confidential manner. In providing the public reports described in section 7.10, and consistent with applicable state and federal confidentiality requirements, the Monitors shall not identify public or private staff or private agencies, except to the extent that such information about public or private staff and private agencies has already been made public. The parties shall have access, through the Monitors, to all information made available to the Monitors, subject to the existing protective order in effect in this case.

**7.5**    The Monitors shall have the authority to conduct, or cause to be conducted, such case record reviews, qualitative reviews, and audits as the Monitors reasonably deem necessary. In order to avoid duplication and build capacity within the agency, DHHS shall provide the Monitors with copies of all state-issued data reports regarding topics covered by this Agreement. Notwithstanding the existence of state data, data analysis or reports, the Monitors shall have the authority to prepare new reports on outcome measures and all other terms of this Agreement to the extent the Monitors deem necessary.

**7.6**    The Monitors and Plaintiffs shall receive, and the Monitors shall review (and, for data, verify the accuracy of) all written processes, programs, procedures, statements of work, formal analyses, system designs, and data reports developed

pursuant to this Agreement. The Monitors shall take into account the timeliness, appropriateness, and quality of these work products in reporting on the State's compliance with the terms of this Agreement.

7.7 The Monitors may grant extensions to due dates outlined in this Agreement after consultation with Plaintiffs.

7.8 In addition to the requirements set forth above, the Monitors' duties shall be to: confirm independently the data reports and statistics provided pursuant to this Agreement; conduct independent case record or other qualitative reviews or audits; review and approve plans, documents, and data reports agreed to be developed and produced by DHHS pursuant to this Agreement; and report on DHHS's progress in implementing the terms of this Agreement and the achievement of the outcomes set forth herein.

7.9 Within three months from the date of court approval of this Agreement, the Monitors shall provide the parties with a written monitoring plan setting forth the methodologies by which the Monitors shall measure DHHS's progress in implementing the terms of this Agreement and achieving the outcomes set forth herein. Specifically, the Monitors' methodologies may include, but are not limited to, analyses of information collected: (a) by DHHS's management and information systems if and when available and accurate; (b) from a review of relevant case records; (c) from the production of data aggregated by the Monitors or third parties; and (d) from interviews with DHHS staff, resource families, class members or prior class members and their families, contract agency staff, service providers, and other child welfare stakeholders. The Monitors shall make best efforts to specify the methods they will utilize to perform their duties as to each and every section of this Agreement. The plan may be periodically revised by the Monitors, after consultation with the parties, particularly if and when DHHS data becomes more available and accurate and when a Quality Assurance Unit becomes functional. Nothing in this paragraph is intended to in any way limit the scope of the Monitors' access to information and individuals as otherwise set forth herein.

7.10 The Monitors shall issue a report setting forth the measurable progress made by DHHS in relation to each of the performance (process and outcome) requirements contained in this Agreement for each six-month period (each such period, a "**Reporting Period**"). Reporting Period 17 begins on July 1, 2019 and ends on December 31, 2019. Each subsequent Reporting Period begins on the day following the completion of the previous Reporting Period.

7.11 The Monitors' reports shall be public documents upon formal submission to the Court.

7.12 The Monitors' reports shall set forth the steps taken by DHHS, the reasonableness of these efforts, and the adequacy of support for the implementation of these steps;

32

the quality of the work done by DHHS in carrying out those steps; and the extent to which that work is producing the intended effects and/or the likelihood that the work will produce the intended effects. Such reports shall be issued every six months, unless the parties agree otherwise.

**7.13** The Monitors and the parties shall develop a plan to transfer the primary monitoring function to DHHS's Quality Assurance Unit upon the termination of this Agreement, or at such earlier time as the parties may agree. The Monitors shall work in collaboration with DHHS in building its quality assurance capacity.

**7.14** The Monitors shall not express any conclusions as to whether DHHS has reached legal compliance on any item or items required under this Agreement.

**7.15** If at any time the Monitors can no longer serve, the parties shall agree on another Monitor, with input and recommendations from the outgoing Monitors.

**7.16** DHHS shall enter into a contract to secure the services of the Monitors. The Monitors shall have a budget and staff sufficient to allow the Monitors to carry out the responsibilities described in this Agreement, and may contract with such experts or consultants as he or she may deem appropriate, in consultation with the parties. Experts or consultants hired by the Monitors may initiate and receive ex parte communications with the parties.

**7.17** Other than as expressly provided in this Agreement, this Agreement shall not be deemed a waiver of any privilege or right DHHS may assert, including those recognized at common law and created by statute, rule, or regulation against any other person or entity with respect to the disclosure of any information.

**7.18** The Monitors shall be permitted to engage in ex parte communications with all parties. The Monitors may periodically meet privately with the Court concerning issues related to this case, provided the parties are made aware of the occurrence of such a meeting.

**7.19** Unless such conflict is waived by the parties, the Monitors and any expert hired by the Monitors shall not accept employment or provide consulting services that would present a conflict of interest with the Monitors' responsibilities under this Agreement, including being retained (on a paid or unpaid basis) by any current or future litigant or claimant, or such litigant's or claimant's attorney, in connection with a claim or suit against the state of Michigan or its departments, officers, agents, or employees.

