# Progress *of the* Michigan Department *of* Human Services

## Monitoring Report for *Dwayne B. v. Whitmer*

### MODIFIED IMPLEMENTATION, SUSTAINABILITY, AND EXIT PLAN

**ISSUED November 10, 2020**

MISEP 17

JULY TO DECEMBER 2019



PUBLIC CATALYST

# CONTENTS

Introduction ....................................................................................................... 3

   Summary of Progress and Challenges ..................................................... 4

   Summary of Commitments ........................................................................ 6

   Methodology .............................................................................................. 13

   Demographics ........................................................................................... 13

Organizational Capacity ................................................................................ 17

   Caseloads and Supervision ..................................................................... 17

Accountability ................................................................................................. 19

   Outcomes .................................................................................................. 19

   Contract Oversight ................................................................................... 20

   Quality Service Reviews .......................................................................... 33

   Data Reporting ......................................................................................... 35

Permanency .................................................................................................... 36

   Developing Placement Resources for Children ..................................... 36

   Placement Standards ............................................................................... 40

   Case Planning and Practice ..................................................................... 43

   Caseworker Visitation .............................................................................. 43

Safety and Well-Being .................................................................................... 46

   Responding to Reports of Abuse and Neglect ....................................... 46

   Health and Mental Health ........................................................................ 49

Youth Transitioning to Adulthood ................................................................. 52

   Extending Eligibility and Services ........................................................... 52

   Achieving Permanency ............................................................................ 53

## FIGURES

Figure 1. Age of Children in Custody on December 31, 2019 ........................................................ 14

Figure 2. Placement Types of Children in Custody on December 31, 2019 ................................. 15

Figure 3. Length of Stay in Care of Children in Custody on December 31, 2019 ....................... 16

Figure 4. Permanency Indicator One, Historical Performance .................................................... 20

## TABLES

Table 1. Race of Children in Custody on December 31, 2019 and Race of Children in the State of
Michigan on July 1, 2019 ............................................................................................................. 15

Table 2. Exits from Care by Exit Type, July 1, 2019 to December 31, 2019 ................................ 16

Table 3. Federal Goals for Children in Custody as of December 31, 2019 ................................... 17

Table 4. Nonrelative Foster Homes Licensed, FY2020 ................................................................ 37

Table 5. Race of Children Placed in Emergency or Temporary Facilities .................................... 42

Table 6. Race of Children Experiencing a Subsequent Emergency or Temporary-Facility Placement ....... 42

Table 7. MISEP 17 Performance on Worker-Child Visitation ....................................................... 44

Table 8. MISEP 17 Performance on Worker-Parent Visitation .................................................... 45

Table 9. MISEP 17 Performance on Child Case File, Medical and Psychological ........................ 50

## APPENDICES

Appendix A. Age Range of Children in Care on December 31, 2019 by County .......................... 54

Appendix B. Length of Stay of Children in Care on December 31, 2019 By County ................... 56

Appendix C. Validated Performance Data, ISEP 14 & 15 ............................................................ 58

Appendix D. QAP Baseline Performance, MISEP 16 ................................................................... 60

Appendix E. Plaintiff's Letter to Monitor – July 15, 2020 ........................................................... 61

Appendix F. Michigan DHHS Corrective Action Plan – September 3, 2020 ................................ 63

## Introduction

This document serves as the fourteenth report to the Honorable Nancy G. Edmunds of the United States District Court for the Eastern District of Michigan in the matter of *Dwayne B. v. Whitmer*. On June 27, 2019, the State of Michigan and the Michigan Department of Health and Human Services (DHHS) and Children's Rights, counsel for the plaintiffs, jointly submitted to the court a Modified Implementation, Sustainability and Exit Plan (MISEP) that establishes a path for the improvement of Michigan's child welfare system. Judge Edmunds entered an order directing implementation of the MISEP following its submission by the parties.

Judge Edmunds had previously approved an Initial Agreement among the parties on October 24, 2008, a subsequent Modified Settlement Agreement on July 18, 2011, and an Implementation, Sustainability and Exit Plan (ISEP) on February 6, 2016. DHHS is a statewide multi-service agency providing cash assistance, food assistance, health services, child protection, prevention, and placement services on behalf of the State of Michigan. Children's Rights is a national advocacy organization with experience in class action reform litigation on behalf of children in child welfare systems.

This report covers the first period of DHHS' performance in the MISEP under Governor Whitmer's administration led by DHHS Director Robert Gordon and the senior deputy director of DHHS' Children's Service Agency, JooYuen Chang.

In sum, the MISEP:

- Provides the plaintiff class relief by committing to specific improvements in DHHS' care for vulnerable children, with respect to their safety, permanency, and well-being;

- Requires the implementation of a comprehensive child welfare data and tracking system, with the goal of improving DHHS' ability to account for and manage its work with vulnerable children;

- Establishes benchmarks and performance standards that the State committed to meet to address risks of harm to children's safety, permanency, and well-being; and

- Provides a clear path for DHHS to exit court supervision after the successful achievement and maintenance of Performance Standards for each commitment agreed to by the parties in the MISEP.

The sections of the MISEP related to monitoring and reporting to the court remain largely unchanged from the parties' prior agreement, as do the sections regarding Enforcement, Dispute Resolution, and Attorneys' Fees.

Pursuant to the MISEP, the court appointed Kevin Ryan and Eileen Crummy of Public Catalyst to continue to serve as the court's monitors, charged with reporting on DHHS' progress implementing its commitments. The monitors and their team are responsible for assessing the state's performance under the MISEP. The parties have agreed that the monitors shall take into account timeliness, appropriateness, and quality in reporting on DHHS' performance. Specifically, the ISEP provides that:

> "The monitors' reports shall set forth the steps taken by DHHS, the reasonableness of these efforts, and the adequacy of support for the implementation of these steps; the quality of the work done by DHHS in carrying out those steps; and the extent to which that work is producing the intended effects and/or the likelihood that the work will produce the intended effects."

This report to the court reflects the efforts of the DHHS leadership team and the status of Michigan's reform efforts as of December 31, 2019. Defined as MISEP Period 17, this report includes progress for the second half of 2019. It is the first monitoring report issued since the ISEP 12 and 13 report covering calendar year 2017, due to changes in administration and ongoing negotiations between the parties. As no report was issued covering DHHS' performance for 2018 and the first half of 2019, validated performance for these periods is included in Appendices C and D of this report.[1]

## Summary of Progress and Challenges

Director Robert Gordon and senior deputy director JooYuen Chang have been deeply engaged in this work. They lead a strong senior management team that possesses the talent and experience to address long-standing problems in the Michigan child welfare system. The early evidence of their turn-around work includes substantial improvements to the operations of Centralized Intake and marked improvements in the quality of the State's data production. Although Michigan DHHS met required performance standards in only 13 of 52 areas in MISEP Period 17, the State's performance was close in a number of additional areas beyond these 13, and the leadership team is focused on broadening its system improvements. Among the areas where the agency has already achieved high levels of performance are:

- DHHS demonstrated a strong commitment to worker-child visits during the period, including children being visited by a caseworker at their placement location at least once per month during the child's first two months of placement.

---

[1] The parties agreed that reporting for Periods 14 & 15 would include validated performance for all actively monitored ISEP commitments measured through data. For Period 16, it was agreed that reporting would include baseline performance of the six MISEP commitments measured through an independent qualitative review conducted by the monitoring team.

- The agency also excelled by ensuring that at least one caseworker-child visit per month included a private meeting during the child's first two months of placement in an initial or new placement.

- In addition, at the conclusion of MISEP 17, the monitoring team identified several commitments eligible for movement based on DHHS' strong performance during the period. The MISEP allows that once DHHS has satisfied the Designated Performance Standard for certain commitments at the end of one reporting period, as validated by the monitors, the commitment is eligible to be moved to Section 5 of the MISEP (To Be Maintained). Five commitments meet these criteria: Maximum Children in a Foster Home (6.7); CPS Investigations and Screening, PCU (6.12.b); Supervisory Oversight (6.16); and Support for Transitioning to Adulthood, Medicaid Access (6.36.b). The monitors recommend to the court and the parties that these provisions be moved to "To Be Maintained."

The MISEP includes commitments that are important to children's safety and permanency which have still not taken hold. The monitoring team observes, in particular, these challenges:

- *Oversight:* DHHS' contract evaluations of CCIs and private CPAs providing placements and services to Plaintiffs was inconsistent, at times ineffective, and in numerous instances did not ensure the safety and well-being of Plaintiffs. DHS developed and submitted a corrective action plan addressing this area, which is described in this report. Children's safety and well-being depends on DHS' effective and timely implementation of this plan.

- *Parent-Worker Visitation:* Although caseworkers are expected to visit the parents of children with a goal of reunification at least once in the parent's home during the first month of placement, the reality is those visits occurred less than half the time during the period.

- *Child Permanency*: The data reflect that 1,758 children (26.6 percent) exited state custody to permanency within 12 months of their entry. DHHS did not meet the MISEP standard of 40.5 percent for this commitment. To meet the performance standard of children's exit to permanency within 12 months of entry to care, DHHS should have achieved timely permanency for an additional 919 children.

- *Maltreatment In Care*: DHS was not able to produce accurate maltreatment-in-care data for MISEP 17, and must do so in order to understand and improve children's experience of safety in care.

## Summary of Commitments

| Section | Commitment | Period 17 Performance | Period 17 Achieved | Report Page |
|---|---|---|---|---|
| 5.1 | DHHS shall conduct contract evaluations of all CCIs and private CPAs providing placements and services to Plaintiffs to ensure, among other things, the safety and well-being of Plaintiffs and to ensure that the CCI or private CPA is complying with the applicable terms of this Agreement. | -- | No | 20 |
| 5.2 | DHHS shall commence all investigations of report of child abuse or neglect within the timeframes required by state law. The designated performance standard is 95%. | 96.8% | Yes | 46 |
| 5.3 | 95% of CPS caseworkers assigned to investigate allegations of abuse or neglect, including maltreatment in care, shall have a caseload of no more than 12 open investigations. | 94.4% | No | 18 |
| 5.4 | 95% of CPS caseworkers assigned to provide ongoing services shall have a caseload of no more than 17 families. | 93.4% | No | 18 |
| 5.5 | 95% of POS workers shall have a caseload of no more than 90 children. | 95.6% | Yes | 18 |
| 5.6 | 95% of licensing workers shall have a workload of no more than 30 licensed foster homes or homes pending licensure. | 94.1% | No | 19 |
| 5.7 | DHHS shall require CCIs to report to DCWL all uses of seclusion or isolation. If not reported, DCWL shall take appropriate action to address the failure of the provider to report the incident and to assure that the underlying incident has been investigated and resolved. | -- | Yes | 27 |
| 6.1 | DHHS shall ensure that of all children in foster care during the applicable federal reporting period, DHHS will maintain an observed rate of victimization per 100,000 days in foster care less than 9.67, utilizing the CFSR Round 3 criteria. | Unable to Verify | No | 19 |
| 6.2 | Until Commitment 6.1 is achieved, DHHS, in partnership with an independent entity, will generate, at least annually, a report that analyzes maltreatment in care data to assess risk factors and/or complete root-cause analysis of maltreatment in care. The report will be used to inform DHHS practice. The first report will be issued no later than June 1, 2020. | -- | Not yet due | -- |
| 6.3 | DHHS shall achieve an observed performance of at least the national standard (40.5%) on CFSR Round Three Permanency Indicator One (Of all children entering foster care in a 12-month period, what percent discharged to permanency within 12 months of entering foster care?) | 26.6% | No | 20 |

| Section | Commitment | Period 17 Performance | Period 17 Achieved | Report Page |
|---------|------------|----------------------|--------------------|-------------|
| **6.4** | DHHS will maintain a sufficient number and array of homes capable of serving the needs of the foster care population, including a sufficient number of available licensed placement within the child's home community for adolescents, sibling groups, and children with disabilities. DHHS will develop for each county and statewide an annual recruitment and retention plan, in consultation with the Monitors and experts in the field, and subject to approval by the Monitors. DHHS will implement the plan, with interim timelines, benchmarks, and final targets, to be measured by the Monitors based on DHHS's good-faith efforts to meet the final targets set forth in the plan. | -- | Yes | 36 |
| **6.5** | Children in the foster care custody of DHHS shall be placed only in a licensed foster home, a licensed facility, pursuant to an order of the court, or an unlicensed relative. | 95.6% | No | 40 |
| **6.6.a** | Siblings who enter placement at or near the same time shall be placed together unless specified exceptions are met. The designated performance standard is 90%. | 68.1% | No | 40 |
| **6.6.b** | If a sibling group is separated at any time, except for the above reasons, the case manager shall make immediate efforts to locate or recruit a family in whose home the siblings can be reunited. These efforts shall be documented and maintained in the case file and shall be reassessed on a quarterly basis. The Monitors will conduct an independent qualitative review to determine compliance with this commitment. The designated performance standard is 90%. | 61.2% | No | 40 |
| **6.7** | No child shall be placed in a foster home if that placement will result in: (1) more than three foster children in that foster home, (2) a total of six children, including the foster family's birth and adopted children, or (3) more than three children under the age of three residing in that foster home. The designated performance standard is 90%. | 90.1% | Yes | 41 |
| **6.8** | Children shall not remain in emergency or temporary facilities, including but not limited to shelter care, for a period in excess of 30 days, unless specified exceptions apply. No child shall remain in a shelter in excess of 60 days. The designated performance standard is 95%. | 67.9% | No | 41 |

| Section | Commitment | Period 17 Performance | Period 17 Achieved | Report Page |
|---------|-----------|----------------------|--------------------|-------------|
| **6.9** | Children shall not be placed in an emergency or temporary facility, including but not limited to shelter care, more than one time within a 12-month period, unless specified exceptions apply. Children under 15 years of age experiencing a subsequent emergency or temporary-facility placement within a 12-month period may not remain in an emergency or temporary facility for more than 7 days. Children 15 years of age or older experiencing a subsequent emergency or temporary-facility placement within a 12-month period may not remain in an emergency or temporary facility for more than 30 days. | 6.3% | No | 42 |
| **6.10.a** | When placing a child with a relative who has not been previously licensed as a foster parent, DHHS shall visit the relative's home to determine if it is safe prior to placement; check law enforcement and central registry records for all adults residing in the home within 72 hours following placement; and complete a home study within 30 days. The designated performance standard is 95%. | 53.0% | No | 38 |
| **6.10.b** | When placing a child with a relative who has not been previously licensed as a foster parent, a home study will be renewed every 12 months for the duration of the child's placement with the relative. The designated performance standard is 95%. | 9.7% | No | 38 |
| **6.11** | DHHS shall complete all investigations of reports of child abuse or neglect within the required timeframes. The designated performance standard is 90%. | 83.4% | No | 46 |
| **6.12.a** | DHHS shall investigate all allegations of abuse or neglect relating to any child in the foster care custody of DHHS. DHHS shall ensure that allegations of maltreatment in care are not inappropriately screened out for investigation. The Monitors will conduct an independent qualitative review to determine compliance with this commitment. The designated performance standard is 95%. | 92.4% | No | 46 |
| **6.12.a** | When DHHS transfers a referral to another agency for investigation, DHHS will independently take appropriate action to ensure the safety and well-being of the child. The Monitors will conduct an independent qualitative review to determine compliance with this commitment. The designated performance standard is 95%. | 78.7% | No | 46 |
| **6.12.b** | DHHS will maintain a Placement Collaboration Unit (PCU) to review and assess screening decisions on plaintiff-class children who are in out-of-home placements and to ensure safety and well-being is addressed on those transferred complaints. The PCU will review 100% of cases until reconsideration for complaints involving plaintiff class children placed out of home are less than 5%. | 98.5% | Yes | 48 |

| Section | Commitment | Period 17 Performance | Period 17 Achieved | Report Page |
|---------|-----------|----------------------|--------------------|-----|
| **6.13** | 95% of foster care, adoption, CPS, POS, and licensing supervisors shall be responsible for the supervision of no more than five caseworkers. | 84.3% | No | 17 |
| **6.14** | 95% of foster care workers shall have a caseload of no more than 15 children. | 90.3% | No | 18 |
| **6.15** | 95% of adoption caseworkers shall have a caseload of no more than 15 children. | 66.7% | No | 18 |
| **6.16** | Supervisors shall meet at least monthly with each assigned worker to review the status and progress of each case on the worker's caseload. Supervisors shall review and approve each service plan. The plan can be approved only after the supervisor has a face-to-face meeting with the worker, which can be the monthly meeting. The designated performance standard is 95%. | 95.0% | Yes | 43 |
| **6.17** | DHHS shall complete an Initial Service Plan (ISP), consisting of a written assessment of the child(ren)'s and family's strengths and needs and designed to inform decision-making about services and permanency planning, within 30 days after a child's entry into foster care. The designated performance standard is 95%. | 82.5% | No | 43 |
| **6.18** | For every child in foster care, DHHS shall complete an Updated Service Plan (USP) at least quarterly. The designated performance standard is 95%. | 86.6% | No | 43 |
| **6.19** | Assessments and service plans shall be of sufficient breadth and quality to usefully inform case planning and shall accord with the requirements of 42 U.S.C. 675(1). To be measured through a QSR. The designated performance standard is 90%. | 66.7% | No | 34 |
| **6.20** | DHHS shall ensure that the services identified in the service plan are made available in a timely and appropriate manner to the child and family and shall monitor the provision of services to determine whether they are of appropriate quality and are having the intended effect. To be measured through a QSR. The designated performance standard is 83%. | 69.3% | No | 34 |
| **6.21.a** | Each child in foster care shall be visited by a caseworker at least twice per month during the child's first two months of placement in an initial or new placement. The designated performance standard is 95%. | 91.4% | No | 43 |
| **6.21.a** | Each child in foster care shall be visited by a caseworker at their placement location at least once per month during the child's first two months of placement in an initial or new placement. The designated performance standard is 95%. | 95.2% | Yes | 43 |
| **6.21.a** | Each child in foster care shall have at least one visit per month that includes a private meeting between the child and caseworker during the child's first two months of placement in an initial or new placement. The designated performance standard is 95%. | 95.3% | Yes | 43 |

| Section | Commitment | Period 17 Performance | Period 17 Achieved | Report Page |
|---|---|---|---|---|
| **6.21.b** | Each child in foster care shall be visited by a caseworker at least once per month. The designated performance standard is 95%. | 97.6% | Yes | 43 |
| **6.21.b** | Each child in foster care shall be visited by a caseworker at their placement location at least once per month. The designated performance standard is 95%. | 95.5% | Yes | 43 |
| **6.21.b** | Each child in foster care shall have at least one visit per month that includes a private meeting between the child and caseworker. The designated performance standard is 95%. | 96.5% | Yes | 43 |
| **6.22.a** | Caseworkers shall visit parents of children with a goal of reunification at least twice during the first month of placement, unless specified exceptions apply. The designated performance standard is 85%. | 73.6% | No | 44 |
| **6.22.a** | Caseworkers shall visit parents of children with a goal of reunification at least once in the parent's home during the first month of placement, unless specified exceptions apply. The designated performance standard is 85%. | 47.9% | No | 44 |
| **6.22.b** | Caseworkers shall visit parents of children with a goal of reunification at least once a month, following the child's first month of placement, unless specified exceptions apply. The designated performance standard is 85%. | 69.4% | No | 44 |
| **6.23** | DHHS shall ensure that children in foster care with a goal of reunification shall have at least twice-monthly visitation with their parents, unless specified exceptions apply. The designated performance standard is 85%. | 62.5% | No | 45 |
| **6.24** | DHHS shall ensure that children in foster care who have siblings in custody with whom they are not placed shall have at least monthly visits with their siblings who are placed elsewhere in DHHS foster care custody, unless specified exceptions apply. The designated performance standard is 85%. | 72.9% | No | 45 |
| **6.25** | At least 85% of children shall have an initial medical and mental health examination within 30 days of the child's entry into foster care. | 83.9% | No | 49 |
| **6.25** | At least 95% of children shall have an initial medical and mental health examination within 45 days of the child's entry into foster care. | 89.3% | No | 49 |
| **6.26** | At least 90% of children shall have an initial dental examination within 90 days of the child's entry into care unless the child has had an exam within six months prior to placement or the child is less than four years of age. | 77.3% | No | 49 |
| **6.27** | For children in DHHS custody for three months or less at the time of measurement: DHHS shall ensure that 90% of children in this category receive any necessary immunizations according to the guidelines set forth by the American Academy of Pediatrics within three months of entry into care. | NA | NA | 49 |

