# Progress of the Michigan Department of Human Services

Monitoring Report for *Dwayne B. v. Whitmer*

MODIFIED IMPLEMENTATION, SUSTAINABILITY, AND EXIT PLAN

**ISSUED June 7, 2021**

MISEP 18

JANUARY TO JUNE 2020



PUBLIC CATALYST

# CONTENTS

Introduction ................................................................................................ 3

    Summary of Progress and Challenges ................................................................ 7

    Summary of Commitments ................................................................................ 9

    Methodology ..................................................................................................... 16

    Demographics .................................................................................................... 16

Organizational Capacity .............................................................................. 21

    Caseloads and Supervision ................................................................................ 21

Accountability ............................................................................................. 22

    Outcomes ............................................................................................................ 22

    Contract Oversight ............................................................................................. 24

    Quality Service Reviews ...................................................................................... 31

    Data Reporting .................................................................................................... 32

Permanency ................................................................................................ 34

    Developing Placement Resources for Children .................................................. 34

    Placement Standards .......................................................................................... 37

    Case Planning and Practice ................................................................................ 40

    Caseworker Visitation ........................................................................................ 41

Safety and Well-Being .................................................................................. 44

    Responding to Reports of Abuse and Neglect ................................................... 44

    Health and Mental Health .................................................................................. 46

Youth Transitioning to Adulthood ................................................................ 51

    Extending Eligibility and Services ....................................................................... 51

    Achieving Permanency ....................................................................................... 51

## FIGURES

Figure 1. Age of Children in Custody on June 30, 2020 ............................................................... 17

Figure 2. Placement Types of Children in Custody on June 30, 2020 ......................................... 19

Figure 3. Length of Stay in Care of Children in Custody on June 30, 2020 ................................. 19

## TABLES

Table 1. Race of Children in Custody on June 30, 2020 and Race of Children in the State of Michigan on July 1, 2019 ................................................................................................................. 18

Table 2. Exits from Care by Exit Type, January 1, 2020 to June 30, 2020 .................................. 20

Table 3. Federal Goals for Children in Custody as of June 30, 2020 .......................................... 20

Table 4. Race of Children in Emergency or Temporary Facilities, MISEP 18 .............................. 39

Table 5. Race of Children Experiencing a Subsequent Emergency or Temporary-Facility Placement ....... 40

Table 6. MISEP 18 Performance on Supervisory Oversight ....................................................... 41

Table 7. MISEP 18 Performance on Worker-Child Visitation ...................................................... 42

Table 8. MISEP 18 Performance on Worker-Parent Visitation .................................................... 43

Table 9. MISEP 18 Performance on Parent-Child Visitation ....................................................... 44

Table 10. MISEP 18 Performance on Sibling Visitation .............................................................. 44

Table 11. MISEP 18 Performance on Child Case File, Medical and Psychological ..................... 49

## APPENDICES

Appendix A. Stipulated Order Regarding Provisions 6.27 and 6.28 of the Modified Sustainability and Exit Plan (MISEP) .............................................................................................................. 53

Appendix B. Plaintiff's Letter to Monitor – July 15, 2020 .......................................................... 57

Appendix C. Michigan DHHS Corrective Action Plan – September 3, 2020 ............................... 59

Appendix D. Age Range of Children in Care on June 30, 2020 By County ................................. 63

Appendix E. Length of Stay of Children in Care on June 30, 2020 by County ........................... 65

Appendix F. MIC Data Report, June 2020 ................................................................................. 67

Appendix G. Stipulated Order Regarding Commitment Modifications Due to COVID-19 to the 1/1/2020 – 6/30/2020 Reporting Period of MISEP ...................................................................................... 89

# Introduction

This document serves as the fifteenth report to the Honorable Nancy G. Edmunds of the United States District Court for the Eastern District of Michigan in the matter of *Dwayne B. v. Whitmer*, covering Period 18 (January 1, 2020 to June 30, 2020) under the Modified Implementation, Sustainability and Exit Plan (MISEP). On June 27, 2019, the State of Michigan and the Michigan Department of Health and Human Services (DHHS) and Children's Rights, counsel for the plaintiffs, jointly submitted to the court the MISEP, which establishes a path for the improvement of Michigan's child welfare system. Judge Edmunds entered an order directing implementation of the MISEP following its submission by the parties.

Judge Edmunds had previously approved an Initial Agreement among the parties on October 24, 2008, a subsequent Modified Settlement Agreement on July 18, 2011, and an Implementation, Sustainability and Exit Plan (ISEP) on February 6, 2016. DHHS is a statewide multi-service agency providing cash assistance, food assistance, health services, child protection, prevention, and placement services on behalf of the State of Michigan. Children's Rights is a national advocacy organization with experience in class action reform litigation on behalf of children in child welfare systems.

In sum, the MISEP:

- Provides the plaintiff class relief by committing to specific improvements in DHHS' care for vulnerable children, with respect to their safety, permanency, and well-being;

- Requires the implementation of a comprehensive child welfare data and tracking system, with the goal of improving DHHS' ability to account for and manage its work with vulnerable children;

- Establishes benchmarks and performance standards that the State committed to meet to address risks of harm to children's safety, permanency, and well-being; and

- Provides a clear path for DHHS to exit court supervision after the successful achievement and maintenance of Performance Standards for each commitment agreed to by the parties in the MISEP.

The sections of the MISEP related to monitoring and reporting to the court remain largely unchanged from the parties' prior agreement, as do the sections regarding Enforcement, Dispute Resolution, and Attorneys' Fees.

Pursuant to the MISEP, the court appointed Kevin Ryan and Eileen Crummy of Public Catalyst to continue to serve as the court's monitors, charged with reporting on DHHS' progress

implementing its commitments. The monitors and their team are responsible for assessing the state's performance under the MISEP. The parties have agreed that the monitors shall take into account timeliness, appropriateness, and quality in reporting on DHHS' performance. Specifically, the MISEP provides that:

> "The monitors' reports shall set forth the steps taken by DHHS, the reasonableness of these efforts, and the adequacy of support for the implementation of these steps; the quality of the work done by DHHS in carrying out those steps; and the extent to which that work is producing the intended effects and/or the likelihood that the work will produce the intended effects."

Following the onset of the pandemic in Michigan and upon agreement of the parties, on September 15, 2020, Judge Edmunds entered a "Stipulated Order Regarding Commitment Modifications due to COVID-19 to the 01/01/2020 - 06/30/2020 Reporting Period of the MISEP," which recognized the potential impact of the health crisis on implementation of the MISEP.[1] On March 12, 2021, Judge Edmunds entered a "Stipulated Order Regarding Provisions 6.27 and 6.28 of the MISEP," which, in part, directs that "provisions 6.27 and 6.28 shall be held in abeyance and DHHS need not provide data to the Monitors or Plaintiffs for provisions 6.27 and 6.28" for Period 18.[2]

During Period 18, employees of Kalamazoo-based Lakeside Academy, a Child Caring Institution (CCI) owned by Sequel Youth and Family Services, physically restrained 16 year-old C.F. on the floor for 12 minutes, suffocating him and causing his death. A subsequent investigation by DHHS determined the restraint was both "improper" and "excessive." The monitors detailed that investigation in the Period 17 report to the Court.

On July 15, 2020, counsel for the Plaintiffs-children in this action wrote to the monitors expressing concern about the conditions that led to the death of C.F.[3] Referring to the MISEP, counsel wrote in part:

---

[1] The Stipulated Order states, "The Parties agree that performance on the following MISEP provisions may be impacted by COVID-19: 6.16, 6.21(a), 6.21(b), 6.22(a), 6.22(b), 6.23, 6.24, 6.25, 6.26, 6.27, 6.28, 6.29, 6.36(a), 6.4, and 6.37 (the "COVID-impacted commitments"). The parties anticipate DHHS performance on COVID-impacted commitments may be skewed as a result of the pandemic. The parties agree that for the Relevant Period, DHHS should not be penalized for negatively skewed performance. The parties agree that positively skewed performance should likewise not be used as a basis for exiting eligible provisions from court oversight. Accordingly, the parties agree that MDHHS performance on COVID-impacted commitments will not be used by either party to demonstrate sustained compliance or non-compliance under the terms of the MISEP."

[2] See Appendix A for a copy of the Stipulated Order.

[3] See Appendix B for a copy of the Plaintiffs' letter.

MISEP, Section 3.1(d), provides the following with respect to commitments in the Structures and Policies category:

At the Monitor's discretion, the Monitors may request, and DHHS will supply, information and data relating to any Commitment in this classification. If the information and data demonstrate a substantial departure from the structural or policy Commitment, the Monitors may request that DHHS propose corrective action. If DHHS fails, within a reasonable period of time as determined by the Monitors, to propose and implement a corrective action that reestablishes compliance with the structural or policy Commitment, the Monitors may, in their discretion, move the Commitment into section 6 (To Be Achieved) or Section 5 (To be Maintained) and undertake full monitoring in relation to the Commitment.

Given the circumstances of the incident at Lakeside and the serious findings of the MDHHS investigation, Plaintiffs request that the Monitors exercise their rights under Section 3.1(d) to request information from MDHHS on the following commitments currently in Structures and Policies: Section 4.7 (Commitment 7, Maltreatment in Care Units), Section 4.19 (Commitment 19, Corporal Punishment & Seclusion/Isolation, Prohibition and Policy), and Section 4.20 (Commitment 20, Contract Agency Requirements).

On August 19, 2020, the monitors requested DHHS propose and implement corrective action with respect to these three provisions in the MISEP that are presently not subject to active monitoring by virtue of their current placement in the Structures and Policies portion of the agreement:

Section 4.7 Maltreatment-in-Care Units (Commitment 7): DHHS will maintain regional maltreatment-in-care units, staffed by specially trained CPS staff, responsible for all investigations of abuse or neglect relating to any child in the foster care custody of DHHS. DHHS shall ensure dedicated supervision, oversight, and coordination of all maltreatment-in-care investigations.

Section 4.19 Corporal Punishment and Seclusion/Isolation, Prohibition and Policy (Commitment 19): DHHS shall prohibit the use of Positive Peer Culture, peer-on-peer restraint, and any other forms of corporal punishment in all foster care placements and shall maintain a policy regarding seclusion/isolation.

Section 4.20 Contract Agency Requirements (Commitment 20):

(a) DHHS's contracts with private CPAs and Child Caring Institutions ("CCI"s) shall be performance-based and shall include all of the following requirements: (1) compliance with performance goals as set forth in this Agreement; (2) compliance with all aspects of all DHHS policies and procedures that apply to the provider; (3)

5

any reports of suspected abuse or neglect of any Plaintiff while receiving such contracted placements or services shall be reported to DHHS for investigation; (4) all placement providers for foster children in DHHS foster care custody are prohibited from using or authorizing the use of corporal punishment for children under the care and supervision of DHHS or the private CPA or CCI; (5) any reports of suspected corporal punishment while in that provider's care shall be reported to DHHS and investigated by DHHS, the CPA, or the CCI, as necessary; and (6) all CCIs or private CPAs that provide placements and child welfare services to Plaintiffs report to DHHS accurate data on at least a six month basis in relation to the requirements of this Agreement. DHHS shall independently monitor and enforce these contracts. Further, DHHS shall maintain a set of enforcement measures to be imposed in the event that a contract agency fails to comply with material terms or requirements of the performance-based contract.

(b) DHHS shall give due consideration to any and all substantial incidents of abuse, neglect, and/or corporal punishment occurring in the placements licensed and supervised by a CPA or CCI at the time of processing its application for licensure renewal. The failure of a CPA or CCI to report suspected abuse or neglect of a child to DHHS shall result in an immediate investigation to determine the appropriate corrective action up to and including termination or modification of relevant portions of a contract, or placement of the provider on provisional licensing status. A repeated failure within one year shall result in a review of the contract agency's violations by a designated Administrative Review Team, which shall include the Director of CSA and the Director of the Division of Child Welfare Licensing (that division, the "DCWL") or its successor agency that shall consider mitigating and aggravating circumstances to determine the appropriate corrective action up to and including license revocation and contract termination.

(c) DHHS shall conduct annual contract evaluations of all CCIs and private CPAs providing placements and services to Plaintiffs to ensure, among other things, the safety and well-being of Plaintiffs and to ensure that the contract is complying with the applicable terms of this Agreement.

(d) DHHS shall maintain sufficient resources to permit its staff to undertake timely and competent contract enforcement activities as set forth in this section.

On September 3, 2020, DHHS submitted a corrective action plan memo to the monitors,[4] identifying steps the agency had already initiated following the death of C.F., and further action it planned to undertake. The agency wrote:

> Upon an immediate review of this incident, Children's Services Agency recognized that its licensing rules, restraint policies, regulatory and contractual oversight of CCIs were insufficient to assure child safety and well-being. The tragedy at Lakeside made clear an urgent need to limit use of restraints and improve CCI oversight, including better tracking of violations and confirmed child maltreatment. From a systems perspective, it also made clear the need to expedite adverse licensing action in response to repeat non-compliance or safety violations, and to reduce the state's reliance on CCIs for children in child welfare.

Pursuant to MISEP Section 3.19, the monitors commenced an assessment of the State's implementation of its proposed corrective action. That assessment is ongoing and the monitors have not yet determined whether compliance has been re-established or whether ongoing, active monitoring will re-commence with respect to Sections 4.7, 4.19 and 4.20. The monitors will detail the findings of this assessment in a future report to the Court.

This report to the Court reflects the efforts of the DHHS leadership team and the status of Michigan's reform efforts as of June 30, 2020. Defined as MISEP Period 18, this report includes progress for the first half of 2020.

## Summary of Progress and Challenges

Michigan DHHS met required performance standards in 13 of 35 areas monitored for compliance in MISEP Period 18.[5] Among the areas where the agency has already achieved high levels of performance are:

- *Foster Care Worker Caseloads:* DHHS agreed that full-time staff, public and private, solely engaged in foster care work, would be responsible for no more than 15 children each. DHHS averaged 95 percent of staff meeting the standard during MISEP 18, meeting the target for the first time.

- *Data Reporting:* In general, the data and reporting in MISEP 18 was of a substantially higher quality, and proceeded with far fewer complications, compared to prior periods.

---

[4] See Appendix C for a copy of the corrective action plan.
[5] There are 15 provisions where performance is described in this report but not assessed for compliance with the respective performance standards as these commitments are COVID-impacted per Judge Edmunds' September 15, 2020 Stipulated Order.

7

DHHS should be commended for its work to ensure accurate data submissions, reflecting significant progress.

- At the conclusion of MISEP 18, the monitoring team identified several commitments eligible for movement based on DHHS' strong performance during the period. The MISEP allows that once DHHS has satisfied the Designated Performance Standard for certain commitments at the end of one reporting period, as validated by the monitors, the commitment is eligible to be moved to Section 5 of the MISEP (To Be Maintained). Three commitments meet these criteria: CPS Investigations, Completion (6.11); Caseloads, Foster Care Workers (6.14); and Data Generation (6.35). The monitors recommend to the court and the parties that these provisions be moved to "To Be Maintained."

The MISEP includes commitments that are important to children's safety and permanency which have still not taken hold. The monitoring team observes, in particular, these challenges:

- *Contract Oversight:* DHHS' contract evaluations of CCIs and private CPAs providing placements and services to Plaintiffs continued to be inconsistent, at times ineffective, and in numerous instances did not ensure the safety and well-being of Plaintiffs. DHHS developed and has begun implementing a corrective action plan addressing this area, which is described in this report. Continued oversight and effective implementation of the plan is necessary to ensure the safety and well-being of children in DHHS custody.

- *Child Permanency*: The data reflect that 1,719 children (27.3 percent) exited state custody to permanency within 12 months of their entry. DHHS did not meet the MISEP standard of 40.5 percent for this commitment. To meet the performance standard of children's exit to permanency within 12 months of entry to care, DHHS should have achieved timely permanency for an additional 799 children.

## Summary of Commitments

| Section | Commitment | Period 18 Performance | Period 18 Achieved | Report Page |
|---|---|---|---|---|
| **5.1** | DHHS shall conduct contract evaluations of all CCIs and private CPAs providing placements and services to Plaintiffs to ensure, among other things, the safety and well-being of Plaintiffs and to ensure that the CCI or private CPA is complying with the applicable terms of this Agreement. | -- | No | 24 |
| **5.2** | DHHS shall commence all investigations of report of child abuse or neglect within the timeframes required by state law. The designated performance standard is 95%. | 97.9% | Yes | 44 |
| **5.3** | 95% of CPS caseworkers assigned to investigate allegations of abuse or neglect, including maltreatment in care, shall have a caseload of no more than 12 open investigations. | 99.8% | Yes | 22 |
| **5.4** | 95% of CPS caseworkers assigned to provide ongoing services shall have a caseload of no more than 17 families. | 99.8% | Yes | 22 |
| **5.5** | 95% of POS workers shall have a caseload of no more than 90 children. | 97.8% | Yes | 22 |
| **5.6** | 95% of licensing workers shall have a workload of no more than 30 licensed foster homes or homes pending licensure. | 95% | Yes | 22 |
| **5.7** | DHHS shall require CCIs to report to DCWL all uses of seclusion or isolation. If not reported, DCWL shall take appropriate action to address the failure of the provider to report the incident and to assure that the underlying incident has been investigated and resolved. | -- | Yes | 30 |
| **6.1** | DHHS shall ensure that of all children in foster care during the applicable federal reporting period, DHHS will maintain an observed rate of victimization per 100,000 days in foster care less than 9.67, utilizing the CFSR Round 3 criteria. | N/A | N/A | 23 |
| **6.2** | Until Commitment 6.1 is achieved, DHHS, in partnership with an independent entity, will generate, at least annually, a report that analyzes maltreatment in care data to assess risk factors and/or complete root-cause analysis of maltreatment in care. The report will be used to inform DHHS practice. The first report will be issued no later than June 1, 2020. | -- | Yes | 23 |
| **6.3** | DHHS shall achieve an observed performance of at least the national standard (40.5%) on CFSR Round Three Permanency Indicator One (Of all children entering foster care in a 12-month period, what percent discharged to permanency within 12 months of entering foster care?) | 27.3% | No | 23 |

| Section | Commitment | Period 18 Performance | Period 18 Achieved | Report Page |
|---|---|---|---|---|
| **6.4** | DHHS will maintain a sufficient number and array of homes capable of serving the needs of the foster care population, including a sufficient number of available licensed placement within the child's home community for adolescents, sibling groups, and children with disabilities. DHHS will develop for each county and statewide an annual recruitment and retention plan, in consultation with the Monitors and experts in the field, and subject to approval by the Monitors. DHHS will implement the plan, with interim timelines, benchmarks, and final targets, to be measured by the Monitors based on DHHS's good-faith efforts to meet the final targets set forth in the plan. | -- | N/A – COVID-Impacted | 34 |
| **6.5** | Children in the foster care custody of DHHS shall be placed only in a licensed foster home, a licensed facility, pursuant to an order of the court, or an unlicensed relative. | 95.4% | No | 37 |
| **6.6.a** | Siblings who enter placement at or near the same time shall be placed together unless specified exceptions are met. The designated performance standard is 90%. | 72.4% | No | 38 |
| **6.6.b** | If a sibling group is separated at any time, except for the above reasons, the case manager shall make immediate efforts to locate or recruit a family in whose home the siblings can be reunited. These efforts shall be documented and maintained in the case file and shall be reassessed on a quarterly basis. The Monitors will conduct an independent qualitative review to determine compliance with this commitment. The designated performance standard is 90%. | 36.8% | No | 38 |
| **6.7** | No child shall be placed in a foster home if that placement will result in: (1) more than three foster children in that foster home, (2) a total of six children, including the foster family's birth and adopted children, or (3) more than three children under the age of three residing in that foster home. The designated performance standard is 90%. | 91.9% | Yes | 38 |
| **6.8** | Children shall not remain in emergency or temporary facilities, including but not limited to shelter care, for a period in excess of 30 days, unless specified exceptions apply. No child shall remain in a shelter in excess of 60 days. The designated performance standard is 95%. | 64.2% | No | 39 |

| Section | Commitment | Period 18 Performance | Period 18 Achieved | Report Page |
|---|---|---|---|---|
| **6.9** | Children shall not be placed in an emergency or temporary facility, including but not limited to shelter care, more than one time within a 12-month period, unless specified exceptions apply. Children under 15 years of age experiencing a subsequent emergency or temporary-facility placement within a 12-month period may not remain in an emergency or temporary facility for more than 7 days. Children 15 years of age or older experiencing a subsequent emergency or temporary-facility placement within a 12-month period may not remain in an emergency or temporary facility for more than 30 days. | 12.5% | No | 39 |
| **6.10.a** | When placing a child with a relative who has not been previously licensed as a foster parent, DHHS shall visit the relative's home to determine if it is safe prior to placement; check law enforcement and central registry records for all adults residing in the home within 72 hours following placement; and complete a home study within 30 days. The designated performance standard is 95%. | 73.8% | No | 35 |
| **6.10.b** | When placing a child with a relative who has not been previously licensed as a foster parent, a home study will be renewed every 12 months for the duration of the child's placement with the relative. The designated performance standard is 95%. | 36.5% | No | 36 |
| **6.11** | DHHS shall complete all investigations of reports of child abuse or neglect within the required timeframes. The designated performance standard is 90%. | 95.1% | Yes | 45 |
| **6.12.a** | DHHS shall investigate all allegations of abuse or neglect relating to any child in the foster care custody of DHHS. DHHS shall ensure that allegations of maltreatment in care are not inappropriately screened out for investigation. The Monitors will conduct an independent qualitative review to determine compliance with this commitment. The designated performance standard is 95%. | 90.9% | No | 45 |
| **6.12.a** | When DHHS transfers a referral to another agency for investigation, DHHS will independently take appropriate action to ensure the safety and well-being of the child. The Monitors will conduct an independent qualitative review to determine compliance with this commitment. The designated performance standard is 95%. | 82.3% | No | 45 |
| **6.12.b** | DHHS will maintain a Placement Collaboration Unit (PCU) to review and assess screening decisions on plaintiff-class children who are in out-of-home placements and to ensure safety and well-being is addressed on those transferred complaints. The PCU will review 100% of cases until reconsideration for complaints involving plaintiff class children placed out of home are less than 5%. | 95.4% | Yes | 46 |

| Section | Commitment | Period 18 Performance | Period 18 Achieved | Report Page |
|---|---|---|---|---|
| **6.13** | 95% of foster care, adoption, CPS, POS, and licensing supervisors shall be responsible for the supervision of no more than five caseworkers. | 86.9% | No | 21 |
| **6.14** | 95% of foster care workers shall have a caseload of no more than 15 children. | 95% | Yes | 21 |
| **6.15** | 95% of adoption caseworkers shall have a caseload of no more than 15 children. | 78.2% | No | 21 |
| **6.16** | Supervisors shall meet at least monthly with each assigned worker to review the status and progress of each case on the worker's caseload. Supervisors shall review and approve each service plan. The plan can be approved only after the supervisor has a face-to-face meeting with the worker, which can be the monthly meeting. The designated performance standard is 95%. | 93.3% (Initial, Jan – Feb) 97.3% (Initial, March – June) 92.1% (Monthly, Jan – Feb) 95.4% (Monthly, March – June) | N/A – COVID-Impacted | 40 |
| **6.17** | DHHS shall complete an Initial Service Plan (ISP), consisting of a written assessment of the child(ren)'s and family's strengths and needs and designed to inform decision-making about services and permanency planning, within 30 days after a child's entry into foster care. The designated performance standard is 95%. | 86.9% | No | 41 |
| **6.18** | For every child in foster care, DHHS shall complete an Updated Service Plan (USP) at least quarterly. The designated performance standard is 95%. | 90.0% | No | 41 |
| **6.19** | Assessments and service plans shall be of sufficient breadth and quality to usefully inform case planning and shall accord with the requirements of 42 U.S.C. 675(1). To be measured through a QSR. The designated performance standard is 90%. | 73.5% | No | 31 |
| **6.20** | DHHS shall ensure that the services identified in the service plan are made available in a timely and appropriate manner to the child and family and shall monitor the provision of services to determine whether they are of appropriate quality and are having the intended effect. To be measured through a QSR. The designated performance standard is 83%. | 71.6% | No | 31 |
| **6.21.a** | Each child in foster care shall be visited by a caseworker at least twice per month during the child's first two months of placement in an initial or new placement. The designated performance standard is 95%. | 90.4% (Jan – Feb) 89.5% (March – June) | N/A – COVID-Impacted | 42 |
| **6.21.a** | Each child in foster care shall be visited by a caseworker at their placement location at least once per month during the child's first two months of placement in an initial or new placement. The designated performance standard is 95%. | 82.5% (Jan – Feb) | N/A – COVID-Impacted | 42 |

