1                       UNITED STATES DISTRICT COURT
                        EASTERN DISTRICT OF MICHIGAN
2                              SOUTHERN DIVISION

3                              —     —     —

    DWAYNE B., a minor, by his Next
4   Friend, John Stempfle, et al, for
    themselves and others similarly
5   situated,
                                        Case No. 06-cv-13548
6            Plaintiff,

                                        HON. NANCY G. EDMUNDS
7      v.

8   GRETCHEN WHITMER, in her official
    capacity as Governor of the State
9   of Michigan, et al,

10           Defendant.
    _____/

11          STATUS CONFERENCE VIA ZOOM VIDEO CONFERENCE

12
                          Detroit, Michigan
13                  Wednesday, August 17, 2022

14  APPEARANCES:

15   For the Plaintiffs:       Samantha Bartosz
                               CHILDREN'S RIGHTS
16                             330 Seventh Avenue
                               New York, New York   10001
17

18   For the Defendant:        Neil Giovanatti
                               Cassandra A. Drysdale-Crown
19                             MICHIGAN ATTORNEY GENERAL
                               P.O. Box 30758
20                             Lansing, Michigan   48909
                               (517) 335-7603
21
    ALSO PRESENT:
22
    Monitors Kevin Ryan and Eileen Crummy, Directors Demetrius
23  Starling, Elizabeth Hertel and Kelly Sesti

24
          *To obtain a copy of this official transcript, contact:*
25              *Sheila D. Rice  Official Court Reporter*
                *(313) 234-2610 • sheila_rice@mied.uscourts.gov*

TABLE OF CONTENTS

MATTER                                                         PAGE

STATUS CONFERENCE

Proceedings ....................................... 4

Certificate of Court Reporter...................... 26

1    Detroit, Michigan

2    Wednesday, August 17, 2022

3    11:03 a.m.

4                                 —   —   —

5            THE CLERK:  Court calls Case Number 06-13548, D.B.

6    versus Whitmer.  This is the date and time set for a status

7    conference.

8            Would counsel please state their name for the record.

9            MS. BARTOSZ:  Good morning, your Honor.  This is

10   Samantha Bartosz from Childrens' Rights on behalf of the

11   Plaintiff class of children.

12           THE COURT:  Good morning, Ms. Bartosz.

13           MR. GIOVANATTI:  Good morning, your Honor.  Neil

14   Giovanatti on behalf of the State.  I also have with me

15   Cassandra Drysdale-Crown, Assistant Attorney General, Director

16   Elizabeth Hertel, Director Demetrius Starling and Kelly Sesti,

17   all from the department.

18           THE COURT:  Good morning, everyone, and Mr. Ryan.

19           MR. RYAN:  Good morning, your Honor.  Kevin Ryan, one

20   of the monitors, here with my colleague.

21           Eileen?

22           MS. CRUMMY:  Yes.  Good morning, everyone.  Eileen

23   Crummy.

24           THE COURT:  Good morning.  We have some observers

25   also; is that right?  Yes, okay.

1          I understand that the State has a presentation they

2    would like to make with respect to steps that have been taken

3    on the Corrective Action Plans; is that right, Mr. Giovanatti?

4          MR. GIOVANATTI:  Correct, your Honor.  That's correct.

5          THE COURT:  Let's start with that then.

6          MR. GIOVANATTI:  Okay.  Good morning again, your

7    Honor.  Today on behalf of the department you'll hear first

8    from Director Hertel.  She will be providing a general overview

9    of the department's progress towards the strategies included in

10   the Corrective Action Plan that was approved earlier this year.

11         And then Kelly Sesti, who is the director of the

12   Division of Continuous Quality Improvement, and she's also the

13   coordinator for implementing the CAPS along with Director

14   Hertel and Director Starling, she will present the PowerPoint

15   presentation which will provide a brief overview and some

16   highlights of some of the specific examples that the department

17   has implemented through the CAP process.

18         And finally, Director Starling will provide some

19   additional remarks, and then he and I will be available to

20   answer any questions the court may have.

21         Director Hertel.

22         THE COURT:  Before we begin, let me just mention that

23   my understanding is that although you made great progress and

24   strides forward in formulating plans to implement their

25   Corrective Action Plan, the monitors have not had an

1   opportunity to review and validate the steps that have been

2   taken.  And we're even one step further away from seeing what

3   impact those plans and policies, new plans and policies, have

4   had, and hopefully will positively have on problem areas that

5   we've identified in the past.  So I'm happy to see this now,

6   but I -- even before seeing it, I think we have to recognize

7   it's a first step, not a final step.

