# Progress of the Michigan Department of Human Services

Monitoring Report for *Dwayne B. v. Whitmer*

MODIFIED IMPLEMENTATION, SUSTAINABILITY, AND EXIT PLAN

**MISEP 22**

**JANUARY TO JUNE 2022**

**ISSUED July 12, 2023**



PUBLIC CATALYST

# CONTENTS

Introduction ......................................................................................................................... 3

    Summary of Progress and Challenges ........................................................................... 4

    Summary of Commitments ........................................................................................... 7

    Methodology ............................................................................................................... 14

    Demographics .............................................................................................................. 14

Organizational Capacity .................................................................................................... 18

    Caseloads and Supervision ......................................................................................... 18

Accountability .................................................................................................................... 20

    Outcomes .................................................................................................................... 20

    Contract Oversight ..................................................................................................... 21

    Quality Service Reviews .............................................................................................. 33

Permanency ....................................................................................................................... 35

    Developing Placement Resources for Children ........................................................... 35

    Placement Standards .................................................................................................. 39

    Case Planning and Practice ......................................................................................... 41

    Caseworker Visitation ................................................................................................ 42

Safety and Well-Being ........................................................................................................ 44

    Responding to Reports of Abuse and Neglect ............................................................ 44

    Health and Mental Health ........................................................................................... 46

Youth Transitioning to Adulthood ..................................................................................... 51

    Achieving Permanency ................................................................................................ 51

## FIGURES

Figure 1. Age of Children in Custody on June 30, 2022 ............................................................... 15

Figure 2. Placement Types of Children in Custody on June 30, 2022 ........................................ 16

Figure 3. Length of Stay of Children in Custody on June 30, 2022 ............................................ 17

## TABLES

Table 1. Race of Children in Custody on June 30, 2022 and Race of Children in the State of Michigan on July 1, 2021 ................................................................................................................... 16

Table 2. Exits from Care by Exit Type, January 1, 2022 to June 30, 2022 ................................. 17

Table 3. Federal Goals for Children in Custody as of June 30, 2022 .......................................... 18

Table 4. Annual Relative Home Studies Completed Late, MISEP 22 ......................................... 38

Table 5. Supervisory Oversight Performance, MISEP 22 ........................................................... 41

Table 6. Worker-Child Visitation Performance, MISEP 22 ......................................................... 43

Table 7. Worker-Parent Visitation Performance, MISEP 22 ...................................................... 43

Table 8. Immunizations for Children in Custody Three Months or Less, MISEP 22 .................. 47

Table 9. Immunizations for Children in Custody Longer Than Three Months, MISEP 22 ......... 48

Table 10. Child Case File, Medical and Psychological Performance, MISEP 22 ......................... 49

## APPENDICES

Appendix A. Age Range of Children in Care on June 30, 2022 by County .................................. 52

Appendix B. Length of Stay of Children in Care on June 30, 2022 by County ........................... 54

Appendix C. MIC Data Report, October 2022 ........................................................................... 56

Appendix D. MISEP Performance, Summary of Commitments ................................................. 74

## Introduction

This document serves as the eighteenth report to the Honorable Nancy G. Edmunds of the United States District Court for the Eastern District of Michigan in the matter of *Dwayne B. v. Whitmer*, covering Period 22 (January 1, 2022 to June 30, 2022) under the Modified Implementation, Sustainability and Exit Plan (MISEP).[1] On June 27, 2019, the State of Michigan and the Michigan Department of Health and Human Services (DHHS) and Children's Rights, counsel for the plaintiffs, jointly submitted to the court the MISEP, which establishes a path for the improvement of Michigan's child welfare system. Judge Edmunds entered an order directing implementation of the MISEP following its submission by the parties.

Judge Edmunds had previously approved an Initial Agreement among the parties on October 24, 2008, a subsequent Modified Settlement Agreement on July 18, 2011, and an Implementation, Sustainability and Exit Plan (ISEP) on February 6, 2016. DHHS is a statewide multi-service agency providing cash assistance, food assistance, health services, child protection, prevention, and placement services on behalf of the State of Michigan. Children's Rights is a national advocacy organization with experience in class action reform litigation on behalf of children in child welfare systems.

In sum, the MISEP:

- Provides the plaintiff class relief by committing to specific improvements in DHHS' care for vulnerable children, with respect to their safety, permanency, and well-being;

- Requires the implementation of a comprehensive child welfare data and tracking system, with the goal of improving DHHS' ability to account for and manage its work with vulnerable children;

- Establishes benchmarks and performance standards that the State committed to meet to address risks of harm to children's safety, permanency, and well-being; and

---

[1] DHHS and the Monitors undertook a review of Michigan's MIC investigations for the federal fiscal year (FFY) 2022, October 1, 2021 – September 30, 2022, much closer in time to the closure of those investigations than in previous periods, in order to assess the appropriateness of those investigations and validate the State's observed rate of child victimizations pursuant to Safety – Maltreatment in Foster Care (MIC), Section 6.1 of the MISEP. The child safety standard of MIC focuses on keeping children in DHHS custody safe from abuse and neglect. DHHS committed to ensure that of all children in foster care during the applicable federal reporting period, DHHS will maintain an observed rate of victimizations per 100,000 days in foster care of less than 9.67. The review has been completed and filed with the Court in March 2023, and therefore the results are included in this report.

3

- Provides a clear path for DHHS to exit court supervision after the successful achievement and maintenance of Performance Standards for each commitment agreed to by the parties in the MISEP.

The sections of the MISEP related to monitoring and reporting to the court remain largely unchanged from the parties' prior agreement, as do the sections regarding Enforcement, Dispute Resolution, and Attorneys' Fees.

Pursuant to the MISEP, the court appointed Kevin Ryan and Eileen Crummy of Public Catalyst to continue to serve as the court's monitors, charged with reporting on DHHS' progress in meeting its commitments. The monitors and their team are responsible for assessing the state's performance under the MISEP. The parties have agreed that the monitors shall take into account timeliness, appropriateness, and quality in reporting on DHHS' performance. Specifically, the MISEP provides that:

> "The monitors' reports shall set forth the steps taken by DHHS, the reasonableness of these efforts, and the adequacy of support for the implementation of these steps; the quality of the work done by DHHS in carrying out those steps; and the extent to which that work is producing the intended effects and/or the likelihood that the work will produce the intended effects."

This report to the Court reflects the efforts of the DHHS leadership team and the status of Michigan's reform efforts as of June 30, 2022. Defined as MISEP Period 22, this report includes progress for the first half of 2022.

## Summary of Progress and Challenges

Michigan DHHS met or exceeded required performance standards in 12 of 55 areas monitored for compliance in MISEP Period 22. Among areas where the agency achieved high levels of performance are:

- *Caseloads:* DHHS exceeded the caseload standards established for child protective service (CPS), purchase of service (POS), and licensing workers.

- *Worker-Child Visitation:* DHHS met the performance standard for two of the six components of worker-child visitation and came close to the other four. The two components DHHS met were ensuring that each child was visited by a caseworker at least once per month and each child was visited by a caseworker at their placement location at least once per month.

4

Michigan DHHS did not meet required performance standards in 42 of 55 areas[2] monitored for compliance in MISEP Period 22, including:

- *Contract Oversight:* In MISEP 22, DHHS' contract evaluations of Child Caring Institutions (CCIs) and private Child Placing Agencies (CPAs) providing placements and services to Plaintiffs continued to be inconsistent, at times ineffective, and in numerous instances did not ensure the safety and well-being of Plaintiffs. The monitoring team reviewed all licensing investigations conducted at CCIs and private CPAs along with corresponding Corrective Action Plans (CAPs) intended to address established violations. The monitoring team found that CAP implementation was often delayed, lacked specificity, and did not reduce risk of harm to children. Frequently, repeat violations of a serious nature, such as physical intervention or improper restraints causing injuries, recurred despite the CAPs.

- *Permanency within 12 Months:* Permanency Indicator One measures the percent of children who enter foster care within a 12-month period who are discharged to permanency[3] within 12 months of their entry date. Based on the data files provided by DHHS, the monitoring team calculated that of the 5,077 children who entered foster care between April 1, 2019 and March 31, 2020, 1,165 children (22.9 percent) exited to permanency within 12 months of their entry. DHHS did not meet the MISEP standard of 40.5 percent for this commitment. To meet the performance standard, DHHS should have achieved permanency for an additional 891 children.

- *Emergency or Temporary Facilities:* DHHS did not meet the commitments related to the placement of children in emergency or temporary facilities during the period. Of the 55 children placed in emergency or temporary facilities during MISEP 22, only 26 (47.3 percent) were placed within the length of stay parameters. Additionally, children experienced 12 subsequent stays in shelter care during the period, however, none of the placement episodes met the terms of the MISEP.

- *Parent-Child Visitation:* DHHS did not meet the performance standard for completion of parent-child visits during the period. Of the 33,442 parent-child visits required during MISEP 22, DHHS completed 20,950 (62.6 percent) timely.

- *Psychotropic Medication, Documentation:* The monitoring team reviewed a randomly selected and statistically significant sample of 66 children who were prescribed psychotropic medication during the period under review. The monitoring team found that the electronic case records for only 21 (31.8 percent) of the children included the required

---

[2] Additionally, there was one commitment that the monitors were unable to verify.
[3] The parties agreed to utilize the federal Child and Family Services Review Round 3 outcome standard for Permanency Indicator One. The federal definition of permanency includes children's discharges from foster care to reunification with parents or primary caregivers, living with a relative, guardianship, or adoption.

documentation for each prescription including initial and ongoing medical monitoring. DHHS did not meet the designated performance standard of 97 percent for the period.

## Summary of Commitments

| Section | Commitment | Performance | Achieved | Report Page |
|---------|-----------|-------------|----------|-------------|
| 5.1 | DHHS shall conduct contract evaluations of all CCIs and private CPAs providing placements and services to Plaintiffs to ensure, among other things, the safety and well-being of Plaintiffs and to ensure that the CCI or private CPA is complying with the applicable terms of this Agreement. | -- | No | 21 |
| 5.2 | DHHS shall commence all investigations of a report of child abuse or neglect within the timeframes required by state law. The designated performance standard is 95%. | 98.1% | Yes | 44 |
| 5.3 | 95% of CPS caseworkers assigned to investigate allegations of abuse or neglect, including maltreatment in care, shall have a caseload of no more than 12 open investigations. | 97.8% | Yes | 19 |
| 5.4 | 95% of CPS caseworkers assigned to provide ongoing services shall have a caseload of no more than 17 families. | 98.1% | Yes | 19 |
| 5.5 | 95% of POS workers shall have a caseload of no more than 90 children. | 99.1% | Yes | 19 |
| 5.6 | 95% of licensing workers shall have a workload of no more than 30 licensed foster homes or homes pending licensure. | 97.5% | Yes | 20 |
| 5.7 | DHHS shall require CCIs to report to DCWL all uses of seclusion or isolation. If not reported, DCWL shall take appropriate action to address the failure of the provider to report the incident and to assure that the underlying incident has been investigated and resolved. | -- | Yes | 32 |
| 6.1 | DHHS shall ensure that of all children in foster care during the applicable federal reporting period, DHHS will maintain an observed rate of victimization per 100,000 days in foster care less than 9.67, utilizing the CFSR Round 3 criteria. | -- | Unable to Verify | 20 |
| 6.2 | Until Commitment 6.1 is achieved, DHHS, in partnership with an independent entity, will generate, at least annually, a report that analyzes maltreatment in care data to assess risk factors and/or complete root-cause analysis of maltreatment in care. The report will be used to inform DHHS practice. The first report will be issued no later than June 1, 2020. | -- | Yes | 21 |
| 6.3 | DHHS shall achieve an observed performance of at least the national standard (40.5%) on CFSR Round Three Permanency Indicator One (Of all children entering foster care in a 12-month period, what percent discharged to permanency within 12 months of entering foster care?) | 22.9% | No | 21 |

7

| Section | Commitment | Performance | Achieved | Report Page |
|---|---|---|---|---|
| **6.4** | DHHS will maintain a sufficient number and array of homes capable of serving the needs of the foster care population, including a sufficient number of available licensed placements within the child's home community for adolescents, sibling groups, and children with disabilities. DHHS will develop for each county and statewide an annual recruitment and retention plan, in consultation with the Monitors and experts in the field, subject to approval by the Monitors. DHHS will implement the plan, with interim timelines, benchmarks, and final targets, to be measured by the Monitors based on DHHS's good-faith efforts to meet the final targets set forth in the plan. | -- | Not yet due | 35 |
| **6.5** | Children in the foster care custody of DHHS shall be placed only in a licensed foster home, a licensed facility, pursuant to an order of the court, or an unlicensed relative. | 98.0% | No | 39 |
| **6.6.a** | Siblings who enter placement at or near the same time shall be placed together unless specified exceptions are met. The designated performance standard is 90%. | 80.2% | No | 40 |
| **6.6.b** | If a sibling group is separated at any time, except for the above reasons, the case manager shall make immediate efforts to locate or recruit a family in whose home the siblings can be reunited. These efforts shall be documented and maintained in the case file and shall be reassessed on a quarterly basis. The Monitors will conduct an independent qualitative review to determine compliance with this commitment. The designated performance standard is 90%. | 72.7% | No | 40 |
| **6.7** | No child shall be placed in a foster home if that placement will result in: (1) more than three foster children in that foster home, (2) a total of six children, including the foster family's birth and adopted children, or (3) more than three children under the age of three residing in that foster home. The designated performance standard is 90%. | 90.2% | Yes | 40 |
| **6.8** | Children shall not remain in emergency or temporary facilities, including but not limited to shelter care, for a period in excess of 30 days, unless specified exceptions apply. No child shall remain in a shelter in excess of 60 days. The designated performance standard is 95%. | 47.3% | No | 40 |

| Section | Commitment | Performance | Achieved | Report Page |
|---|---|---|---|---|
| **6.9** | Children shall not be placed in an emergency or temporary facility, including but not limited to shelter care, more than one time within a 12-month period, unless specified exceptions apply. Children under 15 years of age experiencing a subsequent emergency or temporary-facility placement within a 12-month period may not remain in an emergency or temporary facility for more than 7 days. Children 15 years of age or older experiencing a subsequent emergency or temporary-facility placement within a 12-month period may not remain in an emergency or temporary facility for more than 30 days. | 0.0% | No | 41 |
| **6.10.a** | When placing a child with a relative who has not been previously licensed as a foster parent, DHHS shall visit the relative's home to determine if it is safe prior to placement; check law enforcement and central registry records for all adults residing in the home within 72 hours following placement; and complete a home study within 30 days. The designated performance standard is 95%. | 65.6% | No | 36 |
| **6.10.b** | When placing a child with a relative who has not been previously licensed as a foster parent, a home study will be renewed every 12 months for the duration of the child's placement with the relative. The designated performance standard is 95%. | 51.5% | No | 38 |
| **6.11** | DHHS shall complete all investigations of reports of child abuse or neglect within the required timeframes. The designated performance standard is 90%. | 96.5% | Yes | 45 |
| **6.12.a** | DHHS shall investigate all allegations of abuse or neglect relating to any child in the foster care custody of DHHS. DHHS shall ensure that allegations of maltreatment in care are not inappropriately screened out for investigation. The Monitors will conduct an independent qualitative review to determine compliance with this commitment. The designated performance standard is 95%. | 87.7% | No | 45 |
| **6.12.a** | When DHHS transfers a referral to another agency for investigation, DHHS will independently take appropriate action to ensure the safety and well-being of the child. The Monitors will conduct an independent qualitative review to determine compliance with this commitment. The designated performance standard is 95%. | 85.5% | No | 45 |
| **6.13** | 95% of foster care, adoption, CPS, POS, and licensing supervisors shall be responsible for the supervision of no more than five caseworkers. | 90.1% | No | 18 |
| **6.14** | 95% of foster care workers shall have a caseload of no more than 15 children. | 93.1% | No | 19 |
| **6.15** | 95% of adoption caseworkers shall have a caseload of no more than 15 children. | 75.0% | No | 19 |

| Section | Commitment | Performance | Achieved | Report Page |
|---------|-----------|-------------|----------|-------------|
| **6.16** | Supervisors shall meet at least monthly with each assigned worker to review the status and progress of each case on the worker's caseload. Supervisors shall review and approve each service plan. The plan can be approved only after the supervisor has a face-to-face meeting with the worker, which can be the monthly meeting. The designated performance standard is 95%. | 90.9% (Initial) | No | 41 |
| **6.16** | Supervisors shall meet at least monthly with each assigned worker to review the status and progress of each case on the worker's caseload. Supervisors shall review and approve each service plan. The plan can be approved only after the supervisor has a face-to-face meeting with the worker, which can be the monthly meeting. The designated performance standard is 95%. | 96.7% (Monthly) | Yes | 41 |
| **6.17** | DHHS shall complete an Initial Service Plan (ISP), consisting of a written assessment of the child(ren)'s and family's strengths and needs and designed to inform decision-making about services and permanency planning, within 30 days after a child's entry into foster care. The designated performance standard is 95%. | 87.8% | No | 42 |
| **6.18** | For every child in foster care, DHHS shall complete an Updated Service Plan (USP) at least quarterly. The designated performance standard is 95%. | 90.8% | No | 42 |
| **6.19** | Assessments and service plans shall be of sufficient breadth and quality to usefully inform case planning and shall accord with the requirements of 42 U.S.C. 675(1). To be measured through a QSR. The designated performance standard is 83%. | 69.5% | No | 34 |
| **6.20** | DHHS shall ensure that the services identified in the service plan are made available in a timely and appropriate manner to the child and family and shall monitor the provision of services to determine whether they are of appropriate quality and are having the intended effect. To be measured through a QSR. The designated performance standard is 83%. | 62.2% | No | 34 |
| **6.21.a** | Each child in foster care shall be visited by a caseworker at least twice per month during the child's first two months of placement in an initial or new placement. The designated performance standard is 95%. | 89.1% | No | 42 |
| **6.21.a** | Each child in foster care shall be visited by a caseworker at their placement location at least once per month during the child's first two months of placement in an initial or new placement. The designated performance standard is 95%. | 94.4% | No | 42 |
| **6.21.a** | Each child in foster care shall have at least one visit per month that includes a private meeting between the child and caseworker during the child's first two months of placement in an initial or new placement. The designated performance standard is 95%. | 94.6% | No | 42 |
| **6.21.b** | Each child in foster care shall be visited by a caseworker at least once per month. The designated performance standard is 95%. | 96.4% | Yes | 42 |

| Section | Commitment | Performance | Achieved | Report Page |
|---------|------------|-------------|----------|-------------|
| **6.21.b** | Each child in foster care shall be visited by a caseworker at their placement location at least once per month. The designated performance standard is 95%. | 95.5% | Yes | 42 |
| **6.21.b** | Each child in foster care shall have at least one visit per month that includes a private meeting between the child and the caseworker. The designated performance standard is 95%. | 94.9% | No | 42 |
| **6.22.a** | Caseworkers shall visit parents of children with a goal of reunification at least twice during the first month of placement unless specified exceptions apply. The designated performance standard is 85%. | 59.5% | No | 43 |
| **6.22.a** | Caseworkers shall visit parents of children with a goal of reunification at least once in the parent's home during the first month of placement unless specified exceptions apply. The designated performance standard is 85%. | 51.3% | No | 43 |
| **6.22.b** | Caseworkers shall visit parents of children with a goal of reunification at least once a month, following the child's first month of placement, unless specified exceptions apply. The designated performance standard is 85%. | 64.6% | No | 43 |
| **6.23** | DHHS shall ensure that children in foster care with a goal of reunification shall have at least twice-monthly visitation with their parents unless specified exceptions apply. The designated performance standard is 85%. | 62.6% | No | 44 |
| **6.24** | DHHS shall ensure that children in foster care who have siblings in custody with whom they are not placed shall have at least monthly visits with their siblings who are placed elsewhere in DHHS foster care custody unless specified exceptions apply. The designated performance standard is 85%. | 70.1% | No | 44 |
| **6.25** | At least 85% of children shall have an initial medical and mental health examination within 30 days of the child's entry into foster care. | 72.9% | No | 46 |
| **6.25** | At least 95% of children shall have an initial medical and mental health examination within 45 days of the child's entry into foster care. | 81.4% | No | 46 |
| **6.26** | At least 90% of children shall have an initial dental examination within 90 days of the child's entry into care unless the child has had an exam within six months prior to placement or the child is less than four years of age. | 62.6% | No | 47 |
| **6.27** | For children in DHHS custody for three months or less at the time of measurement: DHHS shall ensure that 90% of children in this category receive any necessary immunizations according to the guidelines set forth by the American Academy of Pediatrics within three months of entry into care. | Ranges from 76.7% - 94.2%[4] | No | 47 |

---

[4] Performance for this commitment is measured separately for each required immunization, of which there are 11.

| Section | Commitment | Performance | Achieved | Report Page |
|---------|-----------|-------------|----------|-------------|
| 6.28 | For children in DHHS custody longer than three months at the time of measurement: DHHS shall ensure that 90% of children in this category receive all required immunizations according to the guidelines set forth by the American Academy of Pediatrics. | Ranges from 75.9% - 96.3%[5] | No | 47 |
| 6.29 | Following an initial medical, dental, or mental health examination, at least 95% of children shall receive periodic and ongoing medical, dental, and mental health care examinations and screenings, according to the guidelines set forth by the American Academy of Pediatrics. | 66.5%, 84.5%, 73.7% | No | 48 |
| 6.30 | DHHS shall ensure that: (1) The child's health records are up to date and included in the case file. Health records include the names and addresses of the child's health care providers, a record of the child's immunizations, the child's known medical problems, the child's medications, and any other relevant health information. | 86.4% | No | 48 |
| 6.30 | DHHS shall ensure that: (2) the case plan addresses the issue of health and dental care needs. | 86.4% | No | 48 |
| 6.30 | DHHS shall ensure that: (3) foster parents and foster care providers are provided with the child's health care records. | 81.8% | No | 48 |
| 6.31 | DHHS shall ensure that at least 95% of children have access to medical coverage within 30 days of entry into foster care by providing the placement provider with a Medicaid card or an alternative verification of the child's Medicaid status and Medicaid number as soon as it is available. | 88.0% | No | 49 |
| 6.32 | DHHS shall ensure that at least 95% of children have access to medical coverage within 24 hours or the next business day following subsequent placement by providing the placement provider a Medicaid card or an alternative verification of the child's Medicaid status and Medicaid number as soon as it is available. | 80.1% | No | 49 |
| 6.33 | DHHS shall ensure that informed consent is obtained and documented in writing in connection with each psychotropic medication prescribed to each child in DHHS custody. The designated performance standard is 97%. | 72.2% | No | 50 |

---

[5] Performance for this commitment is measured separately for each required immunization, of which there are 11.

| Section | Commitment | Performance | Achieved | Report Page |
|---------|------------|-------------|----------|-------------|
| **6.34** | DHHS shall ensure that: (1) A child is seen regularly by a physician to monitor the effectiveness of the medication, assess any side effects and/or health implications, consider any changes needed to dosage or medication type and determine whether medication is still necessary and/or whether other treatment options would be more appropriate; (2) DHHS shall regularly follow up with foster parents/caregivers about administering medications appropriately and about the child's experience with the medication(s), including any side effects; (3) DHHS shall follow any additional state protocols that may be in place related to the appropriate use and monitoring of medications. | 31.8% | No | 50 |
| **6.37** | DHHS will continue to implement policies and provider services to support the rate of older youth achieving permanency. | 44.1% | No | 51 |

## Methodology

To prepare this report, the monitoring team conducted a comprehensive series of verification activities. These included: meetings with DHHS leadership, private agency leadership, and Plaintiffs' counsel and extensive reviews of individual children's records and other documentation. The monitoring team also reviewed and analyzed a wide range of aggregate and detailed data produced by DHHS, and reviewed policies, memos, and other internal information relevant to DHHS' work during the period. To verify information produced by DHHS, the monitoring team conducted virtual field-based interviews, cross-data validation, and case record reviews. By agreement of the parties, the monitoring team assessed DHHS' performance for six MISEP commitments utilizing a qualitative case review[6] process. The monitoring team reviewed thousands of distinct reports from DHHS including individual case records, relative foster home studies, Division of Child Welfare Licensing (DCWL) investigations and reports, and CPS referrals and investigations.

