# Progress of the Michigan Department of Human Services

Monitoring Report for *Dwayne B. v. Whitmer*
MODIFIED IMPLEMENTATION, SUSTAINABILITY, AND EXIT PLAN

**MISEP 24**
JANUARY TO JUNE 2023

**ISSUED July 2, 2024**



PUBLIC CATALYST

# CONTENTS

Introduction .................................................................................................................. 3

    Summary of Progress and Challenges ................................................................. 4

    Summary of Commitments .................................................................................. 7

    Methodology ..................................................................................................... 12

    Demographics ................................................................................................... 12

Organizational Capacity ............................................................................................ 16

    Caseloads and Supervision ............................................................................... 16

Accountability .......................................................................................................... 17

    Outcomes ......................................................................................................... 17

    Contract Oversight ........................................................................................... 19

    Quality Service Reviews .................................................................................... 30

Permanency ............................................................................................................. 31

    Developing Placement Resources for Children .................................................. 31

    Placement Standards ........................................................................................ 35

    Caseworker Visitation ....................................................................................... 37

Child Well-Being ....................................................................................................... 38

    Health and Mental Health ................................................................................. 38

Youth Transitioning to Adulthood ............................................................................ 41

    Achieving Permanency ...................................................................................... 41

## FIGURES

Figure 1. Age of Children in Custody on June 30, 2023 ................................................................ 13

Figure 2. Placement Types of Children in Custody on June 30, 2023 ........................................ 15

Figure 3. Length of Stay of Children in Custody on June 30, 2023 ........................................... 15

## TABLES

Table 1. Race of Children in Custody on June 30, 2023 and Race of Children in the State of Michigan on July 1, 2021 ............................................................................................................... 14

Table 2. Exits from Care by Exit Type, January 1, 2023 to June 30, 2023 ................................. 16

Table 3. Federal Goals for Children in Custody as of June 30, 2023 ......................................... 16

Table 4. Annual Relative Home Studies Completed Late, MISEP 24 ....................................... 35

Table 5. Worker-Parent Visitation Performance, MISEP 24 ..................................................... 37

Table 6. Child Case File, Medical and Psychological Performance, MISEP 24 ......................... 40

## APPENDICES

Appendix A. Stipulated Order Amending the Modified Implementation, Sustainability and Exit Plan (MISEP) ................................................................................................................................ 43

Appendix B. Age Range of Children in Care on June 30, 2023 by County ................................ 49

Appendix C. Length of Stay of Children in Care on June 30, 2023 by County .......................... 51

Appendix D. MIC Data Report, October 2023 ......................................................................... 53

Appendix E. MISEP Performance, Summary of Commitments .................................................. 65

## Introduction

This document serves as the twentieth report to the Honorable Nancy G. Edmunds of the United States District Court for the Eastern District of Michigan in the matter of *Dwayne B. v. Whitmer*, covering Period 24 (January 1, 2023 to June 30, 2023) under the Modified Implementation, Sustainability and Exit Plan (MISEP). On June 27, 2019, the State of Michigan and the Michigan Department of Health and Human Services (DHHS) and Children's Rights, counsel for the plaintiffs, jointly submitted to the court the MISEP, which establishes a path for the improvement of Michigan's child welfare system. Judge Edmunds entered an order directing implementation of the MISEP following its submission by the parties.

Judge Edmunds had previously approved an Initial Agreement among the parties on October 24, 2008, a subsequent Modified Settlement Agreement on July 18, 2011, and an Implementation, Sustainability and Exit Plan (ISEP) on February 6, 2016. DHHS is a statewide multi-service agency providing cash assistance, food assistance, health services, child protection, prevention, and placement services on behalf of the State of Michigan. Children's Rights is a national advocacy organization with experience in class action reform litigation on behalf of children in child welfare systems.

In sum, the MISEP:

- Provides the plaintiff class relief by committing to specific improvements in DHHS' care for vulnerable children, with respect to their safety, permanency, and well-being;

- Requires the implementation of a comprehensive child welfare data and tracking system, with the goal of improving DHHS' ability to account for and manage its work with vulnerable children;

- Establishes benchmarks and performance standards that the State committed to meet to address risks of harm to children's safety, permanency, and well-being; and

- Provides a clear path for DHHS to exit court supervision after the successful achievement and maintenance of Performance Standards for each commitment agreed to by the parties in the MISEP.

The sections of the MISEP related to monitoring and reporting to the court remain largely unchanged from the parties' prior agreement, as do the sections regarding Enforcement, Dispute Resolution, and Attorneys' Fees.

Pursuant to the MISEP, the court appointed Kevin Ryan and Eileen Crummy of Public Catalyst to continue to serve as the court's Monitors, charged with reporting on DHHS' progress in meeting

its commitments. The Monitors and their team are responsible for assessing the state's performance under the MISEP. The parties have agreed that the Monitors shall take into account timeliness, appropriateness, and quality in reporting on DHHS' performance. Specifically, the MISEP provides that:

> "The Monitors' reports shall set forth the steps taken by DHHS, the reasonableness of these efforts, and the adequacy of support for the implementation of these steps; the quality of the work done by DHHS in carrying out those steps; and the extent to which that work is producing the intended effects and/or the likelihood that the work will produce the intended effects."

The parties jointly submitted a "Stipulated Order Amending the MISEP" to the court, which was approved by Judge Edmunds on January 25, 2024. The order recognizes Michigan's significant and sustained progress in numerous areas and continues to stress the obligation of the state to ensure child safety for plaintiff class children. Judge Edmunds has directed the Monitors to continue to closely scrutinize child safety through ongoing case reviews. The order reduces the number of commitments DHHS must meet under the MISEP, with 33 provisions exiting the agreement and another 11 provisions moving out of active monitoring to MISEP Section 4, Structures and Policies. Additionally, the order amends performance measures and standards for six commitments.[1]

This report to the Court reflects the efforts of the DHHS leadership team and the status of Michigan's reform efforts as of June 30, 2023. Defined as MISEP Period 24, this report includes progress for the first half of 2023 and covers the first period of DHHS' performance under the Stipulated Order Amending the MISEP. Additionally, it includes performance on the maltreatment in care (MIC) rate for federal fiscal year (FFY) 2023, which ran from October 1, 2022 to September 30, 2023.

## Summary of Progress and Challenges

Michigan DHHS met or exceeded required performance standards in six of 28 areas monitored for compliance in MISEP Period 24. Among areas where the agency achieved positive levels of performance are:

- *Support for Youth Transitioning to Adulthood, Permanency:* During MISEP 24, 46.8 percent of youth aged 15 and older who exited foster care were discharged with an exit type of reunification, adoption, or guardianship. This represents a 1.4 percent increase from DHHS's MISEP 23 performance. Per the Stipulated Order, positive trending during this period makes this commitment eligible for immediate exit from the MISEP.

---

[1] See Appendix A for a copy of the Stipulated Order Amending the MISEP.

- *Adoption Caseloads:* The parties agreed that adoption caseworkers shall have a caseload of no more than 15 children. Per the Stipulated Order, after two consecutive periods of positive trending this commitment will become eligible to move to Structures and Policies. DHHS achieved 88.1 percent in MISEP 24, representing a 2.6 percent increase from performance in MISEP 23 and the first period of positive trending.

- *Separation of Siblings:* The parties agreed that siblings who enter placement at or near the same time shall be placed together unless specified exceptions are met. Per the Stipulated Order, after two consecutive periods of positive trending this commitment will become eligible to move to Structures and Policies. DHHS achieved 80.8 percent in MISEP 24, representing a 2.4 percent increase from performance in MISEP 23 and the first period of positive trending.

Although Michigan DHHS did not meet required performance standards in 22 of 28 areas monitored for compliance in MISEP Period 24, in three of these 22 areas, DHHS' performance was within 10 percent of the performance standard. They are:

- *Assessments and Service Plans, Content:* DHHS agreed that assessments and service plans would be of sufficient breadth and quality to usefully inform case planning and in accordance with the requirements of 42 U.S.C. 675(1). The designated performance standard is 83 percent and performance is measured through a Quality Service Review (QSR). Of cases reviewed during MISEP 24, 82.1 percent were rated as having acceptable assessments and service plans.

- *Medical and Mental Health Exams:* The parties agreed that at least 85 percent of children shall have an initial medical and mental health exam within 30 days of the child's entry into foster care and that at least 95 percent of children shall have an initial medical and mental health exam within 45 days of the child's entry into foster care. DHHS achieved 80.9 percent for exams within 30 days and 87.1 percent for exams within 45 days.

- *Sibling Visitation:* The parties agreed that for children in foster care who have siblings in custody with whom they are not placed, DHHS shall ensure they have at least monthly visits with their siblings. The designated performance standard is 85 percent. DHHS achieved 78.2 percent.

The 28 areas monitored for compliance in MISEP Period 24 include 17 where Michigan DHHS did not meet required performance standards by more than 10 percentage points, including:

- *Psychotropic Medication:* The monitoring team reviewed a randomly selected and statistically significant sample of 66 children who were prescribed psychotropic medication during the period under review. The monitoring team found that the electronic case records for only 23 (34.8 percent) of the children included the required

documentation for each prescription including initial and ongoing medical monitoring. Additionally, DHHS data indicates that required informed consents were on file for 74.7 percent of psychotropic medications prescribed to children during the period. DHHS did not meet the designated performance standard of 97 percent for either commitment.

- *Worker-Parent and Parent-Child Visitation:* DHHS did not meet the designated performance standard of 85 percent for completion of worker-parent or parent-child visits due during the period. For worker-parent visitation, DHHS completed 64.4 percent of required visits during the first month of placement, 71.7 percent of required visits during subsequent months of placement, and 52.4 percent of required visits at the parents place of residence. For parent-child visitation, DHHS completed 66.0 percent of required visits.

Additionally, one area of the MISEP where the Monitors assessed that Michigan DHHS did not achieve performance, and which does not have a numerical performance standard is:

- *Contract Evaluations:* In MISEP 24, DHHS' contract evaluations of Child Caring Institutions (CCIs) and private Child Placing Agencies (CPAs) providing placements and services to Plaintiffs continued to be inconsistent, at times ineffective, and in numerous instances did not ensure the safety and well-being of Plaintiffs. The monitoring team reviewed all licensing investigations conducted at CCIs and private CPAs along with corresponding Corrective Action Plans (CAPs) intended to address established violations. The monitoring team found that CAP implementation was often delayed, ineffective, deficient, or non-existent; lacked specificity, clarity, and substance; and often did not remediate risk to children. Frequently repeat violations of a serious nature, such as physical force, improper restraints causing injuries, ineffective intervention for youth with suicidality, and improper supervision, often by the same staff persons, recurred despite the CAPs.

Finally, there was one area of the MISEP where the Monitors could not verify Michigan DHHS' reported performance:

- *Maltreatment in Foster Care:* For FFY 2023, DHHS provided data indicating the State substantiated 459 incidents of MIC, involving 437 children in DHHS custody, for an observed rate of 14.50 victimizations per 100,000 days in foster care. The Monitors reviewed a random sample of 120 MIC investigations from FFY 2023 and assessed that 38 (31.7 percent) of the 120 investigations reviewed were deficient. This includes 32 investigations where there was insufficient information gathered to render a finding and six investigations the Monitors determined met the criteria for substantiation. As a result, the Monitors cannot validate that the observed rate accurately represents the prevalence of child maltreatment in care.

6

## Summary of Commitments

| Section | Commitment | Performance | Achieved | Report Page |
|---------|-----------|-------------|----------|-------------|
| 5.1 | DHHS shall conduct contract evaluations of all CCIs and private CPAs providing placements and services to Plaintiffs to ensure, among other things, the safety and well-being of Plaintiffs and to ensure that the CCI or private CPA is complying with the applicable terms of this Agreement. | -- | No | 19 |
| 6.1 | DHHS shall ensure that of all children in foster care during the applicable federal reporting period, DHHS will maintain an observed rate of victimization per 100,000 days in foster care less than 9.07, utilizing the CFSR Round 4 criteria. | State reported 14.50 victimizations per 100,000 days in care | Unable to verify | 17 |
| 6.2 | Until Commitment 6.1 is achieved, DHHS, in partnership with an independent entity, will generate, at least annually, a report that analyzes maltreatment in care data to assess risk factors and/or complete root-cause analysis of maltreatment in care. The report will be used to inform DHHS practice. The first report will be issued no later than June 1, 2020. | -- | Yes | 18 |
| 6.3 | DHHS will develop strategy plans to be implemented in each of certain selected counties, covering at least 20% of the foster care population and at DHHS's choosing from within the Big 14 counties of the State, to improve the rate of permanency for children within their first 12 months in foster care. By Oct 1, 2025, DHHS will provide a Permanency Within 12 Months Report to the monitoring team. Based on this report, the monitoring team shall determine if DHHS made good faith efforts to improve the rate of permanency within 12 months in the selected counties. | -- | Not yet due | 18 |
| 6.4 | DHHS will maintain a sufficient number and array of homes capable of serving the needs of the foster care population, including a sufficient number of available licensed placements within the child's home community for adolescents, sibling groups, and children with disabilities. DHHS will develop for each county and statewide an annual recruitment and retention plan, in consultation with the Monitors and experts in the field, subject to approval by the Monitors. DHHS will implement the plan, with interim timelines, benchmarks, and final targets, to be measured by the Monitors based on DHHS's good-faith efforts to meet the final targets set forth in the plan. | -- | Not yet due | 31 |

| Section | Commitment | Performance | Achieved | Report Page |
|---------|-----------|-------------|----------|-------------|
| **6.6.a** | Siblings who enter placement at or near the same time shall be placed together unless specified exceptions are met. This provision shall become eligible to immediately exit the MISEP after two consecutive periods of positive trending in validated performance from the baseline measure reported in the Monitor's MISEP 23 report. | 80.8% | Yes | 35 |
| **6.6.b** | If a sibling group is separated at any time, except for the above reasons, the case manager shall make immediate efforts to locate or recruit a family in whose home the siblings can be reunited. These efforts shall be documented and maintained in the case file and shall be reassessed on a quarterly basis. The Monitors will conduct an independent qualitative review to determine compliance with this commitment. The designated performance standard is 90%. | 62.5% | No | 35 |
| **6.8** | Children shall not remain in emergency or temporary facilities, including but not limited to shelter care, for a period in excess of 30 days, unless specified exceptions apply. No child shall remain in a shelter in excess of 60 days. The designated performance standard is 95%. | 70.6% | No | 36 |
| **6.9** | Children shall not be placed in an emergency or temporary facility, including but not limited to shelter care, more than one time within a 12-month period, unless specified exceptions apply. Children under 15 years of age experiencing a subsequent emergency or temporary-facility placement within a 12-month period may not remain in an emergency or temporary facility for more than 7 days. Children 15 years of age or older experiencing a subsequent emergency or temporary-facility placement within a 12-month period may not remain in an emergency or temporary facility for more than 30 days. | 20.7% | No | 36 |
| **6.10.a** | When placing a child with a relative who has not been previously licensed as a foster parent, DHHS shall visit the relative's home to determine if it is safe prior to placement; check law enforcement and central registry records for all adults residing in the home within 72 hours following placement; and complete a home study within 30 days. The designated performance standard is 95%. | 71.9% | No | 33 |
| **6.10.b** | When placing a child with a relative who has not been previously licensed as a foster parent, a home study will be renewed every 12 months for the duration of the child's placement with the relative. The designated performance standard is 95%. | 62.5% | No | 34 |

| Section | Commitment | Performance | Achieved | Report Page |
|---------|-----------|-------------|----------|-------------|
| **6.15** | 95% of adoption caseworkers shall have a caseload of no more than 15 children. This provision shall become eligible to immediately move to Structures and Policies after two consecutive trending periods of positive trending in validated performance from the baseline measure reported in the Monitor's MISEP 23 report. | 88.1% | Yes | 17 |
| **6.19** | Assessments and service plans shall be of sufficient breadth and quality to usefully inform case planning and shall accord with the requirements of 42 U.S.C. 675(1). To be measured through a QSR. The designated performance standard is 83%. | 82.1% | No | 30 |
| **6.20** | DHHS shall ensure that the services identified in the service plan are made available in a timely and appropriate manner to the child and family and shall monitor the provision of services to determine whether they are of appropriate quality and are having the intended effect. To be measured through a QSR. The designated performance standard is 83%. | 60.7% | No | 30 |
| **6.22.a** | Caseworkers shall visit parents of children with a goal of reunification at least twice during the first month of placement unless specified exceptions apply. The designated performance standard is 85%. | 64.4% | No | 37 |
| **6.22.a** | Caseworkers shall visit parents of children with a goal of reunification at least once in the parent's home during the first month of placement unless specified exceptions apply. The designated performance standard is 85%. | 52.4% | No | 37 |
| **6.22.b** | Caseworkers shall visit parents of children with a goal of reunification at least once a month, following the child's first month of placement, unless specified exceptions apply. The designated performance standard is 85%. | 71.7% | No | 37 |
| **6.23** | DHHS shall ensure that children in foster care with a goal of reunification shall have at least twice-monthly visitation with their parents unless specified exceptions apply. The designated performance standard is 85%. | 66.0% | No | 38 |
| **6.24** | DHHS shall ensure that children in foster care who have siblings in custody with whom they are not placed shall have at least monthly visits with their siblings who are placed elsewhere in DHHS foster care custody unless specified exceptions apply. The designated performance standard is 85%. | 78.2% | No | 38 |
| **6.25** | At least 85% of children shall have an initial medical and mental health examination within 30 days of the child's entry into foster care. | 80.9% | No | 38 |
| **6.25** | At least 95% of children shall have an initial medical and mental health examination within 45 days of the child's entry into foster care. | 87.1% | No | 38 |

| Section | Commitment | Performance | Achieved | Report Page |
|---------|-----------|-------------|----------|-------------|
| 6.26 | At least 90% of children shall have an initial dental examination within 90 days of the child's entry into care unless the child has had an exam within six months prior to placement or the child is less than four years of age. | 72.4% | No | 39 |
| 6.29 | Following an initial medical, dental, or mental health examination, at least 95% of children shall receive periodic and ongoing medical, dental, and mental health care examinations and screenings, according to the guidelines set forth by the American Academy of Pediatrics. | 69.4%, 85.0%, 75.0% | No | 39 |
| 6.30 | DHHS shall ensure that: (1) The child's health records are up to date and included in the case file. Health records include the names and addresses of the child's health care providers, a record of the child's immunizations, the child's known medical problems, the child's medications, and any other relevant health information. The designated performance standard is 90%. | 71.8% | No | 39 |
| 6.30 | DHHS shall ensure that: (2) the case plan addresses the issue of health and dental care needs. The designated performance standard is 90%. | 93.8% | Yes | 39 |
| 6.30 | DHHS shall ensure that: (3) foster parents and foster care providers are provided with the child's health care records. The designated performance standard is 90%. | 100.0% | Yes | 39 |
| 6.32 | DHHS shall ensure that at least 95% of children have access to medical coverage within 24 hours or the next business day following subsequent placement by providing the placement provider a Medicaid card or an alternative verification of the child's Medicaid status and Medicaid number as soon as it is available. | 82.9% | No | 40 |
| 6.33 | DHHS shall ensure that informed consent is obtained and documented in writing in connection with each psychotropic medication prescribed to each child in DHHS custody. The designated performance standard is 97%. | 74.7% | No | 40 |
| 6.34 | DHHS shall ensure that: (1) A child is seen regularly by a physician to monitor the effectiveness of the medication, assess any side effects and/or health implications, consider changes needed to dosage or medication type and determine whether medication is still necessary and/or whether other treatment options would be more appropriate; (2) DHHS shall regularly follow up with foster parents/caregivers about administering medications appropriately and about the child's experience with the medication(s), including any side effects; (3) DHHS shall follow any additional state protocols that may be in place related to the appropriate use and monitoring of medications. | 34.8% | No | 41 |

| Section | Commitment | Performance | Achieved | Report Page |
|---------|------------|-------------|----------|-------------|
| **6.37** | DHHS will continue to implement policies and provide services to support the rate of older youth achieving permanency. This provision shall become eligible to immediately exit the MISEP after one period of positive trending in validated performance from the baseline measure reported in the Monitor's MISEP 23 report. | 46.8% | Yes | 41 |

## Methodology

To prepare this report, the monitoring team conducted a comprehensive series of verification activities to evaluate the Department's progress in achieving the commitments in the MISEP. These included: meetings with DHHS leadership, private agency leadership, and Plaintiffs' counsel; extensive reviews of individual children's records and other documentation; and participation in blended Child and Family Services Reviews (CFSR)/Quality Service Reviews (QSR). The monitoring team also reviewed and analyzed a wide range of aggregate and detailed data produced by DHHS, and reviewed policies, memos, and other internal information relevant to DHHS' work during the period. To verify information produced by DHHS, the monitoring team conducted virtual field-based interviews, cross-data validation, and case record reviews. By agreement of the parties, the monitoring team assessed DHHS' performance for four MISEP commitments utilizing a qualitative case review [2] process. The monitoring team reviewed thousands of distinct reports from DHHS including individual case records, relative foster home studies, Division of Child Welfare Licensing (DCWL) investigations and reports, and CPS referrals and investigations.

