1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF MICHIGAN
2                          SOUTHERN DIVISION

3
     DWAYNE B., a minor, by his Next
4    Friend, John Stempfle, et al., for
     themselves and others similarly
5    situated,

6                        Plaintiff,

7    -v-                                  Case No. 06-cv-13548
                                          Hon. Nancy G. Edmunds
8    GRETCHEN WHITMER, in her official
     capacity as Governor of the State of
9    Michigan, et al.,

10                       Defendant.
     _____/
11
             STATUS CONFERENCE VIA ZOOM VIDEO CONFERENCE
12
           BEFORE THE HONORABLE NANCY G. EDMUNDS
13               United States District Judge
                 231 West Lafayette Boulevard
14                     Detroit, Michigan
                         July 2, 2024
15
     APPEARANCES:
16
     FOR THE PLAINTIFF:    Samantha Bartosz
17                         Children's Rights
                           330 Seventh Avenue,
18                         New York, New York  10001

19   FOR THE DEFENDANT:    Neil Giovanatti
                           Erin Harrington
20                         Michigan Attorney General
                           P.O. Box 30758
21                         Lansing, Michigan  48909
     ALSO PRESENT:
22    Monitors Kevin Ryan and Eileen Crummy, Directors Demetrius
     Starling and Elizabeth Hertel
23
              To Obtain a Certified Transcript Contact:
24               Stacy K. Locher, CSR-5699
           (313) 234-2609  stacy_locher@mied.uscourts.gov
25                    www.transcriptorders.com

1              **TABLE OF CONTENTS**

2

MATTER_____PAGE

3

**STATUS CONFERENCE**

4     Proceedings.......................................  3
Certificate of Court Reporter......................  29

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    Detroit, Michigan

 2    July 2, 2024

 3    11:03 a.m.

 4                        _   _   _

 5         THE CLERK:  The United States District Court for the

 6    Eastern District of Michigan is now in session.  The Honorable

 7    Nancy G. Edmunds, United States District Court judge,

 8    presiding.  Calling Case No. 06-13548, Dwayne B., et al.,

 9    versus Whitmer, et al.

10         Counsel, please place your appearances on the record.

11         MS. BARTOSZ:  Good morning, your Honor.  This is

12    Samantha Bartosz from Children's Rights on behalf of the

13    plaintiff class of children.

