# Progress of the
# Michigan Department
of Human Services

Monitoring Report for *Dwayne B. v. Whitmer*
MODIFIED IMPLEMENTATION, SUSTAINABILITY, AND EXIT PLAN

**ISSUED January 14, 2025**

MISEP 25

JULY TO DECEMBER 2023



PUBLIC
CATALYST

# CONTENTS

Introduction ........................................................................................................... 3

    Summary of Progress and Challenges ............................................................... 4

    Summary of Commitments ............................................................................... 7

    Methodology ................................................................................................... 11

    Demographics ................................................................................................. 11

Organizational Capacity ....................................................................................... 15

    Caseloads and Supervision ............................................................................ 15

Accountability ...................................................................................................... 16

    Outcomes ........................................................................................................ 16

    Contract Oversight .......................................................................................... 18

    Quality Service Reviews ................................................................................. 25

Permanency .......................................................................................................... 27

    Developing Placement Resources for Children .............................................. 27

    Placement Standards ....................................................................................... 33

    Caseworker Visitation ..................................................................................... 34

Child Well-Being .................................................................................................. 36

    Health and Mental Health .............................................................................. 36

## FIGURES

Figure 1. Age of Children in Custody on December 31, 2023 ..................................................................... 12

Figure 2. Placement Types of Children in Custody on December 31, 2023 ................................................ 14

Figure 3. Length of Stay of Children in Custody on December 31, 2023 .................................................... 14

## TABLES

Table 1. Race of Children in Custody on December 31, 2023 and Race of Children in the State of
Michigan on July 1, 2023 ........................................................................................................................... 13

Table 2. Exits from Care by Exit Type, July 1, 2023 to December 31, 2023 ................................................ 15

Table 3. Federal Goals for Children in Custody as of December 31, 2023 .................................................. 15

Table 4. Worker-Parent Visitation Performance, MISEP 25 ....................................................................... 35

Table 5. Child Case File, Medical and Psychological Performance, MISEP 25 ............................................ 37

## APPENDICES

Appendix A. Age Range of Children in Care on December 31, 2023 by County .......................................... 40

Appendix B. Length of Stay of Children in Care on December 31, 2023 by County .................................... 42

Appendix C. MISEP Performance, Summary of Commitments .................................................................. 44

# Introduction

This document serves as the twenty-first report to the Honorable Nancy G. Edmunds of the United States District Court for the Eastern District of Michigan in the matter of *Dwayne B. v. Whitmer*, covering Period 25 (July 1, 2023 to December 31, 2023) under the Modified Implementation, Sustainability and Exit Plan (MISEP). On June 27, 2019, the State of Michigan and the Michigan Department of Health and Human Services (DHHS) and Children's Rights, counsel for the plaintiffs, jointly submitted to the court the MISEP, which establishes a path for the improvement of Michigan's child welfare system. Judge Edmunds entered an order directing the implementation of the MISEP following its submission by the parties.

Judge Edmunds had previously approved an Initial Agreement among the parties on October 24, 2008, a subsequent Modified Settlement Agreement on July 18, 2011, and an Implementation, Sustainability and Exit Plan (ISEP) on February 6, 2016. DHHS is a statewide multi-service agency providing cash assistance, food assistance, health services, child protection, prevention, and placement services on behalf of the State of Michigan. Children's Rights is a national advocacy organization with experience in class action reform litigation on behalf of children in child welfare systems.

In sum, the MISEP:

- Provides the plaintiff class relief by committing to specific improvements in DHHS' care for vulnerable children, with respect to their safety, permanency, and well-being;

- Requires the implementation of a comprehensive child welfare data and tracking system, with the goal of improving DHHS' ability to account for and manage its work with vulnerable children;

- Establishes benchmarks and performance standards that the State committed to meet to address risks of harm to children's safety, permanency, and well-being; and

- Provides a clear path for DHHS to exit court supervision after the successful achievement and maintenance of Performance Standards for each commitment agreed to by the parties in the MISEP.

The sections of the MISEP related to monitoring and reporting to the court remain largely unchanged from the parties' prior agreement, as do the sections regarding Enforcement, Dispute Resolution, and Attorneys' Fees.

Pursuant to the MISEP, the court appointed Kevin Ryan and Eileen Crummy of Public Catalyst to continue to serve as the court's monitors, charged with reporting on DHHS' progress in meeting

its commitments. The monitors and their team are responsible for assessing the state's performance under the MISEP. The parties have agreed that the monitors shall take into account timeliness, appropriateness, and quality in reporting on DHHS' performance. Specifically, the MISEP provides that:

> "The monitors' reports shall set forth the steps taken by DHHS, the reasonableness of these efforts, and the adequacy of support for the implementation of these steps; the quality of the work done by DHHS in carrying out those steps; and the extent to which that work is producing the intended effects and/or the likelihood that the work will produce the intended effects."

The parties jointly submitted a "Stipulated Order Amending the MISEP" to the court, which was approved by Judge Edmunds on January 25, 2024. The order recognizes Michigan's significant and sustained progress in numerous areas and continues to stress the obligation of the state to ensure child safety for plaintiff class children. Judge Edmunds has directed the monitors to continue to closely scrutinize child safety through ongoing case reviews. The order reduces the number of commitments MDHHS must meet under the MISEP, with 33 provisions exiting the agreement and another 11 provisions moving out of active monitoring to MISEP Section 4, Structures and Policies. Additionally, the order amends performance measures and standards for six commitments.

This report to the Court reflects the efforts of the DHHS leadership team and the status of Michigan's reform efforts as of December 31, 2023. Defined as MISEP Period 25, this report includes progress for the second half of 2023 and covers the second period of DHHS' performance under the Stipulated Order Amending the MISEP.

## Summary of Progress and Challenges

Michigan DHHS met or exceeded required performance standards in five of 26 areas monitored for compliance in MISEP Period 25. Among areas where the agency achieved positive levels of performance are:

- *Adoption Caseloads:* The parties agreed that adoption caseworkers shall have a caseload of no more than 15 children. DHHS achieved 89.3 percent in MISEP 25, representing a 1.2 percent increase from performance in MISEP 24 and the second period of positive trending. Per the Stipulated Order, positive trending during this period makes this commitment eligible for movement to Section 4 of the MISEP, Structures and Policies.

- *Assessments and Service Plans, Content*: DHHS agreed that assessments and service plans would be of sufficient breadth and quality to usefully inform case planning and in accordance with the requirements of 42 U.S.C. 675(1). The designated performance

4

standard is 83 percent, and performance is measured through a Quality Service Review (QSR). Of cases reviewed during MISEP 25, 85.0 percent were rated as having acceptable assessments and service plans. Per the MISEP, performance during this period makes this commitment eligible to move to Section 5 of the MISEP, To Be Maintained.

- *Provision of Services*: DHHS agreed that the services identified in the service plan will be made available in a timely and appropriate manner to the child and family and the provision of services will be monitored to determine whether they are of appropriate quality and are having the intended effect. The designated performance standard is 83 percent, and performance is measured through a Quality Service Review (QSR). Of cases reviewed during MISEP 25, 85.7 percent were rated as having acceptable assessments and service plans. Per the MISEP, performance during this period makes this commitment eligible to move to Section 5 of the MISEP, To Be Maintained.

Although Michigan DHHS did not meet the required performance standards in 21 of 26 areas monitored for compliance in MISEP Period 25, in four of these 21 areas, DHHS' performance was within 10 percent of the performance standard. They include:

- *Sibling Visitation:* The parties agreed that for children in foster care who have siblings in custody with whom they are not placed, DHHS shall ensure they have at least monthly visits with their siblings. The designated performance standard is 85 percent. DHHS achieved 83.6 percent.

- *Medical and Mental Health Exams:* The parties agreed that at least 85 percent of children shall have an initial medical and mental health exam within 30 days of the child's entry into foster care and that at least 95 percent of children shall have an initial medical and mental health exam within 45 days of the child's entry into foster care. DHHS achieved 80.6 percent for exams within 30 days and 86.5 percent for exams within 45 days.

The 26 areas monitored for compliance in MISEP Period 25 include 16 where Michigan DHHS did not meet required performance standards by more than 10 percentage points, including:

- *Psychotropic Medication:* The monitoring team reviewed a randomly selected and statistically significant sample of 66 children who were prescribed psychotropic medication during the period under review. The monitoring team found that the electronic case records for only 30 (45.5 percent) of the children included the required documentation for each prescription including initial and ongoing medical monitoring. Additionally, DHHS data indicates that required informed consents were on file for 77.7 percent of psychotropic medications prescribed to children during the period. DHHS did not meet the designated performance standard of 97 percent for either commitment.

- *Worker-Parent and Parent-Child Visitation:* DHHS did not meet the designated performance standard of 85 percent for completion of worker-parent or parent-child visits due during the period. For worker-parent visitation, DHHS completed 65.6 percent of required visits during the first month of placement, 72.3 percent of required visits during subsequent months of placement, and 51.8 percent of required visits at the parents' place of residence. For parent-child visitation, DHHS completed 67.1 percent of required visits.

- *Relative Foster Parents:* The monitoring team reviewed a randomly selected and statistically significant sample of 65 unlicensed relative homes where children were initially placed during the period under review. The monitoring team found that 40 (61.5 percent) of the homes had required safety assessments, background checks, and home studies completed per the requirements of the MISEP. Additionally, the monitoring team reviewed a randomly selected and statistically significant sample of 66 unlicensed relatives due for renewal home studies during the period under review. The monitoring team found that 36 (54.5 percent) of the homes had the home study completed, including all clearances, per the requirements of the MISEP. DHHS did not meet the designated performance standard of 95 percent for either provision.

Additionally, one area of the MISEP where the Monitors assessed that Michigan DHHS did not achieve performance, and which does not have a numerical performance standard is:

- *Contract Evaluations:* In 2020, DHHS identified to the Monitors a set of strategies designed to enhance child safety following the death of a 16 year-old child in a residential facility. Those strategies included strengthening and coordinating contract monitoring, licensing oversight and technical assistance. In MISEP 25, the Monitors assessed that DHHS' contract evaluations of Child Caring Institutions (CCIs) and private Child Placing Agencies (CPAs) providing placements and services to Plaintiffs were at times inconsistent, ineffective, and in numerous instances did not ensure the safety and well-being of Plaintiffs. The monitoring team reviewed all licensing investigations conducted during the period at CCIs and private CPAs along with corresponding Corrective Action Plans (CAPs) intended to address established violations. The monitoring team continued to find that CAP content and follow-up were often, but not always, inadequate. Many CAPs did not address all the violations in the investigation and failed to include provisions that would rectify underlying issues that led to the improper use of restraints. Some CAPs were also submitted late, and agency follow up on CAPs at times failed to ensure full compliance with all CAP child safety provisions.

## Summary of Commitments

| Section | Commitment | Performance | Achieved | Report Page |
|---------|-----------|-------------|----------|-------------|
| **5.1** | DHHS shall conduct contract evaluations of all CCIs and private CPAs providing placements and services to Plaintiffs to ensure, among other things, the safety and well-being of Plaintiffs and to ensure that the CCI or private CPA is complying with the applicable terms of this Agreement. | -- | No | 18 |
| **6.1** | DHHS shall ensure that of all children in foster care during the applicable federal reporting period, DHHS will maintain an observed rate of victimization per 100,000 days in foster care less than 9.07, utilizing the CFSR Round 4 criteria. | -- | Not yet due | 16 |
| **6.2** | Until Commitment 6.1 is achieved, DHHS, in partnership with an independent entity, will generate, at least annually, a report that analyzes maltreatment in care data to assess risk factors and/or complete root-cause analysis of maltreatment in care. The report will be used to inform DHHS practice. The first report will be issued no later than June 1, 2020. | -- | Not yet due | -- |
| **6.3** | DHHS will develop strategy plans to be implemented in each of certain selected counties, covering at least 20% of the foster care population and at DHHS's choosing from within the Big 14 counties of the State, to improve the rate of permanency for children within their first 12 months in foster care. By Oct 1, 2025, DHHS will provide a Permanency Within 12 Months Report to the monitoring team. Based on this report, the monitoring team shall determine if DHHS made good faith efforts to improve the rate of permanency within 12 months in the selected counties. | -- | Not yet due | 16 |
| **6.4** | DHHS will maintain a sufficient number and array of homes capable of serving the needs of the foster care population, including a sufficient number of available licensed placements within the child's home community for adolescents, sibling groups, and children with disabilities. DHHS will develop for each county and statewide an annual recruitment and retention plan, in consultation with the Monitors and experts in the field, subject to approval by the Monitors. DHHS will implement the plan, with interim timelines, benchmarks, and final targets, to be measured by the Monitors based on DHHS's good-faith efforts to meet the final targets set forth in the plan. | -- | Yes | 27 |
| **6.6.a** | Siblings who enter placement at or near the same time shall be placed together unless specified exceptions are met. This provision shall become eligible to immediately exit the MISEP after two consecutive periods of positive trending in validated performance from the baseline measure reported in the Monitor's MISEP 23 report. | 79.8% | No | 33 |

| Section | Commitment | Performance | Achieved | Report Page |
|---------|-----------|-------------|----------|-------------|
| **6.6.b** | If a sibling group is separated at any time, except for the above reasons, the case manager shall make immediate efforts to locate or recruit a family in whose home the siblings can be reunited. These efforts shall be documented and maintained in the case file and shall be reassessed on a quarterly basis. The Monitors will conduct an independent qualitative review to determine compliance with this commitment. The designated performance standard is 90%. | 56.1% | No | 33 |
| **6.8** | Children shall not remain in emergency or temporary facilities, including but not limited to shelter care, for a period in excess of 30 days, unless specified exceptions apply. No child shall remain in a shelter in excess of 60 days. The designated performance standard is 95%. | 71.2% | No | 34 |
| **6.9** | Children shall not be placed in an emergency or temporary facility, including but not limited to shelter care, more than one time within a 12-month period, unless specified exceptions apply. Children under 15 years of age experiencing a subsequent emergency or temporary-facility placement within a 12-month period may not remain in an emergency or temporary facility for more than 7 days. Children 15 years of age or older experiencing a subsequent emergency or temporary-facility placement within a 12-month period may not remain in an emergency or temporary facility for more than 30 days. | 47.5% | No | 34 |
| **6.10.a** | When placing a child with a relative who has not been previously licensed as a foster parent, DHHS shall visit the relative's home to determine if it is safe prior to placement; check law enforcement and central registry records for all adults residing in the home within 72 hours following placement; and complete a home study within 30 days. The designated performance standard is 95%. | 61.5% | No | 30 |
| **6.10.b** | When placing a child with a relative who has not been previously licensed as a foster parent, a home study will be renewed every 12 months for the duration of the child's placement with the relative. The designated performance standard is 95%. | 54.5% | No | 32 |
| **6.15** | 95% of adoption caseworkers shall have a caseload of no more than 15 children. This provision shall become eligible to immediately move to Structures and Policies after two consecutive periods of positive trending in validated performance from the baseline measure reported in the Monitor's MISEP 23 report. | 89.3% | Yes | 16 |
| **6.19** | Assessments and service plans shall be of sufficient breadth and quality to usefully inform case planning and shall accord with the requirements of 42 U.S.C. 675(1). To be measured through a QSR. The designated performance standard is 83%. | 85.0% | Yes | 26 |

