```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MICHIGAN
                         SOUTHERN DIVISION


D.B., ET AL.,

              Plaintiffs,
                                    HONORABLE NANCY G. EDMUNDS
     v.
                                    No. 06-13548
MICHIGAN, GOVERNOR OF, ET AL.,

              Defendants.
_____/


                        STATUS CONFERENCE
            (Conducted Via Zoom Videoconferencing Software)
                     Tuesday, January 14, 2025


Appearances:

                                    Neil Giovanatti
Samantha Bartosz                    Erin Harrington
Children's Rights                   Michigan Dept. of Att. General
88 Pine Street #800                 P.O. Box 30217
New York, NY  10005                 Lansing, MI  48909
212.683.2210                        517.373.4875
sbartosz@childrensrights.org        giovanattin@michigan.gov
  On behalf of Plaintiffs             On behalf of Defendants

Elizabeth Hertel                    Demetrius Starling
Director, MDHHS                     Director, Children's Services
333 S. Grand, P.O. Box 30195        333 S. Grand, P.O. Box 30195
Lansing, MI  48909                  Lansing, MI  48909
517.241.3740                        517.241.3740
  On behalf of MDHHS                  On behalf of MDHHS

Eileen Crummy                       Kevin Ryan
Oklahoma Human Services             Oklahoma Human Services
2400 N. Lincoln Blvd.               2400 N. Lincoln Blvd.
Oklahoma City, OK  73105            Oklahoma City, OK  73105
405.522.5050                        405.522.5050
  On behalf of The Monitors           On behalf of The Monitors
```

*To obtain a certified transcript, contact:*
*Timothy M. Floury, CSR-5780*
*Official Court Reporter*
*Theodore Levin United States Courthouse*
*231 West Lafayette Boulevard*
*Detroit, Michigan 48226*
*(313)234-2607 · floury@transcriptorders.com*

*Transcript produced using machine shorthand and CAT software.*

# I N D E X

Motion Hearing                                                    Page

Report by Ms. Crummy ............................. 4

Report by Mr. Ryan ............................... 5

Report by Ms. Bartosz ............................ 7

Report by Ms. Hertel ............................. 8

Report by Mr. Starling .......................... 11

Report by Mr. Giovanatti ........................ 16

Certification of Reporter ....................... 20

- - -

# E X H I B I T S

| Number | Description | Id'd | Rcvd | Vol. |
|---|---|---|---|---|

***None Marked, Offered or Received***

- - -

*Status Conference*
*Tuesday, January 14, 2025*

*Page 3*

1        Detroit, Michigan
2        Tuesday, January 14, 2025
3        10:31 a.m.
4                 -  -  -
5    **THE COURT:** Let's get a roll call of who's on the
6  phone.
7    **MS. BARTOSZ:** Good afternoon, your Honor. For the
8  plaintiffs, Samantha Bartosz from Children's Rights.
9    **THE COURT:** Good morning.
10   **MR. GIOVANATTI:** Good morning, your Honor. From the
11 defendants, Neil Giovanatti from the AG's office. I also have
12 Erin Harrington with me from the AG's office, Director
13 Elizabeth Hertel from DHHS, and Director Starling from the
14 Children's Services Administration within DHHS.
15   **THE COURT:** Thank you. Good morning.
16   **MS. CRUMMY:** Good morning, your Honor. Eileen Crummy
17 from the monitors.
18   **MR. RYAN:** Good morning, your Honor. Kevin Ryan, the
19 monitors.
20   **THE COURT:** Good morning, everyone.
21         So this appears to me to be kind of an interim
22 report. We're still waiting for data from Child Safety Plans
23 that have been under way for quite a while now. I guess the
24 data's supposed to come within the next couple of months, so
25 hopefully by the spring or summer we'll have a fuller picture

*06-13548; D.B., et al. v. Michigan, Governor of, et al.*

1 of where we are, but it looks like progress is being made,
2 certainly in some areas.
3     But why don't I hear first from the monitors and then
4 from the parties.
5     **MS. CRUMMY:**  Good morning, your Honor, this report to
6 the Court reflects the efforts of the DHHS leadership team and
7 the status of Michigan's reform efforts as of December 30th,
8 2023.  Defined as MISEP period 25, this report includes
9 progress for the second half of 2023, and covers the second
10 period of DHHS's performance under the stipulated order
11 amending the MISEP, which the Court approved in January 2024.
12     Michigan DHHS met or exceeded required performance
13 standards in five of the 26 areas monitored for compliance in
14 MISEP period 25.  And in addition to five areas, DHHS
15 performance came within 10 percent of the performance standard.
16     Among areas where the agency achieved positive levels
17 of performance are adoption caseloads.  The parties agreed that
18 adoption caseworkers will have a caseload of no more than 15
19 children.  DHHS achieved 89.3 percent in MISEP 25, representing
20 a 1.2 percent increase from performance in the prior period and
21 the second period of positive trending, per the stipulated
22 order.  Positive trending during this period makes this
23 commitment eligible for movement to Section 4 of the MISEP,
24 structures and policies, and will no longer be subject to
25 active monitoring at this point.