**7.20** The Monitors are not a state or local agency or an agent thereof, and accordingly the records maintained by the Monitors shall not be deemed public records subject to public inspection. Neither the Monitors nor any person or entity hired or otherwise retained by the Monitors to assist in furthering any provision of this Agreement shall be liable for any claim, lawsuit, or demand arising out of the

Monitors' good-faith performance pursuant to this Agreement. This paragraph does not apply to any proceeding before a court related to performance of contracts or subcontracts for monitoring this Agreement.

7.21   For provisions of this Agreement requiring Monitors' approval, the Monitors shall respond in writing within 45 days of receiving the required proposal, unless otherwise specified in this Agreement. Signature by either Kevin Ryan or Eileen Crummy on a written approval shall be deemed approval by the Monitors.

7.22   For provisions of this Agreement requiring Plaintiffs' approval, Plaintiffs' counsel shall respond in writing within 45 days of receiving the required proposal in writing, unless otherwise specified in this Agreement.

## 8.   Enforcement and Dispute Resolution

**8.1**   This Agreement shall constitute the entire integrated Agreement of the parties. No prior or contemporaneous communications, oral or written, shall be relevant or admissible for purposes of determining the meaning of any provisions herein in this matter or in any other proceeding.

**8.2**   In the event that Plaintiffs identify an area in which they believe DHHS is not in substantial compliance with an enforceable provision of this Agreement:

(a)   Plaintiffs shall, prior to seeking judicial relief, notify DHHS and the Monitors, in writing, of the compliance issue.

(b)   Within 15 calendar days of Plaintiffs' notification, DHHS shall respond in writing to Plaintiffs and the Monitors as to what actions, if any, it proposes to take with regard to the issue of alleged non-compliance. The 15-day period may be extended by the Monitors for good cause.

(c)   The parties shall meet with the Monitors within 15 calendar days from Plaintiffs' receipt of the DHHS response, unless otherwise agreed by the parties. The purpose of this meeting shall be for the parties to engage in good faith discussions facilitated by the Monitors to determine whether additional actions are necessary to address Plaintiffs' assertion of non-compliance. The parties shall engage in these facilitated dispute resolution discussions for a period not to exceed 30 calendar days, unless extended by mutual agreement of the parties.

(d)   If at the end of the 30-day period, or the period as extended by mutual agreement of the parties, Plaintiffs determine that judicial action is necessary, Plaintiffs may seek further relief from the Court.

(e)   To the extent that any non-compliance by DHHS is in whole or in part attributable to DHHS's organizational structure, changes in organizational structure shall be considered as among the elements of the corrective actions needed to correct the non-compliance.

(f)   If Plaintiffs believe that DHHS has violated this Agreement and, as a result, have caused or are likely to cause immediate and irreparable harm to a child(ren) in DHHS's foster care custody, they may seek emergency judicial relief. Before taking such action, however, Plaintiffs must give DHHS written notice with respect to any such harm, including with such notice any documentation that Plaintiffs believe supports their decision to invoke the provisions of this paragraph. DHHS shall respond to this notice in writing within three business days. The parties must then invoke the provisions in this section 8.2, provided that the entire process shall be completed within 10 business days of DHHS's response to Plaintiffs' notice, unless extended by mutual agreement of the parties.

8.3   DHHS shall maintain sufficient records to document its compliance with all of the requirements of this Agreement. During the term of this Agreement, DHHS shall maintain any and all records required by or developed under this Agreement.

8.4   In the event that legislation known as the "Federal Consent Decree Fairness Act" is enacted into law, DHHS agrees that it shall not invoke their right under that Act to modify or vacate the consent decree resulting from this Agreement. Nothing in this section limits DHHS's ability to seek to modify or vacate the provisions of this Agreement under other law.

8.5   This Agreement shall be binding on all successors, assignees, employees, agents and all those working for or on behalf of Plaintiffs and DHHS.

## 9. Attorneys' Fees

**9.1** For purposes of this agreement, the parties acknowledge that Plaintiffs, as prevailing parties in this lawsuit, are entitled to recover and reserve the right to seek expenses of litigation, including reasonable attorneys' fees and nontaxable costs, pursuant to 42 U.S.C. § 1988 and Fed. R. Civ. P. 23(h).

[Signature Page Follows]

Each party is signing this agreement on the date stated opposite that party's signature.

For Plaintiffs

Date: ___June 17, 2019___   By: _~Samantha Bartosz~_

Samantha M. Bartosz
CHILDREN'S RIGHTS, INC.
88 Pine Street, Suite 800
New York, NY 10005
Phone: 212.683.2210

For Defendants

Date: ___6/20/19___   By: _~Gretchen Whitmer~_

Gretchen Whitmer, in her official capacity as
Governor of the State of Michigan

Date: ___6/20/19___   By: _~Robert Gordon~_

Robert Gordon, in his official capacity as
Director of DHHS

IT IS SO ORDERED.

_~Nancy Edmunds~_
HON. NANCY G. EDMUNDS, U.S.D.J.

DATED: ___6-27-19___