10

| Section | Commitment | Period 17 Performance | Period 17 Achieved | Report Page |
|---------|-----------|:---:|:---:|:---:|
| 6.28 | For children in DHHS custody longer than three months at the time of measurement: DHHS shall ensure that 90% of children in this category receive all required immunizations according to the guidelines set forth by the American Academy of Pediatrics. | NA | NA | 49 |
| 6.29 | Following an initial medical, dental, or mental health examination, at least 95% of children shall receive periodic and ongoing medical, dental, and mental health care examinations and screenings, according to the guidelines set forth by the American Academy of Pediatrics. | 69.7%, 87.7%, 92.1% | No | 49 |
| 6.30 | DHHS shall ensure that: (1) The child's health records are up to date and included in the case file. Health records include the names and addresses of the child's health care providers, a record of the child's immunizations, the child's known medical problems, the child's medications, and any other relevant health information; (2) the case plan addresses the issue of health and dental care needs; (3) foster parents and foster care providers are provided with the child's health care records. | 75.0%, 62.5%, 59.4% | No | 50 |
| 6.31 | DHHS shall ensure that at least 95% of children have access to medical coverage within 30 days of entry into foster care by providing the placement provider with a Medicaid card or an alternative verification of the child's Medicaid status and Medicaid number as soon as it is available. | 88.9% | No | 51 |
| 6.32 | DHHS shall ensure that at least 95% of children have access to medical coverage within 24 hours or the next business day following subsequent placement by providing the placement provider a Medicaid card or an alternative verification of the child's Medicaid status and Medicaid number as soon as it is available. | 82.8% | No | 51 |
| 6.33 | DHHS shall ensure that informed consent is obtained and documented in writing in connection with each psychotropic medication prescribed to each child in DHHS custody. The designated performance standard is 97%. | 75.9% | No | 51 |
| 6.34 | DHHS shall ensure that: (1) A child is seen regularly by a physician to monitor the effectiveness of the medication, assess any side effects and/or health implications, consider any changes needed to dosage or medication type and determine whether medication is still necessary and/or whether other treatment options would be more appropriate; (2) DHHS shall regularly follow up with foster parents/caregivers about administering medications appropriately and about the child's experience with the medication(s), including any side effects; (3) DHHS shall follow any additional state protocols that may be in place related to the appropriate use and monitoring of medications. | 33.8% | No | 51 |

11

| Section | Commitment | Period 17 Performance | Period 17 Achieved | Report Page |
|---------|-----------|----------------------|-------------------|-------------|
| **6.35** | DHHS shall generate from its Children Welfare Information System accurate and timely reports and information regarding the requirements and outcome measures set forth in this Agreement. | -- | No | 35 |
| **6.36.a** | DHHS will continue to implement policies and provide services to support youth transitioning to adulthood, including ensuring youth have been informed of services available through the Youth Adult Voluntary Foster Care (YAVFC) program. Performance for this commitment will be measured through an increase in the rate of foster youth aging out of the system participating in the YAVFC program for a minimum of two periods. | 35.1% Baseline | Performance to be evaluated in Period 18 | 52 |
| **6.36.b** | DHHS will continue to implement policies and provide services to support youth transitioning to adulthood, including ensuring youth have been informed of the availability of Medicaid coverage. Performance for this commitment will be measured through an increase in the rate of foster youth aging out of the system who have access to Medicaid. The designated performance standard for this commitment is 95%. | 98.6% | Yes | 53 |
| **6.37** | DHHS will continue to implement policies and provider services to support the rate of older youth achieving permanency. | 55.1% Baseline | Performance to be evaluated in Period 18 | 53 |

12

## Methodology

To prepare this report, the monitoring team conducted a comprehensive series of verification activities. These included: meetings with DHHS leadership, private agency leadership, and plaintiffs' counsel; visits to local child welfare offices and private agencies; and extensive reviews of individual children's records and other documentation. The monitoring team conducted joint verification activities with DHHS that included two Quality Service Reviews (QSRs) covering five counties. The QSRs included: 1) interviews with DHHS stakeholders such as judiciary staff, guardians ad litem, foster parents, service providers, caseworkers, and supervisors; and 2) case specific interviews with individuals involved in case decision making, including children, parents, caregivers, caseworkers, teachers, and therapists. The monitoring team also reviewed and analyzed a wide range of aggregate and detail data produced by DHHS, and reviewed policies, memos, and other internal information relevant to DHHS' work during the periods. To verify information produced by DHHS, the monitoring team conducted field-based interviews, cross-data validation, and case record reviews. By agreement of the parties, the monitoring team assessed DHHS' performance for six MISEP commitments utilizing a qualitative case review[2] process. The monitoring team reviewed thousands of distinct reports from DHHS including individual case records, relative foster home studies, Division of Child Welfare Licensing (DCWL) investigations and reports, and CPS referrals and investigations.

## Demographics

DHHS produced demographic data from July 1, 2019 to December 31, 2019. DHHS data indicate there were 11,698 children in custody as of December 31, 2019. Of the children and youth in care on December 31, 2019, 334 youth were enrolled in the Young Adult Voluntary Foster Care (YAVFC) program. During the reporting period, 2,616 children and youth were placed in foster care and 3,215 children and youth exited care.[3] DHHS served 14,844 children during the period.[4] Though young children aged zero to six years made up the largest portion (5,585 or 48 percent), Michigan continued to have a large population of older youth in custody. Twenty-four percent (2,828) were 12 to 17 years of age and six percent (686) were 18 years and over, as detailed in Figure 1.

---

[2] The sample sizes for the monitoring team's case record reviews were based on a statistically significant sample of cases and a methodology based on a 90 percent confidence level.

[3] The monitoring team identified three children who appear twice in the entry cohort file (0.1% of the 2,616 entries). Each child appearing twice in the file had a unique removal date but was missing a discharge date. The monitoring team also identified four children who appeared twice in the exit cohort file (0.1% of 3,215 exits). All children appearing twice in the exit cohort file correspond to children or youth who exited foster care two times during the reporting period.

[4] The monitoring team identified 73 children who appeared twice in the during cohort file (0.5% of 14,844). All children appearing twice in the during cohort were served more than once during the reporting period.

**Figure 1. Age of Children in Custody on December 31, 2019**

*Source: MiSACWIS, n=11,698*



With regard to gender, the population was about equally split—51 percent male and 49 percent female. With regard to race, the population of children was 54 percent White, 31 percent African-American, under one percent Native American, under one percent Asian, and under one percent Native Hawaiian or Pacific Islander. Additionally, 14 percent of children reported being of mixed race. Seven percent of children were identified with Hispanic ethnicity and can be of any race. In contrast, the population of all children in the state of Michigan was 74 percent White, 17 percent African-American, under one percent Native American, three percent Asian, and under one percent Native Hawaiian or Pacific Islander. Additionally, five percent of children were of mixed race, and nine percent of children were identified with Hispanic ethnicity and can be of any race.[5]

---

[5] Data on the race of all children in the state of Michigan was sourced from the U.S. Census Bureau, Population Division, 7/1/2019 Population Estimate.

**Table 1. Race of Children in Custody on December 31, 2019[6] and Race of Children in the State of Michigan on July 1, 2019**
Source: MiSACWIS, US Bureau of the Census

| Race | Count (DHHS Custody) | Percent (DHHS Custody) | Count (State of Michigan) | Percent (State of Michigan) |
|---|---|---|---|---|
| White | 6,375 | 54% | 1,580,791 | 74% |
| Black/African American | 3,584 | 31% | 355,649 | 17% |
| Mixed Race | 1,666 | 14% | 115,292 | 5% |
| Native American | 40 | 0.3% | 18,426 | 0.9% |
| Unable to Determine | 13 | 0.1% | -- | -- |
| Asian | 19 | 0.2% | 72,695 | 3% |
| Native Hawaiian or Pacific Islander | 1 | 0.0% | 1,080 | 0.1% |
| Total | 11,698 | 100% | 2,143,933 | 100% |
| Hispanic ethnicity and of any race | 861 | 7% | 182,284 | 9% |

Note: Percentages do not add up to 100 due to rounding.

As the following figure demonstrates, 86 percent of children in DHHS' custody lived in family settings on December 31, 2019, including relatives (39 percent), foster families (36 percent), with their own parents (nine percent), and in homes that intend to adopt (two percent). Of children in custody, 1,037 (nine percent) lived in institutional settings, including residential treatment and other congregate care facilities. Another 388 children (three percent) resided in independent living placements, which serve youth on the cusp of aging-out of care. The remaining two percent of children resided in other settings, were AWOL, or were in unidentified placements.

**Figure 2. Placement Types of Children in Custody on December 31, 2019**
*Source: MiSACWIS, n=11,698*



---

[6] Children with "Unable to Determine" and "No Match Found" entered as their race are pooled together in the "Unable to Determine" row.

Of the children in care on December 31, 2019, 41 percent were in care less than one year, while 13 percent were in care for more than three years.

**Figure 3. Length of Stay in Care of Children in Custody on December 31, 2019**
*Source: MiSACWIS, n= 11,698*



**Table 2. Exits from Care by Exit Type, July 1, 2019 to December 31, 2019**
Source: MiSACWIS

| Exit Type | Frequency | Percent |
|---|---|---|
| Reunification | 1,490 | 46% |
| Adoption | 1,161 | 36% |
| Emancipation | 274 | 9% |
| Guardianship | 187 | 6% |
| Living with relatives | 63 | 2% |
| Transfer to another agency | 28 | 1% |
| Runaway | 7 | 0.2% |
| Death of a child | 5 | 0.2% |
| **Total** | **3,215** | **100%** |

Note: Percentages do not add up to 100 due to rounding.

As the following table demonstrates, of the 11,698 children in custody on December 31, 2019, the majority (7,002 or 60 percent) had reunification as a federal goal. For the remaining children, 3,195 (27 percent) had a goal of adoption, 884 (eight percent) had a goal of APPLA, 509 (four percent) had a goal of guardianship, and 108 (0.9 percent) had placement with a relative as a federal goal.

**Table 3. Federal Goals for Children in Custody as of December 31, 2019[7]**

Source: MiSACWIS

| Federal Goal | Frequency | Percent |
|---|---|---|
| Reunification | 7,002 | 60% |
| Adoption | 3,195 | 27% |
| APPLA | 884 | 8% |
| Guardianship | 509 | 4% |
| Relative | 108 | 0.9% |
| **Total** | **11,698** | **100%** |

Note: Percentages do not add up to 100 due to rounding.

## Organizational Capacity

### Caseloads and Supervision

The MISEP sets forth caseload standards for staff and supervisors performing critical child welfare functions. The agreement states that caseload compliance will be measured by taking the average of three data reports each reporting period, prepared on the last workday of August, October, and December. For MISEP 17, the monitors used caseload counts from August 30th, October 31st, and December 31st to determine compliance.

*Supervisor Caseloads (6.13)*

DHHS agreed that full-time foster care, adoption, CPS, purchase of service (POS), and licensing supervisors, both public and private, would be responsible for no more than five caseload carrying staff each. An employee of DHHS or a private child placing agency that is non-caseload carrying will count as 0.5 toward the worker-to-supervisor ratio and administrative and technical support staff who support the supervisor's unit are not counted toward the worker-to-supervisor ratio. In addition, the supervisor methodology requires accounting for the practice among some of the private agencies of assigning both supervisory and direct caseload responsibilities to the same person, which requires pro-rating both supervisory and caseload performance for these hybrid supervisors. DHHS committed that 95 percent of supervisors would meet the MISEP caseload standard. During MISEP 17, DHHS averaged 84.3 percent of supervisors meeting the standard, missing the target.

---

[7] Children with a federal goal of APPLA and APPLA-E are pooled together for the "APPLA" row.

*Foster Care Caseloads (6.14)*

DHHS agreed that full-time staff, public and private, solely engaged in foster care work, would be responsible for no more than 15 children each. Staff who perform foster care work as well as other functions are held to a pro-rated standard. The MISEP requires that 95 percent of staff engaged in foster care work meet the caseload standard. DHHS averaged 90.3 percent of staff meeting the standard during MISEP 17, missing the target.

*Adoption Caseloads (6.15)*

DHHS agreed that full-time staff, public and private, solely engaged in adoption work would be responsible for no more than 15 children each. Staff who perform adoption work as well as other functions are held to a pro-rated standard. The MISEP requires that 95 percent of staff engaged in adoption work meet the caseload standard. For MISEP 17, DHHS averaged 66.7 percent of staff meeting the standard, missing the target.

*Child Protective Services (CPS) Investigations Caseloads (5.3)*

DHHS agreed that full-time staff solely engaged in investigations would be responsible for no more than 12 open investigations. Staff who perform investigative work as well as other functions are held to a pro-rated standard. The MISEP requires that 95 percent of staff engaged in CPS investigations work meet the caseload standard. For MISEP 17, DHHS averaged 94.4 percent of staff meeting the standard, slightly missing the target.

*CPS Ongoing Caseloads (5.4)*

DHHS agreed that full-time staff solely engaged in CPS ongoing services, a public-sector function, would be responsible for no more than 17 families each. Staff who perform CPS ongoing work as well as other functions are held to a pro-rated standard. The MISEP requires that 95 percent of staff engaged in CPS ongoing work meet the caseload standard. DHHS averaged 93.4 percent of staff meeting the standard in MISEP 17, missing the target.

*Purchase of Service Caseloads (5.5)*

POS work comprises the support and oversight that DHHS staff provide with respect to foster care and adoption child welfare cases assigned to the private sector. The MISEP established the full-time POS standard at 90 cases. However, there are some DHHS staff who are assigned a mix of POS and other work including licensing, foster care, and adoption. For those staff, the standard of 90 POS cases is pro-rated based on their other responsibilities. DHHS committed that 95 percent of staff engaged in POS work would meet the MISEP standard of 90 cases. For MISEP 17, DHHS averaged 95.6 percent of staff meeting the standard, meeting the target.

*Licensing Caseloads (5.6)*

DHHS agreed that full-time staff, public and private, solely engaged in licensing work would be responsible for no more than 30 licensed foster homes or homes pending licensure. Staff who perform licensing work as well as other functions are held to a pro-rated standard. The MISEP requires that 95 percent of staff engaged in licensing work meet the caseload standard. DHHS averaged 94.1 percent of staff meeting the standard in MISEP 17, slightly missing the target.

## Accountability

### Outcomes

Pursuant to the MISEP, DHHS agreed to meet federal outcome standards regarding safety and permanency for children. The MISEP adopts outcome methodologies developed by the federal government, including one safety measure and one permanency measure from Round Three of the federal Child and Family Services Reviews (CFSR). Performance on all measures is calculated for DHHS by the University of Michigan based on Adoption and Foster Care Analysis and Reporting System (AFCARS) and National Child Abuse and Neglect Data System (NCANDS) files produced by DHHS.

*Safety – Maltreatment in Foster Care (6.1)*

The child safety standard of maltreatment in care (MIC), focuses on keeping children in DHHS custody safe from abuse and neglect. DHHS committed to ensure that of all children in foster care during the applicable federal reporting period, DHHS will maintain an observed rate of victimizations per 100,000 days in foster care less than 9.67.