12

| Section | Commitment | Period 18 Performance | Period 18 Achieved | Report Page |
|---------|------------|----------------------|---------------------|-------------|
| **6.21.a** | Each child in foster care shall have at least one visit per month that includes a private meeting between the child and caseworker during the child's first two months of placement in an initial or new placement. The designated performance standard is 95%. | 82.7% (Jan – Feb) | N/A – COVID-Impacted | 42 |
| **6.21.b** | Each child in foster care shall be visited by a caseworker at least once per month. The designated performance standard is 95%. | 97.9% (Jan – Feb) 97.1% (March – June) | N/A – COVID-Impacted | 42 |
| **6.21.b** | Each child in foster care shall be visited by a caseworker at their placement location at least once per month. The designated performance standard is 95%. | 96.4% (Jan – Feb) | NA – COVID-Impacted | 42 |
| **6.21.b** | Each child in foster care shall have at least one visit per month that includes a private meeting between the child and caseworker. The designated performance standard is 95%. | 95.4% (Jan – Feb) | N/A – COVID-Impacted | 42 |
| **6.22.a** | Caseworkers shall visit parents of children with a goal of reunification at least twice during the first month of placement, unless specified exceptions apply. The designated performance standard is 85%. | 71.7% (Jan – Feb) 83.2% (March – June) | N/A – COVID-Impacted | 43 |
| **6.22.a** | Caseworkers shall visit parents of children with a goal of reunification at least once in the parent's home during the first month of placement, unless specified exceptions apply. The designated performance standard is 85%. | 53.4% | N/A – COVID-Impacted | 43 |
| **6.22.b** | Caseworkers shall visit parents of children with a goal of reunification at least once a month, following the child's first month of placement, unless specified exceptions apply. The designated performance standard is 85%. | 69.6% (Jan – Feb) 71.7% (March – June) | N/A – COVID-Impacted | 43 |
| **6.23** | DHHS shall ensure that children in foster care with a goal of reunification shall have at least twice-monthly visitation with their parents, unless specified exceptions apply. The designated performance standard is 85%. | 64.7% (Jan – Feb) 59.4% (March – June) | N/A – COVID-Impacted | 43 |
| **6.24** | DHHS shall ensure that children in foster care who have siblings in custody with whom they are not placed shall have at least monthly visits with their siblings who are placed elsewhere in DHHS foster care custody, unless specified exceptions apply. The designated performance standard is 85%. | 69.5% (Jan – Feb) 56.8% (March – June) | N/A – COVID-Impacted | 44 |
| **6.25** | At least 85% of children shall have an initial medical and mental health examination within 30 days of the child's entry into foster care. | 69.8% | N/A – COVID-Impacted | 46 |
| **6.25** | At least 95% of children shall have an initial medical and mental health examination within 45 days of the child's entry into foster care. | 76.6% | N/A – COVID-Impacted | 46 |

| Section | Commitment | Period 18 Performance | Period 18 Achieved | Report Page |
|---|---|---|---|---|
| **6.26** | At least 90% of children shall have an initial dental examination within 90 days of the child's entry into care unless the child has had an exam within six months prior to placement or the child is less than four years of age. | 36.4% | N/A – COVID-Impacted | 47 |
| **6.27** | For children in DHHS custody for three months or less at the time of measurement: DHHS shall ensure that 90% of children in this category receive any necessary immunizations according to the guidelines set forth by the American Academy of Pediatrics within three months of entry into care. | N/A | N/A COVID-Impacted and subject to separate March 12, 2021 Order | 47 |
| **6.28** | For children in DHHS custody longer than three months at the time of measurement: DHHS shall ensure that 90% of children in this category receive all required immunizations according to the guidelines set forth by the American Academy of Pediatrics. | NA | N/A COVID-Impacted and subject to separate March 12, 2021 Order | 47 |
| **6.29** | Following an initial medical, dental, or mental health examination, at least 95% of children shall receive periodic and ongoing medical, dental, and mental health care examinations and screenings, according to the guidelines set forth by the American Academy of Pediatrics. | 58.3%, 75.6%, 38.6%, | N/A – COVID-Impacted | 48 |
| **6.30** | DHHS shall ensure that: (1) The child's health records are up to date and included in the case file. Health records include the names and addresses of the child's health care providers, a record of the child's immunizations, the child's known medical problems, the child's medications, and any other relevant health information; (2) the case plan addresses the issue of health and dental care needs; (3) foster parents and foster care providers are provided with the child's health care records. | 90.6%, 93.8%, 93.8% | No | 48 |
| **6.31** | DHHS shall ensure that at least 95% of children have access to medical coverage within 30 days of entry into foster care by providing the placement provider with a Medicaid card or an alternative verification of the child's Medicaid status and Medicaid number as soon as it is available. | 89.5% | No | 49 |

| Section | Commitment | Period 18 Performance | Period 18 Achieved | Report Page |
|---------|-----------|----------------------|-------------------|-------------|
| **6.32** | DHHS shall ensure that at least 95% of children have access to medical coverage within 24 hours or the next business day following subsequent placement by providing the placement provider a Medicaid card or an alternative verification of the child's Medicaid status and Medicaid number as soon as it is available. | 82.1% | No | 49 |
| **6.33** | DHHS shall ensure that informed consent is obtained and documented in writing in connection with each psychotropic medication prescribed to each child in DHHS custody. The designated performance standard is 97%. | 74.4% | No | 49 |
| **6.34** | DHHS shall ensure that: (1) A child is seen regularly by a physician to monitor the effectiveness of the medication, assess any side effects and/or health implications, consider any changes needed to dosage or medication type and determine whether medication is still necessary and/or whether other treatment options would be more appropriate; (2) DHHS shall regularly follow up with foster parents/caregivers about administering medications appropriately and about the child's experience with the medication(s), including any side effects; (3) DHHS shall follow any additional state protocols that may be in place related to the appropriate use and monitoring of medications. | 26.9% | No | 50 |
| **6.35** | DHHS shall generate from its Child Welfare Information System accurate and timely reports and information regarding the requirements and outcome measures set forth in this Agreement. | -- | Yes | 32 |
| **6.36.a** | DHHS will continue to implement policies and provide services to support youth transitioning to adulthood, including ensuring youth have been informed of services available through the Youth Adult Voluntary Foster Care (YAVFC) program. Performance for this commitment will be measured through an increase in the rate of foster youth aging out of the system participating in the YAVFC program for a minimum of two periods. | 34.3% | N/A – COVID-Impacted | 51 |
| **6.36.b** | DHHS will continue to implement policies and provide services to support youth transitioning to adulthood, including ensuring youth have been informed of the availability of Medicaid coverage. Performance for this commitment will be measured through an increase in the rate of foster youth aging out of the system who have access to Medicaid. The designated performance standard for this commitment is 95%. | 99.6% | Yes | 51 |
| **6.37** | DHHS will continue to implement policies and provider services to support the rate of older youth achieving permanency. | 50.5% | N/A – COVID-Impacted | 51 |

## Methodology

To prepare this report, the monitoring team conducted a comprehensive series of verification activities. These included: meetings with DHHS leadership, private agency leadership, and Plaintiffs' counsel; and extensive reviews of individual children's records and other documentation. The monitoring team also reviewed and analyzed a wide range of aggregate and detail data produced by DHHS, and reviewed policies, memos, and other internal information relevant to DHHS' work during the period. To verify information produced by DHHS, the monitoring team conducted virtual field-based interviews, cross-data validation, and case record reviews. By agreement of the parties, the monitoring team assessed DHHS' performance for seven MISEP commitments utilizing a qualitative case review[6] process. The monitoring team reviewed thousands of distinct reports from DHHS including individual case records, relative foster home studies, Division of Child Welfare Licensing (DCWL) investigations and reports, and CPS referrals and investigations.

## Demographics

DHHS produced demographic data from January 1, 2020 to June 30, 2020. DHHS data indicate there were 11,312 children in custody as of June 30, 2020. Of the children and youth in care on June 30, 2020, 363 youth were enrolled in the Young Adult Voluntary Foster Care (YAVFC) program. During the reporting period, 1,934 children and youth were placed in foster care and 2,305 children and youth exited care.[7] DHHS served 13,559 children during the period.[8] Though young children aged zero to six years made up the largest portion (5,370 or 47 percent), Michigan continued to have a large population of older youth in custody. Twenty-five percent (2,781) were 12 to 17 years of age and seven percent (745) were 18 years and over, as detailed in Figure 1.

---

[6] The sample sizes for the monitoring team's case record reviews were based on a statistically significant sample of cases and a methodology based on a 90 percent confidence level.

[7] The monitoring team identified four children who appear twice in the entry cohort file (0.2% of the 1,934 entries). Each child appearing twice in the file had a unique removal date but was missing a discharge date.

[8] The monitoring team identified 57 children who appeared twice in the during cohort file (0.4% of 13,559). All children appearing twice in the during cohort were served more than once during the reporting period.

**Figure 1. Age of Children in Custody on June 30, 2020**

*Source: MiSACWIS, n=11,312*



With regard to gender, the population was about equally split—50 percent male and 50 percent female. With regard to race, the population of children was 54 percent White, 31 percent African-American, under one percent Native American, under one percent Asian, and under one percent Native Hawaiian or Pacific Islander. Additionally, 14 percent of children reported being of mixed race. Seven percent of children were identified with Hispanic ethnicity and can be of any race. In contrast, the population of all children in the state of Michigan was 74 percent White, 17 percent African-American, under one percent Native American, three percent Asian, and under one percent Native Hawaiian or Pacific Islander. Additionally, five percent of children in the state of Michigan were of mixed race, and nine percent of children were identified with Hispanic ethnicity and can be of any race.[9]

---

[9] Data on the race of all children in the state of Michigan was sourced from the U.S. Census Bureau, Population Division, 7/1/2019 Population Estimate.

**Table 1. Race of Children in Custody on June 30, 2020[10] and Race of Children in the State of Michigan on July 1, 2019**

Source: MiSACWIS, US Bureau of the Census

| Race | Count (DHHS Custody) | Percent (DHHS Custody) | Count (State of Michigan) | Percent (State of Michigan) |
|---|---|---|---|---|
| White | 6,142 | 54% | 1,580,791 | 74% |
| Black/African American | 3,476 | 31% | 355,649 | 17% |
| Mixed Race | 1,617 | 14% | 115,292 | 5% |
| Native American | 46 | 0.3% | 18,426 | 0.9% |
| Unable to Determine | 12 | 0.1% | -- | -- |
| Asian | 16 | 0.2% | 72,695 | 3% |
| Native Hawaiian or Pacific Islander | 3 | 0.0% | 1,080 | 0.1% |
| **Total** | **11,312** | **100%** | **2,143,933** | **100%** |
| Hispanic ethnicity and of any race | 838 | 7% | 182,284 | 9% |

Note: Percentages do not add up to 100 due to rounding.

As the following figure demonstrates, 87 percent of children in DHHS' custody lived in family settings on June 30, 2020, including relatives (40 percent), foster families (35 percent), with their own parents (nine percent), and in homes that intend to adopt (two percent). Of children in custody, 926 (eight percent) lived in institutional settings, including residential treatment and other congregate care facilities. Another 439 children (four percent) resided in independent living placements, which serve youth on the cusp of aging-out of care. The remaining one percent of children resided in other settings, were AWOL, or were in unidentified placements.

---

[10] Twelve children with "Unable to Determine" or "No Match Found" were pooled together in the "Unable to Determine" row.

**Figure 2. Placement Types of Children in Custody on June 30, 2020**

*Source: MiSACWIS, n=11,312*



Of the children in care on June 30, 2020, 37 percent were in care less than one year, while 15 percent were in care for more than three years.

**Figure 3. Length of Stay in Care of Children in Custody on June 30, 2020**

*Source: MiSACWIS, n= 11,312*



**Table 2. Exits from Care by Exit Type, January 1, 2020 to June 30, 2020**
Source: MiSACWIS

| Exit Type | Frequency | Percent |
|---|---|---|
| Reunification | 1,127 | 49% |
| Adoption | 743 | 32% |
| Emancipation | 234 | 10% |
| Guardianship | 163 | 7% |
| Living with relatives | 17 | 0.7% |
| Transfer to another agency | 13 | 0.6% |
| Death of a child | 6[11] | 0.3% |
| Runaway | 2 | 0.1% |
| **Total** | **2,305[12]** | **100%** |

Note: Percentages do not add up to 100 due to rounding.

As the following table demonstrates, of the children in custody on June 30, 2020, the majority (7,196 or 64 percent) had reunification as a federal goal. For the remaining children, 2,562 (23 percent) had a goal of adoption, 908 (eight percent) had a goal of APPLA, 524 (five percent) had a goal of guardianship, and 122 (one percent) had placement with a relative as a federal goal.

**Table 3. Federal Goals for Children in Custody as of June 30, 2020[13]**
Source: MiSACWIS

| Federal Goal | Frequency | Percent |
|---|---|---|
| Reunification | 7,196 | 64% |
| Adoption | 2,562 | 23% |
| APPLA | 908 | 8% |
| Guardianship | 524 | 5% |
| Relative | 122 | 1% |
| **Total** | **11,312** | **100%** |

Note: Percentages do not add up to 100 due to rounding.

---

[11] DHHS reported two children died as a result of abuse or neglect during the period. This includes foster child C.F. who passed away after being restrained by residential facility staff, discussed *supra*, and a two-month-old infant, in a relative placement, who passed away as a result of unsafe sleep practices.

[12] Cohort data provided by DHHS included 2,304 exits, including five child deaths, during MISEP 18; however, the monitoring team identified an additional child who died during the period and did not appear in the cohort data. DHHS has since corrected the data entry issue that resulted in the child being omitted from the cohort data.

[13] Children with a federal goal of APPLA and APPLA-E are pooled together for the "APPLA" row.

# Organizational Capacity

## Caseloads and Supervision

The MISEP sets forth caseload standards for staff and supervisors performing critical child welfare functions. The agreement states that caseload compliance will be measured by taking the average of three data reports each reporting period, prepared on the last workday of February, April, June, August, October, and December. For MISEP 18, the monitors used caseload counts from February 28th, April 30th, and June 30th to determine compliance.

*Supervisor Caseloads (6.13)*

DHHS agreed that full-time foster care, adoption, CPS, purchase of service (POS), and licensing supervisors, both public and private, would be responsible for no more than five caseload carrying staff each. An employee of DHHS or a private child placing agency that is non-caseload carrying will count as 0.5 toward the worker-to-supervisor ratio and administrative and technical support staff who support the supervisor's unit are not counted toward the worker-to-supervisor ratio. In addition, the supervisor methodology requires accounting for the practice among some of the private agencies of assigning both supervisory and direct caseload responsibilities to the same person, which requires pro-rating both supervisory and caseload performance for these hybrid supervisors. DHHS committed that 95 percent of supervisors would meet the MISEP caseload standard. During MISEP 18, DHHS averaged 86.9 percent of supervisors meeting the standard, missing the target.

*Foster Care Caseloads (6.14)*

DHHS agreed that full-time staff, public and private, solely engaged in foster care work, would be responsible for no more than 15 children each. Staff who perform foster care work as well as other functions are held to a pro-rated standard. The MISEP requires that 95 percent of staff engaged in foster care work meet the caseload standard. DHHS averaged 95 percent of staff meeting the standard during MISEP 18, meeting the target. *Per the MISEP, compliance during this period makes the commitment eligible to move to "To Be Maintained."*

*Adoption Caseloads (6.15)*

DHHS agreed that full-time staff, public and private, solely engaged in adoption work would be responsible for no more than 15 children each. Staff who perform adoption work as well as other functions are held to a pro-rated standard. The MISEP requires that 95 percent of staff engaged in adoption work meet the caseload standard. For MISEP 18, DHHS averaged 78.2 percent of staff meeting the standard, missing the target.

*Child Protective Services (CPS) Investigations Caseloads (5.3)*

DHHS agreed that full-time staff solely engaged in investigations would be responsible for no more than 12 open investigations. Staff who perform investigative work as well as other functions are held to a pro-rated standard. The MISEP requires that 95 percent of staff engaged in CPS investigations work meet the caseload standard. For MISEP 18, DHHS averaged 99.8 percent of staff meeting the standard, exceeding the target.

*CPS Ongoing Caseloads (5.4)*

DHHS agreed that full-time staff solely engaged in CPS ongoing services, a public-sector function, would be responsible for no more than 17 families each. Staff who perform CPS ongoing work as well as other functions are held to a pro-rated standard. The MISEP requires that 95 percent of staff engaged in CPS ongoing work meet the caseload standard. DHHS averaged 99.8 percent of staff meeting the standard in MISEP 18, exceeding the target.

*Purchase of Service Caseloads (5.5)*

POS work comprises the support and oversight that DHHS staff provide with respect to foster care and adoption child welfare cases assigned to the private sector. The MISEP established the full-time POS standard at 90 cases. However, there are some DHHS staff who are assigned a mix of POS and other work including licensing, foster care, and adoption. For those staff, the standard of 90 POS cases is pro-rated based on their other responsibilities. DHHS committed that 95 percent of staff engaged in POS work would meet the MISEP standard of 90 cases. For MISEP 18, DHHS averaged 97.8 percent of staff meeting the standard, exceeding the target.

*Licensing Caseloads (5.6)*

DHHS agreed that full-time staff, public and private, solely engaged in licensing work would be responsible for no more than 30 licensed foster homes or homes pending licensure. Staff who perform licensing work as well as other functions are held to a pro-rated standard. The MISEP requires that 95 percent of staff engaged in licensing work meet the caseload standard. DHHS averaged 95 percent of staff meeting the standard in MISEP 18, meeting the target.

## Accountability

### Outcomes

Pursuant to the MISEP, DHHS agreed to meet federal outcome standards regarding safety and permanency for children. The MISEP adopts outcome methodologies developed by the federal government, including one safety measure and one permanency measure from Round Three of

the federal Child and Family Services Reviews (CFSR). Performance on all measures is calculated for DHHS by the University of Michigan based on Adoption and Foster Care Analysis and Reporting System (AFCARS) and National Child Abuse and Neglect Data System (NCANDS) files produced by DHHS.

*Safety – Maltreatment in Foster Care (6.1)*

The child safety standard of maltreatment in care (MIC), focuses on keeping children in DHHS custody safe from abuse and neglect. DHHS committed to ensure that of all children in foster care during the applicable federal reporting period, DHHS will maintain an observed rate of victimizations per 100,000 days in foster care less than 9.67.

Performance for this commitment is reported annually. Performance for federal fiscal year (FFY) 2020, which ran from October 1, 2019 to September 30, 2020, will be validated and discussed in the MISEP 19 report.

*MIC Data Report (6.2)*

DHHS committed to generate, at least annually and in partnership with an independent entity, a report that analyzes maltreatment in care data to assess risk factors and/or complete root-cause analysis of maltreatment in care. The report will be used to inform DHHS practice, and it will continue to be generated until Commitment 6.1, the child safety standard of MIC, is achieved. The first report was to be issued no later than June 1, 2020.