8           DIRECTOR HERTEL:  Thank you for that.  And I would

9   like to thank you for this opportunity and to be able to

10  provide this update for our continued efforts to ensure our

11  children's safety.  And I would also like to thank our

12  monitoring team in Children's Rights for their continued work

13  on this case.  And given that comment that you just made, your

14  Honor, I think as part of moving forward we'll make sure that

15  during our planning we incorporate maybe a better communication

16  now as we continue to plan and implement these steps.

17          So at our last hearing in April the court did approve

18  a Corrective Action Plan for the areas in the MISEP where our

19  performance needs to continue to improve.  And, your Honor,

20  over the last four months the department has worked hard and

21  dedicated significant resources to implement the strategies

22  outlined within this Corrective Action Plan.

23          As of July 31st of this year, the department has

24  implemented the vast majority of our CAP items, 67 of the 71 to

25  be precise.  Four additional CAP items are currently in

1  progress with only one remaining CAP item scheduled to be

2  implemented this fall.

3          These efforts have led to us at the department

4  improving our contract oversight process, bridging some of our

5  gaps and services, and making some really important steps to

6  improve our child welfare system.  Our progress will continue

7  as we fulfill the remaining promises in the CAP.  And I remain

8  extremely engaged in this case, and my team and I are committed

9  to prioritizing the successful implementation of this

10  Corrective Action Plan.

11          For instance, I personally approve every emergency

12  shelter placement.  Shelter placements are a critical area of

13  improvement for us, and I am proud of the progress on this

14  front, as we have insured that all children in shelters are

15  receiving services and are seeing decreases in the length of

16  stay for youth in shelter.

17          We have made significant strides in the last few

18  months and will continue to make improvements to our child

19  welfare system.  I remain confident that through the dedicated

20  efforts of Director Starling and our Children Services staff as

21  well as our broader department staff that we will continue to

22  make the progress we hope to achieve and continue to improve

23  our performance toward the MISEP commitments.

24          I will now turn it over to Kelly Sesti who has been

25  coordinating the implementation of the strategies for the

```
 1    department.  I'm not sure if you've had the opportunity to meet
 2    Kelly previously, but I'm happy to introduce you to her.  Kelly
 3    has worked with us in Child Welfare for 25 years, and as the
 4    director of our Continuous Quality Improvement Team she is
 5    empowered to hold all of us accountable on these items when we
 6    fall short.  Kelly does not take her responsibilities or her
 7    commitment to the department in the State of Michigan lightly,
 8    and as a result challenges us to continually learn, assess and
 9    improve.  And I am personally really excited about what the
10    leadership Kelly has provided and about the progress that I
11    think we will continue to make.
12             Kelly, I'll turn it over to you.
13             THE COURT:  Nice to meet you, Ms. Sesti.
14             DIRECTOR SESTI:  Thank you, your Honor.  And thank
15    you, Director Hertel.
16             And, Neil, are you going to pull up the PowerPoint for
17    us?
18             MR. GIOVANATTI:  Yes.
19             Lisa, you might have to give me the ability to share a
20    screen.  Let me see if it works.
21             Can you see the PowerPoint?
22             DIRECTOR SESTI:  We can.
23             THE COURT:  Yes.
24             DIRECTOR SESTI:  Thank you.
25             THE CLERK:  Do you need me to do anything?
```

1          MR. GIOVANATTI:  No, it worked.

2          THE CLERK:  Okay.  Good.

3          DIRECTOR SESTI:  All right.  Good morning, your Honor.

4   As Director Hertel indicated, my name is Kelly Sesti, and I'm

5   the department's liaison for CAP implementation as well as

6   being the director of the Division of Continuous Quality

7   Improvement.

8          In my division, we review all of the quality

9   improvement activities for our child activity programs.  We

10  also complete all of the data reporting and submissions for the

11  CAP and the MISEP.

12         Today I'm going to highlight just some of the work

13  that the department has concluded over the last four months as

14  we have implemented CAP strategies.  To be clear, this

15  presentation only addresses a handful of the more significant

16  CAP items that we have implemented today.

17         As Director Hertel discussed, we have implemented 67

18  different items from the CAP.  The department has also provided

19  the monitoring team with comprehensive documentation and

20  evidence of our implementation of the other CAP items.  Here

21  we're just going to highlight a few of these developments.