## Demographics

DHHS produced demographic data from January 1, 2022 to June 30, 2022. DHHS data indicate that there were 9,509 children in custody as of June 30, 2022. Of the children and youth in care on June 30, 2022, 382 youth (four percent) were enrolled in the Young Adult Voluntary Foster Care (YAVFC) program. During the reporting period, 1,812 children and youth were placed in foster care and 2,099 children and youth exited care. DHHS served 11,608 children during the period.

Though young children aged zero to six years made up the largest portion (4,435 or 47 percent), Michigan continued to have a large population of older youth in custody. Twenty-five percent (2,400) were 12 to 17 years of age and seven percent (682) were 18 years and over, as detailed in Figure 1.

---

[6] The sample sizes for the monitoring team's case record reviews were based on a statistically significant sample of cases and a methodology based on a 90 percent confidence level.

**Figure 1. Age of Children in Custody on June 30, 2022**
Source: MiSACWIS, *n=9,509*



With regard to gender, the population is equally split—50 percent male and 50 percent female. With regard to race, the population of children was 52 percent White, 33 percent Black or African American, one percent Native American, under one percent Asian, and under one percent Native Hawaiian or Pacific Islander (see Table 1). Additionally, 15 percent of children were reported as being of mixed race. Eight percent of children were identified with Hispanic ethnicity and could be of any race. The data indicated that DHHS was unable to determine the race of less than one percent of children in care on June 30, 2022. In contrast, the population of all children in the state of Michigan was 66 percent White, 15 percent Black or African American, three percent Asian, one percent American Indian or Alaska Native, and under one percent Native Hawaiian or Pacific Islander. Additionally, twelve percent of children in the state of Michigan were of mixed race, and nine percent of children were identified with Hispanic ethnicity and can be of any race. Three percent of children in the state of Michigan were of some other race.[7]

---

[7] Data on the race of all children in the state of Michigan was sourced from the U.S. Census Bureau, Population Division, 7/1/2021 Population Estimate.

**Table 1. Race of Children in Custody on June 30, 2022 and Race of Children in the State of Michigan on July 1, 2021**

Source: MiSACWIS, US Bureau of the Census

| Race | Count (DHHS Custody) | Percent (DHHS Custody) | Percent (State of Michigan) |
|---|---|---|---|
| White | 4,921 | 52% | 66% |
| Black/African American | 3,093 | 33% | 15% |
| Mixed Race | 1,414 | 15% | 12% |
| American Indian or Alaska Native | 50 | 1% | 1% |
| Unable to Determine | 14 | 0% | -- |
| Asian | 14 | 0% | 3% |
| Native Hawaiian or Pacific Islander | 3 | 0% | 0% |
| Some Other Race | -- | -- | 3% |
| **Total** | **9,509** | **100%** | **100%** |
| Hispanic ethnicity and of any race | 787 | 8% | 9% |

Note: Percentages do not add up to 100 due to rounding.

As Figure 2 demonstrates, 89 percent of children in DHHS' custody lived in family settings, including with relatives (44 percent), foster families (36 percent), their own parents ("in-home") (eight percent), and in homes that intend to adopt (two percent). Of children in custody, 510 (five percent) lived in institutional settings, including residential treatment and other congregate care facilities. Another 434 children (five percent) resided in independent living placements, which serve youth on the cusp of aging-out of care. The remaining one percent were AWOL. There were no children with unidentified placements or placements in other settings.

**Figure 2. Placement Types of Children in Custody on June 30, 2022**

Source: MiSACWIS, *n=9,509*



Of the children in care on June 30, 2022, 36 percent were in care for less than one year, while 20 percent were in care for more than three years.

**Figure 3. Length of Stay of Children in Custody on June 30, 2022**
Source: MiSACWIS, *n=9,509*



**Table 2. Exits from Care by Exit Type, January 1, 2022 to June 30, 2022[8]**
Source: MiSACWIS

| Exit Type | Frequency | Percent |
|---|---|---|
| Reunification | 787 | 37% |
| Adoption | 805 | 38% |
| Emancipation | 325 | 15% |
| Guardianship | 126 | 6% |
| Living with relatives | 41 | 2% |
| Death of a child | 7 | 0% |
| Transfer to another agency | 5 | 0% |
| Runaway | 3 | 0% |
| **Total** | **2,099** | **100%** |

Note: Percentages do not add up to 100 due to rounding.

As the table below demonstrates, of the children in custody on June 30, 2022, the majority (5,606 or 59 percent) had reunification as a federal goal. For the remaining children, 2,512 (26 percent) had a goal of adoption, 769 (eight percent) had a goal of APPLA, 484 (five percent) had a goal of

---

[8] The 2,099 exits include three children who exited care twice (The children appearing twice in the file had unique removal and discharge dates).

guardianship, and 138 (one percent) had placement with a relative as a federal goal. There were no children with missing federal goal codes.

**Table 3. Federal Goals for Children in Custody as of June 30, 2022**
Source: MiSACWIS

| Federal Goal | Frequency | Percent |
|---|---|---|
| Reunification | 5,606 | 59% |
| Adoption | 2,512 | 26% |
| APPLA | 769 | 8% |
| Guardianship | 484 | 5% |
| Relative | 138 | 1% |
| **Total** | **9,509** | **100%** |

Note: Percentages do not add up to 100 due to rounding.

# Organizational Capacity

## Caseloads and Supervision

The MISEP sets forth caseload standards for staff and supervisors performing critical child welfare functions. The agreement states that caseload compliance will be measured by taking the average of three data reports each reporting period, prepared on the last workday of February, April, June, August, October, and December. For MISEP 22, the monitors used caseload counts from February 28th, April 29th, and June 30th of 2022 to determine compliance.

*Supervisor Caseloads (6.13)*

DHHS agreed that full-time foster care, adoption, CPS, purchase of service (POS), and licensing supervisors, both public and private, would be responsible for no more than five caseload-carrying staff each. An employee of DHHS or a private child placing agency that is non-caseload carrying will count as 0.5 toward the worker-to-supervisor ratio and administrative and technical support staff who support the supervisor's unit are not counted toward the worker-to-supervisor ratio. In addition, the supervisor methodology requires accounting for the practice among some of the private agencies of assigning both supervisory and direct caseload responsibilities to the same person, which requires pro-rating both supervisory and caseload performance for these hybrid supervisors. DHHS committed that 95 percent of supervisors would meet the MISEP caseload standard. During MISEP 22, DHHS averaged 90.1 percent of supervisors meeting the standard, missing the target.

*Foster Care Caseloads (6.14)*

DHHS agreed that full-time staff, public and private, solely engaged in foster care work, would be responsible for no more than 15 children each. Staff who perform foster care work as well as other functions are held to a pro-rated standard. The MISEP requires that 95 percent of staff engaged in foster care work meet the caseload standard. DHHS averaged 93.1 percent of staff meeting the standard during MISEP 22, falling slightly short of the standard.

*Adoption Caseloads (6.15)*

DHHS agreed that full-time staff, public and private, solely engaged in adoption work would be responsible for no more than 15 children each. Staff who perform adoption work as well as other functions are held to a pro-rated standard. The MISEP requires that 95 percent of staff engaged in adoption work meet the caseload standard. For MISEP 22, DHHS averaged 75.0 percent of staff meeting the standard, missing the target.

*Child Protective Services (CPS) Investigations Caseloads (5.3)*

DHHS agreed that full-time staff solely engaged in investigations would be responsible for no more than 12 open investigations. Staff who perform investigative work as well as other functions are held to a pro-rated standard. The MISEP requires that 95 percent of staff engaged in CPS investigations work meet the caseload standard. For MISEP 22, DHHS averaged 97.8 percent of staff meeting the standard, exceeding the target.

*CPS Ongoing Caseloads (5.4)*

DHHS agreed that full-time staff solely engaged in CPS ongoing services, a public-sector function, would be responsible for no more than 17 families each. Staff who perform CPS ongoing work as well as other functions are held to a pro-rated standard. The MISEP requires that 95 percent of staff engaged in CPS ongoing work meet the caseload standard. DHHS averaged 98.1 percent of staff meeting the standard in MISEP 22, exceeding the target.

*Purchase of Service Caseloads (5.5)*

POS work comprises the support and oversight that DHHS staff provide with respect to foster care and adoption child welfare cases assigned to the private sector. The MISEP established the full-time POS standard at 90 cases. However, there are some DHHS staff who are assigned a mix of POS and other work including licensing, foster care, and adoption. For those staff, the standard of 90 POS cases is pro-rated based on their other responsibilities. DHHS committed that 95 percent of staff engaged in POS work would meet the MISEP standard of 90 cases. For MISEP 22, DHHS averaged 99.1 percent of staff meeting the standard, exceeding the target.

*Licensing Caseloads (5.6)*

DHHS agreed that full-time staff, public and private, solely engaged in licensing work would be responsible for no more than 30 licensed foster homes or homes pending licensure. Staff who perform licensing work, as well as other functions, are held to a pro-rated standard. The MISEP requires that 95 percent of staff engaged in licensing work meet the caseload standard. DHHS averaged 97.5 percent of staff meeting the standard in MISEP 22, exceeding the target.

## Accountability

### Outcomes

Pursuant to the MISEP, DHHS agreed to meet federal outcome standards regarding safety and permanency for children. The MISEP adopts outcome methodologies developed by the federal government, including one safety measure and one permanency measure from Round Three of the federal Child and Family Services Reviews (CFSR). Performance on all measures is calculated for DHHS by the University of Michigan based on the Adoption and Foster Care Analysis and Reporting System (AFCARS) and National Child Abuse and Neglect Data System (NCANDS) files produced by DHHS.

*Safety – Maltreatment in Foster Care (6.1)*

The child safety standard of maltreatment in care (MIC), focuses on keeping children in DHHS custody safe from abuse and neglect. DHHS committed to ensure that of all children in foster care during the applicable federal reporting period, DHHS will maintain an observed rate of victimizations per 100,000 days in foster care of less than 9.67.

Performance for this commitment is reported annually and is not traditionally included in this report cycle, but DHHS and the Monitors undertook a review of Michigan's MIC investigations for the federal fiscal year (FFY) 2022, October 1, 2021 – September 30, 2022 much closer in time to the closure of those investigations than in previous periods, in order to assess the appropriateness of those investigations and validate the State's observed rate of child victimizations.

For FFY 2022, DHHS provided data indicating the State substantiated 261 incidents of MIC, involving 245 children in DHHS custody, for an observed rate of 8.04 victimizations per 100,000 days in foster care. However, the Monitors cannot validate that the observed rate accurately represents the prevalence of child maltreatment in care.

The Monitors and DHHS reviewed a random sample of 230 MIC investigations from FFY 2022 and determined that 78 (33.9 percent) of the 230 investigations reviewed were deficient. This

includes 34 investigations the monitoring team determined met the criteria for substantiation and 44 investigations where there was insufficient information gathered to render a finding.

DHHS reviewed the Monitors' findings and determined 62 of the 78 (79.5 percent) investigations identified by the Monitors were deficient. Full summaries of the 78 investigations determined to be deficient were filed with the Court in March 2023.

*MIC Data Report (6.2)*

DHHS committed to generating, at least annually and in partnership with an independent entity, a report that analyzes MIC data to assess risk factors and/or complete root-cause analysis of MIC. The report will be used to inform DHHS practice, and it will continue to be generated until Commitment 6.1, the child safety standard of MIC, is achieved.

DHHS partnered with the Child and Family Data Lab at the University of Michigan to produce a MIC analysis report, which was issued in October 2022, discussed below.[9]

*Permanency Indicator One (6.3)*

Permanency Indicator One measures the percent of children who enter foster care within a 12-month period who are discharged to permanency within 12 months of their entry date. Three years of AFCARS data is required to measure performance for this outcome, therefore performance was calculated for children who entered care between April 1, 2019 and March 31, 2020. Based on the data files provided by DHHS, the monitoring team calculated that of the 5,077 children who entered foster care during this period, 1,165 children (22.9 percent) exited to permanency within 12 months of their entry. DHHS did not meet the MISEP standard of 40.5 percent for this commitment. To meet the performance standard, DHHS should have achieved permanency for an additional 891 children within 12 months of their entry date.

## Contract Oversight

*Contract-Agency Evaluation (5.1)*

The MISEP requires DHHS to conduct contract evaluations of all Child Caring Institutions (CCIs) and private Child Placing Agencies (CPAs), including an annual inspection of each CPA, an annual visit to a random sample of CPA foster homes, and an annual unannounced inspection of each CCI. During the required visits, the Division of Child Welfare Licensing (DCWL) is expected to monitor compliance with rule, policy, contract, and MISEP requirements, with the primary focus being the safety and well-being of children.

---

[9] See Appendix C for a copy of the report.

DHHS reported that DCWL continues to be funded for 22 child welfare licensing field consultants who perform monitoring activities including annual licensing inspections, investigations, technical assistance, and consultation. Additionally, seven field analysts are expected to conduct visits comprised of interviews with foster families and unlicensed relative caregivers to assess safety and service provision within their homes. Three area managers supervise the field consultants and field analysts.

*Child Caring Institutions (CCIs)*

As reported in the previous period, following the suffocation death of a restrained child at Lakeside Academy in 2019, and the State's uneven implementation of corrective actions developed thereafter, the monitoring team began a process in January 2021 of analyzing child safety data on CCIs. The process, which continued through this period, involved the monitoring team's review and assessment in real-time of data and information on Special Investigations, Maltreatment in Care (MIC) investigations, and the use of restraints (both authorized and unauthorized). The data and information highlighted facilities that demonstrated serious lapses in child safety, representing a substantial risk to children in state custody. Where there were concerning patterns or egregious violations of child safety, the monitoring team engaged the Department in regular meetings to discuss the facilities. The monitoring team expressed concerns based on documented harm to children and requested information on any safety measures the Department intended to take, or had taken, such as placement suspensions, licensing modifications, and revocations.

The October 2022 MIC report from the University of Michigan Child and Family Data Lab, in collaboration with DHHS, highlights the heightened safety risks for children placed by DHHS in congregate care. The report states:

- Children living in congregate care settings (referred to as child caring institutions) are at the greatest risk of experiencing MIC.

- At any point in time, approximately four percent of children in care in Michigan are living in a CCI. Over the course of their foster care experience, only seven percent of children will eventually live in a CCI. Yet CCIs account for approximately 18 percent of all MIC events.

- An overall lack of staff, poor decision-making by facility staff, inadequately trained staff, and problematic organizational policies (or lack of understanding of policies) seem to be the primary factors responsible for MIC.

- A review of the detailed disposition summaries confirm these findings. We encourage DHHS to work closely with residential providers in Michigan to address these concerns.

As part of its oversight process, the Department continued to refine and utilize a Risk Stratification Tool first developed in the summer of 2021 that creates a numerical risk score for each facility by weighing those safety factors mentioned above. The Department also maintained a Residential Collaboration and Technical Assistance Unit (RCTAU) which the Department assembled to assist with heightened-risk facilities. On a weekly basis, DHHS produced to the monitors a rank-ordered list of the "highest risk" facilities in the State. The monitoring team provided feedback on the Department's evaluations of the highest-scoring facilities, and frequently noted inconsistencies or inaccuracies in the data during the period.

The Department indicated early in this period that any facility with a risk score of ten or higher would be subject to intensified monitoring by DHHS, including a weekly administrative meeting with the RCTAU, and corrective actions developed through an individualized Action Plan. Throughout this reporting period, there were at least 15 facilities each week with a risk score of ten or higher. In two separate weeks (one in January 2022 and one in March 2022), there were 21 facilities with a risk score above ten. The monitors found that the Department's commitment to engage these facilities in the development and adherence to Action Plans often failed to materialize or languished. The maximum number of Action Plans that existed in any given week was nine. The Department's ongoing documented assessment of plan implementation often reflected general program updates without specificity for actions taken to improve youth safety in the facilities.

During MISEP 22, the Department increased the risk score from 10 to 15 triggering heightened DHHS oversight of facilities. The monitoring team found that despite decreasing the number of facilities subject to heightened oversight by DHHS, the children placed in some of these facilities continued to experience harm. The following describes the lack of improved safety in three programs that have subsequently closed:

1. At the beginning of the reporting period, Facility D was on a Second Provisional License largely due to the significant number of improper restraints of children. The risk score was in the 20s, and in March 2022, DHHS permitted the facility to return to a Regular License status, even though there were 13 open Corrective Action Plans (CAPs). From March through June, the facility's risk score steadily rose to between 20 and 30, making it one of the riskiest facilities in the State. An affiliated center, Facility N, had a risk score that ranged between 21 and 35 every week during the reporting period. The elevated risk score was due to a high number of child restraints, averaging 23 a month during MISEP 22, and a high rate of substantiated allegations of child abuse and neglect.

   The monitoring team engaged in multiple conversations with the Department regarding the serious youth safety concerns at these two facilities. Concerns included repeat allegations of physical abuse where the same staff were identified as alleged

perpetrators, recurring incidents of staff failing to respond adequately to the medical needs of youth, and multiple investigations of child abuse and neglect where the Chief Administrator failed to provide requested documents or viewable video footage. While there were Action Plans in place by the RCTAU, the monitoring team found no evidence that the plans were leading to any meaningful improvements in the safety level for youth prior to both facilities closing in July 2022.

In reviewing MIC investigations that occurred at this program, the monitoring team found that the MIC investigators did not consider critical context in individual investigations. There was no indication that the facilities' lengthy history of prior allegations, substantiations, incident reports, and licensing violations was considered by individual investigators reviewing new allegations. This fragmented approach presented a significant risk to child safety and failed to address serious systemic problems. The monitoring team identified 11 unsubstantiated investigations involving Facilities D and N that were deficient or should have been substantiated, leaving in place an unresolved risk of harm to youth. These include:

- A youth (age 16) had bruises on her face and head that came from a staff member choking her with a towel, making it difficult to breathe. She also had scratches on her arm and body from staff members grabbing and hitting her. The monitoring team concluded after review that this investigation should have been substantiated for physical abuse.

- A youth (age 17) was verbally and physically abused by two staff, was found by law enforcement at an abandoned house, and did not feel safe returning to the facility. The monitoring team found the investigation to be deficient as there was not enough information gathered to determine if physical abuse had occurred.

- A youth (age 12) ran away from the facility and alleged physical abuse by staff. A staff member allegedly slammed her head against the wall causing head pain. She also alleged staff pulled her hair and cursed at her. She had fingerprint marks on her neck and bruising on her arms and legs. The monitoring team found the investigation was deficient and insufficient information was obtained and reviewed.

- A youth (age 13) alleged being beaten by another child at the facility, including suffering a "busted head," and being unable to breathe after being hit in the chest multiple times. The child was not taken to the hospital in a timely manner, nor were actions taken to protect the child from the youth who attacked them. This incident occurred in the bathroom where youth were unsupervised. The monitoring team found that the investigation was deficient because DHHS did not view video footage nor interview additional staff and youth who witnessed the incident.

- A youth (age 15) alleged that he was body slammed by staff. The monitoring team found the investigation was deficient because DHHS did not interview youth witnesses and another staff person assisting with the restraint.

- A youth (age 15) alleged that staff were physically aggressive and that he feared them. The youth had gone AWOL on multiple occasions. Staff admitted to restraining the youth. The monitoring team found the investigation was deficient because the DHHS investigator relied on the facility's report that the restraint had been investigated and the video had been viewed, only receiving from DCWL the incident report for the restraint. Additionally, the facility nurse who evaluated the child after the restraint was not interviewed.

- Two female youth (ages 14 and 15) were alleged to be physically abused by a staff person. The staff person put one of the youth in a choke hold, antagonized one of the youth by making inappropriate comments, and pushed both girls to the wall and floor causing bleeding. The DHHS investigator did not interview other staff involved in restraining the girls and did not obtain the nurse's report of the children's condition.

- A youth (age 13) who had previously resided at the facility stated that staff would have youth urinate into cups to use for their own drug screenings. She also stated that youth would go AWOL and drink alcohol. Staff would not allow them into the facility when they returned, and they had to sleep on the porch. Additionally, the previous resident alleged a staff person had given her a marijuana vape pen in exchange for her urine. She said all the staff providing vape pens had been terminated already. The monitoring team found that the investigation was deficient as one of the alleged perpetrators was not interviewed, nor were attempts made to interview staff who no longer worked at the facility. Additionally, DHHS did not reach a determination regarding the allegation that youth were not allowed back into the facility after being AWOL.

- A youth (age 14) had extensive eczema and substantial brown marks covering her legs and arms. Staff were aware of the issues but had not taken her for medical treatment, nor determined if the leg and arm marks were bruises and if so, how they occurred. Only after this allegation was received was the child taken for medical treatment. She was diagnosed with a condition that requires an extensive treatment regimen, and if not followed, can cause serious complications. The monitoring team found that medical neglect should have been substantiated for this investigation.

2. Throughout MISEP 22, Facility B had the highest risk score identified by the State, which consistently was in the 60-70 range. The next highest score for any other facility was in

the thirties. The risk was largely attributed to the prevalence of child restraints and investigations of child abuse and neglect related to improper restraints. In the prior period, there also were two separate incidents of youth sexual contact and staff failing to provide adequate supervision. In both instances, it was determined that direct care staff were unaware of the background and history of the youth in care, particularly as it related to prior sexualized behaviors. In one of the instances, which involved a youth sexually assaulting another youth in the shower, DHHS did not substantiate individuals for Improper Supervision because the facility did not have a shower supervision policy. DHHS did not assess the culpability of program administrators for failing to share the children's history of sexualized behaviors with staff or the failure to develop or implement adequate supervision policies. The facility was on a First Provisional License for the entire reporting period and had been recommended by DCWL for a Second Provisional License. Despite multiple concerns expressed by the monitoring team to the Department, no additional action was taken regarding safety at the facility, which voluntarily closed in June 2022.

3. Two affiliated institutions, Facilities A and E, had risk scores in the mid to upper teens during MISEP 22 and operated under regular licenses. In the prior period, the monitoring team had raised multiple concerns with the Department about these two facilities, due to the number of substantiations of child abuse and neglect and improper restraints of youth. The monitoring team's concerns included a substantiated incident of physical abuse where a staff member engaged in a fight with a youth while two other staff observed without intervening. Other allegations included the use of improper and supine restraints, youth receiving rug burns from being dragged as part of a restraint, and a report of youth not being given proper clothing to wear. Additionally, there were multiple referrals regarding a 40-year-old supervisor allegedly grooming and having sexual encounters with female residents. After several allegations of this nature, he was moved by the facility director to another program operated by the same administrator. Shortly after his transfer, new sexual abuse allegations regarding girls at this facility were reported. Additionally, a 20-year-old colleague at this facility alleged that the supervisor raped her twice on campus while he was working the third shift. He contended that the sexual encounter was consensual. No licensing violations were established for his behavior, and he resigned from the program and left the state amid the ongoing investigations.

Facilities A and E closed in February 2022, but another affiliated program within the same network continues to be operative.

DHHS reported that during MISEP 22, DCWL conducted 19 unannounced renewal and 13 unannounced interim inspections of CCIs, totaling 32 inspections for the period. Twenty-three

inspections required CAPs for 114 licensing violations. DHHS records indicate that DHHS determined nine of the CCIs were in substantial compliance with appropriate statutes, administrative licensing rules, contract regulations, and MISEP requirements.

DCWL completed 218 Special investigations during MISEP 22, according to DHHS, involving 392 allegations of non-compliance in 47 contracted CCIs. Of the 218 Special Investigations, reportedly 135 (61.9 percent) resulted in no violations being established. Violations were found with 70 (32.1 percent) of the Special Investigations, requiring CAPs approved by DCWL. An additional 13 (6.0 percent) of the Special Investigations resulted in a finding of non-compliance, but based on adverse actions being taken, a CAP was not allowed.