## Demographics

DHHS produced demographic data from January 1, 2023 to June 30, 2023. DHHS data indicate that there were 9,138 children in custody as of June 30, 2023.[3] The population reflects a steep decline from the 18,048 children under DHHS' supervision (of whom 16,067 were in out-of-home care) on October 24, 2008, the beginning of Period One in this matter. Of the children and youth in care on June 30, 2023, 329 youth (3.6 percent) were enrolled in the Young Adult Voluntary Foster Care (YAVFC) program. During the reporting period, 1,869 children and youth were placed in foster care[4] and 1,931 children and youth exited care.[5] DHHS served 11,070 children during the period.[6]

Though young children aged zero to six years made up the largest portion (4,275 or 47 percent), Michigan continued to have a large population of older youth in custody. Twenty-six percent (2,332) were 12 to 17 years of age and seven percent (629) were 18 years and over, as detailed in Figure 1.

---

[2] The sample sizes for the monitoring team's case record reviews were based on a statistically significant sample of cases and a methodology based on a 90 percent confidence level.

[3] The monitoring team identified one child who appeared in care twice on June 30, 2023, with two unique removal dates. According to the information in MiSACWIS, the first episode ended prior to the end of the reporting period, while the second episode continued through the end of the period.

[4] The 1,869 entries include 10 children who entered care twice.

[5] The 1,931 exits include four children who exited care twice.

[6] The monitoring team identified 50 children who appeared twice in the during cohort file (0.5 percent of 11,070). All children appearing twice in the during cohort were served more than once during the reporting period.

**Figure 1. Age of Children in Custody on June 30, 2023[7]**

Source: MiSACWIS, *n=9,138*



With regard to gender, the population was nearly equally split—50.4 percent male and 49.6 percent female. With regard to race, the population of children was 51 percent White, 33 percent Black/African American, one percent Native American, under one percent Asian, and under one percent Native Hawaiian or Pacific Islander (see Table 1). Additionally, 15 percent of children were reported to be of mixed race. Eight percent of children were identified with Hispanic ethnicity and can be of any race. The data indicated that DHHS was unable to determine the race of less than one percent of children in care on June 30, 2023. In contrast, the population of all children in the state of Michigan was 66 percent White, 15 percent Black or African American, three percent Asian, one percent American Indian or Alaska Native, and under one percent Native Hawaiian or Pacific Islander. Additionally, twelve percent of children in the state of Michigan were of mixed race, and nine percent of children were identified with Hispanic ethnicity and can be of any race. Three percent of children in the state of Michigan were of some other race.[8]

---

[7] The monitoring team identified 24 instances where the DHHS child age variable did not match the monitoring team's child age calculation. In each instance, the child's date of birth was on June 30th (the last day of the PUR) or July 1st of various years. June 30th is also the date used to calculate the child age at the end of the PUR, which may have caused the discrepancies. Notably, other children in the cohort with a June 30th and July 1st date of birth did not show these same discrepancies.

[8] Data on the race of all children in the state of Michigan was sourced from the U.S. Census Bureau, Population Division, 7/1/2021 Population Estimate.

**Table 1. Race of Children in Custody on June 30, 2023 and Race of Children in the State of Michigan on July 1, 2021**

Source: MiSACWIS, US Bureau of the Census

| Race | Count (DHHS Custody) | Percent (DHHS Custody) | Percent (State of Michigan) |
|---|---|---|---|
| White | 4,630 | 51% | 66% |
| Black/African American | 3,050 | 33% | 15% |
| Mixed Race | 1,374 | 15% | 12% |
| American Indian or Alaska Native | 64 | 1% | 1% |
| Unable to Determine[9] | 8 | 0% | -- |
| Asian | 9 | 0% | 3% |
| Native Hawaiian or Pacific Islander | 3 | 0% | 0% |
| Some Other Race | -- | -- | 3% |
| Total | 9,138 | 100% | 100% |
| Hispanic ethnicity and of any race | 749 | 8% | 9% |

As Figure 2 demonstrates, 90 percent of children in DHHS' custody lived in family settings, including with relatives (50 percent), foster families (32 percent), and their own parents ("in-home") (seven percent), and in homes that intend to adopt (two percent). Of children in custody, 472 (five percent) lived in institutional settings, including residential treatment and other congregate care facilities. Another 419 children (five percent) resided in independent living placements, which typically serve youth on the cusp of aging-out of care. The remaining less than one percent were AWOL. There were no children with unidentified placements or placements in other settings.

---

[9] Children with "Unable to Determine" and "No Match Found" entered as their race are pooled together in the "Unable to Determine" row.

**Figure 2. Placement Types of Children in Custody on June 30, 2023**
Source: MiSACWIS, *n=9,138*



Of the children in care on June 30, 2023, 38 percent were in care for less than one year, while 20 percent were in care for more than three years.

**Figure 3. Length of Stay of Children in Custody on June 30, 2023**
Source: MiSACWIS, *n=9,138*



**Table 2. Exits from Care by Exit Type, January 1, 2023 to June 30, 2023**[10]
Source: MiSACWIS

| Exit Type | Frequency | Percent |
|---|---|---|
| Reunification | 736 | 38% |
| Adoption | 729 | 38% |
| Emancipation | 281 | 15% |
| Guardianship | 142 | 7% |
| Living with relatives | 25 | 1% |
| Death of child | 4 | 0% |
| Transfer to another agency | 10 | 1% |
| Runaway | 4 | 0% |
| **Total** | **1,931** | **100%** |

As the table below demonstrates, of the children in custody on June 30, 2023, the majority (5,425 or 59 percent) had reunification as a federal goal. For the remaining children, 2,286 (25 percent) had a goal of adoption, 809 (nine percent) had a goal of APPLA, 495 (five percent) had a goal of guardianship, and 123 (one percent) had placement with a relative as a federal goal. There were no children with missing federal goal codes.

**Table 3. Federal Goals for Children in Custody as of June 30, 2023**
Source: MiSACWIS

| Federal Goal | Frequency | Percent |
|---|---|---|
| Reunification | 5,425 | 59% |
| Adoption | 2,286 | 25% |
| APPLA | 809 | 9% |
| Guardianship | 495 | 5% |
| Relative | 123 | 1% |
| **Total** | **9,138** | **100%** |

Note: Percentages do not add up to 100 due to rounding.

## Organizational Capacity

### Caseloads and Supervision

The MISEP sets forth caseload standards for staff and supervisors performing critical child welfare functions. The agreement states that caseload compliance will be measured by taking the average of three data reports each reporting period, prepared on the last workday of February,

---

[10] The 1,931 exits include four children who exited care twice. (The children appearing twice in the file had unique removal and discharge dates.)

April, June, August, October, and December. For MISEP 24, the monitoring team used caseload counts from February 28th, April 28th, and June 30th of 2023 to determine compliance.

*Adoption Caseloads (6.15)*

DHHS agreed that full-time staff, public and private, solely engaged in adoption work would be responsible for no more than 15 children each. Staff who perform adoption work as well as other functions are held to a pro-rated standard. The Stipulated Order Amending the MISEP indicates that this commitment shall become eligible to immediately move to Section 4, Structures and Policies, and remain subject to the Court's jurisdiction pursuant to the terms of the MISEP, after two consecutive periods of positive trending in validated performance from the baseline measure reported in the Court Monitors' report for MISEP 23. For MISEP 24, DHHS averaged 88.1 percent of staff meeting the standard. This represents a 2.6 percent increase from the MISEP 23 baseline performance of 85.5 percent.

## Accountability

### Outcomes

*Safety – Maltreatment in Foster Care (6.1)*

The child safety standard of maltreatment in care (MIC), focuses on keeping children in DHHS custody safe from abuse and neglect. DHHS committed to ensure that of all children in foster care during the applicable federal reporting period, DHHS will maintain an observed rate of victimizations per 100,000 days in foster care of less than 9.07, utilizing the CFSR Round 4 criteria developed by the federal government. Performance on this measure is calculated for DHHS by the University of Michigan based on the Adoption and Foster Care Analysis and Reporting System (AFCARS) and National Child Abuse and Neglect Data System (NCANDS) files produced by DHHS.

Performance for this commitment is reported annually. The Monitors undertook a review of Michigan's MIC investigations for the FFY 2023, October 1, 2022 – September 30, 2023, to assess the adequacy of those investigations and validate the State's observed rate of child victimizations.

For FFY 2023, DHHS provided data indicating the State substantiated 459 incidents of MIC, involving 437 children in DHHS custody, for an observed rate of 14.50 victimizations per 100,000 days in foster care. The reported statewide rate of victimization per 100,000 days in foster care has steadily increased over the last three federal fiscal years, from 5.55 in FFY 2021 to 8.04 in FFY 2022 to 14.50 in FFY 2023.

The Monitors cannot validate that the observed rate provided by DHHS accurately represents the prevalence of child maltreatment in care. The Monitors reviewed a random sample of 120 MIC investigations from FFY 2023 and determined that 82 (68.3 percent) were conducted appropriately and 38 (31.7 percent) of the 120 investigations reviewed were deficient. This includes 32 investigations in which there was insufficient information gathered to render a finding and six investigations that the Monitors determined met the criteria for substantiation.

Full summaries of the 38 investigations determined to be deficient have been filed under seal with the Court. Each summary includes the key allegations and the Monitors' findings. The Monitors provided this information to the State and considered DHHS' responses in preparation of the filing.

*MIC Data Report (6.2)*

DHHS committed to generating, at least annually and in partnership with an independent entity, a report that analyzes MIC data to assess risk factors and/or complete root-cause analysis of MIC. The report will be used to inform DHHS practice, and it will continue to be generated until Commitment 6.1, the child safety standard of MIC, is achieved.

DHHS partnered with the Child and Family Data Lab at the University of Michigan to produce a MIC analysis report, which was issued in October 2023.[11]

*Permanency in 12 Months (6.3)*

The Stipulated Order Amending the MISEP modified commitment 6.3 such that DHHS is required to develop strategy plans in select counties, covering at least 20 percent of the foster care population and at DHHS' choosing from within the Big 14 counties of the State, to improve the rate of permanency for children within their first 12 months in foster care. The strategy plan is to focus on identified needs and barriers to be addressed in the respective counties to improve the rate of permanency for children within their first 12 months in foster care, such as court delays, parenting time, service array, father engagement, foster parent support, placement disruption, and family resources among other such factors to be identified by DHHS. The strategy plan must include a description of the specific strategies to be implemented to improve permanency and set forth implementation action steps with timelines, identify lead staff responsible for implementation and articulate the intended outcomes of each strategy.

DHHS committed to provide a copy of the strategy plan for each county to the monitoring team within 30 days of execution of the Stipulated Order. DHHS may thereafter modify the strategies contained in the plans during the 12-month implementation period, beginning January 1, 2024,

---

[11] See Appendix D for a copy of the report.

as it deems appropriate. DHHS agreed to provide an updated strategy plan, containing the elements as described above, to the monitoring team within 30 days of any modification(s).

Then, by October 1, 2025, DHHS is to provide a Permanency within 12 Months Report to the monitoring team that shall include:

- The aggregate 12-month permanency rate for the children who entered foster care within the first six months of the previous period (January 1, 2023 – June 30, 2023) in the selected counties;

- The aggregate 12-month permanency rate for the children who entered foster care within the first six months of the period under review (January 1, 2024 – June 30, 2024) in the selected counties; and

- A summary of DHHS's efforts and strategies to improve permanency in the selected counties and data demonstrating any progress achieved.

Based on the above DHHS report, the monitoring team shall determine if DHHS made good faith efforts to improve the rate of permanency within 12 months in the selected counties. Positive trending in the aggregate permanency rate over the 12-month period shall be deemed to show that DHHS has made good faith efforts to improve permanency in the selected counties. Negative trending in the permanency rate over the 12-month period shall not, alone, be considered to show a lack of good faith efforts but will be considered by the Monitors together with all relevant factors. If DHHS is found to have made good faith efforts, this commitment shall exit court jurisdiction. Failure by DHHS to achieve a finding of good faith efforts will require an additional implementation period as described herein.

The monitoring team will report on the strategy plans, the aggregate 12-month permanency rates in the selected counties, and DHHS' good faith efforts to improve the permanency rate in the selected counties in future reports.

## Contract Oversight

*Contract-Agency Evaluation (5.1)*

The MISEP requires DHHS to conduct contract evaluations of all Child Caring Institutions (CCIs) and private Child Placing Agencies (CPAs), including an annual inspection of each CPA, an annual visit to a random sample of CPA foster homes, and an annual unannounced inspection of each CCI. During the required visits, the Division of Child Welfare Licensing (DCWL) is expected to monitor compliance with rule, policy, contract, and MISEP requirements, with the primary focus being the safety and well-being of children.

DHHS reported that during this period DCWL continued to be funded for 22 child welfare licensing field consultants who perform monitoring activities including annual licensing inspections, investigations, technical assistance, and consultation. Additionally, DHHS reported that seven field analysts conduct visits comprised of interviews with foster families and unlicensed relative caregivers to assess safety and service provision within their homes. Three area managers supervise the field consultants and field analysts.

DHHS reported that the rule set for foster homes, CWL-Pub-10 – Children's Foster Home Licensing Rules, was approved by the Legislative Services Bureau and the Joint Committee on Administrative Rules of the Michigan Legislature and filed with the Office of the Great Seal on June 9, 2023.[12] These foster home licensing rules then became effective June 16, 2023 and the CPA rule set became effective July 3, 2023.

DHHS reported that in January of 2023, DCWL conducted a meeting with CCI providers to give updates, and to review current information and internal processes. The State reported the meeting focused on contract and policy auditing changes, printing of licenses, changes to central registry[13] processes, and CPS background checks.

*Child Caring Institutions (CCIs)*

During the period, the monitoring team continued to monitor the work of DHHS relevant to those CCIs that the State determined posed the greatest risk to the safety of youth in care.

The monitoring team's review process consists of the evaluation of weekly and monthly data provided by DHHS related to licensing investigations, Maltreatment in Care (MIC) investigations, and the use of restraints. DHHS continued to employ the Risk Stratification Tool to identify the numerical Risk Score for each facility in the State on a weekly basis. DHHS reported that when certain facilities reach a threshold score of 10.0, DHHS adds them to a Weekly CCI Update Spreadsheet reviewed weekly by an oversight committee of DHHS staff who meet to discuss safety strategies and activities at these facilities. If a facility's score increased to 15.0 or higher, DHHS reported that the facility was then subject to heightened oversight by, and engagement with, the State.

During the period, DHHS reported weekly Risk Scores for 49 CCIs. At the beginning of the period, 13 facilities had a score of 10.0 or higher and qualified for increased monitoring. Eight of these

---

[12] The rules had last been updated in 2019. Since then, federal law requirements changed to require model foster home standards and new issues emerged that required a review of the entire rule set to address issues involving LGBT youth, vaccinations, and variance requirements. Additionally, there were conflicts within the CCI, CPA, and foster family and group home rules that needed to be amended for consistency purposes.

[13] Central registry is the state's child abuse and neglect registry which hold records of individuals confirmed as perpetrators of serious abuse or neglect, sexual abuse, sexual exploitation, or a case involving confirmed methamphetamine production.

facilities had a score of 15.0 or higher. At the conclusion of the period, an increased number of facilities (16) had a score of 10.0 or higher, including 11 facilities with a score of 15.0 or higher. Eight of the facilities with a score of 10.0 or higher in January continued to have a score of 10.0 or higher in June.[14] On average, there were 16 facilities each week (32.7 percent) that had a score of 10.0 or higher and 10 facilities each week (20.4 percent) that had a score of 15.0 or above. For facilities that had a score of 15.0 or higher, the Residential Collaboration Technical Assistance Unit (RCTAU) developed Action Plans focusing on necessary improvements including facility management, staff development/training, policies and procedures, supervision, programming, family involvement, and youth engagement.

During the report period, DHHS monitored the use of restraints in CCIs and reported that the range of restraints was between 150 (March) and 194 (June) with an average of 179 restraints per month across all CCIs statewide. This represents an increase from the prior reporting period where the average was 175 reported restraints per month.

During the report period, the monitoring team became aware of the consistently high risk posed to youth who resided in four facilities under the management and direction of one umbrella agency. At the conclusion of the last report period, the monitoring team communicated to DHHS growing concerns related to Facility 1, one of these four facilities. The monitoring team noted that this facility had a Risk Score of 37.0 at the end of the prior reporting period, which was the highest risk profile of any assessed facility in the state serving children in the class. As this reporting period unfolded, numerous incidents and investigations revealed a pattern of conduct showing facility staff were either slow to respond or failed to intervene in situations of physical aggression, assaults, and/or fights among youth placed in the facility. There were also indications that at times, youth were permitted to initiate or participate in physical interventions with peers with the approval of staff. In the prior reporting period, there were at least eight investigations related to this type of incident. These continued into the current reporting period and the monitoring team raised concerns about youth safety with the Department on several occasions.