14         THE COURT:  Good morning.  Anyone else?

15         MR. GIOVANATTI:  Good morning, your Honor.  The Zoom

16    chopped off.  This is Neil Giovanatti from the Michigan

17    Attorney General's office.

18         THE COURT:  Good morning.

19         MR. GIOVANATTI:  Can you hear me, your Honor?

20         THE COURT:  I can hear you, yes.  I see you now too.

21         MR. GIOVANATTI:  I apologize.  My Zoom keeps closing.

22    Neil Giovanatti for the AG's office.  My co-counsel, Erin

23    Harrington, is also on the line as well as Director Hertel and

24    Director Starling from MDHHS.

25         THE COURT:  Good morning, everyone.  I see Eileen,
```

1    Ms. Crummy, is here and Kevin.

2         MR. RYAN:  Yes, your Honor, Kevin Ryan with Eileen

3    Crummy, two of the court appointed monitors.

4         MS. CRUMMY:  Good morning, your Honor.

5         THE COURT:  Good morning.  So this is report number

6    24, seems like it's been my whole judicial life working on this

7    case one way or the other but it looks like in many ways we are

8    moving in the right direction finally.

9         Ms. Crummy and Mr. Ryan, do you prefer to give your

10   report first or would you rather hear from the parties first

11   and then give your report?

12        MR. RYAN:  We prefer to go first, your Honor.

13        THE COURT:  Go ahead, please.

14        MR. RYAN:  Thank you, your Honor.

15        Your Honor, last January the parties jointly submitted

16   a stipulated order amending the MISEP to the court which the

17   court approved on January 25th, 2024.  The order recognizes

18   Michigan's significant and sustained progress in many areas and

19   continues to stress the obligation of the state to ensure child

20   safety for plaintiff class children.

21        The order reduces the number of remaining commitments

22   that DHHS must meet under the MISEP with 33 provisions exiting

23   the agreement and another 11 provisions moving out of active

24   monitoring.  Additionally, the order amends performance

25   measures and standards for six commitments.

1          This report to the court reflects the efforts of the

2     DHHS leadership team and the status of Michigan's reform

3     efforts as of June 30th, 2023.  Defined as MISEP period 24,

4     this report includes progress for the first half of 2023 and

5     covers the first period of DHHS's performance on the

6     maltreatment in care rate -- excuse me, performance under the

7     stipulated order amending the MISEP.

8          Additionally, it includes performance on the

9     maltreatment in care rate for federal fiscal year 2023 which

10    ran from October 1st, 2022 to September 30, 2023.  Michigan

11    DHHS met or exceeded required performance standards in six of

12    28 areas monitored for compliance in MISEP period 24 and in

13    three additional areas of those 28, DHHS's performance came

14    within 10 percent of the performance standard.

15         Among the areas where the agency achieved positive

16    levels of performance are support for youth transitioning to

17    adulthood permanency.  During MISEP 24 the agency achieved the

18    1.4 percent increase from DHHS's MISEP 23 performance and per

19    the stipulated order, positive trending during this period

20    makes this commitment eligible for immediate exit from the

21    MISEP and the court order.

22         Adoption caseloads.  The parties agreed that adoption

23    case workers shall have a caseload of no more than 15 children.

24    Per the stipulated order, after two consecutive periods of

25    positive trending, this commitment will become eligible to move

1    to structures and policies which essentially is not active

2    monitoring.  DHHS achieved 88.1 percent in MISEP 24

3    representing a 2.6 percent increase from its performance in

4    MISEP 23 and so this is the first period of positive trending.

5            Another example is the separation of siblings.  The

6    parties agreed that siblings who enter placement at or near the

7    same time shall be placed together unless specified exceptions

8    are met.  Per the stipulated order, after two consecutive

9    periods of positive trending, this commitment will become

10   eligible to move to structure and policies.  DHHS achieved

11   80.8 percent in MISEP 24 representing a 2.4 percent increase

12   from its performance in MISEP 23 and so this too is the first

13   period of positive trending.

14           MS. CRUMMY:  There where 17 areas where DHHS did not

15   meet required performance standards by more than 10 percentage

16   points as detailed in our report.  Child safety remains a

17   paramount interest in this case and both parties have

18   repeatedly expressed to us a commitment to ensure that children

19   in the state's custody are safe.  For federal fiscal year 2023,

20   DHHS provided data indicating the state substantiated 459

21   incidents of child maltreatment in care involving 437 children

22   in DHHS custody for an observed rate of 14.5 victimizations for

23   100,000 days in foster care which is considerably higher than

24   the federal standard agreed to by the parties and embedded in

25   this court's order.

1          We comprehensively reviewed a random sample of 120

2     abuse and neglect investigations from federal fiscal year 2023

3     and assessed that 82 investigations were conducted adequately

4     and 38 of the 120 investigations reviewed were deficient.  This

5     includes 32 investigations where there was insufficient

6     information gathered to render a finding and six investigations