8

| Section | Commitment | Performance | Achieved | Report Page |
|---------|------------|-------------|----------|-------------|
| **6.20** | DHHS shall ensure that the services identified in the service plan are made available in a timely and appropriate manner to the child and family and shall monitor the provision of services to determine whether they are of appropriate quality and are having the intended effect. To be measured through a QSR. The designated performance standard is 83%. | 85.7% | Yes | 26 |
| **6.22.a** | Caseworkers shall visit parents of children with a goal of reunification at least twice during the first month of placement unless specified exceptions apply. The designated performance standard is 85%. | 65.6% | No | 34 |
| **6.22.a** | Caseworkers shall visit parents of children with a goal of reunification at least once in the parent's home during the first month of placement unless specified exceptions apply. The designated performance standard is 85%. | 51.8% | No | 34 |
| **6.22.b** | Caseworkers shall visit parents of children with a goal of reunification at least once a month, following the child's first month of placement, unless specified exceptions apply. The designated performance standard is 85%. | 72.3% | No | 34 |
| **6.23** | DHHS shall ensure that children in foster care with a goal of reunification shall have at least twice-monthly visitation with their parents unless specified exceptions apply. The designated performance standard is 85%. | 67.1% | No | 35 |
| **6.24** | DHHS shall ensure that children in foster care who have siblings in custody with whom they are not placed shall have at least monthly visits with their siblings who are placed elsewhere in DHHS foster care custody unless specified exceptions apply. The designated performance standard is 85%. | 83.6% | No, but very close | 35 |
| **6.25** | At least 85% of children shall have an initial medical and mental health examination within 30 days of the child's entry into foster care. | 80.6% | No | 36 |
| **6.25** | At least 95% of children shall have an initial medical and mental health examination within 45 days of the child's entry into foster care. | 86.5% | No | 36 |
| **6.26** | At least 90% of children shall have an initial dental examination within 90 days of the child's entry into care unless the child has had an exam within six months prior to placement or the child is less than four years of age. | 70.8% | No | 36 |
| **6.29** | Following an initial medical, dental, or mental health examination, at least 95% of children shall receive periodic and ongoing medical, dental, and mental health care examinations and screenings, according to the guidelines set forth by the American Academy of Pediatrics. | 69.2%, 87.1%, 74.7% | No | 36 |

| Section | Commitment | Performance | Achieved | Report Page |
|---|---|---|---|---|
| **6.30** | DHHS shall ensure that: (1) The child's health records are up to date and included in the case file. Health records include the names and addresses of the child's health care providers, a record of the child's immunizations, the child's known medical problems, the child's medications, and any other relevant health information. The designated performance standard is 90%. | 45.5% | No | 37 |
| **6.30** | DHHS shall ensure that: (2) the case plan addresses the issue of health and dental care needs. The designated performance standard is 90%. | 51.5% | No | 37 |
| **6.30** | DHHS shall ensure that: (3) foster parents and foster care providers are provided with the child's health care records. The designated performance standard is 90%. | 90.9% | Yes | 37 |
| **6.32** | DHHS shall ensure that at least 95% of children have access to medical coverage within 24 hours or the next business day following subsequent placement by providing the placement provider a Medicaid card or an alternative verification of the child's Medicaid status and Medicaid number as soon as it is available. | 79.5% | No | 38 |
| **6.33** | DHHS shall ensure that informed consent is obtained and documented in writing in connection with each psychotropic medication prescribed to each child in DHHS custody. The designated performance standard is 97%. | 77.7% | No | 38 |
| **6.34** | DHHS shall ensure that: (1) A child is seen regularly by a physician to monitor the effectiveness of the medication, assess any side effects and/or health implications, consider any changes needed to dosage or medication type and determine whether medication is still necessary and/or whether other treatment options would be more appropriate; (2) DHHS shall regularly follow up with foster parents/caregivers about administering medications appropriately and about the child's experience with the medication(s), including any side effects; (3) DHHS shall follow any additional state protocols that may be in place related to the appropriate use and monitoring of medications. | 45.5% | No | 38 |

10

## Methodology

To prepare this report, the monitoring team conducted a comprehensive series of verification activities to evaluate the Department's progress in achieving the commitments in the MISEP. These included meetings with DHHS leadership and Plaintiffs' counsel and extensive reviews of individual children's records and other documentation. The monitoring team also reviewed and analyzed a wide range of aggregate and detailed data produced by DHHS, and reviewed policies, memos, and other internal information relevant to DHHS' work during the period. To verify information produced by DHHS, the monitoring team conducted cross-data validation and case record reviews. By agreement of the parties, the monitoring team assessed DHHS' performance for four MISEP commitments utilizing a qualitative case review[1] process. The monitoring team reviewed thousands of distinct reports from DHHS including individual case records, relative foster home studies, Division of Child Welfare Licensing (DCWL) investigations and reports, and CPS referrals and investigations.

## Demographics

DHHS produced demographic data from July 1, 2023 to December 31, 2023. DHHS data indicate that there were 9,152 children in custody as of December 31, 2023. Of the children and youth in care on December 31, 2023, 315 youth (3.4 percent) were enrolled in the Young Adult Voluntary Foster Care (YAVFC) program. During the reporting period, 1,826 [2] children and youth were placed in foster care and 1,815 children and youth exited care.[3] DHHS served 10,967 children during the period.[4]

Though young children aged zero to six years made up the largest portion (4,158 or 45 percent), Michigan continues to have a large population of older youth in custody. Twenty-six percent (2,387) were 12 to 17 years of age and seven percent (670) were 18 years and over, as detailed in Figure 1.

---

[1] The sample sizes for the monitoring team's case record reviews were based on a statistically significant sample of cases and a methodology based on a 90 percent confidence level.

[2] The 1,826 entries include three children who entered care twice (the children appearing twice in the file had unique removal dates and placement setting IDs).

[3] The 1,815 exits include two children who exited care twice (the children appearing twice in the file had unique removal and discharge dates).

[4] The monitoring team identified 41 children who appeared twice in the "during" cohort file (0.4% of 10,967). All children appearing twice in the during cohort were served more than once during the reporting period.

### Figure 1. Age of Children in Custody on December 31, 2023[5]

Source: MiSACWIS, *n=9,152*



Note: Percentages do not add up to 100 due to rounding.

With regard to gender, the population is nearly equally split—51 percent male and 49 percent female. With regard to race, the population of children was 35 percent Black/African American, 49 percent White, one percent Native American, under one percent Asian, and under one percent Native Hawaiian or Pacific Islander (see Table 1). Additionally, 15 percent of children were reported to be of mixed race. Eight percent of children were identified with Hispanic ethnicity and can be of any race. The data indicated that DHHS was unable to determine the race of less than one percent of children in care on December 31, 2023. In contrast, the population of all children in the state of Michigan was 73 percent White, 17 percent Black or African American, four percent Asian, one percent American Indian or Alaska Native, and under one percent Native Hawaiian or Pacific Islander. Additionally, six percent of children in the state of Michigan were of mixed race, and nine percent of children were identified with Hispanic ethnicity and can be of any race.[6]

---

[5] The monitoring team identified 17 instances where the MIDHHS child age variable did not match the monitoring team's child age calculation. In each instance, the child's date of birth was on December 31st (the last day of the PUR) of various years. December 31st is also the date used to calculate the child age at the end of the PUR, which may have caused the discrepancies.

[6] Data on the race of all children in the state of Michigan was sourced from the U.S. Census Bureau, Population Division, 7/1/2023 Population Estimate.

Table 1. Race of Children in Custody on December 31, 2023 and Race of Children in the State of Michigan on July 1, 2023

Source: MiSACWIS, US Bureau of the Census

| Race | Count (DHHS Custody) | Percent (DHHS Custody) | Percent (State of Michigan) |
|---|---|---|---|
| White | 4,489 | 49% | 73% |
| Black/African American | 3,224 | 35% | 17% |
| Mixed Race | 1,352 | 15% | 6% |
| American Indian or Alaska Native | 63 | 1% | 1% |
| Unable to Determine[7] | 12 | <1% | -- |
| Asian | 9 | <1% | 4% |
| Native Hawaiian or Pacific Islander | 3 | <1% | <1% |
| **Total** | **9,152** | **100%** | **100%** |
| Hispanic ethnicity and of any race | 768 | 8% | 9% |

Note: Percentages do not add up to 100 due to rounding.

As Figure 2 demonstrates, 89 percent of children in DHHS' custody lived in family settings, including with relatives (51 percent), foster families (30 percent), and their own parents ("in-home") (seven percent), and in homes that intend to adopt (one percent). Of children in custody, 492 (five percent) lived in institutional settings, including residential treatment and other congregate care facilities. Another 433 children (five percent) resided in independent living placements, which typically serve youth on the cusp of aging out of care. The remaining one percent were AWOL. There were no children with unidentified placements or placements in other settings.

---

[7] Children with "Unable to Determine" and "No Match Found" entered as their race are pooled together in the "Unable to Determine" row.

Figure 2. Placement Types of Children in Custody on December 31, 2023

Source: MiSACWIS, *n=9,152*



Of the children in care on December 31, 2023, 38 percent were in care for less than one year, while 20 percent were in care for more than three years (see Figure 3).

Figure 3. Length of Stay of Children in Custody on December 31, 2023

Source: MiSACWIS, *n=9,152*



14

Table 2. Exits from Care by Exit Type, July 1, 2023 to December 31, 2023[8]

Source: MiSACWIS

| Exit Type | Frequency | Percent |
|---|---|---|
| Adoption | 795 | 44% |
| Reunification | 603 | 33% |
| Emancipation | 244 | 13% |
| Guardianship | 136 | 7% |
| Living with relatives | 30 | 2% |
| Death of child | 0 | 0% |
| Transfer to another agency | 4 | <1% |
| Runaway | 3 | <1% |
| **Total** | **1,815** | **100%** |

As Table 3 demonstrates, of the children in custody on December 31, 2023, the majority (5,610 or 61 percent) had reunification as a federal goal. For the remaining children, 2,116 (23 percent) had a goal of adoption, 800 (nine percent) had a goal of APPLA,[9] 498 (five percent) had a goal of guardianship, and 128 (one percent) had placement with a relative as a federal goal. There were no children with missing federal goal codes.

Table 3. Federal Goals for Children in Custody as of December 31, 2023

Source: MiSACWIS

| Federal Goal | Frequency | Percent |
|---|---|---|
| Reunification | 5,610 | 61% |
| Adoption | 2,116 | 23% |
| APPLA | 800 | 9% |
| Guardianship | 498 | 5% |
| Relative | 128 | 1% |
| **Total** | **9,152** | **100%** |

Note: Percentages do not add up to 100 due to rounding.

# Organizational Capacity

## Caseloads and Supervision

The MISEP states that caseload compliance will be measured by taking the average of three data reports each reporting period, prepared on the last workday of February, April, June, August,

---

[8] The 1,815 exits include two children who exited care twice. (The children appearing twice in the file had unique removal and discharge dates.)

[9] APPLA stands for Another Planned Permanent Living Arrangement. Per Michigan foster care policy FOM 722-07F, a permanency goal of APPLA must include a stable, secure living arrangement that includes relationships with significant adults in the youth's life that will continue beyond foster care.

October, and December. For MISEP 25, the monitors used caseload counts from August 31st, October 31st, and December 28th of 2023 to determine compliance.