    *06-13548; D.B., et al. v. Michigan, Governor of, et al.*

*Status Conference*
*Tuesday, January 14, 2025*

*Page 5*

*1*         Foster Home array:  DHHS committed to maintain a
*2* sufficient number and array of homes capable of serving the
*3* needs of the foster care population.  DHHS agreed to develop
*4* and implement for each county and statewide an annual
*5* recruitment and retention plan in consultation with the
*6* monitors and experts in the field, which is subject to approval
*7* by the monitors.  During the period under review, defined as
*8* fiscal year 24, the monitors approved the state's recruitment
*9* and retention plans and found that DHHS made good faith efforts
*10* to maintain an array of homes sufficient to meet the needs of
*11* children in foster care.  This reflects significant progress
*12* and performance during this period and makes this commitment
*13* eligible to move to Section 5 of the MISEP to be maintained.
*14*         Then assessments and service plans:  DHHS also
*15* committed to ensure that case assessments and service plans
*16* would be sufficient breadth and quality to usefully inform case
*17* planning.  And DHHS further agreed that services identified in
*18* the plans will be made in a timely and appropriate manner to
*19* meet the needs of children and families.
*20*         Performance for these commitments is assessed through
*21* a quality service review.  The designated performance standard
*22* is 83 percent, which DHHS met, making these commitments
*23* eligible to move to Section 5 of the MISEP to be maintained.
*24*        **MR. RYAN:**  Your Honor, of the 26 areas monitored for
*25* compliance in MISEP period 25, there are 16 areas where DHHS

*06-13548; D.B., et al. v. Michigan, Governor of, et al.*

1  didn't meet the required performance standard by more than ten
2  percentage points.  One of these was psychotropic medication.
3  The monitoring team reviewed a randomly selected and
4  statistically significant sample of children who were
5  prescribed psychotropic medication during the period under
6  review, and found that only 45 1/2 percent of the children's
7  records showed documentation for each prescription, including
8  initial and ongoing medication monitoring.
9           Additionally, DHHS data indicates that required
10 informed consents were on file for 77.7 percent of psychotropic
11 medication, and that doesn't meet the required performance
12 standard of 97 percent for either of those commitments.
13          Following the last status conference in this case,
14 the state submitted a plan to improve child safety and custody.
15 We reviewed the plan and have met with the state regarding
16 ongoing implementation.  Within the next several weeks, the
17 state will provide us with DHHS's reported performance on
18 maltreatment and care for children in the class from
19 October 1st, 2023, through September 30th, 2024, and will
20 update the Court on that performance and the state's efforts on
21 child safety in our next report.
22          In closing, your Honor, we want to underscore the
23 many strides that Michigan has and continues to make in
24 improving its foster care system for children in custody, and
25 thank the state and its leadership and its many partners for

*06-13548; D.B., et al. v. Michigan, Governor of, et al.*

*Status Conference*
*Tuesday, January 14, 2025*

*Page 7*

1 their efforts that are reflected in the system today.  The
2 Court's been very clear with the parties and with us that
3 safety for children in the class remains the paramount concern.
4     Thank you, Judge Edmunds, for your oversight and
5 guidance, always with children's safety and best interests at
6 the forefront of this case.
7     And that concludes our remarkets, your Honor.
8     **THE COURT:**  Thank you, Mr. Ryan and Ms. Crummy.
9     Ms. Bartosz?
10    **MS. BARTOSZ:**  Thank you, your Honor.  On behalf of
11 plaintiffs, I think I can be brief, your Honor.
12    And, first, let me echo what Mr. Ryan just stated,
13 and that is, there has been progress made by the state in a
14 number of areas, and we share the monitors' appreciation for
15 the efforts that have been made by the states to accomplish
16 that and are appreciative.
17    That said, Judge, we remain principally concerned
18 about three safety areas that still have a ways to go, and
19 those are the maltreatment and care issue raised in MISEP
20 provision 6.1, the contract oversight issue raised in MISEP
21 5.1, and the psychotropic medication oversight matters
22 addressed in MISEP 6.33 and 6.34.  We're particularly concerned
23 about the need for additional progress in those very
24 fundamental safety areas for children and continue to watch
25 that carefully.