Final data provided by Michigan indicated that for federal fiscal year (FFY) 2019, there were 532 incidents of MIC, involving 506 children in DHHS custody, for an observed rate of 12.50 victimizations per 100,000 days in foster care. To meet the performance standard of 9.67 victimizations per 100,000 days in foster care, DHHS should have prevented 120 of these incidents of MIC during FFY2019, according to the data submitted to the monitors.

During standard verification work, the monitoring team analyzed DHHS' data files and validated DHHS' calculations regarding the number of days children spent in care during the federal fiscal year. That data forms the basis for the denominator used in calculating MIC. To confirm the numerator – the number of incidents of MIC – the monitoring team undertook a record review, reading a random sample of 78 cases that had been identified by DHHS. Unfortunately, the monitors found a significant number of those cases did not accurately identify when the child was abused or neglected. The monitoring team's review surfaced the over-inclusion of cases and

raised the possibility of exclusion of others that should have been included in the DHHS data. Therefore, the monitors are unable to verify DHHS' performance.

*Permanency Indicator One (6.3)*

Permanency Indicator One measures the percent of children who enter foster care within a 12-month period who are discharged to permanency[8] within 12 months of their entry date. Three years of AFCARS data is required to measure performance for this outcome, therefore performance was calculated for children who entered care between October 1, 2016 and September 30, 2017. Based on the data files provided by DHHS, the monitoring team calculated that of the 6,610 children who entered foster care during this period, 1,758 children (26.6 percent) exited to permanency within 12 months of their entry. DHHS did not meet the MISEP standard of 40.5 percent for this commitment. To meet the performance standard, DHHS would need to have achieved permanency for an additional 919 children. DHHS' performance for this commitment has declined over the past three fiscal years, as indicated in the following figure.

**Figure 4. Permanency Indicator One, Historical Performance**
Source: Michigan AFCARS data, October 1, 2014 to September 30, 2019



# Contract Oversight

*Contract-Agency Evaluation (5.1)*

The MISEP requires DHHS to conduct contract evaluations of all Child Caring Institutions (CCIs) and private Child Placing Agencies (CPAs), including an annual inspection of each CPA, an annual visit to a random sample of CPA foster homes, and an annual unannounced inspection of each

---

[8] The parties agreed that permanency for children is defined as exit to reunification, adoption, or guardianship.

CCI. During the required visits, the Division of Child Welfare Licensing (DCWL) is expected to monitor compliance with rules, policy, contractual and MISEP requirements, with the primary focus being the safety and well-being of children.

DCWL has 19 child welfare field licensing consultants who perform consolidated monitoring activities including annual licensing inspections and investigations of the CCIs and CPAs. Also, there are eight field analysts who visit the homes of foster parents and unlicensed relative caregivers to verify child safety and well-being. The analysts conduct interviews to gather qualitative feedback with foster parents, foster children, and unlicensed caregivers. Licensing consultants and field analysts are supervised by two area managers statewide. During the reporting period, DHHS reported that staffing at DCWL was sufficient to allow for the evaluation of the contracted CCIs and CPAs.

In August 2019, DCWL began the formal rule revision process for CCI, CPA, and foster family homes. Community forums and focus groups were held throughout Michigan, consisting of families, youth, agency staff, and community partners impacted by licensing rules. The feedback gathered was compiled for use during the revision process. Two ad hoc stakeholder committees, including internal and external partners, were formed, and met regularly to make recommendations for new rules. One committee developed the foster home and CPA rules, and the other the CCI rules. Final draft language has been crafted and is under review.

During the period, DCWL consultants and program managers provided technical assistance during monthly teleconference calls with foster home licensing supervisors. Some of the topics included: field analyst safety alerts; emergency plan review requests; first aid/CPR sources; hazardous materials; foster home evaluations; the rule revision process; environmental health inspections; and working with LGBTQ Youth.

Several Communication Issuances were promulgated during the period including one involving the use of a revised safety alert and inspection methodology. The safety alert is a form utilized by the analysts to advise the consultants and agencies of any issues in the visited foster or unlicensed relative homes that require remediation, with timeframes for remediation. Urgent issues must be rectified by the CPAs immediately. Critical issues must be rectified within five calendar days, and issues categorized as concerns must be remediated by the date of the next on-site CPA inspection. The analyst who visited homes of an agency now also participates in the first CPA inspection meeting, along with the consultant.

During the period, DHHS reported that DCWL consultants completed 39 inspections of CPAs of which 16 were renewals and 23 were interim inspections. Thirty-eight of the agencies required a corrective action plan (CAP) for non-safety rule violations, with only one agency determined to

be in substantial compliance for all requirements. One inspection resulted in a recommendation for a first provisional license based on the number of violations and multiple repeat violations.

The field analysts visited a random sample of foster homes associated with each contracted CPA scheduled for a renewal or interim inspection. During the period, the analysts visited 134 foster homes and 80 unlicensed relative homes supervised by 37 of the 39 contracted CPAs. Two CPAs did not have any foster or unlicensed relative homes. Safety alerts involving urgent or critical concerns were issued by DHHS to 14 agencies involving 20 homes. Nine of the agencies had one or more unlicensed relative home with a safety/health concern; two agencies had at least one foster home with a safety/health concern; and three agencies had at least one foster home and one unlicensed relative home with a safety/health concern. DHHS analysts identified safety concerns that  include: lack of a safety-approved crib; unsafe sleep practices; foster children's bedrooms without a door, or a doorknob; no drywall throughout the house with exposed wires in the child's bedroom; unsafe stairs; no finished flooring, or holes in the flooring; insufficient means of egress; non-working smoke detectors; missing carbon monoxide detectors; an unlocked medicine box; no emergency evacuation plans; no alarms on doors where children had access to outdoor bodies of water; no protective gates around a fireplace and pellet stove; a teen sharing a bed with an adult; no outlet or light switch covers; and no safety net for a trampoline. Each of these concerns reflects an opportunity for DHHS to better support families, and the records reviewed by the monitoring team reflect multiple missed opportunities to do so. There was documentation in 11 of the consultants' renewal and interim inspection reports that all the concerns identified by the analysts were resolved, while documentation for three agencies did not.

In addition to the 14 agencies receiving critical or urgent safety alerts, DHHS issued to ten agencies safety alerts that identified additional concerns needing to be resolved by the time of the on-site inspections. Some of these included: lack of Family Team Meeting (FTM) notification and participation; families not receiving medical passports; and services, such as Michigan Youth Opportunities Initiative (MYOI), not being provided to older youth.

Field analysts are required by the MISEP to visit a certain number of each CPA's foster homes, dependent on the total number of homes supervised by the agency. CPAs with fewer than 50 homes are required to have at least three homes visited. During MISEP 17, an agency with three foster homes only had two homes visited during this period. For the third foster home, the family was not home when the analyst arrived for the scheduled visit and phone contact was unsuccessful on the day of the scheduled visit. There is no documentation that the visit was rescheduled.

DHHS reported that licensing consultants conducted 37 special investigations involving 27 contracted CPAs during the period. The 37 investigations involved 74 allegations of non-

compliance related to rules, policy, contract, and ISEP requirements. DCWL established 33 (44.6 percent) of the 74 allegations in 21 special investigations, requiring CAPs for 21 of the 27 agencies. Some of the incidents that resulted in established violations included: weekly parenting visits not occurring; a foster child not receiving dental care within the last 12 months; staff purchasing and allowing a 15-year-old to smoke a cigarillo; a foster child being bitten by the foster family's dog that resulted in facial injuries requiring stitches, when both the foster parent and agency knew the dog was a risk to children in the home; and staff refusing to pick up a youth from the police station. According to DHHS, there were no disciplinary licensing actions that resulted from the special investigations, beyond the required CAPs.

During this period DHHS reported that private agencies conducted 560 foster home special evaluations. These are investigations conducted by the contract agency when an allegation is made regarding a home in their network. The monitoring team reviewed 83 of these special evaluations and found 25 homes required CAPs for 28 established violations. Twenty-four of the 83 investigations were referred for MIC investigations. Five foster homes had their licenses revoked as a result of the investigations. The revocation reasons included: a two-year-old foster child stepping on campfire embers and sustaining second degree burns, and the foster family not following a physician's recommendation to take him to the hospital for treatment; a worker discovering while doing an adoption assessment that the foster father was on Central Registry for sexually abusing nine and 13-year-old girls; a foster parent lying about her criminal history and there being multiple recent physical abuse allegations, none of which were referred to CI or investigated; two incidents of physical abuse by the foster parent who caused a foster child's lip to split and swell and redness to the face; and a foster mother refusing to have a mental health evaluation which was required by a previous CAP.

DHHS reported that DCWL conducted 24 unannounced renewal and 23 unannounced interim inspections of CCIs, totaling 47 inspections for the period. Forty-three inspections required CAPs, while four of the CCIs were in substantial compliance with appropriate statutes, administrative licensing rules, contract, and MISEP requirements.

According to DHHS, licensing consultants completed 320 of 321 special investigations of 68 CCIs related to potential violations of rules, policy, and contract and ISEP requirements during the period. DCWL initiated but did not complete one investigation that was resolved as part of a recommended disciplinary process. That agency's license was closed in March 2020. The 320 special investigations involved 548 allegations. Of the 320 completed special investigations, there were 134 that resulted in non-compliance requiring a CAP, with 213 (38.9 percent) of the 548 allegations resulting in an established violation. Thirty-eight staff were terminated as a result of the investigations and 62 were disciplined.

The monitoring team reviewed all 320 special investigations. Two hundred and seventy-seven were referred to Centralized Intake (CI) for a potential CPS investigation. One hundred and sixty-seven of those referrals were assigned for investigation, with 19 of the investigations resulting in a substantiated disposition. In its review, of the 320 special investigations, the monitoring team found that an additional 15 incidents met the criteria for a CPS investigation. In some instances, the incident was referred to CI but screened-out for investigation, and in others the allegations were never referred to CI by the CCI or by DCWL. Some examples of incidents that should have been referred to CI and assigned for CPS investigation include:

- While at the hospital, a youth alleged that staff were smoking marijuana in the bathroom and gave her some. This should have been referred to CI and investigated for improper supervision.

- A facility teacher left a sharp knife on her desk unattended and a resident took the knife and locked herself in a bathroom stall with it. A staff member climbed over the stall to retrieve the knife and when the youth reached into her pocket for it, she cut her finger. DCWL established a violation and the teacher was disciplined with a one-day unpaid suspension. This should have been referred to CI and assigned for investigation of improper supervision and threatened harm.

- During the course of an investigation it was learned that another youth stated that he wanted to kill himself, ran upstairs, crawled out a window, and jumped from the roof. He was transported by ambulance to the hospital. This should have been referred to CI for improper supervision.

The risk of harm to children in some CCIs during the period was documented repeatedly in state records reviewed by the monitors. Those documents revealed:

- A youth (age 14), who is not in the Plaintiff class, but who was placed in a CCI among numerous foster children, tied a bedsheet to her neck and hanged herself from a towel bar. She had made two previous suicide attempts and had stated she wanted to kill herself on the day she died. Despite this, there was no safety protection plan in effect, and staff on the night she died did not conduct every-15-minutes minimum resident checks as required.

- Staff injured a youth (age 13) during a restraint that occurred in the youth's bedroom (contrary to policy). During the restraint, the youth became limp, and fell to the floor. Staff pushed him forward and rubbed his face aggressively on the floor, resulting in bruising and swelling by his eyes, other facial bruises, and multiple rug burns. Staff was initially suspended and later was terminated.

- Residents were injured from street fighting with one another at the facility. One youth (age 15) had extensive bruises on his arms, legs, and collar bone. The facility was aware of the fighting and stated discipline policies and additional cameras would address the issue.

- A youth (age 12) was physically restrained at a CCI. A hospital examination determined he suffered a comminuted and mildly displaced fracture of the medial left clavicle.

- Three youth (ages 11, 11, and 12) engaged in oral sex with each other in the playground while the staff person talked and texted on his phone rather than supervising them.

- Three staff slammed a youth (age 12) against the wall. The facility made no incident report and no medical attention was provided to the child. (The same youth was subjected to another inappropriate restraint that resulted in a licensing violation a week later.) DCWL determined that three staff used an unsafe and unnecessary restraint when the youth was told to go to bed, resulting in bruises to his chin, shoulder, and wrist.

- A staff member inappropriately restrained a youth (age 14) by pressing his elbow into the youth's head and neck. Another staff member assisting with the restraint told the perpetrating staff to let up when the youth was gasping for breath and communicating that he was being choked.

- A staff member pushed a youth (age 11) bruising the child's chest.

- During a restraint, a youth (age 12) suffered significant bruising on his arm, between the elbow and shoulder, including a handprint-shaped mark.

- A staff member wrote a youth (age 17) an inappropriate letter wanting to "hook up" with him, as well as giving him the staff person's personal cell number. DCWL established violations for the staff person pursuing a romantic/sexual relationship with the resident.

In addition to reviewing all of the special investigations for the period, the monitoring team reviewed all 134 required CAPs as well as the follow-up documentation provided by DHHS for the CAPs. The monitoring team found that CAP follow-up was often ineffective and scattershot. Follow-up documentation was at times late or altogether absent; it often lacked pertinent information to confirm that all rectification steps were taken by the CCIs; it was at times irrelevant to the established violations; and in some cases contained no documentation that DCWL had conducted any follow-up to ensure compliance. Additionally, the monitoring team found frequently that repeat violations of a serious nature, such as physical intervention or improper restraints causing injuries, recurred despite the CAPs, and at times the CAPs did not address prevalent underlying issues that posed a serious risk of harm to children's safety. For example:

- A CCI had two violations for several Prison Rape Elimination Act (PREA) standards and for a staff person engaging in an inappropriate conversation with a resident. The CAP submitted on October 21, 2019 involved addressing PREA staff training, and resident intake and hiring protocols. The only follow-up on implementation was an email from the facility dated September 3, 2020 stating that the training had occurred and the CAP had been fully implemented. No specific details on other components of the CAP were mentioned in the email.

- A violation was issued for behavior management after staff pushed a resident. The CAP of August 7, 2019 vaguely represented that staff would be disciplined and the agency would reinforce expectations for allowable behavior management techniques. No specific actions were detailed. DHHS indicated that CAP follow-up was contained in the renewal inspection report of May 28, 2020, however no information on implementation of the CAP was found in the report.

- One CCI had eight special investigations that resulted in established licensing violations, the majority for behavior management and improper resident restraints. With respect to all the CAPs developed during the period, DHHS provided as evidence of agency follow-up only a single June 17, 2020 Order of Summary Suspension & Notice of Intent to Revoke License, subsequent to a child's death. The Order noted generally, for some of the CAPs, that staff were terminated and other staff had received trauma-based training, but specific information was not given.

- The facility provided a CAP dated October 23, 2019 to DCWL indicating the actions to be taken to address an improper child restraint violation. The facility included a conference with the employee involved in the unwarranted physical restraint, a review of physical restraint policy with the employee, and training for all staff. The CAP follow-up information dated June 29, 2020 provided by DHHS only indicated that documentation was provided and interviews conducted, without providing any specific corrective action details.

- A violation for a CCI was established when a youth was restrained by staff and one staff put her hands around the youth's neck and legs. There were three previous repeat violations at this facility related to physical restraints of children. The CAP follow-up covered the four investigations. The follow-up information provided by DCWL did not provide adequate details; rather, it just indicated that all timeframes for CAP completion were met and verified via "interviews with staff and documentation." Additional follow-up was to include unannounced visits and weekly check-ins to ensure proper staffing, documentation of which was not provided by DHHS.

- It was reported that a staff member punched a child in the face when he did not get out of bed. Also, two other staff carried the youth into a classroom when he refused to move from the hallway, resulting in a minor injury. Two violations, one for behavior management and one for resident restraint were established. The CAP indicated one staff was disciplined, and another terminated, and additional training was required. No other detailed information was provided. DCWL did not indicate which staff were re-trained and whether the training was effective in helping staff to understand expectations relative to physical restraints.

- A violation was established when a youth was restrained improperly and forced into a wall as captured on video. Staff was suspended for five days and retrained. DCWL indicated that the CAP was fully implemented as verified via personnel records showing terminations and suspensions. DCWL did not provide additional information regarding interviews with staff to assess their competence and understanding of appropriate procedures for de-escalation and relating to residents without using physical intervention as a first resort.

- The CCI was cited for staff sufficiency. Even though a youth was on one-to-one supervision, he continued to have self-harming behaviors leading to emergency room treatment. The follow-up report indicated the youth was placed on two-to-one supervision during showering and that staff would receive training. There was no specific information regarding the date of the training, the staff who attended, or who conducted the training.

- The CCI was cited for a behavior management violation, involving an improper restraint. The CAP involved termination of staff and refresher training for all staff in verbal and physical emergency intervention techniques using the Nurtured Heart Approach. The follow-up documentation did not specify who conducted the training, the staff who were trained, or the date it was held.

*Scope of Future Monitoring*

Following the end of this report period, employees of Kalamazoo-based Lakeside Academy, a CCI owned by Sequel Youth and Family Services, physically restrained 16 year-old C.F. on the floor for 12 minutes, suffocating him and causing his death. A subsequent investigation by DHHS determined the restraint was both "improper" and "excessive." Publicly released video footage from Lakeside shows C.F. seated in the cafeteria, throwing a sandwich. Sequel staff then forcefully pushed C.F. to the ground in a supine position and *several were observed on the video with their weight on [his] chest, abdomen and legs, making this an unsafe and excessive restraint,* according to DHHS investigators. Witnesses reported that C.F. repeatedly said he could not breathe during the restraint.

27

When Sequel staff released C.F. from the restraint, his body was limp and he was unresponsive. Some of the staff noticed foam at his mouth, but no one provided immediate medical attention. Several staff pulled C.F. upward to a seated position, but he remained motionless, his head drooping. His body fell slowly over to his right side and onto his back. At least seven Sequel staff stood near C.F., looking at him, including a nurse and a supervisor. Approximately five and a half minutes after C.F. was released, a nurse took C.F.'s hand briefly, then left the cafeteria and returned minutes later, using a pulse oximeter on C.F.'s finger. A staff member appeared to check for C.F.'s breath and the program director then brought water to put on C.F.'s face. Twelve minutes passed before anyone called 911. A staff member then started chest compressions on C.F. Several staff appeared to roll C.F. onto his side. Approximately 15 minutes after the restraint ended, a nurse got down on the floor next to C.F. to begin chest compressions. C.F. was transported to the hospital and died two days later.