DHHS partnered with the Child and Family Data Lab at the University of Michigan to produce the first MIC root-cause analysis report, which was issued in June 2020.[14]

*Permanency Indicator One (6.3)*

Permanency Indicator One measures the percent of children who enter foster care within a 12-month period who are discharged to permanency[15] within 12 months of their entry date. Three years of AFCARS data is required to measure performance for this outcome, therefore performance was calculated for children who entered care between April 1, 2017 and March 31, 2018. Based on the data files provided by DHHS, the monitoring team calculated that of the 6,294 children who entered foster care during this period, 1,719 children (27.3 percent) exited to permanency within 12 months of their entry. DHHS did not meet the MISEP standard of 40.5 percent for this commitment. To meet the performance standard, DHHS should have achieved permanency for an additional 799 children.

---

[14] See Appendix F for a copy of the report.
[15] The parties agreed that permanency for children is defined as exit to reunification, adoption, or guardianship.

## Contract Oversight

*Contract-Agency Evaluation (5.1)*

The MISEP requires DHHS to conduct contract evaluations of all CCIs and private Child Placing Agencies (CPAs), including an annual inspection of each CPA, an annual visit to a random sample of CPA foster homes, and an annual unannounced inspection of each CCI. During the required visits, the Division of Child Welfare Licensing (DCWL) is expected to monitor compliance with rule, policy, contract, and MISEP requirements, with the primary focus being the safety and well-being of children.

DHHS reported that DCWL is funded for 19 child welfare field licensing consultants who perform consolidated monitoring activities including annual licensing inspections and investigations of CCIs and CPAs. In addition, eight field analysts conduct visits consisting of interviews with foster parents, foster children, and unlicensed relative caregivers to verify safety in these homes. Two area managers had been supervising the licensing consultants and field analysts; a third area manager was added in May 2020 and in place through the end of the period.

In January 2020, licensing rules were updated to comport with the Family First Prevention Services Act (FFPSA), a federal law effective February 9, 2018, which provides financial assistance for: enhancing support services for families, helping children to remain at home, reducing the unnecessary use of congregate care, and building the capacity of communities to support children and families. The updated Michigan licensing rules included those relevant to hazardous materials and firearm storage, definitions, requirements of criminal history checks, and staff qualifications.

During this period, two committees of rulemaking stakeholders met to compose draft language for foster home, CPA and CCI licensing rule revisions. One committee developed the foster home and CPA rules, and the other the CCI rules. DHHS reported that as of April 2021, the CCI rules have been passed onto the Department of Licensing and Regulatory Affairs (LARA) for public hearings scheduled for June 3 and 10, 2021. Additionally, the CPA and foster home rules are still awaiting review, then they will be filed with LARA.

DHHS reported that there were a number of Communication Issuances released during the period regarding COVID-19 procedures and protocols, including the following:

- Guidance on licensing renewal processes and annual evaluations, with suspension of in-person visits for a temporary period (March 25, 2020 – April 13, 2020);
- CCI staffing ratio: temporary suspension for 30 days (March 18, 2020 – April 17, 2020) of the pre-approval requirement for deviations from the contracted staff-to-resident ratio

as a result of emergency staffing, and variance instructions if and when there was difficulty maintaining staff-to-resident ratio requirements;

- A foster care licensing capacity survey was implemented to determine foster parents' ability/willingness to accept placement of youth who tested positive for COVID;

- Comprehensive guidance for congregate care settings to prevent COVID transmission;

- Guidance to licensing staff regarding temporary suspension of in-person special evaluations (March 20, 2020 – April 6, 2020), except if child safety was an issue; and

- Guidance regarding notification requirements for children with COVID or CCI staff with symptoms or a COVID diagnosis.

DHHS reported there were 41 CPA inspections conducted during the period, which included 21 interim and 20 renewal inspections. Two agencies were in substantial compliance with applicable statutes, licensing rules, contract regulations, and MISEP requirements, while 39 agencies required a corrective action plan (CAP). Two CPAs voluntarily closed during the period.

DCWL field analysts conduct annual home visits to assess safety and service provision within licensed foster homes and unlicensed relative homes supervised by agencies with interim and renewal inspections in the period. During each home visit, safety and well-being standards are assessed and interviews with foster children, foster parents, unlicensed relatives, and birth parents are completed. During the reporting period, DCWL field analysts visited a random sample of licensed foster homes and unlicensed relatives associated with 35 of the 41 contracted CPAs scheduled for a renewal or interim inspection. Six of the CPAs did not have any foster or unlicensed relative homes.

DHHS reported that field analysts visited 207 foster and unlicensed relative homes. In person visits were conducted for 165 homes, while 42 virtual contacts occurred due to COVID restrictions. DHHS issued safety alerts for urgent or critical concerns in 12 homes, involving nine agencies. Eleven of the homes were unlicensed relatives and one was a licensed foster home. Safety concerns identified by the DCWL analysts included: a children's bedroom with a lock on the outside door, children sleeping in a bedroom with inadequate space while ceiling repair was being completed in the room, no carbon monoxide or smoke detectors, electricity not fully working in several rooms, broken windows in the living room and foster and adoptive children's bedrooms, missing light switch or outlet covers, electric heaters in bedrooms, a leaking roof with water spots evident on the ceiling, detergent not stored properly, a displaced metal floor divider presenting a fall hazard, an eight month old wearing jewelry that was a choking risk, and foster parents with two residences where the primary residence had not been assessed for safety. DCWL issued an alert of concern to a tenth CPA because a caregiver did not have a medical

insurance card for a child in care. There was documentation by the analyst and/or consultant that for all ten agencies, the identified issues were rectified.

The MISEP requires that the field analysts visit a certain number of each CPA's foster homes, dependent on the total number of homes supervised by the agency. CPAs with fewer than 50 homes are required to have at least three homes visited, and those agencies with 50 or more homes are required to have five percent of those foster homes visited.

During MISEP 18, an agency with 47 foster homes only had two homes visited during this period. While attempts were made to visit a third foster home, these were unsuccessful and there was no documentation that attempts to visit an alternate foster home were made. Another agency had 180 foster homes, and eight foster homes were visited by the analyst. Nine foster home visits were required to meet the standard of visiting five percent of the agency's foster homes.

DHHS reported that licensing consultants conducted 31 special investigations involving 19 contracted CPAs during the period. The 31 investigations involved 72 allegations of non-compliance related to rule, policy, contract and MISEP requirements. DCWL established violations for 34 (47.2 percent) of the 72 allegations, requiring CAPs for 17 of the 19 agencies. Due to recommendations for agency license revocations, CAPs for two special investigations were not submitted, according to DHHS.

The monitoring team reviewed all of the 31 special investigations. Some of the incidents that resulted in established violations included: required home visits not occurring by agency staff, staff sharing inappropriate personal information with clients, a foster care worker engaging in an inappropriate romantic relationship with a client, failure to report suspected child abuse, and inadequate supervision. There was also an investigation regarding an infant's death in a relative's home, where the birth mother was living in the home, contrary to a court order. The infant died as a result of safe sleep protocols not being followed by the mother and relative caregiver. The infant's twin and older sibling were removed from this relative's home subsequent to the child's death.

DHHS reported that during the period private agencies conducted 427 foster home special evaluations. These are investigations conducted by the supervising agency when an allegation is made regarding a foster home in their network. The monitoring team reviewed 79 of these special evaluations and found 34 of the 79 homes required CAPs due to established violations. Twenty-seven of the incidents were referred for MIC investigations. Nine foster homes had their licenses recommended for revocation as a result of the investigations. Some of the revocation reasons included: substantiated sexual abuse by a foster father; multiple allegations of unsanitary conditions in a home, including a chinchilla in the infant's room with animal feces found on the bedroom floor; the foster parent having a romantic relationship with the child's birth father and

allowing the father unauthorized access to the child that resulted in an altercation; non-compliance with foster parent training requirements; a home determined to be filthy, smelling of mildew; domestic violence resulting in an arrest of the foster father; the caregiver testing positive for drugs; the foster parents not allowing their birth children to be interviewed; and inappropriate discipline, including a relative caregiver holding a gun to a child's head. All but one of the evaluations was referred for a CPS investigation.

There was significant delay in recording revocation closures in MiSACWIS after the homes were recommended for revocation. As of April 2021, there was still no revocation closing action recorded for three of the nine homes, and one home appeared to have an active license. Without license revocation clearly identified as the closure reason, there is a risk these families can successfully apply to a different agency in the future to be approved as caregivers, or that children could be placed in a home with a revoked license if the home remains open in MiSACWIS.

DHHS reported that DCWL conducted 23 unannounced renewal and 16 unannounced interim inspections of CCIs, totaling 39 inspections for the period. Thirty inspections required CAPs, while DHHS records indicate nine of the CCIs were in substantial compliance with appropriate statutes, administrative licensing rules, contract regulations, and MISEP requirements.

DHHS reported that DCWL completed 396 special investigations involving 645 allegations of non-compliance in 64 contracted CCIs during the period. Violations were established for 306 (47.4 percent) of the 645 allegations. Ten CCIs were recommended for a first provisional license, and two were issued a first provisional license. One CCI was issued a second provisional license. According to DHHS, due to the severity of violations, four CCIs were recommended for licensure revocation, and a fifth CCI was administratively closed.

DHHS reported that at the end of MISEP 18, to ensure more timely and comprehensive attention to all complaints, the following procedures were implemented:

- Field consultants create and upload any new special investigation into the licensing Bureau of Information Tracking System (BITS) within 24 hours of assignment, and indicate whether CPS is involved;

- Priority special investigations with CPS involvement are initiated within two business days of assignment;

- Field consultants notify the alleged victims' workers within two calendar days of the opened investigation;

- On-site investigations at facilities are unannounced;

- Circumstances or potential circumstances directly impacting a child's safety, require immediate action by the field consultant;

- Field consultants and area managers attend CPS-MIC case conferences at the conclusion of joint investigations, and consider these findings when determining appropriate licensing action;

- Enhanced scrutiny by the area managers occurs prior to a licensing recommendation determination, including the review of violations from previous months and proper identification of rule violations, with particular attention to those of a similar or same nature;

- Area managers and field consultants collaborate on the CAP reviews prior to the field consultant making an approval determination;

- CAPs for all Child Care Organizations (CCOs) must be completed on a newly developed template;

- Field consultants must follow up on the completion of CAPs with quarterly unannounced visits; and

- All CAPs submitted in response to a provisional license are reviewed by the DCWL Director.

The monitoring team reviewed 200 of the 396 CCI special investigations for the period and found that 156 of the 200 DCWL investigations were referred to Centralized Intake (CI) for a potential CPS investigation. Eighty-three of those referrals were assigned for investigation, with ten of the investigations resulting in a substantiated disposition. The monitoring team found that an additional ten special investigation incidents met the criteria for a CPS investigation.[16] For eight of the ten investigations, the incident was referred to CI but screened-out rather than investigated. One investigation initially was referred and screened out, but at a later date was reconsidered and accepted for a CPS investigation. In the tenth instance, the allegation was never referred to CI by the facility or by licensing staff. Examples of some of the incidents determined by the monitoring team to warrant assignment for a CPS investigation included:

- A child (age 11) snuck into the facility laundry room, then grabbed and ingested bleach. This child had previously been hospitalized for suicidal behaviors and was on a safety plan to have stringent daily supervision.

---

[16] With MISEP commitment 6.12.a, DHHS committed to investigate all allegations of abuse or neglect relating to any child in the custody of DHHS and to ensure that allegations of maltreatment in care are not inappropriately screened out and therefore not investigated by CPS. The MISEP requires that this provision be measured by the monitors through a qualitative review. The monitoring team found that the CCI review findings were consistent with the qualitative review findings for the 6.12.a commitment.

- Two youth (both age 15) disclosed that a staff member was having sexual relations with a youth, and that staff have inappropriate conversations about youth and other staff at the facility. Staff reportedly enter the bathroom before youth are finished. One of the youths was sleeping on a mattress on the floor at the facility.

- It was alleged that a resident (age 15) was not receiving her anti-psychotic medication while at the facility, nor having the required weekly blood draws to monitor the medication, as required by the prescribing physician.

- A male and female resident (both age 13) who reside at a facility servicing youth with intellectual and developmental disabilities had sex in the bathroom. Later the female resident stated that she had been raped, was very distraught, and was taken to the hospital for a rape assessment. There was a previous sexual encounter between these two residents that resulted in a safety plan where they were not to have unsupervised contact with each other. A staff person acknowledged that he should not have allowed them to go to the bathroom at the same time (they both went to the boys' bathroom, rather than the female resident using the girls' room). An improper supervision licensing violation was established.

- Two youth (ages 16 and 17) had a sexual encounter at the facility while a staff member who was to be supervising them had fallen asleep. Both youths had tested positive for Covid-19 and the incident happened while they were in quarantine.

The Monitors identified that 8 of the 83 investigations were deficient and left in place unresolved risk of harm to children in CCIs during the period. Two of the investigations involved plaintiff class children, and six involved children not in the class but placed in CCIs where children in the plaintiff class resided. Unrectified safety or risk issues for any youth in a facility reflect conditions and risk of harm to other residents, including plaintiff class children.

In addition to reviewing the 200 special investigations, the monitoring team also reviewed CAPs for 74 investigations, initiated between January 2, 2020 and June 29, 2020, where violations were established, as well as the follow-up documentation provided by DHHS for the CAPs. The monitoring team found that CAP content and follow-up was often ineffective and deficient, lacked specificity, and did not remediate risk to children. Frequently repeated violations of a serious nature, such as physical intervention or improper restraints causing injuries, recurred despite the CAPs, and at times the CAPs did not address prevalent underlying issues that posed a serious risk of harm to children's safety.

Following the death of C.F. on May 1, 2020, as discussed in the monitors' Period 17 Report to the Court, DHHS recognized that its licensing rules, restraint policies, and regulatory and contractual oversight of CCIs were insufficient to ensure child safety and well-being. C.F.'s death made clear

to DHHS leadership there was an urgent need to limit the use of restraints and improve CCI oversight, including better tracking of violations and confirmed child maltreatment. From a systems perspective, it also illustrated the need to expedite licensing action in response to repeat non-compliance or safety violations.

With these acknowledgements, DHHS has initiated a CCI risk remediation and child safety plan which, as described in the Introduction to this report, the monitors are closely assessing.

*Seclusion in Contract Agencies (5.7)*

The MISEP requires that all uses of seclusion or isolation in CCIs be reported to DCWL for necessary action. If not reported, DCWL is required to take appropriate action to address the failure to report the incident and to ensure that it has been investigated and resolved.

DCWL is required to monitor the occurrence of seclusion or isolation incidents by CCIs. Area managers and licensing consultants receive a monthly spreadsheet which includes the number of seclusion or isolation incidents reported. The spreadsheet for the period indicates there were 626 incidents of reported seclusion or isolation that involved 13 CCI agencies. This is an increase of 50 incidents from MISEP 17 (July 1, 2019 – December 31, 2019) when there were 576 reported incidents.

Additionally, DHHS reported that during this period two agencies each had one seclusion and isolation incident that was not reported to DCWL. These substantiated violations required CAPs that were submitted and accepted. With the first agency CAP, the field consultant confirmed that the rule requirements were reviewed with supervisors and staff, an update was made to the facility's procedural documents, and DCWL increased its oversight. The second agency CAP included enhanced training and supervisory oversight for staff on all shifts. According to the field consultant, there are managers and supervisors covering evenings and weekends to provide oversight and guidance on all shifts. The agency requested an extension of the CAP so the hiring of additional supervisors could occur. DCWL granted the extension through December 1, 2020, to allow the agency time to complete the hiring process.

During the period, three seclusion rule violations were also established in special investigations.

With the first agency, the field consultant concluded that a resident was confined to his room for a period of 4.5 hours. DCWL reported successful CAP completion with staff being terminated, policy review occurring with existing staff, and unannounced rounds being conducted twice per shift by administrative staff.

The second agency seclusion violation involved a resident being secluded in her room for 20 minutes, although she had not jeopardized the safety of herself or others.   The approved CAP included an administrative staff meeting with all residential clinical unit managers to discuss the

use of seclusion for safety reasons versus unwarranted seclusion. The DCWL field consultant confirmed that all aspects of the CAP were implemented.

The third agency with a violation involved an incident for which the resident's seclusion time was not documented. The approved CAP included a meeting with all residential clinical unit managers to address the issue, and they in turn were to relay this information to their units. The CAP also included a series of mandatory trainings for existing staff members. The field consultant confirmed that the meeting with residential clinical unit managers was held, although the series of trainings had not yet commenced at the end of the period due to the COVID-19 restriction on assembling more than ten people in a room.

## Quality Service Reviews

DHHS continues to implement the Quality Service Review (QSR) process to provide a probative review of case practice in a selection of cases, surfacing strengths as well as opportunities for improvement in how children and their families benefit from services. Each review focuses on an identified county or counties and includes in-depth case reviews, as well as focus groups and surveys.

The parties agreed that performance described below for two commitments would be measured through QSR case reviews. The first commitment is Assessments and Service Plans, Content (6.19). The performance standard for this commitment is 90 percent. The second commitment is Provision of Services (6.20). The performance standard for this commitment is 83 percent.

During MISEP 18, DHHS conducted blended CFSR/QSR reviews in Business Service Centers (BSC) 3, 4, and 5. DHHS chose a randomly selected sample of open cases for review during each QSR. Cases were graded on 21 indicators covering different areas of case practice and the status of the child and family. Information was obtained through in-depth interviews with case participants including the child, parents or legal guardians, current caregiver, caseworker, teacher, therapist, service providers, and others having a significant role in the child's or family's life. A six-point rating scale was used to determine whether performance on a given indicator was acceptable. Any indicator scored at four or higher was determined acceptable, while any indicator scored at three or lower was determined to be unacceptable.

*Assessments, Service Plans, and Provision of Services (6.19, 6.20)*

DHHS agreed to develop a comprehensive written assessment of a family's strengths and needs, designed to inform decision making about services and permanency planning. The plans must be signed by the child's caseworker, the caseworker's supervisor, the parents, and the child, if age appropriate. If a parent or child is unavailable or declines to sign the service plan, DHHS must identify steps to secure their participation in accepting services.

31

The written service plan must include:

- A child's assigned permanency goal;

- Steps that DHHS, CPAs when applicable, other service providers, parents, and foster parents will take together to address the issues that led to the child's placement in foster care and that must be resolved to achieve permanency;

- Services that will be provided to children, parents, and foster parents, including who will provide the services and when they will be initiated;

- Actions that caseworkers will take to help children, parents, and foster parents connect to, engage with, and make good use of services; and

- Objectives that are attainable and measurable, with expected timeframes for achievement.

DHHS reviewed 24 children's cases, with 68 applicable items, relevant to this commitment during MISEP 18. Of the 68 applicable items, DHHS reported that 50 (73.5 percent) were rated as having acceptable assessments and service plans, below the performance standard of 90 percent for this commitment.

Furthermore, DHHS agreed that the services identified in service plans will be made available in a timely and appropriate manner and to monitor services to ensure that they have the intended effect. DHHS also agreed to identify appropriate, accessible, and individually compatible services; to assist with transportation; and to identify and resolve barriers that may impede children, parents, and foster parents from making effective use of services. Finally, DHHS committed to amend service plans when services are not provided or do not appear to be effective.

DHHS reviewed 24 children's cases, with 67 applicable items, relevant to this commitment during MISEP 18. Of the 67 applicable items, DHHS reported that 48 (71.6 percent) were rated as acceptable for provision of services, below the 83 percent performance standard for this commitment.

## Data Reporting

DHHS produced data from MiSACWIS to demonstrate performance on commitments in MISEP 18 and to document baseline populations and samples for QAPs. DHHS produced data under the Modified Implementation Sustainability and Exit Plan for Period 18. DHHS continued to submit "cohort" data, which describes entries and exits from foster care during the period, the number of children served during the period, and the number of children in care at the beginning and end of the period. For QAPs, DHHS continued to use the methodology that allows the Department to focus performance measurement resources on commitments where performance neared or

exceeded standards designated in the MISEP as opposed to commitments where past performance indicated only a small chance of meeting MISEP standards.

The monitoring team analyzed the information to verify its quality, assessed the methodology used to compute performance for each metric, and attempted to replicate the performance calculations made by DHHS. In these efforts, both DHHS and the monitoring team relied on the written Metrics Plan updated as of February 2020. The Metrics Plan outlines in detail the descriptions of data to be supplied by DHHS to the monitoring team and the calculation methodologies to assess performance for each commitment for which DHHS produces a data report.

In general, the data and reporting in MISEP 18 proceeded with fewer complications compared to MISEP 17. For 13 of the 28 commitments, the monitoring team identified minor data quality issues that had little or no impact on performance calculations. The overall improvement in data quality allowed the monitoring team to focus on and resolve issues that involved small numbers of children (usually less than one percent of the metric denominator). DHHS resubmitted two data sets and submitted a revised placement table due to observed data issues. Additionally, for MISEP 18 reporting, DHHS agreed to provide aggregate data for commitments 6.21, 6.22, 6.23 and 6.24 (the visitation commitments) reflecting performance for the COVID-impacted period of March 1, 2020 through June 30, 2020. In DHHS' initial visitation commitment data submission, the Department did not include data for the COVID-impacted period but provided the data upon request from the monitoring team.

For commitment 6.21(a), worker-child visits during the first two months of placement, DHHS employed a verification methodology that deviated from the agreed upon methodology described in the Metrics Plan. The monitoring team noted the deviation and ultimately agreed with the changes introduced by DHHS.

The monitoring team worked through issues with DHHS by email, conference calls, and meetings. Thus, the monitors verified DHHS' performance on each of the 28 commitments for which DHHS submitted data from MiSACWIS or conducted a QAP. Data issues caused minor delays and small amounts of additional work but did not prevent reporting on any of the commitments for which data were submitted. *Per the MISEP, compliance during this period makes the commitment eligible to move to "To Be Maintained."*

Permanency

## Developing Placement Resources for Children

*Foster Home Array (6.4)*

In the MISEP, DHHS committed to maintain a sufficient number and array of homes capable of serving the needs of the foster care population, including enough available licensed placements within the child's home community for adolescents, sibling groups, and children with disabilities. DHHS agreed to develop for each county and statewide an annual recruitment and retention plan, in consultation with the monitors and experts in the field, which is subject to approval by the monitors. DHHS committed to implement the plan, with interim timelines, benchmarks, and final targets, to be measured by the monitors based on DHHS' good faith efforts to meet the final targets set forth in the plan.