22         So first we wanted to provide a broad and current

23  overview of our foster care system.  So this graph shows you

24  the number of children under the department's supervision, for

25  example, kids being in care or being monitored by the

1    department, and those are the blue bars.  It also shows you the

2    number of children in out-of-home care.  Those are the brown

3    bars.  And the number of children removed from their families

4    along with a number of children who have exited foster care,

5    that's the yellow and red lines across the top.

6         As you can see, Michigan has continued to see a

7    decrease in the number of children under our supervision and in

8    the foster care system over the last year.  Michigan currently

9    has less than 10,400 children in foster care, which is a

10   significant decrease from the onset of the lawsuit when the

11   settlement was first signed.

12        For example, in 2008 there were approximately 19,000

13   children in foster care.  So we have significantly decreased

14   the number of children in care.  We also continue to see the

15   number of children exiting from foster care outpacing the

16   number of children entering care.  These trends show us that

17   Michigan is dedicated to safely maintaining children with their

18   parents whenever possible, and we continue to implement our

19   prevention efforts to keep kids with their families whenever

20   safely possible.

21        So of the children in out-of-home placement, a small

22   percentage are receiving treatment in a congregate care

23   setting, which are our residential facilities that we typically

24   refer to as child care institutions, or CCIs.  As you can see

25   in this chart, of the total population Michigan averages around

1    4.5 percent of children placed in CCIs.  According to Casey

2    Family Programs, on average usually about nine percent of a

3    state's population is placed in CCIs.  Michigan is at half the

4    national average.  As of June, we have less than 400 children

5    in our residential facilities, which is about 4.3 percent of

6    our population.  These statistics are significant as they

7    demonstrate Michigan's continued focus on reducing the number

8    of children placed in facilities as the department continues to

9    expand our array of services for the community.

10        So this leaves me to 5.1, which is contract agency

11    evaluation.  So we know that this is an area that has been of

12    special focus to the court, the monitoring team and Plaintiffs

13    as we all seek to ensure safety of children in CCIs.  So 5.1 of

14    the MISEP requires the department to conduct contract

15    evaluations of all congregate care facilities in our private

16    foster care agencies.  As part of the oversight, the department

17    is required to confirm that these contracted agencies are

18    providing placements and services to children to ensure their

19    safety and well-being.

20        In order to improve the department's oversight of

21    these facilities, we have created a system of review in which

22    Director Hertel and other agency leaders are now regularly

23    reviewing congregate care facilities that show a high risk

24    level.  We also developed a new division within the Children's

25    Services agency to provide direct oversight of our private

1    agency foster care providers and our congregate care providers.

2    This division will work directly with the department's

3    leadership to coordinate efforts among the various units within

4    Children's Services to ensure that we have a full understanding

5    of each agencies' performance, particularly as it relates to

6    appropriate contracting decisions.

7         The new contract oversight division reports directly

8    to Director Starling and is comprised of two focus areas, the

9    first being the Residential Collaboration and Technical

10   Assistance Unit, and the second being Foster Care Contracts

11   Unit.  This new division specifically will provide oversight

12   and technical assistance to the contracted agencies, develop

13   partnerships with our private agencies through increased

14   communications, monitoring and providing staff training, ensure

15   child safety through, among other things, monitoring restraints

16   and mental treatment data, assisting agencies to focus on

17   improvement of key indicators, which are critical to our

18   compliance with the lawsuit and ensuring better outcomes for

19   children.  And provide contract compliance oversight with a

20   focus to improve outcomes.

21        For 6.3, the department continues to have a keen focus

22   on permanency with a continued goal of increasing the number of

23   children achieving permanency in 12 months.  Over the last four

24   months, we have implemented many strategies and partnerships to

25   improve this outcome for children and families.  For example,

1     we implemented a case review system to ensure that caseworkers

2     are focussed on permanency throughout the life of a case to

3     eliminate obstacles to reunification as soon as possible.

4     We've also partnered with the state court administrator's

5     office to develop juvenile court data packets to ensure that

6     our judges have access to data tracking the amount of time

7     children on their docket are in care.  We will continue to

8     collaborate with our courts to reduce time and care.