DHHS revoked one CCI license during the period and eight CCIs voluntarily closed. One CCI was recommended for revocation based on the nature of the violations found during investigations, and another two CCIs had their licenses suspended and then recommended for revocation. Three CCIs were recommended for a First Provisional License. One CCI was issued a First Provisional License, and another CCI was issued a Second Provisional License.

The monitoring team reviewed all 218 CCI special investigations for the period. One hundred eighty-eight of the Special Investigations were referred to Centralized Intake (CI) and 134 were assigned for a CPS investigation. Twenty-one of the 134 investigations resulted in a substantiated disposition for child abuse or neglect.

The monitoring team found that an additional 14 Special Investigations included allegations or findings during this period that met the criteria for a CPS investigation of child abuse and neglect. For eight of the 14 investigations, the incidents were referred to CI but were not assigned for investigation. Six other incidents were never referred to CI by the facility or DHHS. The following are some examples determined by the monitoring team to warrant assignment for a CPS investigation:

- A youth (age 17 and a temporary court ward) who resided at a CCI facility was not given her psychotropic medication. The facility reportedly did not fill the prescription at the pharmacy due to insurance issues. CCI staff did not reach out to anyone regarding the lack of medication issue until the last minute. The medication was considered one that was "lifesaving."

- A youth (age 13 and a temporary court ward) went AWOL from a CCI facility after being beaten by another resident including being kicked in the head. The facility staff did not know about the fight. The youth went to the home of a family member who took him to the emergency room, where he was diagnosed with head injuries.

- A child (age 11 and a permanent state ward) had Type I diabetes and was on two types of insulin. Since being placed at the CCI, her blood glucose levels had been dangerously high in the 200-300 range from fasting and non-fasting tests.[10] It was unknown if the child's glucose levels were being monitored correctly and treated with the proper insulin dosage.

- A youth (age unknown) residing at a CCI facility hit his face on the dashboard of the agency van and sustained facial injuries when the staff who was driving stopped short at an intersection. This youth and another resident in the van were not wearing seat belts. The facility was on a regular license at the time the incident was reported. Five days after the report, the facility's license was suspended, and a notice of intent to revoke was issued.

- A youth (age unknown) was bitten by a dog at a CCI facility when a staff member's husband brought the dog onto the campus. There were additional concerns regarding staff allowing youth to be bullied at the facility.

In a further effort to validate the prevalence of maltreatment in care and assess child safety, the monitoring team reviewed many of the MIC investigations for the 134 licensing incidents assigned by CI. The monitoring team found numerous child abuse and neglect investigations into certain high-risk CCIs were deficient, left children exposed to risks of harm and led to more children and youth being harmed over time in certain facilities. Themes noted by the monitoring team, include:

- DHHS' investigations predominantly focused on direct caregivers but did not routinely consider the potential culpability of CCI program administrators in MIC investigations, such as when the design or operation of a program itself created a known, substantial risk of abuse or neglect that individual staff were unable to address.

- DHHS continued to place children in CCIs that operated without adequate video surveillance in public spaces. Video recordings provide valuable evidence in investigations of allegations of MIC and, as a result, can help keep children safe. Even CCIs with cameras often did not have those cameras configured to provide comprehensive coverage, at times did not maintain cameras in operational status, and frequently fail to provide recordings for MIC investigations. The monitors discovered while reading investigative records an instance where CCI staff acknowledged that their facility had operating cameras, despite the fact that DHHS documented the facility had denied their existence to DHHS in numerous previous investigations of child abuse and neglect. The monitors raised this circumstance to DHHS, but the facility remained open, DHHS continued to

---

[10] The Centers for Disease Control and Prevention indicates that a fasting blood sugar level of 99 milligrams per deciliter (mg/dl) or lower is normal; 100-125 mg/dl indicates prediabetes; and 126 mg/dl or higher indicates diabetes. A non-fasting blood sugar level of 200 mg/dl or higher indicates diabetes.

place children there, and DHHS offered no explanation for its failure to obtain and review the video surveillance footage.

In addition to the 218 special investigations, corresponding CPS referrals, and CPS-MIC investigations, the monitoring team also reviewed CAPs and CAP follow-up documentation provided by DHHS for the investigations where licensing violations were established. As with the last several periods, during this period the monitoring team continued to find that CAP content and follow-up were often inadequate. CAP implementation was often delayed, lacked specificity, and did not remediate risk of harm to children. Frequently repeat violations of a serious nature, such as physical intervention, improper restraints causing injuries, or improper supervision, often by the same staff persons, recurred despite the CAPs. There was little evidence that CAPs for repeat violations that failed to remediate risks of harm were revamped, nor that numerous staff were held accountable for violations, even when repetitive. In one instance where a staff person was found sleeping on the job, the corrective action plan was to re-train him.

*Child Placing Agencies (CPAs)*

DHHS reported that during MISEP 22 there were 49 CPA inspections, which included 25 interim and 24 renewal inspections. DHHS determined two agencies were in substantial compliance with applicable statutes, licensing rules, contract regulations, and MISEP requirements, while 47 agencies required CAPs due to a total of 593 violations. There were no CPA closings during the period.

As indicated above, DCWL field analysts conduct annual home visits to assess safety and service provision within licensed foster homes and unlicensed relative homes supervised by agencies with interim and renewal inspections. According to DHHS, DCWL field analysts visited a random sample of licensed foster homes and unlicensed relatives associated with 44 of the 49 contracted CPAs scheduled for a renewal or interim inspection during MISEP 22. Five of the agencies did not supervise any foster or unlicensed relative homes.

DCWL field analyst reports indicate that 147 foster homes and 126 unlicensed relative homes were visited during MISEP 22 for a total of 273 visits. DCWL issued 29 safety alerts for urgent or critical concerns in 22 unlicensed relative homes and seven regular foster homes. Safety issues included: inoperable smoke or carbon monoxide detectors; rooms lacking the required means of egress; a missing door, doorknob, window, flooring, and drywall; use of physical/corporal punishment; a door leading to water without an alarm; the refusal of visits/walkthroughs by unlicensed relative caregivers; unlocked gun/medication; a leaking sink and roof; a water heater placement being unsafe; safe-sleep non-compliance; and overnight sleeping violations. DHHS

documented certain follow-up on the safety alert forms and in the annual agency inspection reports.[11]

The MISEP requires that the field analysts visit a certain number of each CPA's foster homes, dependent on the total number of homes supervised by the agency. CPAs with fewer than 50 homes are required to have at least three licensed foster homes visited, and those agencies with 50 or more licensed homes are required to have five percent of those foster homes visited. Based on the information provided by DHHS, this commitment was met for the period.

DHHS reported that during MISEP 22, licensing consultants conducted 76 Special Investigations involving 42 contracted CPAs. The investigations involved 146 allegations of non-compliance related to rule, policy, contract, and MISEP requirements. DHHS found that 27 (35.5 percent) of the Special Investigations were in substantial compliance and a CAP was not required. Forty-seven (61.8 percent) of the 76 investigations resulted in non-compliance findings that required CAPs, with 78 (53.4 percent) of the 146 allegations resulting in established violations. DHHS recommended one CPA for license revocation due to the nature of the substantiated violation, and therefore a CAP was not allowed.

The monitoring team reviewed all 76 CPA Special Investigations during the period. Established violations included: deplorable conditions in a resource home, including dog feces, filth, and a urine smell, none of which were addressed by the agency; a worker placing a child with a parent for 19 days in violation of the safety plan and while the parent admitted to drug usage; a caseworker shown on video punching, grabbing, and cursing at a restrained youth, and the agency not reporting this assault; a male staff admitting to a sexual encounter with a youth; an agency not making reasonable efforts toward reunification, including not providing parental visitation; an agency allowing a youth to leave the state without proper paperwork or a home assessment being done; agency staff found to be sleeping on the job or leaving youth unattended; an agency not checking that weapons (two guns, a rifle, and sword) were properly secured in a home where the foster parent was charged with felony homicide for shooting a paramour (unknown by the agency to be in the home and with whom she had a history of

---

[11] In reviewing safety alert follow-up documentation, the monitoring team identified circumstances where caregivers appeared to need more support in order to safely care for children, and instances where concerns for child safety elevated by the alert seemed unresolved. For example, an alert was issued on April 21, 2022, when the unlicensed relative caregiver refused to allow a walk-through of the home or for the analyst to view the caregiver's bedroom.  Later, the caregiver told the foster care worker she refused access to the analyst as there was a hole in the roof that was causing a leak in an unused bedroom. The worker discussed a safety plan with the caregiver that no one would use the room until repairs were done. Pictures of the room indicated that there were several holes in the bedroom ceiling with one being several feet long exposing the wood beams above. In March 2023, DHHS reported that a partial repair had been made but did not specify what that meant. Another home visited on November 22, 2021, showed damage from a bathroom sink leaking upstairs. DHHS updated the monitors in March 2023 that damaged ceiling tiles had been replaced, but the sink still had not been repaired.

domestic violence) on a night when both were drinking alcohol and snorting cocaine; staff using unauthorized physical management on a child; an agency knowing of and not rectifying a faulty phone system that resulted in foster parents not being able to reach staff for two days to notify them that a child was hospitalized after an overdose; an agency not reporting to DHHS within 24 hours that their system was hacked by "foreign agents" with ransom requested, potentially exposing personal information for 384 children; an agency being financially unstable, including delinquency with bills incurred in its operation; a worker not reporting that she suspected a youth was using drugs, alcohol, and tobacco; inconsistencies and unclear information in the daily medication log for youth; medical passports not being provided to caregivers; and an agency not making the required caseworker home visits, as per policy.

DHHS reported that during MISEP 22, private agencies conducted 380 foster home Special Evaluations. These are investigations conducted by the supervising agency when an allegation is made regarding a foster home in their network. The monitoring team reviewed 77 of these Special Evaluations and found that 30 of the investigations resulted in established violations. DHHS determined 25 of the 30 homes required CAPs while five were not allowed CAPs due to license revocation recommendations. Seventeen of the 77 Special Evaluations were also referred for MIC investigations. Issues precipitating revocation recommendations for the five foster homes were:

- A respite caregiver attempted to drop off a child to the regular foster parent at 9:00 a.m. but no one answered the door, and a crying baby could be heard. Continued attempts to contact the foster mother through phone calls and texts were unsuccessful. The police were called at 10:30 a.m. for a wellness check and found the foster mother had been sleeping with a two-year-old and an 11-month-old in her care.

- A foster parent was not following a safety plan from a previous 2021 special evaluation, where a recommendation for revocation was made due to the foster parent allowing a paramour with an extensive CPS history in the home. Revocation was again recommended for violation of the safety plan, however a group of three siblings in foster care who were in the process of being adopted were court-ordered to remain in the home.

- There was a preponderance of evidence that a foster father caused mental injury to a 13-year-old foster child who identified as bisexual, by making derogatory remarks about her.

31

- A couple was found in violation of the 14-day notice policy.[12] This was their first placement, and the couple felt the agency did not provide full disclosure about the child's behaviors. They dropped off the child's possessions at the agency on the eighth day of their notification and asked for the child not to be returned to their home.

- There were multiple issues with the fifth home that was recommended for revocation including foster children being hit, the children frequently not attending school, the wrong medication being given to a foster child, and the children being underweight. The foster children were removed after living in this home for more than seven years without permanency. There had been five previous Special Evaluations, three (including this one) recommending revocation, but the home is still open in MiSACWIS.

As of April 2023, four of the above homes remain active in the Child Welfare Licensing Module (CWLM),[13] and one home had the license expire in 2022 but still has not been closed.

Other concerns noted by the monitoring team in reviewing the Special Evaluations included the following:

- An 11-month-old child was sleeping with blankets and a cord around her torso. The cord had reportedly fallen from a television attached to the wall. The two foster children were removed for a respite weekend until safe sleep training and other safety issues could be addressed and then were returned to the home.

- A ten-month-old foster child was observed in a crib without safe sleep practices. At the completion of the Special Evaluation, when issues had reportedly been rectified, a picture was sent from the foster parent to the worker showing the baby sleeping on her stomach. This does not constitute safe sleep consistent with Michigan's safe sleep training, and yet the worker's response to this photo was favorable.

*Seclusion in Contract Agencies (5.7)*

The MISEP requires that all uses of seclusion or isolation in CCIs be reported to DCWL for necessary action. If not reported, DCWL is required to take appropriate action to address the failure to report the incident and to ensure that it has been investigated and resolved. DCWL is required to monitor the occurrence of seclusion or isolation incidents in CCIs.

---

[12] MDHHS Licensing Rules for Foster Home Families, Rule 400.9403 requires that foster parents "provide written notification to the agency of the need for a foster child to be moved from the foster home not less than 14 calendar days before the move, except when a delay would jeopardize the foster child's care or safety or the safety of members of the foster family."

[13] The CWLM is Michigan's first module in CCWIS and provides access to information on licensed foster homes in place of MiSACWIS. The CWLM went live in October 2022.

The monitoring of seclusion and isolation by DCWL occurs as per the following: Michigan law, licensing rules for CCIs, residential foster care abuse and neglect contracts and policy, and juvenile justice contracts and policy. DHHS amended CCI licensing rules relevant to seclusion in May 2022 to include circumstances when seclusion can be used, de-escalation techniques to be used prior to seclusion, and a requirement that agencies develop a seclusion reduction/elimination plan. The new rules prohibit all seclusion effective November 1, 2022.

DHHS reported that during the MISEP 22 period, as in the past period, licensing consultants monitored incidents of seclusion during renewal and interim on-site visits. Seclusion rooms were observed to ensure compliance with statute, rules, and contract regulations. During inspections, the following documents relevant to seclusions were reviewed: MiSACWIS seclusion incident reports, seclusion logs, prior inspections and investigations, and data reports compiled by DCWL analysts. During the period, DHHS reported that there were no violations of seclusion established in annual inspections or special investigations.

## Quality Service Reviews

DHHS continues to implement the Quality Service Review (QSR) process to provide a probative review of case practice in a selection of cases, surfacing strengths as well as opportunities for improvement in how children and their families benefit from services. Each review focuses on an identified county or counties and includes in-depth case reviews, as well as focus groups and surveys.

The parties agreed that performance for two commitments would be measured through QSR case reviews. The first commitment is Assessments and Service Plans, Content (6.19). The performance standard for this commitment is 90 percent. The second commitment is Provision of Services (6.20). The performance standard for this commitment is 83 percent.

During MISEP 22, DHHS conducted blended CFSR/QSR reviews in Business Service Centers (BSC) 3, 4, and 5. The monitoring team participated in the blended reviews in BSCs 3 and 4 in March 2022. Monitoring team members participated in case reviews, panel discussions, and case scoring.

DHHS chose a randomly selected sample of open cases for review during each CFSR/QSR. Cases were graded on 21 indicators covering different areas of case practice and the status of the child and family. Information was obtained through in-depth interviews with case participants including the child, parents or legal guardians, current caregiver, caseworker, teacher, therapist, service providers, and others with a significant role in the child's or family's life. A six-point rating scale was used to determine whether performance on a given indicator was acceptable. Any indicator scored at four or higher was determined acceptable, while any indicator scored at three or lower was determined to be unacceptable.

*Assessments, Service Plans, and Provision of Services (6.19, 6.20)*

DHHS agreed to develop a comprehensive written assessment of a family's strengths and needs, designed to inform decision-making about services and permanency planning. The plans must be signed by the child's caseworker, the caseworker's supervisor, the parents, and the child, if age appropriate. If a parent or child is unavailable or declines to sign the service plan, DHHS must identify steps to secure their participation in accepting services.

The written service plan must include:

- A child's assigned permanency goal;

- Steps that DHHS, CPAs when applicable, other service providers, parents, and foster parents will take together to address the issues that led to the child's placement in foster care and that must be resolved to achieve permanency;

- Services that will be provided to children, parents, and foster parents, including who will provide the services and when they will be initiated;

- Actions that caseworkers will take to help children, parents, and foster parents connect to, engage with, and make good use of services; and

- Objectives that are attainable and measurable, with expected timeframes for achievement.

DHHS reviewed 25 children's cases, with 82 applicable items relevant to this commitment during MISEP 22. Of the 82 applicable items, DHHS reported that 57 (69.5 percent) were rated as having acceptable assessments and service plans, below the performance standard of 83 percent for this commitment.

Furthermore, DHHS agreed that the services identified in service plans will be made available in a timely and appropriate manner and to monitor services to ensure that they have the intended effect. DHHS also agreed to identify appropriate, accessible, and individually compatible services; assist with transportation; and identify and resolve barriers that may impede children, parents, and foster parents from making effective use of services. Finally, DHHS committed to amending service plans when services are not provided or do not appear to be effective.

DHHS reviewed 25 children's cases, with 82 applicable items relevant to this commitment during MISEP 22. Of the 82 applicable items, DHHS reported that 51 (62.2 percent) were rated as acceptable for provision of services, below the 83 percent performance standard for this commitment.

Permanency

## Developing Placement Resources for Children

*Foster Home Array (6.4)*

In the MISEP, DHHS committed to maintain a sufficient number and array of homes capable of serving the needs of the foster care population, including a sufficient number of available licensed placements within the child's home community for adolescents, sibling groups, and children with disabilities. DHHS agreed to develop for each county and statewide an annual recruitment and retention plan, in consultation with the monitors and experts in the field, which is subject to approval by the monitors. DHHS committed to implement the plan, with interim timelines, benchmarks, and final targets, to be measured by the monitors based on DHHS' good faith efforts to meet the final targets set forth in the plan.

DHHS' Adoption and Foster Home Recruitment and Retention plans cover the state fiscal year (SFY) running from October 1st to September 30th each year. This report covers DHHS' recruitment efforts for the first nine months of the SFY2022 recruitment cycle, from October 1, 2021 to June 30, 2022. DHHS' good faith efforts to achieve the final targets for SFY2022 will be evaluated at the end of the fiscal year.

For SFY2022 DHHS agreed to license 965 new non-relative homes. During the first nine months of SFY2022, DHHS licensed 611 new unrelated homes, 63 percent of the SFY2022 non-relative licensing goal. During that same period, 1,020 unrelated foster homes were closed, for a net loss of 409 homes. During MISEP 22 the population of children in DHHS custody decreased by 301 children.

For the special populations of children, DHHS agreed to license 602 foster homes willing to accept adolescent placements. DHHS licensed 206 adolescent homes during the first nine months of SFY2022, 34 percent of the target for the year. During the same timeframe 352 adolescent homes were closed for a net loss of 146 homes. The SFY2022 target for siblings is 549 new homes and DHHS licensed 339, 62 percent of the target. During the same time 638 sibling homes were closed for a net loss of 299 homes. Finally, DHHS committed to license 171 homes for children with disabilities. DHHS licensed 379 homes exceeding the target in the first nine months of SFY2022. However, during the same period 684 homes were closed for a net loss of 305 homes.

As outlined above, in the first nine months of SFY2022, DHHS experienced net foster home losses as well as net losses in homes for adolescents, children with disabilities, and sibling groups. The monitors continue to recommend that DHHS closely track specific reasons for foster home closures to understand the factors that lead to these resource losses and develop targeted strategies to support and retain non-relative licensed homes.

When assessing the adequacy of DHHS' array of foster home available to accept placements, the monitors take into consideration as indicators of foster home sufficiency, the agency's performance regarding other MISEP commitments. These commitments include Separation of Siblings (6.6); Maximum Children in a Foster Home (6.7); Emergency or Temporary Facilities, Length of Stay (6.8); and Emergency or Temporary Facilities, Repeated Placement (6.9).

During the reporting period, DHHS did not meet the performance standard for Separation of Siblings (6.6); Emergency or Temporary Facilities, Length of Stay (6.8); and Emergency or Temporary Facilities, Repeated Placement (6.9). Considered in combination with the net losses in foster homes for adolescents, sibling groups, and children with disabilities described above, DHHS must strengthen efforts to develop a sufficient array of foster homes willing to meet the needs of children in custody.

This is the fourth consecutive period in which DHHS experienced net foster home losses for children in the special populations and did not meet the commitments relative to Separation of Siblings (6.6); Emergency or Temporary Facilities, Length of Stay (6.8); and Emergency or Temporary Facilities, Repeated Placement (6.9). In MISEP 22, DHHS still had substantial work to do to understand and stem net foster home losses and to heighten its focus on licensing homes willing to accept children in the special populations. These significant home losses compromised the placement array for children and contributed to the separation of siblings and the placement of children in shelters.

*Relative Foster Parents (6.10.a)*

When children are placed in out-of-home care, preference must be given to placement with a relative. DHHS committed to ensuring that safety assessments, safety planning (when appropriate) and background checks occur for all non-licensed homes. The MISEP relative commitments are particularly important to child safety as 44 percent of children in DHHS custody were living with relatives at the conclusion of MISEP 22. In the MISEP, DHHS committed to ensure that:

- Prior to a child's placement, DHHS will visit with relatives to determine if it is safe;

- Law enforcement and central registry background checks for all adults living in the home will be completed within 72 hours of placement;

- A home study will be completed within 30 days of placement determining whether the placement is safe and appropriate.

The parties agreed the monitors will conduct an independent qualitative review each period to measure DHHS' performance for this commitment. The designated performance standard is 95 percent.

For MISEP 22, the monitoring team reviewed a random sample of 64 unlicensed relative homes. The monitoring team determined the performance was achieved overall in 42 cases (65.6 percent) but was not achieved in 22 cases (34.4 percent). For one of the 22 cases, there was insufficient evidence to validate the timely completion of background checks. For each of the individual safety requirements performance was as follows:

- An initial home safety visit prior to placement was completed for 63 homes (98.4 percent).

- Law enforcement and central registry checks were completed for caregivers within 72 hours of placement for 58 homes (90.6 percent).

- Twenty-three homes had additional adult household members. Law enforcement background checks were completed timely for 20 homes (86.9 percent) and central registry checks were completed timely for 21 homes (91.3 percent).

- Michigan policy requires that all caregivers and adult household members must have their names and addresses searched on the Michigan Public Sex Offender Registry. The monitoring team was able to find evidence that this background check was completed for 57 (89.1 percent) of the homes.

- A home study was completed within 30 days for 59 relative placements (92.2 percent).

DHHS did not meet the designated standard of 95 percent. Additional reasons why cases did not meet the standard include:

- In six cases the background checks were completed late, more than 72 hours after the initial placement.

- Six homes did not meet the performance requirements due to improper weapon storage.

- Three cases required a Placement Exception Request (PER) approval, which was not completed.[14] When a PER is required, the DHHS caseworker must complete the PER and route it to the supervisor for review, who is then expected to route it to the DHHS county director for review and approval.

   - A PER was required for more than five children living in the home. A sixth child was placed on February 4, 2022, and the PER still reads "pending approval" as of November 28, 2022.

---

[14] In these three cases neither a verbal nor written approval was documented in MiSACWIS. DHHS Policy FOM 722-03E requires a minimum of a verbal approval prior to placement with documentation and approval within the electronic case management record completed within 30 calendar days from the date of verbal approval.

- A PER was required for more than three foster children living in the home. The children were placed in the home on February 14, 2022, and the PER still reads "in progress" as of November 28, 2022.

- A PER was required for more than three foster children in the home. The children were placed on May 27, 2022, and the PER still reads "in progress" as of November 22, 2022.

- In one case the initial home visit to complete the Relative Placement Safety Screen was conducted a day late. Additionally, the background checks for the caregivers were completed eight days after the child's placement.

*Relative Foster Parents (6.10.b)*

The MISEP requires that a relative placement home study, including all clearances, must be completed, and approved annually[15] for unlicensed caregivers to ensure the safety of children placed in relative homes. An approved relative home study is valid for one year. This commitment is measured through an independent qualitative review conducted by the monitors with a designated performance standard of 95 percent.