The Department eventually placed this facility on a provisional license. While there was an Action Plan developed by RCTAU, the monitoring team could not find evidence in the weekly updates that RCTAU was providing specific interventions or technical assistance to mitigate risk to youth

---

[14] Of the remaining five facilities with a risk score of 10.0 or higher in January, one was closed by the Department.

safety,[15] and by the end of January 2023, the Risk Score had risen to 40.4. The monitoring team continued to raise concerns with the Department about this facility until late February 2023 when an incident occurred where two youths engaged in a physical fight and one youth reportedly "slammed" another youth to the floor which resulted in the youth receiving a fractured skull and being hospitalized. Following the assault, one youth was arrested, the facility's contract with DHHS was ended, the facility's license was summarily suspended by the Department, and the youth in residence were relocated. Several of the staff from Facility 1 were subsequently transferred to other facilities within the umbrella agency network. Risk Scores at these facilities began to increase and in early March 2023, the monitoring team was notified that all state youth were being removed from Facility 2, another one of the umbrella agency's facilities, due to safety concerns at the facility. At that time, the Risk Scores for the third and fourth facilities under the umbrella agency were above 15 and according to the Department's methodology should have been subject to engagement by the RCTAU.

Facility 3, another facility under the umbrella agency, had a Risk Score of 17.0 at the beginning of the reporting period and maintained a score above 15.0 for the entire period, rising to 19.0 at one point during the period. The facility was not listed among the institutions receiving heighted oversight or engagement by RCTAU. When the monitoring team inquired directly about why this facility was not receiving the level of attention that the Risk Score should have triggered, the Department responded that facility was a "shelter," was not considered "a long term CCI provider," and was not eligible for oversight or assistance by RCTAU. The Department noted that technical assistance to shelters was to be provided by DCWL.

In mid-June 2023, the monitoring team noted that the Risk Score for Facility 4, had risen to 30.5, the highest score in the state. In late June, DHHS notified the monitoring team that the facility was being recommended for a change in licensure to a Provisional License.

During this reporting period, the monitoring team was notified by the Department that changes were being proposed to the Risk Stratification Tool that would change some of the "weighting" given to an overall score that came from investigations and/or substantiations that were more

---

[15] In response to a draft of this report, DHHS informed the monitoring team that "RCTAU conducted extensive technical assistance, meeting with the agency twice weekly," and described specific, detailed interventions and assistance the agency reported that it provided. At the time of the events described above, the monitoring team requested routine updates on the activities of RCTAU and reviewed every submission of the RCTAU Action Plan with respect to monitored facilities. Those reports frequently and generally identified "technical assistance being provided" and that the RCTAU staff received "program updates," which led the monitoring team to express concern to State leaders about oversight at the facility and child safety as conditions deteriorated. During this period, the monitoring team requested detailed information about RCTAU's activities, which led the State to produce to the monitoring team regular RCTAU Action Plan updates, none of which included at the time the detailed technical assistance on staff training, supervision, youth safety, policy development, and other areas described recently to the monitoring team.

"historical" and might not be reflective of more current patterns and trends. The monitoring team observed that these changes placed a greater emphasis on those factors that indicated a risk to youth safety in the previous 12 months and reduced the emphasis on events that occurred 18-24 months prior.

DHHS reported that during MISEP 24 DCWL conducted 17 unannounced renewal and 16 unannounced interim inspections of CCIs, totaling 33 inspections for the period. DHHS determined that 25 of the CCIs required CAPs. Eight CCIs were in substantial compliance with appropriate statutes, administrative licensing rules, contract regulations, and MISEP requirements, as per DHHS' reporting, so CAPs were not required for these agencies.

As of the end of the period, three CCIs were recommended for a first provisional license, and a fourth CCI was issued a first provisional license. One CCI was recommended for licensure revocation, and a CCI that was recommended for licensure revocation during MISEP 23, and had requested a hearing, had that license revoked in July 2023. No CCIs closed during the period.

DCWL completed 178 special investigations involving 301 allegations in 39 contracted CCIs for MISEP 24, according to DHHS. One hundred and three of the special investigations resulted in substantial compliance with no CAP required. Violations were found with 75 of the 178 special investigations with 133 violations established, and agencies terminated the employment of 29 staff as a result of the special investigations. Seventy-three of the special investigations required CAPs approved by DCWL. Two special investigations resulted in a finding of non-compliance, but based on recommendations for licensure revocation, CAPs were not allowed.

The monitoring team reviewed all 178 CCI special investigations for the period. One hundred and sixty-one of the special investigations were referred to Centralized Intake (CI) and 107 of these allegations were assigned for CPS investigation. Twenty of the 107 investigations resulted in a substantiated disposition of child abuse and/or neglect, while 87 of the investigations resulted in an unsubstantiated disposition.

The monitoring team assessed that an additional 27 DCWL special investigations[16] during this period surfaced allegations that met the criteria for a CPS-MIC investigation. For 24 of the 27 licensing investigations, the incidents were referred to CI but were not assigned for CPS-MIC investigation. Three other incidents were never referred to CI. The following are examples of incidents determined by the monitoring team to warrant assignment for a CPS-MIC investigation:

- A school administrator reported that a child (age 10 and a permanent court ward) had broken eyeglasses held together with tape and string for at least three months. The condition of the glasses resulted in cuts on the child's nose that required band-aids. The school administrator had raised the issue with the child's group home coordinator several times and was repeatedly told that they were working to get the glasses fixed.[17] CI transferred this referral to the ongoing foster care worker and DCWL. However, a CPS-MIC investigation was never conducted.

- A youth (age 14 and a temporary court ward) called CI and stated that facility staff pushed and shoved her and did anything they could to get her out of the residence, including throwing all her belongings outside. She requested immediate assistance. Staff could be heard talking to her and laughing in the background, but they would not get on the phone. The youth was very upset and reported feeling unsafe and needing immediate help. She was advised to call 911. There was an ongoing CPS-MIC investigation regarding this youth at the time this referral was made to CI. The ongoing investigator was made aware of this referral but did not address these allegations in the ongoing investigation. DHHS did not conduct a CPS-MIC investigation regarding these allegations. Instead, the referral was transferred to the ongoing foster care worker.

- A staff person left two youths (age 12 and a permanent state ward, and age 11 and a temporary court ward) unattended outdoors. During that time, one youth forced the

---

[16] Two of the 27 allegations were called into CI and were initially not assigned for investigation. The first allegation involved a supervisor instructing two youth (both aged 12, temporary and permanent court wards) to beat a third youth (age 9, a temporary court ward and the youngest child at the facility). The two youths proceeded to punch the third youth. The allegation was considered "hearsay" and not accepted for investigation. Twelve days later, after DCWL confirmed that the child was hit, punched, and kicked by the two residents at the supervisor's directive, it was referred again to CI. This time it was accepted for investigation and concluded with a substantiated disposition for Improper Supervision and an intensive risk level. The second incident involved a 13-year-old youth and permanent court ward with an injured foot who often took his walking boot off, causing it to break. The foot healed and then was reinjured. There was a delay in taking the youth for medical treatment for the injury that ultimately required a new boot and wheelchair. The allegation was initially transferred, but the Placement Collaboration Unit (PCU) requested case assignment, which occurred five days later, as the concern was that medical care was not immediately and appropriately sought.

[17] Upon receipt of the draft of this report, DHHS indicated to the monitoring team that the delay in the child getting new glasses was because an appointment could not be secured with an optometrist during this three-month period. DHHS did not identify any other efforts made to ensure the child obtained the needed eyeglasses over the three-month period.

other to engage in oral sex. A licensing violation was issued as the facility's internal supervision policy was not followed, and both children had histories of being victims of sexual abuse. DCWL imposed a CAP. CI transferred this referral to law enforcement and DCWL. However, a CPS-MIC investigation was not conducted.

- A youth (age 9 and a temporary court ward) was getting water from a fountain before dinner. A resident and a staff person observed another staff person as she put her hands around the child's neck and pulled him away from the water fountain. It appeared she was choking him when she grabbed the child by the neck. CI transferred this referral to the ongoing foster care worker and DCWL. However, a CPS-MIC investigation was not conducted.

- A child (age unknown) was refusing to come out of the bathroom while being antagonized verbally by a staff person. When the youth did exit the bathroom, the staff person pushed the youth. Video footage established that the staff person pushed the youth three times, with one of the pushes resulting in the youth falling to the ground. DCWL established a licensing violation and imposed a CAP. These allegations were not referred to CI and a CPS-MIC investigation was not conducted.

- A staff person witnessed another staff person arguing, cursing at, and threatening to beat a youth (age 16 and a temporary court ward). This staff person had to be physically held back from the youth and removed from the unit. The staff person later admitted that she had threatened to put her hands on the youth and was terminated from employment.

In addition to the 178 special investigations, corresponding CPS referrals, and CPS-MIC investigations, the monitoring team also reviewed CAPs and CAP follow-up documentation provided by DHHS relevant to the investigations where licensing violations were established. As with the last several periods of reported CCI monitoring by DHHS, during this period the monitoring team continued to find that CAP content and follow-up were often inadequate. CAP implementation was often delayed, ineffective, deficient or non-existent; lacked specificity, clarity, and substance; and did not remediate risk to children. Frequently repeat violations of a serious nature, such as physical force, improper restraints causing injuries, ineffective intervention for youth with suicidality, and improper supervision, often by the same staff persons, recurred despite the CAPs. In numerous instances, there was no evidence that previous CAPs for repeat child safety violations were analyzed and revamped, even after identified risks to children's safety persisted. Often CAP verification only consisted of staff interviews, rather than documentation review to ensure that CAP provisions actually were implemented.

Examples of issues with CAPs include:

- The confirmed violations related to a special investigation included: staff allowing youth to beat up another youth; a lack of staff supervision, qualification, and response to violence against a child; and failure to engage in mandated reporting of abuse and neglect. The complaint was received on March 3, 2023. The licensing violation letter was dated May 30, 2023, and the CAP was not submitted until August 2, 2023. During an on-site visit on October 11, 2023, the consultant found that the vast majority of the CAP had not been implemented, despite the facility being recommended for a first provisional license in June 2023.[18]

- DHHS established violations at a restraint-free facility in February and March regarding staff restraining youth. A staff person used a restraint on a youth 12 days after signing acknowledgements of the facility's hands-free policy and crisis intervention/de-escalation policy, as a result of CAPs for the previous violations. There was no documentation of employee discipline for the failure to comply with the policies he acknowledged less than two weeks before the incident.

- A staff person threw a youth to the ground and pushed him after he was back on his feet. Evidence also showed that the youth was restrained in a prone position that was prohibited since 2021. This facility had four prior violations for using prone restraints. The CAP generally identified providing more opportunities for staff engagement in the practice of proper floor restraint protocol. The CAP lacked a concrete and effective plan for preventing the repetitive prone restraints. The CAP also lacked documentation of any disciplinary measures and specific follow-up with the staff person who threw the youth to the ground.

- A CCI staff person was terminated from employment for failing to provide proper care and supervision. This involved transporting a youth to a store when this was not the plan, failing to supervise the youth adequately in the store, and not conducting a pocket check of the youth upon return to the facility. These failures resulted in the youth stealing and consuming alcohol and bringing it back to the facility. The required CAP follow-up was to include verification that the staff person was terminated. Additional CAP components included: a change to the shift checklist; an updated protocol for pocket check expectations that were to be included in the program manual; and verified staff training on the changes. However, CAP follow-up documentation did not include any of these

---

[18] Upon receipt of the draft of this report, DHHS indicated to the monitoring team that DCWL confirmed implementation of the CAP on December 12, 2023, nine months after the allegations were referred to DCWL. The Department indicated that DHHS policy allows for six months to implement a CAP after it has been approved. However, the approved CAP indicates that all uncompleted tasks had an implementation date of August 15, 2023.

additional components of the CAP. The CAP also did not include any action related to refresher training on supervision expectations when staff were off-site with youth.[19]

*Child Placing Agencies (CPAs)*

DHHS reported that during MISEP 24 there were 45 CPA inspections, which included 19 interim and 26 biennial renewal inspections. Two contracted agencies were in substantial compliance with applicable statutes, licensing rules, contract regulations, and MISEP requirements, while 43 agencies required CAPs due to a total of 288 established violations. One CPA was issued a first provisional license. There were no CPA closings during the period.

As indicated above, DCWL field analysts conduct annual home visits to assess safety and service provision within licensed foster homes, as well as unlicensed relative homes supervised by agencies with interim and renewal inspections. According to DHHS, DCWL field analysts visited a random sample of licensed foster homes and unlicensed relatives associated with 38 of the 45 contracted CPAs scheduled for a renewal or interim inspection during MISEP 24. Seven of the agencies did not supervise any foster or unlicensed relative homes.

DCWL field analyst reports indicate that 117 foster homes and 99 unlicensed relative homes were visited during MISEP 24 for a total of 216 home visits. DCWL issued 35 safety alerts[20] for urgent or critical concerns in 20 unlicensed relative homes and 15 regular foster homes. Safety issues included: inoperable smoke or carbon monoxide detectors; standing water in a basement; bedbug infestation; individuals sleeping in basements without proper egress; caregivers admitting to using corporal punishment; a caregiver and baby sleeping in a utility room; unsecured gun ammunition; the refusal of visits/walkthroughs by both licensed foster parents and unlicensed relatives; dog feces in a bedroom and basement; and a roof and ceiling in disrepair. Follow-up to the safety alerts was noted on the safety alert forms and in the annual agency inspection reports.

The MISEP requires that the field analysts visit a certain number of each CPA's foster homes, relative to the total number of homes supervised by the agency. CPAs with fewer than 50 homes are required to have at least three licensed foster homes visited, and those agencies with 50 or more licensed homes are required to have five percent of those foster homes visited. Reports provided by DHHS indicated that one agency with fewer than 50 homes had only one home

---

[19] Upon receipt of the draft of this report, DHHS indicated to the monitoring team that DCWL fully verified implementation of the CAP. However, the documentation provided to the monitoring team only indicates that DCWL verified termination of the employee and not implementation of the other CAP provisions.

[20] DHHS reported that 32 safety alerts were issued during the period, but the monitoring team found that 35 safety alerts were issued.

visited by the analyst rather than the required three homes. Therefore, DHHS did not meet the requirement for this commitment during this period.

DHHS reported that during MISEP 24 licensing consultants conducted 49 special investigations involving 31 contracted CPAs. The investigations involved 72 allegations of non-compliance related to rule, policy, contract, and MISEP requirements. DHHS determined in 27 (55.1 percent) of the special investigations that CPAs were in substantial compliance, and therefore a CAP was not required. Twenty-two (44.9 percent) of the 49 special investigations resulted in non-compliance findings that required CAPs, with 31 (43.1 percent) of the 72 allegations resulting in established violations. The monitoring team reviewed all 49 CPA special investigations.[21]

DHHS reported that during MISEP 24 private agencies conducted 372 foster home special evaluations. These are investigations conducted by the supervising agency when an allegation is made regarding a foster home in their network. The monitoring team reviewed 96 of these special evaluations. Thirty-eight of the 96 special evaluations were referred and accepted for MIC investigations. Twenty-eight MIC investigations resulted in an unsubstantiated disposition, and ten investigations resulted in a substantiated disposition. Forty-one of the 96 special evaluations resulted in established licensing violations. Twenty-eight of the 41 Special Evaluations with violations required CAPs. Thirteen of the Special Evaluations were not required or allowed to have CAPs due to the voluntary closure of four homes and nine licensure revocation recommendations. Concerns regarding licensed foster homes noted by the monitoring team in reviewing the special evaluations included the following:

- A foster parent bit a child (age 13) after the child was upset, tried to run away from the foster home, and had bitten the foster parent. The child was treated at the emergency room and was found to have bite marks on her neck. The child stated that the caregiver held her down until she could barely breathe. She bit the foster parent to get her off of her and the foster parent responded by biting her back. The CPS investigation substantiated the caregiver for physical abuse, but the home has an active license through October 3, 2026.

- The foster home was alleged to be filthy with flies and trash everywhere, food left out all day, and broken glass and a knife in the backyard accessible to the children. Upon investigation, the home was observed to be in disarray. The house smelled of cat urine,

---

[21] Examples of established violations from these 49 licensing investigations include: an agency left five children for three months in a home that lacked electricity, had broken windows, bug infestation, insufficient beds, no carbon monoxide detectors, and water leaks; an agency did not provide for the necessary medical and nutritional needs of a youth with diabetes resulting in the youth being hospitalized and agency staff were substantiated for medical neglect; a lack of required supervision allowed youth in an independent living facility to drink alcohol and become intoxicated; and an agency delayed reporting for eight days a potential sexual abuse incident to CI.

there was broken glass and broken furniture on the back porch, and the inside of the home was "not maintained in a manner appropriate or in compliance with the Licensing Rule." This was a repeat violation, and a first provisional license was issued. This home had 17 special evaluations between 2016 and 2023. A child placed in 2017 remained in this home as of May 13, 2024.

- A two-year-old child with developmental delays was allegedly being left in her crib for hours at a time without physical stimulation. She was previously pulling herself up but had regressed. When the home was visited, the child was observed to have delays, but the foster parent stated that she was getting services to help her reach her potential, although she admitted missing a few Early On medical appointments. When a review of appointment compliance occurred, it was found that in service year 2021-2022, 15 out of 33 appointment hours were missed, and 12 out of 19 appointment hours were missed during service year 2022-2023. The foster mother was issued a CAP requiring her to watch a video on the importance of Early On services and then to discuss it with the caseworker.

- A child (age 13) with hyperthyroidism had not received her medication for more than six months. She was experiencing hair loss and having trouble swallowing, precipitating a visit to the emergency room. The foster mother had not taken the child for her last two endocrinologist appointments. The CPS investigation substantiated the foster mother for medical neglect, however she was not placed on Central Registry. The child remained in the home with a CAP, including requiring the foster mother to keep medication logs and participate in three hours of training.

- The foster parent gave a child (age 13) a backup cell phone, despite signing numerous agency safety plans stating that the child was not to have one. The foster mother also took the child to a tattoo parlor to buy a needle for piercing her nose and belly button and bought her vapes. Additionally, she took the child to a family celebration, in violation of the safety plan. The foster parent admitted to buying the child a needle to pierce her belly button and nose, and stated she was unaware she needed agency permission. The child's safety plan included that sharp objects were to be locked. The foster parent stated the child was given vapes and a blunt at the unauthorized family gathering she attended. She admitted to buying vapes for the child, saying they were non-nicotine and that her goal was to trade them for the nicotine vape the child was given by her biological family. The CAP required the foster parent to complete training on parenting teens and those with trauma. The CPS investigation substantiated the foster parent for improper supervision, but she was not placed on Central Registry. The child was removed from the home, but as of May 13, 2024, the home was listed in the CWLM as active through December 21, 2024.

## Quality Service Reviews

DHHS continues to implement the QSR process to provide a probative review of case practice in a selection of cases, surfacing strengths as well as opportunities for improvement in how children and their families benefit from services. Each review focuses on an identified county or counties and includes in-depth case reviews, as well as focus groups and surveys.

The parties agreed that performance for two commitments would be measured through QSR case reviews. The first commitment is Assessments and Service Plans, Content (6.19). The performance standard for this commitment is 83 percent.[22] The second commitment is Provision of Services (6.20). The performance standard for this commitment is 83 percent.