7     which we determined met the criteria for substantiation under

8     Michigan law.  Continuing to improve the adequacy of abuse and

9     neglect investigations and ensuring child safety for children

10    in the class remains paramount in this matter.

11          In closing, your Honor, we want to underscore the

12    tremendous strides that Michigan has made in improving its care

13    for children in foster care and thank the state and its

14    partners for the years of effort that are reflected in the

15    system today and we thank you, Judge Edmunds, for your

16    oversight and guidance with children's interest always foremost

17    in this case.  Thank you.

18          THE COURT:  Thank you, Ms. Crummy.  I'll hear from the

19    parties now and then I'll have some brief response after I've

20    heard from you.

21          MS. BARTOSZ:  Thank you.  This is Samantha Bartosz

22    with Children's Rights.  Nice to see you, your Honor.

23          THE COURT:  Nice to see you.

24          MS. BARTOSZ:  Since we last met with the court, at the

25    court's suggestion or perhaps direction, the parties met

1    together with the monitors and worked very hard, Judge, at

2    looking through the MISEP and looking for ways to focus our

3    energies to bring this matter toward closure and as the

4    monitors pointed out in their statements, we exited from the

5    MISEP various outcomes where the state had achieved what we

6    sought to see as plaintiffs and we were delighted to see those

7    outcomes in fact exit court jurisdiction.  We whittled the

8    MISEP down to those areas that remained out of compliance and

9    remained important to plaintiff in trying to secure an adequate

10   child welfare system.

11          Your Honor, we're most pleased to see further progress

12   by DHHS in coming toward compliance with the open MISEP items

13   that remain and applaud the state on reaching the exit level

14   for a couple of those outcomes.  That's what we're all hoping

15   to see and hoping to bring this matter closer to the exit door

16   just as soon as we possibly can has always been the hope of

17   plaintiffs here.

18          Your Honor, with that said, we, as plaintiffs, remain

19   very concerned in relation to the rate of maltreatment in care

20   being reported by DHHS to the federal government.  Ms. Crummy

21   spoke to that for federal fiscal year 2023 that reported

22   performance under the child and family service's review outcome

23   was 14.50 versus a score of 9.07 that is required to conform

24   with the federal performance level.

25          That performance, Judge, in 2023 of 14.50 is an

1    extreme worsening, deterioration in performance from the prior
2    two years.  Performance was reported as 8.04 in fiscal year
3    2022 and at 5.55 in fiscal year 2021 so --
4          THE COURT:  We don't know if this may be a two-edged
5    sword.  It could be that we're getting more reports than we got
6    in '22 and '23 and that's why the number is higher.  We don't
7    really know at this point because a lot of the investigations
8    have been found to be deficient but maybe the investigations
9    are showing up more instances than they used to.
10         MS. BARTOSZ:  That may be, Judge.  My point, your
11   Honor, simply to point out that the level of performance is
12   moving at least on paper, Judge, in the --
13         THE COURT:  In the wrong direction.
14         MS. BARTOSZ:  And that raises serious questions in
15   terms of how do we explain this and how can it be turned
16   around?  So in looking at this current MISEP report, we have
17   great concern about outcome 6.1, maltreatment in care, and
18   really look forward to a chance to meet with DHHS leadership
19   and counsel to talk about that matter and explore what may be
20   the systemic obstacles in the way of bringing performance
21   closer to compliance and we hope to be able to set up a meeting
22   to talk about that quite soon.
23         The other matter I just wanted to elevate for the
24   court and child safety is our priority here, I think all
25   parties have recognized that.  State performance with respect

Status Conference - July 2, 2024

1   to psychotropic medications continues to lag.  That is a matter
2   of child safety.  A child placed erroneously on a psychotropic
3   medication or on a cocktail of such medications can suffer very
4   real physical and emotional harm and we agreed with the state
5   years ago now to bring the informed consent process and medical
6   records process relating to psychotropic medications into
7   compliance with sound standards and it hasn't moved
8   sufficiently forward.
9        So we likewise look forward to a chance to sit down
10   with the state officials and their lawyers and talk about that
11   matter and talk about what steps might be taken to break that
12   loose and move it forward.  We are particularly interested in
13   exploring with the state the efforts it made under the
14   corrective action plan that your Honor requested a year ago and
15   whether those bore fruit in certain areas or somehow helps to
16   identify other barriers that might need focus.
17        So from our point of view, it's a day to be pleased
18   about the progress and to encourage continued progress and a
19   day to raise concern with respect to two important safety
20   issues.
21        THE COURT:  Thank you, Ms. Bartosz.  The state?
22        MS. HERTEL:  It appears both of our attorneys are not
23   here.
24        THE COURT:  Should we give them a try again?