*Adoption Caseloads (6.15)*

DHHS agreed that full-time staff, public and private, solely engaged in adoption work would be responsible for no more than 15 children each. Staff who perform adoption work as well as other functions are held to a pro-rated standard. The Stipulated Order Amending the MISEP indicates that this commitment shall become eligible to immediately move to Section 4, Structures and Policies, and remain subject to the Court's jurisdiction pursuant to the terms of the MISEP, after two consecutive periods of positive trending in validated performance from the baseline measure reported in the Court Monitor's report for MISEP 23. For MISEP 25, DHHS averaged 89.3 percent of staff meeting the standard. This represents an increase from the MISEP 24 performance of 88.1 percent and is the second period of positive trending. *Per the Stipulated Order, positive trending during this period makes this commitment eligible for movement to Section 4, Structures and Policies.*

# Accountability

## Outcomes

*Safety – Maltreatment in Foster Care (6.1)*

The child safety standard of maltreatment in care (MIC), focuses on keeping children in DHHS custody safe from abuse and neglect. DHHS committed to ensure that of all children in foster care during the applicable federal reporting period, DHHS will maintain an observed rate of victimizations per 100,000 days in foster care of less than 9.07, utilizing the CFSR Round 4 criteria developed by the federal government. Performance on this measure is calculated for DHHS by the University of Michigan based on the Adoption and Foster Care Analysis and Reporting System (AFCARS) and National Child Abuse and Neglect Data System (NCANDS) files produced by DHHS.

Performance for this commitment is reported annually. Performance for federal fiscal year (FFY) 2023, which ran from October 1, 2022 to September 30, 2023, was discussed in the MISEP 24 report. Performance for FFY 2024, October 1, 2023 to September 30, 2024, will be validated and reported in the future.

*Permanency in 12 Months (6.3)*

The Stipulated Order Amending the MISEP modified commitment 6.3 such that DHHS is required to develop strategy plans in select counties, covering at least 20 percent of the foster care population and at DHHS' choosing from among the "Big 14" counties of the State, to improve the

rate of permanency for children within their first 12 months in foster care. The strategy plan is to focus on identified needs and barriers to be addressed in the respective counties to improve the rate of permanency for children within their first 12 months in foster care, such as court delays, parenting time, service array, father engagement, foster parent support, placement disruption, and family resources among other such factors to be identified by DHHS. The strategy plan must include a description of the specific strategies to be implemented to improve permanency and set forth implementation action steps with timelines, identify lead staff responsible for implementation and articulate the intended outcomes of each strategy.

DHHS committed to providing a copy of the strategy plan for each county to the monitoring team within 30 days of execution of the Stipulated Order. DHHS may thereafter modify the strategies contained in the plans during the 12-month implementation period, beginning January 1, 2024, as it deems appropriate. DHHS agreed to provide an updated strategy plan, containing the elements as described above, to the monitoring team within 30 days of any modification(s).

Then, by October 1, 2025, DHHS is to provide a Permanency within 12 Months Report to the monitoring team that shall include:

- The aggregate 12-month permanency rate for the children who entered foster care within the first six months of the previous period (January 1, 2023 – June 30, 2023) in the selected counties;

- The aggregate 12-month permanency rate for the children who entered foster care within the first six months of the period under review (January 1, 2024 – June 30, 2024) in the selected counties; and

- A summary of DHHS's efforts and strategies to improve permanency in the selected counties and data demonstrating any progress achieved.

Based on the above DHHS report, the monitoring team shall determine if DHHS made good faith efforts to improve the rate of permanency within 12 months in the selected counties. Positive trending in the aggregate permanency rate over the 12-month period shall be deemed to show that DHHS has made good faith efforts to improve permanency in the selected counties. Negative trending in the permanency rate over the 12-month period shall not, alone, be considered to show a lack of good faith efforts but will be considered by the Monitors together with all relevant factors. If DHHS is found to have made good faith efforts, this commitment shall exit court jurisdiction. Failure by DHHS to achieve a finding of good faith efforts will require an additional implementation period as described herein.

DHHS selected Ingham, Jackson, Kent, Muskegon, Oakland, and Saginaw as the focus counties for improving the permanency rate. These counties were selected from the Big 14 counties and

17

DHS reported they constituted 20.2 percent of the foster care population as of December 31, 2023. As of this report writing, the Monitoring Team is in the process of final data validation of the percentage of children in these six counties. In March 2024, DHHS submitted to the monitoring team a strategy plan dedicated to improving permanency within 12 months in the selected counties. The plan focuses on identifying and eliminating barriers to permanency for individual cases and addressing county-level barriers with a focus on ensuring adequate services, collaborative relationships with judicial partners, and family engagement. The monitoring team will report on implementation of the strategy plans, the aggregate 12-month permanency rates in the selected counties, and DHHS' efforts to improve the permanency rate in the selected counties in future reports.

## Contract Oversight

*Contract-Agency Evaluation (5.1)*

The MISEP requires DHHS to conduct contract evaluations of all Child Caring Institutions (CCIs) and private Child Placing Agencies (CPAs), including an annual inspection of each CPA, an annual visit to a random sample of CPA foster homes, and an annual unannounced inspection of each CCI. During the required visits, the Division of Child Welfare Licensing (DCWL) is expected to monitor compliance with rule, policy, contract, and MISEP requirements, with the primary focus being the safety and well-being of children. Following the death of a child in custody in a residential facility in 2020, DHHS identified to the Monitors a set of strategies designed to improve child safety, including strengthening and coordinating contract monitoring, licensing oversight and technical assistance.

DHHS reported that during this period DCWL continued to be funded for 22 child welfare licensing agency consultants who performed monitoring activities including annual licensing inspections, investigations, technical assistance, and consultation. Additionally, DHHS reported that five agency analysts conducted visits comprised of interviews with foster parents, foster children, and unlicensed relative caregivers to assess child safety. Three area managers and one program manager supervised the field consultants and field analysts.

DHHS reported that the rule set for foster homes, CWL-Pub-10 – Children's Foster Home Licensing Rules, became effective July 3, 2023. Updated licensing rule books were mailed to chief administrators and licensee designees.[10]

---

[10] DHHS reported that rule change highlights included defining sexual orientation, gender, identity, and expression (SOGIE); adding trauma responsive care, collaboration in transportation, and foster parent bill of rights as topics for foster parent orientation; inclusion of tribal language and the schedule of foster care payments to the foster parent/agency agreement; a rule that an agency may not be more restrictive than departmental policies or the administrative rules governing licensing and services; and requiring foster parent training on emergency procedures, first aid and fire safety, firearm storage, SOGIE, human trafficking, and trauma-informed parenting.

DHHS reported that the agency convened a meeting with CCI providers in October 2023 to provide information on Corrective Action Plans, fingerprinting, risk scores and technical assistance. This meeting was part of the Sustaining Performance Improvement quarterly meeting where contracted providers, Child Safety and Program Compliance (CSPC), DCWL, and Children's Services Administration (CSA) managers shared information focused on performance improvement related to CCI dashboard redesign, exit conference process, sibling and in-person parenting time exception data, supporting family relationships, and contact exception requests and MiSACWIS.

DHHS also reported that monthly Foster Home Licensing Supervisor Meetings, hosted by DCWL, were held in July, August, October, and November of 2023. The meetings included information and training on business processes and licensing information.[11]

*Child Caring Institutions (CCIs)*

During this reporting period, the monitoring team continued to monitor DHHS's oversight of those CCIs which posed the greatest risk to the safety of youth in care, as assessed by DHHS.

Consistent with prior reporting periods, the monitoring team's review process consisted of evaluations of weekly and monthly data provided by DHHS related to licensing investigations, Maltreatment in Care (MIC) investigations, and the use of restraints. DHHS continued to utilize the Risk Stratification Tool to identify a numerical score for each facility in the State on a weekly basis. As in prior reporting periods, when a facility's score reached a threshold of 10.0, DHHS added them to a Weekly CCI Update Spreadsheet reviewed weekly by a committee of DHHS staff who meet to discuss concerns or issues that should be monitored by the Department.  If a facility's score increased to 15.0 or higher, DHHS reported that the facility was then subject to heightened monitoring by, and engagement with, the Residential Collaboration and Technical Assistance Unit (RCTAU). This included regular on-site and virtual visits by the assigned RCTAU Analyst, and the development of an Action Plan focused on the specific issues posing a safety risk to youth at the facility. Once the plan was completed and presented to the agency leadership, the RCTAU analyst was expected to evaluate the facility's progress toward making improvements to its operations and provide technical assistance as needed. DHHS reported that the RCTAU was reassigned to DCWL during MISEP 25.

---

[11] Topics included fingerprinting required to reopen a foster home license; accepting or continuing placement of an 18-year-old or older juvenile justice youth; internal business processes for Corrective Action Plans (CAPs), special evaluations, rules, variances, and re-opening providers; rules prohibiting agencies from being more restrictive than the department policies or rules and rules related to hazardous materials, variance approval letters, and action review team determination letters; and a new CPA Incident form.

During the reporting period, DHHS reported weekly risk scores for each facility. At the beginning of the reporting period, 17 (34.0 percent) of 50 facilities had a risk score of 10.0 or higher and qualified for increased monitoring. Ten of these facilities had a score of 15.0 or higher. By the end of the reporting period, six of the 17 facilities saw their risk scores decrease to below 10.0 and no longer received increased State monitoring. Another five facilities saw a decrease in their risk scores but remained above the 10.0 threshold. Six of the 17 facilities with risk scores above 10.0 at the beginning of the period saw an increase in their risk scores by the end of the period. Overall, DHHS determined that 18 (33.3 percent) of 54 facilities had a risk score of 10.0 or higher at the end of the period, including 11 with a score of 15.0 or higher. On average, 34.7 percent of facilities each week had a risk score of 10.0 or higher and 20.0 percent of facilities each week had a risk score of 15.0 or higher during the period.

Each month during the reporting period, DHHS provided the monitoring team with data on the total number of child restraints each facility reported. Overall child restraint use ranged from 187 restraints (July) to 256 restraints (November). The November total represents the highest single month of documented child restraints since May 2022. The average number of child restraints per month during the reporting period was 217. This represents an increase of over 20 percent from the prior reporting period, when the average was 179 child restraints per month.

One umbrella agency with multiple facilities/licenses[12] was particularly prominent in regard to its restraint use. Facilities under this agency accounted for 294 (22.5 percent) of the 1,306 child restraints at CCIs during the reporting period. Toward the end of the period, DHHS elevated its engagement and oversight of the umbrella agency. In the next report, the Monitors will discuss DHHS's oversight at the umbrella agency in MISEP 26 and report on the impact on the use of child restraints.

---

[12] There were four facilities/licenses under this umbrella agency that had active child placements during the period under review. Two of the facilities had active placements throughout the entire period. The third facility had active placements in July and August 2023; however, in mid-August 2023, all youth and staff at the facility were transferred to the fourth facility where they remained through the end of the period. Prior to this transfer in mid-August 2023, the fourth facility did not have any placements.

DHHS reported during the period that facilities considered "shelters" are monitored by DCWL but are not eligible for heightened oversight by the RCTAU, even if the facility has a risk score of 10.0 or higher. By the conclusion of this reporting period, the monitors were aware of three "shelter" facilities with risk scores above 10.0 but not subject to review by RCTAU. Two of these facilities saw their risk scores rise quickly during the period. This includes one facility which had a risk score of 14.0 at the start of the period and 22.0 at the end of the period. The other facility, which was licensed on July 3, 2023, had a risk score of 11.8 as of late October 2023, which then increased to 22.4 by late November 2023. DHHS confirmed that this new facility had five special investigations from September to December 2023, with at least two resulting in established violations. Because this facility was considered a shelter, it was not assigned to the RCTAU for monitoring. DHHS reported that the agency changed its position and made shelters eligible for RCTAU oversight and support in mid-2024. DHHS reported that during MISEP 25 DCWL conducted 11 unannounced renewal and 12 unannounced interim inspections of CCIs, totaling 23 inspections for the period. DHHS determined that 15 of the CCIs required CAPs. Eight CCIs were in substantial compliance with appropriate statutes, administrative licensing rules, contract regulations, and MISEP requirements, as per DHHS' reporting, so CAPs were not required for these agencies.

As of the end of the period, three contracted CCIs were issued a first provisional license. In addition, two CCIs were recommended for a first provisional license, one CCI that had been recommended for a first provisional license remained under review, one previously contracted CCI had its license revoked, and one previously contracted CCI was administratively closed. There were no voluntary CCI closures during the period.

DCWL completed 135 special investigations involving 256 allegations in 39 contracted CCIs for MISEP 25, according to DHHS. Sixty-nine of the special investigations resulted in a substantial compliance finding by DHHS with no CAP required. Violations were found in 66 of the 135 special investigations with 126 violations established, and individuals' employment was terminated as a result of 25 of the special investigations. CAPs approved by DCWL were required in all 66 special investigations in which violations were established.

The monitoring team reviewed all 135 CCI special investigations for the period. One hundred and twenty of the special investigations were referred to Centralized Intake (CI) and 74 of these allegations were assigned for CPS investigation. Fifteen of the 74 investigations resulted in a substantiated disposition of child abuse and/or neglect, while 59 of the investigations resulted in an unsubstantiated disposition.

In addition to the 135 special investigations, corresponding CPS referrals, and CPS-MIC investigations, the monitoring team also reviewed CAPs and CAP follow-up documentation

provided by DHHS relevant to the investigations where licensing violations were established. As with the last several periods of reported CCI monitoring by DHHS, during this period the monitoring team continued to find that CAP content and follow-up were at times inadequate to protect children's safety. Many CAPs did not address all the violations in the investigation and failed to include provisions that would rectify underlying issues that led to the improper use of restraints of children. Agency follow up on CAPs often failed to ensure full compliance with all CAP provisions. For facilities that were both being monitored by the RCTAU and had CAPs, the efficacy of RCTAU monitoring on CAP implementation was questionable.