*06-13548; D.B., et al. v. Michigan, Governor of, et al.*

*Status Conference*
*Tuesday, January 14, 2025*

*Page 8*

1 Thank you, your Honor.

2 **THE COURT:** Thank you, Ms. Bartosz.

3 Mr. Giovanatti, are you going to speak, or
4 Ms. Hertel, Director Hertel? Who wants to take the lead here?

5 **MR. GIOVANATTI:** Thank you, your Honor. Good
6 morning.

7 Director Hertel and Director Starling both have some
8 brief remarks prepared, and then I will come back at the end to
9 address one of the findings in the MISEP.

10 Director Hertel?

11 **MS. HERTEL:** Thank you.

12 Thank you, your Honor, for the continued opportunity
13 to update you and the Court with our ongoing efforts and
14 strategies to make sure that children placed under the care of
15 the department are safe and are achieving positive outcomes.

16 We, too, are very happy with the progress that we've
17 obtained during this reporting period and look forward to
18 continuing discussions as we work toward exiting the MISEP in
19 the near future.

20 I would like to highlight a couple of the actions we
21 have implemented during this reporting period, and how we are
22 working to help keep kids safe, strengthen families, expand and
23 improve access to behavioral health care services and resources
24 in Michigan.

25 We continue to focus on improving the safety and

*06-13548; D.B., et al. v. Michigan, Governor of, et al.*

1  wellbeing of Michigan children through our Keep Kids Safe
2  Action agenda.  As I mentioned during your last meeting, this
3  agenda is separated into five categories:  Prevention,
4  intervention, stability, wellness and workforce.
5         I'd like to highlight some of our recent updates and
6  progress here.  Through our focus on prevention, we are
7  providing access to community-based interventions by connecting
8  families to resources and supports to promote safety and
9  wellbeing prior to abuse occurring.
10        Intervention focuses on child safety, unbiased
11 assessments and engagements, strength-based interventions that
12 are family-focused.
13        In the stability category, we focus on engaging a
14 broad array of stakeholders to support children and families.
15 We value consistent and reliable resources for families and
16 we're leveraging creative -- creativity to address some of the
17 challenges that are family-specific.
18        We provide trauma-informed, family-focused,
19 person-centered planning to meet needs, which include access to
20 quality behavioral health supports, achieving educational
21 outcomes and safe and stable housing, and within our workforce,
22 we are trusted to take action to ensure safety and support for
23 families and our workers.  We value the professionalism and
24 expertise that we have and we support wellness and a positive
25 work-life balance.

*06-13548; D.B., et al. v. Michigan, Governor of, et al.*

*Status Conference*
*Tuesday, January 14, 2025*

*Page 10*

1  In addition to this action agenda, I would like to
2  highlight two innovative programs that we've developed that
3  help strengthen Michigan families.  Our Family Impact Teams and
4  My Family Together.  We launched our Family Impact Teams in
5  August of 2023 with a statewide extension expected early this
6  year.  These teams work to keep children at risk of neglect
7  safely at home by connecting a family resource specialist to
8  child welfare staff so that we're providing services to
9  families like household goods, appliances, beds, utilities,
10  childcare, housing, and we have delivered services to more than
11  4,000 families in 23 counties.
12       Additionally, we launched My Family Together, which
13  is a two-year pilot that we began in October of last year in 25
14  counties, which is designed to streamline access to services
15  and create efficiencies by concentrating our resources and
16  reducing the number of different programs that families have to
17  navigate as their needs change.
18       We will continue our efforts to improve the access to
19  the behavioral health care system making behavioral health care
20  and substance abuse disorder services more accessible to
21  individuals and families.  These efforts, of course, pay
22  dividends for our child welfare programs by allowing parents
23  and children better access to these services.  We went live
24  with a searchable statewide map of substance use disorder
25  services just a couple of months ago.