The Office of the Medical Examiner of Kalamazoo ruled C.F.'s death a homicide due to restraint asphyxia, and authorities criminally charged three Sequel employees in connection with C.F.'s death. Two Sequel staff now face charges of involuntary manslaughter for restraining C.F. in a grossly negligent manner, and two counts each of child abuse. A third Sequel staff member, a nurse, was charged with one count of involuntary manslaughter and one count of child abuse after she witnessed the restraint but made no effort to seek or obtain timely medical care for C.F.

C.F. came into foster care on July 10, 2015 after his mother died; he experienced nine placements prior to his tenth and last placement at Lakeside Academy on November 14, 2018. All of his placements were in emergency shelters, secure institutions, or residential centers, except for an initial fictive kin placement with a friend of his deceased mother, which lasted for 12 days in 2015.

State records reveal a practice of pervasive child restraints at Lakeside and ineffective oversight by DHHS. Records reviewed by the monitors reveal that Sequel employees restrained C.F. at least 28 times from November 2018 through his death, including on January 4, 2020 when a staff member leaned on C.F. while another one pushed on that employee's back. In a video of that incident viewed by DHHS investigators after C.F. died, after four minutes of restraint, C.F. was motionless. "The restraint, however, is not ended for 32 minutes, when the remaining staff release his arms and sit him up. [C.F.] appears unsteady when he stands, and staff escort him by both arms out of camera view," according to the MDHHS report.

One of the children who witnessed the January 2020 restraint said C.F. was "struggling for breath" while another child said he had heard C.F. say at least twice "he couldn't breathe during the restraint." DHHS investigators determined no staff were disciplined in connection with the restraint because agency leadership had reportedly failed to watch the video footage of the restraint and Sequel employees lied about the length of the restraint in their written incident

reports. Describing the January 2020 restraint of C.F., the DHHS investigator describes this interaction with two Lakeside managers:

> The DCWL Consultant interviewed Director 3 via phone, on 06/04/20, and she reported no knowledge of this incident. Director 3 reported that all restraints are to be not longer than 10 minutes in duration and a half hour restraint would be "flagged" for review. Director 3 reported that staff have to report the duration of restraints. Director 3 stated that disciplinary action could occur for restraints over 10 minutes. Director 3 reported that she thought all restraints on video were reviewed by the quality team and documented in a log.

> The DCWL Consultant emailed Director 1 regarding this video and the accompanying incident reports for clarification. When asked if all restraint videos are reviewed, Director 1 replied, "We do not have a policy that specifically addresses the camera review of incidents. We review all of the incident reports and we try to review all restraints on video, but at times that wasn't always feasible." Director 1 also stated, "From the documentation that I have looked at, it does not appear that this restraint video had been reviewed or brought to management's attention, and therefore staff were not disciplined for it." Director 1 confirmed that the individual who is seen separating and restraining a peer in the video is another resident and not a staff. Director 1 additionally emailed the following clarification regarding the documentation on the incident reports for this restraint.

> You are correct on the incident reports – all of the staff inappropriately documented that the restraint lasted 10 minutes.

The DHHS investigation into C.F.'s death notes that "Lakeside Academy has had many investigations alleging physical abuse due to improper restraints used by staff." According to state records, MDHHS conducted an astounding 73 investigations into child abuse or neglect at Lakeside in the two years preceding the killing of C.F. The prevalence of these investigations shockingly averages to a new allegation of child abuse or neglect every ten days at this single facility for two consecutive years. Five of those investigations led to substantiations: three for the physical abuse of children (two in 2019 and one in 2020), one for the physical abuse of children and improper supervision (in 2018) and one for improper supervision (also in 2018). According to the DHHS investigation into C.F.'s death:

> Lakeside Academy has had many investigations alleging physical abuse due to improper restraints used by staff. Out of the five substantiations, three of the substantiations were for physical abuse, one was for improper supervision, and

one was for improper supervision and physical abuse. The current investigation alleges physical abuse due to being restrained improperly…

Lakeside Academy has a lengthy history over several years of allegations regarding Improper Supervision, Failure to Protect, Medical Neglect, Physical Neglect, Mental Injury, Physical Abuse, Sexual Abuse, and Threatened Harm. Some of the investigations that have been received resulted in substantiations of abuse or neglect by individual staff members. Majority of the cases received for investigation have been denied. If the investigations resulted in a confirmed case, the facility terminates the perpetrator and a licensing violation follows.

DCWL records detail at least 65 special investigations of Lakeside Academy from May 2018 to April 2020, establishing at least 72 violations for, among other things, improper restraints of children, sexual abuse, physical intervention, and improper supervision. Time and again, DHHS required Lakeside to do little more than document a CAP, but there is no evidence the agency effectively monitored safety and implementation of corrective action.

A June 17, 2020 DCWL investigative report into the circumstances surrounding C.F.'s death found 10 licensing violations at Lakeside, including improper restraint, many of which were repeat violations. In its 63 page report, DCWL recommended that Lakeside's license be revoked because of violations.

On July 15, 2020, Counsel for the Plaintiff-Children in this action wrote to the monitors expressing concern about the conditions that led to the death of C.F.[9] Referring to the MISEP, Counsel wrote in part:

MISEP, Section 3.1(d), provides the following with respect to commitments in the Structures and Policies category:

At the Monitor's discretion, the Monitors may request, and DHHS will supply, information and data relating to any Commitment in this classification. If the information and data demonstrate a substantial departure from the structural or policy Commitment, the Monitors may request that DHHS propose corrective action. If DHHS fails, within a reasonable period of time as determined by the Monitors, to propose and implement a corrective action that reestablishes compliance with the structural or policy Commitment, the Monitors may, in their discretion, move the Commitment into section 6 (To Be Achieved) or Section 5 (To be Maintained) and undertake full monitoring in relation to the Commitment.

---

[9] See Appendix E for a copy of the plaintiff's letter.

Given the circumstances of the incident at Lakeside and the serious findings of the MDHHS investigation, Plaintiffs request that the Monitors exercise their rights under Section 3.1(d) to request information from MDHHS on the following commitments currently in Structures and Policies: Section 4.7 (Commitment 7, Maltreatment in Care Units), Section 4.19 (Commitment 19, Corporal Punishment & Seclusion/Isolation, Prohibition and Policy), and Section 4.20 (Commitment 20, Contract Agency Requirements).

On August 19, 2020, the Monitors requested DHHS propose and implement corrective action with respect to these three provisions in the MISEP that are presently not subject to active monitoring by virtue of their current placement in the Structures and Policies portion of the agreement:

Section 4.7 Maltreatment-in-Care Units (Commitment 7): DHHS will maintain regional maltreatment-in-care units, staffed by specially trained CPS staff, responsible for all investigations of abuse or neglect relating to any child in the foster care custody of DHHS. DHHS shall ensure dedicated supervision, oversight and coordination of all maltreatment-in-care investigations.

Section 4.19 Corporal Punishment and Seclusion/Isolation, Prohibition and Policy (Commitment 19): DHHS shall prohibit the use of Positive Peer Culture, peer-on-peer restraint, and any other forms of corporal punishment in all foster care placements and shall maintain a policy regarding seclusion/isolation.

Section 4.20 Contract Agency Requirements (Commitment 20):

(a) DHHS's contracts with private CPAs and Child Caring Institutions ("CCI"s) shall be performance-based and shall include all of the following requirements: (1) compliance with performance goals as set forth in this Agreement; (2) compliance with all aspects of all DHHS policies and procedures that apply to the provider; (3) any reports of suspected abuse or neglect of any Plaintiff while receiving such contracted placements or services shall be reported to DHHS for investigation; (4) all placement providers for foster children in DHHS foster care custody are prohibited from using or authorizing the use of corporal punishment for children under the care and supervision of DHHS or the private CPA or CCI; (5) any reports of suspected corporal punishment while in that provider's care shall be reported to DHHS and investigated by DHHS, the CPA, or the CCI, as necessary; and (6) all CCIs or private CPAs that provide placements and child welfare services to Plaintiffs report to DHHS accurate data on at least a six month basis in relation to the requirements of this Agreement. DHHS shall independently monitor and

enforce these contracts. Further, DHHS shall maintain a set of enforcement measures to be imposed in the event that a contract agency fails to comply with material terms or requirements of the performance-based contract.

(b) DHHS shall give due consideration to any and all substantial incidents of abuse, neglect, and/or corporal punishment occurring in the placements licensed and supervised by a CPA or CCI at the time of processing its application for licensure renewal. The failure of a CPA or CCI to report suspected abuse or neglect of a child to DHHS shall result in an immediate investigation to determine the appropriate corrective action up to and including termination or modification of relevant portions of a contract, or placement of the provider on provisional licensing status. A repeated failure within one year shall result in a review of the contract agency's violations by a designated Administrative Review Team, which shall include the Director of CSA and the Director of the Division of Child Welfare Licensing (that division, the **"DCWL"**) or its successor agency that shall consider mitigating and aggravating circumstances to determine the appropriate corrective action up to and including license revocation and contract termination.

(c) DHHS shall conduct annual contract evaluations of all CCIs and private CPAs providing placements and services to Plaintiffs to ensure, among other things, the safety and well-being of Plaintiffs and to ensure that the contract is complying with the applicable terms of this Agreement.

(d) DHHS shall maintain sufficient resources to permit its staff to undertake timely and competent contract enforcement activities as set forth in this section.

On September 3, 2020, DHHS submitted a corrective action plan memo to the monitors,[10] identifying steps the agency had already initiated following the death of C.F., and further action it planned to undertake. The agency wrote:

Upon an immediate review of this incident, Children's Services Agency recognized that its licensing rules, restraint policies, regulatory and contractual oversight of CCIs were insufficient to assure child safety and well-being. The tragedy at Lakeside made clear an urgent need to limit use of restraints and improve CCI oversight, including better tracking of violations and confirmed child maltreatment. From a systems perspective, it also made clear the need to expedite adverse licensing action in response to repeat non-compliance or safety violations, and to reduce the state's reliance on CCIs for children in child welfare.

---

[10] See Appendix F for a copy of the corrective action plan.

Pursuant to MISEP Section 3.19, the monitors plan to assess the State's implementation of its proposed corrective action and determine in the next report to the Court whether compliance has been re-established or whether ongoing, active monitoring will re-commence with respect to Sections 4.7, 4.19 and 4.20.

*Seclusion in Contract Agencies (5.7)*

The MISEP requires that all uses of seclusion or isolation in CCIs be reported to DCWL for necessary action. If not reported, DCWL is required to take appropriate action to address the failure to report the incident and to ensure that it has been investigated and resolved.

DCWL is required to monitor the occurrence of seclusion or isolation incidents by CCIs. Area managers and licensing consultants receive a monthly spreadsheet which includes the number of seclusion or isolation incidents reported. The spreadsheet for the period indicates there were an astounding 576 incidents of reported seclusion or isolation that involved 13 CCI agencies.

Additionally, DHHS reported that during this period two agencies each had one seclusion and isolation incident that was not reported to DCWL. These substantiated violations required CAPs that were submitted and accepted by DCWL. The violation of one agency was specific to a technical issue, and the completed CAP included the facility seeking technical assistance from the MiSACWIS help desk to rectify reporting issues. The completed CAP for the second agency included centralizing incident reports, re-educating staff, and taking disciplinary action for incomplete incident reporting.

# Quality Service Reviews

DHHS continues to implement the Quality Service Review (QSR) to provide a probative review of case practice in a selection of cases, surfacing strengths as well as opportunities for improvement in how children and their families benefit from services. Each review focuses on an identified county or counties and includes in-depth case reviews, as well as focus groups and surveys.

The parties agreed that performance for two commitments would be measured through QSR case reviews. The first commitment is Assessments and Service Plans, Content (6.19). The performance standard for this commitment is 90 percent. The second commitment is Provision of Services (6.20). The performance standard for this commitment is 83 percent.

During MISEP 17, DHHS conducted QSRs in Ogemaw/Roscommon and Ostego/Crawford/Oscoda counties and a blended CFSR/QSR in the five BSC 5 counties. The monitoring team participated in the QSRs in Ogemaw/Roscommon and Ostego/Crawford/Oscoda counties in September 2019. Monitoring team members observed and participated in the focus groups, case reviews, case scoring, and presentations to administrators.

DHHS chose a randomly selected sample of open cases for review during each QSR. Cases were graded on 21 indicators covering different areas of case practice and the status of the child and family. Information was obtained through in-depth interviews with case participants including the child, parents or legal guardians, current caregiver, caseworker, teacher, therapist, service providers, and others having a significant role in the child's or family's life. A six-point rating scale was used to determine whether performance on a given indicator was acceptable. Any indicator scored at four or higher was determined acceptable, while any indicator scored at three or lower was determined to be unacceptable.

*Assessments, Service Plans, and Provision of Services (6.19, 6.20)*

DHHS agreed to develop a comprehensive written assessment of a family's strengths and needs, designed to inform decision making about services and permanency planning. The plans must be signed by the child's caseworker, the caseworker's supervisor, the parents, and the child, if age appropriate. If a parent or child is unavailable or declines to sign the service plan, DHHS must identify steps to secure their participation in accepting services.

The written service plan must include:

- A child's assigned permanency goal;

- Steps that DHHS, CPAs when applicable, other service providers, parents, and foster parents will take together to address the issues that led to the child's placement in foster care and that must be resolved to achieve permanency;

- Services that will be provided to children, parents, and foster parents, including who will provide the services and when they will be initiated;

- Actions that caseworkers will take to help children, parents, and foster parents connect to, engage with, and make good use of services; and

- Objectives that are attainable and measurable, with expected timeframes for achievement.

DHHS reviewed 25 children's cases, with 78 applicable items, relevant to this commitment during MISEP 17. Of the 78 applicable items, DHHS reported that 52 (66.7 percent) were rated as having acceptable assessments and service plans, below the performance standard of 90 percent for this commitment.

Furthermore, DHHS agreed that the services identified in the service plan will be made available in a timely and appropriate manner and to monitor services to ensure that they have the intended effect. DHHS also agreed to identify appropriate, accessible, and individually compatible services; to assist with transportation; and to identify and resolve barriers that may

impede children, parents, and foster parents from making effective use of services. Finally, DHHS committed to amend the service plan when services are not provided or do not appear to be effective.

DHHS reviewed 25 children's cases, with 75 applicable items, relevant to this commitment during MISEP 17. Of the 75 applicable items, DHHS reported that 52 (69.3 percent) were rated as acceptable for provision of services, below the 83 percent performance standard for this commitment.

## Data Reporting

DHHS produced data from MiSACWIS to demonstrate performance on MISEP 17 commitments and to document baseline populations and samples for the monitoring team's qualitative reviews. DHHS produced data for commitments 6.36 and 6.37 concerning support for youth transitioning to adulthood that were not produced in previous periods. DHHS continued to submit "cohort" data, which describes children's entries and exits from foster care during the period, the number of children served during the period, and the number of children in care at the beginning and end of the period.

The monitoring team analyzed the information to verify its quality, assessed the methodology used to compute performance for each metric, and attempted to replicate the performance calculations made by DHHS. In these efforts, both DHHS and the monitoring team relied on the written Metrics Plan initialized in January 2017 and updated as of February 2020. The Metrics Plan outlines in detail the descriptions of data to be supplied by DHHS to the monitoring team and the calculation methodologies to assess performance for each commitment for which DHHS produces a data report.

In general, the data and reporting in MISEP 17 was markedly improved from previous periods, but included an inaccurate submission for the MISEP child safety outcome, which came to light during the monitors' case record review as described in this report, and prevented the monitors from verifying the agency's performance. For an additional eleven of the 28 commitments, the monitoring team identified minor data quality issues that had little or no impact on performance calculations. DHHS resubmitted revised cohort data due to observed data issues. The monitoring team worked through issues with DHHS by email, conference calls, and meetings. These communications resulted in two refinements to the Metrics Plan pertaining to commitments 6.36.a and 6.32. As a result, the monitors verified DHHS' performance on 27 of the 28 commitments for which DHHS submitted data from MiSACWIS or that were conducted through a QAP.

## Permanency

## Developing Placement Resources for Children

*Foster Home Array (6.4)*

In the MISEP, DHHS committed to maintain a sufficient number and array of homes capable of serving the needs of the foster care population, including a sufficient number of available licensed placements within the child's home community for adolescents, sibling groups, and children with disabilities. DHHS agreed to develop for each county and statewide an annual recruitment and retention plan, in consultation with the monitors and experts in the field, which is subject to approval by the monitors. DHHS committed to implement the plan, with interim timelines, benchmarks, and final targets, to be measured by the monitors based on DHHS' good faith efforts to meet the final targets set forth in the plan.

At the conclusion of MISEP 17, the Department reported a total of 5,667 licensed foster homes, including 4,380 homes that were licensed for unrelated children. By comparison, at the end of ISEP 13 (December 31, 2017), the last period for which the monitors evaluated DHHS' foster home array, the Department reported 6,220 licensed foster homes, including 4,829 licensed for unrelated children. DHHS experienced a decrease of 449 foster homes (9.3 percent) for unrelated children over this two-year period. During the same time, the population of children in DHHS' custody placed in unrelated foster homes decreased by 323 children from 4,564 to 4,241 children, a seven percent decline. As a result, DHHS lost ground over the two-year period in ensuring an adequate number of unrelated foster homes capable of serving the needs of the foster care population are available for children requiring these family-based placements.