DHHS' Adoption and Foster Home Recruitment and Retention plans cover FY2020, running from October 1, 2019 to September 30, 2020. These county and statewide plans were developed in consultation with and approved by the monitors. The plans include interim targets and benchmarks. For FY2020 DHHS agreed to license 1,222 new non-relative homes of which 660 will accept adolescent placements, 234 homes will accept children with disabilities, and 696 homes will be developed to accept sibling groups.

During the first nine months of FY2020, DHHS licensed 852 new unrelated foster homes, 70 percent of the FY2020 non-relative licensing goal. During the same period, 964 unrelated foster homes were closed, for a net loss of 123 homes. It should be noted that during MISEP 18 the child population decreased by 387 children, somewhat offsetting the foster home net loss during the first six months of FY2020.

For the special populations of children, DHHS agreed to license 660 foster homes willing to accept adolescent placements. DHHS licensed 210 homes, 32 percent of the target during the first nine months of FY2020. During the same time 295 adolescent homes were closed for a net loss of 85 homes. The FY2020 target for sibling homes is 696 new homes and DHHS licensed 498 homes, 72 percent of the target. During the same time 598 sibling homes were closed for a net loss of 100 homes. Finally, DHHS committed to license 234 homes for children with disabilities. DHHS licensed 564 homes greatly exceeding the target in the first nine months of FY2020. During the same time 649 homes were closed for a net loss of 85 homes.

As outlined above, DHHS experienced overall net foster home losses as well as net losses in homes for siblings and adolescents. DHHS tracks foster home closures but categorizes closure reasons broadly without specific closure reasons. The monitors urge DHHS to track the specific reasons for foster home closures to understand the factors that lead to these resource losses,

both positive and negative, and to implement strategies to support and retain unrelated foster parents for children in custody.

When assessing the adequacy of DHHS' array of foster home placements, the monitors take into consideration as indicators of foster home sufficiency, the agency's performance regarding other MISEP commitments. These commitments include Separation of Siblings (6.6); Maximum Children in a Foster Home (6.7); Emergency or Temporary Facilities, Length of Stay (6.8); and Emergency or Temporary Facilities, Repeated Placement (6.9).

During the reporting period, DHHS did not meet the performance standard for Separation of Siblings (6.6); and for Emergency or Temporary Facilities, Length of Stay (6.8); and Emergency or Temporary Facilities, Repeated Placement (6.9). In combination with the net losses in foster homes for siblings and adolescents described above, DHHS must continue to develop a sufficient array of foster home placements to meet the needs of children in custody.

Per the September 15, 2020 Stipulated Order this is a COVID-impacted commitment and performance for the period, as described in this report, will not be used by either party to demonstrate sustained compliance or non-compliance with the terms of the MISEP. While DHHS' efforts were significant during this pandemic period, moving forward there is work to be done for DHHS to understand and stem net foster home losses, and to heighten its focus on licensing foster homes for the special populations of siblings and adolescents.

*Relative Foster Parents (6.10.a)*

When children are placed in out-of-home care, preference must be given to placement with a relative. Safety assessments, safety planning (when appropriate), and background checks must occur for all non-licensed homes. The MISEP relative safety commitments are particularly important to child safety as 40 percent of children in DHHS custody were living with relatives at the conclusion of MISEP 18. In the MISEP, DHHS committed to ensure that:

- Prior to a child's placement, DHHS will visit the relative's home to determine it is safe;

- Law enforcement and central registry background checks for all adults living in the home will be completed within 72 hours of placement; and

- A home study will be completed within 30 days of placement determining whether the placement is safe and appropriate.

The parties agreed the monitors will conduct an independent qualitative review each period to measure DHHS' performance for this commitment. The designated performance standard for this commitment is 95 percent.

For MISEP 18, the monitoring team reviewed a sample of 65 unlicensed relative foster homes. The team determined performance was achieved overall in 36 cases (55.4 percent) and performance was not achieved in 12 cases (18.5 percent). The monitoring team was unable to verify 17 cases (26.2 percent). The reason is there was insufficient evidence that supported timely completion of background checks. The monitoring team could only find background check dates on the relative initial safety screen and a notation of "no" or "non-applicable" to indicate whether a central registry and law enforcement history exists. In two cases reviewed by the monitoring team, the initial safety screens indicated that background checks were completed timely and the relative caregivers had no criminal or CPS histories. However, when subsequent background checks were completed during the home study, criminal or CPS history was found. The first case missed a 2017 criminal history for an adult household member. The second missed the caregiver's criminal history which included three arrests between 2009 and 2015.

Performance for each of the four components individually, was as follows:

- An initial home safety assessment prior to placement was completed for 63 homes (96.9 percent).

- Central registry background checks were completed for relative caregivers within 72 hours of placement for 47 homes (72.3 percent).

- Law enforcement background checks were completed for relative caregivers within 72 hours of placement for 45 homes (69.2 percent).

- A home study was completed within 30 days of placement for 57 relative placements (87.7 percent).

DHHS did not meet the designated performance standard of 95 percent. Factors that contributed to not meeting the standard include, late background checks for caregivers and other adult household members, relative home studies completed beyond the 30-day timeframe, and workers not visiting the prospective relative home prior to placement. One home had improper storage of weapons and two homes did not have a Placement Exception Request (PER) submitted timely.

*Relative Foster Parents (6.10.b)*

The MISEP requires a relative placement home study, including all clearances, must be completed, and approved annually[17] for unlicensed caregivers to ensure the safety of children placed in relative homes. An approved relative home study is valid for one year. This commitment

---

[17] Annually is defined as within 365 days of the last relative placement home study.

is measured through an independent qualitative review conducted by the monitors with a designated performance standard of 95 percent.

For this commitment, the monitoring team reviewed a sample of 63 unlicensed relative homes due for a renewal home study. The monitoring team found in its review that 23 homes (36.5 percent) met the performance standards in the MISEP, and 40 cases (63.5 percent) did not. DHHS did not meet the designated performance standard of 95 percent during the period.

A predominant concern found in the annual reviews was completion of an approved annual home study within 365 days with timely clearances. An annual home study was completed timely for 25 homes (39.7 percent). Additionally, for relative caregivers, central registry checks were completed timely, prior to the approval of the annual home study, in 44 cases (69.8 percent) and criminal history background checks were completed timely, prior to the approval of the annual home study, in 45 cases (71.4 percent). For other household adults the monitoring team was unable to find evidence that central registry checks were completed in 14 cases (22.2 percent) and whether criminal history checks were completed in 15 cases (23.8 percent). Michigan policy requires that all caregivers and household members aged 12 years and older must have his/her name and address searched on the Michigan Public Sex Offender Registry. The monitoring team was able to find evidence that this background check was completed for 43 (68.3 percent) of the homes. The monitoring team found in its review a significant number of cases with notable gaps between the date home studies were signed by the supervisor and the approval date listed in MiSACWIS.

The monitoring team, in its review of annual unlicensed relative home studies, found concerns not identified or addressed by DHHS. These included relatives lacking sufficient resources, which reflects an urgent opportunity for DHHS to ensure the safety and well-being of children by meeting families' needs. The monitoring team expects that when such issues are surfaced in the annual home study, DHHS will document its efforts to address the issues and ensure children in these homes will be both safe and have their needs met.

## Placement Standards

*Placement Standard (6.5)*

The MISEP requires that all children placed in the foster care custody of DHHS be placed in a licensed foster home, a licensed facility, pursuant to a court order, or with an unlicensed relative. According to the data submitted by DHHS for MISEP 18, there were 11,172 children[18] subject to this commitment. Of those children, 10,655 (95.4 percent) children were placed in settings allowable in the MISEP. Five hundred seventeen children (4.6 percent) were placed in settings

---

[18] This provision excludes children in temporary placement settings including AWOL, jail, detention, and hospitals.

not allowed in the MISEP.[19] DHHS did not meet the performance standard of 100 percent for this commitment.

*Placing Siblings Together (6.6)*

The MISEP requires DHHS to place siblings together when they enter foster care at or near the same time. Exceptions can be made if placing the siblings together would be harmful to one or more of the siblings, one of the siblings has exceptional needs that can only be met in a specialized program or facility, or the size of the sibling group makes such placement impractical notwithstanding efforts to place the group together. DHHS provided data to the monitoring team indicating there were 395 sibling groups whose members entered foster care within 30 days of each other during MISEP 18. Of these 395 sibling groups, 286 (72.4 percent) were either placed together or had a timely approval for an allowable exception. The monitoring team reviewed case records for a sample of the children with allowable exceptions and determined they were valid. DHHS did not meet the designated performance standard of 90 percent for this commitment.

The commitment also requires that when siblings are separated at any time except for any of the aforementioned reasons, the case manager shall make immediate efforts to locate or recruit a family in whose home the siblings can be reunited. Efforts to place siblings together are to be documented and maintained in the case file and reassessed quarterly. The parties agreed that the monitoring team would conduct an independent qualitative review to measure performance for this commitment.

For MISEP 18 the monitoring team reviewed 57 children's case records subject to this provision and found that DHHS met the terms of the commitment in 21 cases (36.8 percent), below the designated performance standard of 90 percent.

*Maximum Children in a Foster Home (6.7)*

In the MISEP, DHHS committed that no child shall be placed in a foster home if that placement will result in more than three foster children in that foster home, or a total of six children, including the foster family's birth and adopted children. In addition, DHHS agreed that no placement will result in more than three children under the age of three residing in a foster home. Exceptions to these limitations may be made by the Director of DCWL when in the best interest of the child(ren) being placed. As of June 30, 2020, there were 5,034 foster homes in Michigan

---

[19] Placement types for the 517 children were as follows: Unrelated Caregiver (255); Rental Home/Apartment (149); Adoptive Home (77); Friend/Partner Home (20); Juvenile Guardianship Home (8); College Dormitory (6); and Missing (2). Some of these placement types appear to be made in the best interests of children (adoptive homes) and the monitors recommend the parties review the allowable exceptions for this commitment.

with at least one child in placement. Of these 5,034 homes, 4,626 (91.9 percent) met the terms of this commitment, meeting the designated performance standard of 90 percent.

*Emergency or Temporary Facilities, Length of Stay (6.8)*

DHHS is required to ensure children shall not remain in emergency or temporary facilities, including shelter care, for a period lasting more than 30 days unless exceptional circumstances exist. DHHS committed that no child shall remain in an emergency or temporary facility for a period lasting more than 60 days with no exceptions. The agreed upon performance standard for this commitment is 95 percent. Of the 120 children placed in emergency or temporary facilities during MISEP 18, 77 (64.2 percent) were placed within the length of stay parameters. DHHS did not meet the performance standard during MISEP 18. The following chart details the race of the 120 children placed in emergency or temporary facilities during the period. As the table below indicates, Black/African American children were disproportionately placed in shelter care. While Black/African American children made up 31 percent of children in DHHS custody, they comprised 52 percent of the children placed in shelters and 58 percent of the children who exceeded length of stay parameters in shelters during the period.

**Table 4. Race of Children in Emergency or Temporary Facilities, MISEP 18**

| Race | Count<br>Children placed in shelters | Percent<br>Children placed in shelters | Count<br>Children who exceeded length of stay parameters | Percent<br>Children who exceeded length of stay parameters |
|---|---|---|---|---|
| Black/African American | 62 | 52% | 25 | 58% |
| White | 41 | 34% | 13 | 30% |
| Mixed Race | 17 | 14% | 5 | 12% |
| Native American | 0 | 0% | 0 | 0% |
| Asian | 0 | 0% | 0 | 0% |
| Native Hawaiian or Pacific Islander | 0 | 0% | 0 | 0% |
| **Total** | **120** | **100%** | **43** | **100%** |
| Hispanic origin (of any race) | 6 | 5% | 4 | 9% |

*Emergency or Temporary Facilities, Repeated Placement (6.9)*

The MISEP requires that no child shall be placed in an emergency or temporary facility more than one time in a 12-month period unless exceptional circumstances exist. Children under 15 years of age experiencing a subsequent emergency or temporary-facility placement within a 12-month period may not remain in an emergency or temporary facility for more than seven days. Children 15 years of age or older experiencing a subsequent emergency or temporary-facility placement within a 12-month period may not remain in an emergency or temporary facility for more than

30 days. During the reporting period, children experienced 40 subsequent stays in shelter care, of which five placement episodes (12.5 percent) met the terms of this commitment. DHHS did not meet the agreed upon performance standard of 97 percent. Table 6 details the race of the children who experienced subsequent stays in shelter care during the period. Again, Black/African American children were disproportionately represented, comprising 53 percent of the children who experienced multiple stays in emergency or temporary facilities, but only 31 percent of the children in DHHS custody.

**Table 5. Race of Children Experiencing a Subsequent Emergency or Temporary-Facility Placement**

| Race | Count | Percent |
|---|---|---|
| Black/African American | 21 | 53% |
| White | 16 | 40% |
| Mixed Race | 3 | 8% |
| Native American | 0 | 0% |
| Asian | 0 | 0% |
| Native Hawaiian or Pacific Islander | 0 | 0% |
| **Total** | **40** | **100%** |
| Hispanic origin (of any race) | 4 | 10% |

Note: Percentages do not add up to 100 due to rounding.

## Case Planning and Practice

*Supervisory Oversight (6.16)*

Supervisors are to meet at least monthly with each assigned caseworker to review the status of progress of each case on the worker's caseload. Supervisors must review and approve each service plan after having a face-to-face meeting with the worker, which can be the monthly supervisory meeting. The designated performance standard for this commitment is 95 percent.

Due to the onset of the COVID-19 pandemic, Judge Edmonds issued a Stipulated Order,[20] which permits supervisory conferences conducted via video conferencing technology or phone. Performance is reported separately for the non-COVID impacted period of January 1, 2020 to February 29, 2020 and the COVID-impacted period of March 1, 2020 to June 30, 2020. The table below includes performance for initial and monthly case consultations due in MISEP 18.

---

[20] See Appendix G for a copy of the Stipulated Order.

**Table 6. MISEP 18 Performance on Supervisory Oversight**

| Requirement | January - February | March - June |
|---|---|---|
| Initial case consultations between a worker and supervisor that were due in the first 30 days | 93.3% | 97.3% |
| Monthly case consultations due between a worker and supervisor | 92.1% | 95.4% |

Per the September 15, 2020 Stipulated Order this is a COVID-impacted commitment and performance for the period, as described in this report, will not be used by either party to demonstrate sustained compliance or non-compliance with the terms of the MISEP.

*Timeliness of Service Plans (6.17, 6.18)*

The MISEP requires that DHHS complete an initial service plan (ISP) within 30 days of a child's entry into foster care (6.17) and then complete an updated service plan (USP) at least quarterly thereafter (6.18). The designated performance standard for both commitments is 95 percent.

During MISEP 18, DHHS did not achieve the designated performance standard for either commitment. Of the 1,877 ISPs due during the period, 1,631 (86.9 percent) were completed within 30 days of a child's entry into foster care or Young Adult Voluntary Foster Care (YAVFC). Of the 20,739 USPs due during the period, 18,622 (90.0 percent) were completed at least quarterly.

## Caseworker Visitation

A key element of permanency practice involves face-to-face time between various people involved with a child welfare case. However, due to the onset of the COVID-19 pandemic, Judge Edmonds issued a Stipulated Order,[21] which broadens the definition of visits to include visits conducted by video conferencing technologies for purposes of measuring performance during MISEP 18. Additionally, the Judge permitted visits conducted via telephone in certain situations where video conferencing was not available during the period.[22] This modification did not eliminate all face-to-face visitations for children in care. The video or telephonic visitation options were authorized for routine visits, but not for emergency situations where a worker must respond to an immediate child health or safety concern.

---

[21] See Appendix G for a copy of the Stipulated Order.
[22] Regarding commitment 6.21 (worker-child visits), telephonic visits were counted as compliant from March 1, 2020 to May 5, 2020. Regarding commitments 6.22 (parent-child visits), 6.23 (worker-parent visits), and 6.24 (sibling visits) telephonic visits were counted as compliant from March 1, 2020 to June 30, 2020.

Performance for each of the visitation commitments is reported separately for the non-COVID impacted period of January 1, 2020 to February 29, 2020 and the COVID-impacted period of March 1, 2020 to June 30, 2020.

*Worker-Child Visitation (6.21)*

DHHS agreed that caseworkers shall visit children in foster care at least two times per month during the child's first two months of placement in an initial or new placement, and at least once per month thereafter. At least one visit each month shall be held at the child's placement location and shall include a private meeting between the child and the caseworker. DHHS and the monitoring team established in the Metrics Plan assessment criteria for the six components that are included in the 6.21 commitment. The designated performance standard is 95 percent for all components.

DHHS' MISEP 18 performance on the six components of worker-child visitation is included in the following table. Per the September 15, 2020 Stipulated Order this is a COVID-impacted commitment and performance for the period, as described in this report, will not be used by either party to demonstrate sustained compliance or non-compliance with the terms of the MISEP.

**Table 7. MISEP 18 Performance on Worker-Child Visitation**

| Requirement | January - February | March - June |
|---|---|---|
| Each child shall be visited by a caseworker at least twice per month during the first two months following an initial or new placement | 90.4% | 89.5% |
| Each child shall be visited by a caseworker at their placement location at least once per month during the first two months following an initial or new placement | 82.5% | -- |
| Each child shall have at least one visit per month that includes a private meeting between the child and caseworker during the first two months following an initial or new placement | 82.7% | -- |
| Each child shall be visited by a caseworker at least once per full month the child is in foster care | 97.9% | 97.1% |
| Each child shall be visited by a caseworker at their placement location at least once per full month the child is in foster care | 96.4% | -- |
| Each child shall have at least one visit per full month the child is in foster care that includes a private meeting between the child and caseworker | 95.4% | -- |

*Worker-Parent Visitation (6.22)*

Caseworkers must visit parents of children with a reunification goal at least twice during the first month of placement with at least one visit in the parental home. For subsequent months, visits must occur at least once per month. Exceptions to this requirement are made if the parent(s) are not attending visits despite DHHS taking adequate steps to ensure the visit takes place or a parent cannot attend a visit due to exigent circumstances such as hospitalization or incarceration. Exceptions are excluded from the numerator and denominator of this calculation. DHHS and the monitoring team established assessment criteria for the three components of this commitment in the Metrics Plan. The designated performance standard is 85 percent for all components.

DHHS' MISEP 18 performance on the three components of worker-parent visitation is included in the following table. Per the September 15, 2020 Stipulated Order this is a COVID-impacted commitment and performance for the period, as described in this report, will not be used by either party to demonstrate sustained compliance or non-compliance with the terms of the MISEP.

**Table 8. MISEP 18 Performance on Worker-Parent Visitation**

| Requirement | January - February | March - June |
|---|---|---|
| Caseworkers shall visit parents of children with a goal of reunification at least twice during the first month of placement | 71.7% | 83.2% |
| Caseworkers shall visit parents of children with a goal of reunification in the parent's place of residence at least once during the first month of placement | 53.4% | -- |
| Caseworkers shall visit parents of children with a goal of reunification at least once for each subsequent month of placement | 69.6% | 71.7% |

*Parent-Child Visitation (6.23)*

When reunification is a child's permanency goal, parents and children will visit at least twice each month. Exceptions to this requirement are made if a court orders less frequent visits, the parents are not attending visits despite DHHS taking adequate steps to ensure the parents' ability to visit, one or both parents cannot attend the visits due to exigent circumstances such as hospitalization or incarceration, or the child is above the age of 16 and refuses such visits. The designated performance standard is 85 percent.

DHHS' MISEP 18 performance for this commitment is included in the following table. Per the September 15, 2020 Stipulated Order this is a COVID-impacted commitment and performance

for the period, as described in this report, will not be used by either party to demonstrate sustained compliance or non-compliance with the terms of the MISEP.

**Table 9. MISEP 18 Performance on Parent-Child Visitation**

| Requirement | January - February | March - June |
|---|---|---|
| Each child with a goal of reunification shall visit with their parents twice a month | 64.7% | 59.4% |

*Sibling Visitation (6.24)*

For children in foster care who have siblings in custody with whom they are not placed, DHHS shall ensure they have at least monthly visits with their siblings. Exceptions to this requirement can be made if the visit may be harmful to one or more of the siblings, the sibling is placed out of state in compliance with the Interstate Compact on Placement of Children, the distance between the child's placements is more than 50 miles and the child is placed with a relative, or one of the siblings is above the age of 16 and refuses to visit. The designated performance standard is 85 percent.

DHHS' MISEP 18 performance for this commitment is included in the following table. Per the September 15, 2020 Stipulated Order this is a COVID-impacted commitment and performance for the period, as described in this report, will not be used by either party to demonstrate sustained compliance or non-compliance with the terms of the MISEP.

**Table 10. MISEP 18 Performance on Sibling Visitation**

| Requirement | January - February | March - June |
|---|---|---|
| Each child who has siblings in custody with whom they are not placed, shall have at least monthly visits with their siblings | 69.5% | 56.8% |

## Safety and Well-Being

## Responding to Reports of Abuse and Neglect

*Commencement of CPS Investigations (5.2)*

DHHS committed to commence investigations of reports of child abuse or neglect within the timeframes required by state law. The designated performance standard for this commitment is 95 percent.

DHHS reported that during MISEP 18, there were 31,501 complaints that required the commencement of an investigation. Of those, 30,828 (97.9 percent) were commenced timely, meeting the performance standard for the period.

*Completion of CPS Investigations (6.11)*

DHHS agreed that all child abuse or neglect investigations would both be completed by the worker and approved by the supervisor within 44 days. The parties agreed to a performance standard of 90 percent for this commitment.