9          As a department, we value the importance of placing

10    children with their siblings.  For 6.6 we focus on the approval

11    process for when siblings need to be separated and our efforts

12    to reunify siblings if they are, in fact, separated.

13         So notable changes that occurred as a result of the

14    CAP include in May 2022 regional offices were charged with

15    ensuring counties were appropriately documenting and approving

16    exception requests for each sibling split.  A job aid with a

17    step-by-step instruction on how to complete an exception was

18    created.  And a data report is now consistently shared with all

19    the counties listing the exceptions that need to be completed.

20         Direct technical assistance was provided by the

21    regional offices to counties regarding the proper completion of

22    all timely sibling split with exceptions.  Due to these

23    efforts, we've already noticed some improvement.  During the

24    first month of focus, the department experienced a 17-percent

25    decrease in the number of sibling groups that were placed

1  without the required exception.  This includes all sibling

2  splits, including initial and replacement requests.  We've also

3  implemented a proactive quality improvement process to ensure

4  staff are appropriately documenting their efforts to reassess

5  placements of siblings that are separated.

6       All right.  For 6.8 and 6.9 shelter placements has

7  been an area of struggle for the State throughout the lawsuit.

8  6.8 and 6.9 limits the length of stay in shelter placements

9  both at initial placements and if a child has to re-enter a

10 shelter placement.

11      In our CAP, Director Hertel committed to requiring her

12 personal approval of all shelter placements.  The department

13 also developed a SharePoint Site to track and monitor all

14 approvals and lengths of stay.  In addition, the department has

15 developed two positions to assist staff when working to

16 transition a youth from an institutional setting back into the

17 community.

18      THE COURT:  Is this the area in which so much

19 publicity has been generated over the last few weeks, the

20 hospital placements of the two nine-year-old boys?  Would this

21 cover that?

22      MR. GIOVANATTI:  Your Honor, that issue is a little

23 bit different, and if you'd like I know Director Hertel can

24 speak to that specifically.  Obviously given the

25 confidentiality concerns, we can't comment on the two specific

1    youth that were mentioned in that article, but if you would

2    like Director Hertel could comment now or at the end of the

3    presentation, whenever you --

4          THE COURT:  We'll wait until the end of the

5    PowerPoint.

6          MR. GIOVANATTI:  Okay.

7          THE COURT:  Go ahead, Ms. Sesti.

8          DIRECTOR SESTI:  Okay.  Thank you.  So for the next

9    slide I mentioned we as a department have a keen interest in

10   ensuring that children are discharged from shelter care as

11   quickly as possible.  So we put a number of efforts into place.

12         First, we are conducting weekly meetings with a

13   regional placement unit, the responsible county staff and the

14   leadership, along with shelter representatives, to review

15   placement plans and required timeframes.

16         Second, we are sending weekly spreadsheets, including

17   -- that include all of the youth in shelter to the department

18   leadership.  And this spreadsheet provides details including

19   the days in shelter, exception timeframes and placement

20   efforts.

21         And lastly, we are sending personal E-mail reminders

22   to all of our regional directors, our county directors and

23   assigned staff regarding the due dates to ensure timely

24   submissions of any exception request.

25         And the last area that I want to touch on is 6.10,

```
1    which focuses on ensuring home studies are completed timely for

2    relative homes.  So we've made significant improvements to

3    support relative placements, including implementation of

4    improved data reports to ensure that staff are aware of

5    upcoming duties and requirements.  CSA executive level meetings

6    are now held monthly to identify and assess barriers for

7    low-performing agencies.

8         From January of 2022 through June, almost 1,500 cases

9    required a completed home assessment.  Of those, 95 percent of

10   those assessments were completed and 71 percent were completed

11   timely, which is a significant improvement to our historic

12   performance.  The department also developed Kinship Support

13   Specialist positions in all five of our regions to specifically

14   support relative and kin caregivers.  And I'm happy to say that

15   over 289 relative and kin caregivers have been served by these

16   workers already.

17        All right.  With that, unless you have any questions

18   from me, I can turn it over to Director Starling.

19        MR. GIOVANATTI:  Thank you.  Director Hertel, do you

20   want to address the hospital issue first?

21        DIRECTOR HERTEL:  Yeah, I certainly can.

22        We have seen over the last I would say 10 to 12 years,

23   an increase in the number of children who are going to

24   emergency departments because of acute behavioral health

25   episodes.  And generally, you know, things are an emergency.
```

1    People take children to the emergency room.  However, they're

2    not actually able to be admitted into a regular inpatient bed.