For this commitment, the monitoring team reviewed a random sample of 66 unlicensed relative homes due for a renewal home study. The monitoring team found that 34 homes (51.5 percent) met each of the performance requirements in the MISEP, and 32 homes (48.5 percent) did not. The performance requirements were not met for 10 of the 32 homes solely because of insufficient evidence to support the timely completion of updated background checks.

An annual home study was completed timely for 58 homes (87.9 percent). Another six homes (9.1 percent) had an annual home study that was completed late, and two homes (3.0 percent) did not have an annual home study completed. The following chart details the amount of time past the due date when each of the six late home studies was completed.

**Table 4. Annual Relative Home Studies Completed Late, MISEP 22**

| Timeframe Overdue | Number of Homes |
|---|---|
| 10-25 days | 3 |
| 1-2 months | 1 |
| 3-5 months | 0 |
| 6-8 months | 2 |

Additionally, for relative caregivers, central registry checks were completed timely, prior to the approval of the annual home study, in 44 cases (66.7 percent), and law enforcement background

---

[15] Annually is defined as within 365 days of the last relative home study.

checks were completed timely in 45 cases (68.2 percent). Twenty-five homes had additional adult household members. Central registry checks were completed timely for 15 (60.0 percent) of these homes, and law enforcement background checks were completed timely for 14 (56.0 percent) of these homes. Michigan policy requires that all caregivers and adult household members must have their names and addresses searched on the Michigan Public Sex Offender Registry. The monitoring team was able to find evidence that this background check was completed for relevant individuals in 43 cases (65.2 percent). DHHS did not meet the designated performance standard of 95 percent during the period.

Other factors contributing to performance lapses are:

- In two cases it is unknown if a new adult household member lived out of the state during the past five years which would require central registry and law enforcement background checks from the state in which the household member resided.

- In three cases the home had improper weapon storage.

- In two cases a required PER was not completed.[16]

    - A PER was required for more than three foster children in the home. A fourth child was placed in the home on October 19, 2021, and the PER still reads "in progress" as of December 14, 2022.

    - A PER was required for more than five children in the home. Two foster children were placed in the home on March 10, 2020, and the PER still reads "in progress" as of April 3, 2023.

## Placement Standards

*Placement Standard (6.5)*

The MISEP requires that all children placed in the foster care custody of DHHS be placed in a licensed foster home, a licensed facility, pursuant to a court order, or with an unlicensed relative.[17] According to the data submitted by DHHS for MISEP 22, there were 9,340 children subject to this commitment.[18] Of those children, 9,156 (98.0 percent) were placed in allowable settings. DHHS only slightly missed the standard of 100 percent for this commitment.

---

[16] In these two cases neither a verbal nor written approval was documented in MiSACWIS. DHHS Policy FOM 722-03E requires a minimum of a verbal approval prior to placement with documentation and approval within the electronic case management record completed within 30 calendar days from the date of verbal approval.

[17] On September 9, 2021 the parties signed a letter of agreement detailing additional living situations that will be deemed compliant for this commitment.

[18] This commitment excludes children in temporary placement settings including AWOL, jail, detention, and hospitals.

*Placing Siblings Together (6.6)*

The MISEP requires DHHS to place siblings together when they enter foster care at or near the same time. Exceptions can be made if placing the siblings together would be harmful to one or more of the siblings, one of the siblings has exceptional needs that can only be met in a specialized program or facility, or the size of the sibling group makes such placement impractical notwithstanding efforts to place the group together. DHHS provided data to the monitoring team indicating there were 353 sibling groups whose members entered foster care within 30 days of each other during MISEP 22. Of these 353 sibling groups, 283 (80.2 percent) were either placed together or had a timely approval for an allowable exception. DHHS did not meet the designated performance standard of 90 percent for this commitment.

The commitment also requires that when siblings are separated at any time except for any of the aforementioned reasons, the case manager shall make immediate efforts to locate or recruit a family in whose home the siblings can be reunited. Efforts to place siblings together are to be documented and maintained in the case file and reassessed quarterly. The parties agreed that the monitoring team would conduct an independent qualitative review to measure performance for this commitment.

For MISEP 22, the monitoring team reviewed 33 children's case records subject to this provision and found that DHHS met the terms of the commitment in 24 cases (72.7 percent), below the designated performance standard of 90 percent.

*Maximum Children in a Foster Home (6.7)*

In the MISEP, DHHS committed that no child shall be placed in a foster home if that placement will result in more than three foster children living in that foster home, or a total of six children, including the foster family's birth and adopted children. In addition, DHHS agreed that no placement will result in more than three children under the age of three residing in a foster home. Exceptions to these limitations may be made by the Director of DCWL when in the best interest of the child(ren) being placed. As of June 30, 2022, there were 4,479 foster homes in Michigan with at least one child in placement. Of these 4,479 homes, 4,042 (90.2 percent) met the terms of this commitment, meeting the designated performance standard of 90 percent.

*Emergency or Temporary Facilities, Length of Stay (6.8)*

DHHS is required to ensure children shall not remain in emergency or temporary facilities, including shelter care, for a period lasting more than 30 days unless exceptional circumstances exist. DHHS committed that no child shall remain in an emergency or temporary facility for a period lasting more than 60 days with no exceptions. The agreed-upon performance standard for this commitment is 95 percent. Of the 55 children placed in emergency or temporary facilities

during MISEP 22, 26 (47.3 percent) were placed within the length of stay parameters. DHHS did not meet the performance standard during MISEP 22.

*Emergency or Temporary Facilities, Repeated Placement (6.9)*

The MISEP requires that no child be placed in an emergency or temporary facility more than one time in a 12-month period unless exceptional circumstances exist. Children under 15 years of age experiencing a subsequent emergency or temporary facility placement within a 12-month period may not remain in an emergency or temporary facility for more than seven days. Children 15 years of age or older experiencing a subsequent emergency or temporary facility placement within a 12-month period may not remain in an emergency or temporary facility for more than 30 days. During the reporting period, children experienced 12 subsequent stays in shelter care, however, none of the placement episodes met the terms of this commitment. DHHS did not meet the agreed-upon performance standard of 97 percent.

## Case Planning and Practice

*Supervisory Oversight (6.16)*

Supervisors are to meet at least monthly with each assigned caseworker to review the status of progress of each case on the worker's caseload. Supervisors must review and approve each service plan after having a face-to-face meeting[19] with the worker, which can be the monthly supervisory meeting. The designated performance standard for this commitment is 95 percent.

The following table includes the performance for initial and monthly case consultations due in MISEP 22. As the table indicates, DHHS met the performance standard for the designated performance standard of 95 percent for one of the two components of the commitment.

**Table 5. Supervisory Oversight Performance, MISEP 22**

| Requirement | Performance |
|---|---|
| Initial case consultations between a worker and supervisor that were due in the first 30 days | 90.9% |
| Monthly case consultations due between a worker and supervisor | 96.7% |

---

[19] On October 18, 2021, the parties signed a letter of agreement allowing video conferences to be compliant for purposes of "face-to-face" meetings required under 6.16 of the MISEP.

*Timeliness of Service Plans (6.17, 6.18)*

The MISEP requires that DHHS complete an initial service plan (ISP) within 30 days of a child's entry into foster care (6.17) and then complete an updated service plan (USP) at least quarterly thereafter (6.18). The designated performance standard for both commitments is 95 percent.

During MISEP 22, DHHS did not achieve the designated performance standard for either commitment. Of the 1,773 ISPs due during the period, 1,556 (87.8 percent) were completed within 30 days of a child's entry into foster care or Young Adult Voluntary Foster Care (YAVFC). Of the 17,036 USPs due during the period, 15,465 (90.8 percent) were completed timely.

## Caseworker Visitation

*Worker-Child Visitation (6.21)*

DHHS agreed that caseworkers shall visit children in foster care at least two times per month during the child's first two months of placement in an initial or new placement, and at least once per month thereafter. At least one visit each month shall be held at the child's placement location and shall include a private meeting between the child and the caseworker. DHHS and the monitoring team established, in the Metrics Plan, assessment criteria for the six components that are included in the 6.21 commitment. The designated performance standard is 95 percent for all components.

DHHS' MISEP 22 performance on the six components of worker-child visitation is included in the following table. As the table below indicates, DHHS met the designated performance standard for two of the six components and came close to the designated performance for the balance.

**Table 6. Worker-Child Visitation Performance, MISEP 22**

| Requirement | Performance |
|---|---|
| Each child shall be visited by a caseworker at least twice per month during the first two months following an initial or new placement | 89.1% |
| Each child shall be visited by a caseworker at their placement location at least once per month during the first two months following an initial or new placement | 94.4% |
| Each child shall have at least one visit per month that includes a private meeting between the child and caseworker during the first two months following an initial or new placement | 94.6% |
| Each child shall be visited by a caseworker at least once per full month the child is in foster care | 96.4% |
| Each child shall be visited by a caseworker at their placement location at least once per full month the child is in foster care | 95.5% |
| Each child shall have at least one visit per full month the child is in foster care that includes a private meeting between the child and caseworker | 94.9% |

*Worker-Parent Visitation (6.22)*

Caseworkers must visit parents of children with a reunification goal at least twice during the first month of placement with at least one visit in the parental home. For subsequent months, visits must occur at least once per month. Exceptions to this requirement are made if the parent(s) are not attending visits despite DHHS taking adequate steps to ensure the visit takes place or if a parent cannot attend a visit due to exigent circumstances such as hospitalization or incarceration. Exceptions are excluded from the numerator and denominator of this calculation. DHHS and the monitoring team established assessment criteria for the three components of this commitment in the Metrics Plan. The designated performance standard is 85 percent for all components.

DHHS' MISEP 22 performance on the three components of worker-parent visitation is included below. As the table indicates, DHHS did not achieve the designated performance standard of 85 percent for any component of the worker-parent visitation commitment during MISEP 22.

**Table 7. Worker-Parent Visitation Performance, MISEP 22**

| Requirement | Performance |
|---|---|
| Caseworkers shall visit parents of children with a goal of reunification at least twice during the first month of placement | 59.5% |
| Caseworkers shall visit parents of children with a goal of reunification in the parent's place of residence at least once during the first month of placement | 51.3% |
| Caseworkers shall visit parents of children with a goal of reunification at least once for each subsequent month of placement | 64.6% |

*Parent-Child Visitation (6.23)*

When reunification is a child's permanency goal, parents and children will visit at least twice each month. Exceptions to this requirement are made if a court orders less frequent visits, the parents are not attending visits despite DHHS taking adequate steps to ensure the parents' ability to visit, one or both parents cannot attend the visits due to exigent circumstances such as hospitalization or incarceration, or the child is above the age of 16 and refuses such visits. The designated performance standard is 85 percent.

Of the 33,442 parent-child visits required during MISEP 22, DHHS completed 20,950 (62.6 percent) timely. DHHS did not meet the designated performance standard during the period.

*Sibling Visitation (6.24)*

For children in foster care who have siblings in custody with whom they are not placed, DHHS shall ensure they have at least monthly visits with their siblings. Exceptions to this requirement can be made if the visit may be harmful to one or more of the siblings, the sibling is placed out of state in compliance with the Interstate Compact on Placement of Children, the distance between the child's placements is more than 50 miles and the child is placed with a relative, or one of the siblings is above the age of 16 and refuses to visit. The designated performance standard is 85 percent.

Of the 13,621 sibling visits required during MISEP 22, DHHS completed 9,545 (70.1 percent) timely. DHHS did not meet the designated performance standard during the period.

## Safety and Well-Being

## Responding to Reports of Abuse and Neglect

*Commencement of CPS Investigations (5.2)*

DHHS committed to commence investigations of reports of child abuse or neglect within the timeframes required by state law. The designated performance standard for this commitment is 95 percent.

DHHS reported that during MISEP 22, 36,305 complaints required the commencement of an investigation. Of those, 35,626 (98.1 percent) commenced timely, exceeding the performance standard for the period.

*Completion of CPS Investigations (6.11)*

DHHS agreed that all child abuse or neglect investigations would be completed by the worker and approved by the supervisor within 44 days. The parties agreed to a performance standard of 90 percent for this commitment.

During MISEP 22, there were 33,578 investigation reports due to be completed. Of those, 32,394 (96.5 percent) were submitted by caseworkers and approved by supervisors within 44 days, meeting the performance standard for this commitment.

*CPS Investigations and Screening, Screening (6.12.a)*

In the MISEP, DHHS committed to investigate all allegations of abuse or neglect relating to any child in the foster care custody of DHHS and to ensure that allegations of maltreatment in care are not inappropriately screened out and therefore not investigated by CPS. The MISEP requires that this provision be measured by the monitors through a qualitative review. A statistically significant sample of cases and a set of questions established by DHHS and the monitors were utilized in the MISEP 22 review. The review population was comprised of all referrals that involved a plaintiff class child (whether they were in out-of-home or in-home placement) that were screened out for CPS investigation during the period. There were 1,563 such referrals in the MISEP 22 data provided by DHHS.

The monitoring team reviewed 65 screened-out CPS referrals and determined that DHHS made appropriate screening decisions in 57 instances (87.7 percent). The monitors determined that four referrals met the criteria for assignment for investigation and four referrals required the screener to obtain additional information to make an appropriate screening decision.

The following referral is an example of one that the monitoring team concluded should have been investigated for child abuse and neglect:

- The foster care worker of an 11-month-old reported observing the infant in her crib with blankets, pillows, and a tv cord wrapped around her torso and shoulder. The cord was not wrapped tightly but it was situated on the child where it could have become tighter if she had moved. The foster parents had been provided information on safe sleep and they had signed an acknowledgment of this information. They continued to use blankets and were unaware that the child had a television cord around her body while sleeping. Centralized Intake determined the referral should be transferred to active workers and licensing.

The following referral is an example of a referral that the monitoring team concluded needed more information before a screening decision could be made:

- An eight-year-old was placed with his grandparents through foster care. It was reported that the child was riding his hoverboard and accidentally chipped some paint. His grandparents then began yelling at him. The grandfather picked the child up by the collar of his shirt and hung him from the rafters of the basement for 30 to 40 seconds as punishment. The child felt scared and humiliated when this happened. The child felt discomfort, but there were no reported injuries. Centralized Intake transferred the referral to the active workers and the PCU for safety planning. More information should have been obtained from the foster care worker, who made the referral, as to what occurred and how the grandfather "hung the child from the rafters." This could potentially result in harm to the child through choking and needed to be clarified.

The MISEP also requires that when DHHS transfers a referral to another agency for investigation, DHHS must independently take appropriate action to ensure the safety and well-being of the child in the Department's custody. The parties agreed that the monitors would conduct an independent qualitative review to determine compliance with this commitment.

The monitoring team reviewed a random sample of 62 referrals received by Centralized Intake regarding plaintiff class children that were transferred outside the Department during the period under review, stratified by county, to determine performance. The designated performance standard for this commitment is 95 percent.

Of the 62 transferred cases, the monitoring team found 53 cases (85.5 percent) met the terms of the MISEP and nine cases (14.5 percent) did not. In the monitor's assessment, DHHS did not meet the designated performance standard of 95 percent for the period.

## Health and Mental Health

*Medical and Mental Health Examinations for Children (6.25)*

DHHS committed in the MISEP that at least 85 percent of children shall have an initial medical and mental health examination within 30 days of the child's entry into foster care and that at least 95 percent of children shall have an initial medical and mental health examination within 45 days of the child's entry into foster care.

During MISEP 22, DHHS completed 1,302 (72.9 percent) of 1,787 required initial medical and mental health exams within 30 days of a child's entry into care. Additionally, DHHS completed 1,451 (81.4 percent) of 1,782 required initial medical and mental health exams within 45 days of a child's entry into care. DHHS did not meet the performance standard for this commitment.

*Dental Care for Children (6.26)*

DHHS committed in the MISEP that at least 90 percent of children shall have an initial dental examination within 90 days of the child's entry into care unless the child had an exam within six months prior to placement or the child is less than four years of age.

During MISEP 22, 618 (62.6 percent) of 987 required initial dental exams were completed timely for children in DHHS custody. DHHS did not meet the performance standard of 90 percent for this commitment.

*Immunizations (6.27, 6.28)*

Under the MISEP, children in DHHS custody must receive all required immunizations according to the guidelines set forth by the American Academy of Pediatrics (AAP). For children in DHHS custody for three or fewer months at the end of the period, DHHS is to ensure that 90 percent receive any necessary immunizations, according to AAP guidelines, within three months of entry into care (6.27). DHHS reported on this commitment through data produced by the Michigan Care Improvement Registry (MCIR). The MCIR is an immunization database that documents immunizations reported to be administered by healthcare providers in Michigan. Performance for each immunization type was calculated by dividing the number of children who require the immunization by the number of children current with the immunization during MISEP 22. DHHS met the 90 percent standard for five of the eleven required immunizations, as charted below.

**Table 8. Immunizations for Children in Custody Three Months or Less, MISEP 22**

| Immunization | Children requiring immunization | Children current with immunization | Performance |
|---|---|---|---|
| DTP/DTap/DT/Td/Tdap | 898 | 797 | 88.8% |
| Hepatitis A | 898 | 822 | 91.5% |
| Hepatitis B | 898 | 821 | 91.4% |
| Hib | 402 | 335 | 83.3% |
| HPV | 338 | 278 | 82.2% |
| Meningococcal Conjugate | 304 | 286 | 94.1% |
| MMR | 898 | 846 | 94.2% |
| Pneumococcal Conjugate | 402 | 339 | 84.3% |
| Polio | 846 | 750 | 88.7% |
| Rotavirus | 163 | 125 | 76.7% |
| Varicella | 898 | 845 | 94.1% |

For children in DHHS custody for longer than three months as of the end of the period, DHHS is to ensure that 90 percent receive all required immunizations according to AAP guidelines (6.28). DHHS also reported on this commitment through data produced by the MCIR. Performance for each immunization type was calculated by dividing the number of children who require the

immunization by the number of children current with the immunization during MISEP 22. DHHS met the 90 percent standard for nine of the eleven required immunizations, as charted below.

**Table 9. Immunizations for Children in Custody Longer Than Three Months, MISEP 22**

| Immunization | Children requiring immunization | Children current with immunization | Performance |
|---|---|---|---|
| DTP/DTaP/DT/Td/Tdap | 7,750 | 7,177 | 92.6% |
| Hepatitis A | 7,750 | 7,234 | 93.3% |
| Hepatitis B | 7,750 | 7,460 | 96.3% |
| Hib | 2,686 | 2,489 | 92.7% |
| HPV | 3,496 | 2,948 | 84.3% |
| Meningococcal Conjugate | 3,166 | 2,886 | 91.2% |
| MMR | 7,750 | 7,412 | 95.6% |
| Pneumococcal Conjugate | 2,686 | 2,459 | 91.5% |
| Polio | 7,175 | 6,821 | 95.1% |
| Rotavirus | 54 | 41 | 75.9% |
| Varicella | 7,750 | 7,402 | 95.5% |

*Ongoing Healthcare for Children (6.29)*

DHHS committed in the MISEP that following an initial medical, dental, or mental health examination, at least 95 percent of children shall receive periodic and ongoing medical, dental, and mental health examinations and screenings, according to the guidelines set forth by the AAP. Performance for this commitment was calculated for each medical type: medical well-child visits for children aged three and younger, annual physicals for children older than three, and semi-annual dental exams.

During MISEP 22, DHHS completed 2,630 (66.5 percent) of 3,957 medical well-child visits timely, 3,877 (84.5 percent) of 4,589 annual physicals timely, and 5,291 (73.7 percent) of 7,178 semiannual dental exams timely. DHHS did not meet the performance standard of 95 percent for any component of this commitment.

*Child Case File, Medical and Psychological (6.30)*

The MISEP requires that DHHS will ensure that:

- Children's health records are up to date and included in the case file. Health records include the names and addresses of the child's health care providers, a record of the child's immunizations, the child's known medical problems, the child's medications, and any other relevant health information;

- The case plan addresses the issue of health and dental care needs; and

- Foster parents or foster care providers are provided with the child's health care records.

DHHS' MISEP 22 performance on each of the three components of the child's medical and psychological case files is charted below. To measure performance, DHHS reviewed 44 foster care cases utilizing CSFR Item 17 criteria described in the chart below. DHHS did not achieve the 95 percent performance standard for any of the components of the child case file commitment during MISEP 22.

**Table 10. Child Case File, Medical and Psychological Performance, MISEP 22**

| Requirement | Applicable Cases | Cases not Compliant | Cases Compliant | Performance Percentage |
|---|---|---|---|---|
| To the extent available and accessible, the child's health records are up to date and included in the case file. | 44 | 6 | 38 | 86.4% |
| The case plan addresses the issue of health and dental care needs. | 44 | 6 | 38 | 86.4% |
| To the extent available and accessible, foster parents or foster care providers are provided with the child's health records. | 44 | 8 | 36 | 81.8% |

*Access to Health Insurance (6.31, 6.32)*

The MISEP requires that DHHS ensure that at least 95 percent of children have access to medical coverage within 30 days of entry into foster care by providing the placement provider with a Medicaid card or an alternative verification of the child's Medicaid status and Medicaid number as soon as it is available (6.31).

Data provided by DHHS indicate that placement providers received a Medicaid card or an alternative verification of the child's Medicaid status and number within 30 days of entry into foster care for 1,573 (88.0 percent) of 1,787 children in MISEP 22. DHHS did not meet the performance standard during the period.

The MISEP also requires DHHS to ensure that 95 percent of children have access to medical coverage within 24 hours or the next business day following subsequent placement by giving the placement provider a Medicaid card or an alternative verification of the child's Medicaid status and Medicaid number as soon as it is available (6.32).

During MISEP 22, 2,470 (80.1 percent) of 3,082 placement providers received Medicaid cards within 24 hours or the next business day following a child's subsequent placement. DHHS also reported that for 3,079 (99.9 percent) of 3,082 subsequent placements, either the provider received a Medicaid card within 24 hours or the next business day following a child's subsequent placement, or the child had Medicaid coverage within 24 hours of the date of placement.

*Psychotropic Medication, Informed Consent (6.33)*

The MISEP requires DHHS to ensure that informed consent is obtained and documented in writing for each child in DHHS custody who is prescribed psychotropic medication, as per DHHS policy.

During MISEP 22, the Department reported 2,319 children required informed consent documentation, for 5,819 unique prescriptions. Data indicated that valid consents were on file for 72.2 percent of the medications. Therefore, DHHS did not meet the designated performance standard of 97 percent for this commitment.

*Psychotropic Medication, Documentation (6.34)*

Under the MISEP, DHHS must ensure that:

- A child is seen regularly by a physician to monitor the effectiveness of the medication, assess any side effects and/or health implications, consider any changes needed to dosage or medication type and determine whether medication is still necessary and/or whether other treatment options would be more appropriate;

- DHHS shall regularly follow up with foster parents/caregivers about administering medications appropriately and about the child's experience with the medication(s), including any side effects; and

- DHHS shall follow any additional state protocols that may be in place and related to the appropriate use and monitoring of medications.

Evidence of these actions should be documented in the child's case record. The parties agreed that performance for this commitment would be measured through an independent qualitative review conducted by the monitoring team.

The population for review was comprised of children in DHHS custody who were prescribed psychotropic medication during the period under review. Consistent with the parameters the parties approved, the monitoring team reviewed a random sample of cases, stratified by county, to determine performance. The designated performance standard for this commitment is 97 percent.

For MISEP 22, the monitoring team randomly selected a sample of 66 cases from a total population of 2,320 children. The monitoring team found 21 cases (31.8 percent) met the terms of this commitment and 45 cases (68.2 percent) did not meet the terms of this commitment. DHHS did not meet the designated performance standard of 97 percent for the period.

# Youth Transitioning to Adulthood

## Achieving Permanency

*Support for Youth Transitioning to Adulthood, Permanency (6.37)*

The MISEP requires DHHS to continue to implement policies and provide services to support the rate of older youth achieving permanency. The parties agreed that this commitment would be measured by examining the outcomes of all older youth who exit foster care during the monitoring period and comparing rates of exits to permanency and rates of exits to emancipation. For purposes of this commitment, older youth is defined as youth aged 15 or older with a permanency goal of reunification, guardianship, adoption, or APPLA. The performance standard for this commitment is positive trending, or any reduction in the rates of older youth exiting without permanency.