During MISEP 24, DHHS conducted blended CFSR/QSR reviews in Business Service Centers (BSC) 1, 2, and 3. The monitoring team participated in the blended reviews in BSC 1 in April 2023, participating in case reviews, panel discussions, and case scoring.

DHHS chose a randomly selected sample of open cases for review during each CFSR/QSR. Cases were graded on 21 indicators covering different areas of case practice and the status of the child and family. Information was obtained through in-depth interviews with case participants including the child, parents or legal guardians, current caregiver, caseworker, teacher, therapist, service providers, and others with a significant role in the child's or family's life. A six-point rating scale was used to determine whether performance on a given indicator was acceptable. Any indicator scored at four or higher was determined acceptable, while any indicator scored at three or lower was determined to be unacceptable.

*Assessments, Service Plans, and Provision of Services (6.19, 6.20)*

DHHS agreed to develop a comprehensive written assessment of a family's strengths and needs, designed to inform decision-making about services and permanency planning. The plans must be signed by the child's caseworker, the caseworker's supervisor, the parents, and the child, if age appropriate. If a parent or child is unavailable or declines to sign the service plan, DHHS must identify steps to secure their participation in accepting services.

The written service plan must include:

- A child's assigned permanency goal;

---

[22] On September 6, 2022, a Stipulated Order was issued which amends the Designated Performance Standard for Section 6.19 from 90 percent to 83 percent and the Floor Performance Standard from 85 percent to 80 percent. These amended performance standards are retroactive to June 27, 2019, the day the MISEP was filed.

- Steps that DHHS, CPAs when applicable, other service providers, parents, and foster parents will take together to address the issues that led to the child's placement in foster care and that must be resolved to achieve permanency;

- Services that will be provided to children, parents, and foster parents, including who will provide the services and when they will be initiated;

- Actions that caseworkers will take to help children, parents, and foster parents connect to, engage with, and make good use of services; and

- Objectives that are attainable and measurable, with expected timeframes for achievement.

DHHS reviewed 10 children's cases, with 28 applicable items relevant to this commitment during MISEP 24. Of the 28 applicable items, DHHS reported that 23 (82.1 percent) were rated as having acceptable assessments and service plans, just missing the performance standard of 83 percent for this commitment.

Furthermore, DHHS agreed that the services identified in service plans will be made available in a timely and appropriate manner and to monitor services to ensure that they have the intended effect. DHHS also agreed to identify appropriate, accessible, and individually compatible services; assist with transportation; and identify and resolve barriers that may impede children, parents, and foster parents from making effective use of services. Finally, DHHS committed to amending service plans when services are not provided or do not appear to be effective.

DHHS reviewed 10 children's cases, with 28 applicable items relevant to this commitment during MISEP 24. Of the 28 applicable items, DHHS reported that 17 (60.7 percent) were rated as acceptable for provision of services, below the 83 percent performance standard for this commitment.

## Permanency

## Developing Placement Resources for Children

*Foster Home Array (6.4)*

In the MISEP, DHHS committed to maintain a sufficient number and array of homes capable of serving the needs of the foster care population, including a sufficient number of available licensed placements within the child's home community for adolescents, sibling groups, and children with disabilities. DHHS agreed to develop for each county and statewide an annual recruitment and retention plan, in consultation with the Monitors and experts in the field, which is subject to approval by the Monitors. DHHS committed to implement the plan, with interim

timelines, benchmarks, and final targets, to be measured by the Monitors based on DHHS' good faith efforts to meet the final targets set forth in the plan.

DHHS' Adoption and Foster Home Recruitment and Retention plans cover the state fiscal year (SFY) running from October 1st to September 30th each year. This report covers DHHS' recruitment efforts for the first nine months of the SFY 2023 recruitment cycle, from October 1, 2022, to June 30, 2023. DHHS' efforts to achieve the final targets for SFY 2023 will be evaluated at the end of the fiscal year.

For SFY 2023 DHHS agreed to license 902 new non-relative homes. During the first nine months of SFY 2023, DHHS licensed 538 new unrelated homes, 60 percent of the SFY 2023 non-relative licensing goal. During that same period, 887 unrelated foster homes were closed, for a net loss of 349 homes, although the population of children in custody remained relatively stable during this period. On December 31, 2022, the child custody population was 9,195 and on June 30, 2023, the child custody population was 9,138.

For the special populations of children, DHHS agreed to license 641 foster homes willing to accept adolescent placements. DHHS licensed 195 adolescent homes during the first nine months of SFY 2023, 30 percent of the target for the year. The SFY 2023 target for siblings was 563 new homes and DHHS licensed 303 sibling homes, 54 percent of the target. Finally, DHHS committed to license 110 homes for children with disabilities. DHHS licensed 385 homes exceeding the target in the first nine months of SFY 2023. DHHS was unable to provide home closures data for the special populations from November 2022 to March 2023, following the agency's conversion to the Child Welfare Licensing Module (CWLM) in October 2022. Therefore, the monitoring team was unable to determine the net gains or losses for the special populations during the period.

When assessing the adequacy of DHHS' array of foster home available to accept placements, the Monitors take into consideration as indicators of foster home sufficiency, the agency's performance regarding other MISEP commitments.

To understand the reasons for the net loss of foster homes, DHHS reported that it surveyed families who closed their foster homes during SFY 2023. Two hundred eighty-two families responded to the survey answering questions regarding the general reasons for home closure, challenges experienced during fostering, and needed supports that would have been beneficial prior to home closure. The survey results have provided useful information for DHHS to consider as it implements strategies to begin to mitigate the loss of homes the agency continues to need. As examples, the survey results identify the top three reasons for home closure as adoption of a child, burnout/frustration, and stress. Families identified the primary challenges to fostering children as challenging child behaviors, court challenges, and visitation. The three needed supports most identified were assistance with children's behaviors, assistance and better

communication from the agency/agency worker, and respite services. The Monitors will report on DHHS' efforts to utilize this information as it implements targeted and systemic retention strategies in SFY 2023 and into SFY 2024.

*Relative Foster Parents (6.10.a)*

When children are placed in out-of-home care, preference must be given to placement with a relative. DHHS committed to ensuring that safety assessments, safety planning (when appropriate), and background checks occur for all non-licensed homes. The MISEP relative commitments are particularly important to child safety as 50 percent of children in DHHS custody were living with relatives at the conclusion of MISEP 24. In the MISEP, DHHS committed to ensure that:

- Prior to a child's placement, DHHS will visit with relatives to determine if it is safe;

- Law enforcement and Central Registry background checks for all adults living in the home will be completed within 72 hours of placement; and

- A home study will be completed within 30 days of placement to determine whether the placement is safe and appropriate.

The parties agreed the Monitors will conduct an independent qualitative review each period to measure DHHS' performance for this commitment. The designated performance standard is 95 percent.

For MISEP 24, the monitoring team reviewed a random sample of 64 unlicensed relative homes. The monitoring team determined the performance was achieved overall in 46 cases (71.9 percent) and was not achieved in 18 cases (28.1 percent). For two of the 18 cases, there was insufficient evidence to validate the timely completion of background checks. For each of the individual safety requirements, DHHS' performance was as follows:

- An initial home safety visit prior to placement was completed for 62 homes (96.9 percent).

- Law enforcement checks were completed for caregivers within 72 hours of placement for 60 homes (93.7 percent).

- Central Registry checks were completed for caregivers within 72 hours of placement for 59 homes (92.2 percent).

- Twenty homes had additional adult household members. Law enforcement background checks were completed timely for 19 homes (95.0 percent) and Central Registry checks were completed timely for 18 homes (90.0 percent).

- Michigan policy requires that all caregivers and adult household members must have their names and addresses searched on the Michigan Public Sex Offender Registry. The monitoring team was able to find evidence that this background check was completed for 58 (90.6 percent) of the homes.

- A home study was completed within 30 days for 53 relative placements (82.8 percent).

DHHS did not meet the designated standard of 95 percent. Additional reasons why cases did not meet the standard include:

- In three cases background checks were completed late, more than 72 hours after the initial placement.

- Two homes did not meet the performance requirements due to improper weapon storage.

- Two cases required a Placement Exception Request (PER) approval, which was not completed.[23] When a PER is required, the DHHS caseworker must complete the PER and route it to the supervisor for review, who is then expected to route it to the DHHS county director for review and approval.

  - A PER was required due to more than five children living in the home. A sixth child was placed on February 1, 2023, and the PER still reads "in progress" as of March 18, 2024.

  - A PER was required due to more than three foster children living in the home. Four children were placed on March 2, 2023, and the PER still reads "in progress" as of March 18, 2024. The children were removed on December 21, 2023.

*Relative Foster Parents (6.10.b)*

The MISEP requires that a relative placement home study, including all clearances, must be completed, and approved annually[24] for unlicensed caregivers to ensure the safety of children placed in relative homes. An approved relative home study is valid for one year. This commitment is measured through an independent qualitative review conducted by the Monitors with a designated performance standard of 95 percent.

For this commitment, the monitoring team reviewed a random sample of 64 unlicensed relative homes due for a renewal home study. The monitoring team found that 40 homes (62.5 percent)

---

[23] In these two cases neither a timely verbal nor written approval was documented in MiSACWIS. DHHS Policy FOM 722-03E requires a minimum of a verbal approval prior to placement with documentation and approval within the electronic case management record completed within 30 calendar days from the date of verbal approval.
[24] Annually is defined as within 365 days of the last relative home study. The supervisor must review and approve the DHS-3130A within 14 calendar days after the date it was completed.

met each of the performance requirements in the MISEP, and 24 homes (37.5 percent) did not. The performance requirements were not met for 16 of the 24 homes solely because of insufficient evidence to support the timely completion of updated background checks.

An annual home study was approved timely by the supervisor for 58 homes (90.6 percent). Another six homes (9.4 percent) had an annual home study that was completed late. The following chart details the amount of time past the due date when each of the six late home studies was completed.

**Table 4. Annual Relative Home Studies Completed Late, MISEP 24**

| Timeframe Overdue | Number of Homes |
|---|---|
| 4 - 9 days | 3 |
| 19 – 21 days | 2 |
| Over a year | 1 |

Additionally, for relative caregivers, Central Registry checks were completed timely, prior to the approval of the annual home study, in 47 cases (73.4 percent), and law enforcement background checks were completed timely in 46 cases (71.8 percent). Seventeen homes had additional adult household members. Central Registry checks were completed timely for ten (58.8 percent) of these homes, and law enforcement background checks were completed timely for thirteen (76.4 percent) of these homes. Michigan policy requires that all caregivers and adult household members must have their names and addresses searched on the Michigan Public Sex Offender Registry. The monitoring team was able to find evidence that this background check was completed for relevant individuals in 45 cases (70.3 percent). DHHS did not meet the designated performance standard of 95 percent during the period.

Other factors contributing to performance lapses include:

- In two cases the home had improper weapon storage.
- In one case the caregiver moved during the period under review. Per policy a safety screen should have been completed within 30 days of the move, however the required safety screen was not uploaded to MiSACWIS.

## Placement Standards

*Placing Siblings Together (6.6)*

The MISEP requires DHHS to place siblings together when they enter foster care at or near the same time. Exceptions can be made if placing the siblings together would be harmful to one or more of the siblings, one of the siblings has exceptional needs that can only be met in a specialized program or facility, or the size of the sibling group makes such placement impractical

notwithstanding efforts to place the group together. The Stipulated Order Amending the MISEP specifies that this commitment shall become eligible to immediately exit the MISEP and the Court's jurisdiction after two consecutive periods of positive trending in validated performance from the baseline measure reported in the Court Monitors' report for MISEP Period 23. DHHS provided data to the monitoring team indicating there were 396 sibling groups whose members entered foster care within 30 days of each other during MISEP 24. Of these 396 sibling groups, 320 (80.8 percent) were either placed together or had a timely approval for an allowable exception. This represents a 2.4 percent increase from the MISEP 23 baseline performance of 78.4 percent.

The commitment also requires that when siblings are separated at any time except for any of the aforementioned reasons, the case manager shall make immediate efforts to locate or recruit a family in whose home the siblings can be reunited. Efforts to place siblings together are to be documented and maintained in the case file and reassessed quarterly. The parties agreed that the monitoring team would conduct an independent qualitative review to measure performance for this commitment.

For MISEP 24, the monitoring team reviewed 32 children's case records subject to this provision and found that DHHS met the terms of the commitment in 20 cases (62.5 percent), below the designated performance standard of 90 percent.

*Emergency or Temporary Facilities, Length of Stay (6.8)*

DHHS is required to ensure children shall not remain in emergency or temporary facilities, including shelter care, for a period lasting more than 30 days unless exceptional circumstances exist. DHHS committed that no child shall remain in an emergency or temporary facility for a period lasting more than 60 days with no exceptions. The agreed-upon performance standard for this commitment is 95 percent. DHHS served 11,070 children during MISEP 24, and 68 (0.6 percent) were placed in emergency or temporary facilities. Of these 68 children, 48 (70.6 percent) were placed within the length of stay parameters. DHHS did not meet the performance standard during MISEP 24.

*Emergency or Temporary Facilities, Repeated Placement (6.9)*

The MISEP requires that no child be placed in an emergency or temporary facility more than one time in a 12-month period unless exceptional circumstances exist. Children under 15 years of age experiencing a subsequent emergency or temporary facility placement within a 12-month period may not remain in such a placement for more than seven days. Children 15 years of age or older experiencing a subsequent emergency or temporary facility placement within a 12-month period may not remain in such a placement for more than 30 days. During the reporting period, 29 children experienced subsequent stays in shelter care, of which six placement episodes (20.7

percent) met the terms of this commitment. DHHS did not meet the agreed-upon performance standard of 97 percent.

## Caseworker Visitation

*Worker-Parent Visitation (6.22)*

Caseworkers must visit parents of children with a reunification goal at least twice during the first month of placement with at least one visit in the parental home. For subsequent months, visits must occur at least once per month. Exceptions to this requirement are made if the parent(s) are not attending visits despite DHHS taking adequate steps to ensure the visit takes place or if a parent cannot attend a visit due to exigent circumstances such as hospitalization or incarceration. Exceptions are excluded from the numerator and denominator of this calculation. DHHS and the monitoring team established assessment criteria for the three components of this commitment in the Metrics Plan. The designated performance standard is 85 percent for all components.

DHHS' MISEP 24 performance on the three components of worker-parent visitation is included below. As the table indicates, DHHS did not achieve the designated performance standard of 85 percent for any component of the worker-parent visitation commitment during MISEP 24.

Table 5. Worker-Parent Visitation Performance, MISEP 24[25]

| Requirement | Performance |
|---|---|
| (1) Caseworkers shall visit parents of children with a goal of reunification at least twice during the first month of placement | 64.4% |
| (2) Caseworkers shall visit parents of children with a goal of reunification in the parent's place of residence at least once during the first month of placement | 52.4% |
| (3) Caseworkers shall visit parents of children with a goal of reunification at least once for each subsequent month of placement | 71.7% |

---

[25] DHHS initially reported performance of (1) 63.0 percent, (2) 51.2 percent, and (3) 66.6 percent for the three components of this provision. The monitoring team was unable to verify this performance utilizing the underlying data file. DHHS provided clarification on the issues identified by the monitoring team, however the monitoring team continued to identify discrepancies in the data. DHHS indicated that many of the identified discrepancies were due to the wrong cohort being used in the development of the data file. DHHS submitted a revised data file and performance calculations utilizing the correct cohort, reporting performance of (1) 62.6 percent, (2) 50.7 percent, and (3) 67.4 percent. The monitoring team was still unable to replicate DHHS' performance calculations and found performance to be between 1.7 and 4.3 percent higher for each of the components of this provision, as indicated in Table 5. Information of the specific discrepancies identified by the monitoring team was provided to DHHS.

*Parent-Child Visitation (6.23)*

When reunification is a child's permanency goal, parents and children will visit at least twice each month. Exceptions to this requirement are made if a court orders less frequent visits, the parents are not attending visits despite DHHS taking adequate steps to ensure the parents' ability to visit, one or both parents cannot attend the visits due to exigent circumstances such as hospitalization or incarceration, or the child is above the age of 16 and refuses such visits. The designated performance standard is 85 percent.

Of the 28,374 parent-child visits required during MISEP 24, DHHS completed 18,716 (66.0 percent) timely. DHHS did not meet the designated performance standard during the period.

*Sibling Visitation (6.24)*

For children in foster care who have siblings in custody with whom they are not placed, DHHS shall ensure they have at least monthly visits with their siblings. Exceptions to this requirement can be made if the visit may be harmful to one or more of the siblings, the sibling is placed out of state in compliance with the Interstate Compact on Placement of Children, the distance between the child's placements is more than 50 miles and the child is placed with a relative, or one of the siblings is above the age of 16 and refuses to visit. The designated performance standard is 85 percent.

Of the 13,569 sibling visits required during MISEP 24, DHHS completed 10,612 (78.2 percent) timely. DHHS did not meet the designated performance standard during the period.

## Child Well-Being

### Health and Mental Health

*Medical and Mental Health Examinations for Children (6.25)*

DHHS committed in the MISEP that at least 85 percent of children shall have an initial medical and mental health examination within 30 days of the child's entry into foster care and that at least 95 percent of children shall have an initial medical and mental health examination within 45 days of the child's entry into foster care.

During MISEP 24, DHHS completed 1,492 (80.9 percent) of 1,845 required initial medical and mental health exams within 30 days of a child's entry into care. Additionally, DHHS completed 1,604 (87.1 percent) of 1,841 required initial medical and mental health exams within 45 days of a child's entry into care. DHHS did not meet the performance standard for this commitment.

*Dental Care for Children (6.26)*

DHHS committed in the MISEP that at least 90 percent of children shall have an initial dental examination within 90 days of the child's entry into care unless the child had an exam within six months prior to placement or the child is less than four years of age.

During the period under review, 744 (72.4 percent) of 1,027 required initial dental exams were completed timely for children in DHHS custody. DHHS did not meet the performance standard of 90 percent for this commitment.

*Ongoing Healthcare for Children (6.29)*

DHHS committed in the MISEP that following an initial medical, dental, or mental health examination, at least 95 percent of children shall receive periodic and ongoing medical, dental, and mental health examinations and screenings, according to the guidelines set forth by the AAP. Performance for this commitment was calculated for each medical type: medical well-child visits for children aged three and younger, annual physicals for children older than three, and semi-annual dental exams.

During MISEP 24, DHHS completed 2,557 (69.4 percent) of 3,687 medical well-child visits timely, 3,630 (85.0 percent) of 4,273 annual physicals timely, and 5,096 (75.0 percent) of 6,795 semiannual dental exams timely. DHHS did not meet the performance standard of 95 percent for any component of this commitment.

*Child Case File, Medical and Psychological (6.30)*

The MISEP requires that DHHS will ensure that:

- Children's health records are up to date and included in the case file. Health records include the names and addresses of the child's health care providers, a record of the child's immunizations, the child's known medical problems, the child's medications, and any other relevant health information;

- The case plan addresses the issue of health and dental care needs; and

- Foster parents or foster care providers are provided with the child's health care records.