25        MS. HERTEL.  I am texting him.

1          THE COURT:  You are welcome to give the report if you

2     want.

3          MS. HERTEL:  Let me try to call him quickly.  I'm so

4     sorry.

5               (Off the record at 11:19 a.m.)

6               (Back on the record at 11:23 a.m.)

7          MS. HERTEL:  I'm going to start with some comments and

8     I will turn it over to Director Starling to make some

9     additional remarks and then I know Neil had a couple of

10     responses on some of the findings specifically in the MISEP 24

11     report but he may have to submit those in writing if he can't

12     be on to verbally express those.

13          Again, I would like to say thank you, your Honor, for

14     this opportunity to continue to update the court with our

15     ongoing efforts and strategies to make sure that children that

16     are placed in our care are safe and are achieving positive

17     outcomes.

18          I would also like to start by acknowledging the

19     stipulated order that was entered earlier this year that did

20     remove several provisions for monitoring and placed a number of

21     other provisions on a clear path to exit in the future.  The

22     department greatly appreciates the assistance provided by

23     Magistrate Judge Grand and the monitoring team in helping the

24     parties to reach an agreement to better focus the MISEP.

25          Candidly we were hoping that the MISEP could be

1    further narrowed and other provisions modified, however, we are

2    incredibly happy with the progress that we've obtained and we

3    look forward to those continuing discussions as appropriate to

4    further focus the MISEP on the handful of issues that we

5    believe remain.

6          As to the department's current progress, MDHHS has

7    implemented the Keep Kids Safe Action Agenda which highlights

8    the steps that the department has taken and will continue to

9    take to improve safety and well-being for Michigan children.

10   The Keep Kids Safe Action Agenda focuses on five key

11   categories:  Prevention, intervention, stability, wellness and

12   workforce.  I'm going to highlight a few actions under each of

13   these very briefly.

14         Under prevention we, as a state, have invested

15   millions of dollars to create more family resource centers

16   which allow Michigan to become one of only five states to

17   receive the Child Safety Forward Grant from the Office for

18   Victims of Crime.  The family resource centers work with

19   families that have a higher risk for abuse and neglect to meet

20   their needs sooner.

21         We are also exploring centralized intake prevention

22   pathways.  We are currently running a pilot with two agencies

23   that proactively contact families who've identified needs but

24   do not require formal child welfare intervention and we are

25   developing a cross enrollment collaboration between our

Status Conference - July 2, 2024

1    economic stability administration and our child welfare teams

2    to text families and connect them to community action agencies

3    so they can quickly resolve any concrete economic needs.

4         We've also developed our family impact teams which is

5    another collaboration between the economic stability

6    administration and our child welfare administration where

7    economic stability staff, those are our benefits eligibility

8    staff, are embedded in child welfare units to quickly resolve

9    economic barriers experienced by families.  This effort is

10   specifically aimed at preventing removal or being able to

11   return children home sooner.

12        Under intervention we have developed an intervention

13   tool for our CPS workers to use to ensure regular communication

14   between case workers and their supervisors during key points of

15   investigation.  We have also actively mapped and identified

16   available substance use disorder services across the state so

17   that families, our workers and our community partners can

18   easily identify nearby resources.

19        Under stability we've established regional placement

20   units to help identify appropriate living arrangements for

21   youth to ensure that they are in the most family-like settings

22   and settings that can best meet their treatment needs.  The

23   department created the Bureau of Children's Coordinated Health

24   Policy and Supports to improve and build upon coordination and

25   oversight of children's behavioral health services and

Status Conference - July 2, 2024

1    placement of children with complex needs.  We're also currently

2    restructuring our rates and payments as well as our contracts

3    for our child caring institutions to provide financial

4    certainty to providers and placement stability for our kids.

5           Under wellness, as mentioned previously, we have

6    created family impact teams which, through increased funding,

7    help to ensure families can access basic needs like adequate

8    food, housing and utilities.  We are supporting families facing

9    behavioral health challenges which has been a major priority

10   for me and this department.

11          Families with a loved one in crisis should be able to

12   find the behavioral healthcare support they need wherever they

13   are, at home, at school or work or in the community.  Ideally,

14   community-based services allow for interventions before a child

15   needs to be admitted into a hospital or a residential facility.