Examples of issues with CAPs include:

- A staff person violated agency restraint policy by grabbing and holding the youth around the neck and holding the youth's arms and legs off the floor while the youth's body was on the floor. The youth sustained scratches on her neck. There were four violations and four separate CAPS at this facility for the same rule violation in 2022.

- A new staff person who was working on her first day with youth was assigned to shadow other staff and, as an incompletely trained employee without the requisite knowledge and skill, could not to be counted in the staff-to-youth ratio. But the CCI counted this new employee as the second staff on the floor and wrongly counted them in the staff-to-youth ratio. Video showed that this staff person hit a youth in the face. The CAP included the creation and implementation of a shadowing checklist for new hires. The CAP did not address scheduling so that shadowing staff are not counted in the ratio.

- Video showed that on September 16, 2023 a staff person inappropriately restrained a youth against the wall with the staff person pressing his elbow against the youth's chin for 28 seconds. A second involved staff reported that this staff person also had his forearm on the chest of the youth while restraining him in the bedroom out of video view. DHHS confirmed the case against the staff person. This same facility had violations of the same rule from incidents that occurred on May 2, 2023 and July 26, 2023 and there were approved CAPS in place as a result of those violations at the time this violation occurred. Follow-up on several provisions of the CAP that resulted from this violation should have included review of documentation that did not occur, including review of the write-up of

the staff person who refused to intervene, the manager's write-up of at least four different incidents, and the agency disciplinary form for the involved staff.

*Child Placing Agencies (CPAs)*

DHHS reported that during MISEP 25 there were 41 CPA inspections, which included 26 interim and 15 biennial renewal inspections. Four contracted agencies were in substantial compliance with applicable statutes, licensing rules, contract regulations, and MISEP requirements, while 37 agencies required CAPs due to a total of 342 established violations. One CPA was recommended for a 2nd provisional license and one CPA was recommended for a 1st provisional license. There were no CPA closings during the period.

As indicated above, DCWL field analysts conduct annual home visits to assess safety and service provision within licensed foster homes, as well as unlicensed relative homes supervised by agencies with interim and renewal inspections. According to DHHS, DCWL field analysts visited a random sample of licensed foster homes and unlicensed relatives associated with 35 of the 41 contracted CPAs scheduled for a renewal or interim inspection during MISEP 25. Six of the agencies did not supervise any foster or unlicensed relative homes.

DCWL field analyst reports indicate that 110 foster homes and 106 unlicensed relative homes were visited during MISEP 25 for a total of 216 home visits. DCWL issued 32 safety alerts for urgent or critical concerns in 21 unlicensed relative homes and 11 regular foster homes.[13]

The MISEP requires that the field analysts visit a certain number of each CPA's foster homes, relative to the total number of homes supervised by the agency. CPAs with fewer than 50 homes are required to have at least three licensed foster homes visited, and those agencies with 50 or more licensed homes are required to have five percent of those foster homes visited. DHHS met this requirement with respect to all agencies under CPA supervision during the period.

DHHS reported that during MISEP 25, licensing consultants conducted 24 special investigations involving 17 contracted CPAs. The investigations involved 50 allegations of non-compliance related to rule, policy, contract, and MISEP requirements. DHHS determined in 19 (79.2 percent) of the special investigations that CPAs were in substantial compliance, and therefore a CAP was not required. Five (20.8 percent) of the 24 special investigations resulted in non-compliance

---

[13] Safety issues identified by DCWL in its oversight included: inoperable or missing smoke or carbon monoxide detectors; individuals sleeping in basements without proper egress; unsecured gun ammunition and medication; spa and pool areas without proper door alarms or barriers to entry; clutter blocking access to a furnace and water heater; bedroom doors not secured properly; a pellet burning stove without a safety barrier; unregistered relatives living in an unlicensed relative home; the refusal of visits/walkthroughs by both licensed foster parents and unlicensed relatives. Follow-up to the safety alerts was noted on the safety alert form and in the annual agency inspection reports.

findings that required CAPs, with seven (14.0 percent) of the 50 allegations resulting in established violations. The monitoring team reviewed all 24 CPA special investigations.[14]

DHHS reported that during MISEP 25, private agencies conducted 288 foster home special evaluations. These are investigations conducted by the supervising agency when an allegation is made regarding a foster home in their network. The monitoring team reviewed 88 of these special evaluations. Thirty-three of the 88 special evaluations were referred and accepted for MIC investigations. Twenty-eight MIC investigations resulted in an unsubstantiated disposition, and five investigations resulted in a substantiated disposition. Thirty-eight of the 88 special evaluations resulted in established licensing violations. Twenty-eight of the 38 Special Evaluations with violations required CAPs. Ten of the Special Evaluations were not required or allowed to have CAPs due to recommendations for licensure revocation in each case.

The monitoring team found that some of the Special Evaluations in the review were inadequate to protect child safety, including failure to interview people who made allegations and to corroborate information through additional interviews and document review. In other instances, follow up to the findings did not adequately protect children's safety. Concerns regarding licensed foster homes noted by the monitoring team in reviewing the special evaluations included the following:

- An allegation was received on July 7, 2023 that a foster parent's adult daughter, an alternate caregiver, punched a foster child (age 7) and threatened her while picking the child up from school. The foster parent failed to respond to more than a dozen attempts to contact her about the investigation. The foster parent was cited for her unwillingness to communicate with the agency for over a month regarding the special evaluation, and a refusal to renew the license was recommended. The notice of intent letter advising the foster parent of the intent to revoke the license of the foster home was sent to the foster parent on April 26, 2024. An appeal was not filed and the window for appeal expired on June 15, 2024. The license status remains pending as of October 2024.

- Two children, ages 6 and 4, reported to their current foster parent that their former foster parents hit the back of their hands with a handle as punishment and hit them with a belt and a hand on the bottom on multiple occasions. When asked if they were ever spanked,

---

[14] Examples of established violations from these 24 licensing investigations included: failure of agency staff to report allegations of abuse and neglect; placement of a child who had intensive needs in a foster home that had been open less than six months and in which the foster parents were not adequately prepared to meet the youth's needs; an agency failing to provide a youth their belongings for weeks after a change in placement and suggesting that the foster parent throw the belongings away; failure to enroll a youth in school for several weeks after placement; and failure to provide prospective adoptive families with their completed adoption assessments.

both children separately reported that their former foster parent spanked them. When asked if there was any other punishment, the six-year-old also stated that the former foster parent hit him with a belt. The child then went to his closet, showed the workers a belt, and snapped it. He reported that the former foster parent hit him with her belt, not the belt he showed to the workers. The former foster parent alleged that the children were being coached to make these allegations. There was no investigation into who may have been coaching them and no associated MIC investigation.

- A foster parent admitted to carrying a 15-year-old child to his room with a hand under the child's knee and the other under the child's neck when the child refused to go to his room. The child reported that the foster parent carried him like a baby. All the other foster children in the home who witnessed the incident reported that the foster parent carried the child upstairs while the child was throwing a fit. One of the child witnesses stated that the foster parent dragged the child upstairs holding his foot and neck. This child also reported that the involved child is treated worse than the other children in the home. The involved child had unexplained red marks on his neck after the incident. The foster parents saw the red marks, photographed them, and reported them to the foster care worker. The investigation did not include any medical assessment. An explanation for the red marks was never established. There was no violation for behavior management and the allegations of maltreatment to the child were not referred to CI for a CPS investigation.

## Quality Service Reviews

DHHS continues to implement the QSR process to provide a probative review of case practice in a selection of cases, surfacing strengths as well as opportunities for improvement in how children and their families benefit from services. Each review focuses on an identified county or counties and includes in-depth case reviews, as well as focus groups and surveys.

The parties agreed that performance for two commitments would be measured through QSR case reviews. The first commitment is Assessments and Service Plans, Content (6.19). The performance standard for this commitment is 83 percent.[15] The second commitment is Provision of Services (6.20). The performance standard for this commitment is 83 percent.

During MISEP 25, DHHS conducted blended CFSR/QSR reviews in Business Service Centers (BSC) 1, 4, and 5. DHHS chose a randomly selected sample of open cases for review during each CFSR/QSR. Cases were graded on 21 indicators covering different areas of case practice and the status of the child and family. Information was obtained through in-depth interviews with case participants including the child, parents or legal guardians, current caregiver, caseworker,

---

[15] On September 6, 2022, a Stipulated Order was issued which amends the Designated Performance Standard for Section 6.19 from 90 percent to 83 percent and the Floor Performance Standard from 85 percent to 80 percent. These amended performance standards are retroactive to June 27, 2019, the day the MISEP was filed.

teacher, therapist, service providers, and others with a significant role in the child's or family's life. A six-point rating scale was used to determine whether performance on a given indicator was acceptable. Any indicator scored at four or higher was determined acceptable, while any indicator scored at three or lower was determined to be unacceptable.

*Assessments, Service Plans, and Provision of Services (6.19, 6.20)*

DHHS agreed to develop a comprehensive written assessment of a family's strengths and needs, designed to inform decision-making about services and permanency planning. The plans must be signed by the child's caseworker, the caseworker's supervisor, the parents, and the child, if age appropriate. If a parent or child is unavailable or declines to sign the service plan, DHHS must identify steps to secure their participation in accepting services.

The written service plan must include:

- A child's assigned permanency goal;

- Steps that DHHS, CPAs when applicable, other service providers, parents, and foster parents will take together to address the issues that led to the child's placement in foster care and that must be resolved to achieve permanency;

- Services that will be provided to children, parents, and foster parents, including who will provide the services and when they will be initiated;

- Actions that caseworkers will take to help children, parents, and foster parents connect to, engage with, and make good use of services; and

- Objectives that are attainable and measurable, with expected timeframes for achievement.

DHHS reviewed six children's cases, with 20 applicable items relevant to this commitment during MISEP 25. Of the 20 applicable items, DHHS reported that 17 (85.0 percent) were rated as having acceptable assessments and service plans, exceeding the performance standard of 83 percent for this commitment. *Per the MISEP, performance during this period makes this commitment eligible to move to "To Be Maintained."*

Furthermore, DHHS agreed that the services identified in service plans will be made available in a timely and appropriate manner and to monitor services to ensure that they have the intended effect. DHHS also agreed to identify appropriate, accessible, and individually compatible services; assist with transportation; and identify and resolve barriers that may impede children, parents, and foster parents from making effective use of services. Finally, DHHS committed to amending service plans when services are not provided or do not appear to be effective.

DHHS reviewed six children's cases, with 21 applicable items relevant to this commitment during MISEP 25. Of the 21 applicable items, DHHS reported that 18 (85.7 percent) were rated as acceptable for provision of services, exceeding the 83 percent performance standard for this commitment. *Per the MISEP, performance during this period makes this commitment eligible to move to "To Be Maintained."*

## Permanency

### Developing Placement Resources for Children

*Foster Home Array (6.4)*

In the MISEP, DHHS committed to maintain a sufficient number and array of homes capable of serving the needs of the foster care population, including a sufficient number of available licensed placements within a child's home community for adolescents, sibling groups, and children with disabilities. DHHS agreed to develop for each county and statewide an annual recruitment and retention plan, in consultation with the monitors and experts in the field, which is subject to approval by the monitors. DHHS committed to implement the plan, with interim timelines, benchmarks, and final targets, to be measured by the monitors based on DHHS' good faith efforts to meet the final targets set forth in the plan.

DHHS' Adoption and Foster Home Recruitment and Retention (AFPRR) plans cover the state fiscal year (SFY), running from October 1st to September 30th each year. This report covers DHHS' recruitment efforts for SFY 2023 which concluded on September 30, 2023, during MISEP 25. In addition, this report covers the first three months of the SFY 2024 recruitment cycle, which extended from October 1, 2023 through December 30, 2023.

For SFY 2023 DHHS agreed to license 902 new non-relative homes. Statewide, DHHS licensed 759 new unrelated homes, 84.1 percent of the SFY 2023 non-relative licensing goal. During that same period, 1,141 unrelated foster homes were closed, for a net loss of 382 homes, although the population of children in custody remained relatively stable during this period. On December 31, 2022, the child custody population was 9,195 and on December 31, 2023, the child custody population was 9,152.

For the special populations of children, DHHS agreed to license 641 foster homes willing to accept adolescent placements, 563 homes for sibling groups, and 110 homes for children with disabilities. DHHS licensed 285 adolescent homes during SFY 2023, only 44.5 percent of the target for the year. During the same period, 405 homes for teens were closed, resulting in a net loss of 120 homes. Regarding homes for children with disabilities, 568 homes were licensed, surpassing the SFY 2023 licensing goal. However, 768 homes for children with disabilities were closed,

resulting in a net loss of 200 homes available for placement of children with disabilities. Four hundred seventy-two homes were licensed for siblings, 83.8 percent of the SFY 2023 licensing goal. Simultaneously, 725 homes for sibling groups were closed, for a net loss of 253 sibling homes.

For SFY 2024, DHHS agreed to license 915 new non-relative homes of which 589 will accept adolescent placements, 76 homes will accept children with disabilities, and 570 homes will accept sibling groups. During the first three months of the fiscal year, DHHS licensed 167 non-relative foster homes statewide, 18.3 percent of the SFY 2024 licensing goal. During this same time, 283 existing homes were closed, resulting in a net loss of 116 homes. In the first three months of SFY 2024, 44 homes for teens were licensed, 7.5 percent of the full year's licensing goal. Simultaneously, during the first three months of the fiscal year, 100 homes for teens were closed, resulting in a net loss of 56 homes. There were 129 homes for children with disabilities licensed in the first three months of SFY 2024, surpassing the licensing goal for SFY 2024. However, 189 homes willing to accept children with disabilities were closed resulting in a net loss of 60 homes. Ninety-six homes accepting sibling groups were licensed, 16.8 percent of the SFY 2024 licensing goal. Meanwhile, 183 homes for sibling groups were closed, resulting in a net loss of 87 homes.