*06-13548; D.B., et al. v. Michigan, Governor of, et al.*

*Status Conference*
*Tuesday, January 14, 2025*

*Page 11*

*1*           In sum, we -- our child welfare program is one that
*2* continues to look for ways to improve to meet the many needs of
*3* the children and families that we serve.  I am encouraged and
*4* proud of the continued work by our team and the positive
*5* effect -- MISEP.
*6*           And I think director Starling now has something.
*7*           **MR. STARLING:**  Thank you, Director Hertel.
*8*           Again, good morning, your Honor.  I want to thank you
*9* for this opportunity to address the Court.
*10*           **THE COURT:**  Good morning.
*11*           **MR. STARLING:**  To start, I join Director Hertel in
*12* reflecting on the positive impact the Children's Services
*13* Administration staff has had on our children in our state on a
*14* daily basis.  I can confidently tell the Court that the
*15* department, and specifically the CSA team, are incredibly
*16* dedicated to obtaining the best outcomes possible for each
*17* child that comes into our system, and we are steadfast in our
*18* goal to continue to improve our system for the betterment of
*19* children and families.
*20*           With that, I'll address a few areas discussed in the
*21* MISEP report before the court today.
*22*           First, related to provision 5.1, the department
*23* continues to improve the oversight of child caring institutions
*24* through strategic practice improvements that promote child
*25* safety and wellbeing.  Beginning in the MISEP 25 reporting

*06-13548; D.B., et al. v. Michigan, Governor of, et al.*

*Status Conference*
*Tuesday, January 14, 2025*

*Page 12*

1  period, we have implemented and engaged in the following
2  activities:  Development of a prevention referral created to
3  standardize the referral process for child caring institutions
4  to receive preventative technical assistance to increase safety
5  in the facilities.  The department also has collaborated with
6  national training experts from the University of Wisconsin
7  Green Bay to establish a process for streamlining and
8  onboarding new providers.
9           The department also routinely conducts sustained
10 performance improvement meetings.  During these meetings, our
11 department, and private agency partners -- new strategies and
12 evaluate impact.  Further, our division of child welfare
13 licensing consultants conduct quarterly corrective action plan
14 meetings and follow-ups to ensure compliance.
15          As the Court is aware, we have been working closely
16 with the monitoring -- monitoring team to make improvements to
17 our oversight of our childcare institutions over the last few
18 years.  These improvements, and our continued emphasis on such
19 oversight, has already made a substantial difference and will
20 continue to improve the outcomes of children who are placed in
21 these facilities.
22          Next, I'd like to highlight a few positive outcomes
23 in the most recent report.  For 6.15, which addresses adoption
24 caseworkers' caseloads, this provision has been under the
25 corrective act plan developed back in 20- -- the department's

*06-13548; D.B., et al. v. Michigan, Governor of, et al.*

1  performance has consistently been improved to the point that
2  the provision would not move to Section 4 of the MISEP
3  structures and policies.  In the report before the Court today,
4  89.3 of our adoption caseworkers were assigned to 15 or fewer
5  children.
6          For 6.19, assessments and service plans, another
7  provision that was under the corrective action plan in 2022,
8  the department has now met the required performance rate and
9  the provision will move to Section 5 of the MISEP.
10          On a similar note, for 6.20, provision of services,
11  the department exceeded the performance standard for the first
12  time, and the provision will move to Section 5.  Notably, the
13  department's performance increased nearly 25 percent for this
14  reporting period.
15          And one that we are really proud of for provision
16  6.4, which addresses foster home array, the department is in
17  compliance for the first time due to the efforts taken over the
18  past several years.  Notably, from October 1st of 2023, to
19  September 30th of 2024, our department and private child
20  placing agencies licensed 809 new foster homes.  This is an
21  increase of four percent for fiscal year '23, and Children
22  Services Administration implemented its newly-developed foster
23  parent retention framework with MDHHS county offices during
24  fiscal year 2024.  This framework serves as a foundation for
25  how we view, engage with and support our foster parents.