DHHS' first Adoption and Recruitment and Retention plans finalized under the MISEP cover FY2020, running from October 1, 2019 to September 30, 2020. These county and statewide plans cover the first three months of MISEP 17 and were developed in consultation with and approved by the monitors. The plans include interim targets and benchmarks. As in previous reporting periods, the plans were developed using the Foster Care Estimator. This tool allows each county and private agency to utilize various data points regarding children and homes to determine unrelated foster home need. DHHS also provides statistical information to each county including children in care by county, children entering and exiting care by county, number of foster homes licensed by county, and foster home closures by county. Utilizing this data and information, DHHS and private agency staff collaborated to identify licensing goals and strategies to recruit new unrelated foster homes.

DHHS requires local DHHS staff to meet with private agency staff, local tribes, members of the faith community/service organizations, community mental health providers, and current foster

and adoptive parents when developing county recruitment plans. In that context, coordinated recruitment activities were then planned and implemented on a countywide basis, in collaboration with DHHS and the private agencies.

For FY2020 DHHS agreed to license 1,222 new non-relative homes of which 660 will accept adolescent placements, 234 homes will accept children with disabilities and 696 homes will be developed to accept sibling groups. The following table shows the goals and progress made to license foster homes during the first three months of FY2020.

**Table 4. Nonrelative Foster Homes Licensed, FY2020**

| Month | Total # of new unrelated foster homes licensed | Monthly goal for new unrelated foster homes | Monthly unrelated foster home closures | # licensed for adolescents | Monthly goal for adolescent foster homes | # licensed for siblings | Monthly goal for sibling foster homes | # licensed for children with disabilities | Monthly goal for foster homes accepting children with disabilities |
|---|---|---|---|---|---|---|---|---|---|
| Oct-19 | 75 | 101 | 135 | 23 | 55 | 43 | 58 | 49 | 19 |
| Nov-19 | 66 | 101 | 119 | 20 | 55 | 38 | 58 | 39 | 19 |
| Dec-19 | 96 | 102 | 90 | 21 | 55 | 58 | 58 | 68 | 19 |
| Total | 237 | 304 | 344 | 64 | 165 | 139 | 174 | 156 | 57 |

During the three-month period subject to MISEP 17, DHHS licensed 237 homes. However, during the same time, 344 unrelated foster homes were closed, for a net loss of 107 homes. DHHS has created and is utilizing an electronic Data Dashboard for private and public staff to track and monitor monthly progress toward achievement of its goals. DHHS must closely track and monitor not only new home licensure but also the reasons for foster home closures to ensure DHHS understands the factors that lead to home closure, both positive and negative, in order to implement strategies to support and retain unrelated foster parents for children in custody.

For the three months included in this reporting period, the monitors find that DHHS has made good faith efforts to develop county and statewide recruitment plans that contain data-driven foster home benchmarks and targets. DHHS has done so in collaboration with its network of community private agency partners throughout Michigan. Further, DHHS allocated $1,030,000 to support implementation of the FY2020 statewide and local recruitment plans. Half of the funding was sent to the counties for direct recruitment and retention work, and half of the funding was maintained by Central Office for statewide efforts. In the next reporting periods, the monitors will evaluate DHHS' efforts to implement, track, and monitor the commitments in its recruitment plans to ensure that the agency's efforts are squarely focused on creating and maintaining an adequate pool of non-relative foster homes. The monitors will also evaluate

DHHS' efforts to ensure that families who have expressed a willingness to accept children with special needs, adolescents and sibling groups, are in fact, accepting these children into their homes.

Further, when assessing in future periods the adequacy of DHHS' array of foster home placements, the monitors will take into consideration as indicators of foster home sufficiency, the agency's performance regarding other MISEP commitments. These commitments include Separation of Siblings (6.6); Maximum Children in a Foster Home (6.7); Emergency or Temporary Facilities, Length of Stay (6.8); and Emergency or Temporary Facilities, Repeated Placement (6.9).

*Relative Foster Parents (6.10.a)*

The MISEP commitments for relative foster homes contain two significant changes from previous agreements, in that the parties agreed that relative foster homes must continue to be assessed for safety in the same manner as unrelated foster homes but relative foster homes are now not required to become licensed. Further, relative foster parents are now eligible to receive foster child board payments, after safety assessments are completed, whether they choose to become licensed or remain unlicensed. Previously, all relatives were required to become licensed.

For children who may be placed with a relative, safety assessments, safety planning (when appropriate), and background checks must occur for all prospective homes prior to a child's placement.[11] The MISEP relative safety commitments are particularly important to child safety as over 39 percent of children in DHHS custody were living with relatives at the conclusion of MISEP 17. In the MISEP, DHHS committed to ensure that:

- Prior to a child's placement, DHHS will visit the relative's home to determine it is safe;

- Law enforcement and central registry background checks for all adults living in the home will be completed within 72 hours of placement; and

- A home study will be completed within 30 days of placement determining whether the placement is safe and appropriate.

The parties agreed the monitors will conduct an independent qualitative review each period to measure DHHS' performance for this commitment. The designated performance standard for this commitment is 95 percent.

For MISEP 17, the monitoring team reviewed a sample of 66 unlicensed foster homes. The team determined performance was achieved overall in 35 cases (53.0 percent) and performance was

---

[11] Relative Engagement and Placement Policy FOM 722-03B

not achieved in 31 cases (47.0 percent).[12] Performance for each of the three components individually, was as follows:

- An initial home safety assessment prior to placement was completed for 61 homes (92.4 percent).

- Law enforcement and central registry checks were completed for relative caregivers within 72 hours of placement for 53 homes (80.3 percent).

- A home study was completed within 30 days of placement for 50 relative placements (75.8 percent).

DHHS did not meet the designated performance standard of 95 percent. Factors that contributed to not meeting the standard include workers not visiting the prospective relative home prior to placement, late background checks for caregivers and other adult household members, and relative home studies completed beyond the 30-day timeframe. The monitoring team, in its relative foster parent reviews, found instances of insufficient follow-up by DHHS with concerns identified in relative home studies, including a lack of follow-up to ensure relatives have sufficient resources to care for children placed by DHHS in their homes.

*Relative Foster Parents (6.10.b)*

The MISEP requires a relative placement home study, including all clearances, must be completed and approved annually[13] for unlicensed caregivers to ensure the safety of children placed in relative homes. An approved relative home study is valid for one year. This commitment is measured through an independent qualitative review conducted by the monitors with a designated performance standard of 95 percent.

For this commitment, the monitoring team selected a sample of 62 unlicensed relative homes due for a renewal home study. The monitoring team found in its review that six homes (9.7 percent) met the performance standards in the MISEP and 56 cases (90.3 percent) did not.[14] DHHS did not meet the designated performance standard of 95 percent during the period.

A predominant concern found in the annual reviews was completion of timely clearances. For relative caregivers, central registry checks were completed timely for all adults living in 33 homes (53.2 percent), and criminal history background checks were completed timely for all adults in 31

---

[12] Baseline performance for this commitment, measured in MISEP 16, did not consider whether the requirement to complete a Sex Offender Registry check was completed timely. MISEP 17 performance included a review of the Sex Offender Registry check as required by DHHS policy.

[13] Defined as within 365 days of the last relative placement home study

[14] Baseline performance for this commitment, measured in MISEP 16, did not consider whether the requirement to complete a Sex Offender Registry check was completed timely. MISEP 17 performance included a review of the Sex Offender Registry check as required by DHHS policy.

(50.0 percent) of the homes. Additionally, Michigan policy requires that all caregivers and household members aged 12 years and older must have his/her name and address searched on the Michigan Public Sex Offender Registry. The monitoring team was able to find evidence that this background check was completed for only six (9.7 percent) of the homes.

The monitoring team, in its review of annual relative home studies, found concerns not identified or addressed by DHHS. These included relatives lacking sufficient resources, which reflects an urgent opportunity for DHHS to ensure the safety and well-being of children by meeting families' needs. The monitoring team expects that when such issues are surfaced in the annual home study DHHS would document its efforts to address the issues and support relatives to ensure children in their homes will be both safe and have their needs met. In the absence of such documentation, the monitoring team can only conclude that the issues of concern remained unaddressed.

## Placement Standards

*Placement Standard (6.5)*

The MISEP requires that all children placed in the foster care custody of DHHS be placed in a licensed foster home, a licensed facility, pursuant to a court order, or an unlicensed relative. According to the data submitted by DHHS for MISEP 17, there were 11,578 children[15] subject to this commitment. Of those children, 11,073 (95.6 percent) children were placed in settings allowable in the MISEP. Five hundred five children (4.4 percent) were placed in settings not allowed in the MISEP.[16]

*Placing Siblings Together (6.6)*

The MISEP requires DHHS to place siblings together when they enter foster care at or near the same time. Exceptions can be made if placing the siblings together would be harmful to one or more of the siblings, one of the siblings has exceptional needs that can only be met in a specialized program or facility, or the size of the sibling group makes such placement impractical notwithstanding efforts to place the group together. DHHS provided data to the monitoring team indicating there were 498 sibling groups whose members entered foster care within 30 days of each other during MISEP 17. Of these 498 sibling groups, 339 (68.1 percent) were either placed together or had a timely approval for an allowable exception. DHHS did not meet the designated performance standard of 90 percent for this commitment.

---

[15] This provision excludes children in temporary placement settings including AWOL, jail, detention, and hospitals.

[16] Placement types for the 505 children were as follows: Unrelated Caregiver (272); Rental Home/Apartment (122); Adoptive Home (74); Friend/Partner Home (17); College Dormitory (9); Juvenile Guardianship Home (9); Missing (2). The monitors encourage the parties to review these classifications and determine the appropriateness of these placement types prior to the next monitoring report.

The commitment also requires that if siblings are separated at any time except for any of the aforementioned reasons, the case manager shall make immediate efforts to locate or recruit a family in whose home the siblings can be reunited. Efforts to place siblings together are to be documented and maintained in the case file and reassessed quarterly. It was agreed that the monitoring team would conduct an independent qualitative review to measure performance for this commitment.

For MISEP 17 the monitoring team reviewed 67 children's case records subject to this provision and found that DHHS met the terms of the commitment in 41 cases (61.2 percent), below the designated performance standard of 90 percent.

*Maximum Children in a Foster Home (6.7)*

In the MISEP, DHHS committed that no child shall be placed in a foster home if that placement will result in more than three foster children in that foster home, or a total of six children, including the foster family's birth and adopted children. In addition, DHHS agreed that no placement will result in more than three children under the age of three residing in a foster home. Exceptions to these limitations may be made by the Director of DCWL when in the best interest of the child(ren) being placed. As of December 31, 2019, there were 5,095 foster homes in Michigan with at least one child in placement. Of these 5,095 homes, 4,592 (90.1 percent) met the terms of this commitment, meeting the designated performance standard of 90 percent. *Per the MISEP, compliance during this period makes the commitment eligible to move to "To Be Maintained."*

*Emergency or Temporary Facilities, Length of Stay (6.8)*

DHHS is required to ensure children shall not remain in emergency or temporary facilities, including shelter care, for a period lasting more than 30 days unless exceptional circumstances exist. DHHS committed that no child shall remain in an emergency or temporary facility for a period lasting more than 60 days with no exceptions. The agreed upon performance standard for this commitment is 95 percent. Of the 159 children placed in emergency or temporary facilities during MISEP 17, 108 (67.9 percent) were placed within the length of stay parameters. DHHS did not meet the performance standard during MISEP 17. The following chart details the race of the 159 children placed in emergency or temporary facilities during the period. As Table 5 indicates, Black/African American children were disproportionately placed in shelter care. While Black/African American children made up 31 percent of children in DHHS custody, they comprised 40 percent of the children placed in shelters during the period.

**Table 5. Race of Children Placed in Emergency or Temporary Facilities**

| Race | Frequency | Percent |
|------|-----------|---------|
| White | 70 | 44% |
| Black/African American | 64 | 40% |
| Mixed Race | 23 | 14% |
| Native American | 2 | 1% |
| Asian | 0 | 0% |
| Native Hawaiian or Pacific Islander | 0 | 0% |
| **Total** | **159** | **100%** |
| Hispanic origin (of any race) | 12 | 8% |

*Emergency or Temporary Facilities, Repeated Placement (6.9)*

The MISEP requires that no child shall be placed in an emergency or temporary facility more than one time in a 12-month period unless exceptional circumstances exist. Children under 15 years of age experiencing a subsequent emergency or temporary-facility placement within a 12-month period may not remain in an emergency or temporary facility for more than seven days. Children 15 years of age or older experiencing a subsequent emergency or temporary-facility placement within a 12-month period may not remain in an emergency or temporary facility for more than 30 days. During the reporting period, children experienced 32 subsequent stays in shelter care, of which two placement episodes (6.3 percent) met the terms of this commitment. DHHS did not meet the agreed upon performance standard of 97 percent. Table 6 details the race of the children who experienced subsequent stays in shelter care during the period. Again, Black/African American children were disproportionately represented, comprising 47 percent of the children who experienced multiple stays in emergency or temporary facilities, but only 31 percent of the children in DHHS custody.

**Table 6. Race of Children Experiencing a Subsequent Emergency or Temporary-Facility Placement**

| Race | Count | Percent |
|------|-------|---------|
| Black/African American | 15 | 47% |
| White | 15 | 47% |
| Mixed Race | 2 | 6% |
| Native American | 0 | 0% |
| Asian | 0 | 0% |
| Native Hawaiian or Pacific Islander | 0 | 0% |
| **Total** | **32** | **100%** |
| Hispanic origin (of any race) | 5 | 15.6% |

42

## Case Planning and Practice

*Supervisory Oversight (6.16)*

Supervisors are to meet at least monthly with each assigned caseworker to review the status of progress of each case on the worker's caseload. Supervisors must review and approve each service plan after having a face-to-face meeting with the worker, which can be the monthly supervisory meeting. The designated performance standard for this commitment is 95 percent.

During MISEP 17, there were 2,558 initial case consultations between a worker and supervisor that were due in the first 30 days. Of those, 2,422 (94.7 percent) were completed timely. Additionally, there were 69,563 monthly case consultations between a worker and supervisor that were due. Of those, 66,099 (95.0 percent) were completed timely. DHHS met the performance standard for this commitment. *Per the MISEP, compliance during this period makes the commitment eligible to move to "To Be Maintained."*

*Timeliness of Service Plans (6.17, 6.18)*

The MISEP requires that DHHS complete an initial service plan (ISP) within 30 days of a child's entry into foster care (6.17) and then complete an updated service plan (USP) at least quarterly thereafter (6.18). The designated performance standard for both commitments is 95 percent.

During MISEP 17, DHHS did not achieve the designated performance standard for either commitment. Of the 2,528 ISPs due during the period, 2,086 (82.5 percent) were completed within 30 days of a child's entry into foster care or Young Adult Voluntary Foster Care (YAVFC). Of the 20,813 USPs due during the period, 18,026 (86.6 percent) were completed at least quarterly.

## Caseworker Visitation

*Worker-Child Visitation (6.21)*

DHHS agreed that caseworkers shall visit children in foster care at least two times per month during the child's first two months of placement in an initial or new placement, and at least once per month thereafter. At least one visit each month shall be held at the child's placement location and shall include a private meeting between the child and the caseworker. DHHS and the monitoring team established in the Metrics Plan assessment criteria for the six components that are included in the 6.21 commitment. The designated performance standard is 95 percent for all components.

DHHS' MISEP 17 strong performance on the six components of worker-child visitation is included in the following table. As the table indicates, DHHS met the designated performance standard for five of the six components.

**Table 7. MISEP 17 Performance on Worker-Child Visitation**

| Requirement | Visits Required | Visits Completed | Performance Percentage |
|---|---|---|---|
| Each child shall be visited by a caseworker at least twice per month during the first two months following an initial or new placement | 19,386 | 17,710 | 91.4% |
| Each child shall be visited by a caseworker at their placement location at least once per month during the first two months following an initial or new placement | 9,693 | 9,237 | 95.3% |
| Each child shall have at least one visit per month that includes a private meeting between the child and caseworker during the first two months following an initial or new placement | 9,693 | 9,227 | 95.2% |
| Each child shall be visited by a caseworker at least once per full month the child is in foster care | 69,563 | 67,871 | 97.6% |
| Each child shall be visited by a caseworker at their placement location at least once per full month the child is in foster care | 69,563 | 67,148 | 96.5% |
| Each child shall have at least one visit per full month the child is in foster care that includes a private meeting between the child and caseworker | 69,563 | 66,399 | 95.5% |

*Worker-Parent Visitation (6.22)*

Caseworkers must visit parents of children with a reunification goal at least twice during the first month of placement with at least one visit in the parental home. For subsequent months, visits must occur at least once per month. Exceptions to this requirement are made if the parent(s) are not attending visits despite DHHS taking adequate steps to ensure the visit takes place or a parent cannot attend a visit due to exigent circumstances such as hospitalization or incarceration. Exceptions are excluded from the numerator and denominator of this calculation. DHHS and the monitoring team established assessment criteria for the three components of this commitment in the Metrics Plan. The designated performance standard is 85 percent for all components.

DHHS' MISEP 17 performance on the three components of worker-parent visitation is included in the following table. As the table indicates, DHHS did not achieve the designated performance standard of 85 percent for any component of the worker-parent visitation commitment during MISEP 17.

**Table 8. MISEP 17 Performance on Worker-Parent Visitation**

| Requirement | Visits Required | Visits Completed | Performance Percentage |
|---|---|---|---|
| Caseworkers shall visit parents of children with a goal of reunification at least twice during the first month of placement | 7,540 | 5,553 | 73.6% |
| Caseworkers shall visit parents of children with a goal of reunification in the parent's place of residence at least once during the first month of placement | 3,770 | 1,807 | 47.9% |
| Caseworkers shall visit parents of children with a goal of reunification at least once for each subsequent month of placement | 61,097 | 42,403 | 69.4% |

*Parent-Child Visitation (6.23)*

When reunification is a child's permanency goal, parents and children will visit at least twice each month. Exceptions to this requirement are made if a court orders less frequent visits, the parents are not attending visits despite DHHS taking adequate steps to ensure the parents' ability to visit, one or both parents cannot attend the visits due to exigent circumstances such as hospitalization or incarceration, or the child is above the age of 16 and refuses such visits. The designated performance standard is 85 percent.