During MISEP 18, there were 29,249 investigation reports due to be completed. Of those, 27,811 (95.1 percent) were submitted by caseworkers and approved by supervisors within 44 days. DHHS exceeded the performance standard for this commitment. *Per the MISEP, compliance during this period makes the commitment eligible to move to "To Be Maintained."*

*CPS Investigations and Screening, Screening (6.12.a)*

In the MISEP, DHHS committed to investigate all allegations of abuse or neglect relating to any child in the foster care custody of DHHS and to ensure that allegations of maltreatment in care are not inappropriately screened out and therefore not investigated by CPS. The MISEP requires that this provision be measured by the monitors through a qualitative review. A statistically significant sample of cases and a set of questions established by DHHS and the monitors was utilized in the MISEP 18 review. The review population was comprised of all referrals that involved a plaintiff class child (whether they were in out-of-home or in-home placement) that were screened out for CPS investigation during the period. There were 1,868 such referrals in the MISEP 18 data provided by DHHS.

The monitoring team reviewed 66 screened-out CPS referrals and determined that DHHS made appropriate screening decisions in 60 instances (90.9 percent). The monitors determined that two referrals met the criteria for assignment for investigation and that in four referrals additional information was needed to make an appropriate screening decision.

The MISEP also requires that when DHHS transfers a referral to another agency for investigation, DHHS must independently take appropriate action to ensure the safety and well-being of the child in the Department's custody. The parties agreed that the monitors would conduct an independent qualitative review to determine compliance with this commitment.

The population for review was comprised of allegations received by Centralized Intake about plaintiff class children that were transferred outside the Department during the period under review. Consistent with the parameters the monitors approved, the monitoring team reviewed

a random sample of cases, stratified by county, to determine performance. The designated performance standard for this commitment is 95 percent.

For MISEP 18, the monitoring team reviewed a sample of 62 transferred cases and found 51 cases met the terms of the MISEP and 11 cases did not meet the terms of the MISEP, for a performance calculation of 82.3 percent. DHHS did not meet the designated performance standard of 95 percent for the period.

*CPS Investigations and Screening, PCU (6.12.b)*

The MISEP also requires DHHS maintain a Placement Collaboration Unit (PCU) to review and assess screening decisions on plaintiff-class children who are in out-of-home placements and to ensure safety and well-being is addressed on those transferred complaints. The PCU is required to review 100 percent of cases until reconsideration of complaints involving plaintiff class children out of home are less than five percent.

The PCU unit consists of two managers and ten casework specialists. The process involves the CI unit forwarding to the PCU all screened-out referrals involving plaintiff class children. The PCU reviews the referral information and is expected to ensure that necessary review and follow-up is conducted by the on-going case worker or licensing consultant and to address any safety concerns. If the PCU determines that the complaint meets the criteria for an investigation, the referral is returned to CI for reassignment.  As necessary, the PCU worker may have contact with the referral source, review any ongoing information in the active case, consult with other professionals, and review history and trends.

According to the data submitted by DHHS, the PCU reviewed all 1,196 transferred complaints alleging abuse or neglect of a child in out-of-home placement, with 12 (1.0 percent) of the complaints returned for assignment for investigation. The monitoring team reviewed a sample of 65 of the transferred complaints reviewed by PCU and found that three (4.6 percent) of the complaints were improperly screened out for CPS investigation. One complaint should have been assigned for investigation and two complaints required more information to make a screening decision. Sixty-two (95.4 percent) of the 65 transferred complaints were appropriately screened out for investigation. PCU determined that all 65 of the transferred complaints reviewed by the monitoring team were appropriately screened out for investigation.

## Health and Mental Health

*Medical and Mental Health Examinations for Children (6.25)*

DHHS committed in the MISEP that at least 85 percent of children shall have an initial medical and mental health examination within 30 days of the child's entry into foster care, and that at

least 95 percent of children shall have an initial medical and mental health examination within 45 days of the child's entry into foster care.

During MISEP 18, the Department completed 1,328 (69.8 percent) of 1,902 required initial medical and mental health exams within 30 days of a child's entry into care. Additionally, DHHS completed 1,454 (76.6 percent) of 1,897 required initial medical and mental health exams within 45 days of a child's entry into care during MISEP 18. Per the September 15, 2020 Stipulated Order this is a COVID-impacted commitment and performance for the period, as described in this report, will not be used by either party to demonstrate sustained compliance or non-compliance with the terms of the MISEP.

*Dental Care for Children (6.26)*

DHHS committed in the MISEP that at least 90 percent of children shall have an initial dental examination within 90 days of the child's entry into care unless the child had an exam within six months prior to placement or the child is less than four years of age.

During MISEP 18, 353 initial dental exams (36.4 percent) of 970 required exams were completed timely for children in DHHS custody. Per the September 15, 2020 Stipulated Order this is a COVID-impacted commitment and performance for the period, as described in this report, will not be used by either party to demonstrate sustained compliance or non-compliance with the terms of the MISEP.

*Immunizations (6.27, 6.28)*

Under the MISEP, children in DHHS custody must receive all required immunizations according to the guidelines set forth by the American Academy of Pediatrics (AAP). For children in DHHS custody for three months or less as of the end of the period, DHHS is to ensure that 90 percent receive any necessary immunizations, according to AAP guidelines, within three months of entry into care (6.27). For children in DHHS custody for longer than three months as of the end of the period, DHHS is to ensure that 90 percent receive all required immunizations according to AAP guidelines.

On March 12, 2021, Judge Edmunds entered a "Stipulated Order Regarding Provisions 6.27 and 6.28 of the MISEP," which, in part, directs that "provisions 6.27 and 6.28 shall be held in abeyance and DHHS need not provide data to the Monitors or Plaintiffs for provisions 6.27 and 6.28" for Period 18.[23] The parties reached an agreement on how to measure these commitments in March 2021 and performance will first be evaluated for MISEP 19.

---

[23] See Appendix A for a copy of the Stipulated Order.

*Ongoing Healthcare for Children (6.29)*

DHHS committed in the MISEP that following an initial medical, dental, or mental health examination, at least 95 percent of children shall receive periodic and ongoing medical, dental, and mental health examinations and screenings, according to the guidelines set forth by the AAP. Performance for this commitment was calculated for each medical type: medical well-child visits for children aged three and younger, annual physicals for children older than three, and annual dental exams.

During MISEP 18, DHHS completed 2,826 (58.3 percent) of 4,851 medical well-child visits timely; 4,062 (75.6 percent) of 5,372 annual physicals timely; and 2,071 (38.6 percent) of 5,372 annual dental exams timely. Per the September 15, 2020 Stipulated Order this is a COVID-impacted commitment and performance for the period, as described in this report, will not be used by either party to demonstrate sustained compliance or non-compliance with the terms of the MISEP.

*Child Case File, Medical and Psychological (6.30)*

The MISEP requires that DHHS will ensure that:

- Children's health records are up to date and included in the case file. Health records include the names and addresses of the child's health care providers, a record of the child's immunizations, the child's known medical problems, the child's medications, and any other relevant health information;

- The case plan addresses the issue of health and dental care needs; and

- Foster parents or foster care providers are provided with the child's health care records.

DHHS' MISEP 18 performance on the three components of the child's medical and psychological case files is charted below. To measure performance, DHHS reviewed 32 foster care cases utilizing CSFR Item 17 criteria described in the chart below. DHHS did not achieve the 95 percent performance standard for any component of the child case file commitment during MISEP 18.

**Table 11. MISEP 18 Performance on Child Case File, Medical and Psychological**

| Requirement | Applicable Cases | Cases Not Compliant | Cases Compliant | Performance Percentage |
|---|---|---|---|---|
| To the extent available and accessible, the child's health records are up to date and included in the case file. | 32 | 3 | 29 | 90.6% |
| The case plan addresses the issue of health and dental care needs. | 32 | 2 | 30 | 93.8% |
| To the extent available and accessible, foster parents or foster care providers are provided with the child's health records. | 32 | 2 | 30 | 93.8% |

*Access to Health Insurance (6.31, 6.32)*

The MISEP requires DHHS ensure that at least 95 percent of children have access to medical coverage within 30 days of entry into foster care by providing the placement provider with a Medicaid card or an alternative verification of the child's Medicaid status and Medicaid number as soon as it is available (6.31).

Data provided by DHHS indicate that placement providers received a Medicaid card or an alternative verification of the child's Medicaid status and number within 30 days of entry into foster care for 1,703 (89.5 percent) of 1,902 children in MISEP 18. DHHS did not meet the performance standard during MISEP 18.

The MISEP also requires DHHS to ensure that 95 percent of children have access to medical coverage within 24 hours or the next business day following subsequent placement by giving the placement provider a Medicaid card or an alternative verification of the child's Medicaid status and Medicaid number as soon as it is available (6.32).

During MISEP 18, DHHS reported 3,086 (82.1 percent) of 3,757 placement providers received Medicaid cards or alternative verification within 24 hours or the next business day following a child's subsequent placement. DHHS did not meet the agreed-upon designated performance standard of 95 percent.

*Psychotropic Medication, Informed Consent (6.33)*

The MISEP requires DHHS to ensure that an informed consent is obtained and documented in writing for each child in DHHS custody who is prescribed psychotropic medication, as per DHHS policy.

During MISEP 18, the Department reported 2,802 children required informed consent documentation, for 6,811 unique prescriptions. Data indicated that valid consents were on file

for 74.4 percent of the medications. Therefore, DHHS did not meet the designated performance standard of 97 percent for this commitment.

*Psychotropic Medication, Documentation (6.34)*

Under the MISEP, DHHS must ensure that:

- A child is seen regularly by a physician to monitor the effectiveness of the medication, assess any side effects and/or health implications, consider any changes needed to dosage or medication type and determine whether medication is still necessary and/or whether other treatment options would be more appropriate;

- DHHS shall regularly follow up with foster parents/caregivers about administering medications appropriately and about the child's experience with the medication(s), including any side effects; and

- DHHS shall follow any additional state protocols that may be in place and related to the appropriate use and monitoring of medications.

Evidence of these actions should be documented in the child's case record. The parties agreed that performance for this commitment would be measured through an independent qualitative review conducted by the monitoring team.

The population for review was comprised of children in DHHS custody who were prescribed a psychotropic medication during the period under review. Consistent with the parameters the parties approved, the monitoring team reviewed a random sample of cases, stratified by county, to determine performance. The designated performance standard for this commitment is 97 percent.

For MISEP 18, the monitoring team randomly selected a sample of 67 cases from a total population of 2,802 children. The monitoring team found 18 cases met the terms of this commitment and 49 cases did not meet the terms of this commitment for a performance calculation of 26.9 percent. DHHS did not meet the designated performance standard of 97 percent for the period.

# Youth Transitioning to Adulthood

## Extending Eligibility and Services

*Support for Youth Transitioning to Adulthood, YAVFC (6.36.a)*

Under the MISEP, DHHS committed to implement policies and provide services to support youth transitioning to adulthood, including ensuring youth have been informed of services available through the Youth Adult Voluntary Foster Care (YAVFC) program. Performance for this commitment is achieved by positive trending in the rate of foster youth aging out of the system participating in the YAVFC program for a minimum of two reporting periods.

Data provided by DHHS indicate that during MISEP 18, there were 1,812 youth eligible for the YAVFC program. Of those youth, 622 (34.3 percent) participated in the program. Per the September 15, 2020 Stipulated Order this is a COVID-impacted commitment and performance for the period, as described in this report, will not be used by either party to demonstrate sustained compliance or non-compliance with the terms of the MISEP.

*Support for Youth Transitioning to Adulthood, Medicaid (6.36.b)*

The MISEP requires DHHS to continue to implement policies and provide services to support youth transitioning to adulthood, including ensuring youth have been informed of the availability of Medicaid coverage. The parties agreed that this commitment would be measured by the rate of foster youth aging out of the system who have access to Medicaid. The designated performance standard for this commitment is 95 percent.

During MISEP 18, 231 youth aged out of the foster care system. Of those youth, DHHS reported 230 (99.6 percent) had access to Medicaid on the first day of the month following foster care discharge. DHHS exceeded the designated performance standard of 95 percent for this commitment.

## Achieving Permanency

*Support for Youth Transitioning to Adulthood, Permanency (6.37)*

The MISEP requires DHHS to continue to implement policies and provide services to support the rate of older youth achieving permanency. The parties agreed that this commitment would be measured by examining the outcomes of all older youth who exit foster care during the monitoring period and comparing rates of exits to permanency and rates of exits to emancipation. For purposes of this commitment, older youth is defined as youth aged 15 or older with a permanency goal of reunification, guardianship, adoption or APPLA. The performance

standard for this commitment is positive trending, or any reduction in the rates of older youth exiting without permanency.

During MISEP 18, there were 390 youth who were 15 years and older who exited foster care. Of those, 197 (50.5 percent) discharged with an exit type of reunification, adoption, or guardianship. Per the September 15, 2020 Stipulated Order this is a COVID-impacted commitment and performance for the period, as described in this report, will not be used by either party to demonstrate sustained compliance or non-compliance with the terms of the MISEP.

**Appendix A. Stipulated Order Regarding Provisions 6.27 and 6.28 of the Modified Sustainability and Exit Plan (MISEP)**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| DWAYNE B., by his next friend, John Stempfle: CARMELA B., by her next friend William Ladd; LISA J., by her next friend, Teresa Kibby; and JULIA, SIMON, and COURTNEY G., by their next friend, William Ladd; for themselves and others similarly situated, | No. 2:06-cv-13548 |
| | HON. NANCY G. EDMUNDS |
| | Class Action |
| Plaintiffs, | **STIPULATED ORDER REGARDING PROVISIONS 6.27 AND 6.28 OF THE MODIFIED SUSTAINABILITY AND EXIT PLAN (MISEP)** |
| v | |
| GRETCHEN WHITMER, in her official capacity as Governor of the State of Michigan, *et al.*, | |
| Defendants. | |

_____/

**STIPULATED ORDER REGARDING PROVISIONS 6.27 AND 6.28 OF THE MODIFIED SUSTAINABILITY AND EXIT PLAN (MISEP)**

WHEREAS provisions 6.27 and 6.28 (Commitments 81 and 82) of the Modified Sustainability and Exhibit Plan (MISEP, ECF No. 294) address immunizations for children in the Plaintiff Class; and

WHEREAS the parties have negotiated the terms of this Stipulation to measure DHHS's compliance with provisions 6.27 and 6.28.

53

IT IS HEREBY STIPULATED AND AGREED by and between the parties that the following terms shall be utilized to measure DHHS's compliance with provisions 6.27 and 6.28 of the MISEP:

**A.  Measurement Terms**

1.  For each reporting period starting in Reporting Period 19 (July 2020 – December 2020), DHHS will provide performance data in the usual course, as described in the MISEP, to the Monitors for the following eleven immunizations: (1) DTP/DTAP/DT/TD/Tdap; (2) Hepatitis B; (3) Hib; (4) Meningococcal Conjugate; (5) Measles, Mumps, Rubella (MMR); (6) Pneumococcal Conjugate; (7) Polio; (8) Varicella; (9) HPV; (10) Rotavirus; and (11) Hepatitis A.

2.  Performance for provisions 6.27 and 6.28 shall be measured by immunization for each of the eleven immunizations listed above. Accordingly, the Monitors shall report DHHS's compliance for each of the eleven immunizations for each reporting period.

3.  To determine DHHS's performance for provisions 6.27 and 6.28, the Monitors shall calculate performance using the following formulas:

**Calculation for 6.27:**

Number of children who entered care in the first 90 days of the reporting period and have been in care for at least 90 days as of the last day of the reporting period and who have received X immunization as of their 90th day in care

Number of children who entered care in the first 90 days of the reporting period and have been in care for at least 90 days as of the last day of the reporting period excluding the children who are overage or underage for X immunization

**Calculation for 6.28:**

Number of children that have been in care for at least 90 days as of the last day of the reporting period who have received X immunization

Number of children that have been in care for at least 90 days as of the last day of the reporting period excluding the children who are overage or underage for X immunization

**B.    Additional Terms**

1.    For Reporting Period 18 (January-June 2020), provisions 6.27 and 6.28 shall be held in abeyance and DHHS need not provide data to the Monitors or Plaintiffs for provisions 6.27 and 6.28.

2.    DHHS is not required to meet any performance benchmark for the influenza immunization to be in compliance with provisions 6.27 and/or 6.28.  Accordingly, DHHS is not required to provide data to the Monitors or Plaintiffs related to the influenza immunization.

The parties respectfully request this Honorable Court enter an

order approving this stipulation.

IT IS SO ORDERED.


Dated:  March 12, 2021          s/ Nancy G. Edmunds
                                      HON. NANCY G. EDMUNDS
                                      United States District Judge


Stipulated and Agreed to by:

*/s/ Samantha M. Bartosz*            Date:  March 11, 2021
Samantha M. Bartosz (P486946)
Children's Rights
88 Pine Street, Suite 800
New York, NY 10005
Phone: (212) 683-2210
sbartosz@childrensrights.org
*Attorneys for Plaintiffs*


*/s/ Neil Giovanatti*            Date:  March 11, 2021
Neil Giovanatti (P82305)
Cassandra Drysdale-Crown (P64108)
Health, Education & Family
Services Division
525 West Ottawa Street
P.O. Box 30758
Lansing, MI 48909
Phone: (517) 335-7603
*Attorneys for Defendants*

**Appendix B. Plaintiff's Letter to Monitor – July 15, 2020**



July 15, 2020

Kevin Ryan
Eileen Crummy
Public Catalyst
kevinmichaelryan1967@gmail.com
ecrummy@public-catalyst.com
(via email)

Re: Lakeside Academy Incident, MISEP Provisions

Dear Kevin and Eileen,

     We write to express our concern regarding the April 29, 2020 incident at Lakeside Academy involving the restraint and tragic death of Cornelius Fredericks, a 16-year-old youth in the custody of the Michigan Department of Health and Human Services ("MDHHS"). We understand that a subsequent June 17, 2020 Department of Child Welfare Licensing Report found 10 licensing violations at Lakeside, including instances of excessive discipline and improper restraint (including peer-on-peer restraint), many of which were found to be repeat violations.

     As you know, the Modified Implementation Sustainability and Exit Plan ("MISEP") includes a number of commitments related to the safety of children in foster care, including the oversight of private providers and institutions like Lakeside. We appreciate the efforts of the Monitors to provide thorough reporting on the safety and oversight commitments in the MISEP that are currently categorized as "To Be Maintained" and "To Be Achieved." Some of these safety-related commitments currently reside in the "Structures and Policies" category, and therefore, receive no active monitoring.

     MISEP, Section 3.1(d), provides the following with respect to commitments in the Structures and Policies category:

> At the Monitor's discretion, the Monitors may request, and DHHS will supply, information and data relating to any Commitment in this classification. If the information and data demonstrates a substantial departure from the structural or policy Commitment, the Monitors may request that DHHS propose corrective action. If DHHS fails, within a reasonable period of time as determined by the Monitors, to propose and implement a corrective action that reestablishes compliance with the structural or policy Commitment, the Monitors may, in their discretion, move the Commitment into section 6 (To

Be Achieved) or Section 5 (To be Maintained) and undertake full monitoring in relation to the Commitment.

Given the circumstances of the incident at Lakeside and the serious findings of the MDHHS investigation, Plaintiffs request that the Monitors exercise their rights under Section 3.1(d) to request information from MDHHS on the following commitments currently in Structures and Policies: Section 4.7 (Commitment 7, Maltreatment in Care Units), Section 4.19 (Commitment 19, Corporal Punishment & Seclusion/Isolation, Prohibition and Policy), and Section 4.20 (Commitment 20, Contract Agency Requirements). Thank you for your continued focus and effort in support of the critical commitments made in the MISEP.

Sincerely,

/s/ *Elizabeth Pitman Gretter*

Elizabeth Pitman Gretter
Children's Rights, Inc.
88 Pine Street, Suite 800
New York, NY 10005
(216) 401-1609


cc:     Cassandra Drysdale-Crown
        Toni Harris
        Neil Giovanatti
        Assistants Attorney General
        Health Education & Family Services Division
        DrysdaleCrownC@michigan.gov
        HarrisT19@michigan.gov
        GiovanattiN@michigan.gov
        (via email)

**Appendix C. Michigan DHHS Corrective Action Plan – September 3, 2020**



STATE OF MICHIGAN
DEPARTMENT OF HEALTH AND HUMAN SERVICES
LANSING

GRETCHEN WHITMER
GOVERNOR

ROBERT GORDON
DIRECTOR

**M E M O R A N D U M**

**DATE:**   September 3, 2020
**TO:**   Kevin Ryan and Eileen Crummy, Public Catalyst
**FROM:**   JooYeun Chang, MDHHS Children's Services Agency Executive Director
**SUBJECT:**   MISEP Section 3.1(d) - Lakeside Academy

This communication is in response to your inquiry on August 19, 2020, pursuant to Section 3.1(d), requesting that MDHHS submit a summary of corrective actions taken in response to the tragic death of a ward placed Lakeside Academy.

Upon an immediate review of this incident, Children's Services Agency recognized that its licensing rules, restraint policies, regulatory and contractual oversight of CCIs were insufficient to assure child safety and wellbeing. The tragedy at Lakeside made clear an urgent need to limit use of restraints and improve CCI oversight, including better tracking of violations and confirmed child maltreatment.  From a systems perspective, it also made clear the need to expedite adverse licensing action in response to repeat non-compliance or safety violations, and to reduce the state's reliance on CCIs for children in child welfare. For the past year, Michigan has been working with CCIs to create contractual standards that incorporate the requirements of Qualified Residential Treatment Program (QRTP), including trauma informed practices, reduced CCI placements and lengths of stay, youth engagement and family involvement in treatment, aftercare, and incorporating measurable performance standards. Michigan anticipates executing the new contracts early in 2021 and becoming QRTP compliant by April 2021. Taken together, we believe the more immediate steps to reduce restraint use and improve licensing oversight along with the transformational steps we are taking to decrease reliance on CCIs and implement QRTP, will result in improved safety and wellbeing for children in our care.

MDHHS understands there is particular interest in demonstrating corrective action in the following commitments that are currently situated in Structures and Policies of the agreement.