3    They either need a psychiatric inpatient bed or some other sort

4    of crisis stabilization placement.  And we do not have adequate

5    number of placements for behavioral health stabilization at

6    this point, and we continue to see the number of children

7    waiting or on waiting lists increase.

8            And the two children who were discussed in that

9    article were in that situation.  They are -- they were wards of

10   the State.  However, we do see that often in many -- probably

11   all of our emergency departments at this point.

12           We have taken -- this is something, like I said, it's

13   ongoing.  It's been occurring for a very long time, and we

14   recognize that.  In the Governor's executive recommendation for

15   fiscal year '23, she requested significant funding, around 40

16   million dollars, to be able to invest in providers being able

17   to build out additional placements for children when it comes

18   to behavioral health.  Thirty-five million dollars was approved

19   in the fiscal year '23 budget, and we are in the planning

20   processes of being able to distribute those funds out to

21   providers to build that capacity up.

22           So we do recognize that again as an issue, and it has

23   been one for a long time and are working to be able to address

24   that.

25           THE COURT:  That's good to hear.  Do you have any

 1    sense of how many children are in that limbo that you just

 2    described waiting for an appropriate placement?

 3              DIRECTOR HERTEL:  If I had to guess, I would guess

 4    every single hospital in the state of Michigan and probably

 5    across the country has at least one child in an emergency

 6    department right now that's looking for placement.

 7              MR. GIOVANATTI:  Just to be clear, your Honor, that

 8    doesn't -- that's all kids, not necessarily foster children, to

 9    be clear.

10              DIRECTOR HERTEL:  Thanks Neil, yes.

11              MR. GIOVANATTI:  Yeah.

12              THE COURT:  You don't have a good number that you

13    can --

14              DIRECTOR HERTEL:  We don't track that number.  It's

15    not a reportable number.  And because they're in an emergency

16    department and they're not admitted they're not billing.  So we

17    can't identify it through claims, because they're not actually

18    getting paid for those children.

19              So we do work closely with the Michigan Hospital

20    Association in Michigan, but we have not started keeping

21    account on that exactly.  We have a -- we can go into a lot

22    more detail, but we actually have a pilot through another

23    program here to identify why people are having difficulty

24    finding placements.  And we were able to track from a small

25    pilot the numbers that we thought a couple years ago, but it's

1    very pervasive.

2         THE COURT:  Okay.  Thank you.  It's one of those

3    issues that I guess still has to be taken up with more

4    activity, which is not to say there hasn't been activity, just

5    that it needs further work.

6         Director Starling, your turn.

7         DIRECTOR STARLING:  Thank you, your Honor, and thank

8    you, Director Hertel, for the additional information and

9    Director Sesti for her very concise and wonderful overview in

10   the PowerPoint presentation.

11        So as you may have seen in the presentation, the

12   department is making really great strides to address some of

13   the actions outlined in our Corrective Action Plan.  There were

14   71 individual Corrective Action Plan items that were due as of

15   July 31st of this year.  Of those 67, which equates to about

16   94.4 percent, have been completed at this time.

17        So echoing Director Hertel's comments, I strongly

18   believe that the Corrective Action Plan will help the

19   department achieve compliance with the associated 14 MISEP

20   commitments.  It is through the efforts of the department staff

21   and our private partners that we've been able to achieve these

22   results.

23        We are very optimistic that through the implementation

24   of the Corrective Action Plans additional commitments will move

25   towards compliance.  We continue to work closely with the

1    monitors regarding safety in our CCI facilities, and we've

2    identified in the CAP for commitment 5.1 some very significant

3    steps, including the creation of the division of child safety

4    and program compliance, which houses the residential

5    collaboration and technical assistance unit, focusing on

6    contracted CCIs and the foster care contracts unit focusing on

7    contracted child placing agencies.

8         In addition to the work on the Corrective Action Plan,

9    the department has been focusing on our prevention efforts in

10   the front end and redesign of our child welfare system that

11   focuses on children remaining with their families whenever

12   safely possible.  We continue to have a focus on strong case

13   practice, ultimately knowing this is essential for long-term

14   sustainable success of our child welfare assistive programs.