During MISEP 22, 460 youth who were 15 years and older exited foster care. Of those, 203 (44.1 percent) were discharged with an exit type of reunification, adoption, or guardianship. This represents a 2.1 percent decrease in performance from the previous reporting period.

**Appendix A. Age Range of Children in Care on June 30, 2022 by County**

| County Name | Ages 0-6 | | Ages 7-11 | | Ages 12-17 | | Ages 18+ | | Total |
|---|---|---|---|---|---|---|---|---|---|
| | Children | % | Children | % | Children | % | Children | % | |
| Alcona | 6 | 37.5% | 2 | 12.5% | 7 | 43.8% | 1 | 6.3% | 16 |
| Alger | 6 | 46.2% | 3 | 23.1% | 4 | 30.8% | 0 | 0.0% | 13 |
| Allegan | 69 | 54.3% | 26 | 20.5% | 27 | 21.3% | 5 | 3.9% | 127 |
| Alpena | 33 | 55.9% | 9 | 15.3% | 11 | 18.6% | 6 | 10.2% | 59 |
| Antrim | 5 | 50.0% | 0 | 0.0% | 5 | 50.0% | 0 | 0.0% | 10 |
| Arenac | 5 | 23.8% | 6 | 28.6% | 10 | 47.6% | 0 | 0.0% | 21 |
| Baraga | 2 | 100.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 2 |
| Barry | 11 | 42.3% | 2 | 7.7% | 10 | 38.5% | 3 | 11.5% | 26 |
| Bay | 36 | 34.6% | 14 | 13.5% | 39 | 37.5% | 15 | 14.4% | 104 |
| Benzie | 7 | 35.0% | 3 | 15.0% | 8 | 40.0% | 2 | 10.0% | 20 |
| Berrien | 89 | 48.1% | 36 | 19.5% | 52 | 28.1% | 8 | 4.3% | 185 |
| Branch | 29 | 49.2% | 15 | 25.4% | 12 | 20.3% | 3 | 5.1% | 59 |
| Calhoun | 96 | 39.8% | 66 | 27.4% | 70 | 29.0% | 9 | 3.7% | 241 |
| Cass | 34 | 39.5% | 16 | 18.6% | 27 | 31.4% | 9 | 10.5% | 86 |
| Central Office | 5 | 62.5% | 2 | 25.0% | 0 | 0.0% | 1 | 12.5% | 8 |
| Charlevoix | 6 | 54.5% | 1 | 9.1% | 3 | 27.3% | 1 | 9.1% | 11 |
| Cheboygan | 11 | 36.7% | 11 | 36.7% | 7 | 23.3% | 1 | 3.3% | 30 |
| Chippewa | 27 | 48.2% | 13 | 23.2% | 12 | 21.4% | 4 | 7.1% | 56 |
| Clare | 25 | 61.0% | 3 | 7.3% | 12 | 29.3% | 1 | 2.4% | 41 |
| Clinton | 13 | 46.4% | 6 | 21.4% | 7 | 25.0% | 2 | 7.1% | 28 |
| Crawford | 17 | 36.2% | 10 | 21.3% | 19 | 40.4% | 1 | 2.1% | 47 |
| Delta | 18 | 43.9% | 6 | 14.6% | 16 | 39.0% | 1 | 2.4% | 41 |
| Dickinson | 10 | 47.6% | 6 | 28.6% | 5 | 23.8% | 0 | 0.0% | 21 |
| Eaton | 26 | 38.2% | 13 | 19.1% | 19 | 27.9% | 10 | 14.7% | 68 |
| Emmet | 5 | 41.7% | 2 | 16.7% | 5 | 41.7% | 0 | 0.0% | 12 |
| Genesee | 247 | 48.0% | 99 | 19.2% | 128 | 24.9% | 41 | 8.0% | 515 |
| Gladwin | 13 | 35.1% | 10 | 27.0% | 13 | 35.1% | 1 | 2.7% | 37 |
| Gogebic | 22 | 68.8% | 6 | 18.8% | 3 | 9.4% | 1 | 3.1% | 32 |
| Grand Traverse | 37 | 62.7% | 9 | 15.3% | 10 | 16.9% | 3 | 5.1% | 59 |
| Gratiot | 19 | 61.3% | 4 | 12.9% | 8 | 25.8% | 0 | 0.0% | 31 |
| Hillsdale | 51 | 51.0% | 27 | 27.0% | 21 | 21.0% | 1 | 1.0% | 100 |
| Houghton | 9 | 81.8% | 1 | 9.1% | 0 | 0.0% | 1 | 9.1% | 11 |
| Huron | 16 | 42.1% | 11 | 28.9% | 9 | 23.7% | 2 | 5.3% | 38 |
| Ingham | 191 | 51.2% | 73 | 19.6% | 84 | 22.5% | 25 | 6.7% | 373 |
| Ionia | 16 | 44.4% | 6 | 16.7% | 9 | 25.0% | 5 | 13.9% | 36 |
| Iosco | 21 | 63.6% | 3 | 9.1% | 6 | 18.2% | 3 | 9.1% | 33 |
| Iron | 5 | 62.5% | 3 | 37.5% | 0 | 0.0% | 0 | 0.0% | 8 |
| Isabella | 23 | 53.5% | 9 | 20.9% | 8 | 18.6% | 3 | 7.0% | 43 |
| Jackson | 77 | 47.2% | 26 | 16.0% | 45 | 27.6% | 15 | 9.2% | 163 |
| Kalamazoo | 196 | 47.7% | 89 | 21.7% | 100 | 24.3% | 26 | 6.3% | 411 |

| County Name | Ages 0-6 | | Ages 7-11 | | Ages 12-17 | | Ages 18+ | | Total |
|---|---|---|---|---|---|---|---|---|---|
| | Children | % | Children | % | Children | % | Children | % | |
| Kalkaska | 6 | 35.3% | 2 | 11.8% | 7 | 41.2% | 2 | 11.8% | 17 |
| Kent | 183 | 38.0% | 85 | 17.7% | 151 | 31.4% | 62 | 12.9% | 481 |
| Lake | 1 | 50.0% | 1 | 50.0% | 0 | 0.0% | 0 | 0.0% | 2 |
| Lapeer | 13 | 54.2% | 5 | 20.8% | 5 | 20.8% | 1 | 4.2% | 24 |
| Leelanau | 15 | 42.9% | 9 | 25.7% | 9 | 25.7% | 2 | 5.7% | 35 |
| Lenawee | 6 | 50.0% | 0 | 0.0% | 6 | 50.0% | 0 | 0.0% | 12 |
| Livingston | 73 | 55.7% | 27 | 20.6% | 28 | 21.4% | 3 | 2.3% | 131 |
| Luce | 39 | 44.8% | 21 | 24.1% | 19 | 21.8% | 8 | 9.2% | 87 |
| Mackinac | 7 | 53.8% | 3 | 23.1% | 3 | 23.1% | 0 | 0.0% | 13 |
| Macomb | 6 | 66.7% | 2 | 22.2% | 1 | 11.1% | 0 | 0.0% | 9 |
| Manistee | 225 | 47.7% | 88 | 18.6% | 120 | 25.4% | 39 | 8.3% | 472 |
| Marquette | 19 | 57.6% | 4 | 12.1% | 10 | 30.3% | 0 | 0.0% | 33 |
| Mason | 24 | 63.2% | 12 | 31.6% | 0 | 0.0% | 2 | 5.3% | 38 |
| Mecosta | 12 | 57.1% | 5 | 23.8% | 3 | 14.3% | 1 | 4.8% | 21 |
| Menominee | 19 | 70.4% | 5 | 18.5% | 3 | 11.1% | 0 | 0.0% | 27 |
| Midland | 12 | 42.9% | 9 | 32.1% | 6 | 21.4% | 1 | 3.6% | 28 |
| Missaukee | 30 | 35.3% | 24 | 28.2% | 24 | 28.2% | 7 | 8.2% | 85 |
| Monroe | 5 | 35.7% | 2 | 14.3% | 5 | 35.7% | 2 | 14.3% | 14 |
| Montcalm | 48 | 51.6% | 22 | 23.7% | 18 | 19.4% | 5 | 5.4% | 93 |
| Montmorency | 39 | 42.9% | 21 | 23.1% | 29 | 31.9% | 2 | 2.2% | 91 |
| Muskegon | 10 | 71.4% | 3 | 21.4% | 0 | 0.0% | 1 | 7.1% | 14 |
| Newaygo | 187 | 49.1% | 75 | 19.7% | 93 | 24.4% | 26 | 6.8% | 381 |
| Oakland | 23 | 41.8% | 10 | 18.2% | 18 | 32.7% | 4 | 7.3% | 55 |
| Oceana | 216 | 52.0% | 77 | 18.6% | 93 | 22.4% | 29 | 7.0% | 415 |
| Ogemaw | 6 | 46.2% | 3 | 23.1% | 4 | 30.8% | 0 | 0.0% | 13 |
| Ontonagon | 1 | 8.3% | 3 | 25.0% | 3 | 25.0% | 5 | 41.7% | 12 |
| Osceola | 2 | 13.3% | 4 | 26.7% | 8 | 53.3% | 1 | 6.7% | 15 |
| Oscoda | 10 | 45.5% | 5 | 22.7% | 6 | 27.3% | 1 | 4.5% | 22 |
| Otsego | 16 | 44.4% | 9 | 25.0% | 9 | 25.0% | 2 | 5.6% | 36 |
| Ottawa | 58 | 40.0% | 42 | 29.0% | 34 | 23.4% | 11 | 7.6% | 145 |
| Presque Isle | 4 | 36.4% | 3 | 27.3% | 4 | 36.4% | 0 | 0.0% | 11 |
| Roscommon | 11 | 37.9% | 8 | 27.6% | 8 | 27.6% | 2 | 6.9% | 29 |
| Saginaw | 78 | 43.6% | 38 | 21.2% | 49 | 27.4% | 14 | 7.8% | 179 |
| Sanilac | 18 | 37.5% | 14 | 29.2% | 13 | 27.1% | 3 | 6.3% | 48 |
| Schoolcraft | 7 | 43.8% | 4 | 25.0% | 5 | 31.3% | 0 | 0.0% | 16 |
| Shiawassee | 16 | 36.4% | 13 | 29.5% | 13 | 29.5% | 2 | 4.5% | 44 |
| St. Clair | 84 | 44.7% | 48 | 25.5% | 40 | 21.3% | 16 | 8.5% | 188 |
| St. Joseph | 57 | 44.2% | 31 | 24.0% | 34 | 26.4% | 7 | 5.4% | 129 |
| Tuscola | 9 | 40.9% | 2 | 9.1% | 7 | 31.8% | 4 | 18.2% | 22 |
| Van Buren | 30 | 47.6% | 12 | 19.0% | 12 | 19.0% | 9 | 14.3% | 63 |
| Washtenaw | 66 | 52.0% | 17 | 13.4% | 33 | 26.0% | 11 | 8.7% | 127 |
| Wayne | 1,194 | 46.4% | 573 | 22.3% | 620 | 24.1% | 186 | 7.2% | 2,573 |
| Wexford | 16 | 43.2% | 4 | 10.8% | 16 | 43.2% | 1 | 2.7% | 37 |
| **Total** | **4,435** | **46.6%** | **1,992** | **20.9%** | **2,400** | **25.2%** | **682** | **7.2%** | **9,509** |

**Appendix B. Length of Stay of Children in Care on June 30, 2022 by County**

| County Name | Less than a year | | 1-2 years | | 2-3 years | | 3-6 years | | 6 years plus | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Children | % | Children | % | Children | % | Children | % | Children | % | |
| Alcona | 3 | 18.8% | 8 | 50.0% | 4 | 25.0% | 1 | 6.3% | 0 | 0.0% | 16 |
| Alger | 6 | 46.2% | 0 | 0.0% | 4 | 30.8% | 3 | 23.1% | 0 | 0.0% | 13 |
| Allegan | 44 | 34.6% | 39 | 30.7% | 30 | 23.6% | 12 | 9.4% | 2 | 1.6% | 127 |
| Alpena | 16 | 27.1% | 19 | 32.2% | 13 | 22.0% | 11 | 18.6% | 0 | 0.0% | 59 |
| Antrim | 3 | 30.0% | 4 | 40.0% | 3 | 30.0% | 0 | 0.0% | 0 | 0.0% | 10 |
| Arenac | 8 | 38.1% | 7 | 33.3% | 4 | 19.0% | 2 | 9.5% | 0 | 0.0% | 21 |
| Baraga | 0 | 0.0% | 1 | 50.0% | 1 | 50.0% | 0 | 0.0% | 0 | 0.0% | 2 |
| Barry | 15 | 57.7% | 5 | 19.2% | 4 | 15.4% | 1 | 3.8% | 1 | 3.8% | 26 |
| Bay | 28 | 26.9% | 39 | 37.5% | 13 | 12.5% | 18 | 17.3% | 6 | 5.8% | 104 |
| Benzie | 8 | 40.0% | 4 | 20.0% | 4 | 20.0% | 4 | 20.0% | 0 | 0.0% | 20 |
| Berrien | 78 | 42.2% | 45 | 24.3% | 44 | 23.8% | 10 | 5.4% | 8 | 4.3% | 185 |
| Branch | 32 | 54.2% | 15 | 25.4% | 8 | 13.6% | 4 | 6.8% | 0 | 0.0% | 59 |
| Calhoun | 120 | 49.8% | 43 | 17.8% | 35 | 14.5% | 37 | 15.4% | 6 | 2.5% | 241 |
| Cass | 35 | 40.7% | 24 | 27.9% | 14 | 16.3% | 7 | 8.1% | 6 | 7.0% | 86 |
| Central Office | 0 | 0.0% | 0 | 0.0% | 7 | 87.5% | 0 | 0.0% | 1 | 12.5% | 8 |
| Charlevoix | 5 | 45.5% | 5 | 45.5% | 0 | 0.0% | 1 | 9.1% | 0 | 0.0% | 11 |
| Cheboygan | 11 | 36.7% | 12 | 40.0% | 2 | 6.7% | 5 | 16.7% | 0 | 0.0% | 30 |
| Chippewa | 32 | 57.1% | 14 | 25.0% | 5 | 8.9% | 5 | 8.9% | 0 | 0.0% | 56 |
| Clare | 11 | 26.8% | 14 | 34.1% | 8 | 19.5% | 6 | 14.6% | 2 | 4.9% | 41 |
| Clinton | 14 | 50.0% | 10 | 35.7% | 2 | 7.1% | 2 | 7.1% | 0 | 0.0% | 28 |
| Crawford | 12 | 25.5% | 17 | 36.2% | 4 | 8.5% | 14 | 29.8% | 0 | 0.0% | 47 |
| Delta | 21 | 51.2% | 10 | 24.4% | 8 | 19.5% | 2 | 4.9% | 0 | 0.0% | 41 |
| Dickinson | 10 | 47.6% | 6 | 28.6% | 3 | 14.3% | 2 | 9.5% | 0 | 0.0% | 21 |
| Eaton | 37 | 54.4% | 11 | 16.2% | 13 | 19.1% | 7 | 10.3% | 0 | 0.0% | 68 |
| Emmet | 6 | 50.0% | 3 | 25.0% | 1 | 8.3% | 1 | 8.3% | 1 | 8.3% | 12 |
| Genesee | 159 | 30.9% | 124 | 24.1% | 99 | 19.2% | 112 | 21.7% | 21 | 4.1% | 515 |
| Gladwin | 5 | 13.5% | 25 | 67.6% | 6 | 16.2% | 1 | 2.7% | 0 | 0.0% | 37 |
| Gogebic | 14 | 43.8% | 12 | 37.5% | 3 | 9.4% | 3 | 9.4% | 0 | 0.0% | 32 |
| Grand Traverse | 30 | 50.8% | 22 | 37.3% | 5 | 8.5% | 2 | 3.4% | 0 | 0.0% | 59 |
| Gratiot | 5 | 16.1% | 11 | 35.5% | 11 | 35.5% | 4 | 12.9% | 0 | 0.0% | 31 |
| Hillsdale | 35 | 35.0% | 41 | 41.0% | 21 | 21.0% | 3 | 3.0% | 0 | 0.0% | 100 |
| Houghton | 2 | 18.2% | 7 | 63.6% | 2 | 18.2% | 0 | 0.0% | 0 | 0.0% | 11 |
| Huron | 15 | 39.5% | 14 | 36.8% | 8 | 21.1% | 1 | 2.6% | 0 | 0.0% | 38 |
| Ingham | 160 | 42.9% | 87 | 23.3% | 55 | 14.7% | 60 | 16.1% | 11 | 2.9% | 373 |
| Ionia | 15 | 41.7% | 11 | 30.6% | 2 | 5.6% | 6 | 16.7% | 2 | 5.6% | 36 |
| Iosco | 5 | 15.2% | 13 | 39.4% | 9 | 27.3% | 6 | 18.2% | 0 | 0.0% | 33 |
| Iron | 1 | 12.5% | 4 | 50.0% | 2 | 25.0% | 1 | 12.5% | 0 | 0.0% | 8 |
| Isabella | 18 | 41.9% | 10 | 23.3% | 8 | 18.6% | 5 | 11.6% | 2 | 4.7% | 43 |
| Jackson | 74 | 45.4% | 41 | 25.2% | 20 | 12.3% | 23 | 14.1% | 5 | 3.1% | 163 |
| Kalamazoo | 149 | 36.3% | 112 | 27.3% | 83 | 20.2% | 59 | 14.4% | 8 | 1.9% | 411 |

| County Name | Less than a year | | 1-2 years | | 2-3 years | | 3-6 years | | 6 years plus | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Children | % | Children | % | Children | % | Children | % | Children | % | |
| Kalkaska | 2 | 11.8% | 6 | 35.3% | 4 | 23.5% | 5 | 29.4% | 0 | 0.0% | 17 |
| Kent | 162 | 33.7% | 138 | 28.7% | 69 | 14.3% | 96 | 20.0% | 16 | 3.3% | 481 |
| Lake | 2 | 100.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 2 |
| Lapeer | 8 | 33.3% | 8 | 33.3% | 1 | 4.2% | 5 | 20.8% | 2 | 8.3% | 24 |
| Leelanau | 15 | 42.9% | 12 | 34.3% | 3 | 8.6% | 4 | 11.4% | 1 | 2.9% | 35 |
| Lenawee | 5 | 41.7% | 3 | 25.0% | 0 | 0.0% | 3 | 25.0% | 1 | 8.3% | 12 |
| Livingston | 53 | 40.5% | 32 | 24.4% | 25 | 19.1% | 20 | 15.3% | 1 | 0.8% | 131 |
| Luce | 17 | 19.5% | 27 | 31.0% | 26 | 29.9% | 17 | 19.5% | 0 | 0.0% | 87 |
| Mackinac | 10 | 76.9% | 0 | 0.0% | 3 | 23.1% | 0 | 0.0% | 0 | 0.0% | 13 |
| Macomb | 3 | 33.3% | 6 | 66.7% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 9 |
| Manistee | 161 | 34.1% | 126 | 26.7% | 70 | 14.8% | 101 | 21.4% | 14 | 3.0% | 472 |
| Marquette | 9 | 27.3% | 12 | 36.4% | 3 | 9.1% | 9 | 27.3% | 0 | 0.0% | 33 |
| Mason | 18 | 47.4% | 17 | 44.7% | 2 | 5.3% | 1 | 2.6% | 0 | 0.0% | 38 |
| Mecosta | 9 | 42.9% | 5 | 23.8% | 5 | 23.8% | 2 | 9.5% | 0 | 0.0% | 21 |
| Menominee | 13 | 48.1% | 11 | 40.7% | 3 | 11.1% | 0 | 0.0% | 0 | 0.0% | 27 |
| Midland | 16 | 57.1% | 6 | 21.4% | 3 | 10.7% | 3 | 10.7% | 0 | 0.0% | 28 |
| Missaukee | 31 | 36.5% | 29 | 34.1% | 14 | 16.5% | 10 | 11.8% | 1 | 1.2% | 85 |
| Monroe | 10 | 71.4% | 3 | 21.4% | 0 | 0.0% | 1 | 7.1% | 0 | 0.0% | 14 |
| Montcalm | 37 | 39.8% | 26 | 28.0% | 10 | 10.8% | 17 | 18.3% | 3 | 3.2% | 93 |
| Montmorency | 36 | 39.6% | 32 | 35.2% | 16 | 17.6% | 5 | 5.5% | 2 | 2.2% | 91 |
| Muskegon | 5 | 35.7% | 5 | 35.7% | 2 | 14.3% | 2 | 14.3% | 0 | 0.0% | 14 |
| Newaygo | 113 | 29.7% | 111 | 29.1% | 86 | 22.6% | 63 | 16.5% | 8 | 2.1% | 381 |
| Oakland | 20 | 36.4% | 15 | 27.3% | 12 | 21.8% | 7 | 12.7% | 1 | 1.8% | 55 |
| Oceana | 128 | 30.8% | 109 | 26.3% | 96 | 23.1% | 66 | 15.9% | 16 | 3.9% | 415 |
| Ogemaw | 10 | 76.9% | 2 | 15.4% | 0 | 0.0% | 1 | 7.7% | 0 | 0.0% | 13 |
| Ontonagon | 3 | 25.0% | 1 | 8.3% | 3 | 25.0% | 2 | 16.7% | 3 | 25.0% | 12 |
| Osceola | 2 | 13.3% | 6 | 40.0% | 2 | 13.3% | 4 | 26.7% | 1 | 6.7% | 15 |
| Oscoda | 8 | 36.4% | 7 | 31.8% | 7 | 31.8% | 0 | 0.0% | 0 | 0.0% | 22 |
| Otsego | 17 | 47.2% | 3 | 8.3% | 8 | 22.2% | 8 | 22.2% | 0 | 0.0% | 36 |
| Ottawa | 65 | 44.8% | 40 | 27.6% | 22 | 15.2% | 15 | 10.3% | 3 | 2.1% | 145 |
| Presque Isle | 5 | 45.5% | 1 | 9.1% | 5 | 45.5% | 0 | 0.0% | 0 | 0.0% | 11 |
| Roscommon | 16 | 55.2% | 6 | 20.7% | 4 | 13.8% | 2 | 6.9% | 1 | 3.4% | 29 |
| Saginaw | 85 | 47.5% | 42 | 23.5% | 22 | 12.3% | 28 | 15.6% | 2 | 1.1% | 179 |
| Sanilac | 15 | 31.3% | 16 | 33.3% | 6 | 12.5% | 11 | 22.9% | 0 | 0.0% | 48 |
| Schoolcraft | 1 | 6.3% | 9 | 56.3% | 3 | 18.8% | 3 | 18.8% | 0 | 0.0% | 16 |
| Shiawassee | 18 | 40.9% | 9 | 20.5% | 7 | 15.9% | 10 | 22.7% | 0 | 0.0% | 44 |
| St. Clair | 60 | 31.9% | 53 | 28.2% | 40 | 21.3% | 26 | 13.8% | 9 | 4.8% | 188 |
| St. Joseph | 41 | 31.8% | 52 | 40.3% | 17 | 13.2% | 15 | 11.6% | 4 | 3.1% | 129 |
| Tuscola | 15 | 68.2% | 4 | 18.2% | 1 | 4.5% | 1 | 4.5% | 1 | 4.5% | 22 |
| Van Buren | 22 | 34.9% | 11 | 17.5% | 6 | 9.5% | 19 | 30.2% | 5 | 7.9% | 63 |
| Washtenaw | 49 | 38.6% | 30 | 23.6% | 30 | 23.6% | 13 | 10.2% | 5 | 3.9% | 127 |
| Wayne | 829 | 32.2% | 615 | 23.9% | 411 | 16.0% | 602 | 23.4% | 116 | 4.5% | 2,573 |
| Wexford | 11 | 29.7% | 10 | 27.0% | 12 | 32.4% | 4 | 10.8% | 0 | 0.0% | 37 |
| **Total** | **3,397** | **35.7%** | **2,545** | **26.8%** | **1,627** | **17.1%** | **1,642** | **17.3%** | **298** | **3.1%** | **9,509** |

55

**Appendix C. MIC Data Report, October 2022**



MALTREATMENT IN CARE
*Leveraging Disposition Summaries to Decrease Risk*

October 2022

**M** | CHILD & ADOLESCENT DATA LAB

## Maltreatment in Care Summary

Maltreatment in care (MIC) refers to confirmed incidents of abuse/neglect while children are in the care and supervision of child welfare agencies. In previous years, the Child and Adolescent Data Lab (Data Lab) analyzed administrative records to help the Michigan Department of Health and Human Services' (MDHHS) Children's Services Agency (CSA) understand the risk and protective factors associated with MIC. The analysis of strictly administrative data was helpful but it was not generating productive insights on specific domains of practice or policy that might lead to a decrease risk of MIC. In the current report, although we continue to analyze the administrative data, we focus specific attention to the disposition summaries and the locations (i.e. placement settings) that represent a disproportionate level of risk. The disposition summaries are an open field text response written by CPS workers at the conclusion of an investigation. These summaries are important because although the administrative records indicate the timing and type of MIC events experienced by a particular child (e.g. neglect, in the parental home, two months after reunification), the details of that event remain unknown. Consequently, it is difficult to uncover and identify opportunities that might be helpful in reducing future risk.