The Stipulated Order Amending the MISEP specifies that the designated performance standard for this commitment shall be reduced to 90 percent and the provisions shall become eligible to immediately exit the MISEP and the Court's jurisdiction after two consecutive periods of compliance with the modified designated performance standard. DHHS' MISEP 24 performance on each of the three components of the child's medical and psychological case files is charted below. To measure performance, DHHS reviewed 32 foster care cases utilizing CSFR Item 17

criteria described in the chart below. DHHS achieved the 90 percent performance standard for two of the three components of the child case file commitment during MISEP 24.

**Table 6. Child Case File, Medical and Psychological Performance, MISEP 24**

| Requirement | Applicable Cases | Cases not Compliant | Cases Compliant | Performance Percentage |
|---|---|---|---|---|
| To the extent available and accessible, the child's health records are up to date and included in the case file. | 32 | 9 | 23 | 71.8% |
| The case plan addresses the issue of health and dental care needs. | 32 | 2 | 30 | 93.8% |
| To the extent available and accessible, foster parents or foster care providers are provided with the child's health records. | 32 | 0 | 32 | 100.0% |

*Access to Health Insurance (6.32)*

The MISEP requires DHHS to ensure that 95 percent of children have access to medical coverage within 24 hours or the next business day following subsequent placement by giving the placement provider a Medicaid card or an alternative verification of the child's Medicaid status and Medicaid number as soon as it is available.

During MISEP 24, 2,582 (82.9 percent) of 3,114 placement providers received Medicaid cards within 24 hours or the next business day following a child's subsequent placement. DHHS also reported that for 3,113 (99.9 percent) of 3,114 subsequent placements, either the provider received a Medicaid card within 24 hours or the next business day following a child's subsequent placement, or the child had Medicaid coverage within 24 hours of the date of placement.

*Psychotropic Medication, Informed Consent (6.33)*

The MISEP requires DHHS to ensure that informed consent is obtained and documented in writing for each child in DHHS custody who is prescribed psychotropic medication, as per DHHS policy.

During MISEP 24, the Department reported 2,213 children required informed consent documentation, for 5,567 unique prescriptions. Data indicated that valid consents were on file for 4,160 (74.7 percent) of the medications. Therefore, DHHS did not meet the designated performance standard of 97 percent for this commitment.

*Psychotropic Medication, Documentation (6.34)*

Under the MISEP, DHHS must ensure that:

- A child is seen regularly by a physician to monitor the effectiveness of the medication, assess any side effects and/or health implications, consider any changes needed to dosage or medication type and determine whether medication is still necessary and/or whether other treatment options would be more appropriate;

- DHHS shall regularly follow up with foster parents/caregivers about administering medications appropriately and about the child's experience with the medication(s), including any side effects; and

- DHHS shall follow any additional state protocols that may be in place and related to the appropriate use and monitoring of medications.

Evidence of these actions should be documented in the child's case record. The parties agreed that performance for this commitment would be measured through an independent qualitative review conducted by the monitoring team.

The population for review was comprised of children in DHHS custody who were prescribed psychotropic medication during the period under review. Consistent with the parameters the parties approved, the monitoring team reviewed a random sample of cases, stratified by county, to determine performance. The designated performance standard for this commitment is 97 percent.

For MISEP 24, the monitoring team randomly selected a sample of 66 cases from a total population of 2,209 children. The monitoring team found 23 cases (34.8 percent) met the terms of this commitment and 43 cases (65.2 percent) did not meet the terms of this commitment. DHHS did not meet the designated performance standard of 97 percent for the period.

## Youth Transitioning to Adulthood

### Achieving Permanency

*Support for Youth Transitioning to Adulthood, Permanency (6.37)*

The MISEP requires DHHS to continue to implement policies and provide services to support the rate of older youth achieving permanency. The parties agreed that this commitment would be measured by examining the outcomes of all older youth who exit foster care during the monitoring period and comparing rates of exits to permanency and rates of exits to emancipation. For purposes of this commitment, older youth is defined as youth aged 15 or older

with a permanency goal of reunification, guardianship, adoption, or APPLA. The Stipulated Order Amending the MISEP specifies that this commitment shall become eligible to immediately exit the MISEP and the Court's jurisdiction after one period of positive trending in validated performance from the baseline measure reported in the Court Monitors' report for MISEP Period 23.

During the period, 400 youth who were 15 years and older exited foster care. Of those, 187 (46.8 percent) were discharged with an exit type of reunification, adoption, or guardianship. This represents a 1.4 percent increase in performance from the MISEP 23 baseline performance of 45.4 percent. *Per the Stipulated Order, positive trending during this period makes this commitment eligible for immediate exit.*

**Appendix A. Stipulated Order Amending the Modified Implementation, Sustainability and Exit Plan (MISEP)**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| DWAYNE B., by his next friend, John Stempfle: CARMELA B., by her next friend William Ladd; LISA J., by her next friend, Teresa Kibby; and JULIA, SIMON, and COURTNEY G., by their next friend, William Ladd; for themselves and others similarly situated, | No. 2:06-cv-13548 |
| | HON. NANCY G. EDMUNDS |
| | Class Action |
| Plaintiffs, | **STIPULATED ORDER AMENDING THE MODIFIED IMPLEMENTATION, SUSTAINABILITY AND EXIT PLAN (MISEP)** |
| v | |
| GRETCHEN WHITMER, in her official capacity as Governor of the State of Michigan, *et al.*, | |
| Defendants. | |

_____/

**STIPULATED ORDER AMENDING THE MODIFIED IMPLEMENTATION, SUSTAINABILITY AND EXIT PLAN (MISEP)**

WHEREAS the parties engaged in negotiations over the last eight months to amend the Modified Implementation, Sustainability, and Exhibit Plan (MISEP, ECF No. 294);

WHEREAS, with the assistance of the monitoring team, Kevin Ryan and Eileen Crummy, and Magistrate Judge David R. Grand, the parties agreed to modify the MISEP as set forth below; and

43

WHEREAS the parties submit this stipulation to codify the agreed amendments to the MISEP and seek the Court's entry of the below Stipulated Order.

IT IS HEREBY STIPULATED AND AGREED by and between the parties that the MISEP shall be amended as follows:

1.    The following provisions exit the MISEP and this Court's jurisdiction upon entry of this order:  4.3, 4.4, 4.6, 4.9, 4.10, 4.11, 4.12, 4.13, 4.14, 4.15, 4.16, 4.17, 4.18, 4.20, 4.21, 4.23, 4.25, 4.26, 4.27, 4.28, 4.30, 5.2, 6.11, 6.12(b), 6.16, 6.17, 6.18, 6.21, 6.27, 6.28, 6.31, 6.36(a), and 6.36(b).

2.    The following provisions move to Section 4, Structures and Policies, and remain subject to the Court's jurisdiction pursuant to the terms of the MISEP, upon entry of this order:  5.3, 5.4, 5.5, 5.6, 5.7, 6.5, 6.7, 6.12(a), 6.13, 6.14, and 6.35.

3.    The following provision shall become eligible to immediately exit the MISEP and the Court's jurisdiction after two consecutive periods of positive trending in validated performance from the baseline measure reported in the Court Monitor's report for MISEP Period 23:  6.6(a).

4.      The following provision shall become eligible to immediately exit the MISEP and the Court's jurisdiction after one period of positive trending in validated performance from the baseline measure reported in the Court Monitor's report for MISEP Period 23:  6.37.

5.      The following provision shall become eligible to immediately move to Section 4, Structures and Policies, and remain subject to the Court's jurisdiction pursuant to the terms of the MISEP, after two consecutive periods of positive trending in validated performance from the baseline measure reported in the Court Monitor's report for MISEP Period 23:  6.15.

6.      The Designated Performance Standard for the following provisions shall be reduced to 90%, and the provisions shall become eligible to immediately exit the MISEP and the Court's jurisdiction after two consecutive periods of compliance with the modified Designated Performance Standard:  6.30(a)(1), 6.30(a)(2), and 6.30(a)(3).

7.      MISEP Provision 6.3 is amended to read:

6.3 – Permanency in Twelve Months

DHHS will develop strategy plans to be implemented in each of certain selected counties, covering at least 20% of the foster care population and at DHHS's choosing from within the Big 14 counties of the State, to improve the rate of

45

permanency for children within their first 12 months in foster care.

The strategy plan will focus on identified needs and barriers to be addressed in the respective counties in order to improve the rate of permanency for children within their first 12 months in foster care, such as court delays, parenting time, service array, father engagement, foster parent support, placement disruption, and family resources among other such factors to be identified by DHHS. The strategy plan will include a description of the specific strategies to be implemented to improve permanency and set forth implementation action steps with timelines, identify lead staff responsible for implementation and articulate the intended outcomes of each strategy.

DHHS will provide a copy of the strategy plan for each county to the monitoring team within 30 days of execution of this Stipulation. DHHS may thereafter modify the strategies contained in the plans during the 12-month implementation period, beginning January 1, 2024, as it deems appropriate. DHHS shall provide an updated strategy plan, containing the elements as described above, to the monitoring team within 30 days of any modification(s).

By October 1, 2025, DHHS shall provide a Permanency within 12 Months Report to the monitoring team that shall include:

- the aggregate 12-month permanency rate for the children who entered foster care within the first 6 months of the previous period (January 1, 2023 – June 30, 2023) in the selected counties;
- the aggregate 12-month permanency rate for the children who entered foster care within the first 6 months of the period under review (January 1, 2024 – June 30, 2024) in the selected counties;

46

- a summary of DHHS's efforts and strategies to improve permanency in the selected counties and data demonstrating any progress achieved.

Based on the above DHHS report, the monitoring team shall determine if DHHS made good faith efforts to improve the rate of permanency within 12 months in the selected counties.  Positive trending in the aggregate permanency rate over the 12-month period shall be deemed to show that DHHS has made good faith efforts to improve permanency in the selected counties.  Negative trending in the permanency rate over the 12-month period shall not, alone, be considered to show a lack of good faith efforts but will be considered by the monitors together with all relevant factors.

If DHHS is found to have made good faith efforts, this provision 6.3 shall exit court jurisdiction.  Failure by DHHS to achieve a finding of good faith efforts will require an additional implementation period as described herein.

8.    Consistent with MISEP Provision 4.2, MISEP Provision 6.1 is amended such that DHHS will maintain an observed rate of victimization per 100,000 days in foster care less than 9.07, utilizing the CFSR Round 4 criteria.

    IT IS SO ORDERED.

s/ Nancy G. Edmunds
HON. NANCY G. EDMUNDS
United States District Judge

Dated:  January 25, 2024

Stipulated and Agreed to by:

_Samantha Bartosz (with permission)_      Date: January 24, 2024
Samantha M. Bartosz (P486946)
Attorney for Plaintiffs


_/s/ Neil A. Giovanatti_      Date: January 24, 2024
Neil A. Giovanatti (P82305)
Erin E. Harrington (P71394)
Attorneys for Defendants

**Appendix B. Age Range of Children in Care on June 30, 2023 by County**

| County Name | Ages 0-6 | | Ages 7-11 | | Ages 12-17 | | Ages 18+ | | Total |
|---|---|---|---|---|---|---|---|---|---|
| | Children | % | Children | % | Children | % | Children | % | |
| Alcona | 8 | 50.0% | 4 | 25.0% | 3 | 18.8% | 1 | 6.3% | 16 |
| Alger | 7 | 46.7% | 2 | 13.3% | 6 | 40.0% | 0 | 0.0% | 15 |
| Allegan | 67 | 55.4% | 20 | 16.5% | 26 | 21.5% | 8 | 6.6% | 121 |
| Alpena | 22 | 56.4% | 7 | 17.9% | 7 | 17.9% | 3 | 7.7% | 39 |
| Antrim | 1 | 20.0% | 0 | 0.0% | 1 | 20.0% | 3 | 60.0% | 5 |
| Arenac | 11 | 47.8% | 5 | 21.7% | 7 | 30.4% | 0 | 0.0% | 23 |
| Baraga | 1 | 20.0% | 4 | 80.0% | 0 | 0.0% | 0 | 0.0% | 5 |
| Barry | 8 | 33.3% | 0 | 0.0% | 12 | 50.0% | 4 | 16.7% | 24 |
| Bay | 41 | 41.8% | 12 | 12.2% | 31 | 31.6% | 14 | 14.3% | 98 |
| Benzie | 4 | 23.5% | 3 | 17.6% | 8 | 47.1% | 2 | 11.8% | 17 |
| Berrien | 97 | 45.1% | 49 | 22.8% | 59 | 27.4% | 10 | 4.7% | 215 |
| Branch | 29 | 42.6% | 15 | 22.1% | 21 | 30.9% | 3 | 4.4% | 68 |
| Calhoun | 114 | 46.3% | 72 | 29.3% | 52 | 21.1% | 8 | 3.3% | 246 |
| Cass | 44 | 49.4% | 12 | 13.5% | 27 | 30.3% | 6 | 6.7% | 89 |
| Central Office | 0 | 0.0% | 1 | 50.0% | 1 | 50.0% | 0 | 0.0% | 2 |
| Charlevoix | 11 | 73.3% | 1 | 6.7% | 1 | 6.7% | 2 | 13.3% | 15 |
| Cheboygan | 17 | 45.9% | 11 | 29.7% | 7 | 18.9% | 2 | 5.4% | 37 |
| Chippewa | 25 | 48.1% | 13 | 25.0% | 12 | 23.1% | 2 | 3.8% | 52 |
| Clare | 17 | 56.7% | 5 | 16.7% | 7 | 23.3% | 1 | 3.3% | 30 |
| Clinton | 6 | 23.1% | 5 | 19.2% | 11 | 42.3% | 4 | 15.4% | 26 |
| Crawford | 12 | 35.3% | 5 | 14.7% | 16 | 47.1% | 1 | 2.9% | 34 |
| Delta | 26 | 61.9% | 7 | 16.7% | 9 | 21.4% | 0 | 0.0% | 42 |
| Dickinson | 5 | 38.5% | 4 | 30.8% | 4 | 30.8% | 0 | 0.0% | 13 |
| Eaton | 34 | 54.8% | 11 | 17.7% | 14 | 22.6% | 3 | 4.8% | 62 |
| Emmet | 6 | 54.5% | 0 | 0.0% | 5 | 45.5% | 0 | 0.0% | 11 |
| Genesee | 226 | 47.6% | 88 | 18.5% | 128 | 26.9% | 33 | 6.9% | 475 |
| Gladwin | 9 | 27.3% | 7 | 21.2% | 16 | 48.5% | 1 | 3.0% | 33 |
| Gogebic | 8 | 44.4% | 3 | 16.7% | 7 | 38.9% | 0 | 0.0% | 18 |
| Grand Traverse | 36 | 62.1% | 10 | 17.2% | 9 | 15.5% | 3 | 5.2% | 58 |
| Gratiot | 12 | 36.4% | 8 | 24.2% | 12 | 36.4% | 1 | 3.0% | 33 |
| Hillsdale | 54 | 51.9% | 29 | 27.9% | 19 | 18.3% | 2 | 1.9% | 104 |
| Houghton | 6 | 42.9% | 5 | 35.7% | 3 | 21.4% | 0 | 0.0% | 14 |
| Huron | 15 | 42.9% | 8 | 22.9% | 10 | 28.6% | 2 | 5.7% | 35 |
| Ingham | 170 | 53.5% | 64 | 20.1% | 64 | 20.1% | 20 | 6.3% | 318 |
| Ionia | 17 | 60.7% | 4 | 14.3% | 5 | 17.9% | 2 | 7.1% | 28 |
| Iosco | 19 | 55.9% | 5 | 14.7% | 8 | 23.5% | 2 | 5.9% | 34 |
| Iron | 5 | 83.3% | 1 | 16.7% | 0 | 0.0% | 0 | 0.0% | 6 |
| Isabella | 28 | 59.6% | 8 | 17.0% | 8 | 17.0% | 3 | 6.4% | 47 |
| Jackson | 73 | 46.8% | 22 | 14.1% | 47 | 30.1% | 14 | 9.0% | 156 |
| Kalamazoo | 144 | 43.8% | 69 | 21.0% | 86 | 26.1% | 30 | 9.1% | 329 |
| Kalkaska | 10 | 50.0% | 2 | 10.0% | 8 | 40.0% | 0 | 0.0% | 20 |