16          If someone does need a higher level of care, we're

17   also working on services and support for a healthy and

18   successful transition back to the community following a stay at

19   one of our hospitals through the creation of the psychiatric

20   residential treatment facilities, or PRTFs, to serve as a step

21   down or a step up.

22          We're also coordinating with partners across the state

23   to create crisis stabilization units to provide an alternative

24   to emergency department and psychiatric inpatient admission for

25   children who can be stabilized through treatment and recovery

1    within 72 hours.

2            We continue to work with other state agencies and our

3    community partners to expand and improve access to the array of

4    behavior health services in Michigan which also includes

5    investing in our state hospitals, our phone and our text lines

6    and improving access to community-based services, investing to

7    strengthen and enhance our behavioral healthcare workforce and

8    creating multiple points of access and coordinated quality

9    care, whether that's through our school-based centers or

10   certified community behavioral health clinics or any other

11   setting to make it easier for people and families to access

12   what they need.

13           We are also -- we've also developed a new MichiCANs

14   screening tool.  This is a universal screening tool to screen

15   for behavioral health needs for children including youth in

16   foster care.  This tool allows for both child welfare staff and

17   community healthcare partners to speak a common language and

18   expedite access to behavioral health services.

19           So both our publically-funded behavioral health system

20   and our child welfare system will be using the same screening

21   tool across the state and having the same access to the same

22   information of those outcomes.  We are also implementing a

23   pilot project to work with our local CMH agencies to connect

24   families with mental health services as soon as children enter

25   foster care.

1          Finally, workforce.  The department has increased pay

2     for our service specialists and provided retention bonuses for

3     our staff.  We've established ongoing partnerships with

4     universities so that we can work to recruit more child welfare

5     specialists and we're developing an ongoing quality assurance

6     unit focused on providing feedback to investigators to improve

7     our investigation quality.

8          Finally, we are undergoing a comprehensive review of

9     all of our children services staffing which has not been

10     reviewed since maybe the '90s, possibly the '80s, to make sure

11     that we are asking our staff to do the jobs that we want them

12     to do with the resources that they need to do those jobs

13     focusing on increasing mentorship, reducing turnover and

14     encouraging shared decision-making and responsibility.

15          Through this agenda we believe we will continue to

16     strengthen families, we will keep kids safe in their homes.  We

17     would like to note that the current MISEP reporting period is

18     for data collected from January 1st, 2023 through July 31st,

19     2023.  Therefore, this data does not reflect a lot of our

20     current performance resulting from our continued reforms from

21     our Keeping Kids Safe agenda.

22          These are just some of the exciting ways, I did have

23     to whittle this down, that we are expanding services for

24     children and families in Michigan and, as I told this court

25     before, you have my full commitment to continue to work to

Status Conference - July 2, 2024                    17

1    improve safety and outcomes for the children and families in

2    Michigan.  I am proud of the work that we do.  I applaud the

3    staff in our department for their efforts to ensure safety for

4    children and I look forward to continuing to improve our child

5    welfare system.

6              I would now like to turn it over to Director Starling

7    to make some more comments on the report.

8              MR. STARLING:  Thank you, Director Hertel.

9              Good morning, your Honor.  Adding to Director Hertel,

10   I also am very proud of our staff and some of the work we have

11   been able to accomplish.  I see some of those continuous

12   positive outcomes for our children and our families in our

13   state on a daily basis and I know it is because of the

14   department staff that is very essential in facilitating these

15   positive outcomes.

16             I will start by addressing some of those positive

17   trends reflected in our MISEP 24 report.  Since the MISEP 21

18   reporting period, adoption caseloads have consistently

19   improved.  In the MISEP 21 report, adoption caseload compliance

20   was around 74.2 percent.  Adoption caseload compliance was 85.5

21   in MISEP 23 and at 88.1 in the MISEP 24 report which, again,

22   demonstrates some significant change and commitment from our

23   department and this commitment would exit monitoring with one

24   more period of increase of performance which I firmly expect

25   with our department.

1        In addition, the department has demonstrated positive

2    trending towards the requirements to support the youth

3    transitioning to adult and permanency planning which is our

4    provision to 6.37 and to reduce the number of sibling groups

5    that are separated upon placement in foster care which is

6    provision 6.6A.  We anticipate continued positive trending