Taking into consideration that foster home closures have an impact on DHHS' ability to maintain a sufficient array of homes capable of meeting the needs of children in the state's custody, during SFY 2023 DHHS developed and implemented a plan to understand the reasons for home closures, and began to develop, implement and monitor systemic strategies directed to address foster parent retention. Examples of these efforts include:

- DHHS entered into a collaboration with AdoptUSKids, a federal capacity building center, to develop and implement a plan for strengthening recruitment and retention practices throughout the state. As a result of these efforts, DHHS acknowledged that it "cannot recruit its way out of a retention problem." DHHS then developed a Michigan specific retention framework to address long standing issues regarding foster parent retention. The framework was presented during a 90-minute virtual learning session which was attended by almost 200 statewide agency leaders. In addition, DHHS then directed that county retention plans must include specific strategies directed to support the needs of foster parents.

- DHHS collaborated with the University of Chicago to initiate a Data-Driven Family Recruitment (DDFR) Project. The focus of the project titled "Addressing Adverse Placements in Michigan" is to identify factors impacting adverse placement outcomes (sibling separations, congregate care, placements far from the child's home). Using data gathered through the project, DHHS' plan is to implement Toolkits for counties to collect

and manage resource family data for the purpose of improving placement matching and the development of recruitment strategies to improve placement outcomes.

- DHHS created a staff position in each BSC to assist caseworkers find appropriate placements for difficult to place children who otherwise might experience placement instability.

- DHHS sends approximately 150 surveys each month to foster parents whose license was recently closed to gain an understanding of the reasons for home closure, services that were beneficial to the family and whether additional support was needed. Annual statewide, regional, and agency specific reports are completed and provided to every agency in Michigan.

- DHHS implemented a closed foster home campaign for families who indicated they might consider reopening their homes in the future. DHHS utilized an ad campaign targeting those families, urging them to consider reopening their licenses. Regional Resource Teams also contacted over 500 families by phone to determine whether anything could be done to assist the family in reopening their home. Results of these efforts will be available during upcoming report periods.

- DHHS implemented a Community Reintegration Home Program (CRH) for youth on the cusp of discharge from CCIs. The CRH is a licensed foster home contracted to provide a family-like placement for youth being discharged from congregate care settings without an identified long-term community placement. The purpose of the CRH is to provide a family-based placement while more permanent placement options are researched and identified, to assess and implement services needed to maintain youth in the community and work with experienced placement resources to successfully transition youth to a long term, successful community placement.

- DHHS implemented a Foster Home Referral Incentive Program making available to foster parents a $250 incentive payment for making referrals that lead to a foster parent's licensure. Foster parents qualify for an additional incentive up to $500 after the referred foster parent maintains placement of a child for at least 90 days.

- DHHS implemented a foster parent respite program. Funds have been provided to agencies for foster parents to find their own families who go through an approval process to provide respite care for children in DHHS custody. Foster families are able to access respite 12 days per quarter per child.

- DHHS secured the services of a national expert in foster family recruitment, development and support to present for staff throughout the state a virtual seven-part training series on targeted foster home recruitment. Topics included: Overview of Targeted

Recruitment; Effective Messaging Techniques; Rural Recruitment Strategies; Finding Families for Children/Teens with Developmental Disabilities; Recruiting for Marginalized, Overrepresented Youth; Recruiting for Teens; and Targeted Recruitment for Siblings.

- DHHS continues to use family incentive grant funding to assist families with overcoming financial barriers to achieving licensing rule compliance. Funds are available to help with home improvements, medical clearances, and any potential safety concerns in the home.

While much work remains, based on the department's efforts outlined above, as well as DHHS' plans for implementation of additional initiatives discussed with the monitoring team during quarterly progress meetings, the monitors find that DHHS has made good faith efforts to maintain an array of  homes sufficient to meet the needs of the foster care population. *Per the MISEP, performance during this period makes the commitment eligible to move to "To Be Maintained."*

*Relative Foster Parents (6.10.a)*

When children are placed in out-of-home care, preference must be given to placement with a relative. DHHS committed to ensuring that safety assessments, safety planning (when appropriate), and background checks occur for all non-licensed homes. The MISEP relative commitments are particularly important to child safety as 51.2 percent of children in DHHS custody were living with relatives at the conclusion of MISEP 25. In the MISEP, DHHS committed to ensure that:

- Prior to a child's placement, DHHS will visit with relatives to determine if it is safe;

- Law Enforcement and Central Registry background checks for all adults living in the home will be completed within 72 hours of placement; and

- A home study will be completed within 30 days of placement to determine whether the placement is safe and appropriate.

The parties agreed the Monitors will conduct an independent qualitative review each period to measure DHHS' performance for this commitment. The designated performance standard is 95 percent.

For MISEP 25, the monitoring team reviewed a random sample of 65 unlicensed relative homes. The monitoring team determined that performance was achieved overall in 40 cases (61.5 percent) and was not achieved in 25 cases (38.5 percent). For four of the 25 cases, there was solely insufficient evidence to validate the timely completion of background checks. For each of the individual safety requirements, DHHS' performance was as follows:

30

- An initial home safety visit prior to placement was completed for 63 homes (96.9 percent).

- Law Enforcement and Central Registry background checks were completed for caregivers within 72 hours of placement for 53 homes (81.5 percent).

- Twenty-five homes had additional adult household members. Law Enforcement and Central Registry background checks were completed timely for 19 homes (76.0 percent).

- Michigan policy requires that all caregivers and adult household members must have their names and addresses searched on the Michigan Public Sex Offender Registry. The monitoring team was able to find evidence that this background check was completed for 48 (73.8 percent) of the homes.

- A home study was completed within 30 days for 62 relative placements (95.4 percent).[16]

DHHS did not meet the designated standard of 95 percent. Additional reasons why cases did not meet the standard include:

- In eight cases background checks were completed late, more than 72 hours after the initial placement.

- One home did not meet the performance requirements due to improper weapon storage.

- Three cases required a Placement Exception Request (PER) approval, which was not completed. When a PER is required, the DHHS caseworker must complete the PER and route it to the supervisor for review, who is then expected to route it to the DHHS county director for review and approval.

  - A PER was required due to more than three foster children, more than five children in the home and more than three children under the age of three living in the home. The children were placed on September 1, 2023 and the PER still reads "in progress" as of September 20, 2024.

  - A PER was required due to more than three foster children and more than five children living in the home. The children were placed on September 21, 2023 and the PER was not approved until July 8, 2024.

---

[16] Credit for timeliness was given for two home studies completed six days late. Three home studies were completed 19, 25 and 29 days late.

        o  A PER was required for more than five children living in the home. There were ten children in the home and a PER was not completed. The foster child was removed from the home on September 15, 2023, 43 days after being placed on August 4, 2023.

*Relative Foster Parents (6.10.b)*

The MISEP requires that a relative placement home study, including all clearances, must be completed, and approved annually[17] for unlicensed caregivers to ensure the safety of children placed in relative homes. An approved relative home study is valid for one year. This commitment is measured through an independent qualitative review conducted by the Monitors with a designated performance standard of 95 percent.

For this commitment, the monitoring team reviewed a random sample of 66 unlicensed relative homes due for a renewal home study. The monitoring team found that 36 homes (54.5 percent) met each of the performance requirements in the MISEP, and 30 homes (45.5 percent) did not. The performance requirements were not met for 18 of the 30 homes solely because of insufficient evidence to support the timely completion of updated background checks.

An annual home study was approved timely by the supervisor for 64 homes (97.0 percent). Another two homes (3.0 percent) had an annual home study that was completed late. One was 20 days late and the other was over 10 months late.

Additionally, for relative caregivers, Central Registry checks were completed timely, prior to the approval of the annual home study, in 49 cases (74.2 percent), and law enforcement background checks were completed timely in 52 cases (78.8 percent). Eighteen homes had additional adult household members. Central Registry checks were completed timely for 10 (55.6 percent) of these homes, and law enforcement background checks were completed timely for 11 (61.1 percent) of these homes. Michigan policy requires that all caregivers and adult household members must have their names and addresses searched on the Michigan Public Sex Offender Registry. The monitoring team was able to find evidence that this background check was completed for relevant individuals in 44 cases (66.7 percent). DHHS did not meet the designated performance standard of 95 percent during the period.

---

[17] Annually is defined as within 365 days of the last relative home study. The supervisor must review and approve the DHS-3130A within 14 calendar days after the date it was completed.

Other factors contributing to performance lapses include:

- In three cases the caregivers moved during the year. Per DHHS policy (MDHHS-5770), a safety screen should have been completed within 30 days of the move. The required safety screens were not uploaded to MiSACWIS.

- In three cases new household members moved into the home during the year. Per DHHS policy (MDHHS-5770), a safety screen, including all clearances, must be reviewed and approved prior to when a new household member is added. The required safety screens were not uploaded to MiSACWIS.

- In one case a PER was required due to more than three foster children living in the home. Four children were placed in the home on September 15, 2021, the PER still reads "In Progress" as of August 14, 2024. The children were removed from the home on August 5, 2024.

- In one case the initial safety screen and home study indicate no criminal history even though Caregiver One has a criminal history from 2002 when he was convicted of a good moral character offense. The criminal history is noted for the first time in the 2023 annual home study. The children were placed on August 6, 2022.

- In one case Central Registry and Sex Offender Registry updated background checks for the caregiver were completed over three months after the approval of the annual 3130A and fourteen days before the children were removed.

## Placement Standards

*Placing Siblings Together (6.6)*

The MISEP requires DHHS to place siblings together when they enter foster care at or near the same time. Exceptions can be made if placing the siblings together would be harmful to one or more of the siblings, one of the siblings has exceptional needs that can only be met in a specialized program or facility, or the size of the sibling group makes such placement impractical notwithstanding efforts to place the group together. The Stipulated Order Amending the MISEP specifies that this commitment shall become eligible to immediately exit the MISEP and the Court's jurisdiction after two consecutive periods of positive trending in validated performance from the baseline measure reported in the Court Monitor's report for MISEP Period 23. DHHS provided data to the monitoring team indicating there were 382 sibling groups whose members entered foster care within 30 days of each other during MISEP 25. Of these 382 sibling groups, 305 (79.8 percent) were either placed together or had a timely approval for an allowable exception. This represents a 1.0 percent decrease from the MISEP 24 performance of 80.8 percent.

33

The commitment also requires that when siblings are separated at any time except for any of the aforementioned reasons, the case manager shall make immediate efforts to locate or recruit a family in whose home the siblings can be reunited. Efforts to place siblings together are to be documented and maintained in the case file and reassessed quarterly. The parties agreed that the monitoring team would conduct an independent qualitative review to measure performance for this commitment.

For MISEP 25, the monitoring team reviewed 41 randomly selected children's case records subject to this provision and found that DHHS met the terms of the commitment in 23 cases (56.1 percent), below the designated performance standard of 90 percent.

*Emergency or Temporary Facilities, Length of Stay (6.8)*

DHHS is required to ensure children shall not remain in emergency or temporary facilities, including shelter care, for a period lasting more than 30 days unless exceptional circumstances exist. DHHS committed that no child shall remain in an emergency or temporary facility for a period lasting more than 60 days with no exceptions. The agreed-upon performance standard for this commitment is 95 percent. DHHS served 10,967 children during MISEP 25, and 73 (0.7 percent) were placed in emergency or temporary facilities. Of these 73 children, 52 (71.2 percent) were placed within the length of stay parameters. DHHS did not meet the performance standard during MISEP 25.

*Emergency or Temporary Facilities, Repeated Placement (6.9)*

The MISEP requires that no child be placed in an emergency or temporary facility more than one time in a 12-month period unless exceptional circumstances exist. Children under 15 years of age experiencing a subsequent emergency or temporary facility placement within a 12-month period may not remain in such a placement for more than seven days. Children 15 years of age or older experiencing a subsequent emergency or temporary facility placement within a 12-month period may not remain in such a placement for more than 30 days. During the reporting period, children experienced 40 subsequent stays in shelter care, of which 19 placement episodes (47.5 percent) met the terms of this commitment. DHHS did not meet the agreed-upon performance standard of 97 percent.

# Caseworker Visitation

*Worker-Parent Visitation (6.22)*

Caseworkers must visit parents of children with a reunification goal at least twice during the first month of placement with at least one visit in the parental home. For subsequent months, visits must occur at least once per month. Exceptions to this requirement are made if the parent(s) are

not attending visits despite DHHS taking adequate steps to ensure the visit takes place or if a parent cannot attend a visit due to exigent circumstances such as hospitalization or incarceration. Exceptions are excluded from the numerator and denominator of this calculation. DHHS and the monitoring team established assessment criteria for the three components of this commitment in the Metrics Plan.[18] The designated performance standard is 85 percent for all components.

DHHS' MISEP 25 performance on the three components of worker-parent visitation is included below. As the table indicates, DHHS did not achieve the designated performance standard of 85 percent for any component of the worker-parent visitation commitment during MISEP 25.