*06-13548; D.B., et al. v. Michigan, Governor of, et al.*

*Status Conference*
*Tuesday, January 14, 2025*

*Page 14*

```
 1           We also reduced the rate of foster home closures over
 2   the last two years.  Back in February of 2024, our department
 3   sent a foster family support survey to licensed foster
 4   families.  According to these survey results, 85.7 of our
 5   foster families who responded indicated that they were
 6   satisfied with their foster parent experience and during fiscal
 7   year '24, our NCDR, which stands -- which is for the National
 8   Center on Diligent Recruitment, provided technical assistance
 9   on the development of Michigan's targeted recruitment efforts
10   and outcomes.
11           NCDR consultations occur biweekly in person or
12   virtually.  On this topic, I'd like to take a moment to
13   acknowledge the incredible efforts and sacrifices of our foster
14   parents in this state.  As the Court knows, foster parents are
15   crucial to the children who enter the child welfare system in
16   our state.  Innovations ensure that they're safe.
17           Finally, I'd like to address two additional
18   initiatives that Children Services Administration has been
19   working on.  First, we create family incentive grants, better
20   known as FIG, that assist families in overcoming financial
21   barriers to achieve a licensing rule compliance.  Our
22   department also authorized $1.9 million to fund almost 800 of
23   these FIG requests for families across the state.  FIG funding
24   assistant MDHHS local offices and private child placement
25   agencies with funding to support relative caregivers and
```

*06-13548; D.B., et al. v. Michigan, Governor of, et al.*

1  licensed foster parents.  By providing funding to address
2  safety concerns, they'll prevent placement of relative children
3  and support families seeking initial licensure and license
4  renewals to address any barriers to receiving or maintaining a
5  foster home license.
6          Second, the department is a kin first state.  Our
7  department strives to place children in the most family-like
8  setting possible, making kinship care a priority area for the
9  department.  We know that children who have experienced trauma
10 can benefit from the stability of living with relatives or
11 other kinship caregivers, and our data supports that children
12 placed in kinship care have better placement stability than
13 those in unrelated homes.  MDHHS has been steadfast in our
14 commitment to kinship families.  We have worked to develop
15 programs that provide necessary resources, advocate for support
16 of policies and raise awareness of the unique challenges that
17 kinship caregivers face.  Our department has been recognized
18 nationally as being a kin first state and considered leaders in
19 the kinship space.  I would like to highlight some of the
20 actions that we have taken as a state to show our commitment to
21 kinship care.
22         Again, Your Honor, we appreciate the opportunity to
23 address the Court, and I appreciate all the guidance from the
24 monitoring team as we look to achieve our goals.
25         I will now turn it back over to Neil.

*06-13548; D.B., et al. v. Michigan, Governor of, et al.*

*Status Conference*
*Tuesday, January 14, 2025*

*Page 16*

1  **MR. GIOVANATTI**: Thank you, Director Hertel and
2  Director Starling.
3      Your Honor, I will briefly address 5.1, which is the
4  contract oversight provision in the MISEP 25 report where, for
5  several years, as Director Starling just mentioned, the
6  department has significantly reformed its oversight process
7  with advice from the monitoring team, particularly close
8  assistance from Mr. Ryan.
9      At this point, we believe the structures are in place
10 to properly oversee childcare institutes and child-placing
11 agents. Accordingly, while the MISEP 25 report finding finds
12 that MDHHS is not in compliance with this provision. We
13 disagree with this finding, and much of our disagreement, your
14 Honor, remains the same as I addressed before this Court the --
15 the last time we met in July, and it's reflected in the report
16 that we doc- -- is docketed on the record, ECF 362.
17     Just very briefly, the department has long complied
18 with the specific requirements set forth in the text of 5.1.
19 The subjective standard under which the monitoring team
20 assesses the department is simply, from our perspective,
21 unmeasurable and also seems to be a moving target, from our
22 perspective. And then, further, I just want to emphasize for
23 the Court and for anyone else listening in, many of the
24 examples or anecdotes documented in the report regarding
25 licensed foster -- facilities or licensed foster homes do not

*06-13548; D.B., et al. v. Michigan, Governor of, et al.*

*Status Conference*
*Tuesday, January 14, 2025*

*Page 17*

1 actually reflect anything related to the department's
2 oversight, and in some instances these examples, they don't
3 actually indicate any unsafe environment for children -- for a
4 child. Rather, many of the examples reflect an unfortunate
5 incident occurring in a licensed placement and the department
6 taking appropriate action to address the concerns. So, again,
7 I understand the purpose of the anecdotes in the report, but it
8 does not necessarily mean that the department did something
9 improper in this specific instance.
10     With that, your Honor, I'd refer the Court back to
11 ECF 362 for a more thorough assessment of our position on 5.1.
12     And with that, your Honor, if the Court has any
13 questions, happy to field them; otherwise, that's it for the
14 department.
15     **THE COURT:** Thank you, Mr. Giovanatti, Director
16 Starling and Director Hertel.
17     As I said in my first comment, I think, this is
18 really an interim report and interim opportunity to kind of
19 catch up on where we've been and where we're going. I'm very
20 interested to see the data that's going to come out in the next
21 couple of months, and we can take it up this summer. We should
22 set another hearing like this for July, perhaps, or even
23 earlier.
24     I do want to echo everyone's thought that significant
25 progress is being made and we are way ahead of where we were