Of the 54,094 parent-child visits required during MISEP 17, DHHS completed 33,828 (62.5 percent) timely. DHHS did not meet the designated performance standard of 85 percent for this commitment during the period. The agency's performance on this commitment is not sufficiently helping to advance its work to achieve permanency pursuant to Commitment 6.3, as discussed above.

*Sibling Visitation (6.24)*

For children in foster care who have siblings in custody with whom they are not placed, DHHS shall ensure they have at least monthly visits with their siblings. Exceptions to this requirement can be made if the visit may be harmful to one or more of the siblings, the sibling is placed out of state in compliance with the Interstate Compact on Placement of Children, the distance between the child's placements is more than 50 miles and the child is placed with a relative, or one of the siblings is above the age of 16 and refuses to visit. The designated performance standard is 85 percent.

Of the 18,477 sibling visits required during MISEP 17, DHHS completed 13,468 (72.9 percent) timely. DHHS did not meet the designated performance standard of 85 percent for this commitment during the period.

## Safety and Well-Being

### Responding to Reports of Abuse and Neglect

*Commencement of CPS Investigations (5.2)*

DHHS committed to commence investigations of reports of child abuse or neglect within the timeframes required by state law. The designated performance standard for this commitment is 95 percent.

DHHS reported that during MISEP 17, there were 46,496 complaints that required the commencement of an investigation. Of those, 44,989 (96.8 percent) were commenced timely, meeting the performance standard for the period.

*Completion of CPS Investigations (6.11)*

DHHS agreed that all child abuse or neglect investigations would both be completed by the worker and approved by the supervisor within 44 days. The parties agreed to a performance standard of 90 percent for this commitment.

During MISEP 17, there were 41,921 investigation reports due to be completed. Of those, 34,952 (83.4 percent) were submitted by caseworkers and approved by supervisors within 44 days. DHHS did not meet the performance standard during MISEP 17.

*CPS Investigations and Screening, Screening (6.12.a)*

In the MISEP, DHHS committed to investigate all allegations of abuse or neglect relating to any child in the foster care custody of DHHS and to ensure that allegations of maltreatment in care are not inappropriately screened out and therefore not investigated by CPS. The MISEP requires that this provision be measured by the monitors through a qualitative review. A statistically significant sample of cases and a set of questions established by DHHS and the monitors was utilized in the MISEP 17 review. The review population was comprised of all referrals that involved a plaintiff class child (whether they were in out of home or in-home placement) that were screened out for CPS investigation during the period. There were 2,057 such referrals in the MISEP 17 data provided by DHHS.

The new administration has prioritized performance improvement at Centralized Intake (CI), and the monitoring team found improvements in screening from previous periods, with critical work still to be done. The monitoring team reviewed 66 screened-out CPS referrals and determined that DHHS made appropriate screening decisions in 61 instances (92.4 percent). The team determined that in five referrals additional information was needed to make an appropriate screening decision.

Reviews of CCI licensing investigations, conducted by the monitoring team, raised concerns about the CPS screening process in Michigan. As indicated in Section 5.1, the monitoring team identified 15 special investigation incidents that met the criteria for a CPS investigation but were not assigned for investigation. Nine of these incidents involved plaintiff class children and were screened out for a CPS-MIC investigation by CI. Examples include:

- Youth (age 15) was found unresponsive in the bathroom with a sweatshirt tied tightly around his neck. When staff rubbed his sternum, he became responsive. The youth was on suicide watch, which meant he was to be visually checked every five minutes. This incident was referred to CI but not accepted for CPS investigation. Days later the same referral was called in by a different reporter, assigned for investigation, and substantiated for improper supervision.

- Two youth (ages 15 and 17) reportedly did not have access to inhalers and nebulizers when they had asthma attacks at school and experienced difficulty breathing. DCWL established a violation regarding one of the residents. This was referred to CI but not accepted for CPS investigation, the information was transferred to DCWL and the foster care workers. This should have been investigated for medical neglect.

- When staff redirected a youth (age nine) to his room, he began throwing things. He then alleged that he was hit in the face by staff who sat on him. When he crawled under a bed, she pulled him out by the legs and slapped him stating "how would you like it if someone hit you?" CI screened out the referral as "the child has a reported history of making up stories," and the child had no reported injuries. The information was transferred to DCWL and the foster care worker.

- When a youth (age 16) was told to clean his room, he reportedly argued with a female staff and threatened to hit her. Another male staff intervened and when the youth began pushing him, the male staff allegedly pushed and punched the youth. Other staff de-escalated the situation. CI screened out the referral, determining there were no reported injuries to the youth. The information was transferred to DCWL and the foster care worker.

- DCWL established a violation when a youth (age 14) did not receive their medication and no one at the facility followed up on recommendations from the youth's doctor. CI screened out the referral and transferred the information to DCWL and the foster care worker.

The MISEP also requires that when DHHS transfers a referral to another agency for investigation, DHHS must independently take appropriate action to ensure the safety and well-being of the

child in the Department's custody. The parties agreed that the monitors would conduct an independent qualitative review to determine compliance with this commitment.

The population for review was comprised of allegations received by CI about plaintiff class children that were transferred outside the Department during the period under review. Consistent with the parameters the monitors approved, the monitoring team reviewed a random sample of cases, stratified by county, to determine performance. The designated performance standard for this commitment is 95 percent.

For MISEP 17, the monitoring team reviewed a sample of 61 transferred cases and found 48 cases met the terms of the MISEP and 13 cases did not meet the terms of the MISEP, for a performance calculation of 78.7 percent. DHHS did not meet the designated performance standard of 95 percent for the period.

*CPS Investigations and Screening, PCU (6.12.b)*

The MISEP also requires DHHS maintain a Placement Collaboration Unit (PCU) to review and assess screening decisions on plaintiff-class children who are in out-of-home placements and to ensure safety and well-being is addressed on those transferred complaints. The PCU is required to review 100 percent of cases until reconsideration of complaints involving plaintiff class children out of home are less than five percent.

The PCU began statewide implementation in March 2019. The unit consists of one manager and six casework specialists. The process involves the CI unit forwarding to the PCU all screened-out referrals involving plaintiff class children. The PCU reviews the referral information and is expected to ensure that necessary review and follow-up is conducted by the on-going case worker or licensing consultant and to address any safety concerns. If the PCU determines that the complaint meets the criteria for an investigation, the referral is returned to CI for reassignment. As necessary, the PCU worker may have contact with the referral source, review any ongoing information in the active case, consult with other professionals, and review history and trends.

According to the data submitted by DHHS, the PCU reviewed all 1,358 transferred complaints alleging abuse or neglect of a child in out-of-home placement, with 45 (3.3 percent) of the complaints returned for assignment for investigation. The monitoring team reviewed a sample of 65 of the transferred complaints reviewed by PCU and found that five (7.7 percent) of the complaints met the criteria for assignment for investigation. Four of the five complaints were also identified by PCU and had already been returned and assigned for investigation. The monitoring team agreed with PCU in 64 (98.5 percent) of the 65 cases reviewed. *Per the MISEP, compliance during this period makes the commitment eligible to move to "To Be Maintained."*

## Health and Mental Health

*Medical and Mental Health Examinations for Children (6.25)*

DHHS committed in the MISEP that at least 85 percent of children shall have an initial medical and mental health examination within 30 days of the child's entry into foster care, and that at least 95 percent of children shall have an initial medical and mental health examination within 45 days of the child's entry into foster care.

During MISEP 17, the Department completed 2,146 (83.9 percent) of 2,558 required initial medical and mental health exams within 30 days of a child's entry into care. Additionally, DHHS completed 2,269 (89.3 percent) of 2,541 required initial medical and mental health exams within 45 days of a child's entry into care during MISEP 17. DHHS did not meet the performance standard for either prong of this commitment during the period.

*Dental Care for Children (6.26)*

DHHS committed in the MISEP that at least 90 percent of children shall have an initial dental examination within 90 days of the child's entry into care unless the child has had an exam within six months prior to placement or the child is less than four years of age.

During MISEP 17, 985 initial dental exams (77.3 percent) of 1,275 required exams were completed timely for children in DHHS custody. DHHS did not meet the performance standard for this commitment.

*Immunizations (6.27, 6.28)*

Under the MISEP, children in DHHS custody must receive all required immunizations according to the guidelines set forth by the American Academy of Pediatrics (AAP). For children in DHHS custody for three months or less as of the end of the period, DHHS is to ensure that 90 percent receive any necessary immunizations, according to AAP guidelines, within three months of entry into care (6.27). For children in DHHS custody for longer than three months as of the end of the period, DHHS is to ensure that 90 percent receive all required immunizations according to AAP guidelines.

The parties have not yet reached an agreement as to how these commitments will be measured, therefore performance was not evaluated for MISEP 17.

*Ongoing Healthcare for Children (6.29)*

DHHS committed in the MISEP that following an initial medical, dental, or mental health examination, at least 95 percent of children shall receive periodic and ongoing medical, dental, and mental health examinations and screenings, according to the guidelines set forth by the AAP.

Performance for this commitment was calculated for each medical type: medical well-child visits for children age three and younger, annual physicals for children older than three, and annual dental exams.

During MISEP 17, DHHS completed 3,583 (69.7 percent) of 5,144 medical well-child visits timely; 4,554 (87.7 percent) of 5,193 annual physicals timely; and 4,784 (92.1 percent) of 5,193 annual dental exams timely. DHHS did not meet the performance standard for any portion of this commitment during MISEP 17.

*Child Case File, Medical and Psychological (6.30)*

The MISEP requires that DHHS will ensure that:

- Children's health records are up to date and included in the case file. Health records include the names and addresses of the child's health care providers, a record of the child's immunizations, the child's known medical problems, the child's medications, and any other relevant health information;

- The case plan addresses the issue of health and dental care needs; and

- Foster parents or foster care providers are provided with the child's health care records.

DHHS' MISEP 17 performance on the three components of the child's medical and psychological case files is charted below. To measure performance, 32 foster care cases were reviewed utilizing CSFR Item 17 criteria described in the chart below. DHHS did not achieve the 95 percent performance standard for any component of the child case file commitment during MISEP 17.

**Table 9. MISEP 17 Performance on Child Case File, Medical and Psychological**

| Requirement | Applicable Cases | Cases Not Compliant | Cases Compliant | Performance Percentage |
|---|---|---|---|---|
| To the extent available and accessible, the child's health records are up to date and included in the case file. | 32 | 8 | 24 | 75.0% |
| The case plan addresses the issue of health and dental care needs. | 32 | 12 | 20 | 62.5% |
| To the extent available and accessible, foster parents or foster care providers are provided with the child's health records. | 32 | 13 | 19 | 59.4% |

*Access to Health Insurance (6.31, 6.32)*

The MISEP requires DHHS ensure that at least 95 percent of children have access to medical coverage within 30 days of entry into foster care by providing the placement provider with a Medicaid card or an alternative verification of the child's Medicaid status and Medicaid number as soon as it is available (6.31).

Data provided by DHHS indicate that placement providers received a Medicaid card or an alternative verification of the child's Medicaid status and number within 30 days of entry into foster care for 2,275 (88.9 percent) of 2,558 children in MISEP 17. DHHS did not meet the performance standard during MISEP 17.

The MISEP also requires DHHS to ensure that 95 percent of children have access to medical coverage within 24 hours or the next business day following subsequent placement by giving the placement provider a Medicaid card or an alternative verification of the child's Medicaid status and Medicaid number as soon as it is available (6.32).

During MISEP 17, DHHS reported 3,833 (82.8 percent) of 4,627 placement providers received Medicaid cards or alternative verification within 24 hours or the next business day following a child's subsequent placement. DHHS did not meet the agreed-upon designated performance standard of 95 percent.

*Psychotropic Medication, Informed Consent (6.33)*

The MISEP requires DHHS to ensure that an informed consent is obtained and documented in writing for each child in DHHS custody who is prescribed psychotropic medication, as per DHHS policy.

During MISEP 17, 2,254 children required informed consent documentation, for 6,760 unique prescriptions. Valid consents were on file for 75.9 percent of the medications. Therefore, DHHS did not meet the designated performance standard of 97 percent for this commitment.

*Psychotropic Medication, Documentation (6.34)*

Under the MISEP, DHHS must ensure that:

- A child is seen regularly by a physician to monitor the effectiveness of the medication, assess any side effects and/or health implications, consider any changes needed to dosage or medication type and determine whether medication is still necessary and/or whether other treatment options would be more appropriate;

- DHHS shall regularly follow up with foster parents/caregivers about administering medications appropriately and about the child's experience with the medication(s), including any side effects; and

- DHHS shall follow any additional state protocols that may be in place and related to the appropriate use and monitoring of medications.

Evidence of these actions should be documented in the child's case record. The parties agreed that performance for this commitment would be measured through an independent qualitative review conducted by the monitoring team.

The population for review was comprised of children in DHHS custody who were prescribed a psychotropic medication during the period under review. Consistent with the parameters the parties approved, the monitoring team reviewed a random sample of cases, stratified by county, to determine performance. The designated performance standard for this commitment is 97 percent.

For MISEP 17, a sample of 68 cases was selected from a total population of 2,851 children. The monitoring team found 23 cases met the terms of this commitment and 45 cases did not meet the terms of this commitment for a performance calculation of 33.8 percent. DHHS did not meet the designated performance standard of 97 percent for the period.

## Youth Transitioning to Adulthood

### Extending Eligibility and Services

*Support for Youth Transitioning to Adulthood, YAVFC (6.36.a)*

Under the MISEP, DHHS committed to implement policies and provide services to support youth transitioning to adulthood, including ensuring youth have been informed of services available through the Youth Adult Voluntary Foster Care (YAVFC) program. Performance for this commitment is achieved by positive trending in the rate of foster youth aging out of the system participating in the YAVFC program for a minimum of two reporting periods. Performance for this commitment will not be monitored during 2019, instead 2019 data will be used to establish a baseline performance level. Once the baseline is established, the parties will then revisit this commitment to determine what constitutes positive trending for future monitoring.

Data provided by DHHS indicate that during MISEP 17, there were 1,836 youth eligible for the YAVFC program. Of those youth, 645 (35.1 percent) participated in the program. This is the first period during which performance was measured for this commitment, and positive trending will be evaluated in future report periods.

*Support for Youth Transitioning to Adulthood, Medicaid (6.36.b)*

The MISEP requires DHHS to continue to implement policies and provide services to support youth transitioning to adulthood, including ensuring youth have been informed of the availability of Medicaid coverage. The parties agreed that this commitment would be measured by the rate of foster youth aging out of the system who have access to Medicaid. The designated performance standard for this commitment is 95 percent.

During MISEP 17, 276 youth aged out of the foster care system. Of those youth, DHHS reported 272 (98.6 percent) had access to Medicaid on the first day of the month following foster care discharge. DHHS exceeded the designated performance standard of 95 percent for this commitment. *Per the MISEP, compliance during this period makes the commitment eligible to move to "To Be Maintained."*

## Achieving Permanency

*Support for Youth Transitioning to Adulthood, Permanency (6.37)*

The MISEP requires DHHS to continue to implement policies and provide services to support the rate of older youth achieving permanency. The parties agreed that this commitment would be measured by examining the outcomes of all older youth who exit foster care during the monitoring period and comparing rates of exits to permanency and rates of exits to emancipation. For purposes of this commitment, older youth is defined as youth aged 15 or older with a permanency goal of reunification, guardianship, adoption or APPLA. The performance standard for this commitment is positive trending, or any reduction in the rates of older youth exiting without permanency.

During MISEP 17, there were 544 youth who were 15 years and older who exited foster care. Of those, 300 (55.0 percent) discharged with an exit type of reunification, adoption, or guardianship. This is the first period during which performance was measured for this commitment, positive trending will be evaluated in future report periods.