1.  Section 4.7 (Commitment 7) – Maltreatment in Care Units
2.  Section 4.19 (Commitment 19) – Corporal Punishment & Seclusion/Isolation, Prohibition and Policy
3.  Section 4.20 (Commitment 20) – Contract Agency Requirements

Below are highlights of the activities initiated by CSA to improve immediate child safety in CCIs. Please note this is not an exhaustive list.

1. *Section 4.7 (Commitment 7) – Maltreatment in Care Units - Careful and Thorough Evaluation of Agency History and Trends: The department will create processes to identify rule violation and MIC history for all facilities. CSA will use this information to identify trends and integrate historical information in on-going monitoring to enhance safety practices and oversight immediately and ongoing using the following strategies:*

   - *Immediate review of facilities to evaluate critical safety needs by:*
     - Reviewed agencies with established rule violations and placed 14 CCIs on provisional licenses as a result.
     - Reviewed agencies with second provisional licenses and enacted weekly visits by DCWL.
     - Reviewed agencies on a first provisional license and enacted monthly visits by DCWL.
     - Reviewed CCIs with two or more safety, or one or more serious violation within the last 24 months and as a result the following occurred:
       - 22 new Corrective Action Plans (CAPS) generated.
       - 20 new safety plans developed.
       - 9 on-site technical assistance visits provided within 30 days.
       - Review of 6 existing CAPS
     - Revocation of licenses:
       - Four facilities recommended for revocation due to repeated safety concerns.
   - *Ongoing analysis of Maltreatment in Care to ensure that trends and facility safety issues are recognized early:*
     - **Quality Oversight of MIC Investigations:** A monthly MIC Manager Quality Review Process will be initiated for CCIs, commencing with agencies with the highest number of prior complaints, regardless of dispositions, with the intent of:
       - assess the quality, policy/procedure compliance and any pattern or trends to support or enhance existing remediation strategies.
       - ensure timely responsiveness to newly identified trends or risks and initiate remediation as a result.

       Findings will be shared with DCWL and CSA leadership.  CPS-MIC managers have been trained and 8 reviews are currently being conducted.

     - **Elevated Oversight of MIC Investigations:** Second line reviews are completed for all CPS-MIC investigations of all complaints pending substantiation. For any CCI with 3 or more substantiations w/in the last year, the case will be reviewed by the CPS-MIC director. The CPS-MIC director will hold a case consultation with DCWL regarding patterns and action steps needed to ensure safety.
     - **Secondary Review of Denied Complaints**: DCQI will complete a monthly review involving 10% of denied MIC investigations involving a CCI.

2. *Section 4.19 (Commitment 19) – Corporal Punishment & Seclusion/Isolation, Prohibition and Policy -Prohibition of restraints: The department will work with experts, community stakeholders and providers towards goal of preventing and*

*striving to eliminate the use of restraints in all licensed child caring institutions. Specific activities include:*

- Issuance of Emergency Administrative Rules which create clear safeguards against dangerous form of restraints, clarified the limited circumstances when restraints could be used to protect against physical harm, and created new reporting requirements to create a baseline to measure progress over time. See attached.
- Issued two communications to all licensed CCIs requiring timely reporting of all restraint incidents to MDHHS effective 7/17/20 and certification of CCI policy and procedure development to demonstrate implementation of the new Emergency Rules by 8/20/20. See attached.
- Developing a workgroup to implement the Annie E. Casey Foundation report recommendations. Subgroups to focus on:
  - Plan to eliminate the use of restraints.
  - Draft permanent revisions to CCI and COF rules.
  - Developing clear disciplinary process for rule violations.
  - Create new standards of practice and new service lines that engage families and youth, are neurodevelopmental and sensory based approaches that focus on positive youth development.
- Creating a new contract management unit that tracks safety, permanency, and wellbeing outcomes.
- Focusing on permanency practice strategies with a sense of urgency for every child who is currently placed and before any child is placed in a CCI.
- Immediately provide technical assistance to CCI providers on positive youth engagement and violence prevention de-escalation techniques.
- Contract with the Building Bridges Initiative to provide ongoing services and technical assistance to providers as we implement the Annie E. Casey Foundation report recommendations.

3. *Section 4.20 (Commitment 20) – Contract Agency Requirements -Qualitative evaluation of ongoing practice: The department will continue conducting qualitative evaluations of system practice and policies and imbed improvement efforts in the CQI process through the following strategies:*
   - Ongoing qualitative analysis of child and agency level information focusing on:
     - Consultants will commence investigations with a review of history.
     - Case consultation will occur between MIC and DCWL for joint investigations prior to disposition.
     - Pre-exit conferences will be held to review history and trends.
     - Job aid for consultants and managers, and tracking methodology was developed on 7/29/20 to ensure processes are followed and trends/history are tracked.
   - Natural Evaluation of CCI Status and safety through unannounced visits:
     - Weekly for second provisional.
     - Monthly for first provisional.
     - Quarterly for all facilities.
     - Unannounced annual inspections to include conversations with youth.

- Enhanced managerial oversight:
    - Consultation to include monthly visit summary.
    - Managers will review corrective action plans with consultants within 7 days.
    - Ensure utilization of CAP template by all consultants.
    - Weekly meetings with consultant to review all pending investigations.
    - Within 7 days of receiving a Special Investigation Review, Manager will review previous 24-month investigations for the CCI.
- Ongoing CQI evaluation through DCQI/DCWL monthly data and quality meetings
- Careful analysis and review of DCWL structure to ensure deliberate and thoughtful action is taken to assess capacity, staffing, and structure to engage in all assigned tasks, such as licensing and compliance activities.
- Ongoing consideration of potential modifications to the current structure of compliance and quality assurance activities is an active area of focus for CSA leadership.
- Policy Change Preparation:
    - Policy changes proposed related to DCWL functions to enhance inclusion, evaluation and integration of MIC information and history into all investigative and CAP decisions.
    - Emergency Rule Certification Checklist Developed (see attached).


Attachments:
- 20-095 Incident Reporting for Child Caring Institutions
- 20-095.1 INCIDENT REPORT TEMPLATE
- 20-095.2 Parent Notification Sample
- 20-096 Guidelines for Implementing Emergency Rules for Child Caring Institutions
- 20-096.1 EMERGENCY RULE IMPLEMENTATION
- AEC CCI Recommendations Tracking Doc
- AEC Workgroup Overview Doc 8.11.20
- Child Welfare Strategy Groups Review and Recommendations
- DCWL Action plan and follow-up
- R400.4159 Resident Restraint

**Appendix D. Age Range of Children in Care on June 30, 2020 By County**

| County Name | Ages 0-6 | | Ages 7-11 | | Ages 12-17 | | Ages 18+ | | Total |
|---|---|---|---|---|---|---|---|---|---|
| | Children | % | Children | % | Children | % | Children | % | |
| Alcona | 7 | 41.2% | 2 | 11.8% | 8 | 47.1% | 0 | 0.0% | 17 |
| Alger | 12 | 54.5% | 5 | 22.7% | 5 | 22.7% | 0 | 0.0% | 22 |
| Allegan | 72 | 39.6% | 48 | 26.4% | 56 | 30.8% | 6 | 3.3% | 182 |
| Alpena | 30 | 56.6% | 4 | 7.5% | 14 | 26.4% | 5 | 9.4% | 53 |
| Antrim | 6 | 37.5% | 0 | 0.0% | 7 | 43.8% | 3 | 18.8% | 16 |
| Arenac | 16 | 55.2% | 5 | 17.2% | 6 | 20.7% | 2 | 6.9% | 29 |
| Baraga | 2 | 66.7% | 0 | 0.0% | 1 | 33.3% | 0 | 0.0% | 3 |
| Barry | 16 | 42.1% | 6 | 15.8% | 13 | 34.2% | 3 | 7.9% | 38 |
| Bay | 63 | 36.2% | 39 | 22.4% | 58 | 33.3% | 14 | 8.0% | 174 |
| Benzie | 6 | 25.0% | 3 | 12.5% | 13 | 54.2% | 2 | 8.3% | 24 |
| Berrien | 150 | 56.8% | 56 | 21.2% | 51 | 19.3% | 7 | 2.7% | 264 |
| Branch | 42 | 52.5% | 19 | 23.8% | 17 | 21.3% | 2 | 2.5% | 80 |
| Calhoun | 129 | 42.0% | 76 | 24.8% | 88 | 28.7% | 14 | 4.6% | 307 |
| Cass | 50 | 43.1% | 26 | 22.4% | 29 | 25.0% | 11 | 9.5% | 116 |
| Central Office | 10 | 76.9% | 2 | 15.4% | 1 | 7.7% | 0 | 0.0% | 13 |
| Charlevoix | 4 | 57.1% | 0 | 0.0% | 3 | 42.9% | 0 | 0.0% | 7 |
| Cheboygan | 13 | 56.5% | 4 | 17.4% | 6 | 26.1% | 0 | 0.0% | 23 |
| Chippewa | 24 | 58.5% | 8 | 19.5% | 7 | 17.1% | 2 | 4.9% | 41 |
| Clare | 21 | 35.6% | 16 | 27.1% | 21 | 35.6% | 1 | 1.7% | 59 |
| Clinton | 13 | 54.2% | 6 | 25.0% | 5 | 20.8% | 0 | 0.0% | 24 |
| Crawford | 20 | 41.7% | 16 | 33.3% | 11 | 22.9% | 1 | 2.1% | 48 |
| Delta | 39 | 68.4% | 11 | 19.3% | 7 | 12.3% | 0 | 0.0% | 57 |
| Dickinson | 20 | 60.6% | 10 | 30.3% | 2 | 6.1% | 1 | 3.0% | 33 |
| Eaton | 44 | 45.4% | 16 | 16.5% | 24 | 24.7% | 13 | 13.4% | 97 |
| Emmet | 10 | 35.7% | 10 | 35.7% | 7 | 25.0% | 1 | 3.6% | 28 |
| Genesee | 244 | 45.8% | 110 | 20.6% | 144 | 27.0% | 35 | 6.6% | 533 |
| Gladwin | 13 | 29.5% | 11 | 25.0% | 19 | 43.2% | 1 | 2.3% | 44 |
| Gogebic | 21 | 61.8% | 6 | 17.6% | 6 | 17.6% | 1 | 2.9% | 34 |
| Grand Traverse | 40 | 54.8% | 14 | 19.2% | 13 | 17.8% | 6 | 8.2% | 73 |
| Gratiot | 26 | 59.1% | 11 | 25.0% | 6 | 13.6% | 1 | 2.3% | 44 |
| Hillsdale | 49 | 57.6% | 23 | 27.1% | 12 | 14.1% | 1 | 1.2% | 85 |
| Houghton | 6 | 50.0% | 1 | 8.3% | 4 | 33.3% | 1 | 8.3% | 12 |
| Huron | 22 | 53.7% | 8 | 19.5% | 11 | 26.8% | 0 | 0.0% | 41 |
| Ingham | 205 | 49.3% | 76 | 18.3% | 104 | 25.0% | 31 | 7.5% | 416 |
| Ionia | 23 | 41.8% | 15 | 27.3% | 15 | 27.3% | 2 | 3.6% | 55 |
| Iosco | 21 | 52.5% | 6 | 15.0% | 11 | 27.5% | 2 | 5.0% | 40 |
| Iron | 13 | 68.4% | 4 | 21.1% | 2 | 10.5% | 0 | 0.0% | 19 |
| Isabella | 27 | 42.2% | 13 | 20.3% | 16 | 25.0% | 8 | 12.5% | 64 |
| Jackson | 99 | 45.8% | 45 | 20.8% | 58 | 26.9% | 14 | 6.5% | 216 |
| Kalamazoo | 206 | 47.1% | 94 | 21.5% | 107 | 24.5% | 30 | 6.9% | 437 |

63

| County Name | Ages 0-6 | | Ages 7-11 | | Ages 12-17 | | Ages 18+ | | Total |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Children | % | Children | % | Children | % | Children | % | |
| Kalkaska | 16 | 55% | 8 | 28% | 4 | 14% | 1 | 3% | 29 |
| Kent | 367 | 47% | 151 | 19% | 212 | 27% | 53 | 7% | 783 |
| Lake | 7 | 47% | 1 | 7% | 6 | 40% | 1 | 7% | 15 |
| Lapeer | 11 | 31% | 6 | 17% | 16 | 46% | 2 | 6% | 35 |
| Leelanau | 0 | 0% | 3 | 43% | 4 | 57% | 0 | 0% | 7 |
| Lenawee | 83 | 54% | 36 | 24% | 30 | 20% | 4 | 3% | 153 |
| Livingston | 52 | 49% | 20 | 19% | 31 | 29% | 3 | 3% | 106 |
| Luce | 3 | 100% | 0 | 0% | 0 | 0% | 0 | 0% | 3 |
| Mackinac | 7 | 44% | 3 | 19% | 4 | 25% | 2 | 13% | 16 |
| Macomb | 257 | 50% | 101 | 20% | 128 | 25% | 26 | 5% | 512 |
| Manistee | 18 | 44% | 14 | 34% | 7 | 17% | 2 | 5% | 41 |
| Marquette | 22 | 60% | 2 | 5% | 12 | 32% | 1 | 3% | 37 |
| Mason | 26 | 62% | 6 | 14% | 9 | 21% | 1 | 2% | 42 |
| Mecosta | 6 | 26% | 8 | 35% | 5 | 22% | 4 | 17% | 23 |
| Menominee | 6 | 43% | 2 | 14% | 6 | 43% | 0 | 0% | 14 |
| Midland | 58 | 50% | 21 | 18% | 31 | 27% | 5 | 4% | 115 |
| Missaukee | 8 | 57% | 2 | 14% | 2 | 14% | 2 | 14% | 14 |
| Monroe | 80 | 52% | 43 | 28% | 27 | 18% | 3 | 2% | 153 |
| Montcalm | 43 | 37% | 34 | 29% | 31 | 27% | 8 | 7% | 116 |
| Montmorency | 7 | 64% | 1 | 9% | 2 | 18% | 1 | 9% | 11 |
| Muskegon | 198 | 49% | 94 | 23% | 100 | 25% | 12 | 3% | 404 |
| Newaygo | 45 | 51% | 28 | 32% | 11 | 13% | 4 | 5% | 88 |
| Oakland | 283 | 48% | 119 | 20% | 142 | 24% | 41 | 7% | 585 |
| Oceana | 12 | 57% | 7 | 33% | 2 | 10% | 0 | 0% | 21 |
| Ogemaw | 17 | 41% | 9 | 21% | 13 | 31% | 3 | 7% | 42 |
| Ontonagon | 1 | 20% | 3 | 60% | 0 | 0% | 1 | 20% | 5 |
| Osceola | 10 | 48% | 1 | 5% | 9 | 43% | 1 | 5% | 21 |
| Oscoda | 9 | 41% | 4 | 18% | 9 | 41% | 0 | 0% | 22 |
| Otsego | 16 | 42% | 12 | 32% | 9 | 24% | 1 | 3% | 38 |
| Ottawa | 85 | 45% | 58 | 31% | 34 | 18% | 12 | 6% | 189 |
| Presque Isle | 8 | 67% | 0 | 0% | 4 | 33% | 0 | 0% | 12 |
| Roscommon | 10 | 46% | 5 | 23% | 5 | 23% | 2 | 9% | 22 |
| Saginaw | 71 | 43% | 34 | 21% | 44 | 27% | 17 | 10% | 166 |
| Sanilac | 27 | 48% | 15 | 27% | 13 | 23% | 1 | 2% | 56 |
| Schoolcraft | 11 | 61% | 5 | 28% | 2 | 11% | 0 | 0% | 18 |
| Shiawassee | 48 | 57% | 16 | 19% | 19 | 23% | 1 | 1% | 84 |
| St. Clair | 132 | 49% | 56 | 21% | 68 | 26% | 11 | 4% | 267 |
| St. Joseph | 74 | 48% | 45 | 29% | 33 | 21% | 3 | 2% | 155 |
| Tuscola | 14 | 41% | 7 | 21% | 9 | 27% | 4 | 12% | 34 |
| Van Buren | 75 | 51% | 35 | 24% | 36 | 24% | 2 | 1% | 148 |
| Washtenaw | 70 | 48% | 30 | 21% | 32 | 22% | 14 | 10% | 146 |
| Wayne | 1316 | 47% | 634 | 23% | 624 | 22% | 213 | 8% | 2787 |
| Wexford | 28 | 51% | 9 | 16% | 14 | 26% | 4 | 7% | 55 |
| Total | 5585 | 48% | 2599 | 22% | 2828 | 24% | 686 | 6% | 11698 |

**Appendix E. Length of Stay of Children in Care on June 30, 2020 by County**

| County Name | Less than a year | | 1-2 years | | 2-3 years | | 3-6 years | | 6 years plus | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Children | % | Children | % | Children | % | Children | % | Children | % | |
| Alcona | 7 | 41.2% | 5 | 29.4% | 5 | 29.4% | 0 | 0.0% | 0 | 0.0% | 17 |
| Alger | 9 | 40.9% | 8 | 36.4% | 5 | 22.7% | 0 | 0.0% | 0 | 0.0% | 22 |
| Allegan | 103 | 56.6% | 47 | 25.8% | 22 | 12.1% | 6 | 3.3% | 4 | 2.2% | 182 |
| Alpena | 19 | 35.8% | 17 | 32.1% | 14 | 26.4% | 2 | 3.8% | 1 | 1.9% | 53 |
| Antrim | 7 | 43.8% | 3 | 18.8% | 4 | 25.0% | 2 | 12.5% | 0 | 0.0% | 16 |
| Arenac | 17 | 58.6% | 6 | 20.7% | 6 | 20.7% | 0 | 0.0% | 0 | 0.0% | 29 |
| Baraga | 1 | 33.3% | 0 | 0.0% | 2 | 66.7% | 0 | 0.0% | 0 | 0.0% | 3 |
| Barry | 20 | 52.6% | 12 | 31.6% | 4 | 10.5% | 1 | 2.6% | 1 | 2.6% | 38 |
| Bay | 52 | 29.9% | 63 | 36.2% | 34 | 19.5% | 20 | 11.5% | 5 | 2.9% | 174 |
| Benzie | 10 | 41.7% | 11 | 45.8% | 3 | 12.5% | 0 | 0.0% | 0 | 0.0% | 24 |
| Berrien | 114 | 43.2% | 84 | 31.8% | 32 | 12.1% | 31 | 11.7% | 3 | 1.1% | 264 |
| Branch | 39 | 48.8% | 28 | 35.0% | 8 | 10.0% | 5 | 6.3% | 0 | 0.0% | 80 |
| Calhoun | 102 | 33.2% | 105 | 34.2% | 60 | 19.5% | 35 | 11.4% | 5 | 1.6% | 307 |
| Cass | 54 | 46.6% | 26 | 22.4% | 13 | 11.2% | 19 | 16.4% | 4 | 3.4% | 116 |
| Central Office | 9 | 69.2% | 0 | 0.0% | 2 | 15.4% | 2 | 15.4% | 0 | 0.0% | 13 |
| Charlevoix | 1 | 14.3% | 3 | 42.9% | 2 | 28.6% | 1 | 14.3% | 0 | 0.0% | 7 |
| Cheboygan | 8 | 34.8% | 8 | 34.8% | 7 | 30.4% | 0 | 0.0% | 0 | 0.0% | 23 |
| Chippewa | 16 | 39.0% | 7 | 17.1% | 7 | 17.1% | 10 | 24.4% | 1 | 2.4% | 41 |
| Clare | 18 | 30.5% | 15 | 25.4% | 18 | 30.5% | 5 | 8.5% | 3 | 5.1% | 59 |
| Clinton | 16 | 66.7% | 6 | 25.0% | 2 | 8.3% | 0 | 0.0% | 0 | 0.0% | 24 |
| Crawford | 9 | 18.8% | 19 | 39.6% | 17 | 35.4% | 2 | 4.2% | 1 | 2.1% | 48 |
| Delta | 25 | 43.9% | 25 | 43.9% | 3 | 5.3% | 4 | 7.0% | 0 | 0.0% | 57 |
| Dickinson | 14 | 42.4% | 13 | 39.4% | 4 | 12.1% | 2 | 6.1% | 0 | 0.0% | 33 |
| Eaton | 35 | 36.1% | 44 | 45.4% | 12 | 12.4% | 4 | 4.1% | 2 | 2.1% | 97 |
| Emmet | 9 | 32.1% | 9 | 32.1% | 9 | 32.1% | 0 | 0.0% | 1 | 3.6% | 28 |
| Genesee | 208 | 39.0% | 154 | 28.9% | 87 | 16.3% | 68 | 12.8% | 16 | 3.0% | 533 |
| Gladwin | 24 | 54.5% | 13 | 29.5% | 2 | 4.5% | 4 | 9.1% | 1 | 2.3% | 44 |
| Gogebic | 15 | 44.1% | 8 | 23.5% | 7 | 20.6% | 4 | 11.8% | 0 | 0.0% | 34 |
| Grand Traverse | 40 | 54.8% | 17 | 23.3% | 12 | 16.4% | 3 | 4.1% | 1 | 1.4% | 73 |
| Gratiot | 22 | 50.0% | 17 | 38.6% | 5 | 11.4% | 0 | 0.0% | 0 | 0.0% | 44 |
| Hillsdale | 53 | 62.4% | 15 | 17.6% | 12 | 14.1% | 4 | 4.7% | 1 | 1.2% | 85 |
| Houghton | 5 | 41.7% | 1 | 8.3% | 2 | 16.7% | 3 | 25.0% | 1 | 8.3% | 12 |
| Huron | 20 | 48.8% | 14 | 34.1% | 4 | 9.8% | 3 | 7.3% | 0 | 0.0% | 41 |
| Ingham | 168 | 40.4% | 133 | 32.0% | 50 | 12.0% | 55 | 13.2% | 10 | 2.4% | 416 |
| Ionia | 17 | 30.9% | 26 | 47.3% | 6 | 10.9% | 6 | 10.9% | 0 | 0.0% | 55 |
| Iosco | 11 | 27.5% | 22 | 55.0% | 2 | 5.0% | 3 | 7.5% | 2 | 5.0% | 40 |
| Iron | 10 | 52.6% | 6 | 31.6% | 3 | 15.8% | 0 | 0.0% | 0 | 0.0% | 19 |
| Isabella | 25 | 39.1% | 20 | 31.3% | 12 | 18.8% | 6 | 9.4% | 1 | 1.6% | 64 |
| Jackson | 65 | 30.1% | 82 | 38.0% | 50 | 23.1% | 16 | 7.4% | 3 | 1.4% | 216 |
| Kalamazoo | 180 | 41.2% | 121 | 27.7% | 77 | 17.6% | 51 | 11.7% | 8 | 1.8% | 437 |