15        By implementing the strategies identified in the

16   Corrective Action Plans we will make substantial progress to

17   improve the department's performance and, more importantly, we

18   believe these strategies will improve safety for our children

19   and decrease the time to permanency for children in the

20   department's care.

21        So with that, your Honor, if you have any questions we

22   would be happy to answer those.

23        THE COURT:  No, I don't have any additional questions.

24   I'd be happy to hear from Ms. Bartosz.

25        MS. BARTOSZ:  Thank you, your Honor.  We appreciate

1    the presentation by the department with respect to the efforts

2    its made to implement the Corrective Action Plan, and on behalf

3    of Plaintiffs we're hopeful that these efforts bring about the

4    positive changes that they're intended to.  And so thank you

5    for that update once again, Defendants, and we're enthused to

6    hear about the hard work that is underway.

7          Your Honor, as you noted at the beginning of this

8    hearing, we await, all of us, the monitors' validation efforts

9    with respect to these efforts and the performance outcomes.

10   And so Plaintiffs will await that before commenting anymore

11   substantively on progress made, but it's our hope that these

12   efforts really bring about major positive change.

13         THE COURT:  Thank you, Ms. Bartosz.

14         Mr. Ryan, Ms. Crummy, do you have anything that you

15   would like to say before I comment?

16         MR. RYAN:  I don't have anything, your Honor.

17         Eileen?

18         MS. CRUMMY:  No.  No, your Honor.

19         THE COURT:  Well, I am pleased and optimistic.  I

20   think everyone seems to be heading in the right direction with

21   the same goal in mind.  My suggestion is that the parties meet

22   toward the end of October after the monitors have had an

23   opportunity to review all of the very substantial number of

24   documents and outlines and underlying data that has accumulated

25   as they begun implementing these Corrective Action Plans and

1   policies.  That meeting itself would not include me, but the

2   monitors could report back -- will I guess report back to me on

3   what progress they have seen by the end of October or toward

4   the end of October, I would say two, two and a half months from

5   today.  And then we would all meet in January with Mr. Ryan and

6   Ms. Crummy having given whatever change in direction they feel

7   is warranted after their review or no change in direction.

8   Everyone could have some input at the October meeting.

9   Monitors would report back to me what occurred, and then we

10  would all meet early in January to see where we are.  Hopefully

11  we're in a good place, or certainly it looks like a better

12  place than we were a year ago.

13        Anyone have any comment on that suggestion?

14        MR. GIOVANATTI:  Your Honor, just one question.  This

15  might be for Mr. Ryan and Ms. Crummy as well.  The next MISEP

16  report, MISEP 21, would -- I think it would be due in November

17  or maybe early December.  We -- the department is -- that

18  report will likely -- it doesn't cover any time period that

19  would have been covered by the Corrective Action Plan.  It

20  covers July of '21 through December of '21.

21        So again, the Corrective Action Plan started in '22

22  so it wouldn't cover any of that time period.  The data will

23  likely be somewhat stale, but traditionally we have a hearing

24  when that report is issued.  I just wanted to hear from the

25  court.  And maybe, Kevin, you can chime in here about how you

1    wanted to handle that report.

2         THE COURT:  We could maybe combine the January meeting

3    with the review of the MISEP report and the Corrective Action

4    Plan, but, Mr. Ryan or Ms. Crummy, your thoughts?

5         MR. RYAN:  Judge, the only validated data that we'll

6    have realtime will be the result of the case record review

7    that's underway now where the department is sharing its

8    completed abuse or neglect substantiation investigations with

9    us, or unsubstantiation investigations with us, and then we're

10   reviewing them and talking with the department about that.  I

11   think the department hopes to have final data to us in February

12   of '23.  So we would be in a position to report to you on kind

13   of realtime information at that time, you know, end of

14   February, early March.  Otherwise, the --

15        THE COURT:  You're talking about for the MISEP period?

16        MR. RYAN:  Yeah.  In terms of assessing the impact of

17   these various corrective actions, the department won't even be

18   giving us its performance data corresponding to this period

19   until March or April of 2023.  So we won't even be able to see

20   what that looks like.