- In the fiscal year of 2021, 192 children experienced maltreatment in care (MIC). Three children experienced two MIC events.

- Approximately 26% of the children were in a parental home setting while 74% were in a substitute care setting (e.g. foster care, congregate care) at the time of MIC.

- The majority of the MIC victims experienced neglect. The most common form of neglect was improper supervision. Approximately 81% of the MIC complaints associated with a child living with a parent (post reunification) were neglect, compared to approximately 50% of the complaints in child caring institutions, 61% of complaints in relative foster home and 69% of non-relative foster homes.

- Children living in congregate care settings (referred to as child caring institutions) are at the greatest risk of experiencing maltreatment in care

- At any point in time, approximately 4% of children in care in Michigan are living in a child caring institution. Over the course of their foster care experience, only 7% of children will eventually live in a child caring institution. Yet child caring institutions account for approximately 18% of all MIC events.

- An overall lack of staff, poor decision-making by facility staff, inadequately trained staff, and problematic organizational policies (or lack of understanding of policies) seem to be the primary factors responsible for MIC

- A review of the detailed disposition summaries confirm these findings. We encourage the MDHHS to work closely with residential providers in Michigan to address these concerns.

- There is some evidence that placement practices (e.g. the use of kinship care) significantly reduces the probability of congregate care. MDHHS might build on this knowledge base by identifying specific policies and practices that successfully (in terms of safety and permanency) limit the use of residential care and thus as a byproduct decrease the risk of MIC.

## Background and Overview

Maltreatment in care is a key measure of child safety. When a court removes a child from the home, it is fair to expect that the state protect the child from further harm.  However, some children who enter the foster care system remain at risk of further maltreatment.  Such maltreatment may be experienced in a foster family (related or unrelated), residential or even a parental home (during the period-of-time between reunification and case closure).  Michigan continues to work diligently to understand the root causes of maltreatment in care and develop innovative policies and practices to help reduce the risk of maltreatment in care.  As noted in previous MIC reports, the primary obstacle or challenge to significantly reducing maltreatment in care in almost every state is the relatively low probability of abuse or neglect occurring once children enter the foster care system.

In 2020, only two states (Rhode Island and Mississippi) reported more than 2% of the foster care population experiencing a substantiated allegation of maltreatment[1].  Only four states (Massachusetts, Maryland, Alaska and New York) report more than 1% of the foster care population.  The remaining 44 states report less than 1% of the foster care population as a victim of MIC.  Thirty-seven of these states (including Michigan) report a risk of less than one-half percent.  Given these low base rates, forecasting risk is complicated, but necessary given the seriousness and consequences associated with children experiencing maltreatment while under the care and supervision of the state.

Forecasting risk is only useful it leads to actions (e.g. changes in policies) that are better informed and capable of implementation.  For example, in previous MIC reports, the Data Lab identified children (or characteristics of children) at greatest risk of MIC.  The results identified various populations (i.e. demographics) and observation periods (e.g. first few months post reunification) that were associated with an increased risk.  Yet these analytic models – or forecasts – did not often yield specific clues on what actions could be better informed and capable of implementation.  It would be unrealistic for any state child welfare system to hire round-the-clock supervision for all families post reunification.  In the current report, the Data Lab decided on a different approach to understanding MIC.  In the current report, our approach was informed from the forecasting literature and attempts of understand extremely rare events (e.g. mass violence, fatal assaults by perpetrators of intimate partner violence).[2]  One lesson from these literatures is to focus on the settings, rather than only on the event itself.  The rationale for this approach is that settings may share common characteristics that offer insights into actions that could be improved and reasonable to implement.  In the current report we focus on MIC events associated with congregate care settings because (1) previous reports indicate an elevated risk associated with these settings and (2) unlike the heterogeneity of parental homes (basically the notional that each one unique unto itself), congregate care facilities share many similarities in terms of staffing and policies that guide practice.

---

[1] There exists wide variation across States in terms of defining, reporting and investigating incidents of maltreatment (both in general and while children are in care).
[2] https://onlinelibrary.wiley.com/doi/full/10.1111/1745-9133.12476

The current report is an update from the Child and Adolescent Data Lab's 2021 MIC report. In terms of a formal definition, maltreatment in care (MIC) refers to incidents of child abuse or neglect suffered by children in the care and supervision of children's services agencies. Typically, this is defined as confirmed incidents of maltreatment experienced by children during foster care placements, but also includes events involving children placed in residential or other settings (including the biological family home under Children and Family Services Reviews (CFSR) round 3 criteria), as long as the agency is responsible for the child's safety and well-being. Ensuring the safety and protection of children in their care is a key priority for children's service agencies, which is why the measure of maltreatment in care is included in the Children & Family Services Reviews (CFSR). Updates to CFSR measures (round 4) are forthcoming.[3]

The report relies on the administrative data collected by investigators and caseworkers. In terms of specific data files, the Data Lab analyzed information from the Adoption and Foster Care Analysis and Reporting System (AFCARS) and the National Child Abuse and Neglect Data System (NCANDS). The administrative records were used to identify specific MIC events. Specific events were then tied to the disposition summaries captured in MiSACWIS. The disposition summaries are open field text responses written by CPS workers at the conclusion of an investigation. MDHHS policy states the caseworkers must document the following in the disposition summary:

- Allegations investigated.
- Investigation disposition (preponderance/no preponderance).
- Names of the alleged and/or confirmed perpetrator(s) and alleged and/or confirmed victim(s).
- Steps taken in the investigation including:
- Verification of the safety and whereabouts of all children listed in investigations persons.
- Interviews with adults.
- Observations of the home and/or scene of alleged abuse/neglect.
- Any documentation obtained to support the conclusion (medical reports, police reports, etc.).
- How the relevant facts/evidence obtained during the investigation led to case outcome.
- The category disposition, the risk level, and any applicable overrides applied.
- The names of individuals added to central registry and the confirmed case type if applicable.
- Any services recommended, offered, or referred if applicable.
- Any safety plans put in place.
- If a petition was filed and rationale

---

[3] https://capacity.childwelfare.gov/states/resources/cfsr-r4-swdi-maltreatment-in-care

## Frequency, Type and Location of MIC Events

In the fiscal year of 2020, 192 children experienced a maltreatment in care (MIC) event.  Three children experienced two MIC events.  Approximately 26% of the children were living in a parental home setting at the time of the MIC complaint, while 74% of children were living in a substitute care setting (e.g. foster care, congregate care) at the time of the MIC event.  The majority of MIC victims experienced neglect.  The most common form of neglect was improper supervision.  Approximately 81% of the MIC complaints associated with a child living with a parent (post reunification) were neglect, compared to approximately 50% of the complaints in child caring institutions, 61% of complaints in relative foster home and 69% of non-relative foster homes.

Consistent with previous MIC reports produced for MDHHS, children living in congregate care settings (specifically child caring institutions (CCI)) were at the greatest risk of experiencing maltreatment in care.  Overall, MIC victims living in a child caring institution account for approximately 18% of all MIC events.  This is concerning because at any given point in time (e.g. last day of the fiscal year) only about 4% of children in Michigan are living in a child caring institution.  Moreover, when you look at every placement associated with a child's out of home experience, their overall probability of placement in a child caring institution remains low.  For example, approximately 5,500 children entered care in calendar year 2019.  Some of these children only experience a single placement setting.  Other children, however, move between various settings.  When we look at the totality of settings experienced by the approximately 5,500 children entering care in 2019, only 7% experience placement in a child caring institution.  The current report focuses on MIC events occurring in CCI because only 7% of children experience congregate care and yet these settings account for 18% of all MIC events.

## Understanding the Common Risk within Child Caring Institutions

The Data Lab studied the disposition summaries (documents written by the investigators) to understand if there were common experiences across MIC events within CCI settings.  We were particularly interested in whether themes would emerge that might offer specific opportunities to decrease future risk.  Three somewhat related, yet distinct themes emerged.  First, the qualifications, experience, staffing patterns and professional judgement of CCI staff are obviously less than adequate.  Second, the inappropriate use of physical force and the inability to safety execute[4] a child restraint increases physical injury and thus increases the risk of MIC.  Third, the lack of thoughtful and planful supervision of youth surrounding attempted or successful AWOL increases the risk that children will experience maltreatment.  If the State is able to help CCIs address these issues, the risk of MIC would likely decrease.  It is important to note that focusing efforts to make improvements in CCIs as a means to reducing the overall risk of MIC is a promising path forward because unique MIC events that occur within CCI settings often involve more than one child.  In our current analyses, four unique MIC complaints resulted in a

---

[4] We recognize that there exists a debate about the use of restraints under any but the most-extreme (e.g. imminent risk of harm to self and others) scenarios.

substantiated allegation of maltreatment for eleven children.  Consequently, focusing on CCIs makes sense because (1) these setting share similar features and (2) reducing the risk of singular events reduces (at a greater rate) the overall number of MIC victims.

## Examples from the Disposition Summaries

The following are examples that represent the themes that emerged from the CCI maltreatment in care events.  We present text from the disposition summaries as evidence.  We do not present each and every disposition summary in totality, as much of the text is unrelated to the risk itself and the length of disposition summaries exceeds the purpose of the current report.  The extracted statements from the disposition summaries require little explanation.  The events are detailed and the factors that lead to these events are self-evident.

## Theme 1: The qualifications, experience and professional judgement of CCI staff are obviously not adequate.

This thematic statement is supported by the obvious lack of professional judgement and poor decision-making of some staff.  As context, we note that residential providers in Michigan are currently struggling (perhaps seriously struggling) to recruit and retain competent staff.  These struggles are directly contributing to the risk of MIC in congregate care settings.

**REPEAT SEXUAL ABUSE OF FEMALE RESIDENT**

A complaint alleging sexual abuse by perpetrator STAFF to victim CHILD.   STAFF is a staff member. STAFF was observed with his hands underneath CHILD's blanket while CHILD was lying down.  STAFF's hand underneath the blankets was moving in a fast motion.  Once approached, both STAFF and CHILD appeared startled and had "frozen" reactions.  There is a concern that STAFF has performed both digital and oral sex on CHILD in the past.  On unknown dates, STAFF gets CHILD books to read and when he returns to the room, they engage in sexual activity. There is a concern for CHILD's welfare being in the same environment as STAFF.   Contact was made with law enforcement and witnesses. Several shifts of video footage were observed from STAFF shifts.  After reviewing the video footage of the shifts that STAFF worked, it was clear that there was an inappropriate relationship between him and victim CHILD. Grooming behavior by STAFF to CHILD was observed including hugging, inappropriate touching including caressing her bare legs and lack of boundaries. There were several shifts where STAFF is viewed to enter the bedroom of the victim for long periods of time, the longest being 53 minutes. Lansing Township Police Department interviewed STAFF, who admitted to sexual intercourse, digital and oral sex with victim CHILD. There has been an ongoing concern with this facility and the level of supervision being provided by their staff. There has been several CPS MIC investigations as a result. During this investigation, several staff on varying shifts that STAFF worked were viewed to not complete the required "eyes on" checks with the residents. It was also viewed that the staff were recording that they were doing the required every 15 minute resident checks, when in fact they were not. These checks were documented to be completed falsely while STAFF was in

victim CHILD's room for long periods of time.  This case was jointly investigated by DCWL and Lansing Township Police Department. There will be several licensing violations including staff qualifications (in regards to STAFF), ratio, lack of use of facemasks and lack of rules for going into residents rooms. There will also be a finding for falsification of documents.


### STAFF MEMBER FALLS ASLEEP, MULTIPLE CHILDREN STEAL KEYS, STEAL VEHICLE AND AWOL

There is a preponderance of evidence to support the allegations of improper supervision by STAFF against CHILD, CHILD, and CHILD.   STAFF works as a third shift supervisor at the facility. Allegations were received that the three youth went AWOL from the facility.   STAFF was asleep and the residents stole his keys and escaped the facility.  STAFF was the staff member assigned to cover South and West Units the night of the 4th into the morning of the 5th. He was covering a 1 to 16 ratio that night. The ratio should be 1 to 12. There was no one else assigned to work to cover the other youth to be in proper ratio. Video was reviewed and uploaded into the documents section. STAFF was the third shift supervisor that night. West and South unit are secure units. Residents are locked in their rooms at night starting around 9:00pm. Staff conduct checks on the residents every 10 minutes and log the checks in a logbook on the unit. They are to use a flashlight to see into the residents' room to verify a sign of life. The facility policy for this is uploaded in the documents section. STAFF falsified his bed check log saying he was doing bed checks even during the times he was observed asleep. Copies of these documents are uploaded as well.  STAFF reported he "prefills" his checks during his shift to help him track when he should do checks. Shift documents were also received that showed STAFF was scheduled to work the unit that shift out of ratio. Video observed before STAFF fell asleep showed he was not conducting full bed checks as described in the facility policy. The doors between the two units and the intake door must be locked at all times. The video shows STAFF going through these doors and not locking them. STAFF fell asleep before 1:00am. He had his radio clipped to his chest. His facility Keys were looped around the antenna of the radio. Facility workers are to have keys secured to themselves. Most staff at the facility use para cord to clip the keys to their belts. STAFF did not have his keys secured that night. It is still unknown how CHILD was able to get out of his room. The video shows him poking his head out of his door around 12:15am.  Due to STAFF not securing the door between South and West Unit, CHILD was able to sneak onto unit and grab facility keys from STAFF. If the door between the units was locked as it should have been, CHILD would not have been able to get anywhere, but due to STAFF failing to secure doors, CHILD was able to get the keys. He then let CHILD and CHILD out of their rooms. They use the facility keys to get their shoes. The residents then use the keys to escape the facility. They stole a truck from a car shop down the road. STAFF did not wake up until 4:00am. The first thing he is seen doing on video is laundry. He is not observed to do any checks. He radios supervision around 5am that he lost his keys then shortly after that radios that there are residents missing. Law Enforcement was not called until 6:01am.  There is concern one of the youths does have a firearm at this time as seen in a video on Facebook.

STAFF MEMBER HELPS MULTIPLE YOUTH AWOL, PROVIDES DRUGS AND SEXUALLY ASSAULTS

There is a preponderance of evidence to support the allegation of improper supervision and sexual abuse perpetrated by STAFF against CHILD, CHILD, and CHILD. CPS-MIC received a complaint stating that STAFF picked up CHILD and another child who went AWOL and took them back to his apartment. STAFF drugged and raped them. They were eventually dropped off. CHILD and the other child are with police. During the investigation, an Accept and Link came into CPS-MIC with additional allegation reporting CHILD as the other child who went AWOL, had sex with STAFF, and was raped by two other supervisors. Additional allegations were received regarding East Campus youth, CHILD; being sexually assaulted by STAFF in the school bathroom and fondled and digitally penetrated her vaginally. The investigation found that STAFF is an Educational Specialist. A forensic interview was completed with CHILD by Detective and CHILD was interviewed at the Detentions Center. They reported that STAFF helped them AWOL from campus. He picked them up and brought them back to his apartment. STAFF provided them with alcohol and marijuana that they consumed and smoked at the apartment. CHILD reported that STAFF had touched her on her breasts and vagina, above her clothes, and when she asked him to stop, he did. CHILD and CHILD disclosed that STAFF had sexually assaulted CHILD while in the apartment. CHILD denied knowledge of CHILD being raped by any supervisors. CHILD later recanted the story to her caseworker, STAFF of her being raped by two other supervisors and reported it was only STAFF. A forensic interview took place with CHILD at the Children's Advocacy Center (CAC) forensic interviewer, STAFF. CHILD reported STAFF was grabbing her butt, over clothes, while kissing her in the bathroom at school. Additionally, STAFF digitally penetrated her vagina, touched her breasts over and under the cloths. STAFF showed her pornographic pictures on his phone. CHILD reported that he also gave her edibles and energy pills that she took. A forensic interview with the other girls on the unit were completed and there were no concerns. STAFF is currently incarcerated.


STAFF TAKES MULTIPLE CHILDREN FOR RIDE IS CAR, SHOWS HANDGUN, LEAVES UNSUPERVISED WHILE PURCHASING ALCOHOL AND MARIJUNA

This complaint was received due to the following allegations: CHILD, CHILD and CHILD reside in a childcare institution. STAFF is an employee. Between 3pm and 7pm, STAFF took CHILD, CHILD and CHILD on an unauthorized errand run in his personal vehicle. STAFF had a 380 Smith and Wesson handgun in his glove compartment, which was later discovered to be missing. STAFF reported the firearm missing.  The facility has vehicles for authorized transportation of the residents however STAFF was not authorized to take the children anywhere he took them so he could run personal errands. It is unknown if the gun was loaded or if there was a safety device attached. CHILD removed the handgun from the glove box however, it is unknown what happened with it after that. There are two different stories of what may have happened to the gun. One story is that the firearm is now back in STAFF's possession and he is expected to show possession of the gun with serial number to PD to verify this. Another story is that the gun is with CHILD's mother, name unknown. Neither of these stories have yet to be verified.  During the course of the investigation CHILD, CHILD and CHILD were all Forensically Interviewed and had

their well-beings verified. CHILD confirmed he and the other residents were in  STAFF's personal vehicle and  STAFF stopped at a liquor store and weed store and  STAFF told them he had a gun in his car. CHILD advised CHILD looked in the glovebox of the car, saw the gun and took the gun out of the glovebox.  STAFF stated that the boys may have seen his handgun in his glovebox when he opened it but he advised he never stated that he believed the boys stole his gun.  STAFF stated that once he realized his gun was missing four days after he had the boys in the vehicle he called the agency.  STAFF confirmed that he left the three residents in his car unsupervised all while being aware that his firearm was easily accessible to the residents in his vehicle.  STAFF agreed to text a picture of his firearm and registration to MIC to confirm his current possession of the firearm but at the time of disposition has failed to do so.

## Theme 2: The inappropriate use of physical force and the inability to safety execute a child restraint increases physical injury and thus increases the risk of MIC

This thematic statement is supported by situations in which staff members are either physically engaging with youth when physical contact seems unjustified or when staff are simply unable to execute a safe child restraint.  As context, we note that adolescents are often non-compliant and present serious challenges for verbal de-escalation.  Yet the following events indicate a serious lack of knowledge and skill with regard to the use of physical force on children.

STAFF MEMBER PUNCHES CHILD IN THE FACE

A referral was made alleging physical abuse toward CHILD by STAFF.  It was reported at 9:15 p.m., CHILD provoked STAFF by poking him in his face and pushing him in his forehead.  He also stabbed STAFF with an ink pen.  CHILD swung at STAFF which caused them to have a physical altercation.  CHILD has a cut above his left eye, several scratches on his face and his face is swollen from the incident.  CHILD was sent to the emergency room for his injuries and law enforcement was contacted.  This is a dual investigation with Police Department and DCWL.  CHILD's well-being was verified.  He was forensically interviewed.  Multiple photographs were taken of CHILD's injuries over time to show the progression of his black eyes, bruising to his left elbow and the stitches to his left eye.  CHILD talked about the incident he had in the cafeteria with another youth before the incident with staff.  He reported being restrained, but other staff had hit him during this process as well.  CHILD said he went to the unit to calm down and read because this is a coping skill he utilizes.  STAFF was calling him names and would run into him as he walked by.  CHILD said STAFF punched him and he hit him back.  He described being punched in the face.  He stated STAFF also picked him up and slammed him onto the ground.  CHILD said the staff ran into another unit and he followed him.  The staff then left the building and CHILD had a broomstick with him.  The staff stated he would come back and shoot CHILD.

CHILD described his nose being "busted" and his eye was swollen.  He had to get stitches above his left eye after being punched.  He also had a bruise to his left arm from being slammed on the ground.  Other youth who may have witnessed the incident were interviewed as well.  Two of them disclosed seeing STAFF punch CHILD.  One said it was multiple times in the face and the other said it was only once.  Another youth interviewed saw STAFF push CHILD and then STAFF was crying in the other unit knowing he did something he shouldn't have done.