| County Name | Ages 0-6 | | Ages 7-11 | | Ages 12-17 | | Ages 18+ | | Total |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Children | % | Children | % | Children | % | Children | % | |
| Kent | 156 | 35.6% | 79 | 18.0% | 142 | 32.4% | 61 | 13.9% | 438 |
| Keweenaw | 1 | 100.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 1 |
| Lake | 13 | 54.2% | 4 | 16.7% | 5 | 20.8% | 2 | 8.3% | 24 |
| Lapeer | 20 | 50.0% | 9 | 22.5% | 9 | 22.5% | 2 | 5.0% | 40 |
| Leelanau | 9 | 42.9% | 4 | 19.0% | 4 | 19.0% | 4 | 19.0% | 21 |
| Lenawee | 52 | 57.1% | 15 | 16.5% | 22 | 24.2% | 2 | 2.2% | 91 |
| Livingston | 27 | 35.5% | 20 | 26.3% | 21 | 27.6% | 8 | 10.5% | 76 |
| Luce | 7 | 87.5% | 1 | 12.5% | 0 | 0.0% | 0 | 0.0% | 8 |
| Mackinac | 13 | 61.9% | 5 | 23.8% | 3 | 14.3% | 0 | 0.0% | 21 |
| Macomb | 216 | 50.2% | 80 | 18.6% | 107 | 24.9% | 27 | 6.3% | 430 |
| Manistee | 19 | 51.4% | 7 | 18.9% | 10 | 27.0% | 1 | 2.7% | 37 |
| Marquette | 18 | 58.1% | 6 | 19.4% | 5 | 16.1% | 2 | 6.5% | 31 |
| Mason | 10 | 52.6% | 1 | 5.3% | 6 | 31.6% | 2 | 10.5% | 19 |
| Mecosta | 9 | 56.3% | 3 | 18.8% | 4 | 25.0% | 0 | 0.0% | 16 |
| Menominee | 14 | 60.9% | 6 | 26.1% | 3 | 13.0% | 0 | 0.0% | 23 |
| Midland | 32 | 38.1% | 17 | 20.2% | 29 | 34.5% | 6 | 7.1% | 84 |
| Missaukee | 7 | 41.2% | 4 | 23.5% | 5 | 29.4% | 1 | 5.9% | 17 |
| Monroe | 40 | 44.4% | 25 | 27.8% | 20 | 22.2% | 5 | 5.6% | 90 |
| Montcalm | 23 | 35.9% | 12 | 18.8% | 24 | 37.5% | 5 | 7.8% | 64 |
| Montmorency | 4 | 80.0% | 0 | 0.0% | 0 | 0.0% | 1 | 20.0% | 5 |
| Muskegon | 178 | 50.0% | 76 | 21.3% | 79 | 22.2% | 23 | 6.5% | 356 |
| Newaygo | 19 | 35.2% | 7 | 13.0% | 22 | 40.7% | 6 | 11.1% | 54 |
| Oakland | 214 | 51.8% | 91 | 22.0% | 85 | 20.6% | 23 | 5.6% | 413 |
| Oceana | 11 | 52.4% | 4 | 19.0% | 6 | 28.6% | 0 | 0.0% | 21 |
| Ogemaw | 9 | 45.0% | 4 | 20.0% | 3 | 15.0% | 4 | 20.0% | 20 |
| Ontonagon | 0 | 0.0% | 1 | 50.0% | 1 | 50.0% | 0 | 0.0% | 2 |
| Osceola | 7 | 36.8% | 6 | 31.6% | 6 | 31.6% | 0 | 0.0% | 19 |
| Oscoda | 7 | 50.0% | 2 | 14.3% | 4 | 28.6% | 1 | 7.1% | 14 |
| Otsego | 17 | 51.5% | 8 | 24.2% | 7 | 21.2% | 1 | 3.0% | 33 |
| Ottawa | 53 | 51.0% | 19 | 18.3% | 28 | 26.9% | 4 | 3.8% | 104 |
| Presque Isle | 1 | 16.7% | 3 | 50.0% | 2 | 33.3% | 0 | 0.0% | 6 |
| Roscommon | 15 | 50.0% | 6 | 20.0% | 9 | 30.0% | 0 | 0.0% | 30 |
| Saginaw | 105 | 54.7% | 31 | 16.1% | 45 | 23.4% | 11 | 5.7% | 192 |
| Sanilac | 13 | 36.1% | 13 | 36.1% | 9 | 25.0% | 1 | 2.8% | 36 |
| Schoolcraft | 6 | 37.5% | 4 | 25.0% | 6 | 37.5% | 0 | 0.0% | 16 |
| Shiawassee | 18 | 40.0% | 10 | 22.2% | 12 | 26.7% | 5 | 11.1% | 45 |
| St. Clair | 72 | 43.6% | 35 | 21.2% | 42 | 25.5% | 16 | 9.7% | 165 |
| St. Joseph | 50 | 48.1% | 19 | 18.3% | 26 | 25.0% | 9 | 8.7% | 104 |
| Tuscola | 3 | 25.0% | 2 | 16.7% | 4 | 33.3% | 3 | 25.0% | 12 |
| Van Buren | 35 | 42.7% | 17 | 20.7% | 23 | 28.0% | 7 | 8.5% | 82 |
| Washtenaw | 57 | 49.1% | 16 | 13.8% | 31 | 26.7% | 12 | 10.3% | 116 |
| Wayne | 1,241 | 45.6% | 625 | 23.0% | 673 | 24.7% | 181 | 6.7% | 2,720 |
| Wexford | 9 | 31.0% | 4 | 13.8% | 13 | 44.8% | 3 | 10.3% | 29 |
| Total | 4,275 | 46.8% | 1,902 | 20.8% | 2,332 | 25.5% | 629 | 6.9% | 9,138 |

**Appendix C. Length of Stay of Children in Care on June 30, 2023 by County**

| County Name | Less than a year | | 1-2 years | | 2-3 years | | 3-6 years | | 6 years plus | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Children | % | Children | % | Children | % | Children | % | Children | % | |
| Alcona | 5 | 31.3% | 2 | 12.5% | 7 | 43.8% | 2 | 12.5% | 0 | 0.0% | 16 |
| Alger | 10 | 66.7% | 1 | 6.7% | 0 | 0.0% | 4 | 26.7% | 0 | 0.0% | 15 |
| Allegan | 57 | 47.1% | 30 | 24.8% | 20 | 16.5% | 13 | 10.7% | 1 | 0.8% | 121 |
| Alpena | 11 | 28.2% | 11 | 28.2% | 8 | 20.5% | 9 | 23.1% | 0 | 0.0% | 39 |
| Antrim | 2 | 40.0% | 1 | 20.0% | 0 | 0.0% | 2 | 40.0% | 0 | 0.0% | 5 |
| Arenac | 13 | 56.5% | 4 | 17.4% | 2 | 8.7% | 4 | 17.4% | 0 | 0.0% | 23 |
| Baraga | 4 | 80.0% | 0 | 0.0% | 1 | 20.0% | 0 | 0.0% | 0 | 0.0% | 5 |
| Barry | 8 | 33.3% | 11 | 45.8% | 2 | 8.3% | 2 | 8.3% | 1 | 4.2% | 24 |
| Bay | 39 | 39.8% | 16 | 16.3% | 25 | 25.5% | 14 | 14.3% | 4 | 4.1% | 98 |
| Benzie | 6 | 35.3% | 6 | 35.3% | 3 | 17.6% | 2 | 11.8% | 0 | 0.0% | 17 |
| Berrien | 97 | 45.1% | 59 | 27.4% | 25 | 11.6% | 30 | 14.0% | 4 | 1.9% | 215 |
| Branch | 36 | 52.9% | 23 | 33.8% | 5 | 7.4% | 3 | 4.4% | 1 | 1.5% | 68 |
| Calhoun | 116 | 47.2% | 86 | 35.0% | 8 | 3.3% | 28 | 11.4% | 8 | 3.3% | 246 |
| Cass | 32 | 36.0% | 32 | 36.0% | 15 | 16.9% | 4 | 4.5% | 6 | 6.7% | 89 |
| Central Office | 1 | 50.0% | 0 | 0.0% | 0 | 0.0% | 1 | 50.0% | 0 | 0.0% | 2 |
| Charlevoix | 9 | 60.0% | 4 | 26.7% | 1 | 6.7% | 1 | 6.7% | 0 | 0.0% | 15 |
| Cheboygan | 14 | 37.8% | 8 | 21.6% | 10 | 27.0% | 5 | 13.5% | 0 | 0.0% | 37 |
| Chippewa | 15 | 28.8% | 17 | 32.7% | 14 | 26.9% | 6 | 11.5% | 0 | 0.0% | 52 |
| Clare | 15 | 50.0% | 5 | 16.7% | 8 | 26.7% | 1 | 3.3% | 1 | 3.3% | 30 |
| Clinton | 7 | 26.9% | 13 | 50.0% | 2 | 7.7% | 3 | 11.5% | 1 | 3.8% | 26 |
| Crawford | 10 | 29.4% | 5 | 14.7% | 10 | 29.4% | 7 | 20.6% | 2 | 5.9% | 34 |
| Delta | 21 | 50.0% | 7 | 16.7% | 7 | 16.7% | 7 | 16.7% | 0 | 0.0% | 42 |
| Dickinson | 5 | 38.5% | 6 | 46.2% | 0 | 0.0% | 2 | 15.4% | 0 | 0.0% | 13 |
| Eaton | 25 | 40.3% | 21 | 33.9% | 8 | 12.9% | 8 | 12.9% | 0 | 0.0% | 62 |
| Emmet | 2 | 18.2% | 5 | 45.5% | 1 | 9.1% | 2 | 18.2% | 1 | 9.1% | 11 |
| Genesee | 194 | 40.8% | 120 | 25.3% | 63 | 13.3% | 77 | 16.2% | 21 | 4.4% | 475 |
| Gladwin | 13 | 39.4% | 4 | 12.1% | 14 | 42.4% | 2 | 6.1% | 0 | 0.0% | 33 |
| Gogebic | 4 | 22.2% | 10 | 55.6% | 4 | 22.2% | 0 | 0.0% | 0 | 0.0% | 18 |
| Grand Traverse | 17 | 29.3% | 23 | 39.7% | 13 | 22.4% | 5 | 8.6% | 0 | 0.0% | 58 |
| Gratiot | 20 | 60.6% | 2 | 6.1% | 4 | 12.1% | 7 | 21.2% | 0 | 0.0% | 33 |
| Hillsdale | 45 | 43.3% | 37 | 35.6% | 14 | 13.5% | 8 | 7.7% | 0 | 0.0% | 104 |
| Houghton | 9 | 64.3% | 1 | 7.1% | 4 | 28.6% | 0 | 0.0% | 0 | 0.0% | 14 |
| Huron | 14 | 40.0% | 8 | 22.9% | 6 | 17.1% | 7 | 20.0% | 0 | 0.0% | 35 |
| Ingham | 105 | 33.0% | 101 | 31.8% | 52 | 16.4% | 50 | 15.7% | 10 | 3.1% | 318 |
| Ionia | 14 | 50.0% | 5 | 17.9% | 6 | 21.4% | 2 | 7.1% | 1 | 3.6% | 28 |
| Iosco | 18 | 52.9% | 4 | 11.8% | 8 | 23.5% | 3 | 8.8% | 1 | 2.9% | 34 |
| Iron | 5 | 83.3% | 1 | 16.7% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 6 |
| Isabella | 26 | 55.3% | 15 | 31.9% | 2 | 4.3% | 1 | 2.1% | 3 | 6.4% | 47 |
| Jackson | 55 | 35.3% | 46 | 29.5% | 25 | 16.0% | 24 | 15.4% | 6 | 3.8% | 156 |
| Kalamazoo | 87 | 26.4% | 110 | 33.4% | 56 | 17.0% | 64 | 19.5% | 12 | 3.6% | 329 |
| Kalkaska | 10 | 50.0% | 0 | 0.0% | 5 | 25.0% | 5 | 25.0% | 0 | 0.0% | 20 |

| County Name | Less than a year | | 1-2 years | | 2-3 years | | 3-6 years | | 6 years plus | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Children | % | Children | % | Children | % | Children | % | Children | % | |
| Kent | 150 | 34.2% | 108 | 24.7% | 80 | 18.3% | 81 | 18.5% | 19 | 4.3% | 438 |
| Keweenaw | 0 | 0.0% | 1 | 100.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 1 |
| Lake | 8 | 33.3% | 10 | 41.7% | 0 | 0.0% | 5 | 20.8% | 1 | 4.2% | 24 |
| Lapeer | 29 | 72.5% | 7 | 17.5% | 0 | 0.0% | 3 | 7.5% | 1 | 2.5% | 40 |
| Leelanau | 9 | 42.9% | 6 | 28.6% | 3 | 14.3% | 1 | 4.8% | 2 | 9.5% | 21 |
| Lenawee | 30 | 33.0% | 32 | 35.2% | 17 | 18.7% | 11 | 12.1% | 1 | 1.1% | 91 |
| Livingston | 22 | 28.9% | 14 | 18.4% | 18 | 23.7% | 21 | 27.6% | 1 | 1.3% | 76 |
| Luce | 0 | 0.0% | 8 | 100.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 8 |
| Mackinac | 15 | 71.4% | 1 | 4.8% | 5 | 23.8% | 0 | 0.0% | 0 | 0.0% | 21 |
| Macomb | 134 | 31.2% | 131 | 30.5% | 67 | 15.6% | 79 | 18.4% | 19 | 4.4% | 430 |
| Manistee | 15 | 40.5% | 9 | 24.3% | 9 | 24.3% | 4 | 10.8% | 0 | 0.0% | 37 |
| Marquette | 12 | 38.7% | 10 | 32.3% | 7 | 22.6% | 2 | 6.5% | 0 | 0.0% | 31 |
| Mason | 11 | 57.9% | 6 | 31.6% | 1 | 5.3% | 1 | 5.3% | 0 | 0.0% | 19 |
| Mecosta | 6 | 37.5% | 9 | 56.3% | 1 | 6.3% | 0 | 0.0% | 0 | 0.0% | 16 |
| Menominee | 12 | 52.2% | 7 | 30.4% | 2 | 8.7% | 2 | 8.7% | 0 | 0.0% | 23 |
| Midland | 36 | 42.9% | 21 | 25.0% | 15 | 17.9% | 7 | 8.3% | 5 | 6.0% | 84 |
| Missaukee | 12 | 70.6% | 3 | 17.6% | 1 | 5.9% | 1 | 5.9% | 0 | 0.0% | 17 |
| Monroe | 35 | 38.9% | 30 | 33.3% | 12 | 13.3% | 11 | 12.2% | 2 | 2.2% | 90 |
| Montcalm | 20 | 31.3% | 14 | 21.9% | 14 | 21.9% | 13 | 20.3% | 3 | 4.7% | 64 |
| Montmorency | 1 | 20.0% | 2 | 40.0% | 2 | 40.0% | 0 | 0.0% | 0 | 0.0% | 5 |
| Muskegon | 146 | 41.0% | 86 | 24.2% | 51 | 14.3% | 66 | 18.5% | 7 | 2.0% | 356 |
| Newaygo | 23 | 42.6% | 12 | 22.2% | 6 | 11.1% | 11 | 20.4% | 2 | 3.7% | 54 |
| Oakland | 162 | 39.2% | 101 | 24.5% | 79 | 19.1% | 56 | 13.6% | 15 | 3.6% | 413 |
| Oceana | 10 | 47.6% | 9 | 42.9% | 2 | 9.5% | 0 | 0.0% | 0 | 0.0% | 21 |
| Ogemaw | 12 | 60.0% | 2 | 10.0% | 1 | 5.0% | 4 | 20.0% | 1 | 5.0% | 20 |
| Ontonagon | 2 | 100.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 2 |
| Osceola | 9 | 47.4% | 3 | 15.8% | 5 | 26.3% | 1 | 5.3% | 1 | 5.3% | 19 |
| Oscoda | 3 | 21.4% | 7 | 50.0% | 2 | 14.3% | 2 | 14.3% | 0 | 0.0% | 14 |
| Otsego | 14 | 42.4% | 14 | 42.4% | 0 | 0.0% | 5 | 15.2% | 0 | 0.0% | 33 |
| Ottawa | 36 | 34.6% | 41 | 39.4% | 10 | 9.6% | 17 | 16.3% | 0 | 0.0% | 104 |
| Presque Isle | 2 | 33.3% | 3 | 50.0% | 0 | 0.0% | 1 | 16.7% | 0 | 0.0% | 6 |
| Roscommon | 10 | 33.3% | 9 | 30.0% | 4 | 13.3% | 6 | 20.0% | 1 | 3.3% | 30 |
| Saginaw | 74 | 38.5% | 69 | 35.9% | 29 | 15.1% | 19 | 9.9% | 1 | 0.5% | 192 |
| Sanilac | 14 | 38.9% | 9 | 25.0% | 9 | 25.0% | 4 | 11.1% | 0 | 0.0% | 36 |
| Schoolcraft | 8 | 50.0% | 1 | 6.3% | 6 | 37.5% | 1 | 6.3% | 0 | 0.0% | 16 |
| Shiawassee | 20 | 44.4% | 8 | 17.8% | 7 | 15.6% | 9 | 20.0% | 1 | 2.2% | 45 |
| St. Clair | 68 | 41.2% | 38 | 23.0% | 25 | 15.2% | 26 | 15.8% | 8 | 4.8% | 165 |
| St. Joseph | 43 | 41.3% | 22 | 21.2% | 23 | 22.1% | 7 | 6.7% | 9 | 8.7% | 104 |
| Tuscola | 0 | 0.0% | 10 | 83.3% | 1 | 8.3% | 0 | 0.0% | 1 | 8.3% | 12 |
| Van Buren | 53 | 64.6% | 12 | 14.6% | 6 | 7.3% | 5 | 6.1% | 6 | 7.3% | 82 |
| Washtenaw | 40 | 34.5% | 32 | 27.6% | 22 | 19.0% | 20 | 17.2% | 2 | 1.7% | 116 |
| Wayne | 977 | 35.9% | 642 | 23.6% | 406 | 14.9% | 549 | 20.2% | 146 | 5.4% | 2,720 |
| Wexford | 8 | 27.6% | 8 | 27.6% | 3 | 10.3% | 10 | 34.5% | 0 | 0.0% | 29 |
| Total | 3,487 | 38.2% | 2,427 | 26.6% | 1,409 | 15.4% | 1,476 | 16.2% | 339 | 3.7% | 9,138 |

**Appendix D. MIC Data Report, October 2023**



MALTREATMENT IN CARE
*Administrative Data and Disposition Summaries to*
*Understand Risk in Relative Care Homes*
October 2023

CHILD & ADOLESCENT DATA LAB

## Maltreatment in Care Summary

Maltreatment in care (MIC) refers to confirmed incidents of abuse/ neglect while children are in the care and supervision of child welfare agencies. In previous years, Data Lab analyzed administrative records and disposition summaries to help the Michigan Department of Health and Human Services' (MDHHS) Children's Services Administration (CSA) understand the risk and protective factors associated with MIC. In the previous (October 2022) MIC report, we focused on MIC events occurring within child caring institutions (CCI) because those settings were identified as high risk. CCIs remain a concern as they are once again overrepresented in MIC complaints. In the current report, we focus on relative homes. We take this approach for two reasons. First, the use of relative care placements is increasing in Michigan, and second, almost half of all MIC events occur in a relative care foster home.

- There were 250 total maltreatment in care (MIC) events in FY 2022. Fifteen children experienced more than one MIC event. This represents an increase from FY 2021 in which 192 children experienced maltreatment in care and 3 children experienced two MIC events.

- The most common MIC event was improper supervision (72% of all MIC complaints).

- Children living in congregate care settings (referred to as child caring institutions) are at an increased risk of experiencing maltreatment in care

- At any point in time, approximately 4% of children in care in Michigan are living in a child caring institution. Over the course of care, about 7% of children will eventually live in a child caring institution. Yet child caring institutions account for approximately 13.6% of all MIC events.

- Relative foster home placement account for approximately 50% of all MIC complaints.

- Compared with non-related foster families, relative homes are more likely to care for males (49% v. 44%) and more likely to care for African American children (57% v. 46%).

- Compared with the MIC events associated with non-related foster families, MIC events in relative foster homes are more likely to involve child sibling groups (32% v. 21%).

- The types of maltreatment experienced varies between non-related and relative foster homes. The MIC events associated with relative foster homes are more likely to be improper supervision (77% v. 58%). The MIC events associated with non-related foster homes are more likely to be physical abuse (37% v. 31%).

- The perpetrator responsible for the MIC event varies between licensed unrelated foster homes and relative foster homes. Foster parents account for approximately 60% of MIC events in unrelated homes. In comparison, the foster parents account for 71% of MIC event in relative foster homes. Biological parents were also more likely identified as a perpetrator of MIC in relative foster homes (45% v. 24%).

- From the dispositional summaries, the following two underlying themes emerge as risk factors associated with MIC in relative foster homes: (1) unauthorized visits with biological parent(s) and (2) alcohol and drug use.

54

## Background and Overview

Maltreatment in care is a key measure of child safety. When a court removes a child from the home, it is fair to expect that the state protects the child from further harm. However, some children who enter the foster care system remain at risk of further maltreatment. Such maltreatment may be experienced in a foster family (related or unrelated), residential or even a parental home (during the period-of-time between reunification and case closure). Michigan continues to work diligently to understand the root causes of maltreatment in care and develop innovative policies and practices to help reduce the risk of maltreatment in care. As noted in previous MIC reports, the primary obstacle or challenge to significantly reducing maltreatment in care in almost every state is the relatively low probability of abuse or neglect occurring once children enter the foster care system.  Moreover, not all risks of harm situations are foreseeable or preventable.