7    performance for both of these provisions which will allow both

8    provisions to exit the MISEP report.

9        The MISEP 24 report also documents an improved

10   performance in certain areas.  One, the assessment of service

11   plans which is 6.19; sibling visits which is 6.24; initial

12   medical and mental health examinations which is 6.25 and many

13   other provisions.  As to maltreatment in care, the department

14   takes seriously the increased maltreatment in care rate and has

15   implemented multiple strategies to reduce harm to children who

16   are in foster care.

17       To start, we've implemented a series of strategies to

18   prevent MIC incidents from happening in the first place which

19   includes, the department has developed a mixed statewide plan

20   to remediate MIC altogether and focuses on getting to the root

21   causes and really determining necessary enhancements of all

22   staff and provider training and supports as needed.

23       The department also established a work group to

24   specifically address MIC prevention of remediation earlier this

25   year.  The work group relies heavily on what the data tells us

Status Conference - July 2, 2024

1    about MIC events and what actions could have potentially

2    prevented the MIC event to begin with.

3          Through this work group the department has modified

4    the role of kinship support workers to provide additional

5    supports to relative providers throughout the life of a case.

6    The work group is also working with our MIC unit to improve the

7    placement collaboration units, procedures and roles.

8          Our leadership is also consistently analyzing MIC data

9    to review the latest trends of MIC to increase awareness and

10    drive the next steps.  This includes establishing data sets to

11    review in detail with BSC directors to support prevention

12    strategy development and also our department is engaged with

13    Oklahoma on their efforts to reduce MIC at the suggestion of

14    our Michigan monitoring team.

15          We have also taken steps to update and improve our MIC

16    investigation procedures.  For example, in September of '23,

17    the MIC unit implemented a uniform disposition format.  This

18    new format ensures that all statutory elements of abuse or

19    neglect are addressed when determining the outcome of an

20    investigation.

21          The department also created a new streamline tool for

22    supervisors to review investigations based off of supervisor

23    feedback.  The tool was significantly shortened from 91

24    questions down to 69 questions.  The tool also includes

25    questions about the new uniform disposition format.

    1          The department also implemented review by the director
    2     of the MIC unit on all substantiated cases arising from
    3     conflict of care facilities and in June of 2024 all MIC unit
    4     staff were retrained on the new maltreatment types to increase
    5     consistency with dispositions.  We are confident that through
    6     these reform efforts our MIC investigations will continue to be
    7     more uniform and thorough and ultimately keep kids safe in
    8     care.
    9          We are confident that -- also that with the work that
   10     we are doing in conjunction with our BSC directors and also our
   11     staff that we have a keen focus on what is needed to progress
   12     some of our MIC data and also ensure that new staff coming in
   13     understand the importance and the paramount importance of
   14     making sure that we have a keen focus of all of our kids in
   15     care but also making sure we remediate those issues before they
   16     become a larger issue in our data.
   17          I don't know if Neil is back on the call at this time.
   18     I will turn it back over to him for more information, also
   19     rebuttal.
   20          MR. GIOVANATTI:  Can you hear me okay?
   21          MR. STARLING:  Yes, I can.
   22          MR. GIOVANATTI:  I apologize.  I have been switching
   23     between computers and phones, literally nothing is working.  If
   24     I fall off again, apologizes.
   25          Your Honor, I'm going to address two specific

 1    provisions that the DHHS disagrees with the court -- or with

 2    the monitoring team's findings in the MISEP 24 report.  First,

 3    on the validation of the department's MIC rate, the 6.1 number

 4    that Ms. Bartosz discussed as well as Ms. Crummy, as the court

 5    is aware, the monitoring team has been conducting a review of

 6    unsubstantiated MIC cases.  The department has raised many

 7    concerns about this review process and continues to hold these

 8    concerns today.

 9          As we did last year, the department intends to file a

10    response to MMT's MIC investigation report with the court under

11    seal later today or early tomorrow and that will address the

12    specific MIC investigations that the monitoring -- that MMT

13    disagrees with the monitors.

14          For purposes of this hearing and for the MISEP 24

15    report, our main concern is that the department's reported MIC

16    rate has not been, for years now, been validated by the

17    monitoring team and, accordingly, the department has not been

18    assessed for compliance as to provision 6.1 of the MISEP.

19          It's been numerous reporting periods since the

20    monitoring team has validated MDHHS's MIC rate for purposes of

21    measuring compliance with 6.1.  I also think it's noteworthy