### Table 4. Worker-Parent Visitation Performance, MISEP 25

| Requirement | Performance |
|---|---|
| (1) Caseworkers shall visit parents of children with a goal of reunification at least twice during the first month of placement | 65.6% |
| (2) Caseworkers shall visit parents of children with a goal of reunification in the parent's place of residence at least once during the first month of placement | 51.8% |
| (3) Caseworkers shall visit parents of children with a goal of reunification at least once for each subsequent month of placement | 72.3% |

*Parent-Child Visitation (6.23)*

When reunification is a child's permanency goal, parents and children will visit at least twice each month. Exceptions to this requirement are made if a court orders less frequent visits, the parents are not attending visits despite DHHS taking adequate steps to ensure the parents' ability to visit, one or both parents cannot attend the visits due to exigent circumstances such as hospitalization or incarceration, or the child is above the age of 16 and refuses such visits. The designated performance standard is 85 percent.

Of the 28,062 parent-child visits required during MISEP 25, DHHS completed 18,828 (67.1 percent) timely. DHHS did not meet the designated performance standard during the period.

*Sibling Visitation (6.24)*

For children in foster care who have siblings in custody with whom they are not placed, DHHS shall ensure they have at least monthly visits with their siblings. Exceptions to this requirement can be made if the visit may be harmful to one or more of the siblings, the sibling is placed out

---

[18] The Metrics Plan is a data analysis plan developed jointly by the monitoring team and DHHS which sets forth in detail the methods, descriptions of the data, and descriptions of the calculations to be supplied by DHHS to the monitoring team to assess performance on many of the MISEP commitments.

of state in compliance with the Interstate Compact on Placement of Children, the distance between the child's placements is more than 50 miles and the child is placed with a relative, or one of the siblings is above the age of 16 and refuses to visit. The designated performance standard is 85 percent.

Of the 13,374 sibling visits required during MISEP 25, DHHS completed 11,183 (83.6 percent) timely, falling slightly below the performance standard of 85 percent.

# Child Well-Being

## Health and Mental Health

*Medical and Mental Health Examinations for Children (6.25)*

DHHS committed in the MISEP that at least 85 percent of children shall have an initial medical and mental health examination within 30 days of the child's entry into foster care and that at least 95 percent of children shall have an initial medical and mental health examination within 45 days of the child's entry into foster care.

During MISEP 25, DHHS completed 1,445 (80.6 percent) of 1,793 required initial medical and mental health exams within 30 days of a child's entry into care. Additionally, DHHS completed 1,546 (86.5 percent) of 1,788 required initial medical and mental health exams within 45 days of a child's entry into care. DHHS did not meet the performance standard for this commitment.

*Dental Care for Children (6.26)*

DHHS committed in the MISEP that at least 90 percent of children shall have an initial dental examination within 90 days of the child's entry into care unless the child had an exam within six months prior to placement or the child is less than four years of age.

During the period under review, 727 (70.8 percent) of 1,027 required initial dental exams were completed timely for children in DHHS custody. DHHS did not meet the performance standard of 90 percent for this commitment.

*Ongoing Healthcare for Children (6.29)*

DHHS committed in the MISEP that following an initial medical, dental, or mental health examination, at least 95 percent of children shall receive periodic and ongoing medical, dental, and mental health examinations and screenings, according to the guidelines set forth by the American Academy of Pediatrics. Performance for this commitment was calculated for each medical type: medical well-child visits for children aged three and younger, annual physicals for children older than three, and semi-annual dental exams.

During MISEP 25, DHHS completed 2,496 (69.2 percent) of 3,607 medical well-child visits timely, 3,794 (87.1 percent) of 4,358 annual physicals timely, and 5,132 (74.7 percent) of 6,872 semiannual dental exams timely. DHHS did not meet the performance standard of 95 percent for any component of this commitment.

*Child Case File, Medical and Psychological (6.30)*

The MISEP requires that DHHS will ensure that:

- Children's health records are up to date and included in the case file. Health records include the names and addresses of the child's health care providers, a record of the child's immunizations, the child's known medical problems, the child's medications, and any other relevant health information;

- The case plan addresses the issue of health and dental care needs; and

- Foster parents or foster care providers are provided with the child's health care records.

The Stipulated Order Amending the MISEP specifies that the designated performance standard for this commitment shall be reduced to 90 percent and the provisions shall become eligible to immediately exit the MISEP and the Court's jurisdiction after two consecutive periods of compliance with the modified designated performance standard. DHHS' MISEP 25 performance on each of the three components of the child's medical and psychological case files is charted below. To measure performance, DHHS reviewed 33 foster care cases utilizing CSFR Item 17 criteria described in the chart below. DHHS achieved the 90 percent performance standard for one of the three components of the child case file commitment during MISEP 25. *Per the Stipulated Order, compliance during this period makes the third component of this commitment, requiring that foster care providers are provided with the children's health records, eligible for rolling exit.*

### Table 5. Child Case File, Medical and Psychological Performance, MISEP 25

| Requirement | Applicable Cases | Cases not Compliant | Cases Compliant | Performance Percentage |
|---|---|---|---|---|
| To the extent available and accessible, the child's health records are up to date and included in the case file. | 33 | 18 | 15 | 45.5% |
| The case plan addresses the issue of health and dental care needs. | 33 | 16 | 17 | 51.5% |
| To the extent available and accessible, foster parents or foster care providers are provided with the child's health records. | 33 | 3 | 30 | 90.9% |

37

*Access to Health Insurance (6.32)*

The MISEP requires DHHS to ensure that 95 percent of children have access to medical coverage within 24 hours or the next business day following subsequent placement by giving the placement provider a Medicaid card or an alternative verification of the child's Medicaid status and Medicaid number as soon as it is available.

During MISEP 25, 2,513 (79.5 percent) of 3,160 placement providers received Medicaid cards within 24 hours or the next business day following a child's subsequent placement. Data provided by DHHS also indicated that for 3,160 (100 percent) of 3,160 subsequent placements, either the provider received a Medicaid card within 24 hours or the next business day following a child's subsequent placement, or the child had Medicaid coverage within 24 hours of the date of placement.

*Psychotropic Medication, Informed Consent (6.33)*

The MISEP requires DHHS to ensure that informed consent is obtained and documented in writing for each child in DHHS custody who is prescribed psychotropic medication, as per DHHS policy.

During MISEP 25, the Department reported 2,213 children required informed consent documentation, for 5,869 unique prescriptions. Data indicated that valid consents were on file for 4,562 (77.7 percent) of the medications. Therefore, DHHS did not meet the designated performance standard of 97 percent for this commitment.

*Psychotropic Medication, Documentation (6.34)*

Under the MISEP, DHHS must ensure that:

- A child is seen regularly by a physician to monitor the effectiveness of the medication, assess any side effects and/or health implications, consider any changes needed to dosage or medication type and determine whether medication is still necessary and/or whether other treatment options would be more appropriate;

- DHHS shall regularly follow up with foster parents/caregivers about administering medications appropriately and about the child's experience with the medication(s), including any side effects; and

- DHHS shall follow any additional state protocols that may be in place and related to the appropriate use and monitoring of medications.

Evidence of these actions should be documented in the child's case record. The parties agreed that performance for this commitment would be measured through an independent qualitative review conducted by the monitoring team.

The population for review was comprised of children in DHHS custody who were prescribed psychotropic medication during the period under review. Consistent with the parameters the parties approved, the monitoring team reviewed a random sample of cases, stratified by county, to determine performance. The designated performance standard for this commitment is 97 percent.

For MISEP 25, the monitoring team randomly selected a sample of 66 cases from a total population of 2,204 children. The monitoring team found 30 cases (45.5 percent) met the terms of this commitment and 36 cases (54.5 percent) did not meet the terms of this commitment. DHHS did not meet the designated performance standard of 97 percent for the period.

**Appendix A. Age Range of Children in Care on December 31, 2023 by County**

| County Name | Ages 0-6 | | Ages 7-11 | | Ages 12-17 | | Ages 18+ | | Total |
|---|---|---|---|---|---|---|---|---|---|
| | Children | % | Children | % | Children | % | Children | % | |
| Alcona | 7 | 46.7% | 5 | 33.3% | 2 | 13.3% | 1 | 6.7% | 15 |
| Alger | 7 | 50.0% | 1 | 7.1% | 6 | 42.9% | 0 | 0.0% | 14 |
| Allegan | 70 | 55.1% | 25 | 19.7% | 23 | 18.1% | 9 | 7.1% | 127 |
| Alpena | 20 | 55.6% | 4 | 11.1% | 9 | 25.0% | 3 | 8.3% | 36 |
| Antrim | 1 | 33.3% | 0 | 0.0% | 1 | 33.3% | 1 | 33.3% | 3 |
| Arenac | 8 | 33.3% | 7 | 29.2% | 8 | 33.3% | 1 | 4.2% | 24 |
| Baraga | 2 | 33.3% | 3 | 50.0% | 1 | 16.7% | 0 | 0.0% | 6 |
| Barry | 6 | 21.4% | 2 | 7.1% | 15 | 53.6% | 5 | 17.9% | 28 |
| Bay | 48 | 44.9% | 14 | 13.1% | 31 | 29.0% | 14 | 13.1% | 107 |
| Benzie | 4 | 19.0% | 6 | 28.6% | 9 | 42.9% | 2 | 9.5% | 21 |
| Berrien | 89 | 41.4% | 49 | 22.8% | 64 | 29.8% | 13 | 6.0% | 215 |
| Branch | 32 | 47.1% | 15 | 22.1% | 17 | 25.0% | 4 | 5.9% | 68 |
| Calhoun | 118 | 52.9% | 55 | 24.7% | 38 | 17.0% | 12 | 5.4% | 223 |
| Cass | 37 | 45.1% | 13 | 15.9% | 23 | 28.0% | 9 | 11.0% | 82 |
| Central Office | 0 | 0.0% | 0 | 0.0% | 2 | 100.0% | 0 | 0.0% | 2 |
| Charlevoix | 8 | 53.3% | 2 | 13.3% | 2 | 13.3% | 3 | 20.0% | 15 |
| Cheboygan | 16 | 48.5% | 6 | 18.2% | 10 | 30.3% | 1 | 3.0% | 33 |
| Chippewa | 29 | 45.3% | 18 | 28.1% | 12 | 18.8% | 5 | 7.8% | 64 |
| Clare | 22 | 61.1% | 4 | 11.1% | 6 | 16.7% | 4 | 11.1% | 36 |
| Clinton | 3 | 13.0% | 3 | 13.0% | 14 | 60.9% | 3 | 13.0% | 23 |
| Crawford | 11 | 32.4% | 6 | 17.6% | 14 | 41.2% | 3 | 8.8% | 34 |
| Delta | 16 | 50.0% | 7 | 21.9% | 9 | 28.1% | 0 | 0.0% | 32 |
| Dickinson | 4 | 36.4% | 4 | 36.4% | 3 | 27.3% | 0 | 0.0% | 11 |
| Eaton | 26 | 53.1% | 8 | 16.3% | 11 | 22.4% | 4 | 8.2% | 49 |
| Emmet | 7 | 58.3% | 0 | 0.0% | 5 | 41.7% | 0 | 0.0% | 12 |
| Genesee | 200 | 44.1% | 92 | 20.3% | 131 | 28.9% | 31 | 6.8% | 454 |
| Gladwin | 7 | 25.9% | 6 | 22.2% | 11 | 40.7% | 3 | 11.1% | 27 |
| Gogebic | 6 | 37.5% | 3 | 18.8% | 7 | 43.8% | 0 | 0.0% | 16 |
| Grand Traverse | 28 | 52.8% | 11 | 20.8% | 10 | 18.9% | 4 | 7.5% | 53 |
| Gratiot | 11 | 33.3% | 8 | 24.2% | 11 | 33.3% | 3 | 9.1% | 33 |
| Hillsdale | 45 | 42.5% | 33 | 31.1% | 27 | 25.5% | 1 | 0.9% | 106 |
| Houghton | 4 | 36.4% | 4 | 36.4% | 2 | 18.2% | 1 | 9.1% | 11 |
| Huron | 12 | 44.4% | 6 | 22.2% | 6 | 22.2% | 3 | 11.1% | 27 |
| Ingham | 139 | 48.6% | 62 | 21.7% | 60 | 21.0% | 25 | 8.7% | 286 |
| Ionia | 16 | 59.3% | 1 | 3.7% | 8 | 29.6% | 2 | 7.4% | 27 |
| Iosco | 16 | 45.7% | 9 | 25.7% | 8 | 22.9% | 2 | 5.7% | 35 |
| Iron | 2 | 40.0% | 2 | 40.0% | 1 | 20.0% | 0 | 0.0% | 5 |
| Isabella | 25 | 52.1% | 5 | 10.4% | 13 | 27.1% | 5 | 10.4% | 48 |
| Jackson | 86 | 50.3% | 23 | 13.5% | 39 | 22.8% | 23 | 13.5% | 171 |
| Kalamazoo | 141 | 43.4% | 77 | 23.7% | 83 | 25.5% | 24 | 7.4% | 325 |
| Kalkaska | 14 | 60.9% | 2 | 8.7% | 6 | 26.1% | 1 | 4.3% | 23 |