*06-13548; D.B., et al. v. Michigan, Governor of, et al.*

*Status Conference*
*Tuesday, January 14, 2025*

*Page 18*

1   even two or three years ago, and I applaud the efforts of the
2   state and the diligence of the plaintiff in staying on top of
3   things and the creative and diligent oversight by the monitors,
4   which, I think, has been just invaluable in moving us forward.
5            From my perspective, I would like to see us focus as
6   much as possible on the child safety issues, see if we can make
7   even more progress on those over the next couple of months, and
8   hopefully move toward finally terminating the oversight
9   sometime perhaps in the next year or two.  I think everyone
10  would be happy with that.
11           I'd be happy to hear any further comments anyone has;
12  otherwise, I look forward to seeing the data.  Mr. Ryan and
13  Ms. Crummy have indicated to me that as soon as they get it and
14  have had an opportunity to review it, they'll share it with me,
15  and then we can all meet and discuss it together.
16           **MS. BARTOSZ:**  Your Honor, if I may briefly.  This is
17  Samantha Bartosz.
18           **THE COURT:**  Yes.
19           **MS. BARTOSZ:**  Just quickly responding to
20  Director Starling's comments, which are very much appreciated,
21  he had focused for a bit on efforts being made by the agency to
22  address relative foster care.  And we applaud the state for
23  efforts made in that direction.  That's a very meaningful part
24  of a foster care system.  I just point out that we remain
25  concerned -- 6.10 which is a safety measure relating to kinship

*06-13548; D.B., et al. v. Michigan, Governor of, et al.*

*Status Conference*
*Tuesday, January 14, 2025*

*Page 19*

1  care and the timely and appropriate oversight and licensing of
2  those placements.  Performance continues to lag there and I'm
3  just hopeful that as the state is focusing on kinship care,
4  that it can double down its efforts and -- with regard to
5  Section 6.1.  We really would like to see improvement there.
6        **THE COURT:**  Okay.  I don't disagree with that.  I
7  think it's probably more difficult than most within other
8  foster care, because kinship relatives come in on a hurry-up
9  basis; that is, some crisis usually provokes it, and there's
10 often not time to do the groundwork that you'd like to have
11 done ahead of time before you put a child in another home,
12 whether it's with a relative or someone else, but that's just
13 my thought about it.  I know everybody here has more experience
14 in childcare oversight, foster care oversight than I do, so --
15       **MR. GIOVANATTI:**  Your Honor, if I may just jump in
16 here.  So 6.10 has to do with licensed placements, not the
17 kinship placements, but the -- I believe the report that has
18 been provided to you through the monitors related to the MIC
19 implication or the plan to try to reduce the MIC rate.  It
20 specifically focuses on these homes that Ms. Bartosz has
21 mentioned, these -- the kinship homes where, through MDHHS's
22 data, they've determined that those are the homes where the
23 most incidents of MIC occur on a, like, statistical basis.  So
24 they're specifically targeting those homes and how to make
25 those safer for children, because they do currently have the

*06-13548; D.B., et al. v. Michigan, Governor of, et al.*

*Status Conference*
*Tuesday, January 14, 2025*

*Page 20*

1  highest rates of MIC incidents.  So the department's aware of
2  the issue, they are specifically addressing it, and as your
3  Honor said, hopefully the data can come back positive for us in
4  the next reporting cycle and thereafter.
5         **THE COURT:**  Okay.  Anything else for anyone?
6         Thank you all for your participation.  Feel free to
7  call any time if there's an issue or a problem.  Continue with
8  the monitors, of course, and I look forward to getting another
9  report within the next few months.
10        **MR. GIOVANATTI:**  Thank you, your Honor.
11        **MS. BARTOSZ:**  Thank you, Judge.
12        **MS. HERTEL:**  Thank you, your Honor.
13     (At 10:59 AM, proceedings adjourned.)
14                          -  -  -
15                  **C E R T I F I C A T I O N**
16        I certify that the foregoing is a correct
17 transcription of the record of proceedings in the
18 above-entitled matter.
19
20 s/ Timothy M. Floury, CSR-5780          2/11/2025
   Timothy M. Floury, CSR-5780             Date
21 Official Court Reporter
22                          -  -  -
23
24
25

*06-13548; D.B., et al. v. Michigan, Governor of, et al.*