**Appendix A. Age Range of Children in Care on December 31, 2019 by County**

| County Name | Less than a year | | 1-2 years | | 2-3 years | | 3-6 years | | 6 years plus | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Children | % | Children | % | Children | % | Children | % | Children | % | |
| Icona | 11 | 58% | 5 | 26% | 3 | 16% | 0 | 0% | 0 | 0% | 19 |
| Alger | 11 | 79% | 2 | 14% | 1 | 7% | 0 | 0% | 0 | 0% | 14 |
| Allegan | 77 | 52% | 50 | 34% | 11 | 7% | 10 | 7% | 1 | 1% | 149 |
| Alpena | 16 | 29% | 21 | 38% | 12 | 22% | 5 | 9% | 1 | 2% | 55 |
| Antrim | 10 | 33% | 16 | 53% | 1 | 3% | 3 | 10% | 0 | 0% | 30 |
| Arenac | 13 | 59% | 7 | 32% | 2 | 9% | 0 | 0% | 0 | 0% | 22 |
| Baraga | 0 | 0% | 0 | 0% | 3 | 75% | 1 | 25% | 0 | 0% | 4 |
| Barry | 27 | 60% | 12 | 27% | 4 | 9% | 2 | 4% | 0 | 0% | 45 |
| Bay | 84 | 43% | 68 | 35% | 19 | 10% | 22 | 11% | 3 | 2% | 196 |
| Benzie | 9 | 60% | 5 | 33% | 0 | 0% | 1 | 7% | 0 | 0% | 15 |
| Berrien | 130 | 47% | 67 | 25% | 40 | 15% | 33 | 12% | 4 | 1% | 274 |
| Branch | 45 | 48% | 31 | 33% | 11 | 12% | 6 | 7% | 0 | 0% | 93 |
| Calhoun | 141 | 43% | 99 | 30% | 55 | 17% | 32 | 10% | 2 | 1% | 329 |
| Cass | 48 | 39% | 38 | 31% | 13 | 11% | 19 | 15% | 5 | 4% | 123 |
| Central Office | 1 | 17% | 1 | 17% | 3 | 50% | 1 | 17% | 0 | 0% | 6 |
| Charlevoix | 3 | 27% | 3 | 27% | 2 | 18% | 3 | 27% | 0 | 0% | 11 |
| Cheboygan | 18 | 60% | 8 | 27% | 4 | 13% | 0 | 0% | 0 | 0% | 30 |
| Chippewa | 13 | 35% | 11 | 30% | 5 | 14% | 6 | 16% | 2 | 5% | 37 |
| Clare | 14 | 25% | 22 | 39% | 14 | 25% | 3 | 5% | 4 | 7% | 57 |
| Clinton | 23 | 66% | 10 | 29% | 2 | 6% | 0 | 0% | 0 | 0% | 35 |
| Crawford | 19 | 36% | 18 | 34% | 12 | 23% | 3 | 6% | 1 | 2% | 53 |
| Delta | 39 | 55% | 25 | 35% | 6 | 9% | 1 | 1% | 0 | 0% | 71 |
| Dickinson | 21 | 57% | 10 | 27% | 3 | 8% | 3 | 8% | 0 | 0% | 37 |
| Eaton | 58 | 63% | 19 | 21% | 9 | 10% | 6 | 7% | 0 | 0% | 92 |
| Emmet | 8 | 32% | 10 | 40% | 6 | 24% | 0 | 0% | 1 | 4% | 25 |
| Genesee | 261 | 46% | 142 | 25% | 76 | 14% | 72 | 13% | 13 | 2% | 564 |
| Gladwin | 34 | 72% | 5 | 11% | 1 | 2% | 5 | 11% | 2 | 4% | 47 |
| Gogebic | 21 | 50% | 6 | 14% | 9 | 21% | 6 | 14% | 0 | 0% | 42 |
| Grand Traverse | 40 | 59% | 21 | 31% | 6 | 9% | 0 | 0% | 1 | 1% | 68 |
| Gratiot | 15 | 40% | 21 | 55% | 2 | 5% | 0 | 0% | 0 | 0% | 38 |
| Hillsdale | 43 | 52% | 21 | 26% | 12 | 15% | 5 | 6% | 1 | 1% | 82 |
| Houghton | 4 | 31% | 3 | 23% | 4 | 31% | 1 | 8% | 1 | 8% | 13 |
| Huron | 22 | 67% | 5 | 15% | 4 | 12% | 2 | 6% | 0 | 0% | 33 |
| Ingham | 208 | 46% | 112 | 25% | 70 | 15% | 51 | 11% | 16 | 4% | 457 |
| Ionia | 34 | 51% | 17 | 25% | 11 | 16% | 4 | 6% | 1 | 1% | 67 |
| Iosco | 12 | 23% | 30 | 57% | 3 | 6% | 5 | 9% | 3 | 6% | 53 |
| Iron | 13 | 62% | 6 | 29% | 2 | 10% | 0 | 0% | 0 | 0% | 21 |
| Isabella | 37 | 54% | 13 | 19% | 11 | 16% | 6 | 9% | 1 | 1% | 68 |
| Jackson | 118 | 44% | 109 | 41% | 26 | 10% | 14 | 5% | 2 | 1% | 269 |
| Kalamazoo | 203 | 44% | 143 | 31% | 61 | 13% | 50 | 11% | 7 | 2% | 464 |

| County Name | Less than a year | | 1-2 years | | 2-3 years | | 3-6 years | | 6 years plus | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Children | % | Children | % | Children | % | Children | % | Children | % | |
| Kalkaska | 12 | 41% | 8 | 28% | 8 | 28% | 1 | 3% | 0 | 0% | 29 |
| Kent | 310 | 40% | 279 | 36% | 106 | 14% | 71 | 9% | 17 | 2% | 783 |
| Lake | 6 | 40% | 5 | 33% | 0 | 0% | 2 | 13% | 2 | 13% | 15 |
| Lapeer | 19 | 54% | 12 | 34% | 1 | 3% | 3 | 9% | 0 | 0% | 35 |
| Leelanau | 1 | 14% | 3 | 43% | 2 | 29% | 0 | 0% | 1 | 14% | 7 |
| Lenawee | 85 | 56% | 42 | 28% | 16 | 11% | 9 | 6% | 1 | 1% | 153 |
| Livingston | 40 | 38% | 39 | 37% | 12 | 11% | 14 | 13% | 1 | 1% | 106 |
| Luce | 2 | 67% | 0 | 0% | 0 | 0% | 1 | 33% | 0 | 0% | 3 |
| Mackinac | 8 | 50% | 0 | 0% | 3 | 19% | 3 | 19% | 2 | 13% | 16 |
| Macomb | 193 | 38% | 176 | 34% | 71 | 14% | 58 | 11% | 14 | 3% | 512 |
| Manistee | 17 | 42% | 16 | 39% | 3 | 7% | 4 | 10% | 1 | 2% | 41 |
| Marquette | 18 | 49% | 13 | 35% | 2 | 5% | 4 | 11% | 0 | 0% | 37 |
| Mason | 19 | 45% | 14 | 33% | 7 | 17% | 1 | 2% | 1 | 2% | 42 |
| Mecosta | 11 | 48% | 6 | 26% | 2 | 9% | 1 | 4% | 3 | 13% | 23 |
| Menominee | 5 | 36% | 9 | 64% | 0 | 0% | 0 | 0% | 0 | 0% | 14 |
| Midland | 57 | 50% | 31 | 27% | 18 | 16% | 8 | 7% | 1 | 1% | 115 |
| Missaukee | 2 | 14% | 6 | 43% | 4 | 29% | 0 | 0% | 2 | 14% | 14 |
| Monroe | 48 | 31% | 52 | 34% | 42 | 28% | 11 | 7% | 0 | 0% | 153 |
| Montcalm | 70 | 60% | 29 | 25% | 7 | 6% | 8 | 7% | 2 | 2% | 116 |
| Montmorency | 4 | 36% | 5 | 46% | 0 | 0% | 1 | 9% | 1 | 9% | 11 |
| Muskegon | 205 | 51% | 105 | 26% | 64 | 16% | 27 | 7% | 3 | 1% | 404 |
| Newaygo | 51 | 58% | 19 | 22% | 15 | 17% | 2 | 2% | 1 | 1% | 88 |
| Oakland | 211 | 36% | 152 | 26% | 110 | 19% | 94 | 16% | 18 | 3% | 585 |
| Oceana | 13 | 62% | 7 | 33% | 1 | 5% | 0 | 0% | 0 | 0% | 21 |
| Ogemaw | 17 | 41% | 14 | 33% | 3 | 7% | 8 | 19% | 0 | 0% | 42 |
| Ontonagon | 1 | 20% | 2 | 40% | 2 | 40% | 0 | 0% | 0 | 0% | 5 |
| Osceola | 10 | 48% | 7 | 33% | 2 | 10% | 2 | 10% | 0 | 0% | 21 |
| Oscoda | 19 | 86% | 2 | 9% | 0 | 0% | 1 | 5% | 0 | 0% | 22 |
| Otsego | 20 | 53% | 9 | 24% | 4 | 11% | 5 | 13% | 0 | 0% | 38 |
| Ottawa | 94 | 50% | 63 | 33% | 22 | 12% | 7 | 4% | 3 | 2% | 189 |
| Presque Isle | 4 | 33% | 4 | 33% | 4 | 33% | 0 | 0% | 0 | 0% | 12 |
| Roscommon | 13 | 59% | 3 | 14% | 3 | 14% | 1 | 5% | 2 | 9% | 22 |
| Saginaw | 85 | 51% | 44 | 27% | 20 | 12% | 12 | 7% | 5 | 3% | 166 |
| Sanilac | 24 | 43% | 20 | 36% | 10 | 18% | 2 | 4% | 0 | 0% | 56 |
| Schoolcraft | 9 | 50% | 6 | 33% | 3 | 17% | 0 | 0% | 0 | 0% | 18 |
| Shiawassee | 26 | 31% | 35 | 42% | 14 | 17% | 8 | 10% | 1 | 1% | 84 |
| St. Clair | 104 | 39% | 83 | 31% | 47 | 18% | 25 | 9% | 8 | 3% | 267 |
| St. Joseph | 64 | 41% | 52 | 34% | 17 | 11% | 17 | 11% | 5 | 3% | 155 |
| Tuscola | 12 | 35% | 13 | 38% | 4 | 12% | 3 | 9% | 2 | 6% | 34 |
| Van Buren | 41 | 28% | 60 | 41% | 31 | 21% | 10 | 7% | 6 | 4% | 148 |
| Washtenaw | 78 | 53% | 32 | 22% | 18 | 12% | 13 | 9% | 5 | 3% | 146 |
| Wayne | 872 | 31% | 774 | 28% | 574 | 21% | 489 | 18% | 78 | 3% | 2787 |
| Wexford | 32 | 58% | 13 | 24% | 5 | 9% | 4 | 7% | 1 | 2% | 55 |
| **Total** | **4836** | **41%** | **3476** | **30%** | **1816** | **16%** | **1311** | **11%** | **259** | **2%** | **11698** |

**Appendix B. Length of Stay of Children in Care on December 31, 2019 By County**

| County Name | Ages 0-6 | | Ages 7-11 | | Ages 12-17 | | Ages 18+ | | Total |
|---|---|---|---|---|---|---|---|---|---|
| | Children | % | Children | % | Children | % | Children | % | |
| Alcona | 7 | 40% | 4 | 21% | 8 | 42% | 0 | 0% | 19 |
| Alger | 7 | 50% | 4 | 29% | 3 | 21% | 0 | 0% | 14 |
| Allegan | 58 | 40% | 39 | 26% | 46 | 31% | 6 | 4% | 149 |
| Alpena | 26 | 47% | 7 | 13% | 17 | 31% | 5 | 9% | 55 |
| Antrim | 15 | 50% | 6 | 20% | 8 | 27% | 1 | 3% | 30 |
| Arenac | 13 | 59% | 3 | 14% | 5 | 23% | 1 | 5% | 22 |
| Baraga | 4 | 100% | 0 | 0% | 0 | 0% | 0 | 0% | 4 |
| Barry | 23 | 51% | 5 | 11% | 14 | 31% | 3 | 7% | 45 |
| Bay | 71 | 36% | 48 | 25% | 64 | 33% | 13 | 7% | 196 |
| Benzie | 1 | 7% | 2 | 13% | 10 | 67% | 2 | 13% | 15 |
| Berrien | 148 | 54% | 64 | 23% | 54 | 20% | 8 | 3% | 274 |
| Branch | 51 | 55% | 20 | 22% | 21 | 23% | 1 | 1% | 93 |
| Calhoun | 139 | 42% | 87 | 26% | 87 | 26% | 16 | 5% | 329 |
| Cass | 58 | 47% | 26 | 21% | 31 | 25% | 8 | 7% | 123 |
| Central Office | 4 | 67% | 0 | 0% | 0 | 0% | 2 | 33% | 6 |
| Charlevoix | 7 | 64% | 1 | 9% | 3 | 27% | 0 | 0% | 11 |
| Cheboygan | 19 | 63% | 4 | 13% | 7 | 23% | 0 | 0% | 30 |
| Chippewa | 19 | 51% | 10 | 27% | 7 | 19% | 1 | 3% | 37 |
| Clare | 21 | 37% | 14 | 25% | 20 | 35% | 2 | 4% | 57 |
| Clinton | 21 | 60% | 8 | 23% | 6 | 17% | 0 | 0% | 35 |
| Crawford | 19 | 36% | 18 | 34% | 12 | 23% | 4 | 8% | 53 |
| Delta | 46 | 65% | 14 | 20% | 9 | 13% | 2 | 3% | 71 |
| Dickinson | 21 | 57% | 12 | 32% | 4 | 11% | 0 | 0% | 37 |
| Eaton | 38 | 41% | 13 | 14% | 33 | 36% | 8 | 9% | 92 |
| Emmet | 10 | 40% | 9 | 36% | 5 | 20% | 1 | 4% | 25 |
| Genesee | 264 | 47% | 120 | 21% | 143 | 25% | 37 | 7% | 564 |
| Gladwin | 14 | 30% | 12 | 26% | 21 | 45% | 0 | 0% | 47 |
| Gogebic | 23 | 55% | 10 | 24% | 7 | 17% | 2 | 5% | 42 |
| Grand Traverse | 41 | 60% | 12 | 18% | 11 | 16% | 4 | 6% | 68 |
| Gratiot | 21 | 55% | 11 | 29% | 6 | 16% | 0 | 0% | 38 |
| Hillsdale | 45 | 55% | 18 | 22% | 17 | 21% | 2 | 2% | 82 |
| Houghton | 6 | 46% | 1 | 8% | 6 | 46% | 0 | 0% | 13 |
| Huron | 19 | 58% | 6 | 18% | 8 | 24% | 0 | 0% | 33 |
| Ingham | 220 | 48% | 94 | 21% | 106 | 23% | 37 | 8% | 457 |
| Ionia | 33 | 49% | 13 | 19% | 18 | 27% | 3 | 5% | 67 |
| Iosco | 17 | 32% | 16 | 30% | 16 | 30% | 4 | 8% | 53 |
| Iron | 15 | 71% | 4 | 19% | 2 | 10% | 0 | 0% | 21 |
| Isabella | 33 | 49% | 11 | 16% | 20 | 29% | 4 | 6% | 68 |
| Jackson | 137 | 51% | 58 | 22% | 64 | 24% | 10 | 4% | 269 |
| Kalamazoo | 214 | 46% | 107 | 23% | 110 | 24% | 33 | 7% | 464 |

| County Name | Ages 0-6 | | Ages 7-11 | | Ages 12-17 | | Ages 18+ | | Total |
|---|---|---|---|---|---|---|---|---|---|
| | Children | % | Children | % | Children | % | Children | % | |
| Kalkaska | 16 | 55% | 8 | 28% | 4 | 14% | 1 | 3% | 29 |
| Kent | 367 | 47% | 151 | 19% | 212 | 27% | 53 | 7% | 783 |
| Lake | 7 | 47% | 1 | 7% | 6 | 40% | 1 | 7% | 15 |
| Lapeer | 11 | 31% | 6 | 17% | 16 | 46% | 2 | 6% | 35 |
| Leelanau | 0 | 0% | 3 | 43% | 4 | 57% | 0 | 0% | 7 |
| Lenawee | 83 | 54% | 36 | 24% | 30 | 20% | 4 | 3% | 153 |
| Livingston | 52 | 49% | 20 | 19% | 31 | 29% | 3 | 3% | 106 |
| Luce | 3 | 100% | 0 | 0% | 0 | 0% | 0 | 0% | 3 |
| Mackinac | 7 | 44% | 3 | 19% | 4 | 25% | 2 | 13% | 16 |
| Macomb | 257 | 50% | 101 | 20% | 128 | 25% | 26 | 5% | 512 |
| Manistee | 18 | 44% | 14 | 34% | 7 | 17% | 2 | 5% | 41 |
| Marquette | 22 | 60% | 2 | 5% | 12 | 32% | 1 | 3% | 37 |
| Mason | 26 | 62% | 6 | 14% | 9 | 21% | 1 | 2% | 42 |
| Mecosta | 6 | 26% | 8 | 35% | 5 | 22% | 4 | 17% | 23 |
| Menominee | 6 | 43% | 2 | 14% | 6 | 43% | 0 | 0% | 14 |
| Midland | 58 | 50% | 21 | 18% | 31 | 27% | 5 | 4% | 115 |
| Missaukee | 8 | 57% | 2 | 14% | 2 | 14% | 2 | 14% | 14 |
| Monroe | 80 | 52% | 43 | 28% | 27 | 18% | 3 | 2% | 153 |
| Montcalm | 43 | 37% | 34 | 29% | 31 | 27% | 8 | 7% | 116 |
| Montmorency | 7 | 64% | 1 | 9% | 2 | 18% | 1 | 9% | 11 |
| Muskegon | 198 | 49% | 94 | 23% | 100 | 25% | 12 | 3% | 404 |
| Newaygo | 45 | 51% | 28 | 32% | 11 | 13% | 4 | 5% | 88 |
| Oakland | 283 | 48% | 119 | 20% | 142 | 24% | 41 | 7% | 585 |
| Oceana | 12 | 57% | 7 | 33% | 2 | 10% | 0 | 0% | 21 |
| Ogemaw | 17 | 41% | 9 | 21% | 13 | 31% | 3 | 7% | 42 |
| Ontonagon | 1 | 20% | 3 | 60% | 0 | 0% | 1 | 20% | 5 |
| Osceola | 10 | 48% | 1 | 5% | 9 | 43% | 1 | 5% | 21 |
| Oscoda | 9 | 41% | 4 | 18% | 9 | 41% | 0 | 0% | 22 |
| Otsego | 16 | 42% | 12 | 32% | 9 | 24% | 1 | 3% | 38 |
| Ottawa | 85 | 45% | 58 | 31% | 34 | 18% | 12 | 6% | 189 |
| Presque Isle | 8 | 67% | 0 | 0% | 4 | 33% | 0 | 0% | 12 |
| Roscommon | 10 | 46% | 5 | 23% | 5 | 23% | 2 | 9% | 22 |
| Saginaw | 71 | 43% | 34 | 21% | 44 | 27% | 17 | 10% | 166 |
| Sanilac | 27 | 48% | 15 | 27% | 13 | 23% | 1 | 2% | 56 |
| Schoolcraft | 11 | 61% | 5 | 28% | 2 | 11% | 0 | 0% | 18 |
| Shiawassee | 48 | 57% | 16 | 19% | 19 | 23% | 1 | 1% | 84 |
| St. Clair | 132 | 49% | 56 | 21% | 68 | 26% | 11 | 4% | 267 |
| St. Joseph | 74 | 48% | 45 | 29% | 33 | 21% | 3 | 2% | 155 |
| Tuscola | 14 | 41% | 7 | 21% | 9 | 27% | 4 | 12% | 34 |
| Van Buren | 75 | 51% | 35 | 24% | 36 | 24% | 2 | 1% | 148 |
| Washtenaw | 70 | 48% | 30 | 21% | 32 | 22% | 14 | 10% | 146 |
| Wayne | 1316 | 47% | 634 | 23% | 624 | 22% | 213 | 8% | 2787 |
| Wexford | 28 | 51% | 9 | 16% | 14 | 26% | 4 | 7% | 55 |
| Total | 5585 | 48% | 2599 | 22% | 2828 | 24% | 686 | 6% | 11698 |