| County Name | Less than a year | | 1-2 years | | 2-3 years | | 3-6 years | | 6 years plus | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Children | % | Children | % | Children | % | Children | % | Children | % | |
| Kalkaska | 12 | 32.4% | 9 | 24.3% | 15 | 40.5% | 1 | 2.7% | 0 | 0.0% | 37 |
| Kent | 225 | 29.8% | 291 | 38.5% | 147 | 19.4% | 70 | 9.3% | 23 | 3.0% | 756 |
| Lake | 8 | 47.1% | 0 | 0.0% | 5 | 29.4% | 1 | 5.9% | 3 | 17.6% | 17 |
| Lapeer | 15 | 48.4% | 11 | 35.5% | 2 | 6.5% | 3 | 9.7% | 0 | 0.0% | 31 |
| Leelanau | 1 | 16.7% | 2 | 33.3% | 0 | 0.0% | 2 | 33.3% | 1 | 16.7% | 6 |
| Lenawee | 77 | 43.8% | 56 | 31.8% | 23 | 13.1% | 19 | 10.8% | 1 | 0.6% | 176 |
| Livingston | 69 | 56.1% | 22 | 17.9% | 20 | 16.3% | 10 | 8.1% | 2 | 1.6% | 123 |
| Luce | 4 | 66.7% | 2 | 33.3% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 6 |
| Mackinac | 4 | 33.3% | 5 | 41.7% | 0 | 0.0% | 1 | 8.3% | 2 | 16.7% | 12 |
| Macomb | 185 | 34.2% | 168 | 31.1% | 106 | 19.6% | 66 | 12.2% | 16 | 3.0% | 541 |
| Manistee | 13 | 32.5% | 19 | 47.5% | 5 | 12.5% | 2 | 5.0% | 1 | 2.5% | 40 |
| Marquette | 18 | 45.0% | 13 | 32.5% | 4 | 10.0% | 5 | 12.5% | 0 | 0.0% | 40 |
| Mason | 14 | 38.9% | 15 | 41.7% | 4 | 11.1% | 2 | 5.6% | 1 | 2.8% | 36 |
| Mecosta | 11 | 57.9% | 2 | 10.5% | 3 | 15.8% | 0 | 0.0% | 3 | 15.8% | 19 |
| Menominee | 5 | 33.3% | 9 | 60.0% | 1 | 6.7% | 0 | 0.0% | 0 | 0.0% | 15 |
| Midland | 46 | 39.7% | 38 | 32.8% | 20 | 17.2% | 10 | 8.6% | 2 | 1.7% | 116 |
| Missaukee | 4 | 25.0% | 6 | 37.5% | 4 | 25.0% | 0 | 0.0% | 2 | 12.5% | 16 |
| Monroe | 41 | 33.9% | 33 | 27.3% | 29 | 24.0% | 16 | 13.2% | 2 | 1.7% | 121 |
| Montcalm | 53 | 42.1% | 48 | 38.1% | 14 | 11.1% | 8 | 6.3% | 3 | 2.4% | 126 |
| Montmorency | 7 | 53.8% | 2 | 15.4% | 2 | 15.4% | 1 | 7.7% | 1 | 7.7% | 13 |
| Muskegon | 161 | 40.1% | 162 | 40.4% | 34 | 8.5% | 38 | 9.5% | 6 | 1.5% | 401 |
| Newaygo | 36 | 41.4% | 31 | 35.6% | 11 | 12.6% | 8 | 9.2% | 1 | 1.1% | 87 |
| Oakland | 183 | 37.1% | 119 | 24.1% | 87 | 17.6% | 87 | 17.6% | 17 | 3.4% | 493 |
| Oceana | 13 | 59.1% | 7 | 31.8% | 2 | 9.1% | 0 | 0.0% | 0 | 0.0% | 22 |
| Ogemaw | 13 | 37.1% | 5 | 14.3% | 11 | 31.4% | 6 | 17.1% | 0 | 0.0% | 35 |
| Ontonagon | 1 | 25.0% | 1 | 25.0% | 2 | 50.0% | 0 | 0.0% | 0 | 0.0% | 4 |
| Osceola | 10 | 45.5% | 8 | 36.4% | 2 | 9.1% | 1 | 4.5% | 1 | 4.5% | 22 |
| Oscoda | 14 | 66.7% | 7 | 33.3% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 21 |
| Otsego | 11 | 27.5% | 18 | 45.0% | 5 | 12.5% | 6 | 15.0% | 0 | 0.0% | 40 |
| Ottawa | 76 | 45.2% | 59 | 35.1% | 22 | 13.1% | 8 | 4.8% | 3 | 1.8% | 168 |
| Presque Isle | 9 | 56.3% | 4 | 25.0% | 1 | 6.3% | 2 | 12.5% | 0 | 0.0% | 16 |
| Roscommon | 9 | 33.3% | 12 | 44.4% | 2 | 7.4% | 2 | 7.4% | 2 | 7.4% | 27 |
| Saginaw | 78 | 43.3% | 58 | 32.2% | 26 | 14.4% | 12 | 6.7% | 6 | 3.3% | 180 |
| Sanilac | 32 | 50.8% | 17 | 27.0% | 12 | 19.0% | 2 | 3.2% | 0 | 0.0% | 63 |
| Schoolcraft | 9 | 47.4% | 6 | 31.6% | 4 | 21.1% | 0 | 0.0% | 0 | 0.0% | 19 |
| Shiawassee | 19 | 23.5% | 37 | 45.7% | 12 | 14.8% | 12 | 14.8% | 1 | 1.2% | 81 |
| St. Clair | 93 | 37.7% | 76 | 30.8% | 41 | 16.6% | 29 | 11.7% | 8 | 3.2% | 247 |
| St. Joseph | 55 | 35.9% | 53 | 34.6% | 19 | 12.4% | 21 | 13.7% | 5 | 3.3% | 153 |
| Tuscola | 16 | 53.3% | 5 | 16.7% | 5 | 16.7% | 3 | 10.0% | 1 | 3.3% | 30 |
| Van Buren | 33 | 26.2% | 44 | 34.9% | 31 | 24.6% | 13 | 10.3% | 5 | 4.0% | 126 |
| Washtenaw | 78 | 53.1% | 29 | 19.7% | 25 | 17.0% | 10 | 6.8% | 5 | 3.4% | 147 |
| Wayne | 798 | 28.9% | 743 | 26.9% | 500 | 18.1% | 623 | 22.6% | 96 | 3.5% | 2760 |
| Wexford | 28 | 50.9% | 17 | 30.9% | 6 | 10.9% | 3 | 5.5% | 1 | 1.8% | 55 |
| **Total** | **4164** | **36.8%** | **3482** | **30.8%** | **1890** | **16.7%** | **1480** | **13.1%** | **296** | **2.6%** | **11312** |

66

**Appendix F. MIC Data Report, June 2020**



## Table of Contents

Maltreatment in Care Summary ............................................................................ 3

Background and Overview........................................................................................ 4

Figure 1: Proportion of Children Experiencing Maltreatment in Care ................... 5

Figure 2: MIC in out of home placement versus parental home ............................ 5

Figure 3: Differences in Criteria for MIC under CFSR Round 2 versus Round 3 ..... 6

Table 1: Cumulative totals & percentages of children that experiences MIC, by entry year .............................................................................................................. 8

Table 2: MIC Rate per 100,000 days ...................................................................... 9

Findings.................................................................................................................. 10

Table 3: Population Characteristics of Children Served in 2018 ........................... 10

Table 4: Median Age of Non-victims and Victims ................................................ 11

Figure 4: Perpetrators Listed in MIC Allegations................................................. 11

Figure 5: Median Number of Months until Report Date (2018) ........................... 11

Figure 6: Percent of Children with Specific Substantiated Allegations, 2018 ....... 12

Figure 7: Services by Relative Licensure Status

Summary of Findings............................................................................................. 12

Table 5: Regional Differences in MIC across the Big 14 Counties .......................... 12

MIC occurring in an out-of-home setting: .............................................................. 13

MIC occurring in a parental home setting: ............................................................. 15

Improved Methods for Case Reading ..................................................................... 17

Implications and Thoughts for the Future ............................................................. 18

Data Preparation .................................................................................................. 19

## Maltreatment in Care Summary

Maltreatment in care (MIC) refers to confirmed incidents of abuse/neglect while children are in the care and supervision of child welfare agencies. The Data Lab analyzed administrative and case file data to help the department understand the risk and protective factors associated with MIC. A summary of key findings follow:

- The most frequent perpetrator of MIC was the child's parent or stepparent.

- When MIC occurs in out of home settings, MIC victims were older than non-MIC victims.

- Children in institutional and unlicensed relative foster homes were more likely to experience MIC, as compared with similar children in non-relative foster care.

- The risk of MIC was approximately the same (no statistically significant difference) for children in licensed relative homes as compared with children in licensed non-relative homes.

- When MIC occurred in parental homes (post reunification), the victims were more likely to be male, white, have a history of neglect and were significantly younger than non-victims.

- When MIC occurred in the parental home, 2 months (on average) elapsed post reunification.

- There was significant geographic variation in terms of MIC. When looking at the largest 14 counties in Michigan, the rate of MIC ranged from 4.65 to 26.66.

- For reunified families, parenting skills services, housing and reunification services significantly decreased the risk of MIC.

- Children associated with unlicensed relative foster homes received significantly fewer services as compared with children in licensed relative foster homes. This finding might help explain the risk of MIC in unlicensed homes – as the receipt of specific services (parenting skills, clinical counseling and social support) reduced the risk of MIC.

- Visitations were correlated with the risk of MIC. That is, victims of MIC were more likely to have visits with their fathers, mothers and caseworkers. It is possible that visits indicate caseworkers paying closer attention to higher risk situations – and thus – it is not the visits that are increasing the risk of MIC (although there could be some surveillance bias occurring) but rather higher risk families are attracting more frequent visits (which is a good thing).

- Safety plans decreased the risk of MIC

- Caregivers with prior allegations (investigations) increased the risk of MIC

- Specific visitation plans decreased the risk of MIC

- Unauthorized visits increased the risk of MIC

## Background and Overview

Maltreatment in care is a key measure of child safety. When the state removes a child from h/her home, it is fair to expect that the state keep the child safe from further harm.

A better understanding of the extent to which children are safe in different types of placement is important for effective policy and programmatic changes. Studies looking at maltreatment in care have found significant differences by licensure and kinship status of caregivers. For example, a study in Illinois found that children who were placed with unlicensed relative caregivers were at 14% higher risk of maltreatment compared to similar children placed with non-relative licensed caregivers (Nieto, Fuller, & Testa, 2009). Similarly, children placed with licensed relative caregivers were 33% less likely to experience maltreatment compared to children placed with non-relative licensed caregivers. Additionally, African American children had a lower risk of maltreatment compared to white children. A separate study found that unlicensed relative caregiver placements were not as safe for children in comparison with licensed relative caregivers, but unlicensed relative caregiver placements were found to be similar to licensed non-relatives (Font, 2015).

*Maltreatment in care (MIC)* refers to incidents of child abuse or neglect suffered by children in the care and supervision of children's services agencies. Typically, this is defined as confirmed incidents of maltreatment experienced by children during foster care placements, but also includes children that are placed in residential or other settings (including the biological family home under CFSR round 3 criteria), as long as the agency is responsible for the child's safety and well-being. Ensuring the safety and protection of children in their care is a key priority for children's service agencies, which is why measures of maltreatment in care are included in the Children & Family Services Reviews (CFSR). Incidents of maltreatment in care are, from a statistical standpoint, infrequent events relative to the number of days in foster care in Michigan. For example, if Michigan serves 12,000 children (on average) in foster care in a given year, that translates to more than 4.38 million days of foster care provided every single year. If the State records 483 MIC incidents in a given year, that means MIC is occurring in roughly 0.010% of foster care days. We strongly emphasize that the rarity of such events does not diminish the impact or the importance of preventing MIC. However, the infrequent nature of such events poses certain challenges for developing prevention strategies, namely that descriptions based on small numbers of cases may not hold over time, or may not generalize to specific localities. At the same time, an understanding of patterns and variations can serve as a departure point for more precise or targeted efforts undertaken at local levels to prevent maltreatment. It is important to note that understanding patterns and variations within one's own State is critical to improving performance over time. There exists wide variation[1] across States in terms of defining, reporting and investigating incidents of maltreatment (both in general and while children are in care).

---

[1] https://www.ncsl.org/Portals/1/Documents/Health/StatePolicies_ChildAbuse.pdf

## Figure 1: Proportion of Children Experiencing Maltreatment in Care



Figure 1 represents the population of children under the supervision of the department (approximately 17,000 children served in a given calendar year). The dark navy color represents children that did not experience MIC, the light blue section represents the children that experienced MIC in a substitute care setting (e.g. foster home, facility) and the green section represents the children that experienced MIC in the parental home (post reunification MIC). We split the MIC in this manner because we view MIC in foster homes as distinctly difference than MIC occurring in the parental home post reunification. From this image, approximately 2% of the child population will experience MIC in a given year.

## Figure 2: MIC in out of home placement versus parental home



Figure 2 displays the proportion of children experiencing maltreatment while in care in out of home placements versus in the parental home. While most MIC occurs while the child is placed in foster care (irrespective of licensing status and placement type) approximately 28% of instances occur when the child is in the parental home but still under the supervision of the department.

71

Figure 3: Differences in Criteria for MIC under CFSR Round 2 versus Round 3

## Round 2



**Eligible perpetrator types:**
Foster parents
Facility staff members

## Round 3

Removal ▸ Placement(s) ▸ Parental Home ▸ Discharge

**Eligible perpetrator types:**
All possible types while child is still under care/supervision of department

Historically, the approach taken by MDHHS surrounding MIC involved the limited analysis of administrative data (to identify MIC events) followed by reading the MIC case files. The administrative data provided an accurate statewide count of MIC (although some issues emerged with capturing perpetrators under the round 2 measure). The administrative estimates were used in comparison with previous reporting periods to assess change over time. The subsequent case readings were used as a means to understand the underlying mechanisms responsible for MIC. Our approach to understanding MIC continues to use administrative data to calculate a statewide count of MIC and this count is used in comparison with previous reporting periods. However, we have made three important enhancements to the analysis of MIC events to help us better understand potential risk/protective factors and to help guide a more data driven sampling for case reads: use of regression modeling, the use of more "real-time" data and data driven case reads that include non-MIC cases.

Using the most recent administrative data, we estimated the performance change in "near real time." Although we generate historical estimates of MIC, we pull the most recently available administrative data to calculate the risk of MIC within the first, second and third month of care. We then compares these risks to similar point in time estimates from previous entry cohorts. Such analyses allows the state to monitor change and to experiment with system improvement in real time, rather than only looking backwards.

In order to investigate and identify which children (or subgroups of children) are at greatest risk for MIC, we compiled administrative data relative to maltreatment from fiscal years 2014 through 2019. A description of the data utilized can be found in **Appendix A**. We were specifically interested in how MIC varies by geographic region, age of the child, placement characteristics, maltreatment history, and time in care. The rationale behind this approach to system

improvement is that not all children are at equal risk of MIC. Risk is determined by a constellation of child, family, placement and perhaps geographic characteristics. We used the integrated longitudinal files to understand these constellations so that the State knows who to target for system reform efforts (if such subgroups emerge) and to help guide case reading.

## The Overall Risk of MIC by Entry Cohort

The following tables (1 and 2) display various ways to monitor and estimate MIC. Table 1 displays the risk of MIC by entry year cohort and distributed by three, six and yearly intervals. Timing is important because understanding when MIC is more likely to occur can help caseworkers pay focused attention at various identified points in the case. In 2018, substantiated MIC events occurred at approximately 331 (median) days from removal. Table 1 estimates are organized differently than the estimates generated by the NCANDS files (which capture anyone in care during a given fiscal year rather than entry cohorts). The column "total entries" represents the number of children that entered foster care during a given calendar year. Table 2 displays a rolling round 3 MIC rate at monthly intervals. This approach might be useful as the Department can have access to more timely estimates. This table captures all MIC events through December 2019. Overall, the MIC estimates in Michigan have been fairly stable (similar to the estimates reported in AFCARS and NCANDS) with perhaps a slight increase in some (not all) recent reporting periods.

Table 1: Cumulative totals & percentages of children that experiences MIC, by entry year

| Year | Total Entries | By 3 Months | By 6 Months | By 1 Year | By 2 Years | By 3 Years | By 4 Years | By 3 Months | By 6 Months | By 1 Year | By 2 Years | By 3 Years | By 4 Years |
|------|------|------|------|------|------|------|------|------|------|------|------|------|------|
| 2014 | 6021 | 47 | 106 | 244 | 346 | 383 | 397 | 0.781% | 1.761% | 4.05% | 5.75% | 6.36% | 6.59% |
| 2015 | 6338 | 40 | 96 | 196 | 322 | 369 | | 0.631% | 1.515% | 3.09% | 5.08% | 5.82% | |
| 2016 | 6279 | 47 | 118 | 245 | 393 | | | 0.749% | 1.879% | 3.90% | 6.26% | | |
| 2017 | 6300 | 59 | 128 | 254 | | | | 0.937% | 2.032% | 4.03% | | | |
| 2018 | 5674 | 38 | 92 | | | | | 0.670% | 1.621% | | | | |
| 2019 | 5686 | 39 | 94 | | | | | 0.71% | 1.65% | | | | |

Table 2: MIC Rate per 100,000 days by entry cohort



## Findings

We explored demographic differences between the three subgroups (non-victims, MIC victims in out of home care settings (OOH) and MIC victims in the parent home (PH)). Differences were observed with respect to the profile of maltreatment victims versus non-victims. These differences appear to depend on the setting in which their maltreatment occurred. Table 3 reflects the population of children served during FY 2018. Victims in out of home care tended to be older (27.8% between 11 and 15 years of age vs. 18.6% for non-victims). Victims in a parental home setting were more likely to be white (71.5%), male (56.9%) younger (58.5% are less than 5 years old), and their initial reason for removal (42.3%) was more likely to be neglect.

### Table 3: Population Characteristics of Children Served in 2018

|                 | Non-victims | Victims (OOH) | Victims (PH) |
|-----------------|-------------|---------------|--------------|
| Male            | 51%         | 51.9%         | 56.9%        |
| White           | 57.8%       | 55.4%         | 71.5%        |
| Black           | 41.1%       | 43.3%         | 28.5%        |
| Multi-racial    | 11.9%       | 14.9%         | 10.6%        |
| Age 0-5*        | 49.1%       | 38.2%         | 58.5%        |
| Age 6-10        | 23.1%       | 24.6%         | 21.1%        |
| Age 11-15       | 18.7%       | 27.8%         | 16.3%        |
| Age 16-18       | 9%          | 8.6%          | 4.1%         |
| Abuse†          | 6.1%        | 7.3%          | 7.3%         |
| Neglect         | 38.9%       | 37.7%         | 42.3%        |
| Abuse & Neglect | 42.5%       | 39.2%         | 36.6%        |

\* Age was determined using the start of FY19 for children already in care, otherwise the child's removal date was used.
† The last 3 entries of the table reflect summary information about the investigation tied to each child's removal, i.e. whether its allegations included abuse, neglect, or both.

## Table 4: Median Age of Non-victims and Victims

| Year | Non-victims | Victims (OOH) | Victims (PH) |
|------|-------------|---------------|--------------|
| 2014 | 5.8 | 6.2 | 4.9 |
| 2015 | 5.8 | 8.6 | 4.5 |
| 2016 | 6.0 | 8.0 | 5.1 |
| 2017 | 6.1 | 8.7 | 5.2 |
| 2018 | 6.2 | 8.2 | 4.8 |

Table 4 displays the median age of MIC victims by setting. Similar to the previous table, victims of MIC in the parental home are consistently younger (across all years) than MIC victims in out of home care settings.

## Figure 4: Perpetrators Listed in MIC Allegations



Figure 4 indicates child's parents or stepparents were the most frequent MIC perpetrator. Respectively, foster parents and relatives were infrequently identified as perpetrators. These findings reflect how the new CFSR approach to MIC will (by far) encourage states to focus efforts on incidents of abuse and neglect that occur in combination with parents (perhaps both before and after reunification). Figure 5 and Figure 6 display the timing and type of MIC within each setting domain. On average, for victims in an out of home setting, MIC occurs approximately 11 months after removal. In contrast, for victims if the parental home, MIC occurs approximately 2 months after reunification. These are important findings because it suggests that although children are at risk of MIC post reunification, the duration of post reunification services could be relatively limited.