21        I'm not sure, Neil, whether you're proposing you all

22   getting it to us sooner and we would validate that or what

23   you're thinking.  But essentially the plan would be to come to

24   court with our MISEP report for the 2021 period.  You would be

25   talking about your corrective actions.  And then I think what

1    the court will have at that point is many periods of

2    performance post the adoption of the MISEP and a pretty clear

3    trend line on those areas that are performing at standard or

4    above, those that are near and those that are not.  And I think

5    that would give the court an opportunity to guide us all on how

6    to rethink the MISEP, whether to rethink it at all.

7        MR. GIOVANATTI:  I understand.  I brought up the MISEP

8    '21 report, because that one is kind of going to be stuck in

9    the middle.  I hear what you're saying, Kevin, about the MISEP

10   '22 report, which will cover a period impacted by the CAPS, but

11   the '21 report is kind of in the middle there without any

12   direction.

13       So I think we can talk offline, though, about the

14   specific timing of the '22 report and figure out exactly how we

15   can get that data to you as soon as possible so we can have a

16   more realtime report.

17       THE COURT:  I'm flexible about whether we do this in

18   combination -- a presentation in combination in terms of the

19   reports or separate and what the timing is.  What I do care

20   about the most, at least right now, is having a sense of

21   whether the progress made on the Corrective Action Plan has

22   been validated and what impact it's had.  Hopefully by January

23   we'll have some sense of that, even if it's not final data.

24       MR. RYAN:  I don't think we will, your Honor, unless

25   the State is able to get us data and information on its actual

1    performance on these CAP items very soon.  So I'll leave it to

2    the State to make a determination about what it's able to share

3    performance information with us soon, but it typically takes a

4    significant period of time for that to be generated.  So I

5    think you all perhaps go back, huddle, let us know how soon you

6    can have that information to us.

7          MR. GIOVANATTI:  I guess just one additional comment

8    on that, your Honor.  I think we can certainly present

9    information of did we actually do the things required in the

10    CAPS.  I think we sent a large packet of information over to

11    the monitors in advance of this hearing and to Plaintiffs as

12    well.

13          In terms of actually seeing the impact in data, we

14    could probably have some preliminary figures by January, but in

15    terms of the actual standard MISEP data points what -- I agree

16    with Mr. Ryan.  There's a significant lag on those points, but

17    I -- we're happy to talk to Kevin offline about trying to speed

18    that process up.

19          MR. RYAN:  Just to give you a for example.  So

20    Director Hertel talked about this heightened level of review

21    and prior approval for children going into emergency shelters.

22    So we would be able to see the shelter authorization forms and

23    we can say, yes, it looks like that's happening.  Whether or

24    not that means fewer kids are ending up in shelters and how

25    long they're staying, that's the data you all have.  If you

1    could get that to us, you know, the first week in January

2    instead of the traditional 90-day period after the period ends

3    we can dig into that more quickly, and I think that would be

4    true for each of the CAP items.

5              THE COURT:  Well, as I said, I'm flexible about

6    whether you need an extra 30 or 60 days at some point.  As long

7    as we stay on top of this and we do meet sometime in the first

8    couple of months of 2023.  And Mr. Ryan and Ms. Crummy can act

9    as liaisons between the parties and the court and let me know

10   where you are and what you think the best time for presentation

11   and evaluation is.

12             MS. CRUMMY:  Thank you, your Honor.

13             THE COURT:  Okay.  Are you all good with that?

14             MR. GIOVANATTI:  Yes, your Honor.

15             MR. RYAN:  Yes, your Honor.

16             THE COURT:  Thank you.  Anything further we can do

17   today?

18             MR. GIOVANATTI:  Nothing further from Defendants.

19             THE COURT:  All right.  Keep in touch.

20             THE CLERK:  We're adjourned.

21             (The proceedings were adjourned at 11:39 a.m.)

22                  —   —   —

23

24

25

*CERTIFICATE OF COURT REPORTER*

I, Sheila D. Rice, Official Court Reporter of the United States District Court, Eastern District of Michigan, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing pages is a correct transcript from the record of proceedings in the above-entitled matter.

*s/Sheila D. Rice*
Sheila D. Rice, CSR-4163, RPR, RMR
Federal Official Court Reporter
United States District Court
Eastern District of Michigan

Date: 10/12/2022
Detroit, Michigan