## STAFF MEMBER DRAGS A NON-COMPLIANT CHILD IN FROM THE PATIO BY HIS LEGS

There is a preponderance of evidence to support physical abuse allegations of CHILD by STAFF. Allegations alleged the following; CHILD is a permanent court ward. CHILD has a large abrasion down his back. A staff member, STAFF, dragged him by his leg when CHILD was having a behavior issue. CHILD was observed to have a large abrasion on his back. Case was investigated in coordination with a Division of Child Welfare Licensing consultant. Forensic interview protocol was attempted with CHILD however due to CHILD's cognitive delays ground rules were unable to be established and CHILD would not answer questions during attempted interview. Interviews were conducted with staff members who were responsible for the care of CHILD on the day in question. Staff member STAFF was initially scheduled to be the one on one staff for CHILD however when CHILD was reported to be having a behavior staff member STAFF stepped in to intervene with CHILD.  STAFF reported that on the day in question he was helping fellow coworker STAFF who was assigned to as CHILD's one to one staff. He reported STAFF normally struggles with CHILD. He reported that he was not CHILD's initial staff and they were short one staff member in the house. He reported that he was trying to assist STAFF in dealing with CHILD. They were in the kitchen area. He reported that he switched spots with STAFF in the kitchen area. He reported that when he turned his back CHILD eloped and left the kitchen area and went outside on the patio area off of the kitchen. He reported that CHILD was on the ground and he grabbed him by the ankle and gently scooted him back into the house. Specialist inquired as to what type of behaviors CHILD was displaying at the time and he reported that CHILD was continuously refusing directives to return back into the house. He was engaged as to if CHILD was being physical with anyone or presenting as threat to himself or others and  STAFF denied that CHILD was displaying any aggressive or harmful behaviors at the time. He reported that before he intervened to gently scoot CHILD into the house he was verbally trying to deescalate and redirect CHILD to go back into the house. He reported that he assisted physically by scooting CHILD due to CHILD's history of aggression and history of displaying behaviors that could harm himself or others. He was engaged as to where the other staff member (STAFF) was in the house and he reported that during the incident STAFF was standing behind him.  STAFF reported being trained on verbal de-escalation and CPI and once a resident is attempting to harm himself or others they can physically intervene if needed using CPI.  STAFF was unable to state what harmful behaviors CHILD was displaying at the time other than refusing to come back into the house.  STAFF reported that CHILD's behaviors can be unpredictable and he has a history of

MULTIPLE STAFF MEMBERS ENGAGED IN INAPPROPRIATE SEXUAL CONTACT AND PHYSICAL RESTRAINTS

There is a preponderance of evidence to support the allegations of physical abuse by STAFF against CHILD. Allegations were received that stated the following: Staff members beat the residents and then give them cocaine. It is not known if any of the residents have been injured. It is not known when the last incident took place. No other details were provided. Accept and Link allegations were also received that stated the following: "On an unknown occasion while outside together, STAFF put down his phone between himself and CHILD and showed her a picture of his penis.  On a different occasion while in the classroom, STAFF told CHILD to wear a jacket with no shirt underneath. He would ask her to partially unzip it. It is unknown if she had a shirt on underneath that day. When other youth or staff came by, he would tell her to zip it back up. STAFF would ask CHILD to go into the woods next to the residential program and do sexual stuff. He would make inappropriate comments like she is "sexy" CHILD felt uncomfortable around STAFF but wanted him to return because he said he would bring her back a pair of Air Jordan. Recently, CHILD had to be restrained due to not going inside when told. CHILD went outside to calm herself down and refused to come inside. STAFF restrained her. It is unknown what the restraint looked like. STAFF and STAFF then dragged CHILD inside by her wrists. CHILD has a bruise under her right upper arm near her armpit. She also has some older bruises on her legs". CHILD is a State Ward at the time of these allegations.  DCWL was notified of the allegations and completed a joint investigation with CPS MIC. he Sheriff was already involved with the worker prior to this investigation regarding a similar investigation with STAFF. Several residents and staff were interviewed at the facility regarding the concerns of cocaine being given to residents by staff. No disclosures were made by any of the residents the workers talked to regarding this. No staff that were interviewed disclosed ever seeing any staff members providing residents with any illegal drugs. CHILD was forensically interviewed by CPS MIC, DCWL, and Law Enforcement regarding concerns of sexual abuse by STAFF found in Investigation ID106852883. During that forensic interview she denied any kind of inappropriate actions by  STAFF, denied him ever making any sexually inappropriate comments to her, denied hearing him say any comments to any of the other residents or herself. There was no indication during that forensic interview that she was lying or hesistant to disclose to the workers. She described  STAFF as one of the best and appropriate staff members at the facility. She was re-interviewed regarding the allegations after the accept and link investigation was assigned. While she did disclose  STAFF making comments of her body, showing a picture of his penis, and asking her to go AWOL to have sex, there was no supporting information found through interviews in Investigation 106852883. Law Enforcement closed their investigation regarding STAFF with no request for criminal charges. CPS MIC and DCWL did review camera footage regarding two restraints involving CHILD. They also received pictures of bruising on both CHILD arms and legs from the second restraint when she was carried through the facility by STAFF. The bruising is consistant with where the workers had their hands on her body. Copies of the video were uploaded to the documents sections of this investigation. Documentation from the SCM training manual was received from Facility Director. That

documentation states injuries may occur if staff use excessive pressure or force. Possible risks include restrictive breathing, cardiac and/or respiratory arrest, bruising, strained muscles, other musculoskeletal injuries, back or neck injuries, self-harm, misuse of body weight and bone locks, The video clearly shows that CHILD was sitting on the ground against a wall in the bedroom. She was not a danger to herself or others. Going hands on and physically carrying her through the facility was excessive and the excessive force caused significant bruising to CHILD. No incident report was written by any staff member involved regarding this carry. This carry was not reported to Foster Care staff or DCWL. The video clearly shows the carry was not executed in a safe or proper was either.


STAFF MEMBER ENGAGES IN – AND SEEMS TO PROVOKE PHYSICAL CONTACT WITH A CHILD, RESULTING IN MULTIPLE INAPPROPRIATE RESTRAINTS THAT RESULT IN INJURIES

There is a preponderance of evidence to support the allegations of physical abuse by STAFF against CHILD. Allegations were received that stated the following: "STAFF was attempting to place CHILD in an approved physical management due to CHILD's aggression. It is alleged that STAFF placed CHILD in a choke hold and also became physically assaultive causing several scratches and bruising on his neck, shoulder, side of rib cage, arms and behind his ear." CHILD is a Temporary Court Ward. STAFF was placed on leave at the start of the investigation and remained on leave throughout the investigation. STAFF was involved in a restraint with CHILD after a basketball game at the facility. CHILD was escalated and upset regarding a fight he had with another resident during the basketball game. STAFF and CHILD met in the staff office after to process what happened. CHILD reported that STAFF told him "if you tried something like that with me on the streets, you would regret it". CHILD reported he felt it was a very threatening statement. He stated staff are supposed to talk to them to calm them down and STAFF was only making him more upset. STAFF also told him he would be in trouble for the other kid starting a fight with him. CHILD did not think that was fair. He broke a glass coffee pot and left the staff office. STAFF followed him out of the office onto the unit. CHILD reported he punched STAFF as he left the front office. He told STAFF "if you wanna box, let's box" He reported he started punching at STAFF. He stated STAFF tried to initiate a restraint and block his hits. He reported STAFF then pinned him against the wall in the back of the unit. He stated STAFF's arm was on his throat. He stated "stop i can't breath" to STAFF but he continued to have his arm placed on his throat. He reported another staff ran over and moved STAFF's arm. They then initiated a two person standing restraint. CHILD dropped his weight. STAFF stopped the restraint but STAFF did not and continued to try to restrain CHILD on the floor. The facility is not supposed to continue restraints on the floor. If a resident goes to the floor, they are to release the restraint. Also if a resident is saying they are in pain or having trouble breathing, they are to release the restraint, which STAFF did not do. STAFF told STAFF to release CHILD on the ground. CHILD stated he was calm and and got up. CHILD reported he started crying after the restraint. He reported STAFF started to comfort him when STAFF stated "cut that crying shit out". This made CHILD upset

again and he started hitting STAFF. A second restraint started with STAFF and STAFF on each arm. STAFF was asked to leave to help CHILD calm down. STAFF processed with CHILD after STAFF left. STAFF was put on administrative leave. Other staff confirmed STAFF having his arm on CHILD's throat. Other staff and residents also confirmed STAFF swearing at CHILD and telling him not to cry or that he doesn't get to cry for what he did. STAFF's statements are out of line and only escalated CHILD and are completely unacceptable for this therapeutic climate. CHILD was observed with bruises near his neck line, bruises on his arm, and scratches on his arms as a result from this restraint.


**STAFF MEMBER INITIATES UNWARRANTED PHYSICAL CONTACT AND CONDUCTS IMPROPER RESTRAINT. FELLOW STAFF MEMBERS FAIL TO INTERVENE.**

There is a preponderance of evidence to support the allegations of physical abuse by STAFF against CHILD. Allegations were received stated the following: "This morning, CHILD was involved in a physical restraint with staff member, STAFF. It is unknown how STAFF restrained CHILD, but it was a single person physical restraint. CHILD was sitting down at the time of the restraint. It is unknown why he was restrained. CHILD is complaining of soreness from the restraint, specifically he feels sore to the touch on his lower/upper back on the side." CHILD is a temporary court ward. A restraint did take place involving STAFF and CHILD. A copy of the video was received and uploaded to the documents section of the investigation. The video shows STAFF pacing around the unit talking with the residents. There is no sound on the video recording. He can be seen walking over to CHILD who is sitting in a chair next to the wall. He leans over and is in CHILD's face. He is then seen grabbing CHILD's shoulders and pulling him off the chair to the ground. He then grapples CHILD while CHILD is facing the ground. At no point in the camera footage is STAFF shown preforming an appropriate restraint technique. Two other staff members are also on the unit and they do no get involved in the restraint. It appears like STAFF is wrestling CHILD instead of restraining him. He then slides CHILD into a bedroom where there is not camera coverage. About four minutes later CHILD comes out of the bedroom and leaves the unit. CHILD sustained multiple injuries from this improper restraint. There was not an appropriate reason for the staff to even initiate a restraint on CHILD. It is also very concerning that the other two staff members on the unit did not intervene when they saw this inappropriate restraint. However, there did not seem to be a policy at the facility for staff to intervene when they see an unsafe restraint. STAFF initiated a restraint that was not warranted and did not use any appropriate SCM restraint techniques during his restraint with CHILD. This caused CHILD to receive multiple injuries from the restraint. He had rug burn on his forehead, a cut on the back of his neck, a cut on his lower back, and a cut on his lip. Pictures were taken and uploaded to the documents section. DCWL will be finding a licensing violation for staff qualification. STAFF has been on leave since the start of this investigation.

## Theme 3: The lack of thoughtful and planful supervision of youth surrounding attempted or successful AWOLS increases the risk that children will experience maltreatment.

This thematic statement is supported by the situations in which staff members are either unwilling or unable to prevent children from leaving residential facilities.  Additionally, when children do leave (AWOL) there does not appear to be any clear policy on when to engage law enforcement or other staff to locate and return the children to care.  As context, we note that staff are unable to prevent every AWOL.  If children are committed to running way, they will likely be successful (eventually).  Yet staff need to know how to respond in a manner that limits the risk of harm to children.

TWO CHILDREN GO AWOL, STAFF ARE GIVEN A DIRECTIVE TO NOT GO AFTER THEM OR NOTIFY LAW ENFORCEMENT, TWO CHILDREN ENGAGE IN SELF-HARM

CHILD is a permanent ward, and CHILD is a juvenile justice ward. Both children were placed when a complaint was received concerning improper supervision. It was alleged that CHILD and CHILD were spotted walking down the street with multiple lacerations on their arms, picked up by police, and brought to the hospital. It was alleged that no staff member reported the children missing to law enforcement. Officers called the facility several times after the children were found, but nobody answered. A staff person from the main campus was finally reached, and that staff person reached someone at the program to get someone to the hospital. It was confirmed through law enforcement, staff interviews, and interviews with the victims that CHILD and CHILD left campus together and the police were not contacted. CHILD and CHILD were forensically interviewed, but CHILD was unable to recall the AWOL incident. She remembered going to the hospital but could not remember what happened before. CHILD reported that she and CHILD walked to a former staff member's (STAFF) house, and her arms were "marked up pretty bad." She reported STAFF called the police, and she was brought to the hospital. Contact was made with STAFF, and she reported seeing CHILD and CHILD walking in front of her house. She recognized them from previously working at the facility and called out to them. She observed them to be covered in blood, and she called 911. CHILD and CHILD reported they cut themselves with glass. They told STAFF that they wanted to kill themselves and they had been gone for a few hours. They stated nobody was following them or trying to look for them. STAFF reported the girls were with her for about 30 minutes until police arrived. She stated that no staff ever showed up or contacted her. STAFF explained that she quit her job at the facility because it "went haywire." She stated that it is a very unsafe place for children. She stated that the children are able to wander the campus, and it is not possible to supervise the children the way they need to be. The facility director, STAFF, was interviewed and reported that the director told the staff present not to follow the youth or call the police. According to STAFF, STAFF said to let them go because they needed to worry about the youth that were still at the house, and he said that CHILD and CHILD would get cold and return to the facility. STAFF reported that the police

are always called when she is working and children AWOL, but, when STAFF is on campus, 911 is not called because his directives "trump" her. STAFF was interviewed and admitted that he told staff not to follow CHILD and CHILD. He denied that he has ever told staff not to call the police. He maintained that policy requires staff to call 911 if they lose sight and sound of a child. STAFF stated that someone must have called 911 when CHILD and CHILD ran but was not sure who. He reported that he received a call from someone at the main campus indicating that police had located the girls and they were brought to the hospital. Additional staff were interviewed. STAFF was working during the AWOL incident. She confirmed that STAFF told staff not to follow the girls and recalled him saying "we're not chasing them anymore." About an hour after the girls left, STAFF asked STAFF if he called the police, and he said that he did not. CHILD reported she immediately called dispatch and learned that police had already picked up the girls, and this was around the same time STAFF received a phone call from the main campus. CHILD reported that, in the past, staff were told multiple times by both STAFF and STAFF not to call 911 when a child AWOLs. She stated that STAFF has said "they will be back," and there have been more times than she can count that someone has AWOL'd, police were not called, and the child returns on their own. Another staff member, STAFF, shared supervision concerns related to the children being allowed to wander the campus. CHILD stated there were a lot of AWOLs, and CHILD and CHILD went AWOL and self-harmed more than others.


STAFF MEMBERS PERMIT MULTIPLE YOUTH TO LEAVE A STAFF SECURE FACILITY AND MAKE NO ATTEMPTS TO PREVENT AWOLS.  SEVERAL OF THE CHILDREN ARE SEXUALLY ASSAULTED.  ONE OF THE STAFF MEMBERS MEETS WITH THE AWOL CHILDREN, PROVIDES THEM MONEY, DRIVES THEM AROUND AND ENGAGES IN INAPPRORPRIATE BEHAVIOR.  THIS STAFF MEMBER DOES NOT NOTIFY LAW ENFORCEMENT ABOUT THE CHILDREN'S WHEREABOUTS.

Several residential youths were permitted to leave the facility and staff made no attempts to de-escalate the children.  The staff failed to create a safety plan to prevent the magnitude of children walking out of the facility. CHILD; CHILD; CHILD; CHILD; CHILD; and CHILD all went AWOL from the facility and for several days they stayed in an abandoned home behind the facility. CHILD had marijuana that he smoked with the other youths from the facility while AWOL. During the time they were AWOL CHILD sexually assaulted CHILD and CHILD. CHILD witnessed the sexual assault against CHILD. While the group was AWOL they started a fire in one of the abandoned homes and CHILD's arm was burned. There is concern that the staff did not report the AWOL timely. Additionally, the facility has not been completing incident reports timely, and the reports that are written are vague and incomplete often naming the incorrect youths in the reports.  The staff reported that they followed the facility AWOL protocol when the youth went AWOL. The staff indicated that according to the policy the staff cannot physically restrain the youths, and that they can only attempt to verbally de-escalate the youths and try to convince them not to go AWOL. If the residents do leave the facility, staff are expected to file an AWOL incident report and contact Police to complete a police AWOL report. Forensic interviews were completed with the youths that had been AWOL. The youths stated

that they left in several groups and met at an abandoned home. The youths verified that the staff did try to talk to them about not going AWOL. The facility is not a locked down facility which allows the youth to walk out of the facility at any time. One of the youths had the gate access code and provided it to the other youths which allowed them to return and enter the facility.  CHILD did sustain a burn to her arm when a bottle of hand sanitizer was used as a fire accelerant when the youths built a fire in one of the abandoned homes. Once CHILD returned to the facility the burn was medically assessed and treated as needed.  CHILD disclosed being sexually assaulted by CHILD while at the abandoned home. The sexual assault allegations were referred to law enforcement.  CHILD disclosed that she had intercourse with CHILD while AWOL. CHILD claimed the sexual intercourse with CHILD was consensual, however CHILD is not of age to grant consent. The allegations regarding CHILD were also referred to law enforcement.  STAFF had provided the AWOL youths with money and food while they were staying in the abandoned home.   Follow up interviews were conducted with CHILD, CHILD, CHILD, CHILD, CHILD and CHILD who each stated that STAFF had come to the abandoned home and provided the youths with money.  STAFF had also picked up CHILD and left with CHILD in his vehicle. CHILD and CHILD disclosed seeing CHILD in the vehicle with  STAFF.  CHILD disclosed leaving the abandoned home with  STAFF in  STAFF's vehicle. CHILD stated that they drove around for a while then  STAFF dropped her back off at the abandoned home. CHILD did not disclose any inappropriate touching during the car ride with  STAFF but did disclose that  STAFF had previously smacked her on the butt while she was placed. The female youths: CHILD; CHILD; CHILD and CHILD each disclosed a pattern of concerning behavior by STAFF. The youths stated that  STAFF would make inappropriate comments; had taken pictures and videos of the female residents; had been observed in a resident's bedroom with the resident during the night with the lights off; and had asked the youths for their social media information. The female youths stated that  STAFF told them to contact him when they got out and he would take them shopping.  There is serious concern regarding  STAFF being inappropriate with the AWOL youths, especially with CHILD.  STAFF provided the AWOLs youths with money and took CHILD from the abandoned home in his vehicle.  STAFF had a responsibility to return the youths if possible and alert authorities regarding the youth's whereabouts. Providing the youths with money and food only perpetuated the AWOL status.

## Implications and Thoughts for the Future

- There are limitations to the analysis of administrative data to help "predict" which children will experience MIC.  The analysis of administrative data is essential but given the infrequency of these events, the Data Lab advises complementary methods.
- Disposition summaries offer additional details that complement administrative records
- Disposition summaries offer opportunities to identify themes associated with risk.
- Congregate care placements, in this report and in previous reports are overrepresented in MIC events
- In the most recent analyses, although only 7% of children ever experience a congregate care placement, approximately 18% of MIC events are associated with congregate care settings (specifically child caring institutions).
- There currently exists a shortage of qualified staff working for Michigan's residential providers.  If children are going to live in these settings, it is critical that MDHHS help providers increase the recruitment and retention of qualified childcare professionals.  There is no gray area when reviewing the decision making of staff exhibited in the noted MIC events.  The lack of clinical judgement and maturity displayed by these professionals is unequivocal.
- The education and training levels are not the only staffing issue.  Several disposition summaries noted facilities experiencing an overall shortage of staff.  Higher child to staff ratios and staff working additional shifts increases risk opportunities.
- MDHHS might work with residential providers to better understand the current staff crisis and the implications for child safety.
- The lack of clarity or formal policies on attempted AWOLs and successful AWOLs is problematic.  There needs to be a clear and consistent policy shared across all congregate care providers.
- MDHHS policy clearly spells out restraint practices for child-care providers[5].  MDHHS policy notes "*restraints may only be used after less restrictive techniques have been exhausted and the restraint is still necessary to prevent serious injury to the child, self-injury, injury to others, or as a precaution against escape where the child may be at risk of injury to self or others*".  It is clear from the disposition summaries that facility staff were either unaware of, or chose to ignore this policy.  Either way, the initiation and execution of restraints in the child caring institutions are problematic and significantly increases the risk of injury to children under their supervision.
- MDHHS should seriously consider writing a report focused specifically on the relationship between CCI facility and staff characteristics that increase the risk of MIC.  Facilities should

---

[5] https://dhhs.michigan.gov/OLMWEB/EX/FO/Public/FOM/722-02B.pdf

share their detailed census of incident reports.  As part of the MDHHS policy, facilities are *required* to document the reason for the restraint, type of restraint, name and roles of staff involved, description of less restrictive interventions used prior to the restraint, demographics of the child and the details of the required debriefing subsequent to the restraint.  MDHHS should use these data to understand how the risk of harm varies across individual facilities and to help reduce the future likelihood of MIC.

- In addition to understanding staffing patterns, staff qualifications and policies associated with child safety in residential facilities, MDHHS should also dedicate analytic time to understanding how best to limit the number of children placed in such settings.

- There is a general understanding and agreement that the child welfare system requires a certain number of residential beds.  Yet the exact number remains unknown.  There is some evidence that placement practices (e.g. the use of kinship care) significantly reduces the probability of congregate care.  MDHHS might build on this knowledge base by identifying specific policies and practices that successfully (in terms of safety and permanency) limit the use of residential care and thus decrease the risk of MIC.

**Appendix D. MISEP Performance, Summary of Commitments**

| | Commitment | Standard | MISEP 17 | MISEP 18 | MISEP 19 | MISEP 20 | MISEP 21 | MISEP 22 |
|---|---|---|---|---|---|---|---|---|
| | **Met the performance standard in all eligible periods** | | | | | | | |
| 5.2 | **CPS Investigations, Commencement:** DHHS shall commence all investigations of report of child abuse or neglect within the timeframes required by state law. The designated performance standard is 95%. | 95% | Yes, 96.8% | Yes, 97.9% | Yes, 97.7% | Yes, 98.3% | Yes, 98.2% | Yes, 98.1% |
| 5.5 | **Caseload, POS Workers:** 95% of POS workers shall have a caseload of no more than 90 children. | 95% | Yes, 95.6% | Yes, 97.8% | Yes, 98.6% | Yes, 99.4% | Yes, 97.8% | Yes, 99.1% |
| 5.7 | **Seclusion/Isolation:** DHHS shall require CCIs to report to DCWL all uses of seclusion or isolation. If not reported, DCWL shall take appropriate action to address the failure of the provider to report the incident and to assure that the underlying incident has been investigated and resolved. | N/A | Yes | Yes | Yes | Yes | Yes | Yes |
| 6.2 | **MIC Data Report:** Until Commitment 6.1 is achieved, DHHS, in partnership with an independent entity, will generate, at least annually, a report that analyzes maltreatment in care data to assess risk factors and/or complete root-cause analysis of maltreatment in care. The report will be used to inform DHHS practice. The first report will be issued no later than June 1, 2020. | N/A | N/A | Yes | N/A | Yes | N/A | Yes |
| 6.7 | **Maximum Children in a Foster Home:** No child shall be placed in a foster home if that placement will result in: (1) more than three foster children in that foster home, (2) a total of six children, including the foster family's birth and adopted children, or (3) more than three children under the age of three residing in that foster home. The designated performance standard is 90%. | 90% | Yes, 90.1% Eligible to be moved to "To be Maintained." | Yes, 91.9% | Yes, 90.0% | Yes, 92.5% | Yes, 90.7% | Yes, 90.2% |

| | Commitment | Standard | MISEP 17 | MISEP 18 | MISEP 19 | MISEP 20 | MISEP 21 | MISEP 22 |
|---|---|---|---|---|---|---|---|---|
| 6.12 (b) | **CPS Investigations, Screening:** DHHS will maintain a Placement Collaboration Unit (PCU) to review and assess screening decisions on plaintiff-class children who are in out-of-home placements and to ensure safety and well-being is addressed on those transferred complaints. The PCU will review 100% of cases until reconsideration for complaints involving plaintiff class children placed out of home are less than 5%. | 95% | Yes, 98.5% Eligible to be moved to "To be Maintained." | Yes, 95.4% Eligible to be moved to "Structures and Policies." | N/A | N/A | N/A | N/A |
| 6.21 (b) | **Visits, Worker-Child:** Each child in foster care shall be visited by a caseworker at least once per month. The designated performance standard is 95%. | 95% | Yes, 97.6% | N/A – COVID-Impacted, 97.9% (Jan-Feb) 97.1% (March – June) | N/A – COVID-Impacted, 97.1% | Yes, 97.1% Eligible to be moved to "To be Maintained." | Yes, 96.1% | Yes, 96.4% |
| 6.36 (a) | **Support for Transitioning to Adulthood, YAVFC:** DHHS will continue to implement policies and provide services to support youth transitioning to adulthood, including ensuring youth have been informed of services available through the Youth Adult Voluntary Foster Care (YAVFC) program. Performance for this commitment will be measured through an increase in the rate of foster youth aging out of the system participating in the YAVFC program for a minimum of two periods. | Positive trending | 41.1%[20] Baseline | N/A – COVID-Impacted, 40.3%20 | N/A – COVID-Impacted, 46.7%20 | Yes, 47.1%20 Eligible to be moved to "To be Maintained." | Yes, 48.8% Eligible to be moved to "Structures and Policies." | N/A |

---

[20] Performance was revised slightly upward for Periods 17 through 20 due to a data error identified in MISEP 21.