Forecasting risk is only useful when it leads to actions (e.g. changes in policies) that are better informed and capable of implementation. In previous MIC reports, the Data Lab identified children (or characteristics of children) at greatest risk of MIC. The results identified various populations (i.e. demographics) and observation periods (e.g. first few months post reunification) that were associated with an increased risk.  For example, in the 2022 report, MIC analyses indicated that children in CCI settings were at an increased risk.  Following a thorough review of the disposition summaries, three distinct themes emerged. First, the qualifications, experience, staffing patterns and professional judgement of CCI staff were obviously less than adequate. Second, the inappropriate use of physical force and the inability to safely execute a child restraint increased physical injury and thus increased the risk of MIC. Third, the lack of thoughtful and planned supervision of youth surrounding attempted or successful AWOL increased the risk that children will experience maltreatment.  Several of these same themes continue to emerge in the analysis of MIC events associated with CCI placements.  In the current report, our analytic approach is similar.  Yet we focus on MIC events associated with relative care foster homes because (1) the use of relative care placements is increasing in Michigan and (2) almost half of all MIC events occur in a relative care foster home.  Moreover, African American children are overrepresented in relative care foster homes, even more so than the overall child welfare population.  As issues of racial disparities and equity are top priorities for MDHHS, it is important to examine the settings more often associated with African American children.  The following figure displays the increase use (approximately 50% over time) of relative care as a first placement.  This figure represents all children placed between 2013 and 2023.



The current report is an update from the Child and Adolescent Data Lab's 2022 MIC report.  In terms of a formal definition, maltreatment in care (MIC) refers to incidents of child abuse or neglect suffered by children under the care and supervision of children's services agencies. Typically, this is defined as confirmed incidents of maltreatment experienced by children during foster care placements, but also includes events involving children placed in residential or other settings (including the biological family home under Children and Family Services Reviews (CFSR) round 3 criteria), as long as the agency is responsible for the child's safety and well-being. Ensuring the safety and protection of children in their care is a key priority for children's service agencies, which is why the measure of maltreatment in care is included in the Children & Family Services Reviews (CFSR). Updates to CFSR measures (round 4) are forthcoming.

The report relies on the administrative data collected by investigators and caseworkers. In terms of specific data files, the Data Lab analyzed information from the Adoption and Foster Care Analysis and Reporting System (AFCARS) and the National Child Abuse and Neglect Data System (NCANDS). The administrative records were used to identify specific MIC events. Specific events were then tied to the disposition summaries captured in MiSACWIS. The disposition summaries are open field text responses written by CPS workers at the conclusion of an investigation.
MDHHS policy states the caseworkers must document the following in the disposition summary:

- Allegations investigated.
- Investigation disposition (preponderance/no preponderance).
- Names of the alleged and/or confirmed perpetrator(s) and alleged and/or confirmed victim(s).
- Steps taken in the investigation including:
- Verification of the safety and whereabouts of all children listed in investigations persons.
- Interviews with adults.
- Observations of the home and/or scene of alleged abuse/neglect.
- Any documentation obtained to support the conclusion (medical reports, police reports, etc.).
- How the relevant facts/evidence obtained during the investigation led to case outcome.
- The category disposition, the risk level, and any applicable overrides applied.
- The names of individuals added to central registry and the confirmed case type if applicable.
- Any services recommended, offered, or referred if applicable.
- Any safety plans put in place.
- If a petition was filed and rationale

## Frequency, Type and Location of MIC Events

In fiscal year of 2022, 234 children experienced 250 maltreatment in care (MIC) events.  The majority of MIC victims experienced neglect (90%). The most common form of neglect was improper supervision (72%).

| Allegation Types | n | Percent* |
|---|---|---|
| Maltreatment | 54 | 21.6% |
| Neglect | 30 | 12.0% |
| Physical Abuse | 82 | 32.8% |
| Failure To Protect | 15 | 6.0% |
| Improper Supervision | 180 | 72.0% |
| Mental Injury | 12 | 4.8% |
| Sexual Abuse | 13 | 5.2% |
| Threatened Harm | 23 | 9.2% |

*Because MIC could involve more than one allegation, the percent column totals to more than 100%.

Consistent with previous MIC reports produced for MDHHS, children living in congregate care settings (specifically child caring institutions (CCI) were at the greatest risk of experiencing maltreatment in care. Overall, MIC victims living in a child caring institution account for approximately 14% (last year it was 18%) of all MIC events. This is concerning because at any given point in time (e.g. last day of the fiscal year) only about 4% of children in Michigan are living in a child caring institution. Moreover, when you look at every placement associated with a child's out of home experience, their overall probability of placement in a child caring institution remains low (only about 7% touch a CCI setting).  In the current report, we explore the risk of MIC associated with relative care homes.

| Location | n | percent |
|---|---|---|
| Relative Foster Home | 124 | 49.6% |
| Unrelated Foster Home | 46 | 18.4% |
| Child Caring Institution | 34 | 13.6% |
| Other | 23 | 9.2% |
| Parental Home | 23 | 9.2% |
| Total | 250 | 100.0% |

It is important to note that the type of MIC events vary by placement settings. The following table is generated from the previous three years of MIC data. The estimates are fairly consistent across years. Children placed in relative care homes are more likely to be associated with a substantiated allegation of improper supervision and less likely to be associated with a substantiated allegation of physical abuse. As noted in the 2022 report, children placed in CCIs are at an increased risk of physical abuse (often stemming from problematic restraints).



58

## Understanding Common Themes in Relative Care Homes

The Data Lab studied the disposition summaries (documents written by the investigators) to understand if there were common experiences across MIC events within relative care settings. We were particularly interested in whether themes would emerge that might offer specific opportunities to decrease future risk.  Two distinct (but often overlapping) themes emerged. First, unauthorized visits are consistently noted throughout the MIC disposition summaries associated with relative care homes.  Specifically, problems occurring when biological parents frequently visit the relative home or when relative care providers permit children to stay with the biological parents.  Second, the presence of drugs and alcohol frequently noted in the disposition summaries of relative care homes.  This is not always an issue for the relative provider themselves and involves biological parents (and thus overlaps with the first theme noted).

## Examples from the Disposition Summaries

The following are examples that represent the themes that emerged from the relative foster home care events: Theme 1 Unauthorized Visits with Biological Parent(s), and Theme 2 Alcohol and Drug Use Compromising the Safety of Children. We present text from the disposition summaries as evidence. We do not present each and every disposition summary in totality, as much of the text is unrelated to the risk itself and the length of disposition summaries exceeds the purpose of the current report. The extracted statements from the disposition summaries require little explanation. The events are detailed and the factors that lead to these events are self-evident.  Several of the MIC events involve both unauthorized visits and alcohol or drugs.

### Theme 1: Unauthorized Visits with Biological Parent(s)

EXAMPLE 1: CPS-MIC complaint was received for improper supervision concerns. At the time of the complaint, the children were placed with their maternal aunt. AUNT allowed the children to stay with PARENTS from 12/25/20 until 12/26/20. The allegations stated that police responded to a call at HOTEL and located the children hiding under the beds and CHILD hiding in the  bathroom with heroin needles. A copy of the police report was received, and CPS-MIC spoke with an officer that was on scene. It was confirmed that MOTHER was not answering the door, and bolt cutters were used to break the chain on the door. The children were observed huddled on the  floor of the room between the two beds. They were partially covered with blankets and crying in the fetal position.  Police located multiple needles with blood inside of them in a makeup type of bag in the hotel room's sink. Two more needles were found in between the mattresses of one of the beds. Some of the needles appeared used. A Narcan kit was also found. MOTHER admitted that she used heroin while the children were in the room.

EXAMPLE 2: CHILD leaves the home and stays with his father whenever he wants. GRANDMOTHER does not notify LE or FC. CHILD was interviewed and stated his grandmother knew he went to his dad's home and always allows him to go to his mom and dad's home without supervision. He stated the incident (moped collision) happened, but he was not injured. LE was contacted and stated the incident occurred and FATHER left SON at the accident scene.  FC and adoption worker stated that GRANDMOTHER knew that CHILD'S parents'  rights were terminated and that he should not have any contact with them, the same was confirmed by the GAL.  AODPTED child in the home forensically interviewed and confirmed CHILD was having unsupervised contact with his parents.

59

EXAMPLE 3: There is a preponderance of evidence to support the allegations of Improper Supervision of CHILD by GRANDMOTHER and MOTHER. ALLEGATIONS: The initial complaint alleged that CHILD (2) is in foster care and placed with her maternal grandma. MOTHER and FATHER are her parents that reside separate. MOTHER frequently displays erratic behavior. MOTHER has mental health issues and does not take her medications. There are multiple police reports regarding MOTHER shoplifting while CHILD was present and without. GRANDMOTHER is aware of MOTHERS issues and the risk of harm it puts CHILD in if she is in her care, however, she has been sending CHILD on unauthorized, unsupervised visits with MOTHER. CHILD is young and has limited verbal ability. There is concern for CHILD's well being while in MOTHER's care. MOTHER has done bizarre and inappropriate things. MOTHER has not resolved the issues leading to the removal of CHILD in July 2021 and GRANDMOHTER is aware of this but still allowing unauthorized, unsupervised visits. INVESTIGATIVE FINDINGS: The investigation found that GRANDMOTHER allowed CHILD to have unsupervised contact with her mother on two separate occasions. The first occasion, on 10/25/2021, resulted in MOTHER shoplifting while CHILD was with her. The shoplifting incident occurred at a local smoke shop that sells a variety of items including vapes, glass pipes, THC and smoking paraphernalia. The second occasion, on 10/30/2021, resulted in law enforcement being contacted because MOTHER was yelling and was alleged to have a knife. MOTHER did not have a knife but law enforcement indicated at that time that MOTHER appeared to be in a "manic state" during their contact.

EXAMPLE 4: there is a preponderance of evidence of improper supervision of CHILD by FATHER. The complaint alleged that GRANDMOTHER has been allowing CHILD to have overnight visitation with her father, which is against the court order. It was further alleged that FATHER engaged in a physical altercation with CHILD'S biological mother in front of CHILD during one of these overnight visits.  CHILD disclosed that she has stayed overnight with her father on multiple occasions, specifically on a Saturday night when GRANDMOTHER has to get up early to go sing with the church choir. CHILD also disclosed that she witnessed her father hitting her mother and pushing her to the ground in the basement of her father's home, and that CHILD saw a photo of MOTHERS face when it was bruised and injured from this fight. GRANDMOTHER was interviewed and disclosed on one occasion, CHILD was giving her attitude so she pushed CHILD'S face. She was warned that there should be no physical discipline whatsoever with CHILD and that was part of her agreement as a foster parent. It was discussed with the foster care worker that possibly a respite caregiver could be identified if GRANDMOTHER needed a break from CHILD. A caregiver has not been identified as of the disposition of this investigation.

EXAMPLE 5: CHILDREN are temporary court wards and reside in a licensed relative foster care placement with their GRANDPARENTS.  A CPS-MIC complaint was received due to allegations that CHILD cut her arm with a butter knife after getting into an argument with GRANDMOTHER and another relative. It was alleged that REALTIVES were encouraging CHILD to cut/hurt herself. It was also alleged that MOTHER has a no contact order with CHILD but GRANDPARENTS are allowing MOTHER to come to the home.  GRANDMOTHER admitted to bringing CHILDREN AND MOTHER to school together at the beginning of the year then out for dinner. MOTHER did not seem to understand why this was a problem. It was also reported by MOTHER that she will come to the home and see CHILD briefly.

EXAMPLE 6: CHILD was brought to the ER due to overdosing on medication that was left out. GRANDFATHER reported he had just gotten home from the pharmacy with a prescription, set it on the table, and forgot to lock it up because he became distracted due to company coming over. He

estimated that it was over an hour from the time that he got home to the time that CHILD notified him that SIBLING had the medication. There is concern that this is not the first time that CHILD has accidentally had access to medications when they should have been locked up. Numerous licensing special evaluations have occurred and addressed proper and safe storage of medications. CHILD took medications that were left out. A rule violation was established, and a corrective action plan (CAP) was signed stating that GRANDPARENTS will ensure all medications are stored in the key-locked filing cabinet within the master bedroom of the home. licensing became involved due to CHILD overdosing on Excedrin that was in the family's vehicle. the same CAP was addressed due to an evaluation involving CHILD not being given her medications regularly.  there was another incident of CHILD overdosing on medication that was left accessible in GRANDMOTHERS purse. Again, a CAP was completed stating that all medications would be kept locked. Due to numerous safety plans and CAPs being completed with the family and CHILD still having access to medication and overdosing, GRANDPARENTS will be substantiated for improper supervision.

EXAMPLE 7: The complaint was assigned for improper supervision, maltreatment and physical abuse naming FATHER as the perpetrator and CHILDREN as victims. Although Centralized Intake tagged FATHER as a perp, he is not a perpetrator pursuant to policy as parental rights have been terminated and he does not reside in the home.  During the course of the investigation it was determined that GRANDMOTHER should be tagged a perpetrator of improper supervision, as there was a pattern shown of GRANDMOTHER allowing the parents to have contact with the children, placing the children at risk of harm.  This complaint specifically alleges that FATHER had a visit with the kids at GRANDMOTHERS home and FATHER yelled at his biological mother. Then FATHER strangled CHILD for five seconds. CHILD has a small abrasion on his right arm.  CHILD said his parents were visiting and do spend the night at times and do visit often. During the visit he and his mom started to argue. FATHER then intervened and CHILD stated his dad was in front of him screaming and yelling which prompted a "fight or flight" reaction according to CHILD. He and his biological dad engaged in an altercation.  CHILD said he felt "afraid" during the incident with his FATHER. He told officers he feels "overwhelmed" at the home and plans to leave when he is 18. MOTHER indicated the parents see the children every day. She denied seeing anything.  She took no responsibility that she was aware the parents are to have no contact.  GRANDMOTHER continued to allow parents time with the children despite the safety plan she was fully aware of.  In addition, the parents continue to have ongoing substance use, which was acknowledge by GRANDMOTHER in the police report.

## Theme 2: Alcohol and Drug Use Compromising the Safety of Children

EXAMPLE 1: Children Protective Services Maltreatment in Care Unit received a complaint on 5/17/2020. "CHILD was found with a spoon in his mouth with suspected heroin on it. CHILD was given Narcan and CPR. The incident happened in GRANDMOTHERS home. Details of the incident are unknown. CHILD is in the hospital currently stabilizing. CHILD's drug screen results are pending." A second referral source contacted CI with the following allegations "CHILD ingested either a drug or drug paraphernalia while at GRANDMOTHER'S home with MOTHER and FATHER present. MOTHER and FATHER are not supposed to be at the home and GRANDMOTHER told them to leave before emergency responders arrived. It is believed that GRANDMOTHER is allowing MOTHER and FATHER to live in her home. MOTHER and FATHER are currently believed to be using methadone and heroin. CHILD ingested the drugs or drug paraphernalia while in MOTHER and FATHERS room at GRANDMOTHERS home. FATHER was going to inject CHILD with a syringe of Narcan but did not. EMS injected CHILD with Narcan. CHILD became stable.

EXAMPLE 2: CHILDREN are placed with their GRANDMOTHER.  Former LTP lives in the house as well, as does his new girlfriend.  Former LTP has been giving all three children marijuana and alcohol when GRANDMOTHER is sleeping. When GRANDMOTHER discovered this she went and got drug tests for the children. Yesterday, LTP found out about GRANDMOTHER buying drug tests and became belligerent. He started spraying bleach all over the home and on GRANDMOTHER. The police were called and responded to the home. LTP was not arrested. GRANDMOTHER left the home and is staying with a relative. CHILDREN came home for a brief time before leaving again to go stay with a friend. ONE CHILD wanted to leave but former LTP "snatched" her up by the arm and then LTP new girlfriend dragged CHILD by the arm back inside the house. CHILD was screaming and crying and did not want to stay. It is unknown if CHILD was injured from being snatched and dragged. LTP GIRLFRIEND has her own CPS involvement with other children. She is not supposed to be around children. LTP Is a felon and has a long history of criminal charges including rape, DV, and burglary. It is unknown how he obtained guardianship over CHILD due to his criminal charges. During the initial home visit there were approximately 15 marijuana plants in the yard that were not locked or in a separate area. LTP also had marijuana drying inside the home that was not locked.

EXAMPLE 3: This investigation was conducted by CPS MIC. CHILD reported to his mother and the therapist what had occurred. He also took photographs on his face. MOTHER also shared that she has concerns about the placement with GRANDMOTHER because of allegations that she is allowing CHILDREN to smoke weed and drink alcohol. A forensic interview was completed with CHILD. There is physical violence in home.  CHILDREN are encouraged to fight one another. CHILD sustained several minor injuries from her actions. GRANDMOTHER allows CHILDREN to smoke weed and drink alcohol, even providing alcohol and paraphernalia to them as gifts. showed a video of CHILD intoxicated and vomiting into the toilet. Another photo of a nearly empty bottle of alcohol was reportedly purchased for the girls by RELATIVE FOSTER PARENT.  CHILD also disclosed that the SIBLINGS purchased weed from an unknown man in the trailer park and that his FATHER gave them an ounce of weed for Christmas.  CHILD suspended from school for smoking weed.

EXAMPLE 4: A referral was received stating CHILD smokes marijuana with his AUNT to help him sleep.  AUNT admitted to providing the substance once to CHILD to see if it would help with his ADHD.  CHILD admitted to using marijuana multiple times with AUNT.  This was a dual investigation with Flint Police Department.  CHILDREN reported AUNT smokes out of a bong that has aliens on it. It is also black, purple, green and white in color.  CHILD stated his mom keeps the bong on a table so the dog doesn't knock it over due to there being water inside of it.  CHILD stated SIBLING is allowed to smoke out of the bong because he's old enough but that he isn't old enough to smoke out of it.  CHILD Stated his mom and SIBLING use the bong every day.  CHILD initially denied AUNT smoking marijuana.  He then admitted she does and she allows him to use it with her because it helps him sleep at night.  CHILD was unable to say how many times he's used with AUNT other than it's been more than ten.  He said they would smoke the bong in the living room when SIBLING was present.  He also stated YOUNGER CHILD took two hits off of the bong on two different occasions.  AUNT admitted to providing CHILD with marijuana on one occasion.  She stated she did this as an experiment because of his ADHD.  AUNT stated she read somewhere that marijuana helps with ADHD so she wanted to see if it would help CHILD.  AUNT did not obtain consent from a pediatrician indicating marijuana would help CHILD'S ADHD which she reported being the reason she allowed him to smoke it.

EXAMPLE 5: A CPS MIC case was investigated with biological MOTHER with her biological children. The children are placed in the care of their maternal GRANDMOTHER.  It was alleged that MOTHER Physically Abused and Improperly Supervised CHILDREN.  It was alleged that MOTHER put CHILD into a chokehold, and CHILD had difficulty breathing.  It was alleged that MOTHER attempted to fight OTHER CHILD.  It was alleged that MOTHER provided CHILD marijuana. The children reported that they live with their grandmother, grandfather, mother, mother's fiancé, and siblings.  It was reported that the maternal grandmother is at home and provides care for them. CHILD reported that her mother wrapped her arms around her neck and choked her while she was sitting on her lap.  She reported turning red and having difficulty breathing.  An interview was completed with MOTHER.  She reported that there was an incident where she was playing with CHILD and wrapped her arms around her neck requesting a hug.  She denied that her daughter having difficulty breathing.  She denied fighting or choking her daughter.  MOTHER reported that she did provide CHILD marijuana on one occasion.  MOTHER reported that she was worried that her daughter would obtain laced marijuana if she got it from someone in the community.