22    that MMT's review of the unsubstantiated MIC investigations

23    only began when DHHS had achieved what would have otherwise

24    been compliance with 6.1 during fiscal year 2020, when DHHS's

25    reported MIC rate was 4.69 MIC incidences per 100,000 days in

1    foster care, far below the then standard of 9.67.

2              DHHS's reported MIC rate is also the best comparison

3    to the federal indicator which is the performance metric for

4    provision 6.1 because MDHHS's reported MIC rate is

5    appropriately compared to other states' reported MIC rates.

6    The federal indicator is essentially the average of every

7    state's reported MIC rates and the other states' MIC

8    investigations are not heavily scrutinized by the federal

9    government in compiling the data set that establishes the

10   federal indicators.

11             Through the monitoring team's MIC review process, DHHS

12   is essentially being held to a higher standard than other the

13   states and the review process has also now skewed DHHS's

14   reported MIC rate.  We know this because DHHS has incorporated

15   much of the feedback the monitors originally provided through

16   their MIC investigation process which has led to a substantial

17   increase in the percentage of cases that are substantiated and

18   in turn, an increase in MDHHS's MIC rate.

19             As Ms. Bartosz mentioned before, the MIC rate has

20   increased to 14.5, I believe it is.  That is at least in part

21   relative to or related to the monitors' review.  The monitoring

22   team has also not conveyed any standard at which it will start

23   to validate the MDHHS's MIC rate.  For example, if under the

24   next review for the next fiscal year the monitoring team finds

25   only one or two investigations -- agrees with DHHS findings,

1   it's not clear the MIC rate will be validated for purposes of

2   6.1 compliance at that time.

3          Suffice it to say, your Honor, the department, the

4   court, the monitoring team need a better way of assessing

5   performance towards 6.1.  The department does not dispute that

6   the MIC rate must decrease and Director Starling commented on

7   many efforts already being undertaken by the department to

8   decrease the MIC rate but we must have some sort of clarity as

9   to what a validated MIC rate will be and what we need to do to

10  achieve a validated MIC rate.  So we invite further discussions

11  with the court, perhaps Magistrate Judge Grand again and the

12  monitoring team on this specific issue of validation for 6.1.

13         The second major area that we find disagreement with

14  the monitors is for MISEP provision 5.1.  5.1 addresses

15  contract agency evaluation, what oversight of congregate care

16  institutes, CCI, child placement agencies.  Over the past three

17  to four years the department has significantly reformed its

18  oversight process with the advice of the team, the monitoring

19  team, specifically Mr. Ryan.

20         While we are always, of course, receptive to guidance

21  and ways to improve this process, we believe the structures

22  that are now in place are sufficient to properly oversee CCIs

23  and CPAs.  Accordingly, while the MISEP 24 report finds that

24  DHHS is not in compliance with provision 5.1, we disagree with

25  this finding.

1          Provision 5.1 specifically calls for DHHS to conduct

2     contract evaluations under specific time frames and to conduct

3     annual and unannounced inspections of licensed facilities.  The

4     department has long complied with the provisions as written in

5     the agreement.  However, because the monitoring team has

6     consistently found DHHS out of compliance because it believes

7     that the department does not comply with some unstated

8     subjective standard for compliance with this term, like the MIC

9     validation, DHHS is essentially aiming at an unknown target.

10          It's not clear what would be compliance and without an

11     objective measure, it is not clear what the department must do

12     to achieve compliance with 5.1.  Thus, like the MIC validation,

13     we invite further conversation with the monitoring team and the

14     court to establish an objective and achievable standard for

15     5.1.

16          I will also note that many of the examples are

17     antidotes that are included in the MISEP 24 report regarding

18     licensed facilities and licensed foster homes, do not

19     accurately reflect anything related to the department's

20     oversight of these facilities, rather they appear to be

21     examples of unfortunate incidents that have occurred in the

22     licensed placement and the department then taking appropriate

23     action to revoke a license or otherwise remedy concern for that

24     placement.

25          In essence, I would urge this court and anyone else

1    listening to read these examples in the report carefully and

2    not incorrectly assume that the department did something

3    inappropriate related to those examples.  DHHS also intends to

4    file a short response specifically related to those examples.

5    We'll file that likely tomorrow to provide additional facts and

6    context for the court's consideration.

7            With that, your Honor, if you have any questions, I'm

8    happy to respond to them or direct them to Director Hertel or

9    Director Starling as is appropriate.

10           THE COURT:  Thank you.  I have a couple remarks and

11   then I will ask Mr. Ryan and Ms. Crummy if they have anything