| County Name | Ages 0-6 | | Ages 7-11 | | Ages 12-17 | | Ages 18+ | | Total |
|---|---|---|---|---|---|---|---|---|---|
| | Children | % | Children | % | Children | % | Children | % | |
| Kent | 158 | 36.7% | 78 | 18.1% | 128 | 29.8% | 66 | 15.3% | 430 |
| Keweenaw | 1 | 100.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 1 |
| Lake | 11 | 50.0% | 4 | 18.2% | 5 | 22.7% | 2 | 9.1% | 22 |
| Lapeer | 15 | 44.1% | 7 | 20.6% | 9 | 26.5% | 3 | 8.8% | 34 |
| Leelanau | 12 | 57.1% | 4 | 19.0% | 3 | 14.3% | 2 | 9.5% | 21 |
| Lenawee | 46 | 52.3% | 14 | 15.9% | 24 | 27.3% | 4 | 4.5% | 88 |
| Livingston | 33 | 41.3% | 19 | 23.8% | 23 | 28.8% | 5 | 6.3% | 80 |
| Luce | 6 | 66.7% | 2 | 22.2% | 1 | 11.1% | 0 | 0.0% | 9 |
| Mackinac | 11 | 57.9% | 6 | 31.6% | 2 | 10.5% | 0 | 0.0% | 19 |
| Macomb | 199 | 47.5% | 81 | 19.3% | 108 | 25.8% | 31 | 7.4% | 419 |
| Manistee | 19 | 55.9% | 5 | 14.7% | 9 | 26.5% | 1 | 2.9% | 34 |
| Marquette | 13 | 50.0% | 5 | 19.2% | 6 | 23.1% | 2 | 7.7% | 26 |
| Mason | 12 | 63.2% | 1 | 5.3% | 5 | 26.3% | 1 | 5.3% | 19 |
| Mecosta | 6 | 42.9% | 3 | 21.4% | 5 | 35.7% | 0 | 0.0% | 14 |
| Menominee | 19 | 54.3% | 8 | 22.9% | 7 | 20.0% | 1 | 2.9% | 35 |
| Midland | 37 | 44.0% | 11 | 13.1% | 30 | 35.7% | 6 | 7.1% | 84 |
| Missaukee | 8 | 40.0% | 6 | 30.0% | 4 | 20.0% | 2 | 10.0% | 20 |
| Monroe | 37 | 43.0% | 18 | 20.9% | 23 | 26.7% | 8 | 9.3% | 86 |
| Montcalm | 18 | 31.6% | 13 | 22.8% | 20 | 35.1% | 6 | 10.5% | 57 |
| Montmorency | 3 | 100.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 3 |
| Muskegon | 187 | 50.3% | 71 | 19.1% | 98 | 26.3% | 16 | 4.3% | 372 |
| Newaygo | 19 | 33.3% | 11 | 19.3% | 23 | 40.4% | 4 | 7.0% | 57 |
| Oakland | 188 | 47.0% | 90 | 22.5% | 99 | 24.8% | 23 | 5.8% | 400 |
| Oceana | 7 | 38.9% | 3 | 16.7% | 7 | 38.9% | 1 | 5.6% | 18 |
| Ogemaw | 6 | 42.9% | 1 | 7.1% | 3 | 21.4% | 4 | 28.6% | 14 |
| Ontonagon | 0 | 0.0% | 1 | 100.0% | 0 | 0.0% | 0 | 0.0% | 1 |
| Osceola | 9 | 36.8% | 7 | 31.6% | 5 | 31.6% | 0 | 0.0% | 21 |
| Oscoda | 5 | 50.0% | 2 | 14.3% | 1 | 28.6% | 1 | 7.1% | 9 |
| Otsego | 18 | 51.5% | 7 | 24.2% | 10 | 21.2% | 1 | 3.0% | 36 |
| Ottawa | 40 | 51.0% | 14 | 18.3% | 32 | 26.9% | 2 | 3.8% | 88 |
| Presque Isle | 1 | 16.7% | 3 | 50.0% | 3 | 33.3% | 0 | 0.0% | 7 |
| Roscommon | 18 | 50.0% | 8 | 20.0% | 9 | 30.0% | 1 | 0.0% | 36 |
| Saginaw | 108 | 54.7% | 30 | 16.1% | 40 | 23.4% | 11 | 5.7% | 189 |
| Sanilac | 14 | 36.1% | 14 | 36.1% | 8 | 25.0% | 2 | 2.8% | 38 |
| Schoolcraft | 3 | 37.5% | 2 | 25.0% | 5 | 37.5% | 0 | 0.0% | 10 |
| Shiawassee | 14 | 40.0% | 7 | 22.2% | 12 | 26.7% | 3 | 11.1% | 36 |
| St. Clair | 71 | 43.6% | 31 | 21.2% | 42 | 25.5% | 13 | 9.7% | 157 |
| St. Joseph | 46 | 48.1% | 27 | 18.3% | 22 | 25.0% | 10 | 8.7% | 105 |
| Tuscola | 1 | 25.0% | 3 | 16.7% | 5 | 33.3% | 3 | 25.0% | 12 |
| Van Buren | 31 | 42.7% | 19 | 20.7% | 25 | 28.0% | 6 | 8.5% | 81 |
| Washtenaw | 58 | 49.1% | 18 | 13.8% | 26 | 26.7% | 8 | 10.3% | 110 |
| Wayne | 1,295 | 45.6% | 680 | 23.0% | 735 | 24.7% | 192 | 6.7% | 2,902 |
| Wexford | 12 | 31.0% | 2 | 13.8% | 7 | 44.8% | 4 | 10.3% | 25 |
| Total | 4,158 | 45.4% | 1,937 | 20.8% | 2,387 | 25.5% | 670 | 6.9% | 9,152 |

41

**Appendix B. Length of Stay of Children in Care on December 31, 2023 by County**

| County Name | Less than a year | | 1-2 years | | 2-3 years | | 3-6 years | | 6 years plus | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Children | % | Children | % | Children | % | Children | % | Children | % | |
| Alcona | 3 | 31.3% | 3 | 12.5% | 7 | 43.8% | 2 | 12.5% | 0 | 0.0% | 15 |
| Alger | 6 | 66.7% | 6 | 6.7% | 0 | 0.0% | 2 | 26.7% | 0 | 0.0% | 14 |
| Allegan | 50 | 47.1% | 39 | 24.8% | 26 | 16.5% | 11 | 10.7% | 1 | 0.8% | 127 |
| Alpena | 12 | 28.2% | 11 | 28.2% | 5 | 20.5% | 7 | 23.1% | 1 | 0.0% | 36 |
| Antrim | 0 | 40.0% | 2 | 20.0% | 0 | 0.0% | 1 | 40.0% | 0 | 0.0% | 3 |
| Arenac | 13 | 56.5% | 6 | 17.4% | 2 | 8.7% | 2 | 17.4% | 1 | 0.0% | 24 |
| Baraga | 2 | 80.0% | 3 | 0.0% | 1 | 20.0% | 0 | 0.0% | 0 | 0.0% | 6 |
| Barry | 19 | 33.3% | 3 | 45.8% | 4 | 8.3% | 1 | 8.3% | 1 | 4.2% | 28 |
| Bay | 53 | 39.8% | 16 | 16.3% | 17 | 25.5% | 17 | 14.3% | 4 | 4.1% | 107 |
| Benzie | 12 | 35.3% | 0 | 35.3% | 7 | 17.6% | 2 | 11.8% | 0 | 0.0% | 21 |
| Berrien | 85 | 45.1% | 68 | 27.4% | 33 | 11.6% | 27 | 14.0% | 2 | 1.9% | 215 |
| Branch | 22 | 52.9% | 33 | 33.8% | 9 | 7.4% | 2 | 4.4% | 2 | 1.5% | 68 |
| Calhoun | 111 | 47.2% | 67 | 35.0% | 16 | 3.3% | 20 | 11.4% | 9 | 3.3% | 223 |
| Cass | 22 | 36.0% | 31 | 36.0% | 14 | 16.9% | 10 | 4.5% | 5 | 6.7% | 82 |
| Central Office | 0 | 50.0% | 1 | 0.0% | 0 | 0.0% | 1 | 50.0% | 0 | 0.0% | 2 |
| Charlevoix | 8 | 60.0% | 2 | 26.7% | 3 | 6.7% | 1 | 6.7% | 1 | 0.0% | 15 |
| Cheboygan | 18 | 37.8% | 10 | 21.6% | 2 | 27.0% | 3 | 13.5% | 0 | 0.0% | 33 |
| Chippewa | 28 | 28.8% | 16 | 32.7% | 12 | 26.9% | 8 | 11.5% | 0 | 0.0% | 64 |
| Clare | 16 | 50.0% | 9 | 16.7% | 5 | 26.7% | 5 | 3.3% | 1 | 3.3% | 36 |
| Clinton | 8 | 26.9% | 5 | 50.0% | 6 | 7.7% | 4 | 11.5% | 0 | 3.8% | 23 |
| Crawford | 12 | 29.4% | 4 | 14.7% | 5 | 29.4% | 11 | 20.6% | 3 | 5.9% | 34 |
| Delta | 16 | 50.0% | 11 | 16.7% | 4 | 16.7% | 1 | 16.7% | 0 | 0.0% | 32 |
| Dickinson | 5 | 38.5% | 4 | 46.2% | 0 | 0.0% | 2 | 15.4% | 0 | 0.0% | 11 |
| Eaton | 17 | 40.3% | 20 | 33.9% | 3 | 12.9% | 7 | 12.9% | 2 | 0.0% | 49 |
| Emmet | 4 | 18.2% | 3 | 45.5% | 2 | 9.1% | 1 | 18.2% | 2 | 9.1% | 12 |
| Genesee | 150 | 40.8% | 143 | 25.3% | 74 | 13.3% | 63 | 16.2% | 24 | 4.4% | 454 |
| Gladwin | 5 | 39.4% | 13 | 12.1% | 3 | 42.4% | 6 | 6.1% | 0 | 0.0% | 27 |
| Gogebic | 4 | 22.2% | 7 | 55.6% | 5 | 22.2% | 0 | 0.0% | 0 | 0.0% | 16 |
| Grand Traverse | 13 | 29.3% | 22 | 39.7% | 14 | 22.4% | 4 | 8.6% | 0 | 0.0% | 53 |
| Gratiot | 19 | 60.6% | 10 | 6.1% | 0 | 12.1% | 4 | 21.2% | 0 | 0.0% | 33 |
| Hillsdale | 39 | 43.3% | 36 | 35.6% | 15 | 13.5% | 15 | 7.7% | 1 | 0.0% | 106 |
| Houghton | 8 | 64.3% | 1 | 7.1% | 2 | 28.6% | 0 | 0.0% | 0 | 0.0% | 11 |
| Huron | 8 | 40.0% | 10 | 22.9% | 2 | 17.1% | 7 | 20.0% | 0 | 0.0% | 27 |
| Ingham | 97 | 33.0% | 79 | 31.8% | 50 | 16.4% | 51 | 15.7% | 9 | 3.1% | 286 |
| Ionia | 14 | 50.0% | 6 | 17.9% | 0 | 21.4% | 6 | 7.1% | 1 | 3.6% | 27 |
| Iosco | 14 | 52.9% | 8 | 11.8% | 8 | 23.5% | 4 | 8.8% | 1 | 2.9% | 35 |
| Iron | 4 | 83.3% | 1 | 16.7% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 5 |
| Isabella | 22 | 55.3% | 18 | 31.9% | 5 | 4.3% | 1 | 2.1% | 2 | 6.4% | 48 |
| Jackson | 96 | 35.3% | 32 | 29.5% | 17 | 16.0% | 20 | 15.4% | 6 | 3.8% | 171 |
| Kalamazoo | 98 | 26.4% | 87 | 33.4% | 61 | 17.0% | 71 | 19.5% | 8 | 3.6% | 325 |
| Kalkaska | 13 | 50.0% | 2 | 0.0% | 4 | 25.0% | 4 | 25.0% | 0 | 0.0% | 23 |