**Appendix C. Validated Performance Data, ISEP 14 & 15**

| Commitment | | | ISEP 14 | ISEP 15 |
|---|---|---|---|---|
| ISEP # | Subject | Performance Standard | Validated Performance | Validated Performance |
| 6.1 | Recurrence of Maltreatment | 94.6% | N/A | 93.4% |
| 6.2 | Maltreatment in Care | 99.68% | N/A | 99.28% |
| 6.3 | Permanency Indicator 1 | 40.5% | 28.9% | 27.7% |
| 6.7 | Placement Standard | 100% | 76.0% | 74.8% |
| 6.8 | Jail and Detention Facilities | 100% | 93.4% | 92.1% |
| 6.9 | Placement Outside 75-Mile Radius | 95% | 93.8% | 92.1% |
| 6.10.a | Separation of Siblings | 90% | 65.6% | 66.5% |
| 6.12 | Maximum Children in Foster Home | 100% | 88.0% | 89.7% |
| 6.13 | Emergency or Temporary Facilities, Length of Stay | 95% | 63.1% | 54.9% |
| 6.14 | Emergency or Temporary Facilities, Repeated Placement | 97% | 1.6% | 1.3% |
| 6.15 | Reviewing Long-Term Institutional Placements | 97% | 51.6% | 50.6% |
| 6.17.a | Relative Foster Parent Licensing, Waivers | 90% | 17.6% | 14.3% |
| 6.17.b | Relative Foster Parent Licensing, Waivers | 90% | 23.4% | 26.0% |
| 6.18 | Relative Foster Parent Licensing, Timeliness | 85% | 37.9% | 34.6% |
| 6.19 | Relative Foster Parent Licensing, Proportion Licensed | 80% | 36.0% | 32.4% |
| 6.20 | CPS Investigations, Commencement | 95% | 93.8% | 94.8% |
| 6.21 | CPS Investigations, Commencement and Completion | 90% | 85.5% | 79.7% |
| 6.23 | Supervisors | 95% | 86.3% | 85.1% |
| 6.24 | Foster Care Workers | 95% | 89.2% | 90.2% |
| 6.25 | Adoption Workers | 95% | 69.0% | 66.3% |
| 6.26 | CPS Investigation Workers | 95% | 92.3% | 91.0% |
| 6.27 | CPS Ongoing Workers | 95% | 94.4% | 91.8% |
| 6.28 | POS Workers | 95% | 92.5% | 95.7% |
| 6.29 | Licensing Workers | 95% | 94.9% | 94.5% |
| 6.30 (1) | Supervisory Oversight, Initial Service Plans | 95% | 86.9% | 93.1% |
| 6.30 (2) | Supervisory Oversight, Updated Service Plans | 95% | 87.2% | 95.6% |
| 6.31 | Timeliness of Initial Service Plans | 95% | 78.2% | 81.1% |
| 6.32 | Timeliness of Updated Service Plans | 95% | 85.4% | 85.0% |
| 6.33 | Assessments and Service Plans, Content | 83% | 62.5% | 62.0% |
| 6.34 | Provision of Services | 83% | 58.3% | 58.0% |
| 6.39.a | Worker-Child Visits: Face to Face Visits Completed Timely (Monthly Contact Type) | 95% | 87.1% | 87.5% |
| 6.39.a | Worker-Child Visits: Own Home Visits Completed Timely (Monthly Contact Type) | 95% | 93.7% | 93.6% |

| Commitment | | | ISEP 14 | ISEP 15 |
|---|---|---|---|---|
| ISEP # | Subject | Performance Standard | Validated Performance | Validated Performance |
| 6.39.a | Worker-Child Visits: Private Visits Completed Timely (Monthly Contact Type) | 95% | 94.5% | 94.9% |
| 6.39.b | Worker-Child Visits: Face to Face Visits Completed Timely (Monthly Contact Type) | 95% | 97.3% | 97.4% |
| 6.39.b | Worker-Child Visits: Own Home Visits Completed Timely (Monthly Contact Type) | 95% | 96.1% | 96.2% |
| 6.39.b | Worker-Child Visits: Private Visits Completed Timely (Monthly Contact Type) | 95% | 95.3% | 95.8% |
| 6.40.a | Worker-Parent Contacts: Face to Face Visits Completed Timely (Entry Contact Type) | 85% | 71.7% | 73.2% |
| 6.40.a | Worker-Parent Contacts: Own Home Visits Completed Timely (Entry Contact Type) | 85% | 48.7% | 49.6% |
| 6.40.b | Worker-Parent Contacts: Face to Face Visits Completed Timely (Monthly Contact Type) | 85% | 66.1% | 68.2% |
| 6.41 | Parent-Child Contracts | 85% | 62.4% | 64.9% |
| 6.42 | Sibling Visitation | 85% | 59.2% | 61.8% |
| 6.43 (1) | Medical and Mental Health Exams: 30-Day Initial Medical | 85% | 87.2% | 83.6% |
| 6.43 (2) | Medical and Mental Health Exams: 45-Day Initial Medical | 95% | 91.7% | 89.3% |
| 6.44 | Initial Dental Exams | 90% | 80.9% | 78.6% |
| 6.47 | Exams and Screenings | 95% | 68.9% (well-child); 85.7% (medical); 90.4% (dental) | 68.9% (well-child); 86.6% (medical); 90.7% (dental) |
| 6.51 | Medical Care and Coverage, At Entry | 95% | 90.5% | 90.1% |
| 6.52 | Medical Care and Coverage, Subsequent | 95% | 84.1% | 82.7% |
| 6.54 | Psychotropic Medication, Informed Consent | 97% | 85.0% | 63.0% |

**Appendix D. QAP Baseline Performance, MISEP 16**

| Commitment | Baseline Performance |
|---|---|
| 6.6b - Separation of Siblings | 50.7% |
| 6.10a - Relative Foster Parents, Initial Placement | 36.4% |
| 6.10b - Relative Foster Parents, Annual Renewal | 15.9% |
| 6.12a - CPS Investigations, Screen Outs | 84.8% |
| 6.12b - CPS Investigations, Transfers | 65.0% |
| 6.34 - Psychotropic Medication, Documentation | 28.4% |

**Appendix E. Plaintiff's Letter to Monitor – July 15, 2020**



July 15, 2020

Kevin Ryan
Eileen Crummy
Public Catalyst
kevinmichaelryan1967@gmail.com
ecrummy@public-catalyst.com
(via email)

Re: Lakeside Academy Incident, MISEP Provisions

Dear Kevin and Eileen,

We write to express our concern regarding the April 29, 2020 incident at Lakeside Academy involving the restraint and tragic death of Cornelius Fredericks, a 16-year-old youth in the custody of the Michigan Department of Health and Human Services ("MDHHS"). We understand that a subsequent June 17, 2020 Department of Child Welfare Licensing Report found 10 licensing violations at Lakeside, including instances of excessive discipline and improper restraint (including peer-on-peer restraint), many of which were found to be repeat violations.

As you know, the Modified Implementation Sustainability and Exit Plan ("MISEP") includes a number of commitments related to the safety of children in foster care, including the oversight of private providers and institutions like Lakeside. We appreciate the efforts of the Monitors to provide thorough reporting on the safety and oversight commitments in the MISEP that are currently categorized as "To Be Maintained" and "To Be Achieved." Some of these safety-related commitments currently reside in the "Structures and Policies" category, and therefore, receive no active monitoring.

MISEP, Section 3.1(d), provides the following with respect to commitments in the Structures and Policies category:

> At the Monitor's discretion, the Monitors may request, and DHHS will supply, information and data relating to any Commitment in this classification. If the information and data demonstrates a substantial departure from the structural or policy Commitment, the Monitors may request that DHHS propose corrective action. If DHHS fails, within a reasonable period of time as determined by the Monitors, to propose and implement a corrective action that reestablishes compliance with the structural or policy Commitment, the Monitors may, in their discretion, move the Commitment into section 6 (To

Be Achieved) or Section 5 (To be Maintained) and undertake full monitoring in relation to the Commitment.

Given the circumstances of the incident at Lakeside and the serious findings of the MDHHS investigation, Plaintiffs request that the Monitors exercise their rights under Section 3.1(d) to request information from MDHHS on the following commitments currently in Structures and Policies: Section 4.7 (Commitment 7, Maltreatment in Care Units), Section 4.19 (Commitment 19, Corporal Punishment & Seclusion/Isolation, Prohibition and Policy), and Section 4.20 (Commitment 20, Contract Agency Requirements). Thank you for your continued focus and effort in support of the critical commitments made in the MISEP.

Sincerely,

/s/ *Elizabeth Pitman Gretter*

Elizabeth Pitman Gretter
Children's Rights, Inc.
88 Pine Street, Suite 800
New York, NY 10005
(216) 401-1609

cc: Cassandra Drysdale-Crown
Toni Harris
Neil Giovanatti
Assistants Attorney General
Health Education & Family Services Division
DrysdaleCrownC@michigan.gov
HarrisT19@michigan.gov
GiovanattiN@michigan.gov
(via email)

**Appendix F. Michigan DHHS Corrective Action Plan – September 3, 2020**



STATE OF MICHIGAN
DEPARTMENT OF HEALTH AND HUMAN SERVICES
LANSING

GRETCHEN WHITMER
GOVERNOR

ROBERT GORDON
DIRECTOR

**M E M O R A N D U M**

**DATE:**     September 3, 2020
**TO:**        Kevin Ryan and Eileen Crummy, Public Catalyst
**FROM:**     JooYeun Chang, MDHHS Children's Services Agency Executive Director
**SUBJECT:**  MISEP Section 3.1(d) - Lakeside Academy

This communication is in response to your inquiry on August 19, 2020, pursuant to Section 3.1(d), requesting that MDHHS submit a summary of corrective actions taken in response to the tragic death of a ward placed Lakeside Academy.

Upon an immediate review of this incident, Children's Services Agency recognized that its licensing rules, restraint policies, regulatory and contractual oversight of CCIs were insufficient to assure child safety and wellbeing. The tragedy at Lakeside made clear an urgent need to limit use of restraints and improve CCI oversight, including better tracking of violations and confirmed child maltreatment.  From a systems perspective, it also made clear the need to expedite adverse licensing action in response to repeat non-compliance or safety violations, and to reduce the state's reliance on CCIs for children in child welfare. For the past year, Michigan has been working with CCIs to create contractual standards that incorporate the requirements of Qualified Residential Treatment Program (QRTP), including trauma informed practices, reduced CCI placements and lengths of stay, youth engagement and family involvement in treatment, aftercare, and incorporating measurable performance standards. Michigan anticipates executing the new contracts early in 2021 and becoming QRTP compliant by April 2021. Taken together, we believe the more immediate steps to reduce restraint use and improve licensing oversight along with the transformational steps we are taking to decrease reliance on CCIs and implement QRTP, will result in improved safety and wellbeing for children in our care.

MDHHS understands there is particular interest in demonstrating corrective action in the following commitments that are currently situated in Structures and Policies of the agreement.

1. Section 4.7 (Commitment 7) – Maltreatment in Care Units
2. Section 4.19 (Commitment 19) – Corporal Punishment & Seclusion/Isolation, Prohibition and Policy
3. Section 4.20 (Commitment 20) – Contract Agency Requirements

Below are highlights of the activities initiated by CSA to improve immediate child safety in CCIs. Please note this is not an exhaustive list.

1. *Section 4.7 (Commitment 7) – Maltreatment in Care Units - Careful and Thorough Evaluation of Agency History and Trends: The department will create processes to identify rule violation and MIC history for all facilities. CSA will use this information to identify trends and integrate historical information in on-going monitoring to enhance safety practices and oversight immediately and ongoing using the following strategies:*

   - *Immediate review of facilities to evaluate critical safety needs by:*
     - Reviewed agencies with established rule violations and placed 14 CCIs on provisional licenses as a result.
     - Reviewed agencies with second provisional licenses and enacted weekly visits by DCWL.
     - Reviewed agencies on a first provisional license and enacted monthly visits by DCWL.
     - Reviewed CCIs with two or more safety, or one or more serious violation within the last 24 months and as a result the following occurred:
       - 22 new Corrective Action Plans (CAPS) generated.
       - 20 new safety plans developed.
       - 9 on-site technical assistance visits provided within 30 days.
       - Review of 6 existing CAPS
     - Revocation of licenses:
       - Four facilities recommended for revocation due to repeated safety concerns.

   - *Ongoing analysis of Maltreatment in Care to ensure that trends and facility safety issues are recognized early:*
     - **Quality Oversight of MIC Investigations:** A monthly MIC Manager Quality Review Process will be initiated for CCIs, commencing with agencies with the highest number of prior complaints, regardless of dispositions, with the intent of:
       - assess the quality, policy/procedure compliance and any pattern or trends to support or enhance existing remediation strategies.
       - ensure timely responsiveness to newly identified trends or risks and initiate remediation as a result.

       Findings will be shared with DCWL and CSA leadership.  CPS-MIC managers have been trained and 8 reviews are currently being conducted.

     - **Elevated Oversight of MIC Investigations:** Second line reviews are completed for all CPS-MIC investigations of all complaints pending substantiation. For any CCI with 3 or more substantiations w/in the last year, the case will be reviewed by the CPS-MIC director. The CPS-MIC director will hold a case consultation with DCWL regarding patterns and action steps needed to ensure safety.
     - **Secondary Review of Denied Complaints**: DCQI will complete a monthly review involving 10% of denied MIC investigations involving a CCI.

2. *Section 4.19 (Commitment 19) – Corporal Punishment & Seclusion/Isolation, Prohibition and Policy -Prohibition of restraints: The department will work with experts, community stakeholders and providers towards goal of preventing and*

*striving to eliminate the use of restraints in all licensed child caring institutions. Specific activities include:*

- Issuance of Emergency Administrative Rules which create clear safeguards against dangerous form of restraints, clarified the limited circumstances when restraints could be used to protect against physical harm, and created new reporting requirements to create a baseline to measure progress over time. See attached.
- Issued two communications to all licensed CCIs requiring timely reporting of all restraint incidents to MDHHS effective 7/17/20 and certification of CCI policy and procedure development to demonstrate implementation of the new Emergency Rules by 8/20/20. See attached.
- Developing a workgroup to implement the Annie E. Casey Foundation report recommendations. Subgroups to focus on:
  - o Plan to eliminate the use of restraints.
  - o Draft permanent revisions to CCI and COF rules.
  - o Developing clear disciplinary process for rule violations.
  - o Create new standards of practice and new service lines that engage families and youth, are neurodevelopmental and sensory based approaches that focus on positive youth development.
- Creating a new contract management unit that tracks safety, permanency, and wellbeing outcomes.
- Focusing on permanency practice strategies with a sense of urgency for every child who is currently placed and before any child is placed in a CCI.
- Immediately provide technical assistance to CCI providers on positive youth engagement and violence prevention de-escalation techniques.
- Contract with the Building Bridges Initiative to provide ongoing services and technical assistance to providers as we implement the Annie E. Casey Foundation report recommendations.

3. *Section 4.20 (Commitment 20) – Contract Agency Requirements -Qualitative evaluation of ongoing practice: The department will continue conducting qualitative evaluations of system practice and policies and imbed improvement efforts in the CQI process through the following strategies:*
   - Ongoing qualitative analysis of child and agency level information focusing on:
     - o Consultants will commence investigations with a review of history.
     - o Case consultation will occur between MIC and DCWL for joint investigations prior to disposition.
     - o Pre-exit conferences will be held to review history and trends.
     - o Job aid for consultants and managers, and tracking methodology was developed on 7/29/20 to ensure processes are followed and trends/history are tracked.
   - Natural Evaluation of CCI Status and safety through unannounced visits:
     - o Weekly for second provisional.
     - o Monthly for first provisional.
     - o Quarterly for all facilities.
     - o Unannounced annual inspections to include conversations with youth.

- Enhanced managerial oversight:
  - Consultation to include monthly visit summary.
  - Managers will review corrective action plans with consultants within 7 days.
  - Ensure utilization of CAP template by all consultants.
  - Weekly meetings with consultant to review all pending investigations.
  - Within 7 days of receiving a Special Investigation Review, Manager will review previous 24-month investigations for the CCI.
- Ongoing CQI evaluation through DCQI/DCWL monthly data and quality meetings
- Careful analysis and review of DCWL structure to ensure deliberate and thoughtful action is taken to assess capacity, staffing, and structure to engage in all assigned tasks, such as licensing and compliance activities.
- Ongoing consideration of potential modifications to the current structure of compliance and quality assurance activities is an active area of focus for CSA leadership.
- Policy Change Preparation:
  - Policy changes proposed related to DCWL functions to enhance inclusion, evaluation and integration of MIC information and history into all investigative and CAP decisions.
  - Emergency Rule Certification Checklist Developed (see attached).


Attachments:
- 20-095 Incident Reporting for Child Caring Institutions
- 20-095.1 INCIDENT REPORT TEMPLATE
- 20-095.2 Parent Notification Sample
- 20-096 Guidelines for Implementing Emergency Rules for Child Caring Institutions
- 20-096.1 EMERGENCY RULE IMPLEMENTATION
- AEC CCI Recommendations Tracking Doc
- AEC Workgroup Overview Doc 8.11.20
- Child Welfare Strategy Groups Review and Recommendations
- DCWL Action plan and follow-up
- R400.4159 Resident Restraint