## Figure 5: Median Number of Months until Report Date (2018)

77



Approx. 11 months
(from removal date)

Approx. 2.1 months
(from return date)

## Figure 6: Percent of Children with Specific Substantiated Allegations, 2018



68% include improper supervision
19% physical abuse
17% sexual abuse
8% physical neglect

95% include improper supervision
24% physical neglect
9% physical abuse
2% sexual abuse

*Regression Analyses*:  To build on the descriptive findings presented above, we used logistic regression models to quantify the importance of specific variables related to MIC. The analysis file was prepared at the placement level, rather than at the child level. This distinction is important to note, in that it means the likelihood of a given placement being positive for MIC is being modeled, rather than the likelihood of an individual child experiencing MIC. The benefit comes from being able to include information about placement settings themselves that are relevant to predicting MIC as an outcome. In addition to placement setting type, individual child characteristics and geographic information were included as predictor variables. A separate regression model was fit to explore the likelihood of MIC within the parental home setting; this model used similar predictor variables as the out-of-home model, but excluded inapplicable variables (e.g. placement type). Unsurprisingly, most of the patterns (i.e. findings) that emerged in the descriptive analyses remained significant in the regression analyses (after controlling for placement level and child level differences).  A full description of each model is displayed in **Appendix A.**

## Summary of Findings

- The risk of MIC varies by geography. Table 5 displays the MIC rates for the largest counties in Michigan.  Over the last 4 years, MIC rates varied between 4.6 (Berrien 2015) and 26.66 (Kalamazoo 2017) across the largest counties.

### Table 5: Regional Differences in MIC across the Big 14 Counties

| County | 2015 | 2016 | 2017 | 2018 |
|--------|------|------|------|------|
| Bay | 19.98 | 10.46 | 22.45 | 11.67 |

| | | | | |
|---|---|---|---|---|
| Berrien | 4.65 | 5.03 | 10.07 | 13.12 |
| Calhoun | 19.65 | 17.76 | 13.35 | 19.21 |
| Genesee | 13.19 | 18.13 | 11.70 | 14.57 |
| Ingham | 13.14 | 8.09 | 17.49 | 14.62 |
| Jackson | 22.13 | 21.72 | 21.84 | 12.93 |
| Kalamazoo | 15.99 | 10.30 | 26.66 | 12.08 |
| Kent | 9.44 | 7.54 | 15.19 | 10.02 |
| Macomb | 10.70 | 9.43 | 3.49 | 12.01 |
| Monroe | 11.74 | 8.13 | 10.93 | 9.36 |
| Muskegon | 6.88 | 6.97 | 18.87 | 9.92 |
| Oakland | 8.96 | 14.13 | 18.00 | 5.42 |
| Saginaw | 7.29 | 9.82 | 19.61 | 10.36 |
| Wayne | 10.89 | 11.86 | 16.08 | 10.71 |

**MIC occurring in an out-of-home setting:**

- The age of the child was related with the risk of MIC. Older children were significantly more likely than younger children (under 3 years of age) to experience MIC.

- Length of stay was negatively correlated with MIC. Children that had been in care longer than 420 days were less likely to experience MIC.

- Children in institutional, justice related, and unlicensed relative foster homes were more likely to experience MIC, as compared with similar children in non-relative foster care or licensed relative care homes. There was no difference when comparing licensed relative care home and licensed non-relative care homes.

- Children placed in unlicensed relative foster homes were significantly more likely to experience MIC as compared with similar children placed in licensed relative foster homes. Using the services data, we attempt to explain why the risk increased for children in unlicensed relative foster homes.

- Children in unlicensed relative homes were significantly less likely to receive services as compared to similar children in licensed relative homes (see figure below). Although some of these differences result from shorter lengths of stay associated with unlicensed relative homes, the differences in services helped explain the risk of MIC. The following figure displays the receipt of services by licensing status.

- In the regression model, parenting skills, clinical counseling and social support services significantly reduced the risk of MIC.



- We investigated the relationship between visitations and MIC. Regular visits could be related to MIC in two possible ways. First, regular visits could be negatively associated with MIC, given that the caseworker(s) responsible for a child would have the policy-required opportunity to physically verify a child's well-being and living arrangements. Second, though slightly counter-intuitive, regular visitation could be positively associated with MIC. For the same reasons above, regular contact might provide the child with opportunities to safely disclose problems to the caseworker(s), or simply provide more frequent opportunities for the caseworker to uncover potential maltreatment.

- Visitations were correlated with the risk of MIC. That is, victims of MIC were more likely to have visits with their fathers, mothers and caseworkers. It is possible that visits indicate workers paying closer attention to higher risk situations – and thus – it is not the visits that are increasing the risk of MIC (although there could be some surveillance bias occurring) but rather higher risk families are attracting more frequent visits (which is a good thing).

- The following figure displays the risk of MIC by placement setting. If the bars move up, then the risk of MIC increases in that placement setting.



### MIC occurring in a parental home setting:

- The age of the child was correlated with MIC. Specifically, children 5 years and younger were significantly more likely to experience MIC in the parental home as compared with similar children 6 years of age and older.

- Children with a history of neglect were significantly more likely to experience MIC in the parental home.

- The provision of reunification and parenting skills services significantly decreased the risk of MIC. This is especially true for reunification services that were provided within the first three months post reunification.

- As it relates to reunification services, many reunified children were not associated with reunification services. It is unclear whether these services were not provided or simply not recorded in MiSACWIS. The following figure displays the services provided for reunification cases. One will not that less than 20% of families received "reunification" services.



## Improved Methods for Case Reading

Knowing which children to target (e.g. children under 3 years of age) is necessary but it is not sufficient to decrease MIC. One also has to know something about what to target. Taking a more comprehensive approach, we implemented an improved sampling plan and the development of hypotheses to guide the reading of case files. The primary goal of these activities was to identify the underlying mechanisms that increase the risk of MIC and the practices that are potentially responsible for decreasing the risk of MIC.

Historically, like many child welfare systems around the county, CSA read only the confirmed MIC cases. This approach is problematic in that it requires sampling on the dependent variables (MIC) and has serious problems of selection bias that may lead to inaccurate conclusions. The problem with reading only the MIC cases is that one has no knowledge about whether those exact risk factors (that seemed to emerge as a common theme) were present in non-MIC cases. This is a common problem with practice of case reads in general. We developed a strategy of reading both MIC and non-MIC cases. We used predictive risk modeling and propensity score matching to identify both MIC and non-MIC cases. The general idea is that we use the risk model to predict cases that might experience MIC. Some of these predictions are accurately classified – meaning that high-risk cases experience MIC and low risk cases do not experience MIC. Alternatively, the risk model identifies high-risk cases that did not experience MIC and low risk cases that did experience MIC. These cases are of great interest and are incorporated into the case read sample. These cases are important because (as one example) they might shed light on specific practices that significantly reduced the risk of MIC from occurring within the high-risk population.

In addition to improving the case read sample plan, we developed specific guidelines on the information extracted from the case files. These guidelines or parameters were focused on the underlying mechanisms that caseworkers and other stakeholders believed (hypothesized) to be responsible for MIC. This process involved a series of in-person meetings with CSA leadership, caseworkers and researchers from the University of Michigan to develop a list of hypotheses about the factors related to MIC. The meetings then focused on how (e.g. what practices) do caseworkers engage in to mitigate these risks. The list of generated hypotheses follow:

**Hypothesis**: Children with behavioral issues are not aligned well within foster family homes. The needs of these children often overwhelm the capacity of caregivers.

**Hypothesis**: Caseworker turnover increases the risk of MIC because there is a lapse in service referrals and a breakdown in the relationship/communication between families and workers.

**Hypothesis**: Foster families with prior violations are not being screened out and/or not being supported once new children enter the home.

**Hypothesis**: The standards around visitations are not well defined – and often times only loosely enforced. This is especially true for relative care placements.

**Hypothesis**: Children return home too quickly and against the advice of the department.

From the generated hypotheses, the group members generated a set of practices that were specifically intended to mitigate the risk of MIC. For example, if there exists differences in the visitation protocol (or expectations) between relative and non-relative caregivers, what are workers doing to mitigate this risk? The case reads focused on understanding whether these mitigating practices occurred. These practices represent what the state will target (or in more general terms, what the state will do) to decrease the future risk of MIC. Looking forward and connecting these activities to the "real time" use of

administrative data, the department will no longer have to wait a full calendar year (or more) to evaluate the efforts. The list of mitigating practices (which were used to guide the case reads) are displayed in Appendix B.

## Summary of Findings from Case Reads

- Safety plans decreased the risk of MIC
- Providers with prior allegations increased the risk of MIC
- Specific visitation plans decreased the risk of MIC
- Unauthorized visits increased the risk of MIC

## Implications and Thoughts for the Future

- CSA should continue to use more "real time" data. Estimating MIC from previous years is important/useful, but it is limited in terms of understanding the risk and protective factors that exist today.
- CSA should consider adopting the current approach to the reading of MIC case files. This approach captures hypotheses from the field, samples both MIC and non-MIC and structures questions designed to test specific hypotheses.
- CSA should consider testing an approach (pilot intervention) that is data driven (e.g. children are at an increased risk of MIC within the first few months post reunification) and can be monitored with "real time" data.
- Targeting post reunification MIC will have largest impact on the overall state rate (because of the volume of events). Moreover, the window for intervention is relatively narrow in terms of duration (first 2 or 3 months post reunification) and in contrast with the out of home care (i.e. foster care) MIC population, the high risk population of this group is well defined (young, neglect)
- CSA and UM should investigate and understand why unlicensed relative homes are associated with an increased risk of MIC. Does it have something to do with the licensing process? Does it have something to do with the families that self-select into the training and licensing status? How might services disparities increase the risk of MIC? This is viewed as a high priority area of study.
- Related, in April of 2019, CSA initiated a new policy to financially support unlicensed relative care providers. Within the next 6 months or so, enough time will have elapsed to evaluate the potential benefits of this new policy in terms of increased safety for children in unlicensed homes.
- CSA and UM should investigate how unauthorized visits increase the risk of MIC.
- CSA should assess the costs of system improvements, or perhaps other methods of data collection (case notes) – to more accurately capture visitations and case services for children and families.
- CSA should commit to understanding the obstacles that prevent the collection of reliable service data. It is clear that services are not captured in MiSACWIS. The lack of reliable services data significantly limits the department's ability to understand the mechanisms (e.g. programs, services) that are responsible for increasing safety for children in out of home care settings.

Appendix A:    Description of MDHHS Data Warehouse Tables and

## Data Preparation

The following analyses and summaries pertain to children observed as being in foster care at some point during the last 5 fiscal years (2014-2019). Data used for this report was provided to the Child & Adolescent Data Lab in August 2019 and May 2020. The data used were delivered as text-based files, with individual files representing tables constructed in the MDHHS Data Warehouse environment. Each table corresponds to different aspects of the child protective services and child welfare systems. Below is a list of tables utilized for this report as well as data fields relevant to the report:

1. Allegation History
- Table summary
- Fields:
    - child ID (childpartyid)
    - investigation case ID (investigation_caseid)
    - complaint date (complaint_date)
    - incident date (incident_date)
    - disposition date (dispstn_dt)
    - disposition category description (catdesc)
    - child role (child_role)
    - allegation description (allegationtypedesc)
    - finding description (findingdesc)
    - relation to perpetrator (relationvictimtoperp)
    - relation to victim (relationperptovictim)
2. Removals
- Table representing placement episodes. Each observation of the table is a unique placement episode tied to a unique child.
- Fields:
    - child ID (childpartyid)
    - placement episode ID (plcmnt_episode_id)
    - removal date (rmvl_dt)
    - discharge date (dschrg_dt)
    - removal county (removal_county_name)
    - responsible county (responsible_county_name)
3. Placements
- Table representing individual placements tied to individual children. Multiple placements can be recorded within each placement episode.
- Fields:
    - child ID (childpartyid)
    - placement episode ID
    - placement start date (providerbegindt)
    - placement end date (providerenddate)
    - placement living arrangements (livarrangedesc)
    - provider ID (provider_party_id)
    - provider license number
4. Child Info
- Table with individual characteristics, such as birth date and gender.
- Fields:

- – child ID (childpartyid)
- – date of birth (birth_dt)
- – gender (genderdesc)
- – Hispanic/Latino indicator (hispanic_latino_txt)

5. Child Race
- Table with racial identity information associated with each child.
- Fields:
  - – child ID (childpartyid)
  - – American Indian/Native American (ame)
  - – Asian (asi)
  - – Black/African American (bla)
  - – White (whi)
  - – Multiracial (mr)

6. Licensing Violations
- Table containing special investigation reports concerning provider licensing violations.
- Fields:
  - – provider ID (provider_party_id)
  - – investigation start date (special_evaluation_start_date)

7. Visitations
- Table with racial identity information associated with each child.

8. Case Services
- Tables with case services provided through the life of the child's care

From the Placements file (#3 listed above), all children with a placement setting that overlapped one of the fiscal years between (and including) 2014-2018 were extracted. An overlap was identified if one of the following conditions was met: 1) the placement start date occurred during one of the fiscal years; 2) the placement end date occurred during one of the fiscal years; 3) both the placement start and end dates were within one of the fiscal years; 4) a placement's start and end dates fully encompass one (or more) of the fiscal years. If a placement was missing an end-date, the date that the data was received was used as a placeholder. After identifying the initial set of placements (and associated children), placements were subsequently excluded from analysis if they met the following criteria: 1) were the sole placement in a foster care episode, and whose living arrangement indicated the child/youth was in a parental home; 2) the placement's start date occurred on or after a youth's 18th birthday, or 3) the total duration of the placement was less than 1 day. Following these exclusions, placements were organized into fiscal year level files. Placements that spanned across multiple fiscal years had their start/end dates recoded to reflect the start/end of each fiscal year they were observed in. Table 1 denotes the total number of placements and unique children observed each year, following exclusions.

| FY | # Placements | # Unique Children/Youth |
|------|--------------|--------------------------|
| 2014 | 32,332 | 15,765 |
| 2015 | 32,327 | 16,172 |
| 2016 | 33,102 | 16,499 |

| 2017 | 34,021 | 16,736 |
| 2018 | 34,245 | 16,614 |

After establishing the foster care population, CPS reports for each fiscal year were identified using the Allegation History file. The initial file was filtered to contain CPS reports that met all of the following criteria:

- The CPS complaint date was recorded during one of the included fiscal years
- The CPS complaint date was at least 2 days after a preceding report tied to the same child (if present)
- The CPS disposition category for the report was either 1, 2, or 3
- The CPS complaint included a child identified in the placements data as an alleged victim (AV), and
- At least one of the allegations listed for this child was marked as having a preponderance of evidence that maltreatment occurred.

Complaints that met these criteria were extracted, and then merged with the placement-level data using the associated child ID. If a complaint's incident date fell within the bounds of one of the child's placement start/end dates, the placement bounding the CPS complaint was marked as having experienced a MIC event. In instances where the incident date was not available/missing, the complaint date was used.

*Regression Models*

A final analysis table was constructed, organized at the child*placement level. Each record contained indicators for the MIC outcome, length of stay as of the placement start date, setting description, and the child's personal characteristics. For the out-of-home cases, we fit a logistic regression model, using the following variables:

Dependent variable:

Substantiated MIC Report 0/1

Independent Variables:

1. Setting description
   - Dummy coded variables for each type
   - Reference: non-relative foster care
2. Time from removal (at placement start date)
   - 5 categories (0-180 days, 181-365, 366-730, 731-1095, 1095+)
   - Reference: 0-180 days
3. Age (at placement start date)
   - 6 categories (0-3, 4-6, 6-8, 9-11, 12-15, 16+)
   - Reference: Ages 0-3
4. Male, 0/1
5. Hispanic, 0/1
6. Black, 0/1
7. Physical Abuse, 0/1
8. Provider licensing violation within the last year, 0/1
9. State Region

- Dummy codes for the following: Wayne, Macomb, Genesee, Oakland, Kent, BSC 1, BSC 2, BSC 3, BSC 4, Missing
- Reference: BSC 3

10. FY
- Dummy codes for 2014-2018
- Reference: 2014

Settings where the youth was marked as being placed in an independent living placement, adoptive home, parental home, or AWOL were excluded. Note: time from removal and age were binned into quintiles to aid with interpretation.

A second logistic regression model was fit solely with cases showing a child placed in a parental home (using the same variables listed above, with the exception of independent variables 1 and 8).

A third logistic regression model was fit solely with cases showing a child placed in a relative home, using the same variables as the first model.

**Appendix G. Stipulated Order Regarding Commitment Modifications Due to COVID-19 to the 1/1/2020 – 6/30/2020 Reporting Period of MISEP**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

DWAYNE B., by his next friend,
John Stempfle: CARMELA B., by
her next friend William Ladd;
LISA J., by her next friend, Teresa          No. 2:06-cv-13548
Kibby; and JULIA, SIMON, and
COURTNEY G., by their next friend,           HON. NANCY G. EDMUNDS
William Ladd; for themselves and
others similarly situated,                   Class Action

    Plaintiffs,                         **STIPULATED ORDER
                                             REGARDING COMMITMENT
v                                            MODIFICATIONS DUE TO
                                             COVID-19 TO THE 01/01/2020
GRETCHEN WHITMER, in her                     – 06/30/2020 REPORTING
official capacity as Governor of the         PERIOD OF MISEP**
State of Michigan, *et al.*,

    Defendants.

_____/

**STIPULATED ORDER REGARDING COMMITMENT
MODIFICATIONS DUE TO COVID-19 TO THE 01/01/2020 -
06/30/2020 REPORTING PERIOD OF THE MODIFIED
SUSTAINABILIITY AND EXIT PLAN (MISEP)**

IT IS HEREBY STIPULATED AND AGREED by the Parties that

the unforeseen COVID-19 pandemic has impacted some provisions of

the Modified Sustainability and Exit Plan ("MISEP"). Accordingly, the

Parties agree to the following modifications of these MISEP

commitments solely for the monitoring period covering January 1, 2020
– June 30, 2020 ("the Relevant Period").

### A.   General Agreement

The Parties agree that performance on the following MISEP
provisions may be impacted by COVID-19: 6.16, 6.21(a), 6.21(b), 6.22(a),
6.22(b), 6.23, 6.24, 6.25, 6.26, 6.27, 6.28, 6.29, 6.36(a), 6.4, and 6.37 (the
"COVID-impacted commitments").

### B.   Monitoring of Commitments Impacted by COVID-19

The parties anticipate MDHHS performance on COVID-impacted
commitments may be skewed as a result of the pandemic. The parties
agree that for the Relevant Period, MDDHS should not be penalized for
negatively skewed performance. The parties agree that positively
skewed performance should likewise not be used as a basis for exiting
eligible provisions from court oversight. Accordingly, the parties agree
that MDHHS performance on COVID-impacted commitments will not
be used by either party to demonstrate sustained compliance or non-
compliance under the terms of the MISEP, and stipulate as follows:

1.     For COVID-impacted commitments requiring compliance in consecutive reporting periods, should MDHHS be unable to meet compliance in the Relevant Period, such performance will not be considered when determining whether MDHHS has been in compliance for consecutive reporting periods, and shall not interrupt MDHHS's compliance in meeting the consecutive reporting period requirements or be used to trigger non-compliance under the terms of the MISEP.

2.     For COVID-impacted commitments requiring compliance in consecutive reporting periods, should MDHHS achieve compliance in the Relevant Period, such performance will not be considered when determining whether MDHHS has been in compliance for consecutive reporting periods or used for purposes of exit under the terms of the MISEP.

3.     For COVID-impacted commitments requiring positive trending in consecutive reporting periods, performance in the Relevant Period will not be considered when determining trend patterns for purposes of exit under the terms of the MISEP.

4.      DHHS shall be credited with meeting performance standards where they achieve compliance of unmodified non-COVID impacted commitments, during the Relevant Period.

**C.      Temporary Modification to MISEP commitments 6.16, 6.21, 6.22, 6.23, and 6.24**

Consistent with the guidance provided by the United States Department of Health and Human Services on March 18, 2020, the parties stipulate to the following for the face-to-face visitation commitments in MISEP provisions 6.16, 6.21, 6.22(a), 6.23, and 6.24:

1.      For purposes of measuring compliance with these provisions, the definition of visits shall include visits conducted by video conferencing, FaceTime, Skype, Zoom, or similar videoconferencing technologies, consistent with MDHHS Communication Issuances 20-032* and 20-045*, may be counted as a compliant visit.

2.      For purposes of measuring compliance with these provisions, visits conducted via telephone call in certain situations where videoconferencing was not available may also be counted as a compliant visit.

a.  Regarding MISEP commitment 6.21 (worker child visits), telephonic visits will be counted as compliant from March 1, 2020, through May 5, 2020.

b.  Regarding MISEP commitments 6.22 (worker parent visits), 6.23 (parent child visits), and 6.24 (sibling visits) telephonic visits will be counted as compliant from March 1, 2020 through June 30, 2020.

3.  This modification has not eliminated all face-to-face visitations with children in care. The video or telephonic visitation options are available for routine visits, but not for emergencies in which the caseworker must respond in person to an immediate child health or safety concern.

**D.   Reporting**

1.  For all commitments in the MISEP, MDHHS will continue providing data to the monitor as usual, who will continue to validate and publicly report performance consistent with the terms of the MISEP.

2.      Additionally, outside the ordinary course of monitoring, MDHHS will provide CRI with the following data sets for commitments 6.16, 6.21, 6.22, 6.23, and 6.24:

    a.      Aggregate data reflecting performance for the non-COVID impacted period of January 1, 2020 through February 29, 2020.

    b.      Aggregate data reflecting performance for the COVID-impacted period of March 1, 2020 through June 30, 2020. The parties agree that this data set will be submitted to CRI without validation.

The parties respectfully request this Honorable Court enter an order approving this stipulation.

IT IS SO ORDERED.

Dated:   September 15, 2020          s/ Nancy G. Edmunds
                                     HON. NANCY G. EDMUNDS
                                     United States District Judge

Stipulated and Agreed to by:

/s/ Samantha (Sara) M. Bartosz        Date:  September 15, 2020
Samantha (Sara) M. Bartosz
Attorney for Plaintiffs
Children's Rights
88 Pine Street, Suite 800
New York, NY 10005
Phone: (212) 683-2210
*Attorneys for Plaintiffs*

/s/ Cassandra Drysdale-Crown       Date:  September 15, 2020
Cassandra Drysdale-Crown (P64108)
Toni Harris (P63111)
Neil Giovanatti (P82305)
Health, Education & Family
Services Division
525 West Ottawa Street
P.O. Box 30758
Lansing, MI 48909
Phone: (517) 335-7603
*Attorneys for Defendants*