| | Commitment | Standard | MISEP 17 | MISEP 18 | MISEP 19 | MISEP 20 | MISEP 21 | MISEP 22 |
|---|---|---|---|---|---|---|---|---|
| 6.36 (b) | **Support for Transitioning to Adulthood, YAVFC:** DHHS will continue to implement policies and provide services to support youth transitioning to adulthood, including ensuring youth have been informed of the availability of Medicaid coverage. Performance for this commitment will be measured through an increase in the rate of foster youth aging out of the system who have access to Medicaid. The designated performance standard for this commitment is 95%. | 95% | Yes, 98.6% Eligible to be moved to "To be Maintained." | Yes, 99.6% Eligible to be moved to "Structures and Policies." | N/A | N/A | N/A | N/A |
| | **Met the performance standard in at least one eligible period** | | | | | | | |
| 5.3 | **Caseload, CPS Investigation Workers:** 95% of CPS caseworkers assigned to investigate allegations of abuse or neglect, including maltreatment in care, shall have a caseload of no more than 12 open investigations. | 95% | No, 94.4% | Yes, 99.8% | Yes, 100% | Yes, 99.7% | Yes, 99.5% | Yes, 97.8% |
| 5.4 | **Caseload, CPS Ongoing Workers:** 95% of CPS caseworkers assigned to provide ongoing services shall have a caseload of no more than 17 families. | 95% | No, 93.4% | Yes, 99.8% | Yes, 99.8% | Yes, 99.5% | Yes, 99.4% | Yes, 98.1% |
| 5.6 | **Caseload, Licensing Workers:** 95% of licensing workers shall have a workload of no more than 30 licensed foster homes or homes pending licensure. | 95% | No, 94.1% | Yes, 95.0% | No, 93.6% | Yes, 95.8% | Yes, 96.5% | Yes, 97.5% |

| | Commitment | Standard | MISEP 17 | MISEP 18 | MISEP 19 | MISEP 20 | MISEP 21 | MISEP 22 |
|---|---|---|---|---|---|---|---|---|
| 6.4 | **Foster Home Array:** DHHS will maintain a sufficient number and array of homes capable of serving the needs of the foster care population, including a sufficient number of available licensed placement within the child's home community for adolescents, sibling groups, and children with disabilities. DHHS will develop for each county and statewide an annual recruitment and retention plan, in consultation with the Monitors and experts in the field, and subject to approval by the Monitors. DHHS will implement the plan, with interim timelines, benchmarks, and final targets, to be measured by the Monitors based on DHHS's good-faith efforts to meet the final targets set forth in the plan. | N/A | Yes | N/A – COVID-Impacted | N/A – COVID-Impacted | Will be included in the MISEP 21 Report | No | Will be reported on at conclusion of fiscal year |
| 6.11 | **CPS Investigations, Completion:** DHHS shall complete all investigations of reports of child abuse or neglect within the required timeframes. The designated performance standard is 90%. | 90% | No, 83.4% | Yes, 95.1% Eligible to be moved to "To be Maintained." | Yes, 96.9% | Yes, 97.1% | Yes, 95.9% | Yes, 96.5% |
| 6.12 (a) | **CPS Investigations, Screening:** DHHS shall investigate all allegations of abuse or neglect relating to any child in the foster care custody of DHHS. DHHS shall ensure that allegations of maltreatment in care are not inappropriately screened out for investigation. The Monitors will conduct an independent qualitative review to determine compliance with this commitment. The designated performance standard is 95%. | 95% | No, 92.4% | No, 90.9% | No, 87.9% | Yes, 95.5% Eligible to be moved to "To be Maintained." | No, 86.4% | No, 87.7% |
| 6.14 | **Caseload, Foster Care Workers:** 95% of foster care workers shall have a caseload of no more than 15 children. | 95% | No, 90.3% | Yes, 95.0% Eligible to be moved to "To be Maintained." | No, 94.4% | No, 93.1% | No, 91.8% | No, 93.1% |

| | Commitment | Standard | MISEP 17 | MISEP 18 | MISEP 19 | MISEP 20 | MISEP 21 | MISEP 22 |
|---|---|---|---|---|---|---|---|---|
| 6.16 | **Supervisory Oversight:** Supervisors shall meet at least monthly with each assigned worker to review the status and progress of each case on the worker's caseload. Supervisors shall review and approve each service plan. The plan can be approved only after the supervisor has a face-to-face meeting with the worker, which can be the monthly meeting. The designated performance standard is 95%. Eligible to be moved to "To be maintained". | 95% | Yes, 95.0% Eligible to be moved to "To be Maintained." | N/A – COVID-Impacted, 93.3% (Initial, Jan-Feb), 97.3% (Initial, March-June), 92.1% (Monthly, Jan-Feb), 95.4% (Monthly, March-June) | N/A – COVID-Impacted, 86.3% (Initial), 94.4% (Monthly) | No, 90.6% (Initial), 93.6% (Monthly) | No, 87.4% (Initial), 93.0% (Monthly) | No, 90.9% (Initial), Yes, 96.7% (Monthly) |
| 6.21 (a) | **Visits, Worker-Child:** Each child in foster care shall be visited by a caseworker at their placement location at least once per month during the child's first two months of placement in an initial or new placement. The designated performance standard is 95%. | 95% | Yes, 95.2% | N/A – COVID-Impacted, 82.5% (Jan-Feb) | N/A – COVID-Impacted, 91.5% | No, 93.7% | No, 94.7% | No, 94.4% |
| 6.21 (a) | **Visits, Worker-Child:** Each child in foster care shall have at least one visit per month that includes a private meeting between the child and caseworker during the child's first two months of placement in an initial or new placement. The designated performance standard is 95%. | 95% | Yes, 95.3% | N/A – COVID-Impacted, 82.7% (Jan-Feb) | N/A – COVID-Impacted, 89.0% | No, 92.6% | No, 94.2% | No, 94.6% |
| 6.21 (b) | **Visits, Worker-Child:** Each child in foster care shall be visited by a caseworker at their placement location at least once per month. The designated performance standard is 95%. | 95% | Yes, 95.5% | N/A – COVID-Impacted, 96.4% (Jan-Feb) | N/A – COVID-Impacted, 91.7% | No, 92.9% | Yes, 95.0% Eligible to be moved to "To be Maintained." | Yes, 95.5% |
| 6.21 (b) | **Visits, Worker-Child:** Each child in foster care shall have at least one visit per month that includes a private meeting between the child and caseworker. The designated performance standard is 95%. | 95% | Yes, 96.5% | N/A – COVID-Impacted, 95.4% (Jan-Feb) | N/A – COVID-Impacted, 88.7% | No, 91.0% | No, 93.6% | No, 94.9% |
| 6.22 (a) | **Visits, Worker-Parent:** Caseworkers shall visit parents of children with a goal of reunification at least twice during the first month of placement, unless specified exceptions apply. The designated performance standard is 85%. | 85% | No, 73.6% | N/A – COVID-Impacted, 71.7% (Jan-Feb), 83.2% (March-June) | N/A – COVID-Impacted, 85.2% | Yes, 85.2% Eligible to be moved to "To be Maintained." | No, 59.1% | No, 59.5% |

78

| | Commitment | Standard | MISEP 17 | MISEP 18 | MISEP 19 | MISEP 20 | MISEP 21 | MISEP 22 |
|---|---|---|---|---|---|---|---|---|
| 6.30 | **Child Case File, Medical and Psychological:** DHHS shall ensure that: (1) The child's health records are up to date and included in the case file. Health records include the names and addresses of the child's health care providers, a record of the child's immunizations, the child's known medical problems, the child's medications, and any other relevant health information. | 95% | No, 75.0% | No, 90.6% | No, 85.7% | No, 94.3% | Yes, 95.0% Eligible to be moved to "To be Maintained." | No, 86.4% |
| 6.30 | **Child Case File, Medical and Psychological:** DHHS shall ensure that: (2) the case plan addresses the issue of health and dental care needs. | 95% | No, 62.5% | No, 93.8% | No, 91.8% | No, 91.4% | Yes, 95.0% Eligible to be moved to "To be Maintained." | No, 86.4% |
| 6.35 | **Generation of Data:** DHHS shall generate from its Child Welfare Information System accurate and timely reports and information regarding the requirements and outcome measures set forth in this Agreement. | N/A | No | Yes Eligible to be moved to "To be Maintained." | Yes Eligible to be moved to "Structures and Policies." | N/A | N/A | N/A |
| 6.37 | **Support for Transitioning to Adulthood, Permanency:** DHHS will continue to implement policies and provider services to support the rate of older youth achieving permanency. | Positive trending | 55.1% Baseline | N/A – COVID-Impacted, 50.5% | N/A – COVID-Impacted, 51.4% | Yes, 51.9% Eligible to be moved to "To be Maintained." | No, 46.2% | No, 44.1% |
| | **Within 10 percent of the performance standard in at least one period** | | | | | | | |
| 6.5 | **Placement Standard:** Children in the foster care custody of DHHS shall be placed only in a licensed foster home, a licensed facility, pursuant to an order of the court, or an unlicensed relative. | 100% | No, 95.6% | No, 95.4% | No, 98.7% | No, 98.6% | No, 98.8% | No, 98.0% |
| 6.6 (a) | **Separation of Siblings:** Siblings who enter placement at or near the same time shall be placed together unless specified exceptions are met. The designated performance standard is 90%. | 90% | No, 68.1% | No, 72.4% | No, 73.4% | No, 71.2% | No, 77.6% | No, 80.2% |

| | Commitment | Standard | MISEP 17 | MISEP 18 | MISEP 19 | MISEP 20 | MISEP 21 | MISEP 22 |
|---|---|---|---|---|---|---|---|---|
| 6.12 (a) | **CPS Investigations, Screening:** When DHHS transfers a referral to another agency for investigation, DHHS will independently take appropriate action to ensure the safety and well-being of the child. The Monitors will conduct an independent qualitative review to determine compliance with this commitment. The designated performance standard is 95%. | 95% | No, 78.7% | No, 82.3% | No, 85.5% | No, 87.1% | No, 88.7% | No, 85.5% |
| 6.13 | **Caseload, Supervisors:** 95% of foster care, adoption, CPS, POS, and licensing supervisors shall be responsible for the supervision of no more than five caseworkers. | 95% | No, 84.3% | No, 86.9% | No, 88.2% | No, 88.9% | No, 88.8% | No, 90.1% |
| 6.17 | **Assessments and Service Plans, Timeliness of Initial Plan:** DHHS shall complete an Initial Service Plan (ISP), consisting of a written assessment of the child(ren)'s and family's strengths and needs and designed to inform decision-making about services and permanency planning, within 30 days after a child's entry into foster care. The designated performance standard is 95%. | 95% | No, 82.5% | No, 86.9% | No, 83.0% | No, 86.2% | No, 87.8% | No, 87.8% |
| 6.18 | **Assessments and Service Plans, Timeliness of Updated Plan:** For every child in foster care, DHHS shall complete an Updated Service Plan (USP) at least quarterly. The designated performance standard is 95%. | 95% | No, 86.6% | No, 90.0% | No, 88.0% | No, 89.5% | No, 87.8% | No, 90.8% |
| 6.19 | **Assessment and Service Plans, Content:** Assessments and service plans shall be of sufficient breadth and quality to usefully inform case planning and shall accord with the requirements of 42 U.S.C. 675(1). To be measured through a QSR. The designated performance standard is 90%. | 83%[21] | No, 66.7% | No, 73.5% | No, 57.6% | No, 73.2% | No, 79.7% | No, 69.5% |

[21] On September 6, 2022 a Stipulated Order was issued which amends that the Designated Performance Standard for 6.19 from 90 percent to 83 percent and the Floor Performance Standard from 85 percent to 80 percent. These amended performance standards are retroactive to June 27, 2019, the day the MISEP was filed.

| | Commitment | Standard | MISEP 17 | MISEP 18 | MISEP 19 | MISEP 20 | MISEP 21 | MISEP 22 |
|---|---|---|---|---|---|---|---|---|
| 6.21 (a) | **Visits, Worker-Child:** Each child in foster care shall be visited by a caseworker at least twice per month during the child's first two months of placement in an initial or new placement. The designated performance standard is 95%. | 95% | No, 91.4% | N/A – COVID-Impacted, 90.4% (Jan-Feb), 89.5% (March-June) | N/A – COVID-Impacted, 89.3% | No, 90.7% | No, 89.2% | No, 89.1% |
| 6.25 | **Medical and Mental Health Examinations:** At least 85% of children shall have an initial medical and mental health examination within 30 days of the child's entry into foster care. | 85% | No, 83.9% | N/A – COVID-Impacted, 69.8% | N/A – COVID-Impacted, 69.8% | N/A – COVID-Impacted, 78.0% | No, 72.9% | No, 72.9% |
| 6.25 | **Medical and Mental Health Examinations:** At least 95% of children shall have an initial medical and mental health examination within 45 days of the child's entry into foster care. | 95% | No, 89.3% | N/A – COVID-Impacted, 76.6% | N/A – COVID-Impacted, 77.9% | N/A – COVID-Impacted, 85.6% | No, 82.1% | No, 81.4% |
| 6.27 | **Immunizations, in Custody 3 Months or Less:** For children in DHHS custody 3 months or less at the time of measurement: DHHS shall ensure that 90% of children in this category receive any necessary immunizations according to the guidelines set forth by the American Academy of Pediatrics within three months of entry into care. | 90% | N/A | N/A – COVID-Impacted and subject to separate March 12, 2021 order | N/A – COVID-Impacted, ranges from 61.2% to 94% | N/A – COVID-Impacted, ranges from 17.9% to 95.8% | No, Ranges from 82.1% - 94.7%[22] | No, Ranges from 76.7% - 94.2%[22] |
| 6.28 | **Immunizations, in Custody Longer Than 3 Months:** For children in DHHS custody longer than three months at the time of measurement: DHHS shall ensure that 90% of children in this category receive all required immunizations according to the guidelines set forth by the American Academy of Pediatrics. | 90% | N/A | N/A – COVID-Impacted and subject to separate March 12, 2021 order | N/A – COVID-Impacted, ranges from 18.2% to 97.2% | N/A – COVID-Impacted, ranges from 84.6% to 96.1% | No, Ranges from 73.9% - 96.2%[23] | No, Ranges from 75.9% - 96.3%[23] |
| 6.30 | **Child Case File, Medical and Psychological:** DHHS shall ensure that: (3) foster parents and foster care providers are provided with the child's health care records. | 95% | No, 59.4% | No, 93.8% | No, 91.8% | No, 88.6% | No, 90.0% | No, 86.4% |

---

[22] Performance for this commitment is measured separately for each required immunization, of which there are 11.

[23] Performance for this commitment is measured separately for each required immunization, of which there are 11.

| | Commitment | Standard | MISEP 17 | MISEP 18 | MISEP 19 | MISEP 20 | MISEP 21 | MISEP 22 |
|---|---|---|---|---|---|---|---|---|
| 6.31 | **Medical Care and Coverage, at Entry:** DHHS shall ensure that at least 95% of children have access to medical coverage within 30 days of entry into foster care by providing the placement provider with a Medicaid card or an alternative verification of the child's Medicaid status and Medicaid number as soon as it is available. | 95% | No, 88.9% | No, 89.5% | No, 87.7% | No, 90.5% | No, 88.3% | No, 88.0% |
| | **Performance is consistently more than 10 percentage points below the standard** | | | | | | | |
| 6.3 | **Permanency Indicator 1:** DHHS shall achieve an observed performance of at least the national standard (40.5%) on CFSR Round Three Permanency Indicator One (Of all children entering foster care in a 12-month period, what percent discharged to permanency within 12 months of entering foster care?) | ≥ 40.5% | No, 26.6% | No, 27.3% | No, 27.4% | No, 28.6% | No, 27.4% | No, 22.9% |
| 6.6 (b) | **Separation of Siblings:** If a sibling group is separated at any time, except for the above reasons, the case manager shall make immediate efforts to locate or recruit a family in whose home the siblings can be reunited. These efforts shall be documented and maintained in the case file and shall be reassessed on a quarterly basis. The Monitors will conduct an independent qualitative review to determine compliance with this commitment. The designated performance standard is 90%. | 90% | No, 61.2% | No, 36.8% | No, 29.8% | No, 38.1% | No, 50.0% | No, 72.7% |
| 6.15 | **Caseload, Adoption Workers:** 95% of adoption caseworkers shall have a caseload of no more than 15 children. | 95% | No, 66.7% | No, 78.2% | No, 81.5% | No, 76.2% | No, 74.1% | No, 75.0% |

82

| | Commitment | Standard | MISEP 17 | MISEP 18 | MISEP 19 | MISEP 20 | MISEP 21 | MISEP 22 |
|---|---|---|---|---|---|---|---|---|
| 6.20 | **Provision of Services:** DHHS shall ensure that the services identified in the service plan are made available in a timely and appropriate manner to the child and family and shall monitor the provision of services to determine whether they are of appropriate quality and are having the intended effect. To be measured through a QSR. The designated performance standard is 83%. | 83% | No, 69.3% | No, 71.6% | No, 51.7% | No, 70.0% | No. 68.5% | No, 62.2% |
| 6.22 (b) | **Visits, Worker-Parent:** Caseworkers shall visit parents of children with a goal of reunification at least once a month, following the child's first month of placement, unless specified exceptions apply. The designated performance standard is 85%. | 85% | No, 69.4% | N/A – COVID-Impacted, 69.6% (Jan-Feb), 71.7% (March-June) | N/A – COVID-Impacted, 74.1% | No, 73.6% | No, 60.4% | No, 64.6% |
| 6.24 | **Visits, Between Siblings:** DHHS shall ensure that children in foster care who have siblings in custody with whom they are not placed shall have at least monthly visits with their siblings who are placed elsewhere in DHHS foster care custody, unless specified exceptions apply. The designated performance standard is 85%. | 85% | No, 72.9% | N/A – COVID-Impacted, 69.5% (Jan-Feb), 56.8% (March-June) | N/A – COVID-Impacted, 69.2% | No, 73.7% | No, 67.6% | No, 70.1% |
| 6.26 | **Dental Examinations:** At least 90% of children shall have an initial dental examination within 90 days of the child's entry into care unless the child has had an exam within six months prior to placement or the child is less than four years of age. | 90% | No, 77.3% | N/A – COVID-Impacted, 36.4% | N/A – COVID-Impacted, 56.7% | N/A – COVID-Impacted, 66.4% | No, 62.8% | No, 62.6% |
| 6.32 | **Medical Care and Coverage, Subsequent Placement:** DHHS shall ensure that at least 95% of children have access to medical coverage within 24 hours or the next business day following subsequent placement by providing the placement provider a Medicaid card or an alternative verification of the child's Medicaid status and Medicaid number as soon as it is available. | 95% | No, 82.8% | No, 82.1% | No, 78.5% | No, 79.3% | No, 80.6% | No, 80.1% |

| | Commitment | Standard | MISEP 17 | MISEP 18 | MISEP 19 | MISEP 20 | MISEP 21 | MISEP 22 |
|---|---|---|---|---|---|---|---|---|
| | **Performance is consistently more than 20 percentage points below the standard** | | | | | | | |
| 6.8 | **Emergency or Temporary Facilities, Length of Stay:** Children shall not remain in emergency or temporary facilities, including but not limited to shelter care, for a period in excess of 30 days, unless specified exceptions apply. No child shall remain in a shelter in excess of 60 days. The designated performance standard is 95%. | 95% | No, 67.9% | No, 64.2% | No, 62.9% | No, 68.7% | No, 55.9% | No, 47.3% |
| 6.10 (a) | **Relative Foster Parents:** When placing a child with a relative who has not been previously licensed as a foster parent, DHHS shall visit the relative's home to determine if it is safe prior to placement; check law enforcement and central registry records for all adults residing in the home within 72 hours following placement; and complete a home study within 30 days. The designated performance standard is 95%. | 95% | No, 53.0% | No, 73.8% | No, 41.5% | No, 43.1% | No, 70.8% | No, 65.6% |
| 6.23 | **Visits, Parent-Child:** DHHS shall ensure that children in foster care with a goal of reunification shall have at least twice-monthly visitation with their parents, unless specified exceptions apply. The designated performance standard is 85%. | 85% | No, 62.5% | N/A – COVID-Impacted, 64.7% (Jan-Feb), 59.4% (March-June) | N/A – COVID-Impacted, 62.0% | No, 59.1% | No, 57.8% | No, 62.6% |
| 6.29 | **Examinations and Screenings:** Following an initial medical, dental, or mental health examination, at least 95% of children shall receive periodic and ongoing medical, dental, and mental health care examinations and screenings, according to the guidelines set forth by the American Academy of Pediatrics. | 95% | No, 69.7%, 87.7%, 92.1% | N/A – COVID-Impacted, 58.3%, 75.6%, 38.6% | N/A – COVID-Impacted, 61.8%, 81.7%, 70.5% | N/A – COVID-Impacted, 68.7%, 85.0%, 74.5% | No, 66.5%, 83.0%, 71.0% | No, 66.5%, 84.5%, 73.7% |
| 6.33 | **Psychotropic Medication, Informed Consent:** DHHS shall ensure that informed consent is obtained and documented in writing in connection with each psychotropic medication prescribed to each child in DHHS custody. The designated performance standard is 97%. | 97% | No, 75.9% | No, 74.4% | No, 76.1% | No, 71.8% | No, 72.5% | No, 72.2% |

| | Commitment | Standard | MISEP 17 | MISEP 18 | MISEP 19 | MISEP 20 | MISEP 21 | MISEP 22 |
|---|---|---|---|---|---|---|---|---|
| | Performance is consistently more than 30 percentage points below the standard | | | | | | | |
| 6.22 (a) | **Visits, Worker-Parent:** Caseworkers shall visit parents of children with a goal of reunification at least once in the parent's home during the first month of placement, unless specified exceptions apply. The designated performance standard is 85%. | 85% | No, 47.9% | N/A – COVID-Impacted, 53.4% | N/A – COVID-Impacted, 45.6% | No, 52.4% | No, 50.0% | No, 51.3% |
| | Performance is consistently more than 40 percentage points below the standard | | | | | | | |
| 6.10 (b) | **Relative Foster Parents:** When placing a child with a relative who has not been previously licensed as a foster parent, a home study will be renewed every 12 months for the duration of the child's placement with the relative. The designated performance standard is 95%. | 95% | No, 9.7% | No, 36.5% | No, 14.1% | No, 37.9% | No, 42.4% | No, 51.5% |
| | Performance is consistently more than 50 percentage points below the standard | | | | | | | |
| 6.9 | **Emergency or Temporary Facilities, Repeated Placement:** Children shall not be placed in an emergency or temporary facility, including but not limited to shelter care, more than one time within a 12-month period, unless specified exceptions apply. Children under 15 years of age experiencing a subsequent emergency or temporary-facility placement within a 12-month period may not remain in an emergency or temporary facility for more than 7 days. Children 15 years of age or older experiencing a subsequent emergency or temporary-facility placement within a 12-month period may not remain in an emergency or temporary facility for more than 30 days. | 95% | No, 6.3% | No, 12.5% | No, 2.9% | No, 18.2% | No, 4.5% | No, 0.0% |

85

| | Commitment | Standard | MISEP 17 | MISEP 18 | MISEP 19 | MISEP 20 | MISEP 21 | MISEP 22 |
|---|---|---|---|---|---|---|---|---|
| 6.34 | **Psychotropic Medication, Documentation:** DHHS shall ensure that: (1) A child is seen regularly by a physician to monitor the effectiveness of the medication, assess any side effects and/or health implications, consider any changes needed to dosage or medication type and determine whether medication is still necessary and/or whether other treatment options would be more appropriate; (2) DHHS shall regularly follow up with foster parents/caregivers about administering medications appropriately and about the child's experience with the medication(s), including any side effects; (3) DHHS shall follow any additional state protocols that may be in place related to the appropriate use and monitoring of medications. | 95% | No, 33.8% | No, 26.9% | No, 34.8% | No, 27.3% | No, 36.4% | No, 31.8% |
| | **Performance has never been achieved, no performance standard** | | | | | | | |
| 5.1 | **Contract-Agency Evaluation:** DHHS shall conduct contract evaluations of all CCIs and private CPAs providing placements and services to Plaintiffs to ensure, among other things, the safety and well-being of Plaintiffs and to ensure that the CCI or private CPA is complying with the applicable terms of this Agreement. | N/A | No | No | No | No | No | No |
| | **Not applicable or unable to verify in all periods** | | | | | | | |
| 6.1 | **Safety – Maltreatment in Foster Care:** DHHS shall ensure that of all children in foster care during the applicable federal reporting period, DHHS will maintain an observed rate of victimization per 100,000 days in foster care less than 9.67, utilizing the CFSR Round 3 criteria. | ≤ 9.67 | Unable to verify | N/A | Unable to verify | N/A | Unable to verify | Unable to verify |