EXAMPLE 6: During the course of the investigation there is sufficient evidence to support the allegations. Per PSM 711-5 Improper Supervision is Placing the child in, or failing to remove the child from, a situation that a reasonable person would realize requires judgment or actions beyond the child's level of maturity, physical condition, or mental abilities and that results in harm or threatened harm to the child. During an unsupervised parenting time, MOM was under the influence of alcohol and Valium impairing her ability to care for her minor children. MOM made the decision to allow LTP to come over to her house where the kids were even though there is a no contact order in place due to previous incidents of domestic violence between MOM and LTP. During the visit a physical altercation occurred between MOM and LTP. The no contact order was in place to ensure the safety of MOM and the children. The prior domestic violence resulted in a case substantiation and played a role in removal of the children. MOM should not have had contact with LTP. CHILDREN are scared because of the physical altercation and scared to be around LTP due to prior physical abuse. All of the children in the home were put at risk of harm. There is continued risk of harm to all of the children due to unresolved domestic violence and substance use by MOM AND LTP.

## Implications and Thoughts for the Future

- There are limitations to the analysis of administrative data to help "predict" which children will experience MIC. The analysis of administrative data is essential but given the infrequency of these events, the Data Lab advises complementary methods.
- Disposition summaries offer additional details that complement administrative records
- Disposition summaries offer opportunities to identify themes associated with risk.
- Congregate care placements, in this report and in previous reports, are overrepresented in MIC events. We suggest experimenting with methods to decrease the risk of MIC in CCI settings, specifically as they related to restraints and children leaving the property with staff.
- With regard to relative care homes, we suggest looking more closely at the frequency of unauthorized visits and how such visits are documented iN case notes and MiSACWIS. It is our understanding the unauthorized visits are not recorded as "licensing violations" in relative care homes as these settings are (mostly) not licensed. Monitoring the frequency of unauthorized visits may serve as a warning sign (or red flag) and prevent problems from escalating.
- In terms of other actionable items, we suggest looking at the Relative Placement Safety Screen data and specifically at the questions related to the placement exception request (PER). There are several items that may indicate an increase risk (e.g. number of other children in the home, number of young children in the home). Are the relative care homes associated with a placement exception request more likely to be subsequently associated with a MIC event?
- There are too few licensed relative homes to determine if licensing (or the process of receiving a license) decreases the risk of MIC for children in relative homes.

## Appendix E. MISEP Performance, Summary of Commitments

| | Commitment | Standard | MISEP 17 | MISEP 18 | MISEP 19 | MISEP 20 | MISEP 21 | MISEP 22 | MISEP 23 | MISEP 24 |
|---|---|---|---|---|---|---|---|---|---|---|
| | **Met the performance standard in all eligible periods** | | | | | | | | | |
| 6.2 | **MIC Data Report:** Until Commitment 6.1 is achieved, DHHS, in partnership with an independent entity, will generate, at least annually, a report that analyzes maltreatment in care data to assess risk factors and/or complete root-cause analysis of maltreatment in care. | N/A | N/A | Yes | N/A | Yes | N/A | Yes | N/A | Yes |
| 6.6 (a) | **Separation of Siblings:** Siblings who enter placement at or near the same time shall be placed together unless specified exceptions are met. This provision shall become eligible to immediately exit the MISEP after two consecutive periods of positive trending in validated performance from the baseline measure reported in the Monitors' MISEP 23 report. | Positive trending | | | | | | | 78.4% Baseline | Yes, 80.8% |
| 6.15 | **Caseload, Adoption Workers:** 95% of adoption caseworkers shall have a caseload of no more than 15 children. This provision shall become eligible to immediately move to Structures and Policies after two consecutive periods of positive trending in validated performance from the baseline measure reported in the Monitors' MISEP 23 report. | Positive trending | | | | | | | 85.5% Baseline | Yes, 88.1% |
| 6.30 | **Child Case File, Medical and Psychological:** DHHS shall ensure that: (2) the case plan addresses the issue of health and dental care needs. | 90% | | | | | | | | Yes, 93.8% |

| | Commitment | Standard | MISEP 17 | MISEP 18 | MISEP 19 | MISEP 20 | MISEP 21 | MISEP 22 | MISEP 23 | MISEP 24 |
|---|---|---|---|---|---|---|---|---|---|---|
| 6.30 | **Child Case File, Medical and Psychological:** DHHS shall ensure that: (3) foster parents and foster care providers are provided with the child's health care records. | 90% | | | | | | | | Yes, 100.0% |
| 6.37 | **Support for Transitioning to Adulthood, Permanency:** DHHS will continue to implement policies and provide services to support the rate of older youth achieving permanency. This provision shall become eligible to immediately exit the MISEP after one period of positive trending in validated performance from the baseline measure reported in the Monitors' MISEP 23 report. | Positive trending | | | | | | | 45.4% Baseline | Yes, 46.8% Eligible for rolling exit |

| | Commitment | Standard | MISEP 17 | MISEP 18 | MISEP 19 | MISEP 20 | MISEP 21 | MISEP 22 | MISEP 23 | MISEP 24 |
|---|---|---|---|---|---|---|---|---|---|---|
|  | Met the performance standard in at least one eligible period | | | | | | | | | |
| 6.4 | **Foster Home Array:** DHHS will maintain a sufficient number and array of homes capable of serving the needs of the foster care population, including a sufficient number of available licensed placement within the child's home community for adolescents, sibling groups, and children with disabilities. DHHS will develop for each county and statewide an annual recruitment and retention plan, in consultation with the Monitors and experts in the field, and subject to approval by the Monitors. DHHS will implement the plan, with interim timelines, benchmarks, and final targets, to be measured by the Monitors based on DHHS's good-faith efforts to meet the final targets set forth in the plan. | N/A | Yes | N/A – COVID-Impacted | N/A – COVID-Impacted | Will be included in the MISEP 21 Report | No | Will be reported on at the end of the fiscal year | No | Will be reported on at the end of the fiscal year |
| 6.22 (a) | **Visits, Worker-Parent:** Caseworkers shall visit parents of children with a goal of reunification at least twice during the first month of placement, unless specified exceptions apply. | 85% | No, 73.6% | N/A – COVID-Impacted, 71.7% (Jan-Feb), 83.2% (March-June) | N/A – COVID-Impacted, 85.2% | Yes, 85.2% Eligible to be moved to "To be Maintained" | No, 59.1% | No, 59.5% | No, 60.1% | No, 64.4% |
|  | Within 10 percent of the performance standard in at least one period | | | | | | | | | |
| 6.19 | **Assessment and Service Plans, Content:** Assessments and service plans shall be of sufficient breadth and quality to usefully inform case planning and shall accord with the requirements of 42 U.S.C. 675(1). | 83% | No, 66.7% | No, 73.5% | No, 57.6% | No, 73.2% | No, 79.7% | No, 69.5% | No, 67.1% | No, 82.1% |

| | Commitment | Standard | MISEP 17 | MISEP 18 | MISEP 19 | MISEP 20 | MISEP 21 | MISEP 22 | MISEP 23 | MISEP 24 |
|---|---|---|---|---|---|---|---|---|---|---|
| 6.25 | **Medical and Mental Health Examinations:** At least 85% of children shall have an initial medical and mental health examination within 30 days of the child's entry into foster care. | 85% | No, 83.9% | N/A – COVID-Impacted, 69.8% | N/A – COVID-Impacted, 69.8% | N/A – COVID-Impacted, 78.0% | No, 72.9% | No, 72.9% | No, 71.0% | No, 80.9% |
| 6.25 | **Medical and Mental Health Examinations:** At least 95% of children shall have an initial medical and mental health examination within 45 days of the child's entry into foster care. | 95% | No, 89.3% | N/A – COVID-Impacted, 76.6% | N/A – COVID-Impacted, 77.9% | N/A – COVID-Impacted, 85.6% | No, 82.1% | No, 81.4% | No, 79.8% | No, 87.1% |
| 6.24 | **Visits, Between Siblings:** DHHS shall ensure that children in foster care who have siblings in custody with whom they are not placed shall have at least monthly visits with their siblings who are placed elsewhere in DHHS foster care custody, unless specified exceptions apply. | 85% | No, 72.9% | N/A – COVID-Impacted, 69.5% (Jan-Feb), 56.8% (March-June) | N/A – COVID-Impacted, 69.2% | No, 73.7% | No, 67.6% | No, 70.1% | No, 70.8% | No, 78.2% |
| | *Performance is consistently more than 10 percentage points below the standard* | | | | | | | | | |
| 6.6 (b) | **Separation of Siblings:** If a sibling group is separated at any time, except for the above reasons, the case manager shall make immediate efforts to locate or recruit a family in whose home the siblings can be reunited. These efforts shall be documented and maintained in the case file and shall be reassessed on a quarterly basis. | 90% | No, 61.2% | No, 36.8% | No, 29.8% | No, 38.1% | No, 50.0% | No, 72.7% | No, 66.7% | No, 62.5% |

| | Commitment | Standard | MISEP 17 | MISEP 18 | MISEP 19 | MISEP 20 | MISEP 21 | MISEP 22 | MISEP 23 | MISEP 24 |
|---|---|---|---|---|---|---|---|---|---|---|
| 6.20 | **Provision of Services:** DHHS shall ensure that the services identified in the service plan are made available in a timely and appropriate manner to the child and family and shall monitor the provision of services to determine whether they are of appropriate quality and are having the intended effect. | 83% | No, 69.3% | No, 71.6% | No, 51.7% | No, 70.0% | No. 68.5% | No, 62.2% | No, 67.1% | No, 60.7% |
| 6.22 (b) | **Visits, Worker-Parent:** Caseworkers shall visit parents of children with a goal of reunification at least once a month, following the child's first month of placement, unless specified exceptions apply. | 85% | No, 69.4% | N/A – COVID-Impacted, 69.6% (Jan-Feb), 71.7% (March-June) | N/A – COVID-Impacted, 74.1% | No, 73.6% | No, 60.4% | No, 64.6% | No, 63.2% | No, 71.7% |
| 6.23 | **Visits, Parent-Child:** DHHS shall ensure that children in foster care with a goal of reunification shall have at least twice-monthly visitation with their parents, unless specified exceptions apply. | 85% | No, 62.5% | N/A – COVID-Impacted, 64.7% (Jan-Feb), 59.4% (March-June) | N/A – COVID-Impacted, 62.0% | No, 59.1% | No, 57.8% | No, 62.6% | No, 63.1% | No, 66.0% |
| 6.26 | **Dental Examinations:** At least 90% of children shall have an initial dental examination within 90 days of the child's entry into care unless the child has had an exam within six months prior to placement or the child is less than four years of age. | 90% | No, 77.3% | N/A – COVID-Impacted, 36.4% | N/A – COVID-Impacted, 56.7% | N/A – COVID-Impacted, 66.4% | No, 62.8% | No, 62.6% | No, 64.8% | No, 72.4% |

| | Commitment | Standard | MISEP 17 | MISEP 18 | MISEP 19 | MISEP 20 | MISEP 21 | MISEP 22 | MISEP 23 | MISEP 24 |
|---|---|---|---|---|---|---|---|---|---|---|
| 6.30 | **Child Case File, Medical and Psychological:** DHHS shall ensure that: (1) The child's health records are up to date and included in the case file. Health records include the names and addresses of the child's health care providers, a record of the child's immunizations, the child's known medical problems, the child's medications, and any other relevant health information. | 90% | | | | | | | | No, 71.8% |
| 6.32 | **Medical Care and Coverage, Subsequent Placement:** DHHS shall ensure that at least 95% of children have access to medical coverage within 24 hours or the next business day following subsequent placement by providing the placement provider a Medicaid card or an alternative verification of the child's Medicaid status and Medicaid number as soon as it is available. | 95% | No, 82.8% | No, 82.1% | No, 78.5% | No, 79.3% | No, 80.6% | No, 80.1% | No, 80.7% | No, 82.9% |
| | *Performance is consistently more than 20 percentage points below the standard* | | | | | | | | | |
| 6.8 | **Emergency or Temporary Facilities, Length of Stay:** Children shall not remain in emergency or temporary facilities, including but not limited to shelter care, for a period in excess of 30 days, unless specified exceptions apply. No child shall remain in a shelter in excess of 60 days. | 95% | No, 67.9% | No, 64.2% | No, 62.9% | No, 68.7% | No, 55.9% | No, 47.3% | No, 68.5% | No, 70.6% |

| | Commitment | Standard | MISEP 17 | MISEP 18 | MISEP 19 | MISEP 20 | MISEP 21 | MISEP 22 | MISEP 23 | MISEP 24 |
|---|---|---|---|---|---|---|---|---|---|---|
| 6.10 (a) | **Relative Foster Parents:** When placing a child with a relative who has not been previously licensed as a foster parent, DHHS shall visit the relative's home to determine if it is safe prior to placement; check law enforcement and central registry records for all adults residing in the home within 72 hours following placement; and complete a home study within 30 days. | 95% | No, 53.0% | No, 73.8% | No, 41.5% | No, 43.1% | No, 70.8% | No, 65.6% | No, 67.7% | No, 71.9% |
| 6.29 | **Examinations and Screenings:** Following an initial medical, dental, or mental health examination, at least 95% of children shall receive periodic and ongoing medical, dental, and mental health care examinations and screenings, according to the guidelines set forth by the American Academy of Pediatrics. | 95% | No, 69.7%, 87.7%, 92.1% | N/A – COVID-Impacted, 58.3%, 75.6%, 38.6% | N/A – COVID-Impacted, 61.8%, 81.7%, 70.5% | N/A – COVID-Impacted, 68.7%, 85.0%, 74.5% | No, 66.5%, 83.0%, 71.0% | No, 66.5%, 84.5%, 73.7% | No, 65.4%, 84.4%, 69.9% | No, 69.4%, 85.0%, 75.0% |
| 6.33 | **Psychotropic Medication, Informed Consent:** DHHS shall ensure that informed consent is obtained and documented in writing in connection with each psychotropic medication prescribed to each child in DHHS custody. | 97% | No, 75.9% | No, 74.4% | No, 76.1% | No, 71.8% | No, 72.5% | No, 72.2% | No, 75.9% | No, 74.7% |
| | **Performance is consistently more than 30 percentage points below the standard** | | | | | | | | | |
| 6.22 (a) | **Visits, Worker-Parent:** Caseworkers shall visit parents of children with a goal of reunification at least once in the parent's home during the first month of placement, unless specified exceptions apply. | 85% | No, 47.9% | N/A – COVID-Impacted, 53.4% | N/A – COVID-Impacted, 45.6% | No, 52.4% | No, 50.0% | No, 51.3% | No, 50.7% | No, 52.4% |

71

| | Commitment | Standard | MISEP 17 | MISEP 18 | MISEP 19 | MISEP 20 | MISEP 21 | MISEP 22 | MISEP 23 | MISEP 24 |
|---|---|---|---|---|---|---|---|---|---|---|
| 6.10 (b) | **Relative Foster Parents:** When placing a child with a relative who has not been previously licensed as a foster parent, a home study will be renewed every 12 months for the duration of the child's placement with the relative. | 95% | No, 9.7% | No, 36.5% | No, 14.1% | No, 37.9% | No, 42.4% | No, 51.5% | No, 48.5% | No, 62.5% |
| | | | | | **Performance is consistently more than 50 percentage points below the standard** | | | | | |
| 6.9 | **Emergency or Temporary Facilities, Repeated Placement:** Children shall not be placed in an emergency or temporary facility, including but not limited to shelter care, more than one time within a 12-month period, unless specified exceptions apply. Children under 15 years of age experiencing a subsequent emergency or temporary-facility placement within a 12-month period may not remain in an emergency or temporary facility for more than 7 days. Children 15 years of age or older experiencing a subsequent emergency or temporary-facility placement within a 12-month period may not remain in an emergency or temporary facility for more than 30 days. | 95% | No, 6.3% | No, 12.5% | No, 2.9% | No, 18.2% | No, 4.5% | No, 0.0% | No, 18.2% | No, 20.7% |

72

| | Commitment | Standard | MISEP 17 | MISEP 18 | MISEP 19 | MISEP 20 | MISEP 21 | MISEP 22 | MISEP 23 | MISEP 24 |
|---|---|---|---|---|---|---|---|---|---|---|
| 6.34 | **Psychotropic Medication, Documentation:** DHHS shall ensure that: (1) A child is seen regularly by a physician to monitor the effectiveness of the medication, assess any side effects and/or health implications, consider any changes needed to dosage or medication type and determine whether medication is still necessary and/or whether other treatment options would be more appropriate; (2) DHHS shall regularly follow up with foster parents/caregivers about administering medications appropriately and about the child's experience with the medication(s), including any side effects; (3) DHHS shall follow any additional state protocols that may be in place related to the appropriate use and monitoring of medications. | 95% | No, 33.8% | No, 26.9% | No, 34.8% | No, 27.3% | No, 36.4% | No, 31.8% | No, 31.8% | No, 34.8% |
| | Performance has never been achieved | | | | | | | | | |
| 5.1 | **Contract-Agency Evaluation:** DHHS shall conduct contract evaluations of all CCIs and private CPAs providing placements and services to Plaintiffs to ensure, among other things, the safety and well-being of Plaintiffs and to ensure that the CCI or private CPA is complying with the applicable terms of this Agreement. | N/A | No | No | No | No | No | No | No | No |

| | Commitment | Standard | MISEP 17 | MISEP 18 | MISEP 19 | MISEP 20 | MISEP 21 | MISEP 22 | MISEP 23 | MISEP 24 |
|---|---|---|---|---|---|---|---|---|---|---|
| | Not applicable or unable to verify in all periods | | | | | | | | | |
| 6.1 | **Safety – Maltreatment in Foster Care:** DHHS shall ensure that of all children in foster care during the applicable federal reporting period, DHHS will maintain an observed rate of victimization per 100,000 days in foster care less than 9.07, utilizing the CFSR Round 4 criteria. | ≤ 9.07 | Unable to verify | N/A | Unable to verify | N/A | Unable to verify | Unable to verify | N/A | Unable to verify |
| 6.3 | **Permanency Indicator 1:** DHHS will develop strategy plans, focused on identified needs and barriers to be addressed regarding permanency, to be implemented in each of certain selected counties. These will cover at least 20% of the foster care population and at DHHS's choosing from within the Big 14 counties of the State, to improve the rate of permanency for children within their first 12 months in foster care. By Oct 1, 2025, DHHS will provide a Permanency Within 12 Months Report to the monitoring team. Based on this report, the monitoring team shall determine if DHHS made good faith efforts to improve the rate of permanency within 12 months in the selected counties. | N/A | | | | | | | | N/A |