12   further they wish to say before we close.  First I would like

13   to congratulate the state for tremendous progress in many

14   areas.  33 areas of concern have been moved out of supervision,

15   11 additional areas have been moved to structural supervision

16   which no longer requires active monitoring by the court.

17           We are down to about -- well, under 30 areas that the

18   state still is working on and I think we all agree that the

19   most important and difficult area to concur is the safety of

20   the children in foster care, the maltreatment in care that we

21   have been talking about for the last hour or so.

22           I don't doubt for a minute that everyone involved in

23   this case prioritizes maltreatment in care as the number one

24   issue still outstanding and most important to the children

25   we're responsible for.  The only real question is how do we get

Status Conference - July 2, 2024                                    26

1    there and I am really quite impressed with what the state has

2    already done to move in the right direction.

3           Director Hertel gave us a comprehensive review of all

4    the steps that have been taken and all of them are important

5    and well-founded but we're not getting there yet and I

6    understand Mr. Giovanatti's, am I pronouncing that right,

7    concern that no actual validation rate has been established,

8    that they're shooting at an unknown target and perhaps that's

9    step one that needs to be taken.

10          In my view, we've made great progress over the last

11   six months in particular and I think it would be a good idea to

12   meet again with Magistrate Grand and all the key players from

13   both sides either in person or by Zoom, whichever works better

14   for the parties, and see if there are some tweaks we can make

15   to the supervision and organization of maltreatment in care

16   issues to move us forward because no matter what your position

17   on whether progress has been adequate or not, you can't

18   possibly look at the 450-some instances of maltreatment in care

19   and not say what can we do about this, what more can we do to

20   ensure the safety of our children and whether the number is 418

21   or 457, it's too many, it's too high.  We've got to get it

22   down.

23          Maybe it means putting one person in charge of that

24   issue above all else, relieving that person of other

25   responsibilities in lieu of taking on the MIC issue.  I'm going

Status Conference -  July 2, 2024

1    to direct the parties with the participation of the monitors as
2    well to set something up with Magistrate Judge Grand in the
3    next 60 days and to present that to me, within 90 days, a
4    revised plan or additional steps to be taken to address the
5    maltreatment in care issue.
6            I think once we get that issue under control, and I
7    don't need to suggest there haven't been great efforts by all
8    parties to do that, but once we get that issue under control,
9    it's pretty much a straight course to exit from this
10   supervision that's been going on now for many years.  Everyone
11   has made great progress, there's still a road to go.
12           So Mr. Ryan or Ms. Crummy, do you have anything
13   further you would like to say?
14           MR. RYAN:  Your Honor, I would just add that I, like
15   you, was impressed by the department's commitments around child
16   safety and I think that the starting place for the discussion
17   with the magistrate should be the department's own blueprint
18   that Director Starling referenced, the initiatives that the
19   department has put forward to ensure maltreatment in care.
20           I don't think we should come to the table trying to
21   brainstorm new solutions.  If the department has a set of
22   strategies and solutions that it's put in place, those could
23   become the bullwork of the commitments going forward and we can
24   focus on those.
25           THE COURT:  I agree.  I agree.  We've already got a

Status Conference - July 2, 2024

1    very fine foundation, we can build on that, we don't have to

2    tear it down and go from scratch, we shouldn't.

3           Ms. Crummy, anything?

4           MS. CRUMMY:  No, I don't have anything to add, your

5    Honor.

6           THE COURT:  Thank you.  Anyone else have any final

7    questions or comments?  I'm going to let Judge Grand know that

8    we're in the process of getting it set up so he can find a date

9    that's convenient for everyone.  It may not be as easy as all

10   that over the next 60 days since it's summertime, a lot of

11   vacations but we'll do our best to get something set up.  Okay.

12   Thank you, everyone.

13          MR.  RYAN:  Judge, maybe one more thing, I'm sorry,

14   but perhaps if the state is willing, the state could share with

15   the court and the monitors and the plaintiffs that plan so that

16   we can all review that before we meet with Judge Grand.

17          THE COURT:  Good idea.  Can we do that, Ms. Hertel or

18   Mr. Giovanatti?

19          MR. GIOVANATTI:  Yes, your Honor.

20          THE COURT:  The sooner the better.  Thank you.

21

22

23

24

25

Status Conference -  July 2, 2024

1                    CERTIFICATE OF COURT REPORTER

2

3           I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled matter.

5

6     s/ Stacy K. Locher                        07/09/2024
      STACY K. LOCHER, CSR-5699,                  Date
7    Federal Official Court Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25