| County Name | Less than a year | | 1-2 years | | 2-3 years | | 3-6 years | | 6 years plus | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Children | % | Children | % | Children | % | Children | % | Children | % | |
| Kent | 140 | 34.2% | 122 | 24.7% | 77 | 18.3% | 77 | 18.5% | 14 | 4.3% | 430 |
| Keweenaw | 0 | 0.0% | 1 | 100.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 1 |
| Lake | 6 | 33.3% | 3 | 41.7% | 7 | 0.0% | 5 | 20.8% | 1 | 4.2% | 22 |
| Lapeer | 23 | 72.5% | 7 | 17.5% | 0 | 0.0% | 3 | 7.5% | 1 | 2.5% | 34 |
| Leelanau | 10 | 42.9% | 7 | 28.6% | 1 | 14.3% | 2 | 4.8% | 1 | 9.5% | 21 |
| Lenawee | 22 | 33.0% | 32 | 35.2% | 22 | 18.7% | 11 | 12.1% | 1 | 1.1% | 88 |
| Livingston | 27 | 28.9% | 21 | 18.4% | 17 | 23.7% | 14 | 27.6% | 1 | 1.3% | 80 |
| Luce | 1 | 0.0% | 8 | 100.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 9 |
| Mackinac | 1 | 71.4% | 12 | 4.8% | 5 | 23.8% | 1 | 0.0% | 0 | 0.0% | 19 |
| Macomb | 111 | 31.2% | 141 | 30.5% | 75 | 15.6% | 77 | 18.4% | 15 | 4.4% | 419 |
| Manistee | 10 | 40.5% | 10 | 24.3% | 12 | 24.3% | 2 | 10.8% | 0 | 0.0% | 34 |
| Marquette | 17 | 38.7% | 6 | 32.3% | 2 | 22.6% | 1 | 6.5% | 0 | 0.0% | 26 |
| Mason | 5 | 57.9% | 12 | 31.6% | 1 | 5.3% | 1 | 5.3% | 0 | 0.0% | 19 |
| Mecosta | 3 | 37.5% | 2 | 56.3% | 8 | 6.3% | 1 | 0.0% | 0 | 0.0% | 14 |
| Menominee | 20 | 52.2% | 7 | 30.4% | 5 | 8.7% | 3 | 8.7% | 0 | 0.0% | 35 |
| Midland | 43 | 42.9% | 21 | 25.0% | 6 | 17.9% | 12 | 8.3% | 2 | 6.0% | 84 |
| Missaukee | 9 | 70.6% | 7 | 17.6% | 2 | 5.9% | 2 | 5.9% | 0 | 0.0% | 20 |
| Monroe | 33 | 38.9% | 21 | 33.3% | 17 | 13.3% | 10 | 12.2% | 5 | 2.2% | 86 |
| Montcalm | 26 | 31.3% | 12 | 21.9% | 3 | 21.9% | 12 | 20.3% | 4 | 4.7% | 57 |
| Montmorency | 1 | 20.0% | 0 | 40.0% | 2 | 40.0% | 0 | 0.0% | 0 | 0.0% | 3 |
| Muskegon | 170 | 41.0% | 82 | 24.2% | 65 | 14.3% | 51 | 18.5% | 4 | 2.0% | 372 |
| Newaygo | 20 | 42.6% | 21 | 22.2% | 7 | 11.1% | 7 | 20.4% | 2 | 3.7% | 57 |
| Oakland | 152 | 39.2% | 121 | 24.5% | 60 | 19.1% | 53 | 13.6% | 14 | 3.6% | 400 |
| Oceana | 6 | 47.6% | 7 | 42.9% | 5 | 9.5% | 0 | 0.0% | 0 | 0.0% | 18 |
| Ogemaw | 8 | 60.0% | 1 | 10.0% | 1 | 5.0% | 3 | 20.0% | 1 | 5.0% | 14 |
| Ontonagon | 1 | 100.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 1 |
| Osceola | 6 | 47.4% | 9 | 15.8% | 4 | 26.3% | 1 | 5.3% | 1 | 5.3% | 21 |
| Oscoda | 3 | 21.4% | 1 | 50.0% | 4 | 14.3% | 1 | 14.3% | 0 | 0.0% | 9 |
| Otsego | 16 | 42.4% | 9 | 42.4% | 6 | 0.0% | 5 | 15.2% | 0 | 0.0% | 36 |
| Ottawa | 33 | 34.6% | 26 | 39.4% | 17 | 9.6% | 9 | 16.3% | 3 | 0.0% | 88 |
| Presque Isle | 3 | 33.3% | 0 | 50.0% | 3 | 0.0% | 1 | 16.7% | 0 | 0.0% | 7 |
| Roscommon | 13 | 33.3% | 14 | 30.0% | 1 | 13.3% | 7 | 20.0% | 1 | 3.3% | 36 |
| Saginaw | 82 | 38.5% | 51 | 35.9% | 37 | 15.1% | 15 | 9.9% | 4 | 0.5% | 189 |
| Sanilac | 12 | 38.9% | 5 | 25.0% | 9 | 25.0% | 12 | 11.1% | 0 | 0.0% | 38 |
| Schoolcraft | 3 | 50.0% | 3 | 6.3% | 3 | 37.5% | 1 | 6.3% | 0 | 0.0% | 10 |
| Shiawassee | 12 | 44.4% | 10 | 17.8% | 9 | 15.6% | 4 | 20.0% | 1 | 2.2% | 36 |
| St. Clair | 72 | 41.2% | 29 | 23.0% | 28 | 15.2% | 18 | 15.8% | 10 | 4.8% | 157 |
| St. Joseph | 47 | 41.3% | 30 | 21.2% | 12 | 22.1% | 8 | 6.7% | 8 | 8.7% | 105 |
| Tuscola | 2 | 0.0% | 6 | 83.3% | 2 | 8.3% | 1 | 0.0% | 1 | 8.3% | 12 |
| Van Buren | 47 | 64.6% | 20 | 14.6% | 4 | 7.3% | 4 | 6.1% | 6 | 7.3% | 81 |
| Washtenaw | 30 | 34.5% | 37 | 27.6% | 25 | 19.0% | 15 | 17.2% | 3 | 1.7% | 110 |
| Wayne | 1,063 | 35.9% | 711 | 23.6% | 407 | 14.9% | 567 | 20.2% | 154 | 5.4% | 2,902 |
| Wexford | 14 | 27.6% | 4 | 27.6% | 0 | 10.3% | 7 | 34.5% | 0 | 0.0% | 25 |
| Total | 3,469 | 37.9% | 2,497 | 27.3% | 1,413 | 15.4% | 1,428 | 15.6% | 345 | 3.8% | 9,152 |

43

## Appendix C. MISEP Performance, Summary of Commitments

| | Commitment | Standard | MISEP 17 | MISEP 18 | MISEP 19 | MISEP 20 | MISEP 21 | MISEP 22 | MISEP 23 | MISEP 24 | MISEP 25 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Met the performance standard in all eligible periods** | | | | | | | | | | |
| 6.2 | MIC Data Report | N/A | N/A | Yes | N/A | Yes | N/A | Yes | N/A | Yes | N/A |
| 6.15 | Caseload, Adoption Workers | Positive trending | | | | | | | 85.5% Baseline | Yes, 88.1% | Yes, 89.3% Eligible to move to "Structures and Policies" |
| 6.30 | Child Case File, Medical and Psychological (3) | 90% | | | | | | | | Yes, 100.0% | Yes, 90.9% Eligible for rolling exit |
| 6.37 | Support for Transitioning to Adulthood, Permanency | Positive trending | | | | | | | 45.4% Baseline | Yes, 46.8% Eligible for rolling exit | N/A |
| | **Met the performance standard in at least one eligible period** | | | | | | | | | | |
| 6.4 | Foster Home Array | N/A | Yes | N/A – COVID-Impacted | N/A – COVID-Impacted | Will be included in the MISEP 21 Report | No | Will be reported on at the end of the fiscal year | No | Will be reported on at the end of the fiscal year | Yes Eligible to move to "To be Maintained" |
| 6.6 (a) | Separation of Siblings | Positive trending | | | | | | | 78.4% Baseline | Yes, 80.8% | No, 79.8% |
| 6.19 | Assessment and Service Plans, Content | 83% | No, 66.7% | No, 73.5% | No, 57.6% | No, 73.2% | No, 79.7% | No, 69.5% | No, 67.1% | No, 82.1% | Yes, 85.0% Eligible to move to "To be Maintained" |
| 6.20 | Provision of Services | 83% | No, 69.3% | No, 71.6% | No, 51.7% | No, 70.0% | No, 68.5% | No, 62.2% | No, 67.1% | No, 60.7% | Yes, 85.7% Eligible to move to "To be Maintained" |
| 6.22 (a) | Visits, Worker-Parent: Two visits per month during the first month of placement | 85% | No, 73.6% | N/A – COVID-Impacted, 71.7% (Jan-Feb), 83.2% (March-June) | N/A – COVID-Impacted, 85.2% | Yes, 85.2% Eligible to move to "To be Maintained" | No, 59.1% | No, 59.5% | No, 60.1% | No, 64.4% | No, 65.6% |
| 6.30 | Child Case File, Medical and Psychological (2) | 90% | | | | | | | | Yes, 93.8% | No, 51.5% |

| | Commitment | Standard | MISEP 17 | MISEP 18 | MISEP 19 | MISEP 20 | MISEP 21 | MISEP 22 | MISEP 23 | MISEP 24 | MISEP 25 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Within 10 percent of the performance standard in at least one period** | | | | | | | | | | |
| 6.25 | **Medical and Mental Health Examinations:** Within 30 days of the child's entry into foster care | 85% | No, 83.9% | N/A – COVID-Impacted, 69.8% | N/A – COVID-Impacted, 69.8% | N/A – COVID-Impacted, 78.0% | No, 72.9% | No, 72.9% | No, 71.0% | No, 80.9% | No, 80.6% |
| 6.25 | **Medical and Mental Health Examinations:** Within 45 days of the child's entry into foster care. | 95% | No, 89.3% | N/A – COVID-Impacted, 76.6% | N/A – COVID-Impacted, 77.9% | N/A – COVID-Impacted, 85.6% | No, 82.1% | No, 81.4% | No, 79.8% | No, 87.1% | No, 86.5% |
| 6.24 | **Visits, Between Siblings** | 85% | No, 72.9% | N/A – COVID-Impacted, 69.5% (Jan-Feb), 56.8% (March-June) | N/A – COVID-Impacted, 69.2% | No, 73.7% | No, 67.6% | No, 70.1% | No, 70.8% | No, 78.2% | No, 83.6% |
| | **Performance is consistently more than 10 percentage points below the standard** | | | | | | | | | | |
| 6.6 (b) | **Separation of Siblings** | 90% | No, 61.2% | No, 36.8% | No, 29.8% | No, 38.1% | No, 50.0% | No, 72.7% | No, 66.7% | No, 62.5% | No, 56.1% |
| 6.22 (b) | **Visits, Worker-Parent:** One visit per month in subsequent months | 85% | No, 69.4% | N/A – COVID-Impacted, 69.6% (Jan-Feb), 71.7% (March-June) | N/A – COVID-Impacted, 74.1% | No, 73.6% | No, 60.4% | No, 64.6% | No, 63.2% | No, 71.7% | No, 72.3% |
| 6.23 | **Visits, Parent-Child** | 85% | No, 62.5% | N/A – COVID-Impacted, 64.7% (Jan-Feb), 59.4% (March-June) | N/A – COVID-Impacted, 62.0% | No, 59.1% | No, 57.8% | No, 62.6% | No, 63.1% | No, 66.0% | No, 67.1% |
| 6.26 | **Dental Examinations** | 90% | No, 77.3% | N/A – COVID-Impacted, 36.4% | N/A – COVID-Impacted, 56.7% | N/A – COVID-Impacted, 66.4% | No, 62.8% | No, 62.6% | No, 64.8% | No, 72.4% | No, 70.8% |
| 6.30 | **Child Case File, Medical and Psychological (1)** | 90% | | | | | | | | No, 71.8% | No, 45.5% |

| | Commitment | Standard | MISEP 17 | MISEP 18 | MISEP 19 | MISEP 20 | MISEP 21 | MISEP 22 | MISEP 23 | MISEP 24 | MISEP 25 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 6.32 | Medical Care and Coverage, Subsequent Placement | 95% | No, 82.8% | No, 82.1% | No, 78.5% | No, 79.3% | No, 80.6% | No, 80.1% | No, 80.7% | No, 82.9% | No, 79.5% |
| 6.33 | Psychotropic Medication, Informed Consent | 97% | No, 75.9% | No, 74.4% | No, 76.1% | No, 71.8% | No, 72.5% | No, 72.2% | No, 75.9% | No, 74.7% | No, 77.7% |
| **Performance is consistently more than 20 percentage points below the standard** | | | | | | | | | | | |
| 6.8 | Emergency or Temporary Facilities, Length of Stay | 95% | No, 67.9% | No, 64.2% | No, 62.9% | No, 68.7% | No, 55.9% | No, 47.3% | No, 68.5% | No, 70.6% | No, 71.2% |
| 6.10 (a) | Relative Foster Parents: Initial Home Studies | 95% | No, 53.0% | No, 73.8% | No, 41.5% | No, 43.1% | No, 70.8% | No, 65.6% | No, 67.7% | No, 71.9% | No, 61.5% |
| 6.29 | Examinations and Screenings | 95% | No, 69.7%, 87.7%, 92.1% | N/A – COVID-Impacted, 58.3%, 75.6%, 38.6% | N/A – COVID-Impacted, 61.8%, 81.7%, 70.5% | N/A – COVID-Impacted, 68.7%, 85.0%, 74.5% | No, 66.5%, 83.0%, 71.0% | No, 66.5%, 84.5%, 73.7% | No, 65.4%, 84.4%, 69.9% | No, 69.4%, 85.0%, 75.0% | No, 69.2%, 87.1%, 74.7% |
| **Performance is consistently more than 30 percentage points below the standard** | | | | | | | | | | | |
| 6.9 | Emergency or Temporary Facilities, Repeated Placement | 95% | No, 6.3% | No, 12.5% | No, 2.9% | No, 18.2% | No, 4.5% | No, 0.0% | No, 18.2% | No, 20.7% | No, 47.5% |
| 6.10 (b) | Relative Foster Parents: Annual Home Studies | 95% | No, 9.7% | No, 36.5% | No, 14.1% | No, 37.9% | No, 42.4% | No, 51.5% | No, 48.5% | No, 62.5% | No, 54.5% |
| 6.22 (a) | Visits, Worker-Parent: One visit per month at the parent's residence during the first month of placement | 85% | No, 47.9% | N/A – COVID-Impacted, 53.4% | N/A – COVID-Impacted, 45.6% | No, 52.4% | No, 50.0% | No, 51.3% | No, 50.7% | No, 52.4% | No, 51.8% |
| 6.34 | Psychotropic Medication, Documentation | 95% | No, 33.8% | No, 26.9% | No, 34.8% | No, 27.3% | No, 36.4% | No, 31.8% | No, 31.8% | No, 34.8% | No, 45.5% |
| **Performance has never been achieved** | | | | | | | | | | | |
| 5.1 | Contract-Agency Evaluation | N/A | No | No | No | No | No | No | No | No | No |

46

| | Commitment | Standard | MISEP 17 | MISEP 18 | MISEP 19 | MISEP 20 | MISEP 21 | MISEP 22 | MISEP 23 | MISEP 24 | MISEP 25 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Not applicable or unable to verify in all periods** | | | | | | | | | | |
| 6.1 | **Safety – Maltreatment in Foster Care** | ≤ 9.07 | Unable to verify | N/A | Unable to verify | N/A | Unable to verify | Unable to verify | N/A | Unable to verify | N/A |
| 6.3 | **Permanency Indicator 1** | N/A | | | | | | | | N/